No. 26-20595

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

Hon. Paula Goodhart, Hon. Jessica Padilla, Hon. Leslie Johnson and Hon. Linda Garcia,

*Appellants*

v.

Maranda Lynn Odonnell, Loetha Shantae McGruder, Robert Ryan Ford, Harris County, Texas, Hon. Alex Salgado, Hon. Shannon Baldwin, Hon. David M. Fleisher, Hon. Kelley Andrews, Hon. Andrew A. Wright, Hon. Erika Ramirez, Hon. Toria Finch, Hon. Juanita Jackson, Hon. Sedrick T. Walker, Hon. Ashley Guice, Hon. Raul Rodriguez, Hon. Toya Jones, Sheriff Ed Gonzalez,

*Appellees*

v.

Ken Paxton, Attorney General for the State of Texas,

*Intervenor-Appellee*

---

On appeal from the United States District Court
for the Southern District of Texas, Houston Division
No. 4:16-cv-1414

---

# **APPELLANTS' MOTION TO EXPEDITE APPEAL**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. *See* Loc. R. 28.2.1. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| **Appellants** | **Counsel for Appellants** |
|---|---|
| Hon. Paula Goodhart<br>Hon. Jessica Padilla<br>Hon. Leslie Johnson<br>Hon. Linda Garcia | Joseph R. Russo, Jr.<br>jrusso@greerherz.com<br>Angie Olalde<br>aolalde@greerherz.com<br>GREER, HERZ & ADAMS, L.L.P.<br>123 Rosenberg St., Suite 3000<br>Galveston, Texas 77550 |
| **Intervenor** | **Counsel for Intervenor** |
| Ken Paxton, Texas Attorney General | Joe Nwaokoro<br>ASSISTANT ATTORNEY GENERAL<br>P.O. Box 12548, Capital Station<br>Austin, Texas 78711-2548<br>Telephone: (512) 463-2120 |
| **Appellees** | **Appellees** |
| Maranda Lynn Odonnell<br>Loetha Shantae McGruder<br>Robert Ryan Ford<br><br>Neal S. Manne<br>nmanne@susmangodfrey.com<br>Joseph S. Grinstein<br>Abbey E. McNaughton<br>SUSMAN GODFREY L.L.P.<br>11000 Louisiana Street, Suite 5100<br>Houston, Texas 77005<br>Telephone: (713) 651-9366 | Travis Walker Fife<br>travis@texascivilrightsproject.org<br>Dustin Rynders<br>dustin@texascivilrightsproject.org<br>Sarah Beebe<br>sarah@texascivilrightsproject.org<br>TEXAS CIVIL RIGHTS PROJECT<br>1500 McGowen, Suite 220<br>Houston, Texas 77004<br>Telephone: (512) 474-5073<br><br>Alec George Karakatsanis<br>alec@civilrightscorps.org<br>Elizabeth Rossi |

Morgan McCollum
mmccollum@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, NY 10001
Telephone: (212) 336-8330

elizabeth@civilrightscorp.org
Jeremy D. Cutting
cody@civilrightscorp.org
CIVIL RIGHTS CORPS
1601 Connecticut Ave NW, Suite 800
Washington, DC 20009
Telephone: (202) 681-2721

**Harris County, Texas**

**Counsel for Harris County**

Jonathan Fombonne
Jonathan.fombonne@harriscountytx.gov
Seth Hopkins
Seth.hopkins@harriscountytx.gov
Rachel Fraser
Rachel.fraser@harriscountytx.gov
HARRIS COUNTY ATTORNEY'S OFFICE
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5383

**Twelve Harris County Criminal Court at Law Judges**

Hon. Alex Salgado
Hon. Shannon Baldwin
Hon. David M. Fleisher
Hon. Kelley Andrews
Hon. Andrew A. Wright
Hon. Erika Ramirez
Hon. Toria Finch
Hon. Juanita Jackson
Hon. Sedrick T. Walker
Hon. Ashley Guice
Hon. Raul Rodriguez
Hon. Tonya Jones

**Counsel for Twelve Harris County Criminal Court at Law Judges**

Allan Van Fleet
G. ALLAN VAN FLEET, P.C.
6218 Elm Heights LN, Suite 201
Houston, Texas 77081-2409
Telephone: (713) 826-1954

**Sheriff Ed Gonzalez**

**Counsel for Sheriff Ed Gonzalez**

Murray J. Fogler
FOGLER, BRAR, O'NEIL & GRAY LLP
909 Fannin Street, Suite 1640
2 Houston Center
Houston, Texas 77002
Telephone: (713) 481-1010

Appellants certify that, to the best of their knowledge, no publicly traded company or corporation has an interest in the outcome of this case or appeal.

By: */s/ Angie Olalde*
Counsel for Appellants

<u>**APPELLANTS' MOTION TO EXPEDITE APPEAL**</u>

Pursuant to Fifth Circuit Local Rule 27.5, Petitioners Judges Paula Goodhart, Jessica Padilla, Leslie Johnson, and Linda Garcia (the "Judges"), ask the Court to expedite this appeal. Pursuant to Local Rule 27.4, the undersigned counsel has contacted all other parties, and expect that an opposition will be filed to this motion.

**Introduction and Nature of the Request**

On August 26, 2026, this Court instructed the district court to "follow *Daves II*." *In re Goodhart*, No. 26-20337, 2026 U.S. App. LEXIS 26177, at *11-12 (5th Cir. Aug. 26, 2026) (per curiam) (citing *Daves v. Dall. Cty.*, 64 F.4th 616 (5th Cir. 2023) ("*Daves II*")). *Daves II* had two holdings. First, it "expressly held that '*ODonnell I*…should [not] have been adjudicated in federal court'" and that the district court should have abstained. *Id.* at *8-9 (quoting *Daves II*, 614 F.4th at 631). Second, *Daves II* held that mootness was a "coequal ground for dismissing," because Texas' bail-reform legislation in S.B. 6 made "substantial changes" to "procedures for assessing bail," are heavily procedural, and any constitutional issues raised about those laws or their implementation are "issues beyond the scope of this case and the circumstances of the plaintiffs who filed it." *Daves II*, 64 F.3d at 632. The Court made clear that applying *Daves II* "does not hinge upon factual development or discovery." *In re Goodhart*, 2026 U.S. App. LEXIS 26177, at *8-9.

The district court permitted discovery into whether the Judges could have obtained their own counsel "independent of their judicial colleagues who support the consent decree." *Id.* at *11.

After limited discovery, the record was undisputed that the Judges requested counsel and Harris County—a party in this case with an opposing position to the Judges—declined to provide their offices with representation. Every other defendant supported the Decree, including the other 12 judges, and every other defendant had counsel. The County defendants who supported the Decree were not forced to find and fund their own representation. It was not until after the Attorney General ("AG") filed a motion to intervene on August 26, 2025 that the County approved counsel for the Judges, and then, only on the condition that the district court first grant the AG's motion to intervene. *See infra* at PDF pp.41, 93 (Appdx. A, ECF 864-1 at 3 ¶ 18, ECF 864-15 at 2).

Plaintiffs argued the Judges could have paid out of pocket, or used campaign funds or office budgets to represent their offices, or secured pro bono counsel.[1]

[1] *See infra* at PDF pp.272-75, 293, 347 (Appdx. B, ECF 886-2 at 58:10-59:25 (asking Judge Goodhart if she could have hired counsel "on [her] own"), at 60:1-9 (Judge Goodhart testifying "there were limitations on, one, what you could use campaign funds for and how much would be considered a contribution in kind. So it wasn't an option to use campaign funds for election law purposes. And plus I don't have any campaign funds"), at 61:19-62:13 (asking if Judge Goodhart tried to hire an attorney with her own funds or campaign funds or "some other funding arrangement"), at 79:12-21 (Judge Goodhart testifying about efforts to obtain counsel, including pro bono representation and stating "the bottom line was nobody was going to take this on for free"), at 133:10-134:5 (asking Judge Goodhart why she did not file a motion *pro se*)); *see also, infra* at PDF pp.403, 410 (Appdx. B, ECF 886-3 at 42:7-22 (asking Judge Johnson whether she

Plaintiffs even asked why the Judges did not represent their offices *pro se*.[2]

The district court held a hearing and requested supplemental briefing, including on mootness. *See infra* at PDF pp.461-63, 547 (Appdx. C at 23:11-21, 25:20-21, 109:11-13 (Sept. 22, 2026 hearing transcript)). Less than one month before state judicial elections, the district court denied the Judges' request to abstain on the basis of delay, without addressing mootness. Although the County had denied their request and the 12 nonmovant judges maintained access to their lawyer, the court found the Judges "could have obtained private or pro bono counsel" earlier. *See infra* at PDF p.590 (Appdx. D, ECF 902 at 23).[3] The order contains inconsistent rulings: (1) the Judges did not waive *Younger* abstention, but (2) the Judges did not timely raise *Younger* abstention under Rule 60(b)(5). *See infra* at PDF pp.605-07 (Appdx. D, ECF 902 at 38-40 (Oct. 5, 2026 Order)). The effect of this is that, under the October 5th order, no party may ever challenge the Consent Decree based on

tried to "pay out of pocket for representation," or allocate her office's budget toward outside counsel), at 49:8-14 (Judge Johson testifying "we didn't have a lawyer, and they weren't going to provide us a lawyer or funds to get a lawyer. In fact, they specifically denied that")).

[2] This contradicts the Court's clear ruling that the Judges would need counsel to raise *Younger* abstention. *In re Goodhart*, 2026 U.S. App. LEXIS 26177, at *11. Judges may not represent their offices *pro se*. *See Cain v. Ruiz*, No. 92-4096 SECTION "K" (6), 1993 U.S. Dist. LEXIS 326, at *2 (E.D. La. 1993) (permitting Harris County district attorney to represent himself *individually* but ordering counsel must appear for official-capacity claims).

[3] The district court's findings are not given "heightened deference" in a 60(b)(5) analysis; "if anything, 'that deference should be lessened relative to an ordinary case.'" *Chisom v. La. ex rel. Landry*, 116 F.4th 309, 317 (5th Cir. 2024) (en banc).

Texas' bail-reform laws—presumably, even for mootness. The Judges immediately appealed, and ask the Court to expedite this appeal.

**Request to Expedite**

This Court mandated that the district court consider *Younger* abstention "on an expedited basis, well before the upcoming Texas judicial election on November 3, 2026. *In re Goodhart*, 2026 U.S. App. LEXIS 26177, at *11-12. It explained "the imminent state judicial election" "counseled expedition" in considering *Younger* abstention. *Id*. at *8-9. In discussing whether *Younger* argument had been waived, it stated that if the Judges could not have obtained independent counsel the Court "do[es] not see how they could have filed earlier." *Id*. at *11. The Judges' terms will run through December 31, 2026. As the election looms, concerns over impacts that a delayed ruling in this Court may have increase daily. Additionally, Judge Goodhart is not running for reelection, and will no longer serve after December 31, 2026.

**Conclusion**

The Judges ask the Court to expedite consideration of this appeal and set accelerated briefing schedules to ensure prompt resolution under *Daves II* and *In re Goodhart* prior to the election, or alternatively, before January 1, 2027. The Judges request all other relief the Court deems appropriate and necessary.

Respectfully Submitted,

GREER, HERZ & ADAMS, L.L.P.

By: */s/ Joseph Russo, Jr.*
Joseph Russo, Jr. (Lead Counsel)
Fed. ID No. 22559
State Bar No. 24002879
jrusso@greerherz.com

Angie Olalde
Fed. ID No. 690133
State Bar No. 24049015
aolalde@greerherz.com

123 Rosenberg St., Ste. 3000
Galveston, TX 77550
(409) 797-3200 (Telephone)
(866) 422-4406 (Facsimile)

*Counsel for Appellants*

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 27.4, the undersigned counsel has contacted all other parties, and an opposition will be filed to this request.

*/s/ Angie Olalde*
Counsel for Appellants

Dated: October 13, 2026

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This document complies with the word limit of FED. R. APP. P. 27(d)(2)(A) because this document contains **1,100** words which is within the 5,200 word-count limit, excluding the portions exempted by the Rules.

2. This document complies with the typeface and type styles requirements of FED. R. APP. P. 27(d)(1)(E) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

*/s/ Angie Olalde*
Counsel for Appellants

Dated: October 13, 2026

## CERTIFICATE OF SERVICE

I certify that, on October 13, 2026, this document and its attachments were filed with the Clerk of Court through the CM/ECF system. Counsel for the parties in this appeal are registered CM/ECF users, and will receive electronic through the CM/ECF system.

*/s/ Angie Olalde*
Counsel for Appellants

No. 26-20595

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

Hon. Paula Goodhart, Hon. Jessica Padilla, Hon. Leslie Johnson and Hon. Linda Garcia,

*Appellants*

v.

Maranda Lynn Odonnell, Loetha Shantae McGruder, Robert Ryan Ford, Harris County, Texas, Hon. Alex Salgado, Hon. Shannon Baldwin, Hon. David M. Fleisher, Hon. Kelley Andrews, Hon. Andrew A. Wright, Hon. Erika Ramirez, Hon. Toria Finch, Hon. Juanita Jackson, Hon. Sedrick T. Walker, Hon. Ashley Guice, Hon. Raul Rodriguez, Hon. Toya Jones, Sheriff Ed Gonzalez,

*Appellees*

v.

Ken Paxton, Attorney General for the State of Texas,

*Intervenor-Appellee*

---

On appeal from the United States District Court
for the Southern District of Texas
No. 4:16-cv-1414

---

# APPENDIX TO APPELLANTS' MOTION TO EXPEDITE APPEAL

Appendix A (ECF 864) Renewed Request for *Younger* Abstention

(ECF 864-1) Ex. 1 - Goodhart declaration

(ECF 864-2) Ex. 1-A - 2023 01 01 Van Fleet Rep Letter

(ECF 864-3) Ex. 1-B - 2023 04 06 Van Fleet Term Letter

(ECF 864-4) Ex. 1-C - 2023 11 13 Padilla email re : counsel

(ECF 864-5) Ex. 1-D - 2024 04 23 J. Fombonne Email

(ECF 864-6) Ex. 1-E - 2025 04 28 P Goodhart email to GCoker

(ECF 864-7) Ex. 1-F - 2025 04 29 Fombonne email re no rep

(ECF 864-8) Ex. 1-G - 2025 06 26 Fombonne email

(ECF 864-9) Ex. 1-H - 2025 09 02 P Goodhart email re: request to County Attorney's office for representation

(ECF 864-10) Ex. 2 - 2023 04 18 Van Fleet no rep email

(ECF 864-11) Ex. 3 – Judge Johnson Affidavit

(ECF 864-12) Ex. 4 - 2025 04 25 Email re : no representation from County Attorney's office

(ECF 864-13) Ex. 5 - 2025 05 30 Van Fleet email re: no rep

(ECF 864-14) Ex. 6 - 2025 06 02 J. Fombonne email non

(ECF 864-15) Ex. 7 - 2025 09 18 Commissioner Court Results

(ECF 864-16) Ex. 8 - 2025 05 30 BG email forwarding mods

(ECF 864-17) Ex. 9 - 2025 07 25 BG ltr rejecting mods

Appendix B (ECF 886) Reply in Support of Renewed Request for *Younger* Abstention

(ECF 886-1) Ex. 10 – Aug. 31, 2026 Hearing Transcript

(ECF 886-2) Ex. 11 – Sept. 2, 2026 Deposition Transcript of Judge Paula Goodhart

(ECF 886-3) Ex. 12 – Sept. 2, 2026 Deposition Transcript of Judge Leslie Johnson

Appendix C Sept. 22, 2026 Hearing Transcript

Appendix D Oct. 5, 2026 Memorandum and Opinion

**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **MARANDA LYNN ODONNELL, *et. al.*, on behalf of themselves and all others similarly situated, Plaintiffs,** | § § § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:16-cv-1414** |
| | § | |
| **HARRIS COUNTY, TEXAS, *et. al.*, Defendants.** | § § | |

**DEFENDANT JUDGES PAULA GOODHART, JESSICA PADILLA,**
**LESLIE JOHNSON, AND LINDA GARCIA'S**
**RENEWED REQUEST FOR *YOUNGER* ABSTENTION**

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING .......... 1

I. Lawsuit Background .......... 1

II. November 2019 – Consent Decree .......... 2

III. The Texas Legislature enacted S.B. 6 and S.B. 9. .......... 3

IV. The Attorney General for the State of Texas intervened seeking to vacate the Consent Decree, and the Judges gained counsel. .......... 4

V. Present Status .......... 5

ISSUE TO BE RULED ON .......... 7

SUMMARY .......... 7

ARGUMENT .......... 9

I. The Court must abstain under Younger .......... 9

II. Younger abstention is not waived .......... 11

A. There is no waiver through predecessors' entry into the consent decree. .......... 11

B. The Judges consistently urged Younger abstention .......... 11

C. There has been no waiver-through action or inaction .......... 12

i. Burden and Evidence .......... 12

ii. Applicable Law .......... 13

iii. The Judges asked for but were denied representation by the County, while their County arranged for their Democrat colleagues' representation .......... 14

iv. The Judges repeatedly asked the County for representation .......... 15

III. Mootness is a "coequal ground" for dismissal .......... 21

IV. CONCLUSION AND PRAYER .......... 22

**INDEX OF AUTHORITIES**

Cases

*Bank of N.Y. Mellon Tr. Co. Nat'l Ass'n v. Meachum*,
No. 21-10766, 2022 U.S. App. LEXIS 10757 (5th Cir. 2022) ....13

*Broad. Satellite Int'l, Inc. v. Nat'l Dig. TV Ctr., Inc.*,
323 F.3d 339 (5th Cir. 2003) ....13

*Daves v. Dallas County*,
64 F.4th 616 (5th Cir. 2023) (en banc) ....9,21

*Daves v. Dallas Cty.*,
22 F.4th 522 (5th Cir. 2022) ....11

*Emergency Mgmt. Agency*,
556 F.3d 307 (5th Cir. 2009) ....12

*Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*,
457 U.S. 423 (1982) ....10

*O'Neill v Coughlan*,
511 F.3d 638 (6th Cir. 2008) ....13

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ....9

*ODonnell v. Goodhart*,
900 F.3d 220 (5th Cir. 2018) ....1,12

*ODonnell v. Harris Cnty.*,
882 F.3d ....11

*Polyflow, L.L.C. v. Specialty RTP, L.L.C.*,
993 F.3d 295 (5th Cir. 2021) ....12

*Preiser v. Rodriguez*,
411 U.S. 475 (1973) ....10

*RTM Media, L.L.C. v. City of Houston*,
584 F.3d 220 (5th Cir. 2009) ....13

*Russell v. Harris Cnty., No. H-19-226*,
2023 U.S. Dist. LEXIS 154051 *10 ....17,21

*State v. U.S. Dep't of Homeland Sec.*,
123 F.4th 186 (5th Cir. 2024) .......... 12

*Tarter v. Hury*,
646 F.2d 1010 (5th Cir. Unit A June 1981) .......... 9,10

*Younger v. Harris*,
401 U.S. 37 (1971) .......... 7,10

Statutes

Fed. R. Civ. P. 60 .......... 11

Tex. Code Crim. Proc. art. 17.08 .......... 3

Tex. Code Crim. Proc. article 17.024 .......... 3

Tex. Penal Code § 22.012 .......... 3

Texas Penal Code § 22.07 .......... 3

TO THE HONORABLE JUDGE LEE H. ROSENTHAL:

Defendants, Judges Paula Goodhart, Jessica Padilla, Leslie Johnson, and Linda Garcia (the "Judges"), file this renewed request to abstain under *Younger* pursuant to the Court's August 27, 2026 hearing and *In re Hon. Paula Goodhart, et al.*, No. 26-20337 (5th Cir. Aug. 26, 2026) (per curiam) ("*In re Goodhart*").[1]

## NATURE AND STAGE OF THE PROCEEDING

### I. Lawsuit Background

Originally filed on May 19, 2016 as a challenge to bail and other pretrial procedures for misdemeanor arrestees in Harris County (Dkt. 3), the Complaint was amended in September 2016 and included all judges of the 16 Harris County Criminal Courts at Law ("HCCCL") as defendants. Dkt. 54. The First Amended Complaint ("FAC") asked that County officials be required to inquire and consider whether arrestees have the ability to pay bail. Dkt. 54 at 121-23. The HCCCL judges moved to dismiss on multiple grounds, including *Younger* abstention, and their motion was denied. Dkt. 125. On January 7, 2017, the Court entered an injunction (Dkt. 302), and on June 1, 2018, the Fifth Circuit narrowed the injunction because it "amounts to the outright elimination of secured bail for indigent misdemeanor arrestees." *ODonnell I*, 892 F.3d at 163-64. The Fifth Circuit also overruled abstention arguments. *Id*. On August 14, 2018, the Fifth Circuit stayed a second injunction order, explaining it was overbroad in that "[s]ecured bail was not to be eliminated for any category of indigent arrestees, no matter how narrow." *ODonnell v. Goodhart*, 900 F.3d 220, 225 (5th Cir. 2018) (*ODonnell II*).

After these rulings from the Fifth Circuit, the judges who had filed the appeal lost the

[1] Following *In re Goodhart*, it appears that the parties and Court need not reach the other arguments made in the Judges' Motion to Vacate. Dkt. 793. If the Court rules otherwise, the Judges request the opportunity to provide any necessary further briefing.

November 2018 election. Once their successors took office in January 2019, they withdrew the appeal and Plaintiffs filed an unopposed motion asking the Fifth Circuit to vacate its August 2018 stay opinion. Plaintiffs argued that the circumstances were "akin" to mootness, since the new defendant judges changed their position and agreed with the Plaintiffs' revised preliminary injunction, which was "consistent with [the new judges'] policy views." Appendix B at 3 (Appellees' Unopposed Motion to Vacate Stay Opinion, No. 18-20466, filed Jan. 8, 2019 before the Fifth Circuit Court of Appeals).

Not long after, on August 1, 2019, Plaintiffs and Defendants jointly moved for approval of a class settlement agreement to impose bail-setting rules more sweeping than Plaintiffs had requested in the FAC and, in many respects, even broader than those the Fifth Circuit had already determined were too broad. The Court then entered the Consent Decree. Dkts. 617-2, 708.

## II. November 2019 - Consent Decree

The Consent Decree states its purpose was to remedy "systemic and longstanding constitutional violations found by the Court" and to "safeguard arrestees' equal protection and due process rights" such as rights to pretrial liberty and against wealth-based detention. Dkt. 617-1 at 11 ¶10. It limits judicial officers' ability to consider the relevant factors and terms of release for most class A and B misdemeanor arrestees. The Consent Decree requires County officials to comply with the HCCCL's Local Rule 9, which mandated the quick release of most misdemeanor arrestees on a general order bond ("GOB") without appearing before a trained magistrate to consider the circumstances of their arrest, criminal history, or any other pertinent facts (Dkt. 708 at 17-18); Loc R. 9.2.[2] Rule 9.5 provides that any judge deciding conditions of release "must have complete

[2] A GOB under the Consent Decree is a single pre-signed document executed by an associate judge and duplicated by the Sheriff for each case. It is not the same as a personal bond, which a judge or magistrate issues after considering the facts and surrounding circumstances. A GOB, on the other hand, issues as a standing order without any judicial officer knowing anything about the case, defendant, or facts. Texas law

discretion to release on a personal bond any misdemeanor arrestee prior to an individualized hearing." Loc. R. 9.5. Rule 9.7 also prohibits any judge from ordering secured money bail "as a condition of pretrial release at any time in the pretrial period for any misdemeanor arrestee" except for limited carveouts. Loc. R. 9.7. Rule 9.10 gives every judicial officer "complete discretion to release any misdemeanor arrestee on a personal bond." Loc. R. 9.10.[3] The Decree incorporated Local Rule 9, and prohibited its amendment without the approval of the Court-appointed Monitor or the Court. Dkt. 708 at ¶¶ 30, 120, 137.[4]

### III. The Texas Legislature enacted S.B. 6 and S.B. 9.

The Texas Legislature enacted criminal pretrial procedure reforms in 2021 and amended them in 2025, with the specific intent of protecting victims, law enforcement, and the public. *See* Appendix C (Bill Analysis, Tex. S.B. 9, 89th Tex. Leg., R.S. (2025)); *see also* Appendix D (Bill Analysis, Tex. S.B. 6, 87th Tex. Leg., R.S. (2021)). It established detailed procedures related to pretrial release, including extensive training for magistrates and hearing officers who make bail determinations (Tex. Code Crim. Proc. article 17.024), requiring an individualized review of all circumstances and factors under statute (Tex. Code Crim. Proc. art. 17.08(a)), and prohibiting a defendant from being released on personal bond if they are charged with certain offenses, including a terroristic threat under Texas Penal Code § 22.07. *See id*. at art. 17.03(b–2)(1)(B)(ii)).

---

not only requires magistrates to conduct an individualized review before issuing a bond order, it also prohibits standing general orders that violate Texas law.

[3] This Rule directly contradicts S.B. 9, now codified at article 17.03 of the Texas Code of Criminal Procedure.

[4] The current version of Local Rule 9 differs from what appears in the Consent Decree. Compare Loc. R. 9 (attached as Appendix G to Dkt. 793-1) with Dkt. 708 at 18 ¶¶ 9.4.1–9.4.6. The main difference is that, in 2022 (before the Judges took the bench), other HCCCL judges amended Rule 9 to add indecent assault as a carveout under paragraph 9.4.2. Indecent assault is a type of sexual assault perpetrated on a person 17 years or older. Tex. Penal Code § 22.012. There is no discussion of this being approved in the monitor's reports, or any other indication that the amendment was submitted to or approved by this Court.

The Consent Decree conflicts with, and prevents compliance with, these laws primarily by prohibiting trained hearing officers, magistrates and judges from considering the facts surrounding an arrest for most class A or B misdemeanor charges.

Plaintiffs' counsel admit the Consent Decree's required local rules violate S.B. 9:

> As you are aware, Senate Bill 9 took effect on September 1, 2025. In addition to other changes, Senate Bill 9 amended Article 17.03 to require cash bail for certain enumerated offenses, including three misdemeanors: terroristic threat Class A, unlawful possession of a weapon, and violating certain protective orders. Article 17.03 as amended by S.B. 9 is inconsistent with L.R. 9.2, 9.3, 9.10, and 9.12 as codified in the federal court Consent Decree issued in the *ODonnell* litigation.

Appendix A at 1–2 (emphasis added).

**IV. The Attorney General for the State of Texas intervened seeking to vacate the Consent Decree, and the Judges gained counsel.**

The State of Texas moved to intervene in August 2025 and moved to vacate the Consent Decree. Dkts. 740 & 742. On October 30, 2025, the Court granted intervention in part, allowing the State to move to vacate or amend the Decree based on mootness under Texas law, and denied the State's ability to argue *Younger* abstention. Dkt. 764 at 35. On November 4, 2025, the undersigned counsel appeared for the Judges. Dkts. 765-766. On November 5th, the Judges moved to be substituted as parties in this case (Dkt. 767), and the Court entered an order granting their substitution. Dkt. 768.

On November 12th, the Court set a December 11, 2025 deadline to file motions to vacate, permitted limited fact discovery, and set a hearing on the motions "if necessary" on August 27, 2026. Dkt. 773. The AG and the Judges filed Motions to Vacate on December 11th. Dkts. 789 & 793. In March 2026, the Monitor filed his Ninth Report. Dkt. 799-1. The AG objected, noting the Monitor did not provide a draft to it as a party before filing, and because the report was riddled with flawed methods and analyses, rendering it unreliable. Dkt. 801 at 1-2. Plaintiffs responded to the objection.

Dkt. 801. On April 16, 2026, the Judges filed their Motion for Expedited Ruling on *Younger* Abstention, maintaining that the Court should quickly consider the issue as a matter of law, without burdensome discovery. Dkt. 803 at 1-2.[5] The Plaintiffs, Harris County, the other 12 HCCCL Judges, and the Sheriff all objected. Dkts. 804-807. They filed a status report and requested a conference. Dkt. 808. This prompted the AG to object to their apparent goal of extending discovery, and the Judges joined the objection. Dkts. 809-810. On May 26, 2026, the Court overruled the AG's objections to the Monitor's Ninth Report, denied the Judges' request to expedite consideration of *Younger* abstention (Dkt. 821), extended discovery, and continued the hearing date for the motions to vacate to November 16, 2026. Dkt. 820. The Judges sought mandamus relief, which all other parties but the AG opposed. Discovery continued in this case, including expert disclosures (Dkts. 847, 848) and the Judges' attempts to obtain data from the Court's Monitor, who refused to provide any data he relied upon for his report. *See* Dkts. 839, 852.

**V. Present Status**

On August 26, 2026, the Fifth Circuit issued *In re Goodhart*, directing the Court to consider the Judges' *Younger* abstention argument on an expedited basis, and "to follow *Daves II*." *In re Goodhart*, No. 26-20337 slip. op. at 8-9. The Court instructed that *Younger* abstention was not waived by the Judges' Democrat predecessors' agreement to the Consent Decree, and pointed to three of its prior opinions in this case, recounting that "the state judges consistently urged the district court and our court to abstain" from the case's inception through 2018, when Democrats swept the judicial elections. *Id*. at 7-8 (emphasis added, citing *ODonnell v. Harris Cnty.*, 892 F.3d 147 (5th Cir. 2018) ("*ODonnell I*"), *ODonnell v. Goodhart*, 900 F.3d 220 (5th Cir. 2018) ("*ODonnell II*"),

[5] The request for expedited consideration came at a time when not only had the Judges been threatened with criminal contempt by Plaintiffs' lawyers (Dkt. 793-2 at 3), but the Monitor had, for the first time in his Ninth Report, singled out some of the Judges for purported violations of the Consent Decree. Dkt. 799-1.

*ODonnell v. Salgado*, 913 F.3d 479, 481 (5th Cir. 2019) ("*ODonnell III*")). The Court noted that it was not until two years after *Daves II* issued that the Judges moved to substitute as parties (*id*. at 3), and rejected the Plaintiffs' implied waiver argument, noting that if the Judges "were unable to obtain counsel independent of their judicial colleagues who support the consent decree, we do not see how they could have filed earlier." *Id*. at 8. It is undisputed that the Judges had no counsel to assist with any challenges to the Consent Decree from the time they took office until outside counsel appeared on their behalf on November 4, 2025. Dkts. 765-766.[6] The docket shows nothing was filed on the Judges' behalf in that time period. The County had delayed, then denied the Judges' requests for outside counsel in April 2024.

The Judges now re-urge *Younger* abstention.

[6] Even with this appearance, the County did not execute counsel's engagement agreement until January 2026.

## ISSUE TO BE RULED ON

| | |
|---|---|
| **Issue** | Whether the Court should abstain under *Younger v. Harris*, 401 U.S. 37 (1971). |
| **Standard of review** | "The district court's decision on abstention is discretionary, but we review de novo whether the prerequisites of abstention have been satisfied." *Daves II*, 64 F.3d at 622-23. |

## SUMMARY

The Fifth Circuit has directed the Court to consider *Younger* abstention on an expedited basis, and to follow *Daves II*. *Daves II* held that *Younger* abstention applies to this case, and instructed that "revis[ing] by federal decree the Texas state court procedures for felony and misdemeanor pretrial bail, should never have been brought in federal court." *Daves II*, 64 F.3d at 620. This Court must follow that holding and dismiss.

Plaintiffs have indicated they will argue waiver, and, separately, that they are entitled to develop a factual record under Rule 60(b). The Fifth Circuit foreclosed these arguments.

With respect to factual development, not only is it undisputed that Texas law has changed, Texas law expressly provides mechanisms for challenging excessive bail. The procedural posture of this case does not distinguish it from *Daves II*, and as the Fifth Circuit held: "*Daves II* does not hinge upon factual development or discovery." *In re Goodhart*, slip op. at 6-7. *In re Goodhart* makes clear that the Court must abstain.

Plaintiffs indicate they want to explore waiver. But the Fifth Circuit largely foreclosed any waiver argument when it (1) held that a predecessor judge's entry into the Consent Decree does not waive *Younger* abstention, and (2) explained that the state judges clearly and consistently argued for abstention in both the district and appellate courts. The only remaining argument Plaintiffs can make is what this Court has described as a "window crack"—namely, if *Younger* abstention is waived as untimely raised because the Judges "were unable to obtain counsel

independent of their judicial colleagues who support the consent decree….”*In re Goodhart*, No. 26-20337 slip. op. at 8. Without counsel, the Fifth Circuit "do[es] not see how [the Judges] could have filed earlier." *Id*.

No detailed factual development is necessary to consider and deny any waiver argument, because it is undisputed that the Judges—***defendants in this lawsuit***—had no attorney, and that the County denied the Judges' request for representation while continually providing their Democrat colleagues with counsel. Any attempt to impute waiver under those circumstances borders frivolity, and would reduce the requirements of establishing implicit waiver into little more than a light sneeze.

Nor is the relevant time period, as Plaintiffs have argued, two years. *Daves II* issued on March 31, 2023. Three of the Judges (Judges Paula Goodhart, Jessica Padilla, and Leslie Johnson) took office on January 1, 2023, but Judge Linda Garcia, one of the movant judges here, did not take office until January 1, 2025. Therefore, even if Plaintiffs could show that three of the Judges sat idly by, did nothing to present or protect their legal rights, and willingly and knowingly waived *Younger* abstention through December 31, 2024 (of course none of which is true, as discussed below), it does nothing to defeat Judge Garcia's right to argue *Younger* which could not have arisen until she took office on January 1, 2025. At that time, the County had already denied three movant Judges' request for counsel. But the Judges plainly continued with their efforts to gain representation counsel during this time period, because counsel appeared for them in November 2025.

The Court should consider *Younger*, and dismiss.

## ARGUMENT

### I. The Court must abstain under *Younger*.

*Daves II* declared that this case should not "have been adjudicated in federal court." *Daves v. Dallas County*, 64 F.4th 616, 631 (5th Cir. 2023) (en banc) ("*Daves II*"). It overruled *ODonnell I*'s decision against abstention. *Id.* at 631, 635. The Fifth Circuit has now clarified that *Daves II* directly controls this case, and is not distinguishable due to its pre-judgment procedural posture. *In re Hon. Paula Goodhart, et al.*, No. 26-20337, slip. op. at 6 (5th Cir. Aug. 26, 2026) (per curiam) ("*In re Goodhart*"). Rather,

> *Daves II* expressly held that "*ODonnell I*...should [not] have been adjudicated in federal court" and that the district court should have abstained. 64 F.4th at 631. Again, *ODonnell I* is this case. *Daves II* does not hinge upon factual development or discovery.

*Id*. at 3. As *Daves II* directs, *Younger* abstention is a doctrine that "remains controlling today, with particular application to interventions into state criminal procedures." *Daves II*, 64 F.3d at 625. Federal courts must abstain when "(1) the federal proceeding would interfere with an ongoing state judicial proceeding; (2) the state has an important interest in regulating the subject matter of the claim; and (3) the plaintiff has an adequate opportunity in the state proceedings to raise constitutional challenges." *Id*. (citation modified). Here, as in *O'Shea*,[7] and *Tarter*,[8] all three criteria apply: there is no dispute that this proceeding interferes with ongoing state judicial proceedings, or that the state has an important interest in regulating its pretrial criminal procedures. And, as the Fifth Circuit discussed in *Daves II*, "Texas law expressly provides mechanisms for challenging excessive bail," including motions for bond reduction, magistrate review of bail orders, and petitions for habeas corpus. *Id*. at 629.

---

[7] *O'Shea v. Littleton*, 414 U.S. 488 (1974).

[8] *Tarter v. Hury*, 646 F.2d 1010, 1013 (5th Cir. Unit A June 1981).

*O'Shea* involved a claim of excessive bail, and request that a federal court constantly supervise state judicial officers, which is "antipathetic to established principles of comity." *Id*. at 626 (quoting *O'Shea*, 414 U.S. at 501). For those charged with a crime, they "would have recourse to [the] federal court" to seek compliance, "or even contempt." *Id*.[9] This "extensive federal oversight" would amount to "an ongoing federal audit of state criminal proceedings" in violation of *Younger*, especially where various adequate legal remedies existed in state court. *Id*. at 626-27. *Tarter* reached the same conclusion. *Id*. at 627. *Daves II* held that *O'Shea* and *Tarter* "supply compelling precedent for withholding federal adjudication of the bail complaint in both *ODonnell I* and *Daves*." *Id*. The Fifth Circuit reviewed its prior holding in *ODonnell I* rejecting *Younger* abstention, and overruled it. *Id*. at 631 (citing, inter alia, *Wallace v. Kern*, 520 F.2d 400 (2d. Cir. 1975)). The Court held that:

> The injunctions issued in Houston and Dallas plainly show federal court involvement to the point of ongoing interference and "audit" of state criminal procedures. Further, in stark contrast to *Gerstein*, Texas courts are neither unable nor unwilling to reconsider bail determinations under the proper circumstances, thus providing state court detainees the chance to raise federal claims without the need to come to federal court. The availability of state court remedies counsels that federal courts may not intervene under equity jurisprudence to decide these disputes.

*Id*. *Daves II* made clear that *Younger*'s focus is on "the fact that errors can be rectified according to state law, not that they must be rectified virtually immediately." *Id*. at 633.

Considering the analysis in *Daves II*, and the direction of *In re Goodhart*, the Court should abstain from further involvement in ongoing HCCCL proceedings pursuant to a "basic doctrine of equity jurisprudence" guided by "notions of comity" and federalism, where this case implicates important state interests and arrestees have an adequate opportunity to raise constitutional challenges through habeas relief. *See Younger*, 401 U.S. at 43-44 (citation modified); *Preiser v. Rodriguez*, 411 U.S. 475 (1973); *see also Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423,

[9] That is exactly what has happened here, as the Judges have previously argued. Dkt.793-2 at 3.

432 (1982).[10]

## II. *Younger* abstention is not waived.

### A. There is no waiver through predecessors' entry into the consent decree.

The Fifth Circuit has now twice held that *Younger* abstention has not been waived. *Daves v. Dallas Cty*., 22 F.4th 522, 547 (5th Cir. 2022); *In re Goodhart*, No. 26-20337 at 7. *In re Goodhart* specifically held that *Younger* abstention was not waived because the Judges' Democrat predecessors entered into the Consent Decree. *In re Goodhart*, slip op. at 6, 9. Plaintiffs, therefore, can no longer contend otherwise.

### B. The Judges consistently urged *Younger* abstention.

The *Younger* abstention argument has a turbulent history in this case, with ample briefing of it before this Court and the Fifth Circuit. In fact, this filing will be at least the seventh time that *Younger* abstention has been raised or urged in this case.

*In re Goodhart* also recognized that the judges have "consistently urged" abstention. *In re Goodhart*, slip op. at 7-8 (citing *ODonnell I*, *ODonnell II* and *ODonnell III*). On November 9, 2016, the County Judges moved to dismiss the complaint arguing, in part, that the Court should abstain under *Younger* (Dkt. 80), and this Court denied the Motion. *See ODonnell v. Harris Cty*., 227 F. Supp. 3d 706, 734-37 (S.D. Tex. Dec. 16, 2016). It was then raised at least twice on appeal. The Fifth Circuit denied the argument in a February 1, 2018 panel decision that was later withdrawn on rehearing (though the denial of *Younger* abstention remained). *See ODonnell v. Harris Cnty.*, 882 F.3d at 538, *withdrawn and superseded on panel reh'g by ODonnell I*, 892 F.3d at 156. Soon after,

---

[10] Plaintiffs contend a full, factual analysis under Rule 60(b) is appropriate even now, after the Fifth Circuit's clear mandate in *In re Goodhart*. The Judges disagree. *In re Goodhart* excused this Court from conducting a detailed factual analysis in its mandate, and its direction that "*Daves II* does not hinge upon factual development or discovery." *In re Goodhart*, slip op. at 6-7. Regardless, it is clear that there has been a change in the law (*Daves II* which is now expressly made applicable under *In re Goodhart*), and applying the Consent Decree is no longer equitable. Fed. R. Civ. P. 60(b)(4), (5), (6).

fourteen HCCCL judges[11] raised *Younger* abstention when requesting a stay of this Court's preliminary injunction, and on August 14, 2018, a Fifth Circuit panel granted the stay without reaching that argument. *ODonnell II*, 900 F.3d at 222. The dissent characterized the *Younger* arguments as "recycle[d]" and noted that the Fifth Circuit had "previously rejected" *Younger* arguments in *ODonnell I*, 892 F.3d at 156-57 & n.3, and opined that the Court was "unlikely to find them persuasive in their repackaged forms." *Id*. at 232 (Graves, J., dissenting). The argument was raised again by the AG (Dkt. 740-1), and by the Judges. Dkt. 793 at 20-22. It was addressed by the Fifth Circuit in *In re Goodhart*. It is now re-urged, again.[12] There is no waiver.

### C. There has been no waiver—through action or inaction.

#### i. Burden and Evidence

It is Plaintiffs' burden to demonstrate waiver. *See State v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 227 (5th Cir. 2024) (defendants do not have to prove no waiver of sovereign immunity, plaintiff asserting jurisdiction "has the burden of pointing to a congressional act that gives it consent to do so"); *see also Emergency Mgmt. Agency*, 556 F.3d 307, 315 (5th Cir. 2009) ("Plaintiff bears the burden of showing Congress's unequivocal waiver of sovereign immunity"); *Polyflow, L.L.C. v. Specialty RTP, L.L.C.*, 993 F.3d 295, 307 (5th Cir. 2021) ("the burden of proving waiver falls even more heavily on the shoulders of the party seeking to prove waiver").

The Four Judges do not believe they need to put forth any evidence on the issue of waiver because (1) it is not their burden, and (2) any argument that they waived *Younger* at a time they were

---

[11] Including Paula Goodhart as Judge of HCCCL No. 1, Bill Harmon as Judge of HCCL No. 2, and Nathalie C. Fleming as Judge of HCCL No. 3. In 2019, Alex Salgado became Judge of HCCL No. 1, Ronnisha Bowman became judge of HCCL No. 2, Erica Hughes became judge of HCCL No. 3. Judges Goodhart and Leslie Johnson currently preside over HCCCL Nos. 2 and 3, respectively.

[12] It is no surprise that these arguments were raised when Republicans were parties to this case, and it is no secret that there were no Republican parties to this case after the consent decree was signed until 2023, when three Republican judges took office.

not represented by counsel can be considered and denied as a matter of law. But, because the Plaintiffs have indicated they will argue waiver, in the interest of expediency and due to the mandate in *In re Goodhart*, the Four Judges provide evidence of their efforts to gain representation to show they have not waived any *Younger* argument, so as not to cause any delay to the Court's consideration.

**ii. Applicable Law**

Any waiver of *Younger* abstention must be clear and explicit. *See, e.g., RTM Media, L.L.C. v. City of Houston*, 584 F.3d 220, 229 n.15 (5th Cir. 2009) (citing *O'Neill v. Coughlan*, 511 F.3d 638, 642 (6th Cir. 2008)). In *RTM*, the Fifth Circuit held the city did not waive *Younger* by conducting full discovery or fully briefing the merits of the case, where it consistently requested that the district court abstain. *Id*. at 229.

The Fifth Circuit has already acknowledged that the state judges have consistently urged abstention. *In re Goodhart*, slip op. at 7-8. *O'Neill*, cited in *RTM*, discussed another case that held that even when no party had raised *Younger* abstention to the district court and it was raised sua sponte on appeal, *Younger* abstention was not waived and the district court had no discretion to grant injunctive relief when *Younger* abstention applies. *See O'Neill*, 511 F.3d at 642-43 (citing *Beeman v. Stafford*, No. 94-3634, 1995 WL 456367, at *4 (6th Cir. Aug. 1, 1995) (unpublished). That is because "a federal court will only tread [wh]ere it is unequivocally invited." *O'Neil*, 511 F.3d at 643.

Finally, implied waiver requires, among other elements, conclusive evidence that a party "unequivocally manifests its intention to no longer assert its right." *Bank of N.Y. Mellon Tr. Co. Nat'l Ass'n v. Meachum*, No. 21-10766, 2022 U.S. App. LEXIS 10757, at *5-6 (5th Cir. 2022) (quotation omitted). There are no grounds to find the elements of waiver, including that the Judges through conduct intended to relinquish their rights. *Broad. Satellite Int'l, Inc. v. Nat'l Dig. TV Ctr., Inc.*, 323

F.3d 339, 345 (5th Cir. 2003).

**iii. The Judges asked for but were denied representation by the County, while the County arranged for their Democrat colleagues' representation.**

Plaintiffs criticize the Judges for not reasserting *Younger* abstention after *Daves II* issued on March 31, 2023. But the Judges were not represented by counsel willing to challenge the Decree from the time they took office until after October 30, 2025, when the below-signed counsel was retained to represent them. It is undisputed that the County hired an attorney to represent the Democrat HCCCL Judges who supported the Consent Decree and refused to hire counsel to represent the Republican HCCCL Judges to challenge the validity of the Decree. The message was clear: the County would provide counsel only to the judges who supported the Consent Decree, and if any HCCCL Judges were concerned that the Decree was invalid, or conflicted with state law, or resulted in the release of violent offenders without judicial review, the County would *not* provide them with an attorney to raise those concerns. As the Fifth Circuit has stated, if the Judges "were unable to obtain counsel independent of their judicial colleagues who support the consent decree, [the Court does] not see how they could have filed earlier." *In re Goodhart*, slip op. at 8. Plaintiffs cannot meet their burden to show waiver here.

First, the Court's docket shows no explicit waiver. From the time the Judges took office (three in 2023, one in 2025) up until November of 2025, there is not one entry filed on their behalf:[13]

| | | |
|---|---|---|
| 09/03/2022 | 734 | NOTICE *of Filing of Fifth Six-Month Monitor Report* by Robert Ryan Ford, Loetha Shanta McGruder, Maranda Lynn ODonnell, filed. (Attachments: # 1 Exhibit 1: Fifth Six-Month Monitor Report)(Cutting, Jeremy) (Entered: 09/03/2022) |
| 01/17/2023 | 735 | Letter from Jamarick Gray re: fairness and settlement agreement, filed. (ckrus, 4) (Entered: 01/17/2023) |

[13] The Fifth Circuit noticed this gap—stating in *In re Goodhart* that it was not until two years after *Daves II* issued that the Judges moved to substitute as parties. *In re Goodhart*, slip op. at 3.

| | | |
|---|---|---|
| 03/03/2023 | 736 | NOTICE *of Filing of Sixth Six-Month Monitor Report* by Robert Ryan Ford, Loetha Shanta McGruder, Maranda Lynn ODonnell, filed. (Attachments: # 1 Exhibit 1: Sixth Six-Month Monitor Report)(Cutting, Jeremy) (Entered: 03/03/2023) |
| 03/03/2024 | 737 | NOTICE *of Filing of Seventh Monitor Report* by Robert Ryan Ford, Loetha Shanta McGruder, Maranda Lynn ODonnell, filed. (Attachments: # 1 Exhibit 1: Seventh Monitor Report)(Cutting, Jeremy) (Entered: 03/03/2024) |
| 03/15/2024 | 738 | NOTICE of Appearance by Travis Walker Fife on behalf of Robert Ryan Ford, Loetha Shanta McGruder, Maranda Lynn ODonnell, filed. (Fife, Travis) (Entered: 03/15/2024) |
| 03/03/2025 | 739 | NOTICE *of Filing of Eighth Monitor Report* by Loetha Shanta McGruder, Robert Ryan Ford, Maranda Lynn ODonnell, filed. (Attachments: # 1 Exhibit Eighth Monitor Report) (Fife, Travis) (Entered: 03/03/2025) |
| 08/26/2025 | 740 | MOTION to Intervene by Ken Paxton, in his official capacity as the Attorney General of Texas, filed. Motion Docket Date 9/16/2025. (Attachments: # 1 Exhibit MEMORANDUM IN SUPPORT OF THE ATTORNEY GENERAL OF TEXAS MOTION TO INTERVENE, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Proposed Order) (Nwaokoro, Joseph) (Entered: 08/26/2025) |

**iv. The Judges repeatedly asked the County for representation.**

On January 1, 2023, when three of the Judges took office, Allan Van Fleet, who represented all of the then-Democrat HCCCL Judges since 2018, wrote to the new judges (including the Republican Judges) to introduce himself and extend his representation to them, with a caveat that he felt was important enough to repeat twice:

> vote. Obviously, if you (or any Judge) were to insist on taking a position contrary to your colleagues, I could not represent you, and you would need different counsel to represent you before the Monitor or Judge Rosenthal.

. . .

> Office of the Public Defender. So far, these individual incidents have been resolved. Obviously, if you (or any Judge) were to insist on taking a position that I believe contrary to the Consent Decree, I could not represent you, and you would need different counsel to represent you before the Monitor or Judge Rosenthal.

Exhibit 1-A. Mr. Van Fleet, as a conscientious attorney, established at the outset that his representation of the Judges' offices only extended so far as they were willing to go along with the

majority HCCCL Judges and to uphold the Decree.

In or around March 2023, the monitors in this Lawsuit held a meeting with the HCCCL Judges. Exhibit 1 at ¶ 3. Part of the discussion was whether the judges must follow state law or the Decree when there is a conflict between them, and Judges Padilla and Goodhart asked the monitors which controls, since the Decree conflicted with new state laws. *Id*. The monitors committed to getting guidance for the judges on that issue. *Id*. *Daves II* was issued shortly thereafter, on March 31, 2023. The HCCCL Judges were emailed a copy that same day by their staff attorney at the time, Ashley Guice. Exhibit 1 at ¶ 4.

In early April 2023, at an HCCCL meeting, Judge Goodhart asked again about conflicts between the Decree and state law, and what impact *Daves II* has on the Decree. *Id*. Shortly after that meeting, Mr. Van Fleet sent Judges Padilla and Goodhart a letter withdrawing from any representation in this Lawsuit. *Id*.; Exhibit 1-B.

Mr. Van Fleet also informed the monitors and other counsel of his withdrawal. Exhibit 2 (PLS_007313-April 18, 2023 email). While the letter does not expressly mention Judge Johnson at that time, Judge Johnson was aligned with Judges Goodhart and Padilla, had the same questions about the Decree, and did not consider Mr. Van Fleet as her attorney in this case. Exhibit 3 at ¶ 3 (Declaration of Hon. Leslie Johnson). Regardless, Mr. Van Fleet's prior correspondence makes clear that legal questions about the validity of the Decree remained outside of his representation. Exhibit 1-A. It was clear at that point that the three Republican Judges had no independent representation working on their behalf in this case.

Regardless, the three Judges wanted an answer to whether state law or the Consent Decree controlled, and what impact *Daves II* had on the Consent Decree. Exhibit 1 at ¶ 5. In April and May of 2023, Judge Goodhart pursued answers from the Attorney General ("AG"), seeking an opinion

on the issue, and asking whether the AG's office could represent them. *Id*. Judge Goodhart was informed that an HCCCL judge could not request an AG opinion. *Id*. She eventually learned the AG's office would not represent her or the other Republican judges because they are not state employees. *Id*. Around this time, briefing was submitted regarding *Daves II*'s impact in a related proceeding in this Court, *Russell v. Harris County* (No. H-19-226). **Exhibit 1** at ¶ 6. The three Judges waited with hope that rulings in the *Russell* matter would be applied to the Decree. *Id*. The opinion dismissing the *Russell* case issued in August of 2023, but was not applied to the Decree. *Id*.; *see also Russell v. Harris Cnty.*, No. H-19-226, 2023 U.S. Dist. LEXIS 154051 *10; 2023 WL 5658936 (S.D. Tex. Aug. 31, 2023) (mem. and order).

In October of 2023, Judges Goodhart and Johnson met with other HCCCL Judges seeking a consensus about revising the Decree and local rules to comply with Texas law, but the majority of the HCCCL Judges would not raise a challenge. **Exhibit 1** at ¶ 7. When that effort failed, and noting that the County provided uninterrupted representation to their Democrat colleagues, the three Judges turned to the County Attorney's Office to request independent representation for them in this case, which would permit them to raise their concerns over the Decree. *Id*. at ¶ 8. Judges Padilla and Goodhart largely handled these discussions, but included Judge Johnson in the request. *Id*.; *see also* **Exhibit 1-C** (email chain beginning October 30, 2023 referencing prior conversation with County Attorney Jonathan Fombonne about obtaining counsel in this lawsuit, stating "We are currently parties to a federal consent decree and do not have representation as our colleagues do. There is a conflict of interest that necessitates us having separate counsel"). The conversations with the County Attorney's office involved a process: they would find and recommend potential attorneys to that office, who would review and approve or decline them, and if approved, a proposed engagement agreement would be submitted to the Commissioners' Court for approval. Exhibit 1 at ¶¶ 8-9.

By mid-December 2023, Judges Padilla and Goodhart finally got a meeting with Mr. Fombonne and County Attorney Christian Menefee regarding their request for counsel for the Republican Judges. *Id*. at ¶ 10; **Exhibit 1-D** at 5-6 (April 23, 2024 email chain beginning December 11, 2023 about providing counsel). Judge Johnson was also to attend that meeting. Exhibit 1 at ¶ 10. The Judges were informed that the County Attorney would submit the matter to the Commissioner's Court to consider in its next executive session. *Id*. But, just after that meeting, the Judges learned that the County Attorney would not submit the request to Commissioners' Court until after the March 2024 primaries. *Id*. at ¶ 11.

On April 23, 2024, the Commissioners' Court finally considered the Judges' request for counsel. On that same day, Mr. Fombonne notified the Judges: "**today, the County Commissioners declined to approve the request for outside counsel**" in this case. **Exhibit 1-D** (April 23, 2024 email from Mr. Fombonne) (emphasis added).

The Judges did not cease their efforts over the next months. Judge Goodhart communicated with the AG's office about potential representation or involvement, and communicated with other elected officials about this issue. *Id*. at ¶12. She detailed her efforts speaking with the AG's office and asking for their assistance:

> After many conversations with Grant Dorfman when he was at the AG's office, another Harris County judge and I had a zoom meeting with James Lloyd and Kimberly Gdula on 8/12/24. We expressed our concerns about the pervasive practice in Harris County of releasing individuals on a "general order bond" without any judicial review because of the O'Donnell consent decree. We were and are concerned that we are being forced to violate state law daily because of the decree. They expressed interest in either representing us or intervening because of a state interest. Since that meeting, I spoke to Ms. Gdula on 11/19/24, 12/10/24 and 3/17/25. I left numerous messages including on 4/8, 4/15 and 4/23, two days after the deputy was shot by the individual released on 4/16 without an individualized bail hearing on his misdemeanor case. I have not heard from the AG's office since our conversation in March, so I do not know where they stand. We would appreciate their assistance in this matter as the Harris County Commissioners refuse to provide counsel for us to appear in federal court.

**Exhibit 1-E** (letter to G. Coker outlining efforts in 2024).

Judge Linda Garcia was elected to County Court at Law No. 16 and took the bench on January 1, 2025. Exhibit 1 at ¶ 13. Judge Garcia is aligned with the other three Republican Judges with respect to their concerns about the Consent Decree and its conflict with state law. *Id*.

Despite their prolonged efforts, the Judges continued without representation, and it was made clear that they would not be provided counsel in this lawsuit. But communications with the County Attorney's office continued about their concerns over the Decree and its requirement to violate state law. **Exhibit 1** at ¶ 14; **Exhibit 1-F**.

On April 23, 2025, a Harris County Deputy Constable was shot, allegedly by a person released on GOB without individualized review. **Exhibit 1-F** at 5. Judge Goodhart reached out to the monitors about the shooting and re-raised the issue of the Decree conflicting with state law. **Exhibit 1-F** at 5. The monitor refused to provide any advice on the Decree. **Exhibit 4** (April 25, 2025 email, RCCCL00000823). He referred Judge Goodhart to Mr. Fombonne, who confirmed that the County Attorney's office would not represent the Judges to challenge the Decree, and the Commissioners' Court declined to approve counsel for them. *Id*. at 2.

Mr. Fombonne also reiterated the County's declination of outside counsel representation to provide advice on challenging the Decree:

> We'd be happy to discuss. To go back to your prior email, I don't believe we said that we were conflicted on providing general legal advice on the consent decree – just that our office wouldn't be able to challenge the continuing validity of the consent decree. As you'll recall, we asked commissioners court for outside counsel for you to do so, but commissioners court declined to approve that contract.

**Exhibit 1-F** at 2.

As described below, it is during this time period (May 30, 2025) that the Judges took a proposal from the HCCCL Judges and presented a modification request to the monitors in an effort to alleviate the Consent Decree's conflict with state law. **Exhibit 1** at ¶ 15; **Exhibit 8** (May 30, 2025

letter). The monitor rejected that request on July 25, 2025. **Exhibit 1** at ¶ 15; **Exhibit 9** (7/25/25 letter). One day later, Mr. Fombonne *again* reiterated that the County Attorney's office would not represent the Judges regarding any modification of the Consent Decree. *Id*. at ¶ 16; **Exhibit 1-G**.

Mr. Van Fleet also confirmed (again) that he did not represent the Judges in response to their May 30, 2025 Decree modification request to the monitors, taken from an HCCCL discussion. **Exhibit 5** (May 30, 2025 email). Mr. Fombonne also responded on June 2, 2025 reiterating to *all counsel* in the case that:

> we've let [the Judges] know [the County] can't represent them in any modification proceedings given the position of the County in this litigation. These judges requested outside counsel last year, but commissioners court did not approve that request.

**Exhibit 6** at HC - 950779.

During this time period, Judge Goodhart reached out to others in attempts to gain assistance. In an April 28, 2025 letter to Senate Legislative Director, Grayson Coker, she outlined additional efforts taken with the AG's office in 2024 and into 2025 **Exhibit 1-E** (April 28, 2025 letter to G. Coker).

The Texas Attorney General moved to intervene on August 26, 2025 [Dkt. 740] and the very next day, the Four Judges made a second request for independent counsel. **Exhibit 1** at ¶17; **Exhibit 1-H** at 7. They were even contacted by Plaintiffs' counsel asking for a response to a motion when they were not represented by counsel. **Exhibit 1** at ¶17; **Exhibit 1-H** (September 2, 2025 email). Judge Goodhart responded that she did not feel comfortable joining a motion without counsel, and communicated her concerns about restrictions on practicing law while serving as an elected judge. **Exhibit 1-H** at 1.

The Judges' request for independent counsel was submitted again to the Commissioners' Court on September 18, 2025, and approved—but only on the condition that "the Attorney General's Motion to Intervene in the O'Donnell case is granted." **Exhibit 7** at 2 (9/18/25 CC Exceptions

Agenda); **Exhibit 1** at ¶ 18. Intervention was granted on October 30, 2025. Dkt. 764. Counsel for the Judges was retained, appeared on November 4, 2025 [Dkt. 765], and moved to substitute the Judges in the next day. Dkt. 767. Consistent with the scheduling order issued in this case, the Judges filed their motion to vacate raising the abstention issue on December 11, 2025. Dkt. 793.

Based on the foregoing, Plaintiffs have no merited argument that the Judges waived their rights to raise the *Younger* abstention doctrine. Consistent with the Fifth Circuit's directives, abstention must be considered and following *Davies II*, this case should be dismissed.

**III. Mootness is a "coequal ground" for dismissal.**

The Judges discuss mootness briefly here because the Court mentioned it at the August 27, 2026 hearing. The Court previously dismissed claims in the *Russell* litigation as moot after *Daves II* issued. *Russell v. Harris Cnty.*, No. H-19-226, 2023 U.S. Dist. LEXIS 154051 *10; 2023 WL 5658936 (S.D. Tex. Aug. 31, 2023) (mem. and order) ("*Daves*, although involving different facts, is largely legally identical to *Russell*. Adherence to Fifth Circuit authority requires that this case be dismissed as moot"). Any ruling on mootness is reviewed *de novo*. *Daves II*, 64 F.4th at 623.

Briefly, *Daves II* addressed *Younger* abstention first, and afterward turned to mootness as a "coequal ground" for dismissal. *Daves II*, 64 F.3d at 633. That ground was not burdened by a heavy factual analysis. The Court noted that the named plaintiffs were not "subject to bail proceedings since years before the advent of S.B. 6," making their ability to pursue ongoing injunctive relief as an injured party or class representative questionable. *Id*. at 634. The provisions of Texas' heavily procedural new bail-reform laws, and their implementation, presented "constitutional issues beyond the scope of this case and the circumstances of the plaintiffs who filed it." *Id*. at 635. The Court held that, "even if federal courts were not compelled by *Younger* and *O'Shea* to abstain, the present controversy must be considered moot" because the issues presented are not live, and the parties lack

a legally cognizable interest in the outcome. *Id*. at 634. The same is true here. The Court may dismiss based on *Younger*, or may sua sponte consider and apply *Daves II*'s mootness analysis. The result is the same.

**CONCLUSION AND PRAYER**

The Judges ask that the Court consider their *Younger* abstention argument on an expedited basis, and issue an order consistent with the holdings in *Daves II*.

Respectfully submitted,

**GREER, HERZ & ADAMS, L.L.P.**

By: /s/ *Joseph R. Russo, Jr.*
Joseph R. Russo, Jr.
Federal I.D. No. 22559
State Bar No. 24002879
jrusso@greerherz.com
Angie Olalde
Fed. ID No. 690133
State Bar No. 24049015
aolalde@greerherz.com
123 Rosenberg Street, Suite 3000
Galveston, Texas 77550
(409) 797-3200 (Telephone)
(866) 456-0170 (Fax)

**ATTORNEYS FOR DEFENDANTS**
**HON. PAULA GOODHART,**
**HON. JESSICA PADILLA,**
**HON. LESLIE JOHNSON, AND**
**HON. LINDA GARCIA**

EXHIBIT
1

**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **MARANDA LYNN ODONNELL, *et. al.*, on behalf of themselves and all others similarly situated, Plaintiffs,** | § § § | |
| **v.** | § | **CIVIL ACTION NO. 4:16-cv-1414** |
| **HARRIS COUNTY, TEXAS, *et. al.*, Defendants.** | § § § | |

**DECLARATION OF JUDGE PAULA GOODHART**

BEFORE ME, the undersigned authority, on this day personally appeared the undersigned affiant, who, being by me duly sworn, on oath stated:

1. My name is Paula Goodhart. I am the presiding Judge of Harris County Criminal Court at Law ("HCCCL") 2, and have been since I took that office on January 1, 2023. I am at least eighteen years of age, of sound mind, capable of making this affidavit and fully competent to testify to the matters stated in this affidavit, and I have personal knowledge of each of the matters stated.

2. **Exhibit 1-A** is a true and correct copy of a letter I received from Allan Van Fleet on or about January 1, 2023 regarding his representation of the HCCCL Judges, including limitations on that representation.

3. In or around March 2023, the monitors in this Lawsuit held a meeting with the HCCCL Judges. Judge Padilla and I asked the monitors whether Texas' new bail-reform laws or the Consent Decree would control HCCCL pretrial procedures, since the Decree conflicted with new state laws. The monitors committed to getting guidance for the judges on that issue.

4. Our staff attorney, Ashley Guice, forwarded the *Daves II* opinion to the HCCCL Judges on March 31, 2023. At an HCCCL meeting in or around the first week of April 2023, I asked again about whether state law conflicts with the Decree and what impact the new opinion has on the Decree. Shortly after that meeting, Judge Padilla and I received the April 6, 2023 letter from Mr. Van Fleet withdrawing from any representation of me and Judge Padilla. A true and correct copy of that letter is attached as **Exhibit 1-B**.

5. Judges Padilla, Johnson, and I wanted an answer to whether state law or the Consent Decree controlled, and what impact *Daves II* had on the Consent Decree. In April and May of 2023 I asked Grant Dorfman who was serving as a Deputy First Assistant at the Attorney General's ("AG") office whether we could request an AG opinion about which controls if there is a conflict, the Consent Decree or Texas' new laws. I was

informed that an HCCCL judge could not request an AG opinion. I also asked whether the AG's office could provide representation for me and my colleagues who questioned the Decree. I eventually learned that would not happen because we were not considered state employees.

6. Around this time, I was aware of briefing concerning the impact of the *Daves II* opinion being submitted to Judge Rosenthal in a related proceeding, *Russell v. Harris Cnty.*, No. H-19-226. I waited, along with my colleagues, to see whether a decision in *Russell* would impact the Decree. The *Russell* decision issued in August 2023, but there was no change made to the Decree.

7. In October of 2023, Judge Johnson I met with other HCCCL Judges at a retreat. We sought a consensus on whether the judges would work to revise the Decree to comply with state law. The majority of HCCCL judges declined.

8. Judge Padilla and I also asked the County to provide representation for us and Judge Johnson, since the County provided the other HCCCL judges with an attorney. I understood that a request for representation could be made to the County Attorney, who would review specific attorneys, and if the County Attorney's office approved them, it would submit a proposed engagement agreement to the Commissioners' Court for approval.

9. Judge Padilla and I spoke with Assistant County Attorney Jonathan Fombonne requesting representation in this Lawsuit. **Exhibit 1-C** is a true and correct copy of an email string between Mr. Fombonne, Judge Padilla and me. **Exhibit 1-D** is a true and correct copy of an email string including the County Attorney Christian Meneffee, Mr. Fombonne, Judge Padilla and me.

10. In mid-December 2023, Judge Padilla and I met with Mr. Fombonne and Mr. Menefee, and again requested that the County provide us counsel in the Lawsuit. Judge Johnson was also to attend that meeting. We were informed that the County Attorney would submit the matter to the Commissioner's Court to consider in its next executive session.

11. Shortly after this mid-December meeting, Mr. Fombonne informed Judge Padilla that the County Attorney would not submit our request for counsel to the Commissioners' Court until after the March 2024 primary elections took place. We continued to follow up with Mr. Fombonne about requesting counsel for us from the Commissioners' Court.

12. After that, over the course of several months, I communicated with the AG's office about potential representation or involvement, and communicated with other elected officials about this issue. Attached **Exhibit 1-E** is a true and correct copy of my April 28, 2025 letter to Grayson Coker discussing my efforts.

13. In 2024, Judge Linda Garcia was elected to County Court at Law No. 16 and took the bench on January 1, 2025. Judge Garcia is aligned with myself, Judge Padilla, and

Judge Johnson with respect to our concerns about the Consent Decree and its conflict with state law.

14. I continued communicating with the County Attorney's office about my concerns about the Decree and being forced to violate state law. I emailed and spoke with Mr. Fombonne on the issue. **Exhibit 1-F** is a true and correct copy of his April 28, 2025 response.

15. On May 30, 2025, I and my Republican colleagues sent a request for modification to the monitor in an effort to alleviate the Consent Decree's conflict with state law. The monitor rejected our request on July 25, 2025.

16. The County Attorney's office informed us that it would not represent us concerning any modification of the Consent Decree. Attached as **Exhibit 1-G** is a true and correct copy of Mr. Fombonne's June 26, 2025 response to questions we had about the Consent Decree.

17. After the AG moved to intervene in August of 2025, Judges Padilla, Johnson, Garcia and I asked the County to again consider providing us outside representation in this Lawsuit. **Exhibit 1-H** is a true and correct copy of a September 2, 2025 response to Plaintiff's counsel asking for our response to a motion while unrepresented.

18. On or about September 18, 2025, the Commissioners Court finally approved hiring counsel to represent us, on the condition that the AG's Motion to Intervene was granted.

19. I was not represented by counsel in the above-referenced case from early 2023 until the law firm of Greer, Herz and Adams, LLP was retained to represent me and my three colleagues, Judges Padilla, Johnson, and Garcia after October 30, 2025. I was not sent draft copies of monitor reports prior to the Ninth Report, when I had counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 31, 2026.

Paula Goodhart

Paula Goodhart

EXHIBIT
1-A


# G. Allan Van Fleet, P.C.

Attorney at Law

2228 Ship's Mechanic Row
Suite 307
Galveston, Texas 77550

(713) 826-1954
allanvanfleet@gmail.com

6218 Elm Heights Lane
Suite 201
Houston, Texas 77081


January 1, 2023

Hon. Paula Goodhart, CCCL No. 2
Hon. Leslie Johnson, CCCL No. 3
Hon. Erika Ramirez, CCCL No. 8
Hon. Juanita Jackson, CCCL No. 10
Hon. Jessica Padilla, CCCL No. 14

Dear Judges:

Congratulations on your recent elections.

Since January 2018, I have represented the Harris County Criminal Court at Law Judges ("CCCL Judges") in connection with *ODonnell v. Harris County, Texas*, Case No. 16-cv-01414 (S.D. Tex. 2019)(Rosenthal, C.J.). This representation has included negotiation of the Consent Decree entered November 21, 2019 (copy attached) and subsequent dealings with the Monitor and other parties in complying with the Decree.

You will learn more about the Consent Decree in the training that the Decree requires of CCCL Judges.

My work in the monitoring phase includes working with the Judges, as well as court administrators (especially Ed Wells and Sylvia Cherry), the Monitor, and the other *ODonnell* parties, to implement practices and procedures to comply with the Consent Decree. In doing so, I have represented the CCCL Judges as a collective body. On most issues, I work initially with the Presiding Judge, and the Judges then reach consensus; on some issues, the Judges adopt positions based on majority or super-majority vote. Obviously, if you (or any Judge) were to insist on taking a position contrary to your colleagues, I could not represent you, and you would need different counsel to represent you before the Monitor or Judge Rosenthal.

My representation also includes working with individual CCCL Judges from time to time to investigate and, if needed, act on potential violations of the Consent Decree (including violations of Local Rule 9, incorporated in the Decree) that may be raised by the Monitor or by Counsel for the Plaintiff Class or the Office of the Public Defender. So far, these individual incidents have been resolved. Obviously, if you (or any Judge) were to insist on taking a position that I believe contrary to the Consent Decree, I could not represent you, and you would need different counsel to represent you before the Monitor or Judge Rosenthal.

That said, I look forward to working with you to ensure compliance with the *ODonnell* Consent Decree.

Yours sincerely,

Allan Van Fleet

c: Hon. Genesis Draper, Presiding CCCL Judge
Hon. Alex Salgado, Co-Presiding CCCL Judge

CCCL Judges

Mr. Ed Wells
Ms. Sylvia Cherry

EXHIBIT
1-B

# G. Allan Van Fleet, P.C.

Attorney at Law

2228 Ship's Mechanic Row
Suite 307
Galveston, Texas 77550

(713) 826-1954
allanvanfleet@gmail.com

6218 Elm Heights Lane
Suite 201
Houston, Texas 77081

April 6, 2023

Hon. Paula Goodhart, CCCL No. 2
Hon. Erika Padilla, CCCL No. 14

Dear Judges:

Pursuant to my letter of January 1, 2023, this will confirm that I do not represent you in connection with the *ODonnell* Consent Decree.

Yours sincerely,

Allan Van Fleet

c: Hon. Genesis Draper, Presiding CCCL Judge
Hon. Alex Salgado, Co-Presiding CCCL Judge

Mr. Ed Wells
Ms. Sylvia Cherry

EXHIBIT
1-C

**From:** Padilla, Judge Jessica (CCL)
**To:** Fombonne, Jonathan (CAO)
**Cc:** Goodhart, Judge Paula (CCL)
**Subject:** RE: Counsel for Judge Goodhart and Judge Padilla
**Date:** Monday, November 13, 2023 4:57:29 PM
**Attachments:** image001.png
image004.png
image005.png
image006.png
image007.png
image013.png
image014.png
image015.png
image002.png
image012.png
image017.png
image018.png
image019.png
image020.png

---

Thank you,
Judge Goodhart will return on Thursday for us to talk. I have given Mr. Peebles your email and office number. He should contact you regarding his fee schedule.

Thank you

Best Regards,
Jessica N. Padilla

**The Honorable Jessica N. Padilla**
Presiding Judge, Harris County Criminal Court at Law No. 14

(832) 927-3425
1201 Franklin St., 11th Floor, Houston, Texas 77002
www.ccl.hctx.net

---

**From:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Sent:** Monday, November 13, 2023 3:35 PM
**To:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>
**Cc:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Subject:** RE: Counsel for Judge Goodhart and Judge Padilla

Hi Judge Padilla,

I'm happy to chat on the phone and discuss the selection of counsel.

Jon

***Jonathan G. C. Fombonne***
First Assistant County Attorney
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002
www.harriscountycao.org

*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

---

**From:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>
**Sent:** Thursday, November 2, 2023 11:56 AM
**To:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Cc:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Subject:** RE: Counsel for Judge Goodhart and Judge Padilla

Mr. Fombonne,
May we have insight to why no on Michael Kirk? We each would like a separate attorney as we do not want any conflicts of interest to arise in the future and have to start this process over. It would be helpful to understand the why when vetting other attorneys.

I will either have Peyton contact you regarding his rate or send it Monday. I am out of town today and have limited email access.

Thank you

Best Regards,
Jessica N. Padilla

**The Honorable Jessica N. Padilla**
Presiding Judge, Harris County Criminal Court at Law No. 14

(832) 927-3425
1201 Franklin St., 11th Floor, Houston, Texas 77002
www.ccl.hctx.net

**From:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Sent:** Thursday, November 2, 2023 10:49 AM
**To:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>
**Cc:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Subject:** RE: Counsel for Judge Goodhart and Judge Padilla

Hi Judges Padilla and Goodhart:

The County Attorney will not approve Michael Kirk. He will approve Mr. Peebles depending on the rate. Can you let me know what his rate is?

Thanks,

***Jonathan G. C. Fombonne***
First Assistant County Attorney
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002
www.harriscountycao.org

*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

**From:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>
**Sent:** Monday, October 30, 2023 9:08 AM
**To:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Cc:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Subject:** Counsel for Judge Goodhart and Judge Padilla

Mr. Fombonne,

This email is a follow-up to the telephone conversation Judge Goodhart and I had with you last week about getting authorization for counsel. We are currently parties to a federal consent decree and do not have representation as our colleagues do. There is a conflict of interest that necessitates us having separate counsel. We are requesting attorneys Peyton Peebles and Michael Kirk. Both gentleman are very familiar with the O'Donnell matter and will not require significant time to get up to speed. Mr. Peebles was the County Criminal Court at Law staff attorney during the litigation of O'Donnell and Mr. Kirk was one of the appellate attorneys. Here is a link to their websites and bios:

Peyton Peebles:

Peyton Peebles - Shellist Peebles McAlister (texaslegalteam.net)

Michael Kirk:

Michael W. Kirk - Cooper & Kirk, PLLC (cooperkirk.com)

Thank you for consideration in this matter.

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2
1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

Best Regards,
Jessica N. Padilla

**The Honorable Jessica N. Padilla**
Presiding Judge, Harris County Criminal Court at Law No. 14
(832) 927-3425
1201 Franklin St., 11th Floor, Houston, Texas 77002
www.ccl.hctx.net

EXHIBIT
1-D

**From:** Fombonne, Jonathan (CAO)
**To:** Padilla, Judge Jessica (CCL); Goodhart, Judge Paula (CCL)
**Cc:** Mintzer, Andrea (CAO)
**Subject:** RE: Counsel request for Judge Goodhart and Padilla
**Date:** Tuesday, April 23, 2024 2:52:53 PM
**Attachments:** image001.png
image007.png
image008.png
image009.png
image010.png
image012.png
image014.png
image002.png
image004.png
image005.png
image015.png

---

Judges Padilla and Goodhart,

Earlier today, the Commissioners Court declined to approve the requests for outside counsel. Please let me know if you'd like to discuss.

Best,

Jon

***Jonathan G. C. Fombonne***
First Assistant County Attorney
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002
www.harriscountycao.org

*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

**From:** Fombonne, Jonathan (CAO)
**Sent:** Monday, March 11, 2024 10:14 PM
**To:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>; Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Cc:** Mintzer, Andrea (CAO) <Andrea.Mintzer@harriscountytx.gov>
**Subject:** RE: Counsel request for Judge Goodhart and Padilla

Hi,

I haven't heard from either lawyer. The agenda deadline is March 18. I'm going to be out for spring break, but I've copied my assistant Andrea Mintzer who can help get the contracts finalized.

Best,

***Jonathan G. C. Fombonne***
First Assistant County Attorney
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002
www.harriscountycao.org

*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

---

**From:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>
**Sent:** Friday, March 1, 2024 8:29 AM
**To:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Subject:** RE: Counsel request for Judge Goodhart and Padilla

Andy Drumheller is the second attorney. We will have them send their rates. Thank you

Best Regards,
Jessica N. Padilla

**The Honorable Jessica N. Padilla**
Presiding Judge, Harris County Criminal Court at Law No. 14
(832) 927-3425
1201 Franklin St., 11th Floor, Houston, Texas 77002
www.ccl.hctx.net

---

**From:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Sent:** Thursday, February 29, 2024 3:25 PM
**To:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>; Goodhart, Judge Paula (CCL)

<Paula_Goodhart@ccl.hctx.net>
**Subject:** RE: Counsel request for Judge Goodhart and Padilla

Yes, we are. Are you still planning on both retaining Peyton Peebles? If so, please have him send me rates, hopefully discounted for government work (this is standard). I can also reach out to him if you'd prefer. If you have someone else in mind, please let me know.

After that, we will send the attorney our standard contract and place it on the agenda for 3/26.

Let me know if you have any questions.

Jon

***Jonathan G. C. Fombonne***
First Assistant County Attorney
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002
www.harriscountycao.org

*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

**From:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>
**Sent:** Thursday, February 29, 2024 2:40 PM
**To:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Subject:** Counsel request for Judge Goodhart and Padilla

Good afternoon,
I wanted to follow up to make sure we are on track for March 26 to present our request for outside counsel to Commissioner's Court. Please let us know if you need anything else from us.
Thank you
Jessica

**Best Regards,**
**Jessica N. Padilla**

**The Honorable Jessica N. Padilla**
Presiding Judge, Harris County Criminal Court at

Law No. 14

(832) 927-3425
1201 Franklin St., 11th Floor, Houston, Texas 77002
www.ccl.hctx.net

**From:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Sent:** Wednesday, December 13, 2023 11:27 AM
**To:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>; Menefee, Christian (CAO) <Christian.Menefee@harriscountytx.gov>
**Cc:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>
**Subject:** RE: Meeting request

Thank you Judge Goodhart. See you soon.

***Jonathan G. C. Fombonne***
First Assistant County Attorney
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002
www.harriscountycao.org

*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

**From:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Sent:** Tuesday, December 12, 2023 5:50 PM
**To:** Menefee, Christian (CAO) <Christian.Menefee@harriscountytx.gov>
**Cc:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>
**Subject:** Re: Meeting request

Good evening,

Judge Leslie Johnson will be joining us tomorrow as well. I look forward to speaking with you.

Paula Goodhart

Get Outlook for iOS

---

**From:** Menefee, Christian (CAO) <Christian.Menefee@harriscountytx.gov>
**Sent:** Monday, December 11, 2023 1:20:01 PM
**To:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Cc:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>
**Subject:** Re: Meeting request

Hey Judge - yes. Wednesday at 12:30pm works. Sending over a calendar invite shortly.

Get Outlook for iOS

---

**From:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Sent:** Monday, December 11, 2023 12:58:20 PM
**To:** Menefee, Christian (CAO) <Christian.Menefee@harriscountytx.gov>
**Cc:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>
**Subject:** Meeting request

Good afternoon,

In light of recent conversations with Mr. Peebles about the potential representation of me and Judge Padilla, I am respectfully requesting a meeting with the two of you to discuss our current situation. Are you available on Wednesday between 12:30 – 2:00? I don't anticipate it will be a lengthy meeting but we would like the opportunity to discuss legal representation. If you need to reach me by telephone, please feel free to call my cell at 713-819-6697.

Thank you,
Paula Goodhart

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2
1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

EXHIBIT
1-E

**From:** Goodhart, Judge Paula (CCL)
**Sent:** Mon, 28 Apr 2025 17:05:57 -0500
**To:** 'Grayson.Coker@senate.texas.gov'
**Subject:** Follow up

Good afternoon Grayson,

As requested, I am providing some follow up information regarding the misdemeanor bail situation in Harris County.

After many conversations with Grant Dorfman when he was at the AG's office, another Harris County judge and I had a zoom meeting with James Lloyd and Kimberly Gdula on 8/12/24. We expressed our concerns about the pervasive practice in Harris County of releasing individuals on a "general order bond" without any judicial review because of the O'Donnell consent decree. We were and are concerned that we are being forced to violate state law daily because of the decree. They expressed interest in either representing us or intervening because of a state interest. Since that meeting, I spoke to Ms. Gdula on 11/19/24, 12/10/24 and 3/17/25. I left numerous messages including on 4/8, 4/15 and 4/23, two days after the deputy was shot by the individual released on 4/16 without an individualized bail hearing on his misdemeanor case. I have not heard from the AG's office since our conversation in March, so I do not know where they stand. We would appreciate their assistance in this matter as the Harris County Commissioners refuse to provide counsel for us to appear in federal court.

Additionally, because of ethical concerns about the current situation, I requested an opinion from the Texas State Bar committee on judicial ethics. They declined to offer an advisory opinion about whether we were violating the Judicial Code of Conduct.

I reviewed the current text of SB9. It does not appear to impact class A and B misdemeanor bail. Currently article 17.028 clearly sets out the requirement that a magistrate shall consider all the factors listed in 17.15(a) in an individualized hearing before determining bail. Additionally, it mandates that a standing order related to bail is prohibited. However, the O'Donnell decree and the current County Criminal Court at Law local rule 9 require most individuals be released without an individualized hearing and the bail document ordering the sheriff to release these individuals is a standing order pre-signed by an associate judge and populated in each case by the sheriff's office. SB9 proposes an amendment to Art. 17.21 (Bail in Felony) that prohibits a sheriff from releasing someone charged with a felony unless they appear before a magistrate and the magistrate has considered the public safety report. Would it be possible to add the same language to Art. 17.20 (Bail in Misdemeanor) so the sheriff would be violating the law if he releases misdemeanor defendants without appearing before a magistrate? The commissioners do not seem concerned with the judges violating state law and hide behind the decree. They may feel differently about the sheriff violating the law.

Harris County judges agreed to the federal consent decree settlement in 2019. When the state law changed and SB6 passed, it conflicted with the settlement and the judges did nothing to remedy the situation despite being told by their staff attorney that the judges' local rule 9 and the

consent decree violated state law. Perhaps some stronger discipline language in the accountability bill would motivate those who signed the settlement to re-think their position.

Thank you for your consideration in this matter. Any assistance you can provide us would be greatly appreciated. I am available to answer any questions you may have and provide additional examples of egregious violations of state law because of the decree.

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2

1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

EXHIBIT
1-F

**From:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Sent:** Tuesday, April 29, 2025 1:29 PM CDT
**To:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Subject:** RE: Harris County Consent Decree

Yes, I am available at 3:00 tomorrow.

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2
1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

**From:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Sent:** Tuesday, April 29, 2025 11:01 AM
**To:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Cc:** Stott, Cory (CCL) <Cory_Stott@ccl.hctx.net>; Wells, Ed (CCL) <Ed_Wells@ccl.hctx.net>; Cherry, Sylvia (CCL) <Sylvia_Cherry@ccl.hctx.net>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>; Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>
**Subject:** RE: Harris County Consent Decree

Hi Judge Goodhart,

Could speak at 3pm tomorrow?

Jon

***Jonathan G. C. Fombonne***
Deputy County Attorney & First Assistant
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002
cao.harriscountytx.gov

*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

**From:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Sent:** Monday, April 28, 2025 2:03 PM


HC-002528

**To:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Cc:** Stott, Cory (CCL) <Cory_Stott@ccl.hctx.net>; Wells, Ed (CCL) <Ed_Wells@ccl.hctx.net>; Cherry, Sylvia (CCL) <Sylvia_Cherry@ccl.hctx.net>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>; Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>
**Subject:** RE: Harris County Consent Decree

Good afternoon Johanthan,

When are you available to meet in the afternoon this week?

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2

1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

**From:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Sent:** Monday, April 28, 2025 11:55 AM
**To:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Cc:** Stott, Cory (CCL) <Cory_Stott@ccl.hctx.net>; Wells, Ed (CCL) <Ed_Wells@ccl.hctx.net>; Cherry, Sylvia (CCL) <Sylvia_Cherry@ccl.hctx.net>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>; Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>
**Subject:** RE: Harris County Consent Decree

Judge Goodhart,

We'd be happy to discuss. To go back to your prior email, I don't believe we said that we were conflicted on providing general legal advice on the consent decree – just that our office wouldn't be able to challenge the continuing validity of the consent decree. As you'll recall, we asked commissioners court for outside counsel for you to do so, but commissioners court declined to approve that contract.

Should we set up a time to discuss? The answer to your question itself is straightforward, and the monitor's answer is the same as the one we would give. It's a final order from a federal court and will stay in place unless it's modified or otherwise changed. I think the question you're asking is whether there are grounds to modify the consent decree given SB6. I'd be happy to discuss that with you.

Jon

***Jonathan G. C. Fombonne***
Deputy County Attorney & First Assistant
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002
cao.harriscountytx.gov

*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

---

**From:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Sent:** Monday, April 28, 2025 11:10 AM
**To:** Brandon Garrett <bgarrett@law.duke.edu>; 'sgthompson@central.uh.edu' <sgthompson@central.uh.edu>
**Cc:** Stott, Cory (CCL) <Cory_Stott@ccl.hctx.net>; Wells, Ed (CCL) <Ed_Wells@ccl.hctx.net>; Cherry, Sylvia (CCL) <Sylvia_Cherry@ccl.hctx.net>; Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>; Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>
**Subject:** RE: Harris County Consent Decree

Good morning,

Considering your refusal to provide the legal authority for the continuation of the decree given the significant changes in state law and the O'Donnell case, I look forward to receiving this information from the County Attorney's office. Mr. Fombonne, when can I expect to receive this information from your office?

Thank you for your consideration in this matter.

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2

1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

---

**From:** Brandon Garrett <bgarrett@law.duke.edu>
**Sent:** Friday, April 25, 2025 9:46 AM
**To:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>; 'sgthompson@central.uh.edu' <sgthompson@central.uh.edu>
**Cc:** Stott, Cory (CCL) <Cory_Stott@ccl.hctx.net>; Wells, Ed (CCL) <Ed_Wells@ccl.hctx.net>; Cherry, Sylvia (CCL) <Sylvia_Cherry@ccl.hctx.net>; Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>; Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>
**Subject:** Re: Harris County Consent Decree

Many thanks Judge,

As far as the status of the consent decree, any consent decree remains in place unless modified by the parties with approval of the judge. It is a final judgment settling a federal case.

But, unlike the County Attorney, we cannot give you legal advice or opinions; we are monitors reporting to the federal judge in the case, and not counsel to any of the parties in the case.

All the best,

Brandon

--
Brandon L. Garrett | L. Neil Williams Professor of Law
Faculty director, Wilson Center for Science and Justice | @WilsonCSJ_
https://wcsj.law.duke.edu
Duke University School of Law
210 Science Drive | Durham, NC | 27708-0373
**P** | 919.613.7090
**E** | bgarrett@law.duke.edu
**W** | http://www.brandonlgarrett.com/

WILSON
CENTER FOR SCIENCE AND JUSTICE
AT DUKE LAW

---

**From:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Date:** Thursday, April 24, 2025 at 4:41 PM
**To:** Brandon Garrett <bgarrett@law.duke.edu>, 'sgthompson@central.uh.edu' <sgthompson@central.uh.edu>
**Cc:** Stott, Cory (CCL) <Cory_Stott@ccl.hctx.net>, Wells, Ed (CCL) <Ed_Wells@ccl.hctx.net>, Cherry, Sylvia (CCL) <Sylvia_Cherry@ccl.hctx.net>, Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>, Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>, Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>
**Subject:** RE: Harris County Consent Decree

Good afternoon Brandon,

Thank you for forwarding this to Mr. Fombonne and his colleagues at the County Attorney's Office. Unfortunately, he previously indicated that his office is unable to provide legal advice and representation for me concerning the O'Donnell decree. As the monitor, are you not able or equipped to answer this question? I assume you have considered questions like this considering recent changes to Texas law and federal opinions related to O'Donnel. I look forward to your response.

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2

1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

**From:** Brandon Garrett <bgarrett@law.duke.edu>
**Sent:** Thursday, April 24, 2025 9:12 AM
**To:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>; 'sgthompson@central.uh.edu' <sgthompson@central.uh.edu>
**Cc:** Stott, Cory (CCL) <Cory_Stott@ccl.hctx.net>; Wells, Ed (CCL) <Ed_Wells@ccl.hctx.net>; Cherry, Sylvia (CCL) <Sylvia_Cherry@ccl.hctx.net>; Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>; Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>
**Subject:** Re: Harris County Consent Decree

Hello Judge,

Thank you for reaching out. I am cc'ing Jonathan Fombonne and colleagues at the county attorney's office, who can answer any questions that you have about federal consent decrees, and the ODonnell Decree in particular,

All the best,

Brandon Garrett

---

**From:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Date:** Wednesday, April 23, 2025 at 1:43 PM
**To:** Brandon Garrett <bgarrett@law.duke.edu>, 'sgthompson@central.uh.edu' <sgthompson@central.uh.edu>
**Cc:** Stott, Cory (CCL) <Cory_Stott@ccl.hctx.net>, Wells, Ed (CCL) <Ed_Wells@ccl.hctx.net>, Cherry, Sylvia (CCL) <Sylvia_Cherry@ccl.hctx.net>
**Subject:** Harris County Consent Decree

Good afternoon,

As you may be aware, a Harris County Deputy Constable was shot on Monday. The individual accused of shooting Deputy Jones was released on April 16 on a general order bond. He did not go in front a magistrate for bail consideration before his release, as required by Texas law. Please provide me the legal authority you rely on to perpetuate the decree despite state law that requires all class A and B misdemeanor arrestees to have an individualized bail hearing. Thank you for your consideration in this matter.

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2

1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

EXHIBIT
1-G

**From:** Goodhart, Judge Paula (CCL)
**Sent:** Wed, 9 Jul 2025 09:57:15 -0500
**To:** Johnson, Judge Leslie (CCL); Garcia,Judge Linda (CCL); Padilla, Judge Jessica(CCL)
**Subject:** FW: Follow up - legal issues - consent decree
**Attachments:** kp0027.pdf

Leslie,

Here is the email from the County Attorney's Office.

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2

1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

**From:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Sent:** Thursday, June 26, 2025 3:00 PM
**To:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Cc:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>; Garcia, Judge Linda (CCL) <Linda_Garcia@ccl.hctx.net>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>
**Subject:** RE: Follow up - legal issues - consent decree

Thank you for your patience. Please see below:

**Questions Presented**

You have asked several questions regarding the consent decree. As we have discussed, the County Attorney's Office can provide you with answers to these questions: (1) What are a judge's obligations to comply with a federal consent decree and corresponding order if it potentially conflicts with state law; (2) are County Criminal Court at Law Judges who were not parties to the consent decree bound by the terms of the *ODonnell* settlement and consent decree?; (3) provide Attorney General authority on whether the County Attorney must represent judges in proceedings before the Commission on Judicial Conduct; and (4) whether a judge retains judicial immunity for personal civil suits for bond decisions made in compliance with a consent decree that might conflict with state law. The County Attorney's Office is unable to opine on any issues related to modification of the consent decree.

## I. A consent decree is an enforceable judicial decree subject to the rules of other judgments and decrees.

"A settlement agreement, once entered into, cannot be repudiated by either party and will be summarily enforced." *United States v. City of New Orleans*, 731 F.3d 434, 439 (5th Cir. 2013) (citing *White Farm Equipment Co. v. Kupcho*, 792 F.2d 526, 530 (5th Cir. 1986)). Consent decrees carry even more weight than settlement agreements because they have been given "due consideration by the district court, and once approved, have the force of a legal judgment." *Id.* (citing *Cavallini v. State Farm Mutual Auto Insurance Co.*, 44 F.3d 256, 268 (5th Cir. 1995)). Even if litigants agreed to change the terms of a consent decree, a federal court could reject the request and refuse to "do their bidding." *Id.* (citing *League of United Latin American Citizens Council No. 4434 v. Clements,* 999 F.2d 831, 845 (5th Cir.1993) (en banc) (citations omitted)).

Thus, a consent decree is "a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 391 (1992). It is an "enforceable, final judgment with the force of res judicata" that "may not lawfully be revised, overturned or refused faith and credit by another Department of Government." *Mi Familia Vota v. Fontes*, 111 F.4th 976, 982 (9th Cir. 2024) (citations and quotations omitted, cleaned up). If a party violates a consent decree, the issuing court can hold him in contempt. *International Association of Firefighters*, 478 U.S. 501, 523, 530 (1986) ("the parties to the decree can be held in contempt of court for failure to comply with its terms").

When parties enter a consent decree, they can agree to terms that are broader than the law requires, and a court interprets a consent decree based on the contract law of the state where the decree is governed. *Allen v. Louisiana*, 14 F.4th 366, 371 (5th Cir. 2021). In *Local No. 93*, a city entered a consent decree to resolve employment discrimination complaints against the fire department. A firefighters' union challenged the decree because it went beyond what was required by Title VII. The Supreme Court examined the legislative history of Title VII and found that "a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial." *Local No. 93, Intern. Association of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525 (1986). See also, *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 439 (2004) (State officials can agree to take steps not required by federal law as long as the agreement's purpose was to vindicate federal law.)

As long as the *ODonnell* Consent Decree is in effect, the Harris County Criminal Court at Law Judges are required to follow it under penalty of contempt of court.

## II. Substitution of parties to a federal lawsuit.

Federal Rule of Civil Procedure 25(d) states that "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party." In *ODonnell*, the Harris County Criminal Court at Law judges were sued in both their official capacities.

Accordingly, County Criminal Court at Law Judges who are not parties to the consent decree but later won those offices by election were automatically substituted as parties.

*Jones v. Gusman*, explains this concept in succinct and relevant fashion. No. 12-859, 2023 WL 11910564 (E.D. La. Sept. 5, 2023). In that case, the Sheriff of Orleans Parish challenged the terms of a consent decree regarding the medical and mental health care of inmates at the Orleans Parish Jail. *Id.* at *1. In denying the Sheriff's motion, the court also specifically rejected the Sheriff's argument that she was not a party to the consent decree because a different person was the duly elected Sheriff of Orleans Parish at the time. *Id.* at *5-6. The Court explained that under Rule 25(d) "even where the party in litigation has actually changed, substituted parties 'must stand in [the] shoes [of predecessor litigants] with respect to all phases of the litigation. The fact that [a predecessor's] litigation may have impaired or adversely affected the rights of [a current party] would not justify [ ] disturbing all prior orders and decrees entered in [the] controversy and unfavorable to [a current party], which were binding on [the predecessor] when made.'" *Id.* at *6 (citing *Deauville Assocs., Inc. v. Murrell*, 180 F.2d 275, 277 (5th Cir. 1950)). As relevant here, the Court ended by stating: "the Sheriff's theory that a 'successor official should not be bound by its predecessor's decisions in a consent decree, especially when their views of the relief differ' lacks merit. There is no legal basis to suggest that the authority of a federal court to enforce its prior orders depends upon the outcome of a local election." *Id.*

## III. Obligation to provide representation in CJC proceedings.

In KP-0027, the Texas Attorney General considered whether the county (through a county attorney or district attorney otherwise) was obligated to represent a county judge in disciplinary proceedings before the State Commission on Judicial Conduct pursuant to Local Government Code 157.901(a). That statute requires the county to represent a county official when they have been sued for an action arising from the performance of public duty. The Attorney General opined that the county was not obligated to represent the judge in CJC proceedings because CJC proceedings did not constitute a suit. Following these statutes the guidance interpreting them, our offices has declined to represent county judges in CJC disciplinary proceedings.

Representation by the Harris County Attorney's office is also governed by Local Government Code 45.201, which provides that the County Attorney's primary duty is to represent "officials of Harris County in all civil matters pending before *the courts of Harris County and any other courts* in which the state, the county, or the officials of the county have matters pending." (emphasis added). Should a CJC decision be appealed to a court, review tribunal, or special court of review, the County Attorney will consider the circumstances under which it is obligated to represent a county judge.

## IV. A judge retains judicial immunity from personal civil suits for bond decisions made in compliance with a consent decree that might conflict with state law.

Judicial immunity is a longstanding concept designed to assure judicial independence:

> Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial

> jurisdiction… This immunity applies even when the judge is accused of acting maliciously and corruptly, and 'it is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences.'

*Pierson v. Ray*, 386 U.S. 547, 553-54 (1967) (internal citations omitted).

Judicial immunity is absolute immunity from liability in federal civil lawsuits. As the Supreme Court explained in *Dennis*:

> Based on the doctrine expressed in *Bradley v. Fisher*, 13 Wall. 335, 20 L.Ed. 646 (1872), this Court has consistently adhered to the rule that "judges defending against § 1983 actions enjoy absolute immunity from damages liability for acts performed in their judicial capacities. *Pierson v. Ray*, 386 U.S. 547 [87 S.Ct. 1213, 18 L.Ed.2d 288] (1967); *Stump v. Sparkman*, 435 U.S. 349 [98 S.Ct. 1099, 55 L.Ed.2d 331] (1978)."

*Dennis v. Sparks*, 449 U.S. 24, 27, 101 S. Ct. 183, 186, 66 L. Ed. 2d 185 (1980) (internal citations omitted).

Judicial immunity extends not only to judges, but to non-judges when they are act in a judicial or quasi-judicial capacity. *Blakely v. Andrade*, 360 F. Supp. 3d 453, 476-77 (N.D. Tex. 2019). Texas county magistrate judges are entitled to judicial immunity, as are court coordinators and anyone else who performs judicial functions. *Id*. See also, *Brown v. United States Postal Inspection Serv*., 206 F. Supp. 3d 1234, 1253 (S.D. Tex. 2016) (absolute immunity extends to any officer who is an integral part of the judicial process, such as prosecutors, clerks, bailiffs, constables issuing writs, court-appointed receivers and trustees, and sheriffs executing judicial orders).

Judicial immunity covers any decision that a judge makes in performing judicial duties. *Nixon v. Fitzgerald*, 457 U.S. 731, 745-746 (1982). This includes when judges make grave procedural errors. *Mitchell v. McBryde*, 944 F.2d 229, 230 (5th Cir. 1991). It extends even to judges who lack discretion to make their rulings. *Lancaster v. Harris County*, 821 Fed. Appx. 267, 270 (5th Cir. 2020).

A judicial officer's bail decision is a clear judicial function subject to this immunity. The Southern District of Texas explained in *Leverton* that a judge's decision to increase bail is "a judicial act well withing the scope of judicial functions" and that the judge setting bail is "absolutely immune to damages under Section 1983." *Leverton v. Garner*, No. CIV.A. G-05-295, 2006 WL 1350243, at *2 (S.D. Tex. May 15, 2006).

Thus, Harris County judges would retain judicial immunity against civil liability for complying with the *ODonnell* Consent Decree in making bail decisions.

**_Jonathan G. C. Fombonne_**
Deputy County Attorney & First Assistant
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002
cao.harriscountytx.gov

*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

---

**From:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Sent:** Thursday, June 12, 2025 9:40 AM
**To:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Cc:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>; Garcia, Judge Linda (CCL) <Linda_Garcia@ccl.hctx.net>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>
**Subject:** RE: Follow up - legal issues - consent decree

Good morning,

When can we expect a follow up to our request?

Thank you,

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2

1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

---

**From:** Goodhart, Judge Paula (CCL)
**Sent:** Tuesday, June 3, 2025 10:23 AM
**To:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Cc:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>; Garcia, Judge Linda (CCL) <Linda_Garcia@ccl.hctx.net>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>
**Subject:** RE: Follow up - legal issues - consent decree

Yes please. It will be appreciated.

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2

1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

**From:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Sent:** Monday, June 2, 2025 10:55 PM
**To:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Cc:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>; Garcia, Judge Linda (CCL) <Linda_Garcia@ccl.hctx.net>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>
**Subject:** RE: Follow up - legal issues - consent decree

Judge Goodhart,

We're endeavoring to provide you a write up this week. Given your email to the monitor from Friday, would you still like to receive this write-up?

Thanks,

Jon

***Jonathan G. C. Fombonne***
Deputy County Attorney & First Assistant
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002

cao.harriscountytx.gov

*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

**From:** Fombonne, Jonathan (CAO)
**Sent:** Monday, May 12, 2025 3:13 PM
**To:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Cc:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>; Garcia, Judge Linda (CCL) <Linda_Garcia@ccl.hctx.net>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>
**Subject:** RE: Follow up - legal issues - consent decree

Thanks Judge Goodhart. We're looking to get you a write-up in the next couple of weeks.

Also, just to frame the first question as I have written it: What are the judge's obligations to comply with a federal consent decree and corresponding order when it potentially conflicts with state law.


***Jonathan G. C. Fombonne***
Deputy County Attorney & First Assistant
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002
cao.harriscountytx.gov


*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

**From:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Sent:** Wednesday, May 7, 2025 2:32 PM
**To:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Cc:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>; Garcia, Judge Linda (CCL) <Linda_Garcia@ccl.hctx.net>
**Subject:** Follow up - legal issues - consent decree

Good afternoon Jonathan,

Thank you for meeting with us last week on Teams. At the conclusion of the meeting, you committed to provide us with the following information:

1. The legal authority that holds that when a federal consent decree is in direct conflict with state law, the decree prevails,
2. The federal rule that automatically substituted us as parties to the settlement when we were elected,
3. The Attorney General's memo that you referenced regarding representation, and
4. Your evaluation of whether our judicial immunity is penetrable if we violate state law regarding bail requirements.

When can we expect a response? Please let me know if you need any additional information. Thank you for your time and attention to this matter.

Paula Goodhart

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2

1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

**1-H**

**From:** Fombonne, Jonathan (CAO)
**Sent:** Tue, 2 Sep 2025 11:35:53 -0500
**To:** Goodhart, Judge Paula (CCL)
**Cc:** Padilla, Judge Jessica (CCL); Johnson,Judge Leslie (CCL); Garcia, Judge Linda(CCL)
**Subject:** RE: ODonnell Motion to Intervene
**Attachments:** RE_ 2nd Request for Counsel for Judges Goodhart, Padilla adding Garcia and Johnson.msg

Judge Goodhart,

I responded to your email on Friday (see attached). I would put a placeholder on the agenda for the 9/9 Court meeting today if possible.

Jon

***Jonathan G. C. Fombonne***
Deputy County Attorney & First Assistant
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002
cao.harriscountytx.gov

*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

---

**From:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Sent:** Tuesday, September 2, 2025 10:32 AM
**To:** cody@civilrightscorps.org; Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>; Johnson, Judge Leslie (CCL) <Leslie_Johnson@ccl.hctx.net>; Garcia, Judge Linda (CCL) <Linda_Garcia@ccl.hctx.net>
**Cc:** Elizabeth Rossi <elizabeth@civilrightscorps.org>
**Subject:** RE: ODonnell Motion to Intervene

Good morning Cody,

I do not feel comfortable joining a motion without representation of counsel, particularly since the judicial code of conduct prohibits me from practicing law while I am a sitting judge. I included Jonathan Fombonne on this email. We made a request to the County Attorney's office for representation and are awaiting approval.

Thank you,

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2

1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

**From:** Cody Cutting <cody@civilrightscorps.org>
**Sent:** Tuesday, September 2, 2025 9:25 AM
**To:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>; Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>; Johnson, Judge Leslie (CCL) <Leslie_Johnson@ccl.hctx.net>; Garcia, Judge Linda (CCL) <Linda_Garcia@ccl.hctx.net>
**Cc:** Elizabeth Rossi <elizabeth@civilrightscorps.org>
**Subject:** Re: ODonnell Motion to Intervene

Good morning,

I plan to file this today. If you would like to join the motion along with the AG and other parties, please let me know.

Thank you,
Cody

On Fri, Aug 29, 2025 at 4:21 PM Cody Cutting <cody@civilrightscorps.org> wrote:

Good afternoon Judges,

Do you intend to join the previously attached motion? I can also omit you if you would prefer.

Thank you,
Cody

On Fri, Aug 29, 2025 at 2:50 PM Joe Nwaokoro <Joe.Nwaokoro@oag.texas.gov> wrote:

Good afternoon, Cody –

Sorry for the late response but no objection. We'll join in the motion.

Thanks,
Joe

Best regards,

Joe Nwaokoro
Attorney| General Litigation Division|P.O. Box 12548, Austin, Texas 78711-2548 |
Phone: 512.979.5382|Fax: 512.477.2348 |Email: joe.nwaokoro@oag.texas.gov

**PRIVILEGED AND CONFIDENTIAL**: This communication may be confidential and/or privileged pursuant to Government Code sections 552.101, 552.103, 552.107, and 552.111, and should not be disclosed without the express authorization of the Attorney General.

**From:** Cody Cutting <cody@civilrightscorps.org>
**Sent:** Friday, August 29, 2025 12:56 PM
**To:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Cc:** Allan Van Fleet <allanvanfleet@gmail.com>; Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>; nmanne@susmangodfrey.com; alec@civilrightscorps.org; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>; Certain, Arlisa (CAO) <Arlisa.Certain@harriscountytx.gov>; dustin@texascivilrightsproject.org; travis <travis@texascivilrightsproject.org>; mfogler@foglerbrar.com; Jones, Veronica (CAO) <Veronica.Jones@harriscountytx.gov>; Mary Sifuentes <Mary.Sifuentes@oag.texas.gov>; Joe Nwaokoro <Joe.Nwaokoro@oag.texas.gov>; Elizabeth Rossi <elizabeth@civilrightscorps.org>; Paula_Goodhart@ccl.hctx.net; jessica_padilla@ccl.hctx.net; linda_garcia@ccl.hctx.net; leslie_johnson@ccl.hctx.net
**Subject:** Re: ODonnell Motion to Intervene

I am adding Judges Goodhart, Padilla, Johnson, and Garcia to this thread.

Attached is a draft motion and scheduling order.

Joe, will the AG join this motion?

On Fri, Aug 29, 2025 at 1:05 AM Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov> wrote:

> No objection.

**_Jonathan G. C. Fombonne_**
Deputy County Attorney & First Assistant
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002
cao.harriscountytx.gov

*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

---

**From:** Allan Van Fleet <allanvanfleet@gmail.com>
**Sent:** Thursday, August 28, 2025 12:32 PM
**To:** cody@civilrightscorps.org; Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>; nmanne@susmangodfrey.com; alec@civilrightscorps.org; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>; Certain, Arlisa (CAO) <Arlisa.Certain@harriscountytx.gov>; Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; dustin@texascivilrightsproject.org; travis <travis@texascivilrightsproject.org>; mfogler@foglerbrar.com; Jones, Veronica (CAO) <Veronica.Jones@harriscountytx.gov>; Mary Sifuentes <Mary.Sifuentes@oag.texas.gov>; Joe.Nwaokoro@oag.texas.gov; Elizabeth Rossi <elizabeth@civilrightscorps.org>
**Subject:** Re: ODonnell Motion to Intervene

No objection

**G. Allan Van Fleet, P.C.**

2228 Ship's Mechanic Row, Suite 307

Galveston, Texas 77550

6218 Elm Heights Lane, Suite 201

Houston, Texas 77081

713.826.1954

allanvanfleet@gmail.com

Linkedin

---

**From:** Cody Cutting <cody@civilrightscorps.org>
**Sent:** Thursday, August 28, 2025 12:13 PM
**To:** rachel.fraser@cao.hctx.net <rachel.fraser@cao.hctx.net>; nmanne@susmangodfrey.com <nmanne@susmangodfrey.com>; alec@civilrightscorps.org <alec@civilrightscorps.org>; allanvanfleet@gmail.com <allanvanfleet@gmail.com>; Seth.Hopkins@harriscountytx.gov <Seth.Hopkins@harriscountytx.gov>; Arlisa.Certain@harriscountytx.gov <Arlisa.Certain@harriscountytx.gov>; jonathan.fombonne@harriscountytx.gov <jonathan.fombonne@harriscountytx.gov>; dustin@texascivilrightsproject.org <dustin@texascivilrightsproject.org>; travis@texascivilrightsproject.org <travis@texascivilrightsproject.org>; mfogler@foglerbrar.com <mfogler@foglerbrar.com>; Veronica.Jones@harriscountytx.gov <Veronica.Jones@harriscountytx.gov>; Mary Sifuentes <Mary.Sifuentes@oag.texas.gov>; Joe.Nwaokoro@oag.texas.gov <Joe.Nwaokoro@oag.texas.gov>; Elizabeth Rossi <elizabeth@civilrightscorps.org>
**Subject:** ODonnell Motion to Intervene

Good afternoon,

Plaintiffs propose filing a joint schedule for briefing the AG's motion to intervene, with response briefs due 9/16 and any reply due 9/23. If the court grants any part of the AG's motion, we can confer regarding a schedule for the motion to vacate, including any necessary fact development and a briefing schedule.

Please let me know by tomorrow at 12pm if you have any objection to that schedule. Otherwise, I can circulate a short joint motion.

Thanks,
Cody

--

**Cody Cutting |** *Attorney*

Pronouns: he/him

**Civil Rights Corps**

Direct: 413-695-3444

**From:** Fombonne, Jonathan (CAO)
**Sent:** Fri, 29 Aug 2025 16:59:10 -0500
**To:** Padilla, Judge Jessica (CCL); Menefee,Christian (CAO)
**Cc:** Goodhart, Judge Paula (CCL); Garcia,Judge Linda (CCL); Johnson, Judge Leslie (CCL)
**Subject:** RE: 2nd Request for Counsel for Judges Goodhart, Padilla adding Garcia and Johnson

Good afternoon Judge Padilla,

Please put a placeholder for the next Commissioners Court agenda requesting counsel. Do you have counsel in mind? Let me know if you'd like to discuss the process for adding this item to the agenda.

We will advise the Commissioners Court on whether they have a legal obligation to pay for counsel given the changed circumstances.

Have a great weekend,
Jon

***Jonathan G. C. Fombonne***
Deputy County Attorney & First Assistant
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002
cao.harriscountytx.gov

*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

---

**From:** Padilla, Judge Jessica (CCL) <Jessica_Padilla@ccl.hctx.net>
**Sent:** Thursday, August 28, 2025 1:44 PM
**To:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; Menefee, Christian (CAO) <Christian.Menefee@harriscountytx.gov>
**Cc:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>; Garcia, Judge Linda (CCL) <Linda_Garcia@ccl.hctx.net>; Johnson, Judge Leslie (CCL) <Leslie_Johnson@ccl.hctx.net>
**Subject:** RE: 2nd Request for Counsel for Judges Goodhart, Padilla adding Garcia and Johnson

Good afternoon,
I am following up on the status of our request – please see below.
Thank you,

Best Regards,
Jessica N. Padilla

**The Honorable Jessica N. Padilla**
Presiding Judge, Harris County Criminal Court at Law No. 14

(832) 927-3425
1201 Franklin St., 11th Floor, Houston, Texas 77002
www.ccl.hctx.net

---

**From:** Padilla, Judge Jessica (CCL)
**Sent:** Wednesday, August 27, 2025 2:45 PM
**To:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; Menefee, Christian (CAO) <Christian.Menefee@harriscountytx.gov>
**Cc:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>; Garcia, Judge Linda (CCL) <Linda_Garcia@ccl.hctx.net>; Johnson, Judge Leslie (CCL) <Leslie_Johnson@ccl.hctx.net>
**Subject:** 2nd Request for Counsel for Judges Goodhart, Padilla adding Garcia and Johnson

Mr. Fombonne,

We write to request, for a second time, your office's facilitation of funds to secure independent legal representation for ourselves regarding the ongoing O'Donnell federal consent decree proceedings.

As you are aware, your office is unable to represent us in this matter due to a clear conflict of interest. Despite our repeated concerns and requests, our interests remain unrepresented. The Attorney General has filed a motion to intervene, which will inevitably trigger a court date and hearing. Without counsel, our interests are not represented in proceedings that directly affect our judicial duties, our courts, and the administration of justice in Harris County.

We urge you to take prompt action to authorize or secure county funding for the retention of private counsel who can represent our collective interests. Any delay jeopardizes our ability to respond appropriately to filings and could have lasting consequences on the outcome of this matter and the operation of our courts.

We respectfully request confirmation that arrangements to secure funding for private legal representation will be made immediately.

Thank you for your prompt attention to this request.

Best Regards,

Jessica N. Padilla

**The Honorable Jessica N. Padilla**
Presiding Judge, Harris County Criminal Court at Law No. 14
(832) 927-3425
1201 Franklin St., 11th Floor, Houston, Texas 77002
www.ccl.hctx.net

EXHIBIT
2

**From:** Allan Van Fleet <allanvanfleet@gmail.com>
**To:** "Fraser, Rachel (CAO)" <Rachel.Fraser@harriscountytx.gov>, Brandon Garrett <bgarrett@law.duke.edu>, "Carmichael, Dottie" <dottie@tamu.edu>, "Guerra Thompson, Sandra (JAD)" <Sandra.GuerraThompson@jad.hctx.net>, "cody@civilrightscorps.org" <cody@civilrightscorps.org>, "Dougherty, Patrick (HCSO)" <Patrick.Dougherty@sheriff.hctx.net>, "Hopkins, Seth (CAO)" <Seth.Hopkins@harriscountytx.gov>, "Jimenez, Victoria (HCSO)" <Victoria.Jimenez@sheriff.hctx.net>, "Wood, Sarah (PDO)" <Sarah.Wood@pdo.hctx.net>, "Bradley, Suzanne (CAO)" <Suzanne.Bradley@harriscountytx.gov>, "Giordanelli, Michael (OJS)" <Michael.Giordanelli@harriscountytx.gov>
**Cc:** "Genesis_Draper@ccl.hctx.net" <Genesis_Draper@ccl.hctx.net>, "Salgado, Judge Alex (CCL)" <Alex_Salgado@ccl.hctx.net>
**Subject:** RE: Bail Order Issue
**Date:** Tue, 18 Apr 2023 14:09:13 -0500
**Inline-Images:** image001.jpg

---

I have shared this with Presiding Judge Draper and Co-Presiding Judge Salgado.

Please note, however, that I no longer represent Judge Goodhart (Court 2) or Judge Padilla (Court 14).

Best regards,

avf

**G. Allan Van Fleet, P.C.**

2228 Ship's Mechanic Row, Suite 307
Galveston, Texas 77550

6218 Elm Heights Lane, Suite 201
Houston, Texas 77081

713.826.1954
allanvanfleet@gmail.com
Linkedin

**From:** Fraser, Rachel (CAO)
**Sent:** Tuesday, April 18, 2023 1:31 PM
**To:** Allan Van Fleet; Brandon Garrett; Carmichael, Dottie; Guerra Thompson, Sandra (JAD); cody@civilrightscorps.org; Dougherty, Patrick (HCSO); Hopkins, Seth (CAO); Jimenez, Victoria (HCSO); Wood, Sarah (PDO); Bradley, Suzanne (CAO); Giordanelli, Michael (OJS)
**Subject:** FW: Bail Order Issue

Good Afternoon:

Natalie Ware called me earlier today and we spoke over the telephone about the issues below. I am circulating her concerns regarding bail reviews, bail orders and materials being circulated in County Courts regarding the same issue in advance of our Thursday call. Please forward to anybody I may have missed.

Warmest Regards,



PLS_007313

RF

**From:** Rogers, Morgan (MAC) <Morgan.Rogers@mac.hctx.net>
**Sent:** Tuesday, April 18, 2023 12:51 PM
**To:** Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>
**Cc:** Ware, Natalie (MAC) <Natalie.Ware@mac.hctx.net>
**Subject:** Bail Order Issue

Hey, Rachel – thank you again for taking the time to meet with us on this issue.

To recap, we have recently learned that attorneys on our list are occasionally receiving appointments to in custody clients who are not present in court for their initial/bail hearing, and the court is nonetheless requiring that a bail order be filed. This was initially brought to our attention via the appointment request process. In these instances, the court coordinator is submitting a request through the FDAMS appointment system for an appointed attorney. In the notes section that allows for an informational note be sent to the eventual appointed attorney, the coordinator is at times writing something like, "Defendant not brought to court. Come by to sign the bail order."

On this bail order, the court is selecting the box **"The Defendant requested a bail hearing be continued to X date"** and is then seeking/requiring the attorney's signature. (Sample attached). We have seen this occur in Courts 2 and 14, although there may be others. At least in Court 2, these bail orders are generated by the coordinator electronically and the attorneys are made to sign via a small electronic pad. This practice prevents the attorney from being able to see what they are signing.

**Why this is an issue:**

1. The client is not present and the attorney is newly appointed, so any indication that the client is requesting a reset is false.
2. A potential consequence to the attorney filing a false document ranges from bar complaint to felony conviction.
3. This improper bail order holds the client in custody on that case in violation of Local Rule 9 (and the O'Donnell Consent Decree) when the individual could be released. By requiring an attorney to sign the document, the attorney is in effect assisting in the holding of their own client in custody.
    1. This is because Local Rule 9.16 states: "The Sheriff must not enforce any order requiring secured money bail that is not accompanied by a record showing that the procedures and findings described in Local Rule 9 were provided. By General Order of the CCCL Judges, if an order to pay secured money bail is unaccompanied by the required record, the Sheriff must deliver to the arrestee a General Order Bond ("GOB") issued by one or more of the CCCL Judges and release the arrestee."

When court staff was asked about the process requiring attorneys to sign a bail order without their clients' presence, we were advised that the courts have been trained to handle this issue in this exact manner. We were also shown a hard copy of PowerPoint slides of that training. (Photos Attached). The PowerPoint explicitly directs the courts, in a situation where the client is not brought to court, to select the box indicating that the Defendant requests a reset of their bail hearing—citing that the failure to file a bail order may result in the person being release. Ashley Guice, General Counsel for the County Courts, acknowledged ownership over the creation of this PowerPoint.

**We have presented to MAC attorneys the following ideas when advocating for their clients under these circumstances:**

1. Refuse to generate the bail order.
2. If the court generates a bail order and requests your signature, ensure you can see what has been generated before determining whether or not to sign.
3. Refuse to sign.
4. Although an option, crossing out the false statement on the bail order before signing will likely result in your client remaining in custody without a hearing, since it is the filing of the bail order that makes the system believe a bail hearing was held (or truthfully reset/waived).

Please let us know if there is any other information that might be helpful in resolving this issue.

Morgan Rogers
Resource Attorney
Harris County Office of Managed Assigned Counsel

1310 Prairie Street, 16th Floor
Houston, TX 77002
Office: 832-927-3923
Cell: 713-588-0270
Email: Morgan.Rogers@mac.hctx.net
Website: https://mac.harriscountytx.gov

EXHIBIT 3

**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **MARANDA LYNN ODONNELL, *et. al.*, on behalf of themselves and all others similarly situated, Plaintiffs,** | § § § | |
| **v.** | § § | **CIVIL ACTION NO. 4:16-cv-1414** |
| **HARRIS COUNTY, TEXAS, *et. al.*, Defendants.** | § § § | |

**AFFIDAVIT OF JUDGE LESLIE JOHNSON**

BEFORE ME, the undersigned authority, on this day personally appeared the undersigned affiant, who, being by me duly sworn, on oath stated:

1. My name is Leslie Johnson. I am the presiding Judge of Harris County Criminal Court at Law ("HCCCL") 3, and have been since I took that office on January 1, 2023. I am at least eighteen years of age, of sound mind, capable of making this affidavit and fully competent to testify to the matters stated in this affidavit, and I have personal knowledge of each of the matters stated.

2. I never considered Allan Van Fleet as my attorney in the above-referenced case ("Lawsuit").

3. I was aligned with Judges Goodhart and Padilla in their efforts to obtain representation, and understood that they were working on that effort for us to obtain counsel.

Further Affiant sayeth not.

[signature]
Leslie Johnson

SUBSCRIBED TO AND SWORN BEFORE ME on this 31st day of August, 2026 by Leslie Johnson.

LAURA COLBERT CONTE
125398032
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
AUGUST 25, 2029

Laura Colbert Conte
Notary Public, State of Texas

Commission Expires: 8-25-2029

EXHIBIT
4

**From:** Brandon Garrett
**Sent:** Fri, 25 Apr 2025 09:46:10 -0500
**To:** Goodhart, Judge Paula (CCL); 'sgthompson@central.uh.edu'
**Cc:** Stott, Cory (CCL); Wells, Ed (CCL); Cherry, Sylvia (CCL); Fombonne, Jonathan (CAO); Hopkins,Seth (CAO); Fraser, Rachel (CAO)
**Subject:** Re: Harris County Consent Decree

Many thanks Judge,

As far as the status of the consent decree, any consent decree remains in place unless modified by the parties with approval of the judge. It is a final judgment settling a federal case.

But, unlike the County Attorney, we cannot give you legal advice or opinions; we are monitors reporting to the federal judge in the case, and not counsel to any of the parties in the case.

All the best,

Brandon

--
Brandon L. Garrett | L. Neil Williams Professor of Law
Faculty director, Wilson Center for Science and Justice | @WilsonCSJ_
https://wcsj.law.duke.edu
Duke University School of Law
210 Science Drive | Durham, NC | 27708-0373
P | 919.613.7090
E | bgarrett@law.duke.edu
W | http://www.brandonlgarrett.com/
WILSON
CENTER FOR SCIENCE AND JUSTICE
AT DUKE LAW

---

**From:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Date:** Thursday, April 24, 2025 at 4:41 PM
**To:** Brandon Garrett <bgarrett@law.duke.edu>, 'sgthompson@central.uh.edu' <sgthompson@central.uh.edu>
**Cc:** Stott, Cory (CCL) <Cory_Stott@ccl.hctx.net>, Wells, Ed (CCL) <Ed_Wells@ccl.hctx.net>, Cherry, Sylvia (CCL) <Sylvia_Cherry@ccl.hctx.net>, Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>, Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>, Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>
**Subject:** RE: Harris County Consent Decree

Good afternoon Brandon,

Thank you for forwarding this to Mr. Fombonne and his colleagues at the County Attorney's Office. Unfortunately, he previously indicated that his office is unable to provide legal advice and representation for me concerning the O'Donnell decree. As the monitor, are you not able or equipped to answer this question? I assume you have considered questions like this considering recent changes to Texas law and federal opinions related to O'Donnel. I look forward to your response.

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal
Court at Law No. 2

1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

---

**From:** Brandon Garrett <bgarrett@law.duke.edu>
**Sent:** Thursday, April 24, 2025 9:12 AM
**To:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>; 'sgthompson@central.uh.edu' <sgthompson@central.uh.edu>
**Cc:** Stott, Cory (CCL) <Cory_Stott@ccl.hctx.net>; Wells, Ed (CCL) <Ed_Wells@ccl.hctx.net>; Cherry, Sylvia (CCL) <Sylvia_Cherry@ccl.hctx.net>; Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>; Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>
**Subject:** Re: Harris County Consent Decree

Hello Judge,

Thank you for reaching out. I am cc'ing Jonathan Fombonne and colleagues at the county attorney's office, who can answer any questions that you have about federal consent decrees, and the ODonnell Decree in particular,

All the best,

Brandon Garrett

---

**From:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Date:** Wednesday, April 23, 2025 at 1:43 PM
**To:** Brandon Garrett <bgarrett@law.duke.edu>, 'sgthompson@central.uh.edu' <sgthompson@central.uh.edu>
**Cc:** Stott, Cory (CCL) <Cory_Stott@ccl.hctx.net>, Wells, Ed (CCL) <Ed_Wells@ccl.hctx.net>, Cherry, Sylvia (CCL) <Sylvia_Cherry@ccl.hctx.net>
**Subject:** Harris County Consent Decree

Good afternoon,

As you may be aware, a Harris County Deputy Constable was shot on Monday. The individual accused of shooting Deputy Jones was released on April 16 on a general order bond. He did not go in front a magistrate for bail consideration before his release, as required by Texas law. Please provide me the legal authority you rely on to perpetuate the decree despite state law that requires all class A and B misdemeanor arrestees to have an individualized bail hearing. Thank you for your consideration in this matter.

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2

1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

EXHIBIT
5

**From:** Allan Van Fleet <allanvanfleet@gmail.com>
**Sent:** Friday, May 30, 2025 3:43 PM CDT
**To:** Brandon Garrett <bgarrett@law.duke.edu>; Elizabeth Rossi <elizabeth@civilrightscorps.org>; allanvanfleet@icloud.com; Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>; cody@civilrightscorps.org; Dustin Rynders <dustin@texascivilrightsproject.org>; Kirsten Budwine <kirsten@texascivilrightsproject.org>; travis <travis@texascivilrightsproject.org>; Certain, Arlisa (CAO) <Arlisa.Certain@harriscountytx.gov>; matthewgarcia@civilrightscorps.org
**CC:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; Thompson, Sandra G <sguerrat@central.uh.edu>
**Subject:** Re: Request for Modification

I do not represent these four judges.
Best regards,
avf

**G. Allan Van Fleet, P.C.**

2228 Ship's Mechanic Row, Suite 307
Galveston, Texas 77550

6218 Elm Heights Lane, Suite 201
Houston, Texas 77081

713.826.1954
allanvanfleet@gmail.com
Linkedin

**From:** Brandon Garrett <bgarrett@law.duke.edu>
**Sent:** Friday, May 30, 2025 1:14 PM
**To:** Elizabeth Rossi <elizabeth@civilrightscorps.org>; Allan Van Fleet <allanvanfleet@gmail.com>; allanvanfleet@icloud.com <allanvanfleet@icloud.com>; Rachel Fraser <rachel.fraser@harriscountytx.gov>; Seth Hopkins <seth.hopkins@harriscountytx.gov>; cody@civilrightscorps.org <cody@civilrightscorps.org>; Dustin Rynders <dustin@texascivilrightsproject.org>; Kirsten Budwine <kirsten@texascivilrightsproject.org>; Travis Fife <travis@texascivilrightsproject.org>; Certain, Arlisa (CAO) <Arlisa.Certain@harriscountytx.gov>; matthewgarcia@civilrightscorps.org <matthewgarcia@civilrightscorps.org>
**Cc:** Jonathan Fombonne <jonathan.fombonne@harriscountytx.gov>; Thompson, Sandra G <sguerrat@central.uh.edu>
**Subject:** FW: Request for Modification

FYI – you all weren't included on this request. Perhaps we can have a call early next week to discuss?

All the best,

Brandon Garrett


HC - 950739

**From:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Date:** Friday, May 30, 2025 at 2:08 PM
**To:** Brandon Garrett <bgarrett@law.duke.edu>, 'sgthompson@central.uh.edu' <sgthompson@central.uh.edu>
**Cc:** CTY Criminal Judges (CCL) <CTYCriminalJudgesCCL@ccl.hctx.net>, Wells, Ed (CCL) <Ed_Wells@ccl.hctx.net>, Cherry, Sylvia (CCL) <Sylvia_Cherry@ccl.hctx.net>, Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>, Stott, Cory (CCL) <Cory_Stott@ccl.hctx.net>
**Subject:** Request for Modification

Good afternoon,

Please find attached a request to modify the federal consent decree in *Maranda Lynn Odonnell, et al. v. Harris County Texas et al.*.

We look forward to your response.

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2

1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

EXHIBIT 6

**From:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Sent:** Monday, June 2, 2025 2:12 PM CDT
**To:** Allan Van Fleet <allanvanfleet@gmail.com>; travis <travis@texascivilrightsproject.org>; Brandon Garrett <bgarrett@law.duke.edu>
**CC:** Elizabeth Rossi <elizabeth@civilrightscorps.org>; allanvanfleet@icloud.com; Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>; cody@civilrightscorps.org; Dustin Rynders <dustin@texascivilrightsproject.org>; Kirsten Budwine <kirsten@texascivilrightsproject.org>; Certain, Arlisa (CAO) <Arlisa.Certain@harriscountytx.gov>; matthewgarcia@civilrightscorps.org; Thompson, Sandra G <sguerrat@central.uh.edu>
**Subject:** RE: Request for Modification

Right – I meant the judges who asked for the modification. They are also parties to the consent decree.

***Jonathan G. C. Fombonne***
Deputy County Attorney & First Assistant
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002
cao.harriscountytx.gov

*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

---

**From:** Allan Van Fleet <allanvanfleet@gmail.com>
**Sent:** Monday, June 2, 2025 10:09 AM
**To:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; travis <travis@texascivilrightsproject.org>; Brandon Garrett <bgarrett@law.duke.edu>
**Cc:** Elizabeth Rossi <elizabeth@civilrightscorps.org>; allanvanfleet@icloud.com; Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>; cody@civilrightscorps.org; Dustin Rynders <dustin@texascivilrightsproject.org>; Kirsten Budwine <kirsten@texascivilrightsproject.org>; Certain, Arlisa (CAO) <Arlisa.Certain@harriscountytx.gov>; matthewgarcia@civilrightscorps.org; Thompson, Sandra G <sguerrat@central.uh.edu>
**Subject:** Re: Request for Modification

The judges I represent will not be on the call. I am meeting with them Tuesday afternoon.

Best,

avf



HC - 950778

**G. Allan Van Fleet, P.C.**

2228 Ship's Mechanic Row, Suite 307
Galveston, Texas 77550

6218 Elm Heights Lane, Suite 201
Houston, Texas 77081

713.826.1954
allanvanfleet@gmail.com
Linkedin

---

**From:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>
**Sent:** Monday, June 2, 2025 10:06 AM
**To:** travis <travis@texascivilrightsproject.org>; Brandon Garrett <bgarrett@law.duke.edu>
**Cc:** Allan Van Fleet <allanvanfleet@gmail.com>; Elizabeth Rossi <elizabeth@civilrightscorps.org>; allanvanfleet@icloud.com <allanvanfleet@icloud.com>; Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>; cody@civilrightscorps.org <cody@civilrightscorps.org>; Dustin Rynders <dustin@texascivilrightsproject.org>; Kirsten Budwine <kirsten@texascivilrightsproject.org>; Certain, Arlisa (CAO) <Arlisa.Certain@harriscountytx.gov>; matthewgarcia@civilrightscorps.org <matthewgarcia@civilrightscorps.org>; Thompson, Sandra G <sguerrat@central.uh.edu>
**Subject:** RE: Request for Modification

Also works for CAO. Will these judges be present? For everyone's information, CAO agreed to provide them with a high-level opinion on a few issues related to the consent decree, but we've let them know that CAO can't represent them in any modification proceedings given the position of the County in this litigation. These judges requested outside counsel last year, but commissioners court did not approve that request.

***Jonathan G. C. Fombonne***
Deputy County Attorney & First Assistant
E: jonathan.fombonne@harriscountytx.gov
P: 713.274.5102
C: 346.354.7475

**Office of the Harris County Attorney**
**Christian D. Menefee**
1019 Congress, 15th Floor
Houston, Texas 77002
cao.harriscountytx.gov

*CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED; ATTORNEY WORK PRODUCT: Emails and attachments received from the Office of the Harris County Attorney may be protected by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please do not read, copy, use, forward, or disclose any such communications or attachments to others; immediately notify the sender by reply email; and delete the email and the reply from your system. Any unauthorized disclosure, copying, distribution, or use of emails from us or any attachments thereto is prohibited.*

**From:** Travis Fife <travis@texascivilrightsproject.org>
**Sent:** Sunday, June 1, 2025 6:09 PM
**To:** Brandon Garrett <bgarrett@law.duke.edu>
**Cc:** Allan Van Fleet <allanvanfleet@gmail.com>; Elizabeth Rossi <elizabeth@civilrightscorps.org>; allanvanfleet@icloud.com; Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>; cody@civilrightscorps.org; Dustin Rynders <dustin@texascivilrightsproject.org>; Kirsten Budwine <kirsten@texascivilrightsproject.org>; Certain, Arlisa (CAO) <Arlisa.Certain@harriscountytx.gov>; matthewgarcia@civilrightscorps.org; Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; Thompson, Sandra G <sguerrat@central.uh.edu>
**Subject:** Re: Request for Modification

Brandon,

Thank you for sharing. Yes, 10:30 on Tuesday works for Plaintiffs.

**Travis Fife**

Pronouns: He/Him/His

*Staff Attorney, Criminal Legal Program*
Texas Civil Rights Project

M: 817.991.4607

www.txcivilrights.org

Facebook | Twitter | Instagram

Donate Now!

On Fri, May 30, 2025 at 4:50 PM Brandon Garrett <bgarrett@law.duke.edu> wrote:

Hello all,

Might our usual Tuesday morning time work for a call?

All the best,

Brandon

**From:** Allan Van Fleet <allanvanfleet@gmail.com>
**Date:** Friday, May 30, 2025 at 4:44 PM
**To:** Brandon Garrett <bgarrett@law.duke.edu>, Elizabeth Rossi <elizabeth@civilrightscorps.org>, allanvanfleet@icloud.com <allanvanfleet@icloud.com>, Rachel Fraser <rachel.fraser@harriscountytx.gov>, Seth Hopkins <seth.hopkins@harriscountytx.gov>, cody@civilrightscorps.org <cody@civilrightscorps.org>, Dustin Rynders <dustin@texascivilrightsproject.org>, Kirsten Budwine <kirsten@texascivilrightsproject.org>, Travis Fife <travis@texascivilrightsproject.org>, Certain, Arlisa (CAO) <Arlisa.Certain@harriscountytx.gov>, matthewgarcia@civilrightscorps.org <matthewgarcia@civilrightscorps.org>
**Cc:** Jonathan Fombonne <jonathan.fombonne@harriscountytx.gov>, Thompson, Sandra G <sguerrat@central.uh.edu>
**Subject:** Re: Request for Modification

I do not represent these four judges.

Best regards,

avf

**G. Allan Van Fleet, P.C.**

2228 Ship's Mechanic Row, Suite 307
Galveston, Texas 77550

6218 Elm Heights Lane, Suite 201
Houston, Texas 77081

713.826.1954
allanvanfleet@gmail.com
Linkedin

---

**From:** Brandon Garrett <bgarrett@law.duke.edu>
**Sent:** Friday, May 30, 2025 1:14 PM
**To:** Elizabeth Rossi <elizabeth@civilrightscorps.org>; Allan Van Fleet <allanvanfleet@gmail.com>; allanvanfleet@icloud.com <allanvanfleet@icloud.com>; Rachel Fraser <rachel.fraser@harriscountytx.gov>; Seth Hopkins <seth.hopkins@harriscountytx.gov>; cody@civilrightscorps.org <cody@civilrightscorps.org>; Dustin Rynders <dustin@texascivilrightsproject.org>; Kirsten Budwine <kirsten@texascivilrightsproject.org>; Travis Fife <travis@texascivilrightsproject.org>; Certain, Arlisa (CAO) <Arlisa.Certain@harriscountytx.gov>; matthewgarcia@civilrightscorps.org <matthewgarcia@civilrightscorps.org>

**Cc:** Jonathan Fombonne <jonathan.fombonne@harriscountytx.gov>; Thompson, Sandra G <sguerrat@central.uh.edu>
**Subject:** FW: Request for Modification

FYI – you all weren't included on this request. Perhaps we can have a call early next week to discuss?

All the best,

Brandon Garrett

---

**From:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Date:** Friday, May 30, 2025 at 2:08 PM
**To:** Brandon Garrett <bgarrett@law.duke.edu>, 'sgthompson@central.uh.edu' <sgthompson@central.uh.edu>
**Cc:** CTY Criminal Judges (CCL) <CTYCriminalJudgesCCL@ccl.hctx.net>, Wells, Ed (CCL) <Ed_Wells@ccl.hctx.net>, Cherry, Sylvia (CCL) <Sylvia_Cherry@ccl.hctx.net>, Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>, Stott, Cory (CCL) <Cory_Stott@ccl.hctx.net>
**Subject:** Request for Modification

Good afternoon,

Please find attached a request to modify the federal consent decree in *Maranda Lynn Odonnell, et al. v. Harris County Texas et al.*.

We look forward to your response.

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2

1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net

EXHIBIT

7

Results of the Commissioners Court Meeting of 09-18-25
All agenda items approved as presented with the following exceptions:
Harris County Commissioners Court
Exceptions to September 18, 2025 Agenda

| Page | Item | Department | Exception |
|---|---|---|---|
| 2 | 2 | County Administration | No Action |
| 2 | 3 | County Administration | No Action |
| 3 | 12 | County Engineer | No Action |
| 13 | 117 | Flood Control District | To direct Flood Control to maintain the public 2018 Flood Bond dashboard – which includes but is not limited to project schedules, prioritization scores, budget, location, and lifecycle stage for all projects – and to update the dashboard quarterly in advance of Commissioners Court meetings; and to direct the Flood Control District to continue working with Court Offices and the community to improve the dashboard's user friendliness including but not limited to providing Bond ID previews, improved language accessibility, incorporating the ability to filter projects by features such as partnership projects, quartile score, project status, and project precinct, and opportunities for the community to be engaged on testing the dashboard and relevant applications.<br><br>**********<br><br>To direct Flood Control to provide quarterly updates to Commissioners Court on the progress of all bond projects including spending and lifecycle stage.<br><br>**********<br><br>To direct the Flood Control District to use the 2022 Prioritization Framework scores to allocate any 2018 Flood Bond funds that become available to Bond IDs that are paused and other bond projects where the scope and funds identified in the Updated Bond Package need to be increased. Funds shall be considered available when the bond reserve contingency exceeds 15% of the total remaining funds left to be spent. Any deviation from the Framework shall require prior approval by a majority vote of Commissioners Court.<br><br>**********<br><br>To direct Flood Control District to add the 2022 Prioritization Framework scores to every Bond ID and associated projects where feasible and with the exceptions of buyout projects and countywide projects as noted in the 2022 Prioritization Framework transmittal.<br><br>********** |

| | | | |
|---|---|---|---|
| 13 | 117 | Flood Control District | To approve the allocation of the 2018 Flood Bond funds for each Bond ID and all associated projects, as presented in the Updated Bond Package and as directed by Commissioners Court, funding current and future needs for all projects in Quartile 1 of the 2022 Prioritization Framework and projects with secured partnerships; and to direct Flood Control to convene the 2018 Flood Bond Working Group – composed of staff from the Court Offices – at least quarterly in advance of Court updates. The Working Group will be consulted on the following: project progress, schedules and spending, new partnerships opportunities that may arise, unneeded/excess funds that may be freed up for reallocation; for projects completing lifecycle stage where the estimated budget exceeds 15% of the allocated amount for that project or the proposed scope materially shifts from what was originally identified and agreed to, approval by Court will be required. The Working Group will work with Flood Control to define what constitutes a material shift and transmit the agreement to the Court. |
| 19 | 159 | County Library | Change to “Request that the County Judge execute the first amendment to an agreement with Cypress Creek Friends of the Library d/b/a Barbara Bush Library Friends (BBLF) to provide all funding and painting/renovation services and materials of certain interior spaces necessary to complete a project at an HCPL facility. Directing OCE to install and maintain the custom carpet and paint, with attic stock from the project. Neither the County nor HCPL will provide any funding for the project.” |
| 22 | 188 | County Attorney | No Action |
| 23 | 196 | Justices of the Peace | No Action |
| 23 | 197 | County Courts | For approval of individual judges for outside counsel representing their interests as elected judges in the O'Donnell v Harris County litigation in response to the AG filing of a Motion to Intervene, if the Attorney General’s Motion to Intervene in the O’Donnell case is granted. |
| 23 | 199 | Travel & Training | To approve all items except 8, 14, 20 and 22.<br><br>**********<br><br>To approve items 8, 14, 20 and 22. |
| 29 | 235 | Grants | Change to “Request by the Commissioner of Precinct 4 for approval to accept from the U.S. Department of Housing and Urban Development grant funds in the amount of $750,000, with no required match, for a playground and amenities project (B-23-CP-TX-1422).” |
| 30 | 243 | ARPA | Change to “Request by the Sheriff’s Office for approval to transfer $200,000 to the FLEX Fund (1040) for already approved startup funds for the Women’s Empowerment Center program.” |

| | | | |
|---|---|---|---|
| 41 | 332 | Commissioner, Precinct 1 | No Action |
| 43 | 361 | Public Hearings | Delete "the Harris County Toll Road Authority and" |
| 44 | 366 | Public Hearings | No Action |
| 44 | 367 | Tax Rates | For the Harris County Flood Control District, that the property tax rate be increased by the adoption of a tax rate of 0.04966, which is effectively a 3.87 percent increase in the tax rate; this consists of 0.03826 for maintenance and operations and 0.01140 for debt service. |
| 44 | 368 | Tax Rates | For Harris County Hospital District dba Harris Health System, that the property tax rate be increased by the adoption of a tax rate of 0.18761, which is effectively a 16.63 percent increase in the tax rate; this rate consists of 0.17876 for maintenance and operations and 0.00885 for debt service. |
| 44 | 369 | Tax Rates | For Port of Houston Authority of Harris County, that the property tax rate be adopted at a tax rate of 0.00590; this rate is for debt service. |
| 44-45 | 370-381 | Transmittals | Accepted |
| 45 | 382 | Transmittals | No Action |
| 45-47 | 383-402 | Transmittals | Accepted |
| 48 | 404 | Executive Session | No Action |
| 48 | 405 | Executive Session | To recommend Tracy Jones for both the Flood Control District and Harris County for the Board of Directors of the Harris Central Appraisal District. |
| 48 | 406 | Executive Session | No Action |
| 48 | 407 | Executive Session | For approval of settlement offers from Purdue and eight (8) Certain Manufacturer Defendants (Alvogen, Inc., Amneal Pharmaceuticals LLC, Apotex Corp., Hikma Pharmaceuticals USA, Inc., Indivior Inc., Mylan, Sun Pharmaceutical Industries, Inc., and Zydus Pharmaceuticals (USA) Inc.) in connection with Texas opioid multidistrict litigation in the matter of County of Harris v. Purdue Pharma, Inc., et al., MDL PRETRIAL CAUSE NO. 2017-82618, in the 152nd District Court of Harris County, Texas, and authorization to execute the related Settlement Participation and Release forms. |
| 48 | 408 | Executive Session | To approve the recommended course of action by the County Attorney. |
| 49 | 410 | Emergency/Supplemental Items | No Action |
| 49 | 411 | Emergency/Supplemental Items | No Action |
| 49 | 414 | Emergency/Supplemental Items | No Action |
| 51 | 430 | Emergency/Supplemental Items | No Action |
| 53 | 449 | Emergency/Supplemental Items | Change to "in the amount of $272,727" |
| 55 | 462 | Emergency/Supplemental Items | No Action |

| | | | |
|---|---|---|---|
| 56 | 466 | Emergency/Supplemental Items | Change to "Request by the Office of the Purchasing Agent for approval of an award on the basis of lowest complete bids to Tejas Office Products, Inc.; Imperial Dade; Sam Tell & Son, Inc.; and Atlantic Tape and Packaging in the amount of $1,600,000 based on estimated quantities and fixed unit pricing for bathroom and kitchen paper products for Harris County for the period of September 18, 2025 – September 17, 2026 with four (4) one-year renewal options (250127), Justification for 0% MWBE Participation Goal: 0% - Drop Shipped." |
| 58 | 481 | Emergency/Supplemental Items | To start the Commissioners Court meetings at 9:00 A.M. instead of 10:00 A.M. beginning on the 2026 calendar year.<br><br>**********<br><br>That press conferences should not take place in the Commissioners Courtroom or the Commissioners Court Lobby on the day of Court any later than 30 minutes before the start of Court.<br><br>**********<br><br>That on Commissioners Court days during the lunch break, there will be no press conferences in the Commissioners Courtroom or in the Commissioners Court Lobby. |
| 59 | 487 | Resolutions | Change to "34 years" |

EXHIBIT
8

**From:** Brandon Garrett <bgarrett@law.duke.edu>
**Sent:** Friday, May 30, 2025 1:14 PM CDT
**To:** Elizabeth Rossi <elizabeth@civilrightscorps.org>; Allan Van Fleet <allanvanfleet@gmail.com>; allanvanfleet@icloud.com; Fraser, Rachel (CAO) <Rachel.Fraser@harriscountytx.gov>; Hopkins, Seth (CAO) <Seth.Hopkins@harriscountytx.gov>; cody@civilrightscorps.org; Dustin Rynders <dustin@texascivilrightsproject.org>; Kirsten Budwine <kirsten@texascivilrightsproject.org>; travis <travis@texascivilrightsproject.org>; Certain, Arlisa (CAO) <Arlisa.Certain@harriscountytx.gov>; matthewgarcia@civilrightscorps.org
**CC:** Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>; Thompson, Sandra G <sguerrat@central.uh.edu>
**Subject:** FW: Request for Modification
**Attachments:** Request for decree modification.pdf

FYI – you all weren't included on this request. Perhaps we can have a call early next week to discuss?

All the best,

Brandon Garrett

---

**From:** Goodhart, Judge Paula (CCL) <Paula_Goodhart@ccl.hctx.net>
**Date:** Friday, May 30, 2025 at 2:08 PM
**To:** Brandon Garrett <bgarrett@law.duke.edu>, 'sgthompson@central.uh.edu' <sgthompson@central.uh.edu>
**Cc:** CTY Criminal Judges (CCL) <CTYCriminalJudgesCCL@ccl.hctx.net>, Wells, Ed (CCL) <Ed_Wells@ccl.hctx.net>, Cherry, Sylvia (CCL) <Sylvia_Cherry@ccl.hctx.net>, Fombonne, Jonathan (CAO) <Jonathan.Fombonne@harriscountytx.gov>, Stott, Cory (CCL) <Cory_Stott@ccl.hctx.net>
**Subject:** Request for Modification

Good afternoon,

Please find attached a request to modify the federal consent decree in *Maranda Lynn Odonnell, et al. v. Harris County Texas et al.*.

We look forward to your response.

The Honorable Paula Goodhart
Presiding Judge, Harris County Criminal Court at Law No. 2

1201 Franklin St., 8th Floor, Houston, Texas 77002
832-927-3125 | www.ccl.hctx.net



HC - 950731

The Harris County Court at Law judges in office on August 1, 2019, consented to a federal decree in *Maranda Lynn Odonnell, et al. v. Harris County Texas et al*. to address constitutional violations alleged in that litigation. The Consent Decree was intended to create and enforce transparent constitutional pretrial practices and systems to ensure misdemeanor arrestees' rights to due process and equal protection.[1] It also ensured that judges would enter written factual findings to support detention decisions.[2] The parties and judge hoped that policies set in place by the Decree would produce meaningful, lasting reform to the county's system of pretrial detention and safeguard against constitutional violations.

The Decree required the judges to create a local rule requiring all class A and class B misdemeanor arrestees, apart from certain "carve out" situations, to be released without any judicial review despite the mandates of TEX. CODE CRIM. P. art. 17.15. The judges created General Order Bonds to effectuate the Decree.

The Texas Legislature thereafter enacted TEX. CODE CRIM. P. art. 17.028. Article 17.028 requires every class A and class B misdemeanor arrestee to have an individualized bail hearing within 48 hours of arrest:

> (a) without unnecessary delay, but not later than 48 hours after a defendant is arrested, a magistrate ***shall*** order, *after individualized consideration of all circumstances and of the factors required by Article 17.15(a),* that the defendant be:
> (1) granted personal bond with or without conditions;
> (2) granted surety or cash bond with or without conditions; or
> (3) denied bail in accordance with the Texas Constitution and other law.

TEX. CODE CRIM. P. art. 17.028(a) (added by Acts 2021, 87th Leg., 2nd C.S., ch. 11 (S.B. 6), § 5, eff. Jan. 1, 2022) (emphasis added). The statute also prohibits bail schedules and standing orders related to bail that are inconsistent with its requirements.

The Consent Decree and Local Rule 9 are in direct conflict with clear, unambiguous, and mandatory Texas law. Arrestees are being released in violation of state law, supported by an illegal standing order.

Our oath as Texas judges requires us to faithfully execute the duties of our office and to preserve, protect and defend the Constitution and laws of the United States and Texas. Local Rule 9.8, incorporated in the Decree, specifically states that "nothing in this provision is intended to conflict with any provision of Texas law or local rules." Executing the Consent Decree, whether actively or by acquiescence, violates our oath of office and our own local rules in light of the Legislature's clear mandate. Such open disregard of state law—in addition to being flat wrong—could expose the judiciary to ethical violations and potentially compromise judicial immunity.

The undersigned judges requested legal guidance from the federal monitors to no avail. On April 30, 2025, we met virtually with Jonathan Fombonne of the Harris County Attorney's Office and requested a legal opinion addressing the federal Decree's direct conflict with state law. We have yet to receive a response.

We therefore formally request to invoke Section 32 of the Consent Decree and seek to modify its language. Specifically, we ask to amend Rule 9 and the Decree as follows to conform with State law:

[1] Consent Decree, p.1, Sec. 2.
[2] Consent Decree, p.11, Sec. 10.





HC - 950733

9.2 To the extent Local Rule 9 conflicts with any other local rule, Local Rule 9 controls. ~~Except for situations described in Local Rule 9.4.1 9.4.6, all misdemeanor arrestees will have unsecured bail amounts set initially at no more than $100 and be promptly released on a personal bond with or without other non financial conditions as soon as practicable after arrest. Consistent with Texas law, a judicial officer is not required to sign a personal bond prior to the person's release.~~

9.4 Subject to Texas law, ~~A~~all misdemeanor arrestees must be considered for released~~d~~ on a personal bond or on non-financial conditions as soon as practicable after arrest, except those who fall within the following categories, who may be detained for up to 48 hours for an individualized hearing:

9.5 Any person arrested for the reasons described in Local Rule 9.4.1-9.4.6 may be kept in custody pending an individualized hearing before a judicial officer. Any judicial officer who makes decisions about conditions of release, including the Harris County Criminal Law Hearing Officers, must—subject to Article 17.03 of the Texas Code of Criminal Procedure and other Texas law—have complete discretion to release on a personal bond any misdemeanor arrestee prior to an individualized hearing.

For all misdemeanor arrestees to whom Local Rules 9.4.1-9.4.6 do not apply, a criminal law hearing officer or judge shall review and consider: (1) the public safety report; (2) factors required for setting the amount of bail listed in Article 17.15 of the Texas Code of Criminal Procedure; and (3) unsecured bail and release on a personal bond with or without other non-financial conditions. A criminal law hearing officer or judge shall devote a defined portion of each shift to such review and consideration, which shall occur as soon as practicable after arrest and shall not result in a decision contrary to Texas law.

9.18 If an arrestee is in the Sheriff's custody 40 hours after arrest and no conditions of release have been determined, the Sheriff must present the arrestee to a judicial officer for a bail hearing. ~~If the person does not appear before a judicial officer within 48 hours of arrest, by general order of the judges, the Sheriff must deliver to the arrestee a "General Order Bond" issued by one or more of the CCCL Judges and release the arrestee.~~

Respectfully submitted,

Paula Goodhart – Judge, Harris County Criminal Court at Law #2

Leslie Johnson – Judge, Harris County Criminal Court at Law #3

Jessica Padilla – Judge, Harris County Criminal Court at Law #14

Linda Garcia – Judge, Harris County Criminal Court at Law #16

**Brandon L. Garrett**
**L. Neil Williams, Jr. Professor of Law**
Duke University School of Law
210 Science Drive
Box 90360 • Durham, NC 27708-0360
Phone: 919-613-7090
BGarrett@law.duke.edu

**Sandra Guerra Thompson**
**Newell H. Blakely Professor of Law**
University of Houston Law Center
4170 Martin Luther King Blvd.
Room 430W • Houston, TX 77204-6060
Phone: 713-743-2134
sgthompson@central.uh.edu

July 25, 2025

Hon. Paula Goodhart, Jessica Padilla,
Leslie Johnson, and Linda Garcia
Judges, Harris County Criminal Courts at Law

Re: Proposal to Modify Rule 9

Dear Judge Goodhart and Colleagues:

We are writing in response to your proposal, shared with us in the letter dated May 30, 2025, on behalf of County Criminal Court at Law Judges Paula Goodhart, Jessica Padilla, Leslie Johnson, and Linda Garcia – to modify the ODonnell Consent Decree and Local Rule 9. We have benefited from the two conversations that we have had and we now we far better understand the proposal. We have also, as we shared with you, been gathering information, regarding case processing and budgetary impacts, to better study the proposal's likely impacts. We write below to share our reasoning in response.

As we all now know, based on more than five years of experience in Harris County with the changes made, Local Rule 9, adopted in early 2019, and the ODonnell Consent Decree, has permitted tens of thousands of people who are arrested for low-level, nonviolent offenses to be released without the need to pay money to secure their liberty. From the beginning of our monitoring work, we have consistently observed and reported that the changes in the bail rules for these minor arrests have not increased repeat offending or created a public safety risk. Instead, public safety has benefited, with steadily declining numbers of misdemeanor arrests and rearrests. Any major changes that might impact the rules that have produced those remarkable public benefits, while safeguarding people's legal and constitutional rights, must be carefully considered.

Our overall task when considering any proposal to modify Rule 9 or the Consent Decree, is to follow the considerations set out in Paragraph 31, which states:

> Any change to Local Rule 9 must ensure that no misdemeanor arrestee is detained solely due to inability to make a monetary payment; that hearings to determine conditions of release or detention comply with constitutional principles of equal protection and substantive and procedural due process; that any condition of release is the least restrictive condition necessary to meet the government's interests in preventing bodily haim to another person and preventing flight from prosecution; and must be consistent with the best available evidence.

Thus, any such request must be evaluated based on whether it satisfies those core principles, reflecting core commitments of the U.S. Constitution, as well as Texas law.

Further, Paragraph 26 states that:

> Any requests for resources and staffing needs by County departments related to the implementation of this Consent Decree will be evaluated by the Monitor, who will provide a recommendation to assist Commissioners Court in its determination of the extent and type of staffing and resources needed, if any, in response to the request.

Thus, for any requested modification that would have substantial budgetary and/or staffing implications, we must examine the types of information that the Commissioner's Court would have to consider.

The Consent Decree states in Paragraphs 32 and 33, that parties may make requests to modifty the Consent Decree. The present request, which Paragraph 32 speaks to, is characterized as a request to "amend Local Rule 9."

**A. The Request for a Modification is Premature**

We begin with a fundamental procedural concern. We view this request, because it involves a request to amend Local Rule 9, as premature.

We agree, of course, that all County Criminal Court at Law judges are parties to ODonnell. However, for four judges to request a modification to the Consent Decree and to amend Rule 9, which the other judges do not join, raises a question of timing and procedure. Without any consensus among the judges on the request, and we have learned that no such consensus exists during our two group conversations about this proposal, we do not have what amounts to a final proposal from the CCCL Judges to consider.

After all, even if the other parties to the Consent Decree agreed that such a modification was a sound and worthwhile improvement, all of the judges would have to vote to approve any amendment to a local rule. We have been informed by counsel for the other thirteen CCCL judges that they do not join in this proposal, at this time. Where the CCCL judges differ over the appropriate path forward, we do not think that consideration of a proposal, with so little support, is itself appropriate.

That is why, we believe, the Cosnent Decree speaks to requests from the "CCCL Judges." The "CCCL Judges" have not made a request to amend Local Rule 9. Four judges have done so. And four judges cannot, acting alone and without further consensus among their colleagues, amend Local Rule 9.

We also note that no other parties have expressed support for the proposal. We sought to reach out to all of the parties to solicit their feedback and to gather information that could inform our decisionmaking. In a July 11, 2025 letter, the plaintiffs detailed their reasons for opposing the request. As noted, counsel for the other thirteen CCCL judges shared that those judges are not of one mind about any change to Rule 9, and they do not join in the request by the four judges.

We believe that if there was proper deliberation among the judges, and also among the parties, a workable proposal could be developed. The Consent Decree, in Paragraphs 32 and 33, contemplates that type of deliberation, where the "CCCL Judges" would themselves come together to consider, and potentially request, a change. We remain very much open to ways to improve the Consent Decree and Rule 9, including to cement the enormous public benefits of these rules going forward.

However, at this time, we decline to approve or reject the proposal as it is not properly before us.

**B. The Merits of the Proposal**

While we do not view this proposal as properly before us, we add that, even if there was consensus of the CCCL judges, and agreement among the other parties, we believe that it is unworkable as drafted, and would have dramatic negative consequences on public safety, liberty, jail operations, and the County budget. We have serious constitutional concerns with what is being proposed. Indeed, the proposal is also not well suited to accomplish the drafters' stated goal of better harmonizing Rule 9 with more recent changes to Texas law.

We note first, that the four judges have advanced this proposal with one stated purpose: to better harmonize Rule 9 to reflect more recent changes in Texas law, specifically, to Article 17.03 of the Texas Code of Criminal Procedure. That is a laudable goal. The drafters of the Consent Decree put great effort into harmonizing the provisions designed to safeguard constitutional rights with Texas law, at that time. Making efforts to maintain that balance, as Texas law changes, is a worthwhile goal. Unfortunately, this proposal does not accomplished that goal well.

In one major respect, the request made by the four judges is not geared towards reflecting past or current Texas law. Currently, Local Rule 9 requires releasing anyone who is detained for more than 48 hours without a bail hearing, or without the required findings made at a bail hearing. The proposal had deleted this remedy from the new Rule 9. During our first zoom meeting to discuss the request, you and your three colleages had agreed to delete this part of the proposal, but then later declined in writing to do so.

There is no reason, based in Texas law, for eliminating the 48-hour remedy, and no such basis was given. Indeed, the 48-hour release requirement of Rule 9 and the Consent Decree provides a remedy for a right which has been well-established in Texas law (under Article 17.028 ("Without unnecessary delay but not later than 48 hours after a defendant is arrested, a magistrate shall…")), and which reflects important constitutional concerns as well – the concern for prolonged detention, without a bail hearing or required findings.

Omitting that protection raises a special concern where the core of the proposal is likely to cause dramatic delays in processing people arrested for misdemeanors, which will burden the entire Joint Processing Center, and potentially impact felony case processing and bail hearings as well. The result may threaten both liberty and also public safety, if these new demands would prevent the type of careful consideration of the most public-safety-salient cases by magistrates.

Indeed, that portion of the proposal may reflect a concern that prolonged detentions are to be expected should the proposal be adopted, and that a 48-hour release rule could result in large numbers of people being released without bail hearings. However, to eliminate the release rule would mean that large numbers of people would suffer the anticipated prolonged detentions, and infringe important protections under Texas statutory and constitutional law, as well as the U.S. Constitution. As a result, this proposal raises serious concerns under Texas law, the stated basis for the request.

**C. The Large Population of Arrestees Affected**

The rest of the proposal adds very broad language, permitting a judge or a magistrate, without a bail hearing, to engage in an early-stage review on paper, during which a personal bond could be granted. The ostensible goal is to permit the reviewing judge or magistrate to consider the factors set out in Article 17.15 of the Texas Code of Criminal Procedure. It is not clear that this language does in fact comport with current Texas Law.

Currently, all people arrested for non-carve-out offenses, receive a General Order Bond. Under this proposal, all such people would instead have their cases reviewed by a judge or magistrate, who would have complete discretion, under this proposal, to either grant a personal bond, or deny one, in which case the person would have a 15.17 hearing. Assuing that such a volume of decisions does in fact comport with the Constitution and with Texas Law would be a challenging task. The proposal offers no guidance or procedures to ensure such compliance.

The numbers of cases would be massive: almost 28,000 cases a year would be shifted to dockets in which they would be eligible for 15.17 hearings, but most would likely be resolved, individually, by magistrates and judges, without such hearings. We have no way of knowing what the time demands of that case review, of 28,000 cases a year, would look like.

This is far more cases than are currently reviewed using an early presentment process. Currently, we see fewer than 1,000 cases a month that receive personal bonds using the current early presentment process, for carve-out cases, which may receive a personal bond in advance of a bail hearing. We observe 5,636 EP case settings using a 6-month interval from Dec. 2024 thru May 2025. We thank the Office of Court Management for reviewing our analysis and sharing data with us.

This suggests that if all current GOBs were added to the EP caseload, there could be a 96% increase in total bond determinations done, currently, by hearing officers (from 14,108 to 27,729) and a 146% increase in EP determinations in particular (from 5,636 to 19,527).

What we also do not know is how many of those 28,000 cases per year would result in 15.17 hearings, and what the resulting burden would be on those magistration dockets. We cannot know whether or how many additional magistrates would need to be hired and whether additional space would be needed for the dockets to be adequate to the task.

The burdens on magistates, and perhaps also judges, would be substantial. We have been provided no estimate regarding what the staffing and resources needs would be. We have been told that existing

resources and staffing will suffice, but only as regards the judiciary. We have every reason to question the accuracy of this assertion for the other stakeholders in the booking and magistration process.

The burdens, likely substantial and to some degree highly uncertain in nature, would also fall on public defenders and on prosecutors, in preparing for those hearings. There is an open question how such a person would then, given the unclear timing of this early-presentment review, appropriately meet with a newly assigned public defender, to adequately prepare for that 15.17 hearing. Any considerable increase in dockets would require additional public defender space and staffing to handle the expansion in these dockets. We note that our understanding is that additional space may simply not be currently available, and the construction costs and the time needed to reconfigure space may be quite large. Currently, carve out cases are identified at charging, so that the public defender's office can be given an advance list of the persons arrested who are scheduled to have 15.17 hearings. The Consent Decree calls for electronic discovery, meeting space, and other supports to ensure that the public defender assigned can meaningfully and adequately prepare for the bail hearing. Under this proposal, those public defense rights would be compromised, and to a degree that is unknown and not addressed by the proposal. Thus, due process rights, both federal and under Article 1 Section 19 of the Texas Constitution, may be compromised at these hearings, in ways that have simply not been addressed.

The text of the proposal does not address adding conditions that restrict a persons liberty to that personal bond, but in writing, the four judges clarified that this could be done: on paper, during early presentment, a judge or magistrate could issue a personal bond with conditions. For someone to be deprived of liberty, based on a paper-review and without a bond hearing, raises serious federal and Texas constitutional concerns.

Nor is such a review, resulting in bond conditions imposed, clearly permitted by Texas Law. The relevant provisions are new enough that they have not been interpreted by Texas courts. And the procedure proposed raises real concerns under Texas Law. Texas law clearly contemplates that individuals receive reasoned decisions, as must be made at 15.17 hearings, before decisions are made that restrict liberty.

**D. County Budget and Costs**

The proposal dramatically impacts the handling of tens of thousands of cases each year in Harris County. Yet, the proposal contains no information about how it would impact County budgets. The Consent Decree was the product of lengthy deliberations, including regarding the cost of its many changes, for a range of stakeholders. The proposal would impact Pretrial Services, the Sheriff's Office, the Public Defender's Office, the District Attorney's Office, and Managed Assigned Counsel's Office, in addition to the CCCL.

We do not have any estimates regarding what the budget impacts on those offices would be or what Commissioiner's Court would need to consider to adequately fund a proposal such as this one. In our consideration of this proposal, we have initiated conversations with relevant stakeholders to develop budgetary estimates which we would need in fulfilling our Consent Decree obligations to provide such information to Commissionsers Court. To date, we do not have information about the resources and staffing that would be required to implement changes of this magnitude.

**E. Criteria for a Successful Proposal**

We have no doubt that other modifications could accomplish the goals set out in Paragraph 31 of the Consent Decree, as well as the goal of improving harmonization with Texas law, while also fully respecting the constitutional rights of persons charged with misdemeanors in Harris County, and promoting public safety. For any such proposal, under Paragraph 26 of the Consent Decree, we would want to see careful advance work to set out what it would cost and what staff would be needed to efficiently review cases at that early stage, to ensure prompt release for the vast majority of persons arrested for misdemeanors. And, of course, any such proposal affecting Local Rule 9 would need a positive vote of the CCCL Judges. Piloting such a system, before fully approving and adopting it, would make great sense especially for better understanding the cost, staffing, and space needs, and perhaps, for any proposal concerning improving the use of early presentment, it could be done using cases currently reviewed for early presentment.

We believe that the Consent Decree and Rule 9 can continue to be improved, so that the benefits of the many years of work are solidified in the years to come. We thank you and all the Parties, who are cc'ed here, as always, for the conscientious and hard work administering and leading the pretrial system in Harris County.

Sincerely yours,

Brandon L. Garrett
ODonnell Monitor

Sandra Guerra Thompson
ODonnell Deputy Monitor

Cc: Elizabeth Rossi, Cody Cutting, Travis Fife, Plaintiffs' Counsel

Seth Hopkins, Rachel Fraser, Jonathan Fombonne, County Attorney's Office

Alisa Certain, Harris County Sheriff's Office

Allan Van Fleet, Counsel for 13 County Criminal Court at Law Judges

**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **MARANDA LYNN ODONNELL, *et. al.*, on behalf of themselves and all others similarly situated, Plaintiffs,** | § § § | |
| **v.** | § § | **CIVIL ACTION NO. 4:16-cv-1414** |
| **HARRIS COUNTY, TEXAS, *et. al.*, Defendants.** | § § § | |

**DEFENDANT JUDGES PAULA GOODHART, JESSICA PADILLA, LESLIE JOHNSON, AND LINDA GARCIA'S REPLY IN SUPPORT OF THEIR RENEWED REQUEST FOR *YOUNGER* ABSTENTION**

## TABLE OF CONTENTS


I. Plaintiffs' response relies on materials that are irrelevant to vacatur of the Consent Decree as a matter of law under *Younger*, *In re Goodhart* and Rule 60(b) requirements. .... 1

II. Plaintiffs do not meet their burden to show waiver. .... 3

A. There is no express waiver. .... 3

B. There is no waiver by predecessor conduct. .... 3

C. When Judge Garcia took office January 1, 2025, she joined with the other Judges' efforts to obtain counsel .... 4

D. The County refused to provide the Judges with counsel for years .... 4

E. Plaintiffs attack the Judges for not finding a way to hire counsel on their own, without the County's help .... 6

F. Plaintiffs' implicit waiver arguments fail .... 9

G. Plaintiffs improperly characterize the Judges' persistent efforts to solve the conflict between the Decree and state law as waiver .... 11

III. Plaintiffs' Rule 60(b) arguments fail .... 12

A. This Court must follow *In re Goodhart* and *Daves II*, the application of which does not "hinge on factual development.", whether under this Court's power or Rule 60(b) .... 12

B. Plaintiffs cannot avoid the Fifth Circuit's mandate to follow *Daves II* by arguing appellate briefing waiver here .... 16

IV. Plaintiffs' extraneous arguments do not defeat dismissal .... 17

CONCLUSION AND PRAYER .... 18

## INDEX OF AUTHORITIES

*Adams v. Thaler*,
679 F.3d 312 (5th Cir. 2012) ....15

*Baum v. Blue Moon Ventures, LLC*,
513 F.3d 181 (5th Cir. 2008) ....16

*BLOM Bank SAL v. Honickman*,
145 S. Ct. 1612 (2025) ....14

*Boren v. U.S. Nat'l Bank Ass'n*,
807 F.3d 99 (5th Cir. 2015) ....9, 10

*Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Local 54*,
468 U.S. 491 (1984) ....3

*Callon Petrol. Co. v. Frontier Ins. Co.*,
351 F.3d 204 (5th Cir. 2003) ....13,15

*Cradle of Liberty Council, Inc. v. City of Phila.*,
No. 08-2429, 2010 U.S. Dist. LEXIS 1082 (E.D. Pa. Jan. 6, 2010) ....3

*Daves v. Dall. Cty.*,
64 F.4th 616 (5th Cir. 2023) .... *passim*

*Doe v. Briley*,
562 F.3d 777 at (6th Cir. 2009) ....13

*Gonzalez v. Crosby*,
545 U.S. 524 (2005) ....15

*In re Goodhart*,
No. 26-20337, 2026 U.S. App. LEXIS 26177 (5th Cir. Aug. 26, 2026) (per curiam) .... *passim*

*Joseph A. v. Ingram*,
275 F.3d 1253 (10th Cir. 2002) ....14

*June Med. Servs. LLC v. Phillips*,
640 F. Supp. 3d 523 (M.D. La. 2022) ....14

*Kaswatuka v. U.S. Dep't of Homeland Sec.*,
7 F.4th 327 (5th Cir. 2021) ....10

*League of Un. Latin Am. Citizens, Dist.*
19 v. City of Boerne, 659 F.3d 421 (5th Cir. 2011) ....13

*McNeil v. United States*,
508 U.S. 106 (1993) ....10

*Norton v. Town of Islip*,
239 F. Supp. 2d 264 (E.D.N.Y. 2003) ....................11

*Ohio Bureau of Empl. Servs. v. Hodory*,
431 U.S. 471 (1977) ....................3

*RTM Media, L.L.C. v. City of Hou.*,
584 F.3d 220 (5th Cir. 2009) ....................12

*Rufo v. Inmates of Suffolk County Jail*,
502 US 367 (1992) ....................13

*Sosna v. Iowa*,
419 U.S. 393 (1975) ....................3

*U.S. v. Bissonnette*,
No. 1:16-cv-1070, 2021 U.S. Dist. LEXIS 75634, 2021 WL 1438309 (E.D. Va. Mar. 4, 2021) (mem. op. and order) ....................11

*U.S. v. Charles*,
469 F.3d 402 (5th Cir. 2006) ....................17

*U.S. v. Fowler*,
605 F.2d 181 (5th Cir. 1979) ....................10

Statutes and Rules

Fed. R. Civ. P. 60 .................... *passim*

Fed. R. Evid. 403 ....................2

Fed. R. Evid. 701 ....................2

Fed. R. Evid. 702 ....................2

Fed. R. Evid. 703 ....................2

Fed. R. Evid. 704 ....................2

Fed. R. Evid. 802 ....................2

Tex. Gov't Code § 45.201 ....................8

Tex. Loc. Gov't Code 157.901 ....................8

TO THE HONORABLE JUDGE LEE H. ROSENTHAL:

Defendants, Judges Paula Goodhart, Jessica Padilla, Leslie Johnson, and Linda Garcia (the "Judges"), file this reply in support of their renewed request to abstain under *Younger*.

## I. Plaintiffs' response relies on materials that are irrelevant to vacatur of the Consent Decree as a matter of law under *Younger*, *In re Goodhart* and Rule 60(b) requirements.

The Fifth Circuit has ordered that this Court must consider *Younger* abstention and follow *Daves II*. *In re Goodhart*, No. 26-20337, 2026 U.S. App. LEXIS 26177, at *12 (5th Cir. Aug. 26, 2026) (per curiam); *Daves v. Dall. Cty.*, 64 F.4th 616, 635 (5th Cir. 2023) ("*Daves II*"). In doing so, the Court held that "*Daves II* does not hinge upon factual development or discovery." *Id.* at *9. Regardless, the narrow 'window crack' Plaintiffs asked to explore was whether the Judges "were unable to obtain counsel independent of their judicial colleagues who support the consent decree," because under those circumstances, the Fifth Circuit "do[es] not see how [the Judges] could have filed earlier." *Id.* at *11.

The Court and parties discussed how to proceed after this opinion issued, the Plaintiffs "agreed to narrow" their discovery (depositions of two of the Judges) "to just this focus of waiver" (Exhibit 10 at 66:8-11), and the Court entered a scheduling order on *Younger* briefing. Dkt. 867. The Judges limited their motion accordingly. Plaintiffs, however, sought leave to file a 65-page brief and raised arguments and purported fact issues that go well beyond the limited nature of the facts necessary to determine the Motion at hand, whether under court directive or any determination to be made as a matter of law under Rule 60(b)(4), (5) or (6).

The Judges dispute the Plaintiffs' arguments, and object to Plaintiffs' attempt to broaden *In re Goodhart* beyond the Fifth Circuit's mandate. Plaintiffs' arguments and evidence that go beyond the issue of waiver due to the inability to obtain counsel is irrelevant, and should not be

considered.[1] The Judges join in the Attorney General's ("AG") reply and objections. The Judges also object to the following evidence attached to the Response and contents therein:

| EX | DATED | WITNESS | OBJECTION |
|---|---|---|---|
| A | 8/10/2026 | Dr. Jennifer Copp | Not Relevant FRE 403; Unreliable and Unhelpful Opinion FRE 702-704 |
| B-1 | 8/27/2026 | Ed Gonzalez | Not Relevant FRE 403; Unreliable and Unhelpful Opinion FRE 701, 702-704 |
| B-2 | 8/21/2026 | Sean Barry Teare | Not Relevant FRE 403; Unreliable and Unhelpful Opinion FRE 701, 702-704 |
| B-3 | 9/1/2026 | Genesis Draper | Not Relevant FRE 403; Unreliable and Unhelpful Opinion FRE 701, 702-704 |
| B-4 | 8/27/2026 | J. Wade Bainum | Not Relevant FRE 403; Unreliable and Unhelpful Opinion FRE 701, 702-704 |
| B-5 | 9/15/2026 | Natalie Michailides | Not Relevant FRE 403; Unreliable and Unhelpful Opinion FRE 701, 702-704 |
| B-6 | 8/27/2026 | Maj. Matthew Ferguson | Not Relevant FRE 403; Unreliable and Unhelpful Opinion FRE 701, 702-704 |
| B-7 | 9/17/2026 | Maj. Tonya Mills | Not Relevant FRE 403; Unreliable and Unhelpful Opinion FRE 701, 702-704; Hearsay FRE 802; Not Disclosed in Discovery |
| B-8 | 8/25/2026 | Amy Lindsey | Not Relevant FRE 403; Unreliable and Unhelpful Opinion FRE 701, 702-704 |
| B-9 | 9/16/2026 | Kiki Teal | Not Relevant FRE 403; Unreliable and Unhelpful Opinion FRE 701, 702-704; Not Disclosed in Discovery |
| B-10 | 8/25/2026 | Jannell Robles | Not Relevant FRE 403; Unreliable and Unhelpful Opinion FRE 701, 702-704 |
| B-11 | 8/25/2026 | Krishnaveni Gundu | Not Relevant FRE 403; Unreliable and Unhelpful Opinion FRE 701, 702-704 |
| B-12 | 9/17/2026 | Daniel Ramos | Not Relevant FRE 403; Unreliable and Unhelpful Opinion FRE 701, 702-704; Not Disclosed in Discovery |
| C-1 | 8/13/2026 | Cheryl Diggs Deposition | Not Relevant FRE 403; Unreliable and Unhelpful Opinion FRE 701, 702-704 |
| C-4 | 7/27/2026 | Porscha Brown | Not Relevant FRE 403; Unreliable and Unhelpful Opinion FRE 701, 702-704 |

[1] The parties had been preparing to submit briefing on their other grounds to vacate the Consent Decree in October when *In re Goodhart* issued and changed the direction of this Court's focus. Plaintiffs have attempted to improperly shoehorn those issues and facts here.

## II. Plaintiffs do not meet their burden to show waiver.

In their response, Plaintiffs have not established waiver.

### A. There is no express waiver.

There is no dispute over whether the Judges explicitly waived *Younger*—they did not. Plaintiffs do not argue to the contrary, thereby conceding there is no objective, intentional, waiver. To the extent they cite cases in their implicit or waiver-by-conduct arguments, those cases do not apply. *See Ohio Bureau of Empl. Servs. v. Hodory*, 431 U.S. 471, 480 (1977) (state defendant expressly waived abstention by deciding "to submit the constitutional issue to th[e] Court for immediate resolution"); *Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Local 54*, 468 U.S. 491, 500 n.9 (1984) (state explicitly agreed to the court's adjudication of the parties' controversy); *Sosna v. Iowa*, 419 U.S. 393, 396 n.3 (1975) (after court asked parties to address Younger, "both parties urged that we reach the merits"); *see also Cradle of Liberty Council, Inc. v. City of Phila.*, No. 08-2429, 2010 U.S. Dist. LEXIS 1082, at *8 (E.D. Pa. Jan. 6, 2010) (city "affirmatively sought to have this Court resolve its case").

### B. There is no waiver by predecessor conduct.

The Fifth Circuit has already held that there is no waiver by their predecessors' entry into the Decree, and that the Judges' predecessors (and Judge Goodhart) clearly and consistently argued for abstention in the district and appellate courts (when they were represented by counsel). There was no *Younger* argument at the time the Decree was entered into to waive, because the Fifth Circuit had said as much, as had this Court. A party cannot waive what they have been told does not exist. Plaintiffs try to discount the *Younger* arguments raised early in this case, claiming 'selective reliance' on them (Dkt. 885 at 61), but they miss the point entirely: those arguments were raised *and denied*. Their shield-and-sword allusion, typically used in privilege disputes, does not apply here. Decrying the undeniable, Plaintiffs next couch the application of changed law and

binding precedent in *Daves II* as 'gamesmanship.' Dkt. 885 at 61. They ignore that, when the Decree was entered, the local rules had already been changed, all parties held the same goals and policies and, as Plaintiffs' own counsel has characterized it, asked the Court to 'codify' those policies in the Decree. Dkt. 793-2 at 4 (Neal Manne letter). Perhaps Plaintiffs intend to argue that a party must somehow "take steps to ensure a ruling" on an argument that has been twice before rejected, within the small window of time between November elections lost by the Republican judges in 2018, and their Democrat successors taking office on January 1st. Dkt. 885 at 62 (citing Dkt. 529, which recounted statements by counsel at a November 28, 2016 hearing that "the political landscape is changing. There has been elections. There is one new county court at law judge who also campaigned on this issue. There is a new DA. There is a new sheriff, both of whom campaigned on this issue….").[2] But the Fifth Circuit has already held and instructed that a public official cannot forever tie the hands of elected successors by entering into a consent decree. *In re Goodhart*, 2026 U.S. App. LEXIS 26177, at *10.

**C. When Judge Garcia took office January 1, 2025, she joined with the other Judges' efforts to obtain counsel.**

An important time period for any waiver analysis begins January 1, 2025, when Judge Garcia took the bench. She joined the other three Judges' continued efforts to obtain counsel, as discussed in the Judges' renewed *Younger* motion, and herein, including talking to colleagues to find a solution and to the AG.

On August 26, 2025, the AG moved to intervene to argue *Younger* abstention (Dkts. 740, 742), and the next day the Judges re-urged their request for counsel to the County. In September, the Commissioners Court finally approved hiring counsel for the Judges—but only on the

[2] Plaintiffs allude to "discovery into potential sanctions" in 2018 without explanation, implicitly admitting they themselves waived any such argument.

condition that the AG's motion to intervene was granted. Dkt. 864-1 ¶ 18. Intervention was granted (in part) on October 30, 2025 (Dkt. 764), and the Judges immediately had counsel appear in this case. Dkts. 765-66 (notices of appearance). And, even though Plaintiffs say no *Younger* motion was filed until *December 2025*, Plaintiffs concede (as they must) that in November 2025, once the Judges had counsel, their attorneys raised abstention to the Monitors, the Plaintiffs, and the Court (Dkt. 885 at 61), and the parties sought a scheduling order for that briefing. Dkt. 770 (Plaintiffs' request for scheduling conference for motions to vacate since the parties could not agree), Dkt. 773 (scheduling order).

Plaintiffs argue there are no evidence of the steps that Judge Garcia took to raise *Younger*, the undisputed evidence is that when she took office, the County had refused to hire counsel for the Judges, and she joined the Judges' efforts to obtain counsel—which were eventually successful. Exhibit 11 at 70:9-18 (explaining 'we' in her declaration means herself and her "Republican colleagues"); Exhibit 12 at 40:13-18, 44:1-8.

**D. The County refused to provide the Judges with counsel for years.**

Plaintiffs spend one scant paragraph of their Response on the only relevant issue—whether the Judges were unable to obtain counsel. Plaintiffs' relative silence is telling: they cannot overcome the undisputed facts that the Judges were unrepresented in this case for years while their judicial colleagues had uninterrupted representation, and the County ignored, delayed, and denied the Judges' repeated requests for counsel. The Judges detailed these efforts in their motion and below.

During 2023, the then-elected Judges talked with the AG about obtaining representation, spent months talking with the County Attorney about obtaining representation, suggested counsel to the County Attorney that he did not approve, and were informed that the County Attorney would not submit the request for counsel to the Commissioners Court until after the 2024 primaries. In

April 2024, the Commissioners Court denied the request. The Judges kept up their efforts, speaking for months internally, with colleagues, with the AG's office, and asking the Monitors for help with the underlying issue of the Decree's conflict with state law. As Judge Johnson explained when asked what she did to obtain counsel, "[Judge Goodhart] kind of drove the bus, so to speak, but we consistently talked about violating state law, having a lawyer, how do we – how do we proceed?" …"And we had asked for a lawyer, and we weren't given a lawyer." Exhibit 12 at 34:15-25, at 40:4-5, 11-18 ("the county wouldn't approve funds for us to have a lawyer when everybody else had a lawyer"). When the AG sought to intervene in August 2025, the Judges re-urged their request for counsel to the County. This time, the Commissioners' Court approved the request—on the condition that the AG was granted leave to intervene, which did not happen until October 30, 2025.

### E. Plaintiffs attack the Judges for not finding a way to hire counsel on their own, without the County's help.

Rather than address this record or otherwise provide evidence to meet their burden to show waiver, Plaintiffs merely conclude that nothing prevented the Judges "from finding counsel" on their own. Dkt. 885 at 54, 61. Their argument is not supported by the record. Plaintiffs cite a deposition question about whether the *Commissioners Court* prohibited the Judges from finding representation. Exhibit 11 at 76:15-18. That does not mean it was actually possible. As the record shows, the Judges consistently requested counsel and assistance, for years.

Moreover, it is the Harris County attorney's "primary duty" to represent County officials "in all civil matters pending" in any "courts in which the state, the county, or the officials of the county have matters pending." Tex. Gov't Code § 45.201. The County attorney must perform such duties "without any additional fee, compensation, or perquisite other than that paid by Harris County out of its officers' salary fund." *Id*. And, under the Local Government Code, when a county

official is sued as the Judges are in this case, they are entitled to representation—either by the district or county attorney or, if additional counsel is necessary or proper (as here, due to the conflict among the HCCCL Judges), "the official or employee is entitled to have the commissioners court of the county employ and pay private counsel." Tex. Loc. Gov't Code 157.901. Texas law would suggest the Judges were entitled to representation the entire time; yet they did not receive representation until late 2025.[3]

Plaintiffs do not explain why the Judges would have to hire and secure funding for counsel when the County provided every other defendant with representation. Plaintiffs' arguments are, themselves, extraordinary, claiming without a shred of evidence that the lack of counsel was somehow "a circumstance of their own making"; presumably, because they were elected and disagreed with their colleagues. At Judge Goodhart's and Johnson's depositions, Plaintiffs' counsel ran through a frenetic series of purported options, including:

- whether they could have used their own personal savings to pay for an attorney to defend them in their official capacities, or
- whether they could have somehow secured pro bono counsel, or
- why the Judges did not use their campaign funds, or
- why the Judges did not just act pro se in this official-capacity case against them.

*See* Exhibit 11 at 58:17-60:9, 61:19-62:13, 799:12-21, 133:13-132:5 (Dep. Judge Goodhart answering questions about whether she could use her own personal funds or campaign funds to hire counsel, or get an attorney to work pro bono, or file something on her own without counsel); Exhibit 12 at 42:7-22 (Dep. Judge Johnson answering questions about whether she tried to pay out of pocket, or allocate her office's budget toward outside counsel).[4] None of these arguments have any relevance to waiver—an intentional relinquishment of a known right. Nor are any of them

[3] Plaintiffs misrepresent the evidence when they say that other attorneys were not sought until August 2025.
[4] Plaintiffs attach only excerpts of the Judge Goodhart and Johnson depositions to their Response. The Judges attach the full transcripts here, redacted to protect privileged judicial discussions.

tenable when the County provided their Democrat judicial colleagues with counsel. As Judge Goodhart explained:

> I did not pay an attorney with my personal funds for an issue that impacted my official capacity when my -- again, when my colleagues had representation, the county had representation, Plaintiffs had representation, and I did not have representation. No, I did not dig into my own funds and hire a lawyer.

Exhibit 11 at 59:19-25. She also addressed Plaintiffs' counsel's suggestion that she use campaign funds to hire an attorney to defend her in this suit:

> And you mentioned something just a moment ago about campaign funds. There were discussions about whether campaign funds could be used. And there were limitations on, one, what you could use campaign funds for and how much would be considered a contribution in kind. So it wasn't an option to use campaign funds for election law purposes. And plus I don't have any campaign funds.

*Id*. at 60:1-9. When pressed further, she explained:

> I was trying to secure representation, which I think is clear through our conversations with the attorney general's office, brainstorming, try to -- trying to figure out, you know, whether we could get representation since the county clearly was not going to provide us representation despite everyone else having representation. … I wasn't aware of any other funding source to secure an attorney to represent me in my official capacity.

*Id*. at 61:20-62:12; *see also* Exhibit 12 at 45:5-11 (Judge Johnson stating, "I feel like your question is making it sound like I did nothing, and we constantly were bouncing ideas off each other. We were talking about it. It was brought up…over and over again"). Judge Goodhart explained the Judges considered trying to find someone to take their case for free, stating she:

> Spoke with some other lawyers brainstorming who might be able to represent us pro bono or if there were any other organizations that would be willing to step up and represent us in this matter. … And the bottom line was nobody was going to take this on for free.

*Id*. at 79:12-21. When Plaintiffs' counsel asked if she could just file something in this case on her own without counsel, Judge Goodhart explained that while she is an experienced attorney,

> Well, I'm prohibited from practicing pro bono work. I can't -- while I'm a sitting court judge. So I could not ethically, given what the judicial code of conduct says,

> represent myself pro bono in federal court, apart from the fact that I am not a federal court practitioner, particularly in matters of civil rights and civil -- civil federal procedure. As -- as you know, it is unethical to practice areas of law that you are not proficient in. And I would say that I -- I would not be capable of representing myself or my colleagues for that matter in a federal court proceeding, particularly one as complicated and voluminous and longstanding as this one. So representing myself was not an option, ethically or otherwise.

*Id*. at 133:13-132:5. Plaintiffs' counsel still pushed, eliciting this response:

> I'm an experienced lawyer that knows enough to not tread waters I'm unfamiliar with. And it wouldn't be fair when my colleagues all had representation. The county had representation. Your clients had representation. The sheriff had representation. And I'm expected to represent myself and -- and leave my duties that the electorate has tasked me with through a democratic election to go fight a battle that I'm entitled to representation on? But I'm expected to represent myself? That wasn't going to happen. Ethically, I couldn't do it.

*Id*. at 134:14-25. Most telling, however, was her response to this question from the AG's counsel:

> **Q. I just have one question for you. Were you aware that Younger abstention could be waived?**
>
> **A. I was not.**

*Id*. at 139:18-20.

### F. Plaintiffs' implicit waiver arguments fail.

Since there is no explicit waiver, and since Plaintiffs concede that the Judges "persistently raised concerns about potential conflicts with state law" (Dkt. 885 at 59), Plaintiffs argue unknowing or unintentional waiver by unrepresented parties, twisting the totality of the circumstances into a knot that disregards a party's understanding or intent. That is antithetical to a waiver analysis.

Plaintiffs' arguments depend entirely on the assumption that unrepresented County criminal court judge defendants must know and be able to traverse complex civil rights litigation in federal court. For example, they argue the Judges should have specifically referenced *Younger*, rather than "complain" about all of the reasons that underlie and support a *Younger* argument such

as complying with state law (comity). The Fifth Circuit has already foreclosed this approach.

Plaintiffs cite *Clark v. Davis*, arguing it holds "[a]s a matter of law" that the lack of counsel cannot excuse any delay in filing a Rule 60(b) motion. Dkt. 885 at 54 (citing *Clark v. Davis*, 850 F.3d 770, 782-83 (5th Cir. 2017)). That is not what *Clark* holds. In *Clark*, the Fifth Circuit's timeliness query concerned an unexplained delay between a decisional change in law and the filing of a 60(b) motion. *Id*. at 782 ("Clark's Rule 60(b) motion did not explain why he did not seek new counsel in the federal district court sooner than he did", and it was still a 12-month delay after new counsel was appointed before the 12(b) motion was filed). *Clark* discussed a good-cause exception to Rule 60(c) timeliness, noting that the "defect which forms the basis of Clark's Rule 60(b) motion—conflicted counsel—was removed in August 2013 *when conflict-free counsel was appointed*…."*Id*. at 783 (emphasis added). This is exactly the point made in *In re Goodhart*, that until the Judges had counsel, they could not have filed sooner.

Plaintiffs cite *McNeil*, which dismissed pro se litigants' federal Tort Claims Act case until they exhausted their administrative remedies. *McNeil v. United States*, 508 U.S. 106, 113 (1993). It did not discuss waiver. Nor did it hold that unrepresented parties sued in their official capacities should, or could, act pro se on behalf of their offices. Plaintiffs cite other cases involving pro se litigants. For the same reasons, these cases do not advance Plaintiffs' arguments. *Kaswatuka v. U.S. Dep't of Homeland Sec.*, 7 F.4th 327 (5th Cir. 2021) (pro se plaintiff sued the wrong defendant under Title VII, requiring dismissal); *U.S. v. Fowler*, 605 F.2d 181 (5th Cir. 1979) (pro se criminal defendant whose motion to continue trial so he could retain counsel was denied when he had been arraigned seven months previously and advised of his right to counsel).

Plaintiffs repeatedly cite *Boren*, a case involving Texas law surrounding when the holder of a note abandons acceleration. *Boren v. U.S. Nat'l Bank Ass'n*, 807 F.3d 99, 105 (5th Cir. 2015).

*Boren* recounts the elements of waiver as an existing right, and the party's actual knowledge of the right coupled with actual intent to relinquish it or conduct inconsistent with the right. *Id*. In *Boren*, the lender waived an earlier acceleration by sending a notice demanding payment to bring the loan current and, if not received, the maturity date would be accelerated. *Id*. at 106. This was an unequivocal manifestation of the intent to abandon the previously demanded acceleration period. *Id*. Plaintiffs also cite *Norton*, a case involving a town that delayed prosecution for five years to allow the court to rule on the plaintiff's claims, and therefore *Younger* did not apply. *Norton v. Town of Islip*, 239 F. Supp. 2d 264, 275 (E.D.N.Y. 2003).

### G. Plaintiffs improperly characterize the Judges' persistent efforts to solve the conflict between the Decree and state law as waiver.

In a last-ditch effort to avoid *Younger*, they characterize the Judges' continued and persistent efforts as some kind of waiver, arguing three of the Judges sought modification, not vacatur, and therefore somehow waived the right to raise a legal argument when they lacked counsel in this case. As Judge Johnson explained, the Judges "were trying to brainstorm of who we could get as a lawyer" (Exhibit 12 at 35:13-15), and discussed several potential attorneys to speak with about representation or about finding someone who could represent them, and this occurred "as soon as we realized that we didn't have counsel and that the county wasn't going to let us find counsel." Exhibit 12 at 39:2-7.

Plaintiffs' repeated attacks on unrepresented parties who suggested changes to the Decree do not establish waiver—at most, the May 2025 suggestion shows the Judges, as parties traversing their options, tried everything they could think of, even sending a suggestion to the Monitor, who refused to act. It is not evidence of waiver. *See U.S. v. Bissonnette*, No. 1:16-cv-1070, 2021 U.S. Dist. LEXIS 75634, 2021 WL 1438309, at *10 (E.D. Va. Mar. 4, 2021) (mem. op. and order) (court would not punish a party for attempting to negotiate an out-of-court modification to a consent

decree before litigating to seek vacatur).

The Plaintiffs *now* ask the Court to consider a May 2025 request that parties submitted to the Monitors, who rejected the request, should now be considered by the Court to determine whether modification of the Decree is justified. Dkt. 885 at 62. The Judges suggested changes to the Decree to alleviate the daily problems they faced due to the Decree's open conflict with state law, and the Monitors and every other party opposed it and refused to raise it to the Court.[5] This does not amount to waiver of a *Younger* argument. The Judges tried each and every avenue they could think of to address the conflict, were denied counsel in this lawsuit, turned to the AG and others for assistance, and even asked the Monitor about a way to fix the immediate problem of the Decree's conflict with state law.

There is no fact issue about waiver. The County delayed and refused to provide counsel to the Judges, preventing them from presenting arguments that the County vehemently opposes.

Plaintiffs try to distinguish *RTM Media*, arguing the party in that case consistently requested abstention—except the party in that case was consistently *represented by counsel*. *RTM Media, L.L.C. v. City of Hou.*, 584 F.3d 220, 229 n.15 (5th Cir. 2009).

## III. Plaintiffs' Rule 60(b) arguments fail.

### A. This Court must follow *In re Goodhart* and *Daves II*, the application of which does not "hinge on factual development", whether under this Court's power or Rule 60(b).[6]

Plaintiffs argue that, contrary to the directive in *In re Goodhart*, the Court must conduct a deep factual analysis under Rule 60(b). They focus on whether applying the Decree prospectively

[5] When the Monitor received this request, he presented it to all other parties, to the exclusion of the Judges (Dkts. 864-13, -14 & -16), and refused to raise these concerns to the Court. Dkt. 864-17. During the course of discovery connected with the motions to vacate, the Monitor has also refused to identify or provide any of the data underlying his sweeping and conclusory opinions, and has acted at all times like a biased advocate rather than a purportedly independent researcher. *See* Dkt. 885 (citing Monitor's articles).

[6] *In re Goodhart*, 2026 U.S. App. LEXIS 26177, at *9.

is equitable regardless of the Fifth Circuit's mandate. Plaintiffs cite cases involving factual inquiries such as whether minority voters in a voting rights case supported a candidate who lost an election, or whether voter dilution caused the loss. *See League of Un. Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 438-39 (5th Cir. 2011); *see also Rufo v. Inmates of Suffolk County Jail*, 502 US 367, 385-87 (1992) (considering changed factual conditions in Rule 60(b) motion).

But this case is not the same, and does not present a need for factual development under Rule 60(b) or otherwise. The Fifth Circuit has held "that the district court *in this case* should have abstained," and that "this very case 'should [not] have been adjudicated in federal court.'" *In re Goodhart*, 2026 U.S. App. LEXIS 26177, at *8 (emphasis in original). This decision was based on mootness as well as abstention.

Coupled with *In re Goodhart*, *Daves II* makes clear that the final order in this case is reversed or vacated, therefore meeting Plaintiffs' proffered analysis under Rule 60(b).[7] *See Daves II*, 64 F.4th at 635 ("we hold that *Younger v. Harris* and its progeny required the district court to abstain; that the *ODonnell I* decision to the contrary is overruled; and that the case is moot by virtue of intervening state law"). Under Rule 60(b)(5), it is clear that there has been a change in Texas' bail-reform statutes, so that applying the Consent Decree now causes daily violations of state law, applying friction between a party-created policy of immediately releasing most misdemeanor arrestees, and new state laws passed to ensure that trained magistrates consider the circumstances before just letting arrestees go without any review. *See, e.g., Doe v. Briley*, 562 F.3d 777 at 779 (6th Cir. 2009) (affirming vacatur of 34-year-old consent decree that proscribed the

[7] With respect to (b)(4), it is not true that the Judges do not contest that jurisdiction existed when the Decree issued. Dkt. 885 at 51. At that time, all parties were united, the local rules had already been amended, and no controversy existed for the Court to determine. Plaintiffs' citation to *Callon*, therefore, is not controlling. *Callon Petrol. Co. v. Frontier Ins. Co.*, 351 F.3d 204, 208-09 (5th Cir. 2003) (affirming denial of Rule 60(b)(4) motion where district court had diversity jurisdiction). Regardless, the Court may follow *Daves II* without traversing this jurisdictional argument.

publication of certain arrest records when subsequent caselaw "has swept away the decree's constitutional foundation"); *see also June Med. Servs. LLC v. Phillips*, 640 F. Supp. 3d 523, 539 (M.D. La. 2022) ("the Court acts properly in vacating an injunction when the legal basis for that injunction has been eliminated—and, indeed, the Court likely abuses its discretion when it doesn't" and collecting cases). *Daves II* also reversed course on *Younger* at a time when this Court continues to mandate specific handling of ongoing criminal proceedings, in contradiction of state law.

If the Court determines none of those reasons apply under *In re Goodhart*, it may vacate under Rule 60(b)(6), which permits vacatur for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). There is no more extraordinary circumstance than a direct mandate to apply Circuit precedent requiring dismissal. In addition, the underlying extraordinary circumstances outlined in *Daves II*, *Younger*, and *In re Goodhart* justify vacatur and dismissal—including to cease ongoing federal court control over pending state criminal proceedings that require most misdemeanor arrestees be immediately released to the streets without any trained magistrate's review. *See, e.g., Joseph A. v. Ingram*, 275 F.3d 1253, 1272 (10th Cir. 2002) ("*Younger* governs whenever the requested relief would interfere with the state court's ability to conduct proceedings, regardless of whether the relief targets the conduct of a proceeding directly").

Plaintiffs contend no extraordinary circumstances warrant 60(b)(6) relief, citing *BLOM Bank*, where a party wanted to reopen the case and amend a complaint. *BLOM Bank SAL v. Honickman*, 145 S. Ct. 1612, 1619 (2025). The Supreme Court held that Rule 60(b)(6), which allows courts to vacate final judgments or orders for "any other reason that justifies relief," is available in extraordinary circumstances, in addition to other Rule 60(b) reasons to vacate such as when a judgment is void, or has been reversed or vacated, or applying it prospectively is no longer equitable. *Id.*

Plaintiffs also cite habeas proceedings relating to criminal convictions, including *Gonzalez v. Crosby*, a habeas proceeding filed over twelve years after the petitioner pled guilty, did not appeal, and began serving a 99-year sentence. *Gonzalez v. Crosby*, 545 U.S. 524, 529 (2005). The Court held, however, that the "extraordinary circumstances" required under 60(b)(6) "will rarely occur in the habeas context." *Id*. at 535-36. In *Gonzalez*, the habeas petition was dismissed as not properly filed because it was untimely and successive, and subsequent authority issued that the petitioner sought to apply regarding tolling and timeliness. *Id*. at 528-29. The Court reviewed the interplay of 60(b) and habeas petitions, noting that "not every interpretation of the federal statutes setting forth the requirements for habeas provides cause for reopening cases long since final." *Id*. at 536-37. In *Gonzalez*, the changed law was "all the less extraordinary" because of his lack of diligence in pursuing review of the limitations issue sooner, citing another case where extraordinary circumstances were not found when a movant failed to appeal an adverse ruling, another party to the same judgment appealed and won, and the petitioner field a Rule 60(b) motion "years later." *Id.* at 537–38 (citing *Ackermann v. United States*, 340 U.S. 193, 195 (1950)). In that case, a free and voluntary decision not to appeal was made, though in hindsight it appeared mistaken. *Id*. Even Plaintiffs' citation to *Callon* falls flat, where the "crux" of that decision to affirm denial of relief under 60(b)(6) "is simply that the [moving party] offers no plausible excuse for ignoring the [$2.7 million final] judgment for some fourteen months" and the plaintiff had sent notice and demanded payment. *Callon Petrol. Co.*, 351 F.3d at 206-07 (noting party did not move under 60(b) until after Callon moved to liquidate its claim). Nor does *Adams v. Thaler* support their argument; it is another habeas proceeding in which the Fifth Circuit recounted *Gonzalez*'s statement that extraordinary circumstances rarely occur in the habeas context. *Adams v. Thaler*, 679 F.3d 312, 319 (5th Cir. 2012).

Here, by contrast, an entire County's misdemeanor criminal pretrial proceedings are continually controlled by a federal court in a manner contrary to the rest of the state, and state law, years after *Daves II* issued mandating vacatur. *Daves II*, 64 F.3d at 635. This is no mere 'intervening change in decisional law' that sits alone here and fails to constitute an extraordinary circumstance under 60(b)(6) as Plaintiffs contend. *See* Dkt. 885 at 51-52 (citing *Hess v. Cockrell*, 281 F.3d 212 (5th Cir. 2002), another habeas proceeding holding 60(b)(6) motions are not substitutes for timely appeals, particularly where mistakes of law are alleged).[8]

**B. Plaintiffs cannot avoid the Fifth Circuit's mandate to follow *Daves II* by arguing appellate briefing waiver here.**

Plaintiffs attempt to avoid dismissal by arguing Rule 60(b) arguments are waived. That argument does not fit here. First, the Fifth Circuit has mandated the Court to follow *Daves II*, and this Court is not confined to the boundaries of party briefing when following that directive. Federal courts may modify continuing decree of injunction on their own motion. *See Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189-90 (5th Cir. 2008). Rule 60(b) "need not necessarily be read as depriving the court of the power to act in the interest of justice in an unusual case in which its attention has been directed to the necessity for relief by means other than a [party-initiated] motion." *Id*. (quotation omitted). So any appellate-briefing-waiver Plaintiffs make, unfounded as it is, does not stop the Court from considering how to implement *In re Goodhart*'s directive.

Second, the parties have openly disagreed before this Court about the appropriate framework and method for applying *In re Goodhart* and *Daves II*. *See* Exhibit 10 at 38-39 (8/27/26 hearing transcript discussing applicability of Rule 60(b)). At that hearing, Plaintiffs argued for the need to develop facts for a Rule 60(b) analysis, to which the Judges' counsel responded that

[8] The Judges have consistently argued, and the Fifth Circuit has confirmed, that arrestees do not have a constitutional right to *immediate* release.

Plaintiffs' cited cases holding that a "flexible approach" requires review of all equity facts (including *Rufo*) are inapposite to this case, "where you've got a prior Fifth Circuit opinion in place that resolves this case" and the "Fifth Circuit [is] telling this Court: Follow this opinion" and "[t]here are no fact issues." Exhibit 10 at 8. Therefore, while Plaintiffs argue a full factual records on equitable principles under Rule 60(b) is required, the Judges disagree as they indicated in their motion. The issue is presently and squarely before the Court—not only through all party briefing, but because the Fifth Circuit has mandated that the Court follow *Daves II*. *See In re Goodhart*, 2026 U.S. App. LEXIS 26177, at *12 (citing *Daves II*, 64 F.4th at 635 which held that "[e]xercising our discretion to review both justiciability issues following remand, we hold that *Younger v. Harris* and its progeny required the district court to abstain; that the *ODonnell I* decision to the contrary is overruled; and that the case is moot by virtue of intervening state law"). That includes vacating the Decree through matter of law application of Rule 60(b)(5) and/or (6).

Plaintiffs cannot escape this result by relying on cases involving appellant briefing waiver, where they raised an entire basis for reversal of a district court order or judgment in a footnote on appeal, without any explanation. *See* Dkt. 885 at 35, 50 (citing *U.S. v. Charles*, 469 F.3d 402 (5th Cir. 2006) (involving a request to reverse for lack of evidence presented in a footnote without any authority, but still finding the record sufficient to support the verdict where the silencer was found in close proximity to the gun for which it was specially threaded).

**IV. Plaintiffs' extraneous arguments do not defeat dismissal.**

Movants address a couple of final points, regardless of relevance.

First, Plaintiffs' state that thousands of constitutional violations will occur without the Decree in place. None of Texas' other 253 counties are subject to ongoing federal control over their criminal pretrial procedures, and any argument challenging Texas' bail-reform statutes are well outside the scope of this lawsuit.

Second, regardless of the vacatur of the Decree, the majority of the HCCCL Judges still have the right to, maintain pretrial procedures that they believe expedite processes and/or go above the protections afforded under state law, as long as they comply with state law requirements.

Plaintiffs' arguments about severe prejudice and resources, and the cost of implementing the Consent Decree are not established facts, as Plaintiffs purport. The parties were gearing up for a full hearing and briefing on detailed arguments such as costs and the effectiveness of the Decree before *In re Goodhart* issued. Those preparations ceased to address the important issue of abstention.

## CONCLUSION AND PRAYER

The Fifth Circuit gave clear and specific instructions. The Judges ask that the Court consider *Younger*, *In re Goodhart*, and issue an order following *Daves II*.

Respectfully submitted,

**GREER, HERZ & ADAMS, L.L.P.**

By: /s/ *Joseph R. Russo, Jr.*
Joseph R. Russo, Jr.
Federal I.D. No. 22559
State Bar No. 24002879
jrusso@greerherz.com
Angie Olalde
Fed. ID No. 690133
State Bar No. 24049015
aolalde@greerherz.com
123 Rosenberg Street, Suite 3000
Galveston, Texas 77550
(409) 797-3200 (Telephone)
(866) 456-0170 (Fax)

**ATTORNEYS FOR DEFENDANTS**
**HON. PAULA GOODHART,**
**HON. JESSICA PADILLA,**
**HON. LESLIE JOHNSON, AND**
**HON. LINDA GARCIA**

**CERTIFICATE OF SERVICE**

I certify that on the 21st day of September, 2026, a true and correct copy of the foregoing document was delivered to all counsel of record via the CM/ECF system and served by electronic notice to all parties of record.

*/s/ Joseph R. Russo, Jr.*

EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

*****************************************************************

MARANDA LYNN ODONNELL, et al., on behalf of themselves and all others similarly situated,

Plaintiffs,

VS.

HARRIS COUNTY, TEXAS, et al.,

Defendants.

4:16-CV-01414

HOUSTON, TEXAS

AUGUST 31, 2026

*****************************************************************

TRANSCRIPT OF PRE-MOTION CONFERENCE PROCEEDINGS HELD VIA ZOOM
HEARD BEFORE THE HONORABLE LEE H. ROSENTHAL
UNITED STATES DISTRICT JUDGE

*****************************************************************

APPEARANCES:

FOR THE PLAINTIFF:

Mr. Travis Walker Fife
Texas Civil Rights Project
PO Box 1108
Houston, Texas 77251

Mr. Jeremy D. Cutting
Ms. Elizabeth Anne Rossi
Civil Rights Corps
1601 Connecticut Ave NW
Suite 800
Washington, DC 20009

Proceedings recorded by mechanical stenography, transcript produced via computer.

Ms. Kirsten Lanae Budwine
Texas Civil Rights Project
1405 Montopolis Drive
Austin, Texas 78741

Ms. Morgan McCollum
Susman Godfrey LLP
One Manhattan West
50th Floor
New York, NY 10001

Ms. Sarah Bellinger Beebe
Texas Civil Rights Project
1500 McGowen Street
Suite 220
Houston, Texas 77004

FOR THE DEFENDANT HARRIS COUNTY, TEXAS:

Mr. Seth Barrett Hopkins
Mr. Daniel Hu
Harris County Attorney's Office
1019 Congress 15th Floor
Houston, Texas 77002

FOR THE DEFENDANTS FOUR MOVANT JUDGES:

Mr. Joseph R. Russo, Jr
Ms. Angela Olalde
Greer Herz Adams LLP
One Moody Plaza
18th Floor
Galveston, Texas 77550-7998

FOR THE DEFENDANT Ed (Sheriff) Gonzalez:

Mr. Murray J. Fogler
Fogler, O'Neil & Gray LLP
909 Fannin Street
Suite 1640
Houston, Texas 77010

FOR THE DEFENDANT 12 NON-MOVANT JUDGES:

Mr. George Allan Van Fleet
G. Allan Van Fleet, P.C.
6218 Elm Heights Lane
Suite 201
Houston, Texas 77081-2409

FOR THE INTERVENOR DEFENDANT: Mr. Joseph Emeka Nwaokoro
Office of the Attorney General
General Litigation Division
P.O. Box 12548 (MC - 019)
Austin, Texas 78701

Official Court Reporter: Lanie M. Smith, CSR, RMR, CRR
Official Court Reporter
United States District Court
Southern District of Texas
515 Rusk
Room 8004
Houston, Texas 77002

PROCEEDINGS

THE COURT: Good afternoon. Is everybody who needs to be present here?

(No response.)

02:56PM THE COURT: Go ahead and state your appearances, please.

MR. FIFE: Travis Fife for the plaintiffs, Judge.

MR. CUTTING: Jeremy Cutting for the plaintiffs.

MR. HU: Daniel Hu for Harris County.

02:57PM MR. HOPKINS: Seth Hopkins for Harris County.

MR. FOGLER: Murray Fogler for the Sheriff.

MR. VAN FLEET: Allan Van Fleet for the 12 Nonmoving Judges.

THE COURT: Thank you.

02:57PM MR. RUSSO: Joseph Russo, Jr., and Angela Olalde for the Four Movant Judges.

THE COURT: All right. So let's take up the issues that we need to address today.

MR. FIFE: Your Honor, we would be happy to take up all 02:57PM of those issues. I was hoping if we could start with the Court's question from last week, which is if the Fifth Circuit says this should have never been in federal court, what are we supposed to do here?

And our further research and reading of the 02:57PM opinion elucidated three what I would call guideposts.

So the first is, as the Court knows, abstention is non-jurisdictional meaning there can't be a serious debate that the Court retains jurisdiction over these proceedings.

And the closest case we could find is a case called *Callon Petroleum Company against Frontier Insurance Company*. That's at 351 F.3d 204 (Fifth Circuit 2003).

And what the Fifth Circuit did there was in defense to post final judgment proceedings, challengers to a final judgment asserted *Burford* abstention; and the Fifth Circuit said: Well, first of all, abstention issues are not the types of egregious jurisdictional defects that Rule 60 can correct.

And in making that holding, the Court said: Well, even if the Court should have abstained at the start, now that we're post final judgment, abstention isn't going to carry the day here. And the Fifth Circuit permitted those district court proceedings to move forward.

And we take two lessons from *Callon*. Number 1 is that this Court should be assured of its jurisdiction to do what -- order whatever proceedings the Court finds necessary to resolve the Four Judges' motion.

The second important piece there is even when abstention was at issue in *Callon*, Rule 60 still supplied the appropriate framework. There is no free-floating

jurisdictional attack.

And, of course, here, the *Younger* abstention isn't even a jurisdictional defense; so I think the Court should feel confident in ordering whatever additional proceedings are necessary to resolve these motions.

Now, I also understood the Court's question to be: Well, what should those proceedings even look like in light of the panel? And I think it's really important to be clear what the Fifth Circuit held and what it didn't hold.

So we know that we're going to have to our work here on a fast timeline unless and until the Fifth Circuit or the Supreme Court steps in and tells us differently, and plaintiffs are willing to work on that timeline.

But the Court didn't tell Your Honor how to rule. It didn't tell the Court to vacate the consent decree. It didn't purport to overrule the *Rufo* framework. And, in fact, it relied on *Rufo* in making its decision and as we're going to talk about in a second, it also demonstrated that the Court can do fact-finding into waiver.

THE COURT: Well, can I ask one question here?

MR. FIFE: Of course.

THE COURT: I'm following you, but that doesn't fully account for the Fifth Circuit's directive -- again, I'm sorry. I'm raspy -- the Fifth Circuit directive to follow what *Daves* required.

MR. FIFE: I believe the exact words of the concluding paragraph were to apply *Daves II*.

THE COURT: Right.

MR. FIFE: And, as Your Honor knows, we vigorously disagree with *Daves II*; but for the purposes of proceedings in your court where you're bound by that decision, we never suggested that you shouldn't apply *Daves*. *Daves* is binding en banc precedent.

But the question becomes -- and this is the last thing I really want to drive home here -- is that the record will demonstrate that vacating the consent decree will create or perpetuate thousands of constitutional violations a year.

The Fifth Circuit said nothing about that situation where you're applying *Daves II* to a record that vacatur will result in constitutional violations, and the clearest precedent you have in that situation is *Rufo* and the Rule 60 equities that strictly prohibit vacatur if doing so will result in constitutional violations.

And so I -- so, yes, let's apply *Daves II*, but let's do so through the Rule 60 framework that the Fifth Circuit relied upon in the panel decision here; and decades of precedent have guided the Court in how to apply.

And the last thing I'll say is just very practically what we think should happen going forward is, Number 1, let's do these depositions on Wednesday. We're happy

to discuss the nuts and bolts of scope.

Mr. Russo, you will be happy to know that as I was getting on here we confirmed we can do them all on Wednesday, three to four hours each.

03:03PM And then let's make sure the briefing schedule will allow -- will be expedited, but also allow fulsome briefing to receive further arguments on these points.

And as you saw from our letter, we also want to reserve time for an evidentiary hearing so the Court can make

03:03PM factual determinations about, A, did the Judges waive *Younger;* and B, will vacating the consent decree result in constitutional violations and the other *Rufo* Rule 60 equities.

THE COURT: Thank you.

Does the other side want to respond?

03:03PM MR. RUSSO: Yes, Your Honor.

The cases cited by plaintiffs are not going to have the situation that you have here. You do not have a situation where you've got a prior Fifth Circuit opinion in place that resolves this case. You don't have the

03:04PM Fifth Circuit telling this Court: Follow this opinion. We don't have the Fifth Circuit telling this Court: There are no fact issues. There is no discovery needed on any of these issues, Rule 60 or otherwise.

While we don't agree that Rule 60 is even in play

03:04PM here, the result regardless is the same. Point being the

Fifth Circuit has outlined abstention needs to be considered and dealt with as a matter of law. The only issue that the Court cited to was this waiver issue which it said doesn't look like it's an issue, but here we go. The specific statement from the Court and its conclusion was: The Court -- we direct the district court to follow *Daves II*.

So, again, that's a very specific situation and one that's very specific to the case facts here, which -- you're not going to find a Rule 60 case where you have these kind of facts, where you have this kind of law that's being applied as a matter of law. There are no facts to be found here, Your Honor. But I will --

THE COURT: Except the waiver.

MR. RUSSO: Yes.

But what I'll say, Your Honor, is, again, Rule 60, whether you apply it or not, you still reach the same result, which is follow *Daves II*; and as a matter of law, there are no facts or discovery to be done in connection with anything other than whether the -- whether the judges intended to waive a known right to bring the abstention doctrine forward.

And, again, of course, the Fifth Circuit noted to the extent these people were unrepresented or didn't have the opportunity to have representation to bring this, what can be said about that. And the reality is the facts are going to

show the County declined them representation in 2024 very plainly and never provided that otherwise.

So factually there's not much for the Court to decide here. And, of course, you have a short timeline provided by the Fifth Circuit. They want to get to this as quickly as possible reasonably so.

Again, we propose we file our motion, give plaintiffs seven days after the discovery is done to respond, we file our reply within a couple of days and we don't believe the Court is going to need a hearing on any of this or Rule 60 or otherwise based upon the Court's ruling in *In re Goodhart.*

This issue of vacatur creating constitutional violations. This has all been dealt with, Your Honor, in the *Daves* analysis. That Court satisfied itself that constitutional violations were not happening and/or Rule 60 -- I'm sorry -- SB 6, SB 9, there are processes in place to deal with that.

So, you know, this notion --

THE COURT: Wait. Wait. Wait.

What is "that"? Constitutional violations?

MR. RUSSO: Yes, Your Honor.

That being this notion that there are constitutional violations that are going to burst forward if this consent decree is set aside or vacated. There are 253 counties in the state of Texas, Your Honor, that are dealing --

using state law to do what they're doing.

Harris County is the only one that's under a consent decree. This notion that all of these constitutional violations are just going to spring forward don't make sense at all. The backdrop behind all this, Your Honor, is Harris County Courts at Law still have the ability to control the way that the bail processes are done without the consent decree in place --

THE COURT: Subject to SB 6 and 9.

MR. RUSSO: Correct. Exactly. That's exactly right. And as long as they're complying with state law, the majority of the judges get to rule the day. And so while we have four judges that are saying, "vacate the consent decree," the reality is the majority of those judges still have every ability to control how bail processes are done within Harris County.

So this notion that, again, constitutional violations are suddenly going to be springing forward all over the place, it doesn't have merit, Your Honor.

In any event, we certainly are willing to talk about how we deal with discovery from here out. We're certainly willing to talk about a reasonable schedule. Again, I think if we can get plaintiffs' response by the 9th of September, which is seven days after we expect discovery to be done, we'll respond -- reply within two days and the Court can

consider everything and be done with it the second week of September.

THE COURT: Mr. Fife?

MR. NWAOKORO: Your Honor, before Mr. Fife, if I may.

03:09PM I had another issue at the beginning of this hearing. I apologize for that.

So I'm not sure whether or not the Court made any remarks relating to the Attorney General's motion for reconsideration.

03:09PM THE COURT: I'm not sure what you're proposing.

MR. NWAOKORO: No. I'm simply stating I had another issue when I joined the call so I don't know whether or not the Court had any comment or question about the Attorney General's motion to reconsider.

03:10PM THE COURT: Well, I think the issue for today is the process for deciding these questions.

MR. NWAOKORO: Okay.

THE COURT: So the Four Judges have moved to vacate on the basis of *Younger* abstention, the Attorney General has moved 03:10PM to reconsider. I think that the basic analysis, although the legal frameworks will differ --

MR. NWAOKORO: Right.

THE COURT: -- the discovery and presentation should be on the same track.

03:10PM MR. NWAOKORO: Okay.

THE COURT: That's my thinking.

MR. NWAOKORO: Okay. If I can expand to Your Honor -- if I can add to what Mr. Russo has stated, I'm looking at *Daves* at Page 635. The Courts observed that the provisions of SB 6 and the implementation are alleged to have raised constitutional issues beyond the scope of this case and the circumstances of the plaintiffs who filed it.

03:11PM

The Court in *Daves* II, was looking at the allegation by the plaintiffs as well in that case that a -- to preserve constitutional issues and the Court expressly disagreed.

03:11PM

And consistent with what Mr. Russo was stating a minute ago, to the extent that a Court deems Rule 60 applicable, we think there really is no tension. If the Court agrees to abstain under *Younger*, then that furnishes the inequitable consideration under Rule 60(b)(5).

03:11PM

So if the Court were to determine that this case is moot as we maintain or that it shall abstain under *Younger*, then that means -- that translates into it is no longer equitable under Rule 60(b)(5) to continue to preserve the consent decree.

03:12PM

Thank you very much.

THE COURT: Thank you.

Go ahead, Mr. Fife. Did you want to say something?

03:12PM

MR. FIFE: No. Please. Please. I thought Your Honor wanted to hear a response.

THE COURT: I think the focus for today ought to be to set the schedule and framework for these -- the substantive issues to be presented and argued.

03:12PM

MR. FIFE: Absolutely. And I should have said at the beginning that Mr. Cutting will be handling the nuts and bolts of the schedule.

But I did just want to say that I think to put that question maybe more pointedly it's are we going to prejudge these issues of whether the facts matter, whether Rule 60 applies and whether constitutional violations would result.

03:12PM

And in our view, we think that much of what Mr. Russo said was -- just misstated the cases that they're relying on and we look forward to briefing those. But I think the important thing for today is let's make a schedule that doesn't prejudge these really weighty issues and allows us to fully brief and argue them.

03:12PM

THE COURT: All right. So looking at the schedule and then we'll go back to the dispute over the scope of the depositions that are scheduled to occur on Wednesday.

03:13PM

On the schedule. So discovery is to be completed by September 3rd, I gather -- discovery and the depositions.

MR. RUSSO: I think it's September 2nd, but...

03:13PM

MR. CUTTING: Mr. Russo is correct I think. Yeah.
THE COURT: All right. Fine. September 2nd.
The Judges have suggested that that means that by September 10 the Non-Movants' responses would be due.
03:14PM Does that work?
MR. CUTTING: We're opposed to that approach, Your Honor. I just -- I don't want to take too much time, just a half step back. I do want to just note that we have -- well, we filed a motion to stay the mandate with the Fifth Circuit on 03:14PM Friday and then in the coming days as soon as the Fifth Circuit rules on that, we will be filing a motion to stay -- or a petition to stay the mandate with the Supreme Court.
So we have that going on. And I say that just to note a little bit of surrounding capacity issues as we talk 03:14PM about some of the upcoming motions that will need to be responded to.
So we totally agree with the Court that we need to set a quick schedule, but we also believe it should be one that is efficient and fair. And as we see it, we have the 03:15PM motion to reconsider which was filed on Friday; we have the Four Judges' renewed motion to vacate, which I don't -- Mr. Russo, I don't know if you're still planning to file today or what the timeline is on that, but I know that it's coming soon; and then, of course, if the Attorney General 03:15PM is successful on his motion to reconsider, he would also have

03:15PM 03:16PM

his own motion to vacate premised on the same abstention 60(b) argument.

So our approach -- really our approaches are twofold. We're fine and fully supportive of one of two approaches. The difference between them really hinges on whether the Attorney General is going to adopt the Four Judges' briefing in the event that his motion to reconsider intervention is granted or if he's going to insist on filing his own brief.

So in the first instance, if he's going to adopt the Four Judges' position in the event -- oh, yes.

THE COURT: Can we pause here and ask the Attorney General's lawyer that question?

MR. NWAOKORO: Yes, Your Honor. When we have discussed that with the plaintiffs, our intent is to adopt essentially the Four Judges' motion. There's a caveat, however, Your Honor. The waiver issue, which is the subject of the deposition, which is fact-intensive, will not apply to the Attorney General. So we expect that our motion -- our abstention is going to be similar -- substantially similar to theirs except for the waiver issue.

So we may end up having a supplemental. It should be very brief, but we think that our arguments are going to substantially align except for the first specific waiver issue that they have, we don't.

THE COURT: Mr. Cutting, how does that affect your analysis?

MR. CUTTING: Well, I imagine Your Honor understands. What we don't want to get in is a situation where first our resources are constrained while we're trying to respond to a motion to intervene and a motion to vacate at the same time on an extremely short timeline.

So what we would propose is that then we deal with the motion for reconsideration first on a very speedy timeline that we would take very seriously despite having these other petitions for relief underway and that we could resolve that ideally within close to a week, we could file our opposition to the motion to intervene by Friday if that's the one thing that we had to focus on, and that the Court resolve that motion to intervene before then deciding the -- setting the schedule.

I mean, we can set the schedule now for the responses to the motion or motions to vacate; but this would allow us to first figure out are we responding to one motion or two motions and let's see the motions and then we get to respond to it.

And the alternative is not only difficult from a workload and capacity point of view, but it also sets up a real unfair situation where the Attorney General basically gets two bites at the apple because they get to see us respond to the

Four Judges' motion to vacate and then formulate their own motion to vacate raising the same issue.

THE COURT: I thought that what I had begun by proposing was that the deadline for both the Attorney General's motion to reconsider on the intervention and the Judges' motion to vacate be simultaneously submitted.

MR. CUTTING: If they want to submit on the same day, we have no issue with that, it's just about our responding. The problem with responding to both of those simultaneously is that we have then filed our response to the Four Judges' motion to vacate and the Attorney General may be permitted to intervene and raise -- and file his own motion and he will have already seen our response and get to file that.

So I think it's not only unfair to the Non-Movants, I think that it's not particularly efficient for the Court to be -- to have to first consider the first motion to vacate and then consider the motion to intervene and then consider a second motion to vacate.

THE COURT: So what is your proposed order?

MR. CUTTING: Well, if, as I hear counsel for the AG stating, they're not going to agree to adopt the Four Judges' position, which was the initial proposal that actually originated with the Four Judges' counsel, if they don't agree to adopting that, then we suggest something like the following: We could submit our response or the Non-Movants could submit

their responses in opposition to the Attorney General's motion to consider on Friday. That's September 4th.

THE COURT: Hang on. Let me write this down.

MR. CUTTING: Of course.

03:20PM THE COURT: The Non-Movants' response to the AG's motion for reconsideration?

MR. CUTTING: Correct. And we could respond to that on Friday.

THE COURT: Okay. Keep going.

03:20PM MR. CUTTING: We propose that the Attorney General, to the extent they wish to reply, would do so on Tuesday. I say that only because Monday is a holiday. Very respectfully, we would see if the Court was amenable to trying to decide that issue at some point next week based on those briefs if that 03:20PM worked; and then we would propose that the motion or motions to vacate, depending on whether or not the Attorney General is permitted to raise this abstention argument, would be due on September 11th, which is Friday; and then we would propose that we would respond by -- Non-Movants would respond to one or both 03:21PM motions on September 30th.

THE COURT: Hang on. So 9/11?

MR. CUTTING: Correct. That would be the motions to vacate, including the Attorney General's if he's permitted to so move.

03:21PM THE COURT: If he's allowed to intervene?

03:21PM 03:22PM 03:22PM 03:22PM 03:23PM

MR. CUTTING: Right. On this basis, yes.

THE COURT: Yes.

All right. After 9/11?

MR. CUTTING: We would propose September 30th as our date to respond -- the Non-Movants' date to respond to whichever motions to vacate are filed, one or both.

THE COURT: All right.

MR. CUTTING: And we would propose October 5th as a reply date; and whenever it's convenient for the Court, but potentially something like October 7th or 8th for a hearing if the Court decides one is necessary or useful.

(Simultaneous speaking.)

MR. CUTTING: We believe that schedule -- Pardon. I didn't mean to speak over you.

THE COURT: Hearing or oral argument depending --

MR. CUTTING: Hearing or oral argument. Whatever the Court ultimately decides based on the briefing is appropriate.

THE COURT: All right. So a couple of questions.

First I need to hear from Mr. Russo and Mr. Nwaokoro on their reactions to this schedule.

Mr. Russo?

MR. RUSSO: Yes, Your Honor.

Nothing about this proposed schedule is an expedited basis and well in advance of the November elections, which is what the Court was directed to do.

I mean, I understand that the AG's office has its motion to reconsider out there, but that process should not hold up or inhibit the Court's consideration of the abstention issue that the Fifth Circuit has directed the Court to consider on an expedited basis.

03:23PM

So just in general having the Four Judges --

THE COURT: What is your schedule -- your counterproposal?

MR. RUSSO: So our schedule, Your Honor, is to file our motion to vacate based on abstention this afternoon; plaintiffs' response to that be filed September 9th, which is a week from the discovery period; we file our reply by September 11th --

03:23PM

THE COURT: Hang on one minute. Let's go back.

So instead of 9/4 for the Non-Movants to respond to the AG's motion to reconsider or motion to intervene, you would propose that that response be filed when?

03:24PM

MR. RUSSO: That's up to the Court, Your Honor, in terms of how you want to schedule this. The issue being, Your Honor, is we -- the Court has been directed to deal with this abstention issue --

03:24PM

THE COURT: Right. Right.

MR. RUSSO: -- that the Four Judges filed. So this notion that, you know, that we're holding up that process because the AG has a motion to reconsider, which frankly from

03:24PM

what I heard from Mr. Nwaokoro is he's basically relying on our motion anyway. But, I mean, I don't think it's prudent for the Court to try to resolve this motion to reconsider while putting the primary process on hold.

03:25PM THE COURT: All right. So we've got -- so you propose to just rely on the current motion to vacate?

MR. RUSSO: No, Your Honor. We would file our motion to vacate by this evening.

THE COURT: Okay.

03:25PM MR. RUSSO: October 31st. I'm sorry. August 31st.

THE COURT: Got it. Okay.

And when do you propose to have the plaintiffs respond?

MR. RUSSO: On September 9th, which is seven days from

03:25PM close of this discovery.

THE COURT: Okay. Keep going.

MR. RUSSO: We file our reply on September 11th, and the Court takes all that under submission and can deal with it on the following week. We don't believe there's any hearing

03:26PM necessary but...

THE COURT: I would want argument. Why not? I mean on these issues I would think that you would want the opportunity to make your positions clear.

So we could do argument on September 14th.

03:26PM Does that work?

MR. RUSSO: That works for us, Your Honor.

MR. CUTTING: Your Honor, could I respond to that?

THE COURT: Sure.

MR. CUTTING: I think an issue we've been having; and frankly, I'm a little confused --

THE COURT: I am, too.

MR. CUTTING: -- because I feel as though each of the movants are pretending as though the other doesn't exist and it all comes together on this Court's docket and you have to deal with how to manage that and do so in an efficient way and we also have to figure out how to respond to these things.

And so it just seems as though it makes so much sense to resolve whatever is getting in the way of addressing the motions to vacate, and we agree those need to be addressed promptly.

THE COURT: Well --

MR. CUTTING: But pick a week to resolve the motion to intervene first makes so much sense because then --

THE COURT: I think -- wait. Wait. Wait.

The first issue that the Fifth Circuit has required me to resolve is abstention.

MR. RUSSO: Correct, Your Honor.

THE COURT: So the relationship between whether I abstain and whether the AG intervenes is something that I think we need to unpack a little.

MR. CUTTING: Your Honor, I think what the Fifth Circuit said was it directed you to consider the issue well in advance of the election --

THE COURT: Right.

03:27PM MR. CUTTING: -- and this is a schedule we've proposed that would enable you to consider it by early October. I think that's certainly well in advance of an election that's one month later.

So, of course, the Fifth Circuit didn't address

03:28PM the Attorney General's motion to reconsider. That wasn't in front of it, that wasn't filed.

THE COURT: All true.

MR. CUTTING: Also I just think the framing of -- that the Fifth Circuit is requiring you to address the Four Judges'

03:28PM motion before kind of aligning your docket to do so is not the way I read that opinion.

THE COURT: All right. So your proposal sort of ignores --

MR. NWAOKORO: Sorry. It looks like I was on mute.

03:28PM I've been trying to provide the Attorney General's perspective so far, but I don't mean to interrupt you.

THE COURT: What I hear the plaintiff is proposing basically puts the Attorney General's issues at the back of the

03:29PM line.

MR. NWAOKORO: Well, Your Honor --

THE COURT: Let me first get Mr. Cutting's response.

Have I accurately stated the proposal, or am I missing something?

03:29PM MR. CUTTING: That we are putting the Attorney General's motion to intervene or motion to vacate at the back of the line?

THE COURT: Motion to reconsider.

MR. CUTTING: Sorry. Motion to reconsider. Excuse me.

03:29PM No. That's actually the exact opposite. We are suggesting that the Attorney General's motion to reconsider be put at the front of the line because it can be dealt with quickly and because once that is done, then we can simultaneously deal with any motions to vacate, including the Four Judges, but potentially including the Attorney General's together --

03:29PM THE COURT: All right. That makes sense.

MR. CUTTING: -- and that is efficient.

THE COURT: That makes more sense.

03:29PM Go ahead, please.

MR. NWAOKORO: Your Honor, I respectfully disagree with that; and for context the Court should know we had a conference call on Friday. During that call Mr. Russo applied his proposal, the one that he enunciated. The plaintiffs stated that they needed about three to four weeks and their proposal

03:30PM

to respond to Mr. Russo landed on September 28th and that's similar to the letter they sent to the Court and that was long before they even heard of the Attorney General's intent to file a motion for reconsideration.

03:30PM And so they had always wanted to have three to four weeks -- in this case, four weeks -- and it was what was stated on Friday and today is the 30th so around the same period.

The Fifth Circuit's mandate is specific and
03:30PM clear --

THE COURT: Mr. Nwaokoro, I'm really not following your argument, and I apologize. I understand what the Fifth Circuit's mandate --

MR. NWAOKORO: Right. The point I'm making --

03:31PM THE COURT: Hang on.

MR. NWAOKORO: -- is that this is a contrived argument to delay because when the parties met to confer on Friday, the plaintiffs clearly stated that they needed four weeks to respond to the Four Judges. That was before they even heard
03:31PM the Attorney General's intent to seek reconsideration; so that had nothing to do with reconsideration. And the mandate from the Fifth Circuit should proceed. It relates solely to the Four Judges' abstention motion.

Now, if the plaintiffs are arguing, as they're
03:31PM contending here, that it means we get two bites, well, the

03:31PM Four Judges are going to be filing their motion to vacate today. Does it mean that the Attorney General also will have to expedite his entire motion to vacate and file them by today or file them by tomorrow? I mean, that is the illogical progression of the argument that they have.

THE COURT: But you just told me that you're going to largely adopt the Four Judges' position with the exception on waiver so --

MR. NWAOKORO: That's right.

03:32PM THE COURT: -- so I don't understand why there's such a hardship to you.

MR. NWAOKORO: I don't think -- no. The point I'm making here is they are pushing everything down to September 28th, September 30th and conditioning the resolution

03:32PM on the Four Judges' *Younger* issue, on the Attorney General's response.

If the Court wants to have an expedited ruling on *Younger*, on the motion to intervene within a few days, that is okay. That would not offer any prejudice. I think we would be

03:32PM fine with that so long as, of course, it doesn't delay in resolving the Four Judges' issue, which is what the Fifth Circuit ordered.

THE COURT: It's not going to delay. It's going to go on the same briefing track essentially.

MR. NWAOKORO: Okay.

THE COURT: I think that's where we are.

MR. NWAOKORO: So if you're taking that path, again --

THE COURT: Hang on one second. Hang on.

The play in this schedule seems to me to be on the distance between -- the time elapsed between the motions to vacate, including the AG's if he is allowed to intervene, and the Non-Movants' response to all the motions, which is proposed to be done simultaneously.

Is that right, Mr. Fife, or Mr. Cutting? Sorry.

MR. CUTTING: Yes. We are proposing that we respond to both motions simultaneously.

THE COURT: Right.

MR. CUTTING: So that's correct.

I do want to just note that what Mr. Nwaokoro has put his finger on is that we initially asked opposing counsel for four weeks to respond to their forthcoming motion; and then upon hearing that the Attorney General intended to move to reconsider, we conceded an extra week and a half and gave them a week and a half of our time in order to still try and get this briefed in front of the Court on the same schedule. We are doing what we can to comply with the Fifth Circuit's order.

THE COURT: No, I understand.

MR. CUTTING: We went from four weeks to two and a half weeks, so I just want to make that clear. It's not

gamesmanship.

THE COURT: All right. So on 9/4, the Non-Movants -- let's call them the plaintiffs, okay? That might make it easier -- will respond to the Attorney General's motion for reconsideration on the motion to intervene and the Attorney General will respond on 9/8.

Am I tracking?

MR. NWAOKORO: Your Honor, that is --

Go ahead, Cody.

03:34PM MR. CUTTING: I was wondering if you could repeat that if you don't mind, Your Honor.

THE COURT: Sure.

So is the proposal that I'm being asked to consider that the Non-Movants will respond to the Attorney General's motion for reconsideration on the motion to intervene on 9/4?

MR. CUTTING: That's correct.

THE COURT: The Attorney General will respond on 9/8?

MR. CUTTING: That's our proposal.

03:35PM THE COURT: And you're asking me to decide that which is not deciding the abstention issue first on 9/10, correct?

MR. CUTTING: Yes. If possible, yes.

THE COURT: And then on 9/11, the motions to vacate, including the Attorney General's if he's allowed to intervene, and then we are looking at the -- the proposal is for until

9/30 for the Non-Movants to respond to all the motions?

MR. CUTTING: That's correct, Your Honor.

THE COURT: So what about that, Mr. Russo or Mr. Nwaokoro, do you object to?

03:35PM MR. RUSSO: So, Your Honor, we object to waiting first of all to get the -- we can get our motions on file earlier than that.

THE COURT: Okay.

MR. RUSSO: And then waiting for until the end of

03:36PM September for responses by plaintiff --

THE COURT: All right. So what you object to is that gap between 9/11 and 9/30?

MR. RUSSO: Yes, but I think, again, we're perfectly willing to move up the date to consider our motion to vacate.

03:36PM THE COURT: So you would move your motion to vacate up to 9/4?

MR. RUSSO: Originally it was, again, filed today --

THE COURT: 8/31.

MR. RUSSO: Your Honor, if the Court wants us to

03:36PM file 9/4, we'll file 9/4, but we're just getting further --

THE COURT: That's fine. If you can file on 8/31, when could the Non-Movants respond to both the AG and to the judges?

MR. CUTTING: Would we be assuming that the AG filed on 9/11 if it's permitted to?

03:37PM THE COURT: You mean if it's allowed to intervene?

MR. CUTTING: Correct. Yes.
THE COURT: Could you do that, Mr. Nwaokoro?
MR. NWAOKORO: To file our motion -- sorry.
Could you repeat that, Your Honor? I didn't follow that.
03:37PM
THE COURT: If you're allowed to intervene, you're going to largely adopt -- you're going to file something that adopts what the judges have said; is that right?
MR. NWAOKORO: That's correct, Your Honor.
03:37PM THE COURT: And you could do that --
MR. NWAOKORO: Yes.
THE COURT: You could do that on 9/11 if I allowed you to intervene.
MR. NWAOKORO: Yes, I can even do that sooner. We can move that up consistent with what Mr. Russo said depending on your ruling.
03:37PM
THE COURT: All right. You can file something that says: If the Judge allows us to intervene, we're going to adopt what the Judges say?
03:37PM MR. NWAOKORO: Yes, something like that.
THE COURT: All right. So with that clarification, Mr. Cutting, when could you respond?
MR. CUTTING: Your Honor, we could respond -- I mean, again, we would be receiving the Attorney General's motion on the 11th.
03:38PM

THE COURT: Yes.

MR. CUTTING: We could plan to respond to both motions. We could try and take our date from September 30 to September 25th, but I think anything less than that would really constrain our ability to respond.

Our response is going to be much more fact-based and intensive than as I understand it the movants' motions will be and we do have some capacity constraints, but we are fine at moving that up if that would help the Court.

I do also just want to -- if there's a faster way to deal -- well, one of two things -- we could either try and find a faster way of dealing with the Attorney General's motion for reconsideration. We think it is a completely meritless motion given that this Court denied his intervention on the abstention issues on the basis of timeliness under Rule 24 and that has been untouched by -- completely untouched and unaddressed by the Fifth Circuit in the *In re Goodhart* decision.

So if the Court would prefer a summary denial or something along those lines, we could perhaps then have more time on the -- I guess then it would be the singular motion to vacate.

Alternatively, perhaps there's a way to stack and push the Attorney General's motion to reconsider after any consideration prior to the election of the Four Judges' motion.

That also is fine with us.

What we are trying to avoid is having to respond to these both at the same time in a completely inefficient and unfair manner, but we are flexible for what the Court thinks is the right approach here.

THE COURT: I think the Attorney General's motion for reconsideration on the motion to intervene is quite -- it's a very different analysis. That's not an abstention issue. And we already know what the Attorney General's position is going to be on the motion to vacate. He's going to do what the Judges -- say what the Judges are saying and stepping aside from the issue of waiver by delay.

MR. CUTTING: Yes. He has said he's presenting his own waiver argument that we will have to respond to separately; and other than that, there seems to be no good reason not to adopt the Judge's motion in full.

MR. NWAOKORO: I would remind the Court that the waiver issue has already been briefed before this Court has ruled on our motion to intervene. What Mr. Cutting just proposed is consistent really with what you have stated from the outset which is why shouldn't we proceed on the Four Judges' motion first and move the Attorney General's to the back end. I mean, I thought that was where we started with and you said no.

THE COURT: I think that the Judges and the Attorney General should file their motion to vacate maybe a day

apart because from what you've said, the Attorney General is going to say, "Ditto," right? So we don't need to build in a large window for the Attorney General to say, "Ditto."

MR. NWAOKORO: Well, Your Honor, I would respectfully disagree. In this case, the Attorney General has had to have -- while the key principles are probably aligned, we have had to have different discovery in this case. We have to expend different resources in this case. We have to make different arguments. I mean, they overlap obviously, but we have the State's interests to protect.

The net effect of this is to negate the intervention that the Attorney General has been allowed to proceed on in this case and essentially fold his arguments with that of the Judges and why to a large extent there's an overlap --

THE COURT: Then fine. Then file a separate motion to -- file your motion for reconsideration and your motion to vacate, which is basically: I'm moving to reconsider so that I can intervene; and if allowed to intervene, here is my motion to vacate.

Can't you file those together?

MR. NWAOKORO: Yes, Your Honor. I guess we've already filed a motion for reconsideration.

THE COURT: Right.

MR. NWAOKORO: If you wanted us to simply have

03:43PM something relating to at least a slice that relates to abstention, we can simply do that.

THE COURT: Okay.

MR. NWAOKORO: To the extent that you allege to the --

03:43PM THE COURT: Hang on. Hang on. I don't think we're extending anything here.

So if the -- what we're proposing is that in six days the Non-Movants are going to respond to the motion for reconsideration that you've already filed.

03:43PM MR. NWAOKORO: Okay.

THE COURT: You're going to respond; and in your response, you will essentially say -- or a few days later you will say: I'm adopting the Judges' motion to vacate?

MR. NWAOKORO: Sure, Your Honor.

THE COURT: Does that work?

MR. NWAOKORO: Yes, that works.

THE COURT: Okay. Or you could do that on the same day.

The motion to vacate is going to be due 8/31, and

03:44PM then the question is when the Non-Movants are going to respond to the motions to vacate. The Non-Movants have suggested 9/25. If that's -- if we stick with that date -- I said "if" -- then --

MR. NWAOKORO: Your Honor, can we get a clarification

03:44PM on what you just stated in terms of the motion to vacate?

THE COURT: Yes, sir.

MR. NWAOKORO: The Four Judges filing theirs today --

THE COURT: Yes. 8/31.

MR. NWAOKORO: In all fairness, we haven't had time to confer on those; so what I would like to ask would be to have a little window in case I need to have anything supplemental in addition to that. And I guess I can meet the deadline -- whether it is a week or a couple of days, I can certainly meet that to make sure that if there is any state-wide issue that I think needs to be --

THE COURT: Okay. 9/4 is your deadline.

MR. NWAOKORO: 9/4.

THE COURT: 9/4.

MR. NWAOKORO: That works.

THE COURT: And I don't want you to repeat the Judges' arguments if you're simply adopting them and adding to them, okay?

MR. NWAOKORO: Understood. Thank you.

THE COURT: All right. So 9/25, Non-Movants' response.

Does that work, Mr. Cutting?

MR. CUTTING: That's fine, Your Honor. Can you clarify whether we are also responding to the Attorney General's motion to reconsider or we are now just first dealing with the motions to vacate and then we will, if necessary, get to the motion to reconsider.

THE COURT: Originally we had talked about your responding to the motion to reconsider by 9/4.

MR. CUTTING: Yes. We can still do that.

THE COURT: All right. Yes.

03:46PM MR. CUTTING: I'm just making sure that I understand our obligations under this schedule.

THE COURT: So on 9/25, you will be responding to the motions on -- to the motions to vacate -- not reconsider, but to vacate -- is that right?

03:46PM MR. CUTTING: Yes. I believe that should work for us.

THE COURT: And obviously all of this should be focused on the abstention issue.

MR. CUTTING: Correct.

THE COURT: And then reply. We're now back to 9/25.

03:47PM The reply could be due on 9/30, and we can have oral argument on October 2nd.

Does that work?

MR. RUSSO: Are you speaking to plaintiffs' counsel, Your Honor?

03:47PM THE COURT: Yes.

MR. CUTTING: I believe that works for us, Your Honor.

THE COURT: All right. Mr. Russo, does that work for you?

MR. RUSSO: No, it does not.

03:47PM THE COURT: What's the problem?

MR. RUSSO: Here is a clarification issue. Are we just filing motions to vacate on *Younger* only, or are we trying to redo the entire case and get everything on the table at once?

THE COURT: That's a good question. That's a really good question because we've sort of gotten away from that focus.

MR. RUSSO: And the Fifth Circuit, again, has been very clear --

THE COURT: I know. *Younger* first.

MR. RUSSO: -- deal with the abstention issue and we're pushing this all the way down the road here. Three weeks and a half to respond to an abstention issue that's been briefed already is not expedient.

THE COURT: All right.

MR. RUSSO: That is uncalled for.

THE COURT: I hear you. I hear you. And we kind of got off of that focus when we started planning for briefing on all issues. So let's return to that focus.

MR. CUTTING: Your Honor, if I may?

THE COURT: Yes. Go ahead.

MR. CUTTING: I understood you to be talking about solely addressing *Younger* this entire time. That's certainly what our proposal was meant to be discussing. And I believe you made it clear earlier in this conference that the issue is that we just have a disagreement with the Movants about what

that means. They believe it requires nothing other than the law, and we maintain that the Rule 60 analysis requires consideration of facts and equity.

So I understand that we are at an impasse with opposing counsel over this, but our understanding of this schedule is that something like this is necessary to address doing what you and what the Fifth Circuit have said, which is address *Younger* first and put everything else aside --

THE COURT: Right. So let's frame it more precisely along those lines, okay?

So 8/31, the motion to vacate that will be filed, including the AG's if he's allowed to intervene, will be limited to discussing *Younger* abstention. Is that right?

MR. RUSSO: That's correct.

THE COURT: Okay.

MR. CUTTING: I believe -- well, I don't want to speak for Mr. Nwaokoro. I thought that he wanted more time from the 31st to submit his motion.

MR. NWAOKORO: Well, actually, Your Honor, I think this works for me.

Mr. Cutting, I think part of that confusion was the scope of the motion to vacate. If it is simply on *Younger,* then what the Court said is accurate. Within a day or so, I can file something indicating --

THE COURT: Fine. Okay. So 8/31. That's today, guys.

MR. NWAOKORO: Right.

THE COURT: All right.

MR. RUSSO: Just while the Court is looking at the calendar, the other issue that we have is the extended time period for a response.

03:50PM

THE COURT: No, I'm getting to that. We've got to get past the deadline to move to vacate on the basis of abstention. That's 8/31.

The response, the plaintiffs have put at 9/25. I think the Attorney General and Mr. Russo -- Attorney General's counsel and the Judge's counsel are arguing that's too much time.

03:51PM

MR. CUTTING: Well, Your Honor, we completely disagree. This is also accounting for us filing an opposition to the Attorney General's motion for reconsideration on the 4th.

03:51PM

THE COURT: Right.

MR. CUTTING: And after that, then turning to these two motions and responding to both of them even though the Attorney General's may well and we believe will not actually be permitted to be filed. And giving ourselves two weeks to put together these very fact-intensive, comprehensive responses, to us, that is both expeditious and eminently fair.

03:51PM

MR. NWAOKORO: Well, I don't think a response to the Attorney General's requires fact-intensive and also we already briefed --

03:52PM

MR. CUTTING: We disagree. Our response will be fact-intensive.

MR. RUSSO: And, Your Honor, maybe this is just an issue that the Court needs to decide for us.

THE COURT: I think it does.

MR. RUSSO: What did the Fifth Circuit mean when it said: There are no facts needed, there are no discovery needed. Just decide if abstention -- if they want to spend time arguing Rule 60 and putting facts, that's their prerogative. That is not what the Fifth Circuit asked the Court to do here.

03:52PM

THE COURT: Mr. Cutting, can you respond to the motions to vacate by 9/14?

MR. CUTTING: Your Honor, I really do not think we can.

03:52PM

THE COURT: Okay. Now we're sort of negotiating here.

MR. CUTTING: Of course --

THE COURT: How about 9/20?

MR. CUTTING: Your Honor, we feel as though we've --

THE COURT: I know.

03:52PM

MR. CUTTING: -- we are now responding to two motions instead of one. I would --

THE COURT: No, no, no. I understand that problem. But, yes, you are -- we've got the Attorney General's motion for reconsideration on intervention and we have the motions to vacate. I agree with that. And you've got to respond to both.

03:53PM

So if the motions to vacate are filed today and you have until 9/21 to respond, that gives you three weeks.

MR. CUTTING: Your Honor, respectfully we are currently stressed to capacity as we appeal and seek a stay of this mandate. It should be noted that this entire schedule is contingent on that stay not being --

THE COURT: I understand. And we need to --

MR. CUTTING: And then we will also be responding --

THE COURT: Right.

MR. CUTTING: -- to the Attorney General's motion.

So this is -- it's a complicated situation. We have a lot of moving parts and we won't realistically be able to just jump in and start working on a response to these motions tomorrow.

So I maintain our position that we believe that -- I believe I said it was September 25th, that Friday, is an appropriate deadline. And we'd also ask the Court given that it now seems that we're going to be addressing two nearly identical motions -- perhaps not identical, but quite similar it sounds -- to allow us an extended page limit so that we can do a single consolidated brief, which I think the Court will likely appreciate.

THE COURT: That's not an issue. I don't think that's going to even be disputed. But, yes, since you're going to respond to them both.

MR. RUSSO: That will not be disputed on our side if they want extra pages, Your Honor. But, again, I have to emphasize for the Court that these issues have been briefed. This is not a new process.

03:55PM THE COURT: Well --

MR. RUSSO: We know what the abstention arguments are going to look like, Your Honor. They're pretty simple.

THE COURT: I wouldn't exactly say they're simple.

MR. CUTTING: We have not briefed the Rule 60 equities.

03:55PM We have briefed some of the underlying legal issues, but certainly there's been a lot left that has not been briefed. It will require us significant resources to pull that briefing together. And our position is that September 25th is a very reasonable deadline that allows the Court to decide this issue

03:55PM well, well in advance of the election.

If Your Honor chooses to overrule us, we'll, of course, comply with whatever schedule you set assuming that the Supreme Court does not step in here; but that's our position that's how much time we believe we need.

03:55PM THE COURT: I think I have to proceed on the assumption that there will not be a stay or a Supreme Court involvement. I think I just have to proceed on that assumption. Obviously if the Fifth Circuit stays the mandate, we could have a separate discussion once we know that has occurred; but for

03:56PM today, I think we have to assume that the Fifth Circuit is not

going to stay the mandate.

MR. CUTTING: That's fine, Your Honor. In the short-term, however --

THE COURT: I think we're all operating in the short-term at this point.

03:56PM

MR. CUTTING: Yes.

THE COURT: That's what expedition requires --

MR. CUTTING: That's fine for now as long as we're clear about the simultaneous request for appellate relief.

03:56PM

THE COURT: Oh, I understand. I expected nothing less.

Okay. So 8/31, motions to vacate on abstention; 9/25, response.

Do you want to reply? Mr. Russo?

MR. RUSSO: Yes, we are going to want to reply.

03:56PM

THE COURT: All right. Can you reply by September 30th?

MR. RUSSO: If the Court is going to require that we wait for a response until the 25th.

THE COURT: No. You're filing your motions to vacate --

03:57PM

MR. RUSSO: For a response. Sorry.

THE COURT: -- on 8/31.

MR. RUSSO: I'm saying if the Court is going to require us to wait on a response until 9/25, again, we can get a reply on file in three days.

03:57PM

03:58PM 03:58PM 03:58PM 03:59PM

THE COURT: Okay.

MR. RUSSO: This issue is packaged up. Again, there's no need to allow plaintiffs' counsel three weeks to respond to a motion that has been addressed several times already.

(Simultaneous speaking.)

MR. RUSSO: The issue that they're having, Your Honor, all relates to this amount of facts that they think they want to apply under Rule 60, which the Fifth Circuit has ignored completely. They're creating a problem that doesn't exist. If they want to argue that they're -- I mean they can argue in their brief: We need to be able to present facts. And if we're wrong, we're wrong.

THE COURT: Hang on. They also at the same time are going to be dealing with these -- with the response to the Attorney General's intervention and to the issue of waiver by delay. So I don't think it's quite as -- even assuming that you're right that there are no facts that have to be considered, no equities to be weighed if you will, they still have a fair amount that they have to deal with so --

MR. RUSSO: Three weeks is still a lot of time, Your Honor. It's unnecessary. Again, we're getting up into --

THE COURT: Well, you tell me you don't need any significant amount of time to file a response or a reply. So fine. If they file theirs on 9/25 and you file your reply -- do you want 9/28? Do you want 9/30?

MR. NWAOKORO: Well, 9/25, Your Honor. I think 9/28 is just the next Monday.

THE COURT: That's right.

MR. NWAOKORO: So we need to review --

03:59PM THE COURT: You tell me there's not much to talk about so if that's what you're going to say.

MS. OLALDE: Your Honor, could we have 9/29 for our reply date, please?

THE COURT: I'm sorry? Your reply date?

03:59PM MS. OLALDE: Yes, please.

THE COURT: At your specific request, that is fine.

MS. OLALDE: Thank you.

THE COURT: So 9/29, AG and Judges' reply; and we can have argument on October 2nd.

04:00PM Does that work?

MR. RUSSO: Then, Your Honor, the Four Movant Judges object to this schedule. If the Court wants to put that schedule in place, I mean, there's nothing we can do about that. This is a much cleaner process than it needs to be.

04:00PM THE COURT: If that's your reply, and I'll have a pretty easy time on October 2nd shortly after that issuing my ruling.

MR. RUSSO: October 7th is inside a month --

THE COURT: 2nd. 2nd.

04:00PM MR. RUSSO: October 2nd is inside a month of the

elections that the Fifth Circuit thought were important so --

THE COURT: No. I understand. I understand. And we're balancing here. So we could move it -- this would be difficult for the plaintiffs, but we could make it instead of 9/25, make it earlier that week, not by much.

Would that help, Mr. Russo?

MR. RUSSO: I think, Your Honor, we just --

THE COURT: Is the concern that the Judges think they're going to be defeated and there won't be a political will to pursue these motions?

MR. RUSSO: The concern is the Fifth Circuit's order to get it on an expedited basis and that's it.

THE COURT: All right. Well, I think -- today is 8/31. We're proposing wrapping this all up in quick order and if it wasn't for the -- the problem is the two tracks -- dealing with the Attorney General and dealing with the Judges and if all the Attorney General is going to say is "I agree with the Judges," then we can perhaps streamline it.

MR. RUSSO: Which, again, should shorten the response.

THE COURT: Is that what you're going to say? Again, I think we've gone over this. That's your position -- is that correct, Mr. Nwaokoro -- that you agree with the Judges that I need to abstain? We're talking only about abstention here.

MR. NWAOKORO: Your Honor, are you talking to me, Mr. Nwaokoro?

THE COURT: Yes, sir.

MR. NWAOKORO: Yes, that's correct. The only difference -- the only caveat is the fact-specific waiver issue; but besides that, we're on the same page on abstention.

04:02PM THE COURT: All right.

MR. CUTTING: Your Honor, I think you already broached this with Mr. Russo, but, you know, we need enough time to respond to these; but if the difference between consenting to a schedule and not is two days, then we can consider it. And I don't know what the specific date being asked is, but we are not completely inflexible on this. We just want to make sure we have enough time to adequately respond.

THE COURT: It would be -- I think we were at 9/25. Mr. Russo is asking me to move that to earlier that week.

04:03PM MR. CUTTING: Okay. How about Tuesday, the 22nd? We would really strongly --

THE COURT: No, I understand. And then we could have the response by Friday, the 25th and argue on September 28th.

Does that work, Mr. Russo?

04:03PM MR. RUSSO: I'm writing this down, Your Honor.

So, again, I think we have a fundamental difference of opinion on how long it's going to take to get a response to us. Again, at this point you're three weeks out for a reply and we're just eating up time waiting on that. And so --

04:04PM

THE COURT: All right.

MR. RUSSO: -- we prefer that it be a week before that. A response be due 9 --

THE COURT: 9 what?

04:04PM MR. RUSSO: 9/15.

THE COURT: I think we can do a little bit -- so 9/15 is Tuesday, a week earlier. I'll make it September 21st, which is the Monday of the next week. That's a few days' difference. So if 9/21 is the date to respond, then we'll have the Judges'

04:05PM reply -- do you want until 9/25?

MR. RUSSO: No, Your Honor.

THE COURT: All right.

MR. RUSSO: We just moved back the response deadline one day for the plaintiffs from the 22nd to the 21st. If we

04:05PM can keep it --

THE COURT: Well, we started at the 25th; and we moved it back to the first day of that week.

MR. CUTTING: Yeah, we started at the 30th.

THE COURT: So 9/21.

04:05PM MR. RUSSO: This is classic negotiation style. Start high --

THE COURT: 9/21.

MR. RUSSO: But, Your Honor, if we could get a response into that prior week, the week of the 14th, even if it's the

04:05PM 18th --

THE COURT: I think I'm going to give them the weekend to finish working on it. It's three days. 9/21 would be the response date.

If you can respond by 9/23, Mr. Russo, then we can have argument on 9/25.

Does that work?

(No response.)

THE COURT: And all of this is just on abstention.

So 8/31, 9/21, 9/23, 9/25.

MR. RUSSO: 9/25, you're saying for argument?

THE COURT: Yes, sir.

MR. RUSSO: Again, Your Honor, that schedule would work if they responded on the 18th.

THE COURT: Well, then I would move your reply date to the 21st; and we would have argument on the 23rd. If you want me to keep the 25th -- I think that they have a legitimate request for having that weekend because they're also dealing with the response to the motion for reconsideration on the motion to intervene and which has to be done while all of this is going on; so they're doing two tracks simultaneously.

MR. RUSSO: But, again, Your Honor, they're responding to two motions, but they're the same motion. It's not two different issues here. And these are --

THE COURT: Well, the AG's motion for reconsideration and intervention is a little bit different. That is

different -- the arguments are different.

MR. RUSSO: And the Court will not move the date to the 17th, 18th?

THE COURT: I don't think that is going to materially advance anything. Doing it on the 21st gives them two extra days to work on it while they're also doing the other work relating to the Attorney General's position on intervention.

MR. RUSSO: And the idea is that the responses to all this is due on whatever day you're giving us, the 21st?

THE COURT: The responses to the motions to vacate, that's the plaintiffs' responses, correct? That would be the 21st the way we have it scheduled now. And you would file a reply and you told me you could do it very quickly so I said the 23rd. If you want until the 25th and argue on the 28th, I'm happy to do that. It's up to you, Mr. Russo.

MR. RUSSO: Yeah, I'm looking at the dates, Your Honor.

THE COURT: No. That's fine.

MR. RUSSO: The 28th will not work.

THE COURT: Will not work for?

MR. RUSSO: I have a trial setting that week. So the 25th, if you're going to argue that day --

THE COURT: Yes.

MR. RUSSO: Reply. Can we have a reply on the 24th?

THE COURT: Sure. And then we can argue on the 28th.

MR. RUSSO: Your Honor, the 28th won't work.

Your Honor, I was hoping we would argue on the 25th --

MR. CUTTING: If the Four Judges and the Attorney General are going to be submitting replies -- well, let me put it this way: If the argument is to be the 25th, which is fine with the plaintiffs, we would ask that the replies be submitted on the 23rd so that we have an opportunity to review them before the argument.

THE COURT: Okay. Your trial is on the 28th, Mr. Russo?

MR. RUSSO: Yes, Your Honor.

THE COURT: Is that a preferential setting?

MR. RUSSO: It's a bench so it won't take long, but it is what it is.

THE COURT: Well, can that judge move things a couple of hours? I'm happy to talk to the judge. That happens a lot. We work out -- we try to help each other resolve scheduling issues.

MR. RUSSO: I understand. Okay.

Well, if counsel needs to see the reply, just make ours due on the 23rd.

THE COURT: And have argument when?

MR. RUSSO: The 25th.

THE COURT: I'm looking at my calendar now and I can't do the 25th, but I can do the 28th.

MR. VAN FLEET: Your Honor, I'm such a minor player in

this I hate to raise my hand, but on the 28th, I begin a trial in Judge D'Agostino's court in the Northern District of New York.

THE COURT: I think you said it right the first time, Mr. Van Fleet. You're a minor player in all of this.

So you could reply on the 24th, and we could have argument on the 28th.

MR. RUSSO: Again, Your Honor --

THE COURT: Oh, you can't do that. Well, I will talk to that judge, Mr. Russo. I think I can solve your -- I can at least try to solve your problem.

What time is your bench trial?

MR. RUSSO: I think it starts at 10.

THE COURT: Where is it?

MR. RUSSO: It's in Galveston.

THE COURT: I'm sorry?

MR. RUSSO: It's in Galveston on the island.

THE COURT: Okay. In state court, right?

MR. RUSSO: Yes, Your Honor.

THE COURT: Okay. And you say it's only going to take a couple of hours?

MR. RUSSO: No, it may take a couple of days.

THE COURT: Well, if you can get that judge to move the start of the bench trial to 1:00, we can have argument that morning.

MR. RUSSO: I can talk to them, Your Honor; but that's going to take another day. It's not going to allow us to agree to a schedule today.

But, again, if the Court were willing to push the response dates up, we wouldn't be where we are.

04:13PM

THE COURT: I don't have availability on the 25th, so that's not going to help.

MR. RUSSO: But earlier that week.

THE COURT: For argument? You just told me that you wanted -- okay. So we already have the response to the motions to vacate on the 21st, you want to reply on the 24th. We can't really push it earlier.

04:13PM

MR. RUSSO: Your Honor, again, if we push the response date to the 17th or 18th, we can reply on the 21st; and you can hold the hearing any time that week.

04:13PM

THE COURT: Mr. Cutting?

MR. CUTTING: Your Honor --

THE COURT: The 21st is as early as you can get?

MR. CUTTING: Yes. I think -- I suppose we could try for that Friday, but I don't see how it would really make a material difference for anyone on the other side; so I --

04:14PM

THE COURT: Well, here is what we could do. If you responded to the motions to vacate by the 18th, then I think that the AG and the Judges would be in a position to file their replies by -- you tell me, Mr. Russo, the 21st?

04:14PM

MR. RUSSO: Yes, Your Honor.

THE COURT: And we could argue on the 23rd.

MR. RUSSO: Those days work for us.

THE COURT: Does that work, Mr. Cutting?

04:14PM MR. CUTTING: Sorry. I just -- I couldn't understand from Mr. Russo if he said they did or didn't.

MR. RUSSO: They do. Those days work for me and us.

MR. CUTTING: We could do that -- well, you said September 18th response.

04:15PM THE COURT: Right.

MR. CUTTING: And then 21st reply --

THE COURT: Correct.

MR. CUTTING: -- from the Movants.

THE COURT: Correct.

04:15PM MR. CUTTING: We have an organizational commitment on the 22nd. If there's any way to have -- sorry. Excuse me -- on the 23rd. If there's any way to have the hearing on the 22nd? No. Okay.

THE COURT: Yes. I could do it on the 22nd. I could

04:15PM have argument on the 22nd. That would work.

MR. CUTTING: Given how fast everything would be moving, I think we would appreciate a potential opportunity for either a sur-reply or a supplemental briefing based on the hearing depending what happens after, but we could commit to

04:15PM the hearing on that date, the 22nd.

THE COURT: That would work. And I could give both sides two days for supplemental responses on the basis of the hearing, which will be --

MR. RUSSO: Responses after the hearing?

04:16PM THE COURT: Yes.

MR. RUSSO: So then we wouldn't have a reply due until after the hearing?

THE COURT: No. Your reply would be due 9/21.

MR. RUSSO: Okay.

04:16PM THE COURT: Both sides could then file a supplement to whatever -- based on whatever new issues they found to be raised at the hearing.

Okay? 8/31, 9/18, 9/21, 9/23. Those are our dates.

MR. CUTTING: And 9/4 for the response to the Attorney

04:16PM General's --

THE COURT: Yes.

MR. CUTTING: -- motion.

THE COURT: 9/4 and the Attorney General's response on 9/8.

04:17PM MR. CUTTING: I'm sorry. Could we just walk through the dates one more time, Your Honor? I want to make sure I have them correctly.

THE COURT: Sure. Me, too.

8/31, today, motions to vacate on abstention due;

04:17PM 9/18, responses to the motions to vacate based on abstention;

9/21, AG and Judges' reply; 9/23, argument.

MR. RUSSO: I thought we were moving that to the 22nd.

MR. CUTTING: Exactly.

THE COURT: No. You're right. I can't read my own handwriting.

04:17PM

9/22, argument.

MR. CUTTING: And then 9/24 for any supplemental response?

THE COURT: Yes. And on the AG side of the ledger, we would have 9/4, the Non-Movants' response to the Attorney General's motion for reconsideration on the motion to intervene; 9/8, the Attorney General response; and 9/11 -- no. That's it. And then I would have to decide by 9/10.

04:17PM

MR. CUTTING: Well --

THE COURT: No. Go ahead.

04:18PM

MR. CUTTING: I think the 9/10, I'm not sure that's a date that's still in play.

THE COURT: It's not workable at that point.

MR. CUTTING: We're okay with -- if the Court wants to do us a favor and decide the motion before we file our combined response, great; but we are -- as long as we can file a combined response with this schedule --

04:18PM

THE COURT: Yes.

MR. CUTTING: -- we could do that so the Court does not need to rush to reach its decision beforehand and can take it

04:18PM

under advisement.

THE COURT: Okay. So you're going to -- so what do you want to do with the 9/4 date for you guys to respond to the Attorney General's motion to reconsider?

04:19PM MR. CUTTING: Nothing. That date remains fine.

THE COURT: Fine. And the Attorney General will respond on 9/8?

MR. NWAOKORO: That's correct. Yes, Your Honor.

THE COURT: All right. And I'll do my best to decide 04:19PM that promptly, but I don't think that decision on that is required before I decide the motions to vacate based on abstention.

MR. NWAOKORO: That's correct.

THE COURT: All right.

04:19PM Have we hashed it out?

MR. FIFE: Go ahead.

MR. CUTTING: I was wondering -- I mean, we don't need to formally do this. I think Mr. Russo, if Mr. Russo and Mr. Nwaokoro could just commit to filing their replies on the 04:20PM 21st, maybe within the workday we could say, just so that we have time to review them before oral argument the following day --

THE COURT: I think that's fair. How about noon?

MR. CUTTING: I leave that to them.

04:20PM MR. NWAOKORO: Your Honor, I think we need a little

more time; and we also ask the plaintiffs to do the same with their filing as well because sometimes you have filings by 8:00 P.M.

MR. CUTTING: I have to say I don't understand the reasoning there. We're filing on a Monday.

04:20PM

THE COURT: I don't either. I think everybody needs to -- I think it's fair to give them time to read your reply before we have to argue the next day.

So noon on the 21st, okay?

(No response.)

04:20PM

THE COURT: Are we set at least on schedule?

MR. RUSSO: Your Honor, on that timing, can we push that to 3:00 P.M.? And the reason I ask is that having assistants put briefing together over the weekend is hard to do. They've got to do their stuff with their cases, et cetera. Just getting into work at 8:00 and trying to get stuff done by noon is going to be tough. So whatever time you can give us after noon is great.

04:21PM

THE COURT: 2:00. 2:00.

And we're going to have the argument on the 22nd. We'll have it in the afternoon so that both sides can have the morning to digest what the other side has said.

04:21PM

MR. CUTTING: Your Honor, that sounds great to the plaintiffs. We appreciate your time on this.

I do want to flag that the first issue on the

04:22PM

scheduling letter, the preconference letter still has not been --

THE COURT: No. I know. I know.

MR. CUTTING: I know we've all been here a while.

04:22PM THE COURT: No. That's fine. That's fine.

So what time do you want to start the arguments? 1:00? 2:00?

MR. CUTTING: 1:00 P.M. is great for the plaintiffs.

THE COURT: Okay. And I would like to do these live. That will be in Courtroom 11D. 04:22PM

All right. Let's take up Topic 1 on the deposition scope.

MR. FIFE: Absolutely, Your Honor. And I just have to say I commend the Court's commitment to fulfilling the mandate; but if there was ever a transcript that demonstrated how 04:23PM egregious and disruptive the Fifth Circuit's ruling was, I think we have it today.

And on the topics of depositions, our proposal is for Judge Goodhart to be deposed from 9:30 to 12:30; and then Judge Johnson, 1:00 P.M. to 4:00 P.M. 04:23PM

Those are approximate times. We have confirmed with Mr. Russo that those times are available and so the only question before the Court is the scope.

THE COURT: Yes. I agree. I agree.

04:23PM MR. FIFE: And I want to start with Topic 1 because

that is where I think we're closest to each other.

THE COURT: All right.

MR. FIFE: And I think what the disagreement comes down to is when you read that paragraph on Page 8 of the Fifth Circuit's opinion, it appears that the Four Judges or the Movant Judges' view is that all that matters is could we get counsel before November 2025. And that is just far, far too narrow of a reading, that is a cherry-pick of one clause of that paragraph.

04:24PM And what the Fifth Circuit is really getting at is were you able to move earlier. So that could include not only attempts to get counsel, but also whether counsel was necessary, steps they could have taken to raise these issues without counsel and other forms of possible delay.

04:24PM I'm happy to go further, but the last thing I'll say is just these facts that we're hoping to inquire into were directly related to facts that the Four Judges put at issue both before this Court and at the Fifth Circuit and we think are well encompassed by the Fifth Circuit's opinion.

04:25PM THE COURT: Response?

MR. RUSSO: Yes, Your Honor.

So the topic as we've drawn it -- again, kind of explicitly from the Fifth Circuit's opinion -- the question being is what were the Judges' efforts to obtain counsel independent of their colleagues. The topic as drafted by

plaintiffs expands that into a review of what did the Judges do to seek modification themselves or to vacate themselves or to challenge it on their own.

And the issue being is they don't have the ability to challenge these things on their own. They are judges and can't engage in the practice of law. They're also representing their office.

So what we're getting into is issues that frankly are irrelevant. The idea of what did you do to modify the decree yourself is an irrelevant proposition.

THE COURT: But isn't that -- isn't what you've just said essentially the testimony that they are likely to give, that they didn't do anything until they were able to proceed with counsel?

MR. RUSSO: And it will be that and it should be that except for this notion -- I think the Court is aware that at some point in 2025 they actually talked to the monitors about making a modification of the rules pursuant to discussing it with the Judges.

That has nothing to do with the ability to bring an abstention claim in front of the Court, so that's the issue is did our Judges impliedly waive the right to bring this defense, this issue, not what did you do to modify the consent decree. And that's what the topic has been expanded to: Let's talk about what you did to modify, let's talk about what you

did to vacate, let's talk about all these things you did on your own. So it's broader than what's at issue, Your Honor.

THE COURT: Why is that objectionable? I'm trying to figure that out.

04:27PM MR. RUSSO: Because the idea of what the Judges did to talk to the monitors about modifying the consent decree has nothing to do with whether they could obtain counsel to bring forth an abstention argument. That's what the Fifth Circuit was concerned with.

04:27PM THE COURT: If the delay -- if the timing was affected by those efforts to modify the decree through negotiations, why wouldn't that be part of the analysis?

MR. RUSSO: Because they don't have counsel at that time, Your Honor. The question is could they have had counsel.

04:28PM MR. FIFE: Your Honor, I mean, as someone who represents a lot of formerly pro se litigants, I wish Mr. Russo's view of waiver reflected the law, but it just doesn't. You can think of all sorts of contexts in which a pro se litigant -- not to mention experienced, accomplished, 04:28PM and high-ranking attorneys -- waive arguments, defenses, let statute of limitations periods lapse.

And so I guess more to the point of how to read the Fifth Circuit is, you know, there's this line in there where the Fifth Circuit describes, quote, the Four Judges' 04:29PM version of the facts. And I think that those versions of facts

or what the Fifth Circuit is referring to encompasses exactly what Your Honor was asking Mr. Russo about, which is did you actually need to have retained counsel paid for by the county in order to raise this defense. And it might turn out that the Judges testify exactly how Mr. Russo just argued, but I think we're entitled to find that out for ourselves.

04:29PM 04:29PM

THE COURT: I think that's right, Mr. Russo. And if the answer is: Yes, we talked to the monitor, but we couldn't go further when that didn't achieve the result that we were hoping for and at that point we needed counsel and we couldn't get counsel independent of the other judges, that seems to me to be part of the same narrative and explanation for the delay.

MR. RUSSO: Well, and it would be, Your Honor; and that's what our topic proposed covers.

04:30PM

THE COURT: But I think --

MR. RUSSO: That's what our topic covers -- your efforts to get counsel, not your efforts to talk about other stuff.

THE COURT: No, no, no. It's why you delayed in getting counsel and the one reason that you just told me is that they first tried other steps.

04:30PM

MR. RUSSO: But let's be careful. It's not the issue of did you delay, it's the issue of did you intend to relinquish your right to bring this claim. There's a difference.

04:30PM

THE COURT: I agree. And if their evidence is we took the time to first attempt a negotiated change, then that is a delay that would be inconsistent with an intent to waive. So it would be in support of your argument.

04:31PM MR. RUSSO: But, Your Honor, again, the law is not delay. It's: Did you intend?

THE COURT: Well, did you delay without intending to relinquish a known right? The argument that I understood the plaintiffs to make was that waiver was shown by the delay. The

04:31PM delay was the waiver.

And if your position is, no, part of the delay was trying to negotiate a modification; and when that failed, having to figure out a way to get counsel, then I think --

MR. RUSSO: I'm sorry. Go ahead.

04:31PM THE COURT: Go ahead.

MR. RUSSO: Our position is that just delay doesn't explain this. It doesn't answer the question. It's: Did you intend to relinquish this right?

THE COURT: Right. And the answer -- yes. I don't see

04:32PM there's daylight between what we're saying.

MR. RUSSO: Well, the daylight is, again, the conversation turns to tell us about all these other things that you did that, the modification request or the request to vacate.

04:32PM THE COURT: I think that's a short conversation. We

04:32PM approached the monitors, we asked them to consider these modifications, and it didn't go anywhere.

MR. RUSSO: I'm just suggesting to the Court as short as it is, it's irrelevant to this question. It's irrelevant to the elements that plaintiffs have to prove here.

MR. FIFE: It sounds like to me that Mr. Russo is arguing with the Fifth Circuit, not us. I mean, the Fifth Circuit is the one who put this at issue. And so I think it's pretty unobjectionable and we've agreed to narrow to just this focus of waiver even though we disagree that that even should be the scope. So, you know, and Mr. Russo will be there to make objections as relevant or as appropriate and we're going to do our best to make it as easy and un-burdensome as possible.

04:33PM THE COURT: I'm going to overrule your objection to the first topic, Mr. Russo. Again, it's limited to the question of whether the delay constituted waiver.

MR. RUSSO: Well, as I've already explained, delay is not the issue. Delay does not get them over the hump.

04:33PM THE COURT: No. You're right. Waiver is the issue, intentional relinquishment of a known right.

MR. RUSSO: Correct. That's what we should be talking about in deposition.

THE COURT: Right, but the reason the issue arose was the delay.

04:33PM

MR. RUSSO: That would also show that the reason it arose is the County declined to give them counsel, but --

THE COURT: They can say that. That's exactly what they're going to say: Including their efforts to retain counsel.

04:34PM

MR. RUSSO: It's just there's a side issue that we're going to get into. If the Court is inclined to allow them to discuss the modification or whatever, it's a sideshow but, you know --

04:34PM

THE COURT: It's a very limited sideshow if it is properly characterized that way.

All right. The second item: The relationship between the election and the Judges' motion to vacate.

MR. FIFE: Yes.

04:34PM

And we certainly disagree that it will be a sideshow; but beyond that we -- I think where this topic comes from and what justifies it is in their briefing for the first time before the Fifth Circuit, the Judges suggested a relationship between the immediacy of the election and the pending motions to vacate. And in our view that raises the question of, well, if the immediacy of the election was the irreparable harm, why did you wait so long into your term to move? What is the importance of the election? When did you know about its importance? And what did you do based on that knowledge?

04:34PM

04:35PM

MR. RUSSO: Your Honor, looking at the Fifth Circuit's opinion, there are no fact issues left open in connection with the opinion's view of the election. They are very well, you know, *Purcell* issues and decided on their own to get this done before the election and move on with it.

04:35PM

So, again, this is an issue that's really not before the Court.

THE COURT: All right. The first topic encompasses the process and timing of the motions to vacate. I don't think that there's a separate topic about the relationship to the election other than the ones that are obvious. They're campaigning, they're worried about losing, what happens to the legal challenge if they lose. All of those are issues, but I don't think that that requires analysis at the deposition stage.

04:36PM 04:36PM

MR. FIFE: Understood, Your Honor. And candidly, I mean, a week ago or maybe two weeks ago we would have agreed a hundred percent with you and it's just this new introduction of the election as some immediate deadline that raised that as an issue for us. But I also take your point that the things I listed are likely included to the extent it goes to knowledge and relinquishment; so I take your point, Your Honor.

04:36PM

THE COURT: And we do know *Purcell* and reverse *Purcell* issues are pretty common. Everybody understands what the considerations are. So, again, I don't think the deposition

04:37PM

topic on that area is required.

MR. FIFE: Understood, Your Honor. We'll withdraw that.

THE COURT: Okay. All right. Thank you.

04:37PM Anything else for today?

MR. FIFE: I was just going to ask in light of the discussion we've had on deposition topics, if the Court can, you know, I think it might make sense to issue a brief order, even just a text order, saying we're permitted to depose the

04:37PM Judges on this topic and then we can make it an exhibit of the deposition and just make sure the record is all clean and easy.

THE COURT: All right. But the order or the minute entry would simply say: The Court overruled the objections to Topic Number 1 of the plaintiffs' proposal to limit the

04:38PM depositions and agreed that the depositions should not focus or should not include Topic Number 2.

MR. FIFE: That would be great. I just think it would make the record clearer.

THE COURT: All right. Anything else for today?

04:38PM MR. NWAOKORO: Your Honor, I think I would appreciate some clarification.

When we are discussing the schedule, as Your Honor may recall, this was specific to the motion to vacate on *Younger*.

04:38PM THE COURT: Yes.

04:39PM 04:39PM 04:39PM 04:40PM 04:40PM

MR. NWAOKORO: As the Court is aware, we have other bases for vacatur. And the question there is, as the Court may recall, the deadline for us to file a motion to vacate on other grounds is October 1st. I would like to clarify whether or not that deadline is still in effect or whether or not we need to revisit the deadlines for the conflict with state law on other issues, which I think we started this conversation mixing some of that up; and I'd would like to appreciate some clarity on how we handle the remainder.

Thank you.

THE COURT: Plaintiffs?

MR. CUTTING: It seems a little premature to be addressing those other parts of the schedule when we've now agreed to this expedited schedule in place that will have everything submitted by I believe it's the 24th of September; so I'm not sure exactly what Mr. Nwaokoro is asking for right now, but --

MR. NWAOKORO: My question -- sorry to interrupt.

MR. CUTTING: What is the proposal, I guess?

MR. NWAOKORO: My question, Mr. Cutting, is just for clarity on where we stand because the schedule that was discussed and agreed upon and the Court issued an order relates to the motion to vacate as it relates to *Younger* only; but as you might be aware, there's more than *Younger* on the table, right?

THE COURT: Well --

MR. NWAOKORO: Conflicts with state law and we had a deadline on that existing schedule for October 1st for the Movants to file their motions to vacate, et cetera.

04:40PM So I'm just seeking clarity on where that stands, the schedule going forward, separate from *Younger* which is on fast track.

THE COURT: *Younger* is on fast track. We can either let this October 1 deadline stay subject to reconsideration 04:40PM after the Court rules on the *Younger* issue --

MR. NWAOKORO: Right.

THE COURT: -- which I think may be the cleanest way to proceed right now. The arguments you're raising are not going to implicate the Judges' positions I don't believe.

04:41PM MR. NWAOKORO: No. That's correct, Your Honor. I just wanted clarification as to how we want to proceed in light of that. And if Your Honor is proposing that we keep that subject to your decision on the *Younger* issue, that is fine; but I think -- I thought it might benefit the parties to know how 04:41PM that would be handled going forward.

THE COURT: Mr. Fife, Mr. Cutting, how do you propose?

MR. CUTTING: I see no issue. Plaintiffs have no issue with keeping it as it is subject to , you know, any reconsideration as the Court proceeds.

04:41PM THE COURT: All right. I agree with that. Very good.

MR. RUSSO: I will raise this, Your Honor, just to throw it out there. I'm not trying to extend things. But we did put on hold additional discovery that we were going to talk about prior to the Fifth Circuit's opinion. So if we're holding up the October day, we're going to have to revisit some of the discovery issues. So I don't think we need to do that today, but just making the Court aware that should we reach that point, there's more to talk about.

THE COURT: We'll have six days to do that.

All right. Is somebody going to volunteer to draft a scheduling order, send it to the other side so I can get it on file right away?

MR. CUTTING: We're happy to do that.

THE COURT: All right. As with everything else currently in this case, expedite.

MR. CUTTING: Understood.

THE COURT: All right. Very good. Anything else for today?

MR. FIFE: Nothing from plaintiffs except gratitude for spending all this time with all of us.

THE COURT: You're going to be spending a lot more time in the next several weeks.

Thank you.

MR. FIFE: Thank you, Your Honor.

THE COURT: You are all excused. Have a good rest of

the week.

MR. NWAOKORO: Thank you.

(The proceedings were adjourned.)

* * * *

REPORTER'S CERTIFICATE

I, Lanie M. Smith, CSR, RMR, CRR, Official Court Reporter, United States District Court, Southern District of Texas, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

/s/ Lanie M. Smith
Official Court Reporter

## /

**/s** [1] - 73:10

## 0

**019** [1] - 3:2

## 1

**1** [6] - 5:19, 7:25, 60:11, 60:25, 69:14, 71:9
**10** [2] - 15:4, 53:13
**10001** [1] - 2:6
**1019** [1] - 2:13
**1108** [1] - 1:18
**11D** [1] - 60:10
**11th** [4] - 19:18, 21:13, 22:17, 31:25
**12** [2] - 2:23, 4:12
**12548** [1] - 3:2
**12:30** [1] - 60:19
**1405** [1] - 2:2
**14th** [2] - 22:24, 49:24
**1500** [1] - 2:8
**15th** [1] - 2:13
**1601** [1] - 1:22
**1640** [1] - 2:21
**17th** [2] - 51:3, 54:14
**18th** [7] - 2:17, 49:25, 50:13, 51:3, 54:14, 54:23, 55:9
**1:00** [4] - 53:24, 60:7, 60:8, 60:20
**1st** [2] - 70:4, 71:3

## 2

**2** [1] - 69:16
**20009** [1] - 1:23
**2003)** [1] - 5:7
**201** [1] - 2:24
**2024** [1] - 10:1
**2025** [2] - 61:7, 62:17
**2026** [1] - 1:10
**204** [1] - 5:6
**21st** [13] - 49:7, 49:14, 50:15, 51:5, 51:9, 51:12, 54:11, 54:14, 54:18, 54:25, 55:11, 58:20, 59:9
**220** [1] - 2:9
**22nd** [9] - 48:15, 49:14, 55:16, 55:18, 55:19, 55:20, 55:25, 57:2, 59:20
**23rd** [6] - 50:15, 51:14, 52:6, 52:20, 55:2, 55:17
**24** [1] - 32:15
**24th** [4] - 51:23, 53:6, 54:11, 70:15
**253** [1] - 10:24
**25th** [14] - 32:4, 42:16, 43:13, 44:18, 48:18, 49:16, 50:16, 51:14, 51:21, 52:1, 52:4, 52:22, 52:24, 54:6
**28th** [11] - 26:1, 27:14, 48:18, 51:14, 51:18, 51:24, 51:25, 52:8, 52:24, 53:1, 53:7
**2:00** [3] - 59:19, 60:7
**2nd** [8] - 14:25, 15:2, 37:16, 46:14, 46:21, 46:24, 46:25

## 3

**30** [1] - 32:3
**30th** [6] - 19:20, 20:4, 26:7, 27:14, 44:16, 49:18
**31** [1] - 1:10
**31st** [3] - 22:10, 39:18
**351** [1] - 5:6
**3:00** [1] - 59:13
**3rd** [1] - 14:24

## 4

**4:00** [1] - 60:20
**4:16-CV-01414** [1] - 1:4
**4th** [2] - 19:2, 40:15

## 5

**50th** [1] - 2:5
**515** [1] - 3:7
**5th** [1] - 20:8

## 6

**6** [3] - 10:16, 11:9, 13:4
**60** [17] - 5:12, 5:24, 7:17, 7:20, 8:12, 8:23, 8:24, 9:9, 9:16, 10:10, 10:15, 13:13, 14:12, 39:2, 41:9, 43:9, 45:8
**60(b** [1] - 16:1
**60(b)(5** [1] - 13:20
**60(b)(5)** [1] - 13:16
**6218** [1] - 2:24
**635** [1] - 13:4

## 7

**77002** [2] - 2:13, 3:8
**77004** [1] - 2:9
**77010** [1] - 2:21
**77081-2409** [1] - 2:25
**77251** [1] - 1:19
**77550-7998** [1] - 2:18
**78701** [1] - 3:3
**78741** [1] - 2:2
**7th** [2] - 20:10, 46:23

## 8

**8** [1] - 61:4
**8/31** [13] - 30:18, 30:21, 35:19, 36:3, 39:11, 39:25, 40:8, 44:11, 44:22, 47:13, 50:9, 56:13, 56:24
**800** [1] - 1:22
**8004** [1] - 3:7
**8:00** [2] - 59:3, 59:16
**8th** [1] - 20:10

## 9

**9** [4] - 10:16, 11:9, 49:3, 49:4
**9/10** [3] - 29:21, 57:13, 57:16
**9/11** [7] - 19:21, 20:3, 29:23, 30:12, 30:24, 31:12, 57:12
**9/14** [1] - 41:13
**9/15** [2] - 49:5, 49:6
**9/18** [2] - 56:13, 56:25
**9/20** [1] - 41:17
**9/21** [9] - 42:2, 49:9, 49:19, 49:22, 50:2, 50:9, 56:8, 56:13, 57:1
**9/22** [1] - 57:6
**9/23** [4] - 50:4, 50:9, 56:13, 57:1
**9/24** [1] - 57:7
**9/25** [15] - 35:21, 36:19, 37:7, 37:14, 40:9, 44:12, 44:24, 45:24, 46:1, 47:5, 48:13, 49:10, 50:5, 50:9, 50:10
**9/28** [2] - 45:25, 46:1
**9/29** [2] - 46:7, 46:13
**9/30** [4] - 30:1, 30:12, 37:15, 45:25
**9/4** [14] - 21:15, 29:2, 29:16, 30:16, 30:20, 36:11, 36:12, 36:13, 37:2, 56:14, 56:18, 57:10, 58:3
**9/8** [5] - 29:6, 29:18, 56:19, 57:12, 58:7
**909** [1] - 2:20
**9:30** [1] - 60:19
**9th** [3] - 11:23, 21:11, 22:14

## A

**ability** [6] - 11:6, 11:15, 32:5, 62:5, 62:20, 73:7
**able** [4] - 42:12, 45:11, 61:11, 62:13
**above-entitled** [1] - 73:8
**absolutely** [2] - 14:6, 60:13
**abstain** [4] - 13:15, 13:18, 23:24, 47:23
**abstained** [1] - 5:15
**abstention** [37] - 5:1, 5:10, 5:11, 5:16, 5:24, 6:2, 9:1, 9:20, 12:19, 16:1, 16:20, 19:17, 21:3, 21:10, 21:21, 23:21, 26:23, 29:21, 32:15, 33:8, 35:2, 37:12, 38:10, 38:12, 39:13, 40:7, 41:8, 43:6, 44:11, 47:23, 48:4, 50:8, 56:24, 56:25, 58:12, 62:21, 63:8
**accomplished** [1] - 63:19
**account** [1] - 6:23
**accounting** [1] - 40:14
**accurate** [1] - 39:23
**accurately** [1] - 25:3
**achieve** [1] - 64:9
**Adams** [1] - 2:16
**add** [1] - 13:3
**adding** [1] - 36:16
**addition** [1] - 36:7
**additional** [2] - 6:4, 72:3
**address** [5] - 4:18, 24:9, 24:14, 39:6,

39:8
**addressed** [2] - 23:14, 45:4
**addressing** [4] - 23:13, 38:22, 42:18, 70:13
**adequately** [1] - 48:12
**adjourned** [1] - 73:3
**adopt** [8] - 16:6, 16:10, 16:15, 18:21, 27:7, 31:7, 31:19, 33:15
**adopting** [3] - 18:24, 35:13, 36:16
**adopts** [1] - 31:8
**advance** [5] - 20:24, 24:3, 24:7, 43:15, 51:5
**advisement** [1] - 58:1
**affect** [1] - 17:1
**affected** [1] - 63:10
**afternoon** [3] - 4:2, 21:10, 59:21
**AG** [9] - 18:20, 21:25, 23:24, 30:22, 30:23, 46:13, 54:24, 57:1, 57:9
**AG's** [6] - 19:5, 21:1, 21:16, 28:6, 39:12, 50:24
**ago** [3] - 13:13, 68:17
**agree** [13] - 8:24, 15:17, 18:21, 18:23, 23:14, 41:25, 47:17, 47:22, 54:2, 60:24, 65:1, 71:25
**agreed** [5] - 66:9, 68:17, 69:15, 70:14, 70:22
**agrees** [1] - 13:15
**ahead** [9] - 4:5, 13:24, 25:20, 29:9, 38:20, 57:15, 58:16, 65:14, 65:15
**al** [2] - 1:4, 1:9
**align** [1] - 16:24
**aligned** [1] - 34:6
**aligning** [1] - 24:15
**Allan** [2] - 2:23, 2:23
**allan** [1] - 4:12
**allegation** [1] - 13:9
**allege** [1] - 35:4
**alleged** [1] - 13:5
**allow** [7] - 8:6, 17:19, 42:20, 45:3, 54:2, 67:7
**allowed** [9] - 19:25, 28:6, 29:24, 30:25, 31:6, 31:12, 34:12, 34:19, 39:12
**allows** [3] - 14:18, 31:18, 43:14
**alternative** [1] - 17:22
**alternatively** [1] - 32:23
**amenable** [1] - 19:13
**amount** [3] - 45:7, 45:19, 45:23
**analysis** [7] - 10:14, 12:20, 17:2, 33:8, 39:2, 63:12, 68:14
**Angela** [2] - 2:16, 4:15
**Anne** [1] - 1:21
**answer** [3] - 64:8, 65:17, 65:19
**anyway** [1] - 22:2
**apart** [1] - 34:1
**apologize** [2] - 12:6, 26:12
**appeal** [1] - 42:4
**appearances** [1] - 4:5
**APPEARANCES** [1] - 1:16
**appellate** [1] - 44:9
**apple** [1] - 17:25
**applicable** [1] - 13:14
**applied** [2] - 9:11, 25:23
**applies** [1] - 14:12
**apply** [7] - 7:2, 7:7, 7:19, 7:22, 9:16, 16:18, 45:8
**applying** [1] - 7:14
**appreciate** [5] - 42:22, 55:22, 59:24, 69:20, 70:8
**approach** [3] - 15:6, 16:3, 33:5
**approached** [1] - 66:1
**approaches** [2] - 16:3, 16:5
**appropriate** [4] - 5:25, 20:17, 42:17, 66:12
**approximate** [1] - 60:21
**area** [1] - 69:1
**argue** [10] - 14:19, 45:10, 48:18, 51:14, 51:21, 51:24, 52:1, 55:2, 59:8
**argued** [2] - 14:5, 64:5
**arguing** [4] - 26:24, 40:11, 41:9, 66:7
**argument** [29] - 16:2, 19:17, 20:15, 20:16, 22:21, 22:24, 26:12, 26:16, 27:5, 33:14, 37:15, 46:14, 50:5, 50:10, 50:15, 52:4, 52:7, 52:21, 53:7, 53:24, 54:9, 55:20, 57:1, 57:6, 58:21, 59:20, 63:8, 65:4, 65:8
**arguments** [10] - 8:7, 16:23, 34:9, 34:13, 36:16, 43:6, 51:1, 60:6, 63:20, 71:13
**arose** [2] - 66:24, 67:2
**aside** [3] - 10:24, 33:11, 39:8
**asserted** [1] - 5:10
**assistants** [1] - 59:14
**assume** [1] - 43:25
**assuming** [3] - 30:23, 43:17, 45:16
**assumption** [2] - 43:20, 43:22
**assured** [1] - 5:20
**attack** [1] - 6:1
**attempt** [1] - 65:2
**attempts** [1] - 61:12
**Attorney** [61] - 3:1, 12:8, 12:13, 12:19, 15:24, 16:6, 16:12, 16:19, 17:24, 18:4, 18:11, 19:1, 19:10, 19:16, 19:23, 24:10, 24:20, 24:24, 25:5, 25:11, 25:15, 26:3, 26:20, 27:2, 27:15, 28:17, 29:4, 29:6, 29:14, 29:18, 29:24, 31:24, 32:12, 32:24, 33:6, 33:9, 33:22, 33:25, 34:1, 34:3, 34:5, 34:12, 36:22, 40:10, 40:15, 40:18, 40:24, 41:23, 42:10, 45:15, 47:16, 47:17, 51:7, 52:2, 56:14, 56:18, 57:10, 57:12, 58:4, 58:6
**Attorney's** [1] - 2:12
**attorneys** [1] - 63:20
**AUGUST** [1] - 1:10
**August** [1] - 22:10
**Austin** [2] - 2:2, 3:3
**availability** [1] - 54:6
**available** [1] - 60:22
**Ave** [1] - 1:22
**avoid** [1] - 33:2
**aware** [4] - 62:16, 70:1, 70:24, 72:7

## B

**backdrop** [1] - 11:5
**bail** [2] - 11:7, 11:15
**balancing** [1] - 47:3
**banc** [1] - 7:8
**Barrett** [1] - 2:11
**based** [10] - 10:11, 19:14, 20:17, 21:10, 32:6, 55:23, 56:11, 56:25, 58:11, 67:24
**bases** [1] - 70:2
**basic** [1] - 12:20
**basis** [8] - 12:19, 20:1, 20:24, 21:5, 32:15, 40:7, 47:12, 56:2
**becomes** [1] - 7:9
**Beebe** [1] - 2:7
**BEFORE** [1] - 1:13
**beforehand** [1] - 57:25
**begin** [1] - 53:1
**beginning** [2] - 12:5, 14:7
**begun** [1] - 18:3
**behalf** [1] - 1:4
**behind** [1] - 11:5
**Bellinger** [1] - 2:7
**bench** [3] - 52:12, 53:12, 53:24
**benefit** [1] - 71:19
**best** [3] - 58:9, 66:13, 73:7
**between** [9] - 16:5, 23:23, 28:5, 30:12, 48:8, 65:20, 67:13, 67:19
**beyond** [2] - 13:6, 67:16
**binding** [1] - 7:7
**bit** [3] - 15:14, 49:6, 50:25
**bites** [2] - 17:25, 26:25
**bolts** [2] - 8:1, 14:7
**bound** [1] - 7:6
**Box** [2] - 1:18, 3:2
**brief** [6] - 14:19, 16:9, 16:23, 42:21, 45:11, 69:8
**briefed** [8] - 28:20, 33:18, 38:12, 40:25, 43:3, 43:9, 43:10, 43:11
**briefing** [11] - 8:5, 8:7, 14:16, 16:7, 20:17, 27:24, 38:17, 43:12, 55:23, 59:14, 67:17
**briefs** [1] - 19:14
**bring** [6] - 9:20, 9:24, 62:20, 62:22, 63:7, 64:24
**broached** [1] - 48:6
**broader** [1] - 63:2
**Budwine** [1] - 2:1
**build** [1] - 34:2
**burdensome** [1] - 66:13
**Burford** [1] - 5:10
**burst** [1] - 10:23
**but..** [2] - 14:25, 22:20

## C

**calendar** [2] - 40:4, 52:23

**Callon** [3] - 5:5, 5:19, 5:24
**campaigning** [1] - 68:12
**candidly** [1] - 68:16
**capacity** [4] - 15:14, 17:23, 32:8, 42:4
**careful** [1] - 64:22
**carry** [1] - 5:16
**case** [16] - 5:4, 8:19, 9:8, 9:9, 13:6, 13:9, 13:17, 26:6, 34:5, 34:7, 34:8, 34:13, 36:6, 38:3, 72:15
**cases** [3] - 8:16, 14:15, 59:15
**caveat** [2] - 16:16, 48:3
**certainly** [7] - 11:20, 11:22, 24:7, 36:8, 38:22, 43:11, 67:15
**CERTIFICATE** [1] - 73:5
**certify** [1] - 73:7
**cetera** [2] - 59:15, 71:4
**challenge** [3] - 62:3, 62:5, 68:13
**challengers** [1] - 5:9
**change** [1] - 65:2
**characterized** [1] - 67:11
**cherry** [1] - 61:8
**cherry-pick** [1] - 61:8
**chooses** [1] - 43:16
**Circuit** [43] - 4:21, 5:7, 5:8, 5:11, 5:17, 6:9, 6:11, 6:24, 7:13, 7:21, 8:18, 8:20, 8:21, 9:1, 9:22, 10:5, 15:9, 15:10, 21:4, 23:20, 24:2, 24:9, 24:14, 26:22, 27:22, 32:17, 38:7, 39:7, 41:6, 41:10, 43:23, 43:25, 45:8, 47:1, 61:10, 61:18, 63:8, 63:23, 63:24, 64:1, 66:7, 66:8, 67:18
**Circuit's** [11] - 6:23, 26:9, 26:13, 28:22, 47:11, 60:16, 61:5, 61:19, 61:23, 68:1, 72:4
**circumstances** [1] - 13:7
**cited** [2] - 8:16, 9:3
**Civil** [4] - 1:18, 1:21, 2:1, 2:8
**claim** [2] - 62:21, 64:24
**clarification** [5] - 31:21, 35:24, 38:1, 69:21, 71:16
**clarify** [2] - 36:21, 70:4
**clarity** [3] - 70:8, 70:21, 71:5
**classic** [1] - 49:20
**clause** [1] - 61:8
**clean** [1] - 69:11
**cleaner** [1] - 46:19
**cleanest** [1] - 71:12
**clear** [7] - 6:9, 22:23, 26:10, 28:25, 38:8, 38:24, 44:9
**clearer** [1] - 69:18
**clearest** [1] - 7:16
**clearly** [1] - 26:18
**close** [2] - 17:12, 22:15
**closest** [2] - 5:4, 61:1
**Cody** [1] - 29:9
**colleagues** [1] - 61:25
**combined** [2] - 57:20, 57:22
**coming** [2] - 15:10, 15:24
**commend** [1] - 60:14
**comment** [1] - 12:13
**commit** [2] - 55:24, 58:19
**commitment** [2] - 55:15, 60:14
**common** [1] - 68:24
**Company** [2] - 5:5, 5:6
**completed** [1] - 14:23
**completely** [6] - 32:13, 32:16, 33:3, 40:13, 45:9, 48:11
**complicated** [1] - 42:11
**comply** [2] - 28:21, 43:17
**complying** [1] - 11:11
**comprehensive** [1] - 40:21
**computer** [1] - 1:25
**conceded** [1] - 28:18
**concern** [2] - 47:8, 47:11
**concerned** [1] - 63:9
**concluding** [1] - 7:1
**conclusion** [1] - 9:5
**conditioning** [1] - 27:14
**confer** [2] - 26:17, 36:5
**conference** [2] - 25:22, 38:24
**CONFERENCE** [1] - 1:13
**confident** [1] - 6:4
**confirmed** [2] - 8:3, 60:21
**conflict** [1] - 70:6
**conflicts** [1] - 71:2
**confused** [1] - 23:5
**confusion** [1] - 39:21
**Congress** [1] - 2:13
**Connecticut** [1] - 1:22
**connection** [2] - 9:18, 68:2
**consent** [10] - 6:15, 7:11, 8:11, 10:24, 11:3, 11:7, 11:13, 13:21, 62:23, 63:6
**consenting** [1] - 48:8
**consider** [12] - 12:1, 18:16, 18:17, 18:18, 19:2, 21:4, 24:2, 24:6, 29:14, 30:14, 48:9, 66:1
**consideration** [4] - 13:16, 21:3, 32:25, 39:3
**considerations** [1] - 68:25
**considered** [2] - 9:1, 45:18
**consistent** [3] - 13:12, 31:15, 33:20
**consolidated** [1] - 42:21
**constituted** [1] - 66:17
**constitutional** [13] - 7:12, 7:15, 7:18, 8:12, 10:12, 10:15, 10:20, 10:23, 11:3, 11:17, 13:6, 13:10, 14:12
**constrain** [1] - 32:5
**constrained** [1] - 17:5
**constraints** [1] - 32:8
**contending** [1] - 26:25
**context** [1] - 25:22
**contexts** [1] - 63:18
**contingent** [1] - 42:6
**continue** [1] - 13:20
**contrived** [1] - 26:16
**control** [2] - 11:6, 11:15
**convenient** [1] - 20:9
**conversation** [3] - 65:22, 65:25, 70:7
**Corps** [1] - 1:21
**correct** [24] - 5:13, 11:10, 15:1, 19:7, 19:22, 23:22, 28:13, 29:17, 29:21, 30:2, 31:1, 31:9, 37:13, 39:14, 47:22, 48:2, 51:11, 55:12, 55:14, 58:8, 58:13, 66:22, 71:15, 73:7
**correctly** [1] - 56:22
**counsel** [26] - 18:20, 18:23, 28:16, 37:18, 39:5, 40:11, 45:3, 52:19, 61:7, 61:12, 61:14, 61:24, 62:14, 63:7, 63:13, 63:14, 64:3, 64:10, 64:11, 64:17, 64:20, 65:13, 67:2, 67:5
**counterproposal** [1] - 21:8
**counties** [1] - 10:25
**county** [1] - 64:3
**County** [8] - 2:12, 4:9, 4:10, 10:1, 11:2, 11:6, 11:16, 67:2
**COUNTY** [2] - 1:9, 2:12
**couple** [6] - 10:9, 20:18, 36:8, 52:14, 53:21, 53:22
**course** [10] - 6:2, 6:21, 9:22, 10:4, 15:24, 19:4, 24:9, 27:20, 41:16, 43:17
**Court** [92] - 3:5, 3:5, 3:6, 5:1, 5:3, 5:14, 5:15, 5:20, 5:21, 6:3, 6:12, 6:14, 6:15, 6:18, 7:22, 8:9, 8:20, 8:21, 9:3, 9:5, 10:3, 10:10, 10:14, 11:25, 12:7, 12:13, 13:8, 13:10, 13:13, 13:14, 13:17, 15:12, 15:17, 17:14, 18:16, 19:13, 20:9, 20:11, 20:17, 20:25, 21:4, 21:18, 21:20, 22:3, 22:18, 25:22, 26:2, 27:17, 28:20, 30:19, 32:9, 32:14, 32:19, 33:4, 33:17, 33:18, 39:23, 40:3, 41:4, 41:11, 42:17, 42:21, 43:3, 43:14, 43:18, 43:21, 44:17, 44:23, 46:17, 51:2, 54:4, 57:19, 57:24, 60:23, 61:18, 62:16, 62:21, 66:3, 67:7, 68:7, 69:7, 69:13, 70:1, 70:2, 70:22, 71:10, 71:24, 72:7, 73:6, 73:10
**COURT** [254] - 1:1, 4:2, 4:5, 4:14, 4:17, 6:20, 6:22, 7:3, 8:13, 9:13, 10:19, 11:9, 12:3, 12:10, 12:15, 12:18, 12:23, 13:1, 13:23, 14:3, 14:20, 15:2, 16:12, 17:1, 18:3, 18:19, 19:3, 19:5, 19:9, 19:21, 19:25, 20:2, 20:7, 20:15, 20:18, 21:7, 21:14, 21:22, 22:5, 22:9, 22:11, 22:16, 22:21, 23:3, 23:6, 23:16, 23:19, 23:23, 24:4, 24:12, 24:17, 24:23, 25:2, 25:8, 25:17, 25:19, 26:11, 26:15, 27:6, 27:10, 27:23, 28:1, 28:3, 28:12, 28:23, 29:2, 29:12, 29:18, 29:20, 29:23, 30:3, 30:8, 30:11, 30:15, 30:18, 30:21, 30:25, 31:2, 31:6, 31:10, 31:12, 31:17, 31:21, 32:1, 33:6, 33:24, 34:16, 34:24, 35:3, 35:5, 35:11, 35:15, 35:17, 36:1, 36:3, 36:11, 36:13, 36:15, 36:19, 37:1, 37:4, 37:7, 37:11, 37:14, 37:20, 37:22, 37:25, 38:4, 38:9, 38:14, 38:16, 38:20, 39:9, 39:15, 39:25, 40:2, 40:6, 40:16, 41:5, 41:12, 41:15, 41:17, 41:19, 41:22, 42:7, 42:9, 42:23, 43:5, 43:8, 43:20, 44:4, 44:7, 44:10, 44:15, 44:19, 44:22, 45:1, 45:13, 45:22, 46:3, 46:5, 46:9, 46:11, 46:13,

46:20, 46:24, 47:2, 47:8, 47:13, 47:20, 48:1, 48:5, 48:13, 48:17, 49:1, 49:4, 49:6, 49:12, 49:16, 49:19, 49:22, 50:1, 50:8, 50:11, 50:14, 50:24, 51:4, 51:10, 51:17, 51:19, 51:22, 51:24, 52:8, 52:11, 52:14, 52:21, 52:23, 53:4, 53:9, 53:14, 53:16, 53:18, 53:20, 53:23, 54:6, 54:9, 54:16, 54:18, 54:22, 55:2, 55:4, 55:10, 55:12, 55:14, 55:19, 56:1, 56:5, 56:8, 56:10, 56:16, 56:18, 56:23, 57:4, 57:9, 57:15, 57:18, 57:23, 58:2, 58:6, 58:9, 58:14, 58:23, 59:6, 59:11, 59:19, 60:3, 60:5, 60:9, 60:24, 61:2, 61:20, 62:11, 63:3, 63:10, 64:7, 64:15, 64:19, 65:1, 65:7, 65:15, 65:19, 65:25, 66:15, 66:20, 66:24, 67:3, 67:10, 68:8, 68:23, 69:4, 69:12, 69:19, 69:25, 70:11, 71:1, 71:8, 71:12, 71:21, 71:25, 72:9, 72:14, 72:17, 72:21, 72:25

**court** [6] - 4:22, 5:18, 7:6, 9:6, 53:2, 53:18
**Court's** [6] - 4:21, 6:6, 10:11, 21:3, 23:9, 60:14
**Courtroom** [1] - 60:10
**Courts** [2] - 11:6, 13:4
**covers** [2] - 64:14, 64:16
**create** [1] - 7:11
**creating** [2] - 10:12, 45:9
**CRR** [2] - 3:5, 73:6
**CSR** [2] - 3:5, 73:6
**current** [1] - 22:6
**cutting** [12] - 14:7, 17:1, 28:9, 31:22, 33:19, 36:20, 39:21, 41:12, 54:16, 55:4, 70:20, 71:21
**CUTTING** [94] - 4:8, 15:1, 15:6, 17:3, 18:7, 18:20, 19:4, 19:7, 19:10, 19:22, 20:1, 20:4, 20:8, 20:13, 20:16, 23:2, 23:4, 23:7, 23:17, 24:1, 24:5, 24:13, 25:5, 25:9, 25:18, 28:10, 28:13, 28:24, 29:10, 29:17, 29:19, 29:22, 30:2, 30:23, 31:1, 31:23, 32:2, 33:13, 36:21, 37:3, 37:5, 37:10, 37:13, 37:21, 38:19, 38:21, 39:16, 40:13, 40:17, 41:1, 41:14, 41:16, 41:18, 41:20, 42:3, 42:8, 42:10, 43:9, 44:2, 44:6, 44:8, 48:6, 48:15, 49:18, 52:2, 54:17, 54:19, 55:5, 55:8, 55:11, 55:13, 55:15, 55:21, 56:14, 56:17, 56:20, 57:3, 57:7, 57:14, 57:16, 57:19, 57:24, 58:5, 58:17, 58:24, 59:4, 59:23, 60:4, 60:8, 70:12, 70:19, 71:22, 72:13, 72:16
**Cutting** [2] - 1:20, 4:8
**Cutting's** [1] - 25:2

## D

**D'Agostino's** [1] - 53:2
**Daniel** [2] - 2:12, 4:9
**date** [18] - 20:5, 20:9, 30:14, 32:3, 35:22, 46:8, 46:9, 48:10, 49:9, 50:3, 50:14, 51:2, 54:14, 55:25, 57:17, 58:3, 58:5
**dates** [4] - 51:16, 54:5, 56:13, 56:21
**Daves** [12] - 6:24, 7:2, 7:5, 7:7, 7:14, 7:19, 9:6, 9:17, 10:14, 13:3, 13:8
**daylight** [2] - 65:20, 65:21
**days** [19] - 10:8, 10:9, 11:24, 11:25, 15:10, 22:14, 27:18, 35:8, 35:12, 36:8, 44:25, 48:9, 50:2, 51:6, 53:22, 55:3, 55:7, 56:2, 72:9
**days'** [1] - 49:8
**DC** [1] - 1:23
**deadline** [12] - 18:4, 36:7, 36:11, 40:7, 42:17, 43:14, 49:13, 68:19, 70:3, 70:5, 71:3, 71:9
**deadlines** [1] - 70:6
**deal** [10] - 10:16, 11:21, 17:8, 21:20, 22:18, 23:9, 25:14, 32:11, 38:10, 45:19
**dealing** [7] - 10:25, 32:12, 36:23, 45:14, 47:15, 47:16, 50:17
**dealt** [3] - 9:2, 10:13, 25:12
**debate** [1] - 5:2
**decades** [1] - 7:22
**decide** [10] - 10:4, 19:13, 29:20, 41:4, 41:8, 43:14, 57:13, 57:20, 58:9, 58:11
**decided** [1] - 68:4
**decides** [2] - 20:11, 20:17
**deciding** [3] - 12:16, 17:15, 29:21
**decision** [7] - 6:17, 7:6, 7:21, 32:18, 57:25, 58:10, 71:18
**declined** [2] - 10:1, 67:2
**decree** [12] - 6:15, 7:11, 8:11, 10:24, 11:3, 11:8, 11:13, 13:21, 62:10, 62:24, 63:6, 63:11
**deems** [1] - 13:13
**defeated** [1] - 47:9
**defects** [1] - 5:12
**DEFENDANT** [4] - 2:11, 2:19, 2:23, 3:1
**Defendants** [1] - 1:10
**DEFENDANTS** [1] - 2:15
**defense** [4] - 5:9, 6:3, 62:23, 64:4
**defenses** [1] - 63:20
**delay** [20] - 26:17, 27:20, 27:23, 33:12, 45:16, 61:14, 63:10, 64:12, 64:23, 65:3, 65:6, 65:7, 65:9, 65:10, 65:11, 65:16, 66:17, 66:18, 66:19, 66:25
**delayed** [1] - 64:19
**demonstrate** [1] - 7:11
**demonstrated** [2] - 6:18, 60:15
**denial** [1] - 32:19
**denied** [1] - 32:14
**depose** [1] - 69:9
**deposed** [1] - 60:19
**deposition** [7] - 16:18, 60:12, 66:23, 68:14, 68:25, 69:7, 69:11
**depositions** [6] - 7:25, 14:22, 14:24, 60:18, 69:15
**describes** [1] - 63:24
**despite** [1] - 17:10
**determinations** [1] - 8:10
**determine** [1] - 13:17
**differ** [1] - 12:21
**difference** [7] - 16:5, 48:3, 48:8, 48:22, 49:8, 54:21, 64:25
**different** [8] - 33:8, 34:7, 34:8, 34:9, 50:23, 50:25, 51:1
**differently** [1] - 6:12
**difficult** [2] - 17:22, 47:4
**digest** [1] - 59:22
**direct** [1] - 9:5
**directed** [4] - 20:25, 21:4, 21:20, 24:2
**directive** [2] - 6:23, 6:24
**directly** [1] - 61:17
**disagree** [7] - 7:5, 25:21, 34:5, 40:13, 41:1, 66:10, 67:15
**disagreed** [1] - 13:11
**disagreement** [2] - 38:25, 61:3
**discovery** [14] - 8:22, 9:18, 10:8, 11:21, 11:24, 12:23, 14:23, 14:24, 21:12, 22:15, 34:7, 41:7, 72:3, 72:6
**discuss** [2] - 8:1, 67:8
**discussed** [2] - 16:14, 70:22
**discussing** [4] - 38:23, 39:13, 62:18, 69:22
**discussion** [2] - 43:24, 69:7
**dispute** [1] - 14:21
**disputed** [2] - 42:24, 43:1
**disruptive** [1] - 60:16
**distance** [1] - 28:5
**DISTRICT** [3] - 1:1, 1:1, 1:14
**district** [2] - 5:17, 9:6
**District** [5] - 3:6, 3:6, 53:2, 73:6
**Ditto** [2] - 34:2, 34:3
**DIVISION** [1] - 1:2
**Division** [1] - 3:2
**docket** [2] - 23:9, 24:15
**doctrine** [1] - 9:20
**done** [11] - 9:18, 10:8, 11:7, 11:15, 11:25, 12:1, 25:13, 28:8, 50:19, 59:16, 68:4
**down** [5] - 19:3, 27:13, 38:11, 48:20, 61:3
**draft** [1] - 72:11
**drafted** [1] - 61:25
**drawn** [1] - 61:22
**drive** [1] - 7:10
**Drive** [1] - 2:2
**due** [10] - 15:4, 19:17, 35:19, 37:15, 49:3, 51:9, 52:20, 56:6, 56:8, 56:24
**during** [1] - 25:23

## E

**early** [2] - 24:6, 54:18
**easier** [1] - 29:4
**easy** [3] - 46:21, 66:13, 69:11
**eating** [1] - 48:24
**Ed** [1] - 2:20

**effect** [2] - 34:11, 70:5
**efficient** [4] - 15:19, 18:15, 23:10, 25:18
**efforts** [5] - 61:24, 63:11, 64:17, 67:4
**egregious** [2] - 5:12, 60:16
**either** [4] - 32:11, 55:23, 59:6, 71:8
**elapsed** [1] - 28:5
**election** [12] - 24:3, 24:7, 32:25, 43:15, 67:13, 67:19, 67:21, 67:23, 68:3, 68:5, 68:11, 68:19
**elections** [2] - 20:24, 47:1
**elements** [1] - 66:5
**Elizabeth** [1] - 1:21
**Elm** [1] - 2:24
**elucidated** [1] - 4:25
**Emeka** [1] - 3:1
**eminently** [1] - 40:22
**emphasize** [1] - 43:3
**en** [1] - 7:8
**enable** [1] - 24:6
**encompassed** [1] - 61:19
**encompasses** [2] - 64:1, 68:8
**end** [3] - 16:22, 30:9, 33:22
**engage** [1] - 62:6
**entire** [4] - 27:3, 38:3, 38:22, 42:5
**entitled** [2] - 64:6, 73:8
**entry** [1] - 69:13
**enunciated** [1] - 25:24
**equitable** [1] - 13:20
**equities** [4] - 7:17, 8:12, 43:9, 45:18
**equity** [1] - 39:3
**essentially** [5] - 16:15, 27:24, 34:13, 35:12, 62:12
**et** [4] - 1:4, 1:9, 59:15, 71:4
**evening** [1] - 22:8
**event** [3] - 11:20, 16:7, 16:11
**evidence** [1] - 65:1
**evidentiary** [1] - 8:9
**exact** [2] - 7:1, 25:10
**exactly** [8] - 11:10, 43:8, 57:3, 64:1, 64:5, 67:3, 70:16
**except** [5] - 9:13, 16:21, 16:24, 62:16, 72:19
**exception** [1] - 27:7
**excuse** [2] - 25:9, 55:16
**excused** [1] - 72:25
**exhibit** [1] - 69:10
**exist** [2] - 23:8, 45:9
**existing** [1] - 71:3
**expand** [1] - 13:2
**expanded** [1] - 62:24
**expands** [1] - 62:1
**expect** [2] - 11:24, 16:19
**expected** [1] - 44:10
**expedient** [1] - 38:13
**expedite** [2] - 27:3, 72:15
**expedited** [6] - 8:6, 20:24, 21:5, 27:17, 47:12, 70:14
**expedition** [1] - 44:7
**expeditious** [1] - 40:22
**expend** [1] - 34:8
**experienced** [1] - 63:19
**explain** [1] - 65:17
**explained** [1] - 66:18
**explanation** [1] - 64:12
**explicitly** [1] - 61:23
**expressly** [1] - 13:10
**extend** [1] - 72:2
**extended** [2] - 40:4, 42:20
**extending** [1] - 35:6
**extent** [6] - 9:23, 13:13, 19:11, 34:14, 35:4, 68:21
**extra** [3] - 28:18, 43:2, 51:5
**extremely** [1] - 17:7

## F

**F.3d** [1] - 5:6
**fact** [10] - 6:16, 6:19, 8:22, 16:18, 32:6, 40:21, 40:24, 41:2, 48:3, 68:2
**fact-based** [1] - 32:6
**fact-finding** [1] - 6:19
**fact-intensive** [4] - 16:18, 40:21, 40:24, 41:2
**fact-specific** [1] - 48:3
**facts** [16] - 9:8, 9:10, 9:11, 9:18, 9:25, 14:11, 39:3, 41:7, 41:9, 45:7, 45:11, 45:17, 61:16, 61:17, 63:25
**factual** [1] - 8:10
**factually** [1] - 10:3
**failed** [1] - 65:12
**fair** [5] - 15:19, 40:22, 45:19, 58:23, 59:7
**fairness** [1] - 36:4
**Fannin** [1] - 2:20
**far** [3] - 24:21, 61:7
**fast** [4] - 6:11, 55:21, 71:7, 71:8
**faster** [2] - 32:10, 32:12
**favor** [1] - 57:20
**federal** [1] - 4:22
**few** [3] - 27:18, 35:12, 49:8
**FIFE** [20] - 4:7, 4:19, 6:21, 7:1, 7:4, 14:1, 14:6, 58:16, 60:13, 60:25, 61:3, 63:15, 66:6, 67:14, 68:16, 69:2, 69:6, 69:17, 72:19, 72:24
**Fife** [7] - 1:17, 4:7, 12:3, 12:4, 13:24, 28:9, 71:21
**Fifth** [54] - 4:21, 5:7, 5:8, 5:11, 5:17, 6:9, 6:11, 6:23, 6:24, 7:13, 7:21, 8:18, 8:20, 8:21, 9:1, 9:22, 10:5, 15:9, 15:10, 21:4, 23:20, 24:2, 24:9, 24:14, 26:9, 26:13, 26:22, 27:22, 28:22, 32:17, 38:7, 39:7, 41:6, 41:10, 43:23, 43:25, 45:8, 47:1, 47:11, 60:16, 61:5, 61:10, 61:18, 61:19, 61:23, 63:8, 63:23, 63:24, 64:1, 66:7, 66:8, 67:18, 68:1, 72:4
**figure** [4] - 17:19, 23:11, 63:4, 65:13
**file** [37] - 10:7, 10:9, 15:23, 17:12, 18:12, 18:13, 21:9, 21:12, 22:7, 22:17, 26:3, 27:3, 27:4, 30:6, 30:20, 30:21, 31:3, 31:7, 31:17, 33:25, 34:16, 34:17, 34:21, 39:24, 44:25, 45:23, 45:24, 51:12, 54:24, 56:10, 57:20, 57:21, 70:3, 71:4, 72:12
**filed** [16] - 13:7, 15:9, 15:20, 18:10, 20:6, 21:11, 21:17, 21:23, 24:11, 30:17, 30:23, 34:23, 35:9, 39:11, 40:20, 42:1
**filing** [10] - 15:11, 16:8, 27:1, 36:2, 38:2, 40:14, 44:19, 58:19, 59:2, 59:5
**filings** [1] - 59:2
**final** [3] - 5:9, 5:10, 5:16
**fine** [20] - 15:2, 16:4, 27:20, 30:21, 32:8, 33:1, 34:16, 36:21, 39:25, 44:2, 44:8, 45:24, 46:11, 51:17, 52:4, 58:5, 58:6, 60:5, 71:18
**finger** [1] - 28:15
**finish** [1] - 50:2
**first** [27] - 5:1, 5:11, 16:10, 16:24, 17:4, 17:9, 17:19, 18:16, 20:19, 23:18, 23:20, 25:2, 29:21, 30:5, 33:22, 36:23, 38:9, 39:8, 49:17, 53:4, 59:25, 64:21, 65:2, 66:16, 67:17, 68:8
**flag** [1] - 59:25
**Fleet** [4] - 2:23, 2:23, 4:12, 53:5
**FLEET** [2] - 4:12, 52:25
**flexible** [1] - 33:4
**floating** [1] - 5:25
**Floor** [3] - 2:5, 2:13, 2:17
**focus** [7] - 14:3, 17:14, 38:6, 38:17, 38:18, 66:10, 69:15
**focused** [1] - 37:11
**Fogler** [3] - 2:19, 2:20, 4:11
**FOGLER** [1] - 4:11
**fold** [1] - 34:13
**follow** [5] - 6:24, 8:20, 9:6, 9:17, 31:5
**following** [5] - 6:22, 18:24, 22:19, 26:11, 58:21
**FOR** [6] - 1:17, 2:11, 2:15, 2:19, 2:23, 3:1
**foregoing** [1] - 73:7
**formally** [1] - 58:18
**formerly** [1] - 63:16
**forms** [1] - 61:14
**formulate** [1] - 18:1
**forth** [1] - 63:8
**forthcoming** [1] - 28:16
**forward** [9] - 5:18, 7:24, 9:21, 10:23, 11:4, 11:18, 14:16, 71:6, 71:20
**four** [8] - 8:4, 11:12, 25:25, 26:6, 26:18, 28:16, 28:24
**FOUR** [1] - 2:16
**Four** [29] - 4:16, 5:22, 12:18, 15:21, 16:6, 16:11, 16:16, 18:1, 18:10, 18:21, 18:23, 21:6, 21:23, 24:14, 25:15, 26:19, 26:23, 27:1, 27:7, 27:15, 27:21, 32:25, 33:21, 36:2, 46:16, 52:2, 61:5, 61:17, 63:24
**frame** [1] - 39:9
**framework** [4] - 5:25, 6:16, 7:20, 14:4

**frameworks** [1] - 12:21
**framing** [1] - 24:13
**frankly** [3] - 21:25, 23:5, 62:8
**free** [1] - 5:25
**free-floating** [1] - 5:25
**Friday** [12] - 15:10, 15:20, 17:13, 19:2, 19:8, 19:18, 25:23, 26:7, 26:17, 42:16, 48:18, 54:20
**front** [4] - 24:11, 25:12, 28:20, 62:21
**Frontier** [1] - 5:6
**fulfilling** [1] - 60:14
**full** [1] - 33:16
**fully** [3] - 6:22, 14:19, 16:4
**fulsome** [1] - 8:6
**fundamental** [1] - 48:21
**furnishes** [1] - 13:15

## G

**Galveston** [3] - 2:18, 53:15, 53:17
**gamesmanship** [1] - 29:1
**gap** [1] - 30:12
**gather** [1] - 14:24
**General** [25] - 3:1, 3:2, 12:19, 15:24, 16:6, 16:19, 17:24, 18:11, 19:10, 19:16, 27:2, 28:17, 29:6, 29:18, 33:25, 34:1, 34:3, 34:5, 34:12, 40:10, 47:16, 47:17, 52:3, 57:12, 58:6
**general** [1] - 21:6
**General's** [37] - 12:8, 12:13, 16:13, 18:4, 19:1, 19:23, 24:10, 24:21, 24:24, 25:6, 25:11, 25:15, 26:3, 26:20, 27:15, 29:4, 29:15, 29:24, 31:24, 32:12, 32:24, 33:6, 33:9, 33:22, 36:22, 40:10, 40:15, 40:19, 40:24, 41:23, 42:10, 45:15, 51:7, 56:15, 56:18, 57:11, 58:4
**George** [1] - 2:23
**given** [3] - 32:14, 42:17, 55:21
**Godfrey** [1] - 2:4
**Gonzalez** [1] - 2:20
**Goodhart** [3] - 10:11, 32:18, 60:19
**granted** [1] - 16:8
**gratitude** [1] - 72:19
**Gray** [1] - 2:20
**great** [5] - 57:21, 59:18, 59:23, 60:8, 69:17
**Greer** [1] - 2:16
**grounds** [1] - 70:4
**guess** [5] - 32:21, 34:22, 36:7, 63:22, 70:19
**guided** [1] - 7:22
**guideposts** [1] - 4:25
**guys** [2] - 39:25, 58:3

## H

**half** [5] - 15:8, 28:18, 28:19, 28:24, 38:12
**hand** [1] - 53:1
**handle** [1] - 70:9
**handled** [1] - 71:20
**handling** [1] - 14:7
**handwriting** [1] - 57:5
**hang** [9] - 19:3, 19:21, 21:14, 26:15, 28:3, 35:5, 45:13
**happy** [7] - 4:19, 7:25, 8:2, 51:15, 52:15, 61:15, 72:13
**hard** [1] - 59:14
**hardship** [1] - 27:11
**harm** [1] - 67:22
**HARRIS** [2] - 1:9, 2:12
**Harris** [6] - 2:12, 4:9, 4:10, 11:2, 11:6, 11:16
**hashed** [1] - 58:15
**hate** [1] - 53:1
**hear** [6] - 14:2, 18:20, 20:19, 24:23, 38:16
**heard** [3] - 22:1, 26:3, 26:19
**HEARD** [1] - 1:13
**hearing** [16] - 8:9, 10:10, 12:6, 20:10, 20:15, 20:16, 22:19, 28:17, 54:15, 55:17, 55:24, 55:25, 56:3, 56:4, 56:7, 56:12
**Heights** [1] - 2:24
**held** [1] - 6:9
**HELD** [1] - 1:13
**help** [4] - 32:9, 47:6, 52:16, 54:7
**hereby** [1] - 73:7
**Herz** [1] - 2:16
**high** [2] - 49:21, 63:20
**high-ranking** [1] - 63:20
**hinges** [1] - 16:5
**hold** [5] - 6:9, 21:3, 22:4, 54:15, 72:3
**holding** [3] - 5:14, 21:24, 72:5
**holiday** [1] - 19:12
**home** [1] - 7:10
**Honor** [102] - 4:19, 6:14, 7:4, 8:15, 9:12, 9:15, 10:13, 10:21, 10:25, 11:5, 11:19, 12:4, 13:2, 14:1, 15:7, 16:14, 16:17, 17:3, 20:22, 21:9, 21:18, 21:20, 22:7, 23:1, 23:2, 23:22, 24:1, 25:1, 25:21, 29:8, 29:11, 30:2, 30:5, 30:19, 31:4, 31:9, 31:23, 34:4, 34:22, 35:14, 35:24, 36:21, 37:19, 37:21, 38:19, 39:19, 40:13, 41:3, 41:14, 41:18, 42:3, 43:2, 43:7, 43:16, 44:2, 45:6, 45:21, 46:1, 46:7, 46:16, 47:7, 47:24, 48:6, 48:20, 49:11, 49:23, 50:12, 50:21, 51:16, 51:25, 52:1, 52:10, 52:25, 53:8, 53:19, 54:1, 54:13, 54:17, 55:1, 56:21, 58:8, 58:25, 59:12, 59:23, 60:13, 61:21, 63:2, 63:14, 63:15, 64:2, 64:13, 65:5, 68:1, 68:16, 68:22, 69:2, 69:20, 69:23, 71:15, 71:17, 72:1, 72:24
**HONORABLE** [1] - 1:13
**hoping** [4] - 4:20, 52:1, 61:16, 64:10
**Hopkins** [2] - 2:11, 4:10
**HOPKINS** [1] - 4:10
**hours** [3] - 8:4, 52:15, 53:21
**HOUSTON** [2] - 1:2, 1:7
**Houston** [6] - 1:19, 2:9, 2:13, 2:21, 2:25, 3:8
**Hu** [2] - 2:12, 4:9
**HU** [1] - 4:9
**hump** [1] - 66:19
**hundred** [1] - 68:18

## I

**idea** [3] - 51:8, 62:9, 63:5
**ideally** [1] - 17:12
**identical** [2] - 42:19
**ignored** [1] - 45:8
**ignores** [1] - 24:18
**II** [7] - 7:2, 7:5, 7:14, 7:19, 9:6, 9:17, 13:8
**illogical** [1] - 27:4
**imagine** [1] - 17:3
**immediacy** [2] - 67:19, 67:21
**immediate** [1] - 68:19
**impasse** [1] - 39:4
**implementation** [1] - 13:5
**implicate** [1] - 71:14
**impliedly** [1] - 62:22
**importance** [2] - 67:23, 67:24
**important** [4] - 5:23, 6:8, 14:17, 47:1
**inclined** [1] - 67:7
**include** [2] - 61:11, 69:16
**included** [1] - 68:21
**including** [7] - 19:23, 25:14, 25:15, 28:6, 29:24, 39:12, 67:4
**inconsistent** [1] - 65:3
**independent** [2] - 61:25, 64:11
**indicating** [1] - 39:24
**inefficient** [1] - 33:3
**inequitable** [1] - 13:16
**inflexible** [1] - 48:11
**inhibit** [1] - 21:3
**initial** [1] - 18:22
**inquire** [1] - 61:16
**inside** [2] - 46:23, 46:25
**insist** [1] - 16:8
**instance** [1] - 16:10
**instead** [3] - 21:15, 41:21, 47:4
**Insurance** [1] - 5:6
**intend** [3] - 64:23, 65:6, 65:18
**intended** [2] - 9:19, 28:17
**intending** [1] - 65:7
**intensive** [5] - 16:18, 32:7, 40:21, 40:24, 41:2
**intent** [4] - 16:15, 26:3, 26:20, 65:3
**intentional** [1] - 66:21
**interests** [1] - 34:10
**interrupt** [2] - 24:21, 70:18
**intervene** [25] - 17:6, 17:13, 17:15, 18:12, 18:17, 19:25, 21:16, 23:18, 25:6, 27:18, 28:6, 29:5, 29:15, 29:24, 30:25, 31:6, 31:13, 31:18, 33:7, 33:19, 34:19, 39:12, 50:19, 57:12

**intervenes** [1] - 23:24
**INTERVENOR** [1] - 3:1
**intervention** [8] - 16:8, 18:5, 32:14, 34:12, 41:24, 45:15, 50:25, 51:7
**introduction** [1] - 68:18
**involvement** [1] - 43:21
**irrelevant** [4] - 62:9, 62:10, 66:4
**irreparable** [1] - 67:22
**island** [1] - 53:17
**issue** [60] - 5:24, 9:2, 9:3, 9:4, 10:12, 12:5, 12:12, 12:15, 16:17, 16:21, 16:25, 18:2, 18:8, 19:14, 21:4, 21:19, 21:21, 23:4, 23:20, 24:2, 27:15, 27:21, 29:21, 33:8, 33:12, 33:18, 36:9, 37:12, 38:1, 38:10, 38:12, 38:24, 40:4, 41:4, 42:23, 43:14, 45:2, 45:6, 45:15, 48:4, 59:25, 61:17, 62:4, 62:21, 62:23, 63:2, 64:22, 64:23, 66:8, 66:19, 66:20, 66:24, 67:6, 68:6, 68:20, 69:8, 71:10, 71:18, 71:22
**issued** [1] - 70:22
**issues** [28] - 4:17, 4:20, 5:11, 8:22, 8:23, 13:6, 13:10, 14:5, 14:11, 14:18, 15:14, 22:22, 24:24, 32:15, 38:18, 43:3, 43:10, 50:23, 52:17, 56:11, 61:13, 62:8, 68:2, 68:4, 68:13, 68:24, 70:7, 72:6
**issuing** [1] - 46:21
**item** [1] - 67:12
**itself** [1] - 10:14

## J

**Jeremy** [2] - 1:20, 4:8
**Johnson** [1] - 60:20
**joined** [1] - 12:12
**Joseph** [3] - 2:15, 3:1, 4:15
**Jr** [2] - 2:15, 4:15
**judge** [4] - 52:14, 52:15, 53:10, 53:23
**Judge** [5] - 4:7, 31:18, 53:2, 60:19, 60:20
**JUDGE** [1] - 1:14
**Judge's** [2] - 33:16, 40:11
**JUDGES** [2] - 2:16, 2:23
**judges** [8] - 9:19, 11:12, 11:13, 11:14, 30:22, 31:8, 62:6, 64:11
**Judges** [32] - 4:13, 4:16, 8:10, 12:18, 15:3, 21:6, 21:23, 25:15, 26:19, 27:1, 31:19, 33:11, 33:24, 34:14, 36:2, 46:16, 47:8, 47:16, 47:17, 47:22, 52:2, 54:24, 61:5, 61:17, 62:1, 62:19, 62:22, 63:5, 64:5, 67:18, 69:10
**Judges'** [27] - 5:22, 15:21, 16:6, 16:11, 16:16, 18:1, 18:5, 18:10, 18:21, 18:23, 24:14, 26:23, 27:7, 27:15, 27:21, 32:25, 33:21, 35:13, 36:15, 46:13, 49:9, 57:1, 61:6, 61:24, 63:24, 67:13, 71:14
**judgment** [3] - 5:9, 5:10, 5:16
**jump** [1] - 42:13
**jurisdiction** [2] - 5:3, 5:20
**jurisdictional** [4] - 5:2, 5:12, 6:1, 6:3
**justifies** [1] - 67:17

## K

**keep** [5] - 19:9, 22:16, 49:15, 50:16, 71:17
**keeping** [1] - 71:23
**key** [1] - 34:6
**kind** [5] - 9:10, 24:15, 38:16, 61:22
**Kirsten** [1] - 2:1
**knowledge** [2] - 67:25, 68:21
**known** [3] - 9:20, 65:8, 66:21
**knows** [2] - 5:1, 7:4

## L

**Lanae** [1] - 2:1
**landed** [1] - 26:1
**Lane** [1] - 2:24
**Lanie** [3] - 3:5, 73:6, 73:10
**lapse** [1] - 63:21
**large** [2] - 34:3, 34:14
**largely** [2] - 27:7, 31:7
**last** [4] - 4:21, 7:9, 7:23, 61:15
**Law** [1] - 11:6
**law** [12] - 9:2, 9:10, 9:11, 9:17, 11:1, 11:11, 39:2, 62:6, 63:17, 65:5, 70:6, 71:2
**lawyer** [1] - 16:13
**least** [3] - 35:1, 53:11, 59:11
**leave** [1] - 58:24
**ledger** [1] - 57:9
**LEE** [1] - 1:13
**left** [2] - 43:11, 68:2
**legal** [3] - 12:21, 43:10, 68:13
**legitimate** [1] - 50:16
**less** [2] - 32:4, 44:10
**lessons** [1] - 5:19
**letter** [4] - 8:8, 26:2, 60:1
**light** [3] - 6:8, 69:6, 71:16
**likely** [3] - 42:22, 62:12, 68:21
**limit** [2] - 42:20, 69:14
**limitations** [1] - 63:21
**limited** [3] - 39:13, 66:16, 67:10
**line** [4] - 24:25, 25:7, 25:12, 63:23
**lines** [2] - 32:20, 39:10
**listed** [1] - 68:21
**litigant** [1] - 63:19
**litigants** [1] - 63:16
**Litigation** [1] - 3:2
**live** [1] - 60:9
**LLP** [3] - 2:4, 2:16, 2:20
**look** [4] - 6:7, 9:3, 14:16, 43:7
**looking** [8] - 13:3, 13:8, 14:20, 29:25, 40:3, 51:16, 52:23, 68:1
**looks** [1] - 24:19
**lose** [1] - 68:13
**losing** [1] - 68:12
**LYNN** [1] - 1:4

## M

**maintain** [3] - 13:18, 39:2, 42:15
**majority** [2] - 11:11, 11:14
**manage** [1] - 23:10
**mandate** [9] - 15:9, 15:12, 26:9, 26:13, 26:21, 42:5, 43:23, 44:1, 60:14
**Manhattan** [1] - 2:5
**manner** [1] - 33:4
**MARANDA** [1] - 1:4
**material** [1] - 54:21
**materially** [1] - 51:4
**matter** [5] - 9:2, 9:11, 9:17, 14:11, 73:8
**matters** [1] - 61:6
**MC** [1] - 3:2
**McCollum** [1] - 2:4
**McGowen** [1] - 2:8
**mean** [19] - 17:17, 20:14, 21:1, 22:2, 22:21, 24:21, 27:2, 27:4, 30:25, 31:23, 33:22, 34:9, 41:6, 45:10, 46:18, 58:17, 63:15, 66:7, 68:17
**meaning** [1] - 5:2
**means** [4] - 13:19, 15:3, 26:25, 39:1
**meant** [1] - 38:23
**mechanical** [1] - 1:24
**meet** [2] - 36:7, 36:8
**mention** [1] - 63:19
**merit** [1] - 11:19
**meritless** [1] - 32:13
**met** [1] - 26:17
**might** [5] - 29:3, 64:4, 69:8, 70:24, 71:19
**mind** [1] - 29:11
**minor** [2] - 52:25, 53:5
**minute** [3] - 13:13, 21:14, 69:12
**missing** [1] - 25:4
**misstated** [1] - 14:15
**mixing** [1] - 70:7
**modification** [5] - 62:2, 62:18, 65:12, 65:23, 67:8
**modifications** [1] - 66:2
**modify** [4] - 62:9, 62:23, 62:25, 63:11
**modifying** [1] - 63:6
**Monday** [4] - 19:12, 46:2, 49:8, 59:5
**monitor** [1] - 64:8
**monitors** [3] - 62:17, 63:6, 66:1
**month** [3] - 24:8, 46:23, 46:25
**Montopolis** [1] - 2:2
**Moody** [1] - 2:17
**moot** [1] - 13:18
**Morgan** [1] - 2:4
**morning** [2] - 53:25, 59:22
**motion** [107] - 5:22, 10:7, 12:8, 12:14, 15:9, 15:11, 15:20, 15:21, 15:25, 16:1, 16:7, 16:16, 16:19, 17:6, 17:9, 17:13, 17:15, 17:18, 17:19, 18:1, 18:2, 18:5, 18:10, 18:12, 18:16, 18:17, 18:18, 19:1, 19:6, 19:15, 21:2, 21:10, 21:16, 21:25, 22:2, 22:3, 22:6, 22:7, 23:17, 24:10,

24:15, 25:6, 25:8, 25:9, 25:11, 26:4, 26:23, 27:1, 27:3, 27:18, 28:16, 29:4, 29:5, 29:15, 30:14, 30:15, 31:3, 31:24, 32:12, 32:14, 32:21, 32:24, 32:25, 33:6, 33:7, 33:10, 33:16, 33:19, 33:21, 33:25, 34:16, 34:17, 34:19, 34:23, 35:8, 35:13, 35:19, 35:25, 36:22, 36:24, 37:2, 39:11, 39:18, 39:22, 40:15, 41:23, 42:10, 45:4, 50:18, 50:19, 50:22, 50:24, 56:17, 57:11, 57:20, 58:4, 67:13, 69:23, 70:3, 70:23

**MOTION** [1] - 1:13

**motions** [44] - 6:5, 15:15, 17:18, 17:20, 19:15, 19:20, 19:22, 20:6, 23:14, 25:14, 28:5, 28:7, 28:11, 29:23, 30:1, 30:6, 32:2, 32:7, 35:21, 36:23, 37:8, 38:2, 40:18, 41:12, 41:20, 41:24, 42:1, 42:14, 42:19, 44:11, 44:19, 47:10, 50:22, 51:10, 54:10, 54:23, 56:24, 56:25, 58:11, 67:20, 68:9, 71:4

**Movant** [3] - 4:16, 46:16, 61:6

**MOVANT** [2] - 2:16, 2:23

**Movants** [14] - 18:15, 18:25, 19:19, 21:15, 29:2, 29:14, 30:1, 30:22, 35:8, 35:20, 35:21, 38:25, 55:13, 71:4

**movants** [1] - 23:8

**Movants'** [6] - 15:4, 19:5, 20:5, 28:7, 36:19, 57:10

**movants'** [1] - 32:7

**move** [17] - 5:18, 19:24, 28:18, 30:14, 30:15, 31:15, 33:22, 40:7, 47:3, 48:14, 50:14, 51:2, 52:14, 53:23, 61:11, 67:23, 68:5

**moved** [4] - 12:18, 12:19, 49:13, 49:16

**moving** [5] - 32:9, 34:18, 42:12, 55:22, 57:2

**MR** [275] - 4:7, 4:8, 4:9, 4:10, 4:11, 4:12, 4:15, 4:19, 6:21, 7:1, 7:4, 8:15, 9:14, 10:21, 11:10, 12:4, 12:11, 12:17, 12:22, 12:25, 13:2, 14:1, 14:6, 14:25, 15:1, 15:6, 16:14, 17:3, 18:7, 18:20, 19:4, 19:7, 19:10, 19:22, 20:1, 20:4, 20:8, 20:13, 20:16, 20:22, 21:9, 21:18, 21:23, 22:7, 22:10, 22:14, 22:17, 23:1, 23:2, 23:4, 23:7, 23:17, 23:22, 24:1, 24:5, 24:13, 24:19, 25:1, 25:5, 25:9, 25:18, 25:21, 26:14, 26:16, 27:9, 27:12, 27:25, 28:2, 28:10, 28:13, 28:24, 29:8, 29:10, 29:17, 29:19, 29:22, 30:2, 30:5, 30:9, 30:13, 30:17, 30:19, 30:23, 31:1, 31:3, 31:9, 31:11, 31:14, 31:20, 31:23, 32:2, 33:13, 33:17, 34:4, 34:22, 34:25, 35:4, 35:10, 35:14, 35:16, 35:24, 36:2, 36:4, 36:12, 36:14, 36:18, 36:21, 37:3, 37:5, 37:10, 37:13, 37:18, 37:21, 37:24, 38:1, 38:7, 38:10, 38:15, 38:19, 38:21, 39:14, 39:16, 39:19, 40:1, 40:3, 40:13, 40:17, 40:23, 41:1, 41:3, 41:6, 41:14, 41:16, 41:18, 41:20, 42:3, 42:8, 42:10, 43:1, 43:6, 43:9, 44:2, 44:6, 44:8, 44:14, 44:17, 44:21, 44:23, 45:2, 45:6, 45:20, 46:1, 46:4, 46:16, 46:23, 46:25, 47:7, 47:11, 47:19, 47:24, 48:2, 48:6, 48:15, 48:20, 49:2, 49:5, 49:11, 49:13, 49:18, 49:20, 49:23, 50:10, 50:12, 50:21, 51:2, 51:8, 51:16, 51:18, 51:20, 51:23, 51:25, 52:2, 52:10, 52:12, 52:18, 52:22, 52:25, 53:8, 53:13, 53:15, 53:17, 53:19, 53:22, 54:1, 54:8, 54:13, 54:17, 54:19, 55:1, 55:3, 55:5, 55:7, 55:8, 55:11, 55:13, 55:15, 55:21, 56:4, 56:6, 56:9, 56:14, 56:17, 56:20, 57:2, 57:3, 57:7, 57:14, 57:16, 57:19, 57:24, 58:5, 58:8, 58:13, 58:16, 58:17, 58:24, 58:25, 59:4, 59:12, 59:23, 60:4, 60:8, 60:13, 60:25, 61:3, 61:21, 62:15, 63:5, 63:13, 63:15, 64:13, 64:16, 64:22, 65:5, 65:14, 65:16, 65:21, 66:3, 66:6, 66:18, 66:22, 67:1, 67:6, 67:14, 68:1, 68:16, 69:2, 69:6, 69:17, 69:20, 70:1, 70:12, 70:18, 70:19, 70:20, 71:2, 71:11, 71:15, 71:22, 72:1, 72:13, 72:16, 72:19, 72:24, 73:2

**MS** [3] - 46:7, 46:10, 46:12

**Murray** [2] - 2:19, 4:11

**mute** [1] - 24:19

## N

**narrative** [1] - 64:12

**narrow** [2] - 61:8, 66:9

**nearly** [1] - 42:18

**necessary** [7] - 5:21, 6:5, 20:11, 22:20, 36:24, 39:6, 61:13

**need** [23] - 4:18, 10:10, 15:15, 15:17, 20:19, 23:14, 23:25, 34:2, 36:6, 42:7, 43:19, 45:3, 45:11, 45:22, 46:4, 47:23, 48:7, 57:25, 58:17, 58:25, 64:3, 70:5, 72:6

**needed** [6] - 8:22, 25:25, 26:18, 41:7, 41:8, 64:10

**needs** [7] - 4:2, 9:1, 36:10, 41:4, 46:19, 52:19, 59:6

**negate** [1] - 34:11

**negotiate** [1] - 65:12

**negotiated** [1] - 65:2

**negotiating** [1] - 41:15

**negotiation** [1] - 49:20

**negotiations** [1] - 63:11

**net** [1] - 34:11

**never** [3] - 4:22, 7:6, 10:2

**New** [2] - 2:6, 53:3

**new** [3] - 43:4, 56:11, 68:18

**next** [5] - 19:14, 46:2, 49:8, 59:8, 72:22

**NON** [1] - 2:23

**non** [1] - 5:2

**Non** [17] - 15:4, 18:15, 18:25, 19:5, 19:19, 20:5, 21:15, 28:7, 29:2, 29:14, 30:1, 30:22, 35:8, 35:20, 35:21, 36:19, 57:10

**non-jurisdictional** [1] - 5:2

**NON-MOVANT** [1] - 2:23

**Non-Movants** [11] - 18:15, 18:25, 19:19, 21:15, 29:2, 29:14, 30:1, 30:22, 35:8, 35:20, 35:21

**Non-Movants'** [6] - 15:4, 19:5, 20:5, 28:7, 36:19, 57:10

**Nonmoving** [1] - 4:12

**noon** [4] - 58:23, 59:9, 59:17, 59:18

**Northern** [1] - 53:2

**note** [3] - 15:8, 15:14, 28:14

**noted** [2] - 9:22, 42:5

**nothing** [10] - 7:13, 20:23, 26:21, 39:1, 44:10, 46:18, 58:5, 62:20, 63:7, 72:19

**notion** [6] - 10:18, 10:22, 11:3, 11:17, 21:24, 62:16

**November** [2] - 20:24, 61:7

**Number** [4] - 5:19, 7:25, 69:14, 69:16

**numbered** [1] - 73:8

**nuts** [2] - 8:1, 14:7

**NW** [1] - 1:22

**NWAOKORO** [54] - 12:4, 12:11, 12:17, 12:22, 12:25, 13:2, 16:14, 24:19, 25:1, 25:21, 26:14, 26:16, 27:9, 27:12, 27:25, 28:2, 29:8, 31:3, 31:9, 31:11, 31:14, 31:20, 33:17, 34:4, 34:22, 34:25, 35:4, 35:10, 35:14, 35:16, 35:24, 36:2, 36:4, 36:12, 36:14, 36:18, 39:19, 40:1, 40:23, 46:1, 46:4, 47:24, 48:2, 58:8, 58:13, 58:25, 69:20, 70:1, 70:18, 70:20, 71:2, 71:11, 71:15, 73:2

**Nwaokoro** [12] - 3:1, 20:20, 22:1, 26:11, 28:14, 30:4, 31:2, 39:17, 47:22, 47:25, 58:19, 70:16

**NY** [1] - 2:6

## O

**O'Neil** [1] - 2:20

**object** [4] - 30:4, 30:5, 30:11, 46:17

**objection** [1] - 66:15

**objectionable** [1] - 63:3

**objections** [2] - 66:12, 69:13

**obligations** [1] - 37:6

**observed** [1] - 13:4

**obtain** [2] - 61:24, 63:7

**obvious** [1] - 68:11

**obviously** [3] - 34:9, 37:11, 43:22

**occur** [1] - 14:22

**occurred** [1] - 43:24

**October** [13] - 20:8, 20:10, 22:10, 24:6, 37:16, 46:14, 46:21, 46:23, 46:25, 70:4, 71:3, 71:9, 72:5

**ODONNELL** [1] - 1:4

**OF** [2] - 1:1, 1:13

**offer** [1] - 27:19

**Office** [2] - 2:12, 3:1

**office** [2] - 21:1, 62:7

**Official** [4] - 3:5, 3:5, 73:6, 73:10

**OLALDE** [3] - 46:7, 46:10, 46:12

**Olalde** [2] - 2:16, 4:15

**once** [3] - 25:13, 38:3, 43:24
**One** [2] - 2:5, 2:17
**one** [21] - 6:20, 9:8, 11:2, 15:18, 16:4, 17:14, 17:19, 19:19, 20:6, 20:11, 21:14, 24:7, 25:24, 28:3, 32:11, 41:21, 49:14, 56:21, 61:8, 64:20, 66:8
**ones** [1] - 68:11
**open** [1] - 68:2
**operating** [1] - 44:4
**opinion** [10] - 4:25, 8:18, 8:20, 24:16, 48:22, 61:5, 61:19, 61:23, 68:2, 72:4
**opinion's** [1] - 68:3
**opportunity** [4] - 9:24, 22:22, 52:6, 55:22
**opposed** [1] - 15:6
**opposing** [2] - 28:15, 39:5
**opposite** [1] - 25:10
**opposition** [3] - 17:13, 19:1, 40:14
**oral** [4] - 20:15, 20:16, 37:15, 58:21
**order** [12] - 5:21, 18:19, 28:19, 28:22, 47:11, 47:14, 64:4, 69:8, 69:9, 69:12, 70:22, 72:11
**ordered** [1] - 27:22
**ordering** [1] - 6:4
**organizational** [1] - 55:15
**originally** [2] - 30:17, 37:1
**originated** [1] - 18:23
**otherwise** [3] - 8:23, 10:2, 10:11
**ought** [1] - 14:3
**ourselves** [2] - 40:20, 64:6
**outlined** [1] - 9:1
**outset** [1] - 33:20
**overlap** [2] - 34:9, 34:15
**overrule** [3] - 6:16, 43:16, 66:15
**overruled** [1] - 69:13
**own** [10] - 16:1, 16:9, 18:1, 18:12, 33:13, 57:4, 62:3, 62:5, 63:2, 68:4

## P

**P.C** [1] - 2:23
**P.M** [5] - 59:3, 59:13, 60:8, 60:20
**P.O** [1] - 3:2
**packaged** [1] - 45:2
**Page** [2] - 13:4, 61:4
**page** [2] - 42:20, 48:4
**pages** [1] - 43:2
**paid** [1] - 64:3
**panel** [2] - 6:8, 7:21
**paragraph** [3] - 7:2, 61:4, 61:9
**Pardon** [1] - 20:13
**part** [4] - 39:21, 63:12, 64:12, 65:11
**particularly** [1] - 18:15
**parties** [2] - 26:17, 71:19
**parts** [2] - 42:12, 70:13
**past** [1] - 40:7
**path** [1] - 28:2
**pause** [1] - 16:12
**pending** [1] - 67:20
**people** [1] - 9:23
**percent** [1] - 68:18
**perfectly** [1] - 30:13
**perhaps** [4] - 32:20, 32:23, 42:19, 47:18
**period** [3] - 21:12, 26:8, 40:5
**periods** [1] - 63:21
**permitted** [7] - 5:17, 18:11, 19:17, 19:23, 30:24, 40:20, 69:9
**perpetuate** [1] - 7:12
**perspective** [1] - 24:21
**petition** [1] - 15:12
**petitions** [1] - 17:11
**Petroleum** [1] - 5:5
**pick** [2] - 23:17, 61:8
**piece** [1] - 5:23
**place** [6] - 8:19, 10:16, 11:8, 11:19, 46:18, 70:14
**plainly** [1] - 10:2
**plaintiff** [2] - 24:23, 30:10
**PLAINTIFF** [1] - 1:17
**plaintiffs** [26] - 4:7, 4:8, 6:13, 8:16, 10:8, 13:7, 13:9, 16:15, 22:12, 25:24, 26:18, 26:24, 29:3, 40:9, 47:4, 49:14, 52:5, 59:1, 59:24, 60:8, 62:1, 65:9, 66:5, 70:11, 71:22, 72:19
**Plaintiffs** [1] - 1:6
**plaintiffs'** [6] - 11:23, 21:11, 37:18, 45:3, 51:11, 69:14
**plan** [1] - 32:2
**planning** [2] - 15:22, 38:17
**play** [3] - 8:24, 28:4, 57:17
**player** [2] - 52:25, 53:5
**Plaza** [1] - 2:17
**PO** [1] - 1:18
**point** [14] - 8:25, 17:23, 19:14, 26:14, 27:12, 44:5, 48:23, 57:18, 62:17, 63:22, 64:10, 68:20, 68:22, 72:8
**pointedly** [1] - 14:10
**points** [1] - 8:7
**political** [1] - 47:9
**position** [12] - 16:11, 18:22, 27:7, 33:9, 42:15, 43:13, 43:18, 47:21, 51:7, 54:24, 65:11, 65:16
**positions** [2] - 22:23, 71:14
**possible** [4] - 10:6, 29:22, 61:14, 66:14
**post** [2] - 5:9, 5:16
**potential** [1] - 55:22
**potentially** [2] - 20:10, 25:15
**practically** [1] - 7:24
**practice** [1] - 62:6
**PRE** [1] - 1:13
**PRE-MOTION** [1] - 1:13
**precedent** [3] - 7:8, 7:16, 7:22
**precisely** [1] - 39:9
**preconference** [1] - 60:1
**prefer** [2] - 32:19, 49:2
**preferential** [1] - 52:11
**prejudge** [2] - 14:11, 14:18
**prejudice** [1] - 27:19
**premature** [1] - 70:12
**premised** [1] - 16:1
**prerogative** [1] - 41:10
**present** [2] - 4:3, 45:11
**presentation** [1] - 12:23
**presented** [1] - 14:5
**presenting** [1] - 33:13
**preserve** [2] - 13:10, 13:20
**pretending** [1] - 23:8
**pretty** [4] - 43:7, 46:21, 66:9, 68:24
**primary** [1] - 22:4
**principles** [1] - 34:6
**pro** [2] - 63:16, 63:19
**problem** [6] - 18:9, 37:25, 41:22, 45:9, 47:15, 53:11
**proceed** [8] - 26:22, 33:21, 34:13, 43:20, 43:22, 62:13, 71:13, 71:16
**PROCEEDINGS** [1] - 1:13
**Proceedings** [1] - 1:24
**proceedings** [9] - 5:3, 5:9, 5:18, 5:21, 6:5, 6:7, 7:5, 73:3, 73:8
**proceeds** [1] - 71:24
**process** [7] - 12:16, 21:2, 21:24, 22:4, 43:4, 46:19, 68:9
**processes** [3] - 10:16, 11:7, 11:15
**produced** [1] - 1:25
**progression** [1] - 27:5
**prohibit** [1] - 7:17
**Project** [3] - 1:18, 2:1, 2:8
**promptly** [2] - 23:15, 58:10
**properly** [1] - 67:11
**proposal** [12] - 18:22, 24:17, 25:3, 25:24, 25:25, 29:13, 29:19, 29:25, 38:23, 60:18, 69:14, 70:19
**propose** [11] - 10:7, 17:8, 19:10, 19:15, 19:18, 20:4, 20:8, 21:17, 22:5, 22:12, 71:21
**proposed** [6] - 18:19, 20:23, 24:5, 28:7, 33:19, 64:14
**proposing** [7] - 12:10, 18:4, 24:23, 28:10, 35:7, 47:14, 71:17
**proposition** [1] - 62:10
**protect** [1] - 34:10
**prove** [1] - 66:5
**provide** [1] - 24:20
**provided** [2] - 10:2, 10:5
**provisions** [1] - 13:4
**prudent** [1] - 22:2
**pull** [1] - 43:12
**Purcell** [3] - 68:4, 68:23
**purport** [1] - 6:16
**purposes** [1] - 7:5
**pursuant** [1] - 62:18
**pursue** [1] - 47:10
**push** [5] - 32:24, 54:4, 54:12, 54:13, 59:12
**pushing** [2] - 27:13, 38:11

**put** [12] - 14:9, 25:12, 28:15, 39:8, 40:9, 40:20, 46:17, 52:3, 59:14, 61:17, 66:8, 72:3
**puts** [1] - 24:24
**putting** [3] - 22:3, 25:5, 41:9

## Q

**questions** [2] - 12:16, 20:18
**quick** [2] - 15:18, 47:14
**quickly** [3] - 10:6, 25:13, 51:13
**quite** [3] - 33:7, 42:19, 45:16
**quote** [1] - 63:24

## R

**raise** [6] - 18:12, 19:17, 53:1, 61:13, 64:4, 72:1
**raised** [3] - 13:5, 56:12, 68:19
**raises** [1] - 67:20
**raising** [2] - 18:2, 71:13
**ranking** [1] - 63:20
**raspy** [1] - 6:24
**re** [2] - 10:11, 32:18
**reach** [3] - 9:16, 57:25, 72:7
**reactions** [1] - 20:20
**read** [5] - 24:16, 57:4, 59:7, 61:4, 63:22
**reading** [2] - 4:24, 61:8
**real** [1] - 17:23
**realistically** [1] - 42:12
**reality** [2] - 9:25, 11:14
**really** [16] - 6:8, 7:10, 13:14, 14:18, 16:3, 16:5, 26:11, 32:5, 33:20, 38:4, 41:14, 48:16, 54:12, 54:20, 61:10, 68:6
**reason** [5] - 33:15, 59:13, 64:20, 66:24, 67:1
**reasonable** [2] - 11:22, 43:14
**reasonably** [1] - 10:6
**reasoning** [1] - 59:5
**receive** [1] - 8:7
**receiving** [1] - 31:24
**reconsider** [22] - 12:14, 12:20, 15:20, 15:25, 16:7, 18:5, 21:2, 21:16, 21:25, 22:3, 24:10, 25:8, 25:9, 25:11, 28:18, 32:24, 34:18, 36:23, 36:25, 37:2, 37:8, 58:4
**reconsideration** [20] - 12:9, 17:9, 19:6, 26:4, 26:20, 26:21, 29:5, 29:15, 32:13, 33:7, 34:17, 34:23, 35:9, 40:15, 41:24, 50:18, 50:24, 57:11, 71:9, 71:24
**record** [5] - 7:10, 7:14, 69:11, 69:18, 73:8
**recorded** [1] - 1:24
**redo** [1] - 38:3
**referring** [1] - 64:1
**reflected** [1] - 63:17
**regardless** [1] - 8:25
**related** [1] - 61:17
**relates** [5] - 26:22, 35:1, 45:7, 70:22, 70:23
**relating** [3] - 12:8, 35:1, 51:7
**relationship** [4] - 23:23, 67:12, 67:19, 68:10
**relevant** [1] - 66:12
**relied** [2] - 6:17, 7:21
**relief** [2] - 17:11, 44:9
**relinquish** [3] - 64:24, 65:8, 65:18
**relinquishment** [2] - 66:21, 68:22
**rely** [1] - 22:6
**relying** [2] - 14:16, 22:1
**remainder** [1] - 70:9
**remains** [1] - 58:5
**remarks** [1] - 12:8
**remind** [1] - 33:17
**renewed** [1] - 15:21
**repeat** [3] - 29:10, 31:4, 36:15
**replies** [4] - 52:3, 52:5, 54:25, 58:19
**reply** [34] - 10:9, 11:25, 19:11, 20:9, 21:12, 22:17, 37:14, 37:15, 44:13, 44:14, 44:15, 44:24, 45:23, 45:24, 46:8, 46:9, 46:13, 46:20, 48:24, 49:10, 50:14, 51:13, 51:23, 52:19, 53:6, 54:11, 54:14, 55:11, 55:23, 56:6, 56:8, 57:1, 59:7
**Reporter** [4] - 3:5, 3:5, 73:6, 73:10
**REPORTER'S** [1] - 73:5
**representation** [2] - 9:24, 10:1
**representing** [1] - 62:7
**represents** [1] - 63:16
**request** [5] - 44:9, 46:11, 50:17, 65:23
**require** [3] - 43:12, 44:17, 44:23
**required** [4] - 6:25, 23:21, 58:11, 69:1
**requires** [5] - 39:1, 39:2, 40:24, 44:7, 68:14
**requiring** [1] - 24:14
**research** [1] - 4:24
**reserve** [1] - 8:9
**resolution** [1] - 27:14
**resolve** [9] - 5:22, 6:5, 17:11, 17:14, 22:3, 23:13, 23:17, 23:21, 52:16
**resolves** [1] - 8:19
**resolving** [1] - 27:21
**resources** [3] - 17:5, 34:8, 43:12
**respectfully** [4] - 19:12, 25:21, 34:4, 42:3
**respond** [46] - 8:14, 10:8, 11:25, 17:5, 17:21, 17:25, 19:7, 19:19, 20:5, 21:15, 22:13, 23:2, 23:11, 26:1, 26:19, 28:10, 28:16, 29:4, 29:6, 29:14, 29:18, 30:1, 30:22, 31:22, 31:23, 32:2, 32:5, 33:2, 33:14, 35:8, 35:11, 35:20, 38:12, 41:12, 41:25, 42:2, 42:25, 45:3, 48:8, 48:12, 49:9, 50:4, 58:3, 58:7
**responded** [3] - 15:16, 50:13, 54:23
**responding** [10] - 17:19, 18:8, 18:9, 36:22, 37:2, 37:7, 40:18, 41:20, 42:8, 50:21
**response** [48] - 4:4, 11:23, 14:2, 18:10, 18:13, 18:25, 19:5, 21:11, 21:17, 25:2, 27:16, 28:7, 32:6, 35:12, 36:19, 40:5, 40:9, 40:23, 41:1, 42:13, 44:12, 44:18, 44:21, 44:24, 45:14, 45:23, 47:19, 48:18, 48:23, 49:3, 49:13, 49:23, 50:3, 50:7, 50:18, 54:5, 54:10, 54:13, 55:9, 56:14, 56:18, 57:8, 57:10, 57:12, 57:21, 57:22, 59:10, 61:20
**responses** [11] - 15:4, 17:18, 19:1, 30:10, 40:21, 51:8, 51:10, 51:11, 56:2, 56:4, 56:25
**rest** [1] - 72:25
**result** [7] - 7:15, 7:18, 8:11, 8:25, 9:17, 14:13, 64:9
**retain** [1] - 67:4
**retained** [1] - 64:3
**retains** [1] - 5:3
**return** [1] - 38:18
**reverse** [1] - 68:23
**review** [4] - 46:4, 52:6, 58:21, 62:1
**revisit** [2] - 70:6, 72:5
**Rights** [4] - 1:18, 1:21, 2:1, 2:8
**RMR** [2] - 3:5, 73:6
**road** [1] - 38:11
**Room** [1] - 3:7
**ROSENTHAL** [1] - 1:13
**Rossi** [1] - 1:21
**Rufo** [4] - 6:16, 6:17, 7:16, 8:12
**Rule** [20] - 5:12, 5:24, 7:17, 7:20, 8:12, 8:23, 8:24, 9:9, 9:16, 10:10, 10:15, 13:13, 13:16, 13:20, 14:12, 32:15, 39:2, 41:9, 43:9, 45:8
**rule** [2] - 6:14, 11:12
**ruled** [1] - 33:18
**rules** [3] - 15:11, 62:18, 71:10
**ruling** [5] - 10:11, 27:17, 31:16, 46:22, 60:16
**rush** [1] - 57:25
**Rusk** [1] - 3:7
**Russo** [36] - 2:15, 4:15, 8:2, 13:3, 13:12, 14:15, 15:1, 15:22, 20:19, 20:21, 25:23, 26:1, 30:3, 31:15, 37:22, 40:10, 44:13, 47:6, 48:7, 48:14, 48:19, 50:4, 51:15, 52:9, 53:10, 54:25, 55:6, 58:18, 60:22, 64:2, 64:5, 64:7, 66:6, 66:11, 66:16
**RUSSO** [102] - 4:15, 8:15, 9:14, 10:21, 11:10, 14:25, 20:22, 21:9, 21:18, 21:23, 22:7, 22:10, 22:14, 22:17, 23:1, 23:22, 30:5, 30:9, 30:13, 30:17, 30:19, 37:18, 37:24, 38:1, 38:7, 38:10, 38:15, 39:14, 40:3, 41:3, 41:6, 43:1, 43:6, 44:14, 44:17, 44:21, 44:23, 45:2, 45:6, 45:20, 46:16, 46:23, 46:25, 47:7, 47:11, 47:19, 48:20, 49:2, 49:5, 49:11, 49:13, 49:20, 49:23, 50:10, 50:12, 50:21, 51:2, 51:8, 51:16, 51:18, 51:20, 51:23, 51:25, 52:10, 52:12, 52:18, 52:22, 53:8, 53:13, 53:15, 53:17, 53:19, 53:22, 54:1, 54:8, 54:13, 55:1, 55:3, 55:7, 56:4, 56:6, 56:9, 57:2, 59:12, 61:21, 62:15, 63:5, 63:13, 64:13, 64:16, 64:22, 65:5, 65:14,

65:16, 65:21, 66:3, 66:18, 66:22, 67:1, 67:6, 68:1, 72:1
**Russo's** [1] - 63:17

## S

**Sarah** [1] - 2:7
**satisfied** [1] - 10:14
**saw** [1] - 8:8
**SB** [4] - 10:16, 11:9, 13:4
**schedule** [36] - 8:5, 11:22, 14:4, 14:8, 14:17, 14:20, 14:23, 15:18, 17:16, 17:17, 20:13, 20:20, 20:23, 21:7, 21:9, 21:19, 24:5, 28:4, 28:21, 37:6, 39:6, 42:5, 43:17, 46:17, 46:18, 48:9, 50:12, 54:3, 57:22, 59:11, 69:22, 70:13, 70:14, 70:21, 71:3, 71:6
**scheduled** [2] - 14:22, 51:12
**scheduling** [3] - 52:16, 60:1, 72:11
**scope** [7] - 8:1, 13:6, 14:21, 39:22, 60:12, 60:23, 66:11
**se** [2] - 63:16, 63:19
**second** [6] - 5:23, 6:18, 12:1, 18:18, 28:3, 67:12
**see** [8] - 15:19, 17:20, 17:25, 19:13, 52:19, 54:20, 65:19, 71:22
**seek** [3] - 26:20, 42:4, 62:2
**seeking** [1] - 71:5
**send** [1] - 72:11
**sense** [6] - 11:4, 23:13, 23:18, 25:17, 25:19, 69:8
**sent** [1] - 26:2
**separate** [4] - 34:16, 43:24, 68:10, 71:6
**separately** [1] - 33:14
**September** [28] - 11:24, 12:2, 14:24, 14:25, 15:2, 15:4, 19:2, 19:18, 19:20, 20:4, 21:11, 21:13, 22:14, 22:17, 22:24, 26:1, 27:14, 30:10, 32:3, 32:4, 42:16, 43:13, 44:16, 48:18, 49:7, 55:9, 70:15
**serious** [1] - 5:2
**seriously** [1] - 17:10
**set** [6] - 10:24, 14:4, 15:18, 17:17, 43:17, 59:11
**Seth** [2] - 2:11, 4:10
**sets** [1] - 17:23
**setting** [3] - 17:15, 51:20, 52:11
**seven** [3] - 10:8, 11:24, 22:14
**several** [2] - 45:4, 72:22
**shall** [1] - 13:18
**Sheriff** [2] - 2:20, 4:11
**short** [6] - 10:4, 17:7, 44:3, 44:5, 65:25, 66:3
**short-term** [2] - 44:3, 44:5
**shorten** [1] - 47:19
**shortly** [1] - 46:21
**show** [2] - 10:1, 67:1
**shown** [1] - 65:9
**side** [7] - 8:14, 43:1, 54:21, 57:9, 59:22, 67:6, 72:11
**sides** [3] - 56:2, 56:10, 59:21
**sideshow** [3] - 67:8, 67:10, 67:16
**significant** [2] - 43:12, 45:23
**similar** [4] - 16:20, 26:2, 42:19
**similarly** [1] - 1:5
**simple** [2] - 43:7, 43:8
**simply** [6] - 12:11, 34:25, 35:2, 36:16, 39:22, 69:13
**Simultaneous** [2] - 20:12, 45:5
**simultaneous** [1] - 44:9
**simultaneously** [6] - 18:6, 18:9, 25:14, 28:8, 28:11, 50:20
**single** [1] - 42:21
**singular** [1] - 32:21
**situated** [1] - 1:5
**situation** [8] - 7:14, 7:16, 8:17, 8:18, 9:7, 17:4, 17:24, 42:11
**six** [2] - 35:7, 72:9
**slice** [1] - 35:1
**Smith** [3] - 3:5, 73:6, 73:10
**solely** [2] - 26:22, 38:22
**solve** [2] - 53:10, 53:11
**someone** [1] - 63:15
**sometimes** [1] - 59:2
**soon** [2] - 15:10, 15:24
**sooner** [1] - 31:14
**sorry** [15] - 6:23, 10:16, 22:10, 24:19, 25:9, 28:9, 31:3, 44:21, 46:9, 53:16, 55:5, 55:16, 56:20, 65:14, 70:18
**sort** [3] - 24:17, 38:5, 41:15
**sorts** [1] - 63:18
**sounds** [3] - 42:20, 59:23, 66:6
**Southern** [1] - 73:6
**SOUTHERN** [1] - 1:1
**southern** [1] - 3:6
**speaking** [3] - 20:12, 37:18, 45:5
**specific** [9] - 9:4, 9:7, 9:8, 16:24, 26:9, 46:11, 48:3, 48:10, 69:23
**speedy** [1] - 17:9
**spend** [1] - 41:8
**spending** [2] - 72:20, 72:21
**spring** [1] - 11:4
**springing** [1] - 11:18
**stack** [1] - 32:23
**stage** [1] - 68:15
**stand** [1] - 70:21
**stands** [1] - 71:5
**start** [7] - 4:20, 5:15, 42:13, 49:20, 53:24, 60:6, 60:25
**started** [5] - 33:23, 38:17, 49:16, 49:18, 70:7
**starts** [1] - 53:13
**state** [8] - 4:5, 10:25, 11:1, 11:11, 36:9, 53:18, 70:6, 71:2
**State's** [1] - 34:10
**state-wide** [1] - 36:9
**statement** [1] - 9:4
**States** [2] - 3:6, 73:6
**STATES** [2] - 1:1, 1:14
**stating** [3] - 12:11, 13:12, 18:21
**statute** [1] - 63:21
**stay** [8] - 15:9, 15:11, 15:12, 42:4, 42:6, 43:21, 44:1, 71:9
**stays** [1] - 43:23
**stenography** [1] - 1:24
**step** [2] - 15:8, 43:18
**stepping** [1] - 33:11
**steps** [3] - 6:12, 61:13, 64:21
**stick** [1] - 35:22
**still** [12] - 5:24, 9:16, 11:6, 11:14, 15:22, 28:19, 37:3, 45:18, 45:20, 57:17, 60:1, 70:5
**streamline** [1] - 47:18
**Street** [2] - 2:8, 2:20
**stressed** [1] - 42:4
**strictly** [1] - 7:17
**strongly** [1] - 48:16
**stuff** [3] - 59:15, 59:16, 64:18
**style** [1] - 49:20
**subject** [5] - 11:9, 16:17, 71:9, 71:17, 71:23
**submission** [1] - 22:18
**submit** [4] - 18:7, 18:25, 39:18
**submitted** [3] - 18:6, 52:5, 70:15
**submitting** [1] - 52:3
**substantially** [2] - 16:20, 16:24
**substantive** [1] - 14:4
**successful** [1] - 15:25
**suddenly** [1] - 11:18
**suggest** [1] - 18:24
**suggested** [4] - 7:7, 15:3, 35:21, 67:18
**suggesting** [2] - 25:11, 66:3
**Suite** [4] - 1:22, 2:9, 2:21, 2:24
**summary** [1] - 32:19
**supplement** [1] - 56:10
**supplemental** [5] - 16:22, 36:6, 55:23, 56:2, 57:7
**supplied** [1] - 5:24
**support** [1] - 65:4
**supportive** [1] - 16:4
**suppose** [1] - 54:19
**supposed** [1] - 4:23
**Supreme** [4] - 6:12, 15:12, 43:18, 43:21
**sur** [1] - 55:23
**sur-reply** [1] - 55:23
**surrounding** [1] - 15:14
**Susman** [1] - 2:4

## T

**table** [2] - 38:3, 70:24
**tension** [1] - 13:14
**term** [3] - 44:3, 44:5, 67:22
**terms** [2] - 21:19, 35:25
**testify** [1] - 64:5
**testimony** [1] - 62:12
**TEXAS** [4] - 1:1, 1:9, 1:7, 2:12

**Texas** [15] - 1:18, 1:19, 2:1, 2:2, 2:8, 2:9, 2:13, 2:18, 2:21, 2:25, 3:3, 3:6, 3:8, 10:25, 73:7
**text** [1] - 69:9
**THE** [260] - 1:13, 1:17, 2:11, 2:15, 2:19, 2:23, 3:1, 4:2, 4:5, 4:14, 4:17, 6:20, 6:22, 7:3, 8:13, 9:13, 10:19, 11:9, 12:3, 12:10, 12:15, 12:18, 12:23, 13:1, 13:23, 14:3, 14:20, 15:2, 16:12, 17:1, 18:3, 18:19, 19:3, 19:5, 19:9, 19:21, 19:25, 20:2, 20:7, 20:15, 20:18, 21:7, 21:14, 21:22, 22:5, 22:9, 22:11, 22:16, 22:21, 23:3, 23:6, 23:16, 23:19, 23:23, 24:4, 24:12, 24:17, 24:23, 25:2, 25:8, 25:17, 25:19, 26:11, 26:15, 27:6, 27:10, 27:23, 28:1, 28:3, 28:12, 28:23, 29:2, 29:12, 29:18, 29:20, 29:23, 30:3, 30:8, 30:11, 30:15, 30:18, 30:21, 30:25, 31:2, 31:6, 31:10, 31:12, 31:17, 31:21, 32:1, 33:6, 33:24, 34:16, 34:24, 35:3, 35:5, 35:11, 35:15, 35:17, 36:1, 36:3, 36:11, 36:13, 36:15, 36:19, 37:1, 37:4, 37:7, 37:11, 37:14, 37:20, 37:22, 37:25, 38:4, 38:9, 38:14, 38:16, 38:20, 39:9, 39:15, 39:25, 40:2, 40:6, 40:16, 41:5, 41:12, 41:15, 41:17, 41:19, 41:22, 42:7, 42:9, 42:23, 43:5, 43:8, 43:20, 44:4, 44:7, 44:10, 44:15, 44:19, 44:22, 45:1, 45:13, 45:22, 46:3, 46:5, 46:9, 46:11, 46:13, 46:20, 46:24, 47:2, 47:8, 47:13, 47:20, 48:1, 48:5, 48:13, 48:17, 49:1, 49:4, 49:6, 49:12, 49:16, 49:19, 49:22, 50:1, 50:8, 50:11, 50:14, 50:24, 51:4, 51:10, 51:17, 51:19, 51:22, 51:24, 52:8, 52:11, 52:14, 52:21, 52:23, 53:4, 53:9, 53:14, 53:16, 53:18, 53:20, 53:23, 54:6, 54:9, 54:16, 54:18, 54:22, 55:2, 55:4, 55:10, 55:12, 55:14, 55:19, 56:1, 56:5, 56:8, 56:10, 56:16, 56:18, 56:23, 57:4, 57:9, 57:15, 57:18, 57:23, 58:2, 58:6, 58:9, 58:14, 58:23, 59:6, 59:11, 59:19, 60:3, 60:5, 60:9, 60:24, 61:2, 61:20, 62:11, 63:3, 63:10, 64:7, 64:15, 64:19, 65:1, 65:7, 65:15, 65:19, 65:25, 66:15, 66:20, 66:24, 67:3, 67:10, 68:8, 68:23, 69:4, 69:12, 69:19, 69:25, 70:11, 71:1, 71:8, 71:12, 71:21, 71:25, 72:9, 72:14, 72:17, 72:21, 72:25
**theirs** [3] - 16:21, 36:2, 45:24
**themselves** [3] - 1:5, 62:2
**they've** [1] - 59:15
**thinking** [1] - 13:1
**thinks** [1] - 33:4
**thousands** [1] - 7:12
**three** [11] - 4:25, 8:4, 25:25, 26:5, 38:11, 42:2, 44:25, 45:3, 45:20, 48:23, 50:2
**throw** [1] - 72:2
**timeline** [6] - 6:11, 6:13, 10:4, 15:23, 17:7, 17:10
**timeliness** [1] - 32:15
**timing** [3] - 59:12, 63:10, 68:9
**today** [21] - 4:18, 12:15, 14:3, 14:17, 15:23, 26:7, 27:2, 27:3, 30:17, 36:2, 39:25, 42:1, 43:25, 47:13, 54:3, 56:24, 60:17, 69:5, 69:19, 72:7, 72:18
**together** [6] - 23:9, 25:16, 34:21, 40:21, 43:13, 59:14
**tomorrow** [2] - 27:4, 42:14
**took** [1] - 65:1
**Topic** [4] - 60:11, 60:25, 69:14, 69:16
**topic** [11] - 61:22, 61:25, 62:24, 64:14, 64:16, 66:16, 67:16, 68:8, 68:10, 69:1, 69:10
**topics** [2] - 60:18, 69:7
**totally** [1] - 15:17
**tough** [1] - 59:17
**track** [4] - 12:24, 27:24, 71:7, 71:8
**tracking** [1] - 29:7
**tracks** [2] - 47:15, 50:20
**transcript** [3] - 1:25, 60:15, 73:7
**TRANSCRIPT** [1] - 1:13
**translates** [1] - 13:19
**Travis** [2] - 1:17, 4:7
**trial** [5] - 51:20, 52:8, 53:1, 53:12, 53:24
**tried** [1] - 64:21
**true** [2] - 24:12, 73:7
**try** [7] - 22:3, 28:19, 32:3, 32:11, 52:16, 53:11, 54:19
**trying** [9] - 17:5, 19:13, 24:20, 33:2, 38:2, 59:16, 63:3, 65:12, 72:2
**Tuesday** [3] - 19:11, 48:15, 49:7
**turn** [1] - 64:4
**turning** [1] - 40:17
**turns** [1] - 65:22
**two** [20] - 5:19, 11:25, 16:4, 17:20, 17:24, 26:25, 28:24, 32:11, 40:17, 40:20, 41:20, 42:18, 47:15, 48:9, 50:20, 50:22, 51:5, 56:2, 68:17
**twofold** [1] - 16:4
**types** [1] - 5:12

## U

**ultimately** [1] - 20:17
**un-burdensome** [1] - 66:13
**unaddressed** [1] - 32:17
**uncalled** [1] - 38:15
**under** [10] - 11:2, 13:15, 13:16, 13:18, 13:20, 22:18, 32:15, 37:6, 45:8, 58:1
**underlying** [1] - 43:10
**understood** [7] - 6:6, 36:18, 38:21, 65:8, 68:16, 69:2, 72:16
**underway** [1] - 17:11
**unfair** [3] - 17:24, 18:14, 33:4
**UNITED** [2] - 1:1, 1:14
**United** [2] - 3:6, 73:6
**unless** [1] - 6:11
**unnecessary** [1] - 45:21
**unobjectionable** [1] - 66:9
**unpack** [1] - 23:25
**unrepresented** [1] - 9:23
**untouched** [2] - 32:16
**up** [20] - 4:17, 4:19, 16:22, 17:23, 21:3, 21:18, 21:24, 30:14, 30:15, 31:15, 32:9, 45:2, 45:21, 47:14, 48:24, 51:15, 54:5, 60:11, 70:8, 72:5
**upcoming** [1] - 15:15
**useful** [1] - 20:11

## V

**vacate** [65] - 6:15, 11:13, 12:18, 15:21, 16:1, 17:6, 17:18, 18:1, 18:2, 18:6, 18:11, 18:17, 18:18, 19:16, 19:23, 20:6, 21:10, 22:6, 22:8, 23:14, 25:6, 25:14, 27:1, 27:3, 28:6, 29:23, 30:14, 30:15, 32:22, 33:10, 33:25, 34:18, 34:20, 35:13, 35:19, 35:21, 35:25, 36:24, 37:8, 37:9, 38:2, 39:11, 39:22, 40:7, 41:13, 41:25, 42:1, 44:11, 44:20, 51:10, 54:11, 54:23, 56:24, 56:25, 58:11, 62:2, 63:1, 65:24, 67:13, 67:20, 68:9, 69:24, 70:3, 70:23, 71:4
**vacated** [1] - 10:24
**vacating** [2] - 7:11, 8:11
**vacatur** [4] - 7:15, 7:17, 10:12, 70:2
**VAN** [2] - 4:12, 52:25
**Van** [4] - 2:23, 2:23, 4:12, 53:5
**version** [1] - 63:25
**versions** [1] - 63:25
**via** [1] - 1:25
**VIA** [1] - 1:13
**view** [6] - 14:14, 17:23, 61:6, 63:17, 67:20, 68:3
**vigorously** [1] - 7:4
**violations** [11] - 7:12, 7:15, 7:18, 8:12, 10:13, 10:15, 10:20, 10:23, 11:4, 11:18, 14:12
**volunteer** [1] - 72:10
**VS** [1] - 1:8

## W

**wait** [9] - 10:19, 23:19, 44:18, 44:24, 67:22
**waiting** [3] - 30:5, 30:9, 48:24
**waive** [5] - 8:10, 9:20, 62:22, 63:20, 65:3
**waiver** [18] - 6:19, 9:3, 9:13, 16:17, 16:21, 16:24, 27:8, 33:12, 33:14, 33:17, 45:15, 48:3, 63:17, 65:9, 65:10, 66:10, 66:17, 66:20
**walk** [1] - 56:20
**Walker** [1] - 1:17
**wants** [4] - 27:17, 30:19, 46:17, 57:19
**Washington** [1] - 1:23
**Wednesday** [3] - 7:25, 8:4, 14:22
**week** [23] - 4:21, 12:1, 17:12, 19:14,

21:12, 22:19, 23:17, 28:18, 28:19, 36:8, 47:5, 48:14, 49:2, 49:7, 49:8, 49:17, 49:24, 51:20, 54:8, 54:15, 68:17, 73:1
**weekend** [3] - 50:1, 50:17, 59:14
**weeks** [15] - 25:25, 26:6, 26:18, 28:16, 28:24, 28:25, 38:11, 40:20, 42:2, 45:3, 45:20, 48:23, 68:17, 72:22
**weighed** [1] - 45:18
**weighty** [1] - 14:18
**West** [1] - 2:5
**whichever** [1] - 20:6
**wide** [1] - 36:9
**willing** [5] - 6:13, 11:20, 11:22, 30:14, 54:4
**window** [2] - 34:3, 36:6
**wish** [2] - 19:11, 63:16
**withdraw** [1] - 69:2
**wondering** [2] - 29:10, 58:17
**words** [1] - 7:1
**workable** [1] - 57:18
**workday** [1] - 58:20
**workload** [1] - 17:23
**works** [5] - 23:1, 35:16, 36:14, 37:21, 39:20
**worried** [1] - 68:12
**wrapping** [1] - 47:14
**write** [1] - 19:3
**writing** [1] - 48:20

## Y

**year** [1] - 7:12
**York** [2] - 2:6, 53:3
**Younger** [20] - 6:2, 8:10, 12:19, 13:15, 13:18, 27:15, 27:18, 38:2, 38:9, 38:22, 39:8, 39:13, 39:22, 69:24, 70:23, 70:24, 71:6, 71:8, 71:10, 71:18
**yourself** [1] - 62:10

## Z

**ZOOM** [1] - 1:13

EXHIBIT 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---

MARANDA LYNN ODONNELL; LOETHA SHANTA MCGRUDER; and ROBERT RYAN FORD,

Plaintiffs,

v.

Case No. 16-cv-01414

HARRIS COUNTY, TEXAS; HARRIS COUNTY SHERIFF ED GONZALEZ; COUNTY COURT AT LAW NO. 1 JUDGE ALEX SALGADO; COUNTY COURT AT LAW NO. 2 JUDGE PAULA GOODHART; COUNTY COURT AT LAW NO. 3 JUDGE LESLIE JOHNSON; COUNTY COURT AT LAW NO. 4 JUDGE SHANNON BALDWIN; COUNTY COURT AT LAW NO. 5 JUDGE DAVID FLEISCHER; COUNTY COURT AT LAW NO. 6 JUDGE KELLEY ANDREWS; COUNTY COURT AT LAW NO. 7 JUDGE ANDREW A. WRIGHT; COUNTY COURT AT LAW NO. 8 JUDGE ERIKA RAMIREZ; COUNTY COURT AT LAW NO. 9 JUDGE TORIA FINCH; COUNTY

COURT AT LAW NO. 10 JUDGE JUANITA JACKSON; COUNTY COURT AT LAW NO. 11 JUDGE SEDRICK T. WALKER; COUNTY COURT AT LAW NO. 12 JUDGE GENESIS DRAPER; COUNTY COURT AT LAW NO. 13 JUDGE RAUL RODRIGUEZ; COUNTY COURT AT LAW NO. 14 JUDGE JESSICA PADILLA; COUNTY COURT AT LAW NO. 15 JUDGE TONYA JONES; COUNTY COURT AT LAW NO. 16 JUDGE LINDA GARCIA;

Defendants,

and

THE ATTORNEY GENERAL OF TEXAS, KEN PAXTON,

Intervenor.

---

DEPOSITION OF JUDGE PAULA GOODHART

DATE: Wednesday, September 2, 2026

TIME: 9:42 a.m.

LOCATION: Remote Proceeding
Greer, Herz & Adams LLP
123 Rosenberg Street, Suite 3000
Galveston, TX 77550

OFFICIATED BY: Bailey Crumbaugh

JOB NO.: 8409576

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS MARANDA LYNN ODONNELL, LOETHA SHANTA MCGRUDER, AND ROBERT RYAN FORD:

TRAVIS FIFE, ESQUIRE (by videoconference)
KIRSTEN BUDWINE, ESQUIRE (by videoconference)
SARAH BELLINGER BEEBE, ESQUIRE (by videoconference)
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741
travis@texascivilrightsproject.org
kirsten@texascivilrightsproject.org
sarah@texascivilrightsproject.org
(817) 991-4607

DANYELLE HONORE, ESQUIRE (by videoconference)
Texas Civil Rights Project
1500 McGowen, Suite 220
Houston, TX 77004
danyelle@texascivilrightsproject.org
(512) 474-5073

A P P E A R A N C E S (Cont'd)

ON BEHALF OF PLAINTIFFS MARANDA LYNN ODONNELL, LOETHA SHANTA MCGRUDER, AND ROBERT RYAN FORD:

ELIZABETH ROSSI, ESQUIRE (by videoconference)
Civil Rights Corps
1601 Connecticut Avenue Northwest, Suite 800
Washington, D.C. 20009
elizabeth@civilrightscorps.org
(202) 681-2721

ON BEHALF OF DEFENDANT HARRIS COUNTY, TEXAS:

DANIEL D. HU, ESQUIRE (by videoconference)
Harris County Attorney's Office
1010 Lamar, 11th Floor
Houston, TX 77002
daniel.hu@harriscountytx.gov
(832) 370-1112

SETH HOPKINS, ESQUIRE (by videoconference)
Harris County Attorney's Office
1318 Emancipation Avenue
Houston, TX 77003
seth.hopkins@harriscountytx.gov

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANTS COUNTY COURT AT LAW NO. 1 JUDGE ALEX SALGADO, COUNTY COURT AT LAW NO. 4 JUDGE SHANNON BALDWIN, COUNTY COURT AT LAW NO. 5 JUDGE DAVID FLEISCHER, COUNTY COURT AT LAW NO. 6 JUDGE KELLEY ANDREWS, COUNTY COURT AT LAW NO. 7 JUDGE ANDREW A. WRIGHT, COUNTY COURT AT LAW NO. 8 JUDGE ERIKA RAMIREZ, COUNTY COURT AT LAW NO. 9 JUDGE TORIA FINCH, COUNTY COURT AT LAW NO. 10 JUDGE JUANITA JACKSON, COUNTY COURT AT LAW NO. 11 JUDGE SEDRICK T. WALKER, COUNTY COURT AT LAW NO. 12 JUDGE GENESIS DRAPER, COUNTY COURT AT LAW NO. 13 JUDGE RAUL RODRIGUEZ, AND COUNTY COURT AT LAW NO. 15 JUDGE TONYA JONES:

GEORGE ALLAN VAN FLEET, ESQUIRE (by videoconference)
G. Allan Van Fleet P.C.
6218 Elm Heights Lane, Suite 201
Houston, TX 77081
allanvanfleet@gmail.com
(713) 826-1954

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANTS COUNTY COURT AT LAW NO. 2 JUDGE PAULA GOODHART, COUNTY COURT AT LAW NO. 3 JUDGE LESLIE JOHNSON, COUNTY COURT AT LAW NO. 14 JUDGE JESSICA PADILLA, AND COUNTY COURT AT LAW NO. 16 JUDGE LINDA GARCIA:

ANGIE OLALDE, ESQUIRE (by videoconference)
Greer, Herz & Adams LLP
2525 South Shore Boulevard, Suite 203
League City, TX 77573
aolalde@greerherz.com
(409) 797-3262

JOSEPH R. RUSSO, ESQUIRE (by videoconference)
Greer, Herz & Adams, LLP
123 Rosenberg Street, Suite 3000
Galveston, TX 77550
jrusso@greerherz.com
(409) 797-3215

A P P E A R A N C E S (Cont'd)

ON BEHALF OF INTERVENOR THE ATTORNEY GENERAL OF TEXAS, KEN PAXTON:

JOSEPH EMEKA NWAOKORO, ESQUIRE (by videoconference)
The Attorney General Of Texas Ken Paxton
4600 Highway 6 North
Houston, TX 77084
joe.nwaokoro@oag.texas.gov
(713) 973-4300

ALSO PRESENT:

Ava Stewart, Intern, Texas Civil Rights Program (by videoconference)
Chris Doyle, Intern, Texas Civil Rights Program (by videoconference)
Alexis Boehmer, Intern, Texas Civil Rights Program (by videoconference)
Judge Leslie Johnson, Defendant (by videoconference)

I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Fife | 13 |
| By Mr. Nwaokoro | 139 |
| By Mr. Hu | 139 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 17 | Declaration of Judge Paula Goodhart | 27 |
| Exhibit 18 | Exhibit 1-C - Email Thread October 30, 2023, to November 13, 2023 | 52 |
| Exhibit 19 | Exhibit 1-D - Email Thread December 11, 2023, to April 23, 2024 | 55 |
| Exhibit 20 | Exhibit 1-E - Letter to Grayson Coker | 68 |
| Exhibit 21 | Yellow Pages Notes | 80 |
| Exhibit 22 | Exhibit 1-F - Email Thread April 23, 2025, to April 29, 2025 | 100 |
| Exhibit 23 | ODonnell Consent Decree Summary and Examples, GOB Examples | 109 |
| Exhibit 24 | Request to Modify | 110 |
| Exhibit 25 | July 25, 2025, Proposal to Modify Rule 9 Letter | 123 |

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 26 | Request Renewal for Younger Abstention | 128 |

QUESTIONS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
| --- | --- |
| 77 | 17 |

P R O C E E D I N G S

THE OFFICER: Good morning. My name is Bailey Crumbaugh; I'm the reporter assigned by Veritext to take the record of this proceeding. We are now on the record at 9:42 a.m.

This is the deposition of Judge Paula Goodhart taken in the matter of Maranda Lynn Odonnell, et al., vs. Harris County, Texas, et al., on Wednesday, September 2, 2026. The reporter is located in Houston, Texas, and the witness is located in Galveston, Texas.

I'm a notary authorized to take acknowledgments and administer oaths in Texas. Parties agree that I will swear in the witness remotely.

At this time, will everyone in attendance please identify yourself for the record?

MR. FIFE: Travis Fife, attorney for the plaintiffs. I'm also joined today by Chris Doyle, Ava Stewart, and Alexis Boehmer, who are legal interns; and then Danyelle Honore, who is a legal fellow, all with Texas Civil Rights Project.

MR. RUSSO: Representing the deponent and four judges, Joseph Russo Jr. and Angie Olalde, office of Greer, Herz & Adams.

MR. HU: Daniel Hu. Along with me is Seth Hopkins, representing Harris County.

MR. NWAOKORO: Joe Nwaokoro for the Office of the Attorney General.

THE OFFICER: Mr. Russo, can you introduce yourself? I'm sorry.

MR. RUSSO: Yeah. it's Joseph Russo Jr. and Angie Olalde here on behalf of the four judges.

THE OFFICER: That is everyone; correct? Okay. Just want to make sure no connections.

Hearing no objection, I will now swear in the witness.

Judge Goodhart, will you please raise your hand? Thank you.

WHEREUPON,

PAULA GOODHART,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE OFFICER: Thank you.

Counsel, you may proceed.

//

//

EXAMINATION

BY MR. FIFE:

Q Good morning, Judge Goodhart. Like I just said, my name is Travis Fife. I'm a lawyer with Texas Civil Rights Project, and I represent the plaintiffs in this case. I first want to say I just really appreciate you giving up some of your morning, and we really appreciate your time.

I'm joined today by Elizabeth Rossi, Sarah Beebe, and Kirsten Budwine, who also represent the plaintiffs, but I'll be the one taking your examination. Could you please state and spell your full name for the record?

A My name is Paula Goodhart, P-A-U-L-A, last name is G-O-O-D-H-A-R-T.

Q Now, before we dive into the substantive matters here, I just wanted to go over some ground rules so we can both be on the same page about what to expect from our conversation today. Does that sound okay?

A Sure.

Q So in this deposition, I'll be asking you questions, and your answers will be recorded by the court reporter at the end of the table. You understand that you need to speak up so the court

reporter can hear you; right?
A I do.
Q And so that means if you answer with a nod or a head shake, I'm not trying to be rude, but I will ask you to verbally state your answer so it's clear for the reporter. Okay?
A I understand.
Q That also means it's important that we aren't talking over each other, meaning that I ask that you will wait until I finish my question before answering. And similarly, I'll do my best for you to finish your answer before asking another question. Okay?
A Yes.
Q And you understand the court reporter just swore you in under oath; right?
A Yes.
Q And that is the same oath that you as a judge administer to witnesses in your courtroom; right?
A Yes.
Q That means that you will provide complete, truthful, and accurate answers; right?
A Yes.
Q Is there any reason why you cannot give

full, complete, and accurate testimony today?
A No.
Q And if I ask a question that is unclear or you don't understand for any reason, will you please let me know so I can rephrase the question?
A Yes.
Q That way, if you answer a question, it means that you understood it; fair?
A Yes, if I'm able to.
Q Yes, exactly. Otherwise, you would ask for clarification.
A Yes.
Q The other thing is that if you need a break at any time, we can take a break. I just ask that you let me finish my question or you finish your answer prior to us taking a break. So if at any point, will you let me know if you need a break?
A Yes.
Q And it sometimes happens that after a few minutes or a few hours, you might remember some additional information or clarification in response to a question. If that happens, let me know and we will correct it right there on the record as soon as you remember. Will you let me know if you remember new information or need to correct an answer?

A Yes.
Q And I take it you're familiar with the consent decree in this case, ODonnell against Harris County, which the consent decree was entered at Docket 708 in November of 2019; is that right?
A Yes.
Q And apologies. Just going back a moment, and I also understand that you're in the same room as two of your attorneys and your judicial colleague, Judge Leslie Johnson; is that right?
A That's correct.
Q And while we have no issue with you being in the same room as them, you do recognize that you attorneys can't pass you notes or provide you answers in the middle of this examination; right?
A I understand that.
Q Excellent. Now, going back, we established that you're familiar with the consent decree entered at Docket 708 by Judge Rosenthal in November 2019 in this case. So if I say consent decree or the decree, you understand I'm referring to the consent decree entered by Judge Rosenthal at Docket 708 in ODonnell against Harris County in November of 2019?
A Yes.
Q And unless you say otherwise, if you refer

to the consent decree or the decree, you're referring to that same consent decree entered at Docket 708 in ODonnell against Harris County?
A Okay.
Q And you recognize that in your capacity as judge of County Criminal Court at Law 2 that you're a party to the consent decree; right?
A Yes.
Q And it was your predecessor in office, the former judge of County Criminal Court at Law 2 that entered into the consent decree in 2019; right?
A Yes.
Q Do you agree that the consent decree remains in effect unless and until a court orders otherwise?
A Yes.
Q But we're here today because you've moved to vacate the consent decree; isn't that right?
A That's correct.
Q So how did you prepare for today's deposition?
A I reviewed documents that have been produced in discovery. I reviewed my declaration. I counseled with my attorneys.
Q So I obviously am not asking for you to disclose any conversation between you and your

attorneys. But in terms of the documents that you reviewed, which specific documents did you review?

A Again, my declaration and all the exhibits that were a part of the declaration. I reviewed some notes that I believe have been disclosed to counsel where I had documented attempts at conversations with people or actual conversations with people.

Q Tho those would've been the yellow legal paper notes?

A Correct. Yeah.

Q And we'll get into your declaration and some of the documents later. I did just want to ask, though, if you prepared any notes for yourself to help you remember information for today's conversation?

A No.

Q Did your attorneys provide you a memorandum or list of facts to help you remember things for today's conversation?

A The only thing my attorneys provided me --

MR. RUSSO: Wait. Let me make sure that we're clear on this.

THE WITNESS: Yeah, it's two questions.

MS. RUSSO: There's -- don't get into any content --

MR. FIFE: Let me clear it up. Retract

the question. Let me do it over.

THE WITNESS: Okay. Okay.

BY MR. FIFE:

Q So I'm not asking you for any advice that your attorneys gave you, written or otherwise.

A Okay.

Q My question is narrower. It's just did your attorneys provide you any documents to help you remember facts for today's conversation?

A Only the exhibits that are part of my declaration. Yeah.

Q Okay. And do you have any documents with you that you plan to refer to during this deposition?

A Just my declaration.

Q Okay. And you have a copy of your declaration with you?

A I do.

Q Have you -- does it have any writings on it, any squiggly notes, anything like that?

A I did make some boxes around a few things just to refresh my memory about some dates.

Q Absolutely. And we will get into that in a moment. So you're currently the presiding judge of County Criminal Court at Law 2; is that right?

A Harris County Criminal Court at Law Number

2, yes.

Q Okay. As you can tell, I'm having a tremendous problem with that mouthful. And if I say Court Number 2 or Court Number 3, can we agree that that refers to Harris County Criminal Courts at Law Number 2, 3, et cetera?

A Sure.

Q Thank you. And you were elected to your current term in November 2022?

A That's correct.

Q Which means you took office January 1, 2023?

A Yes.

Q And before that, you were the presiding judge of Court 1?

A Yes. Not immediately before that, but yes. Yes.

Q Yes. You were elected to Court 2 in 2010; is that right?

A I was appointed to Court 1 in 2010 and then subsequently elected in 2010.

Q Okay. So you were appointed in 2010; right?

A Correct.

Q Then you ran in the 2010 election; right?

A Correct.

Q At which point, you won the seat and ran for



Veritext Legal Solutions
800-336-4000

reelection again in 2014; right?

A Correct.

Q And you were -- so you served as the presiding judge of Court 1 from 2010 through 2018; right?

A Yes.

Q But you lost your election in November of 2018 to Judge Alex Salgado; is that right?

A Correct.

Q And I understand -- are you running for reelection in this cycle, 2026?

A I'm not.

Q Why is that?

A Because I'm eligible to retire, and that is the decision that I've made is to retire.

Q Well, congratulations.

A I have a new grandbaby on the way. I want to spend more time with my family.

Q Wonderful. Congratulations.

A Thank you.

Q And in preparing for this deposition, looking back at your career, it strikes me that you're a very experienced lawyer who has worked on thousands of cases as a judge, defense lawyer, and prosecutor. Would you agree with that?

A Yes.
Q And you graduated University of Houston Law School in 1993?
A I did.
Q And then you were in the DA's office from 1993 until 2007; is that right?
A That's correct.
Q From 2007 to 2010, you ran your own law practice; is that right?
A Correct.
Q What type of cases did you take?
A I was a criminal defense attorney.
Q Were all of those in state court, or did you take any federal cases as well?
A They were all in state court.
Q Okay. How many cases do you think you worked on while in -- from 2007 to 2010?
A I would be speculating if I gave you an answer to that. I -- I don't recall.
Q More than a hundred?
A I -- I don't recall.
Q Okay. Fair enough. And then from after that, you were elected to the bench and served as the judge of Court 1 for eight years; right?
A I was appointed to the bench in March.

Q Yeah.

A And so I served more than eight years before I was defeated.

Q Okay. More than eight years as presiding judge of Court 1?

A Correct.

Q And then between -- after you were unseated from Court 1 and before you retook the bench in Court 2, you were in private practice from about early 2019 through your election in November of 2022?

A Yes.

Q What type of legal work did you do there then?

A I worked for a firm that specialized in criminal defense, so I did criminal defense work primarily, and I did a small, very small, amount of work on personal injury cases.

Q And by personal injury, you mean you represented people who are harmed by a tort in civil litigation?

A Correct.

Q How many personal injury cases do you think you did in that time?

A I think I probably worked on five at that time. That was not my area of expertise. There was

another partner in the firm who specialized in that area.

Q And so across your career, it's fair to say you've worked on thousands of cases and have a wide range of experience both on the bench and both as a prosecutor and defense attorney?

A I -- I think it's fair to say I've handled thousands of cases in criminal state court, yes, in various capacities.

Q And then some civil litigation as well, like we just talked --

A Again, I -- like I said --

Q About five cases?

A Maybe five cases. Right.

Q And, you know, one thing I wanted to clarify at the start is, in light of some of the scheduling discussions that have been happening with Judge Rosenthal in this case, initially we had planned to have a full examination, a full conversation, with you this morning.

But Judge Rosenthal has authorized us to inquire into "the process and timing of the judges' efforts to challenge, vacate, or modify the consent decree, including their efforts to retain counsel to represent them on these issues." Are you prepared to

discuss this topic today?
A I believe so.
Q Wonderful. When did you decide to run for Court 2 in the 2022 election cycle?
A I'm not sure, but it would've been before the filing deadline that's required to get on the ballot.
Q But at the time you filed for election, you knew the consent decree was operative in Harris County?
A Yes.
Q And that if you were elected and took office, you would be bound by the consent decree as a party to it; right?
MR. RUSSO: Object. Calls for legal conclusion.
BY MR. FIFE:
Q But you can --
THE WITNESS: I don't know if they can hear.
MR. FIFE: I heard. I heard.
THE WITNESS: Oh, okay. Sorry.
BY MR. FIFE:
Q Yeah. Thank you, Judge. Let me ask the question again just to clear it up. At the time that

you decided to run, you were aware that if you won election, you would take office and be a party to the consent decree?

A I -- I knew the consent decree was in effect when I started in January of 2023. And I think it was a reasonable conclusion that I was going -- in my capacity as a judge of Court 2, going to be a part of the decree.

Q And when you say in your capacity as Court 2, you'd be a part of the decree, it sounds like to me what you're saying is that you would be bound by it unless and until that a court ordered otherwise?

MR. RUSSO: Object to form.

BY MR. FIFE:

Q You can answer.

A I -- I think yes is the answer to that question.

Q And you filed a declaration in this case on Monday evening; is that right?

A I believe that's when it was, yes.

Q Yeah. And I -- well, I guess --

A Whatever the date is on it. So if that -- is that Monday? Yes.

Q Yes, Judge. Yeah. So I am going to share my screen and mark this as Exhibit 17.

(Exhibit 17 was marked for identification.)

Judge Goodhart, can you see my screen? It has the case caption and declaration of Judge Paula Goodhart here.

A I can.

Q Wonderful. And if I highlight text like I'm doing with the title, can you see that?

A Yes, I can.

Q Wonderful. So as you can see at the top, this is a document identifying stamp that is assigned to documents filed in federal court. This is document number 864-1 and is Exhibit 1 attached to you and your colleagues' renewed motion to vacate. Okay?

A Okay.

Q Now, I want to start with paragraph 2. You said that Allan Van Fleet, on or about January 1, 2023, sent you a letter "regarding his representation of the HCCCL judges, including limitations on that representation"; right?

A That's what it says.

Q And in that letter, he notified you that if you took -- if you wanted to take a position adverse to the majority of County Criminal Court at Law judges that he would not be able to represent you in

advocating for that position?

A I believe that's what the email said.

Q And you said that in March of 2023, you met with the court-appointed monitors; right?

A Correct.

Q Was this at one of their semi-annual public meetings when they come into town?

A I believe that they were in town, but I'm not sure if it was for a public meeting or just a meeting with parties. And when I say parties, I mean other folks within the county because at that meeting, there were also folks from pretrial services. I believe there was somebody from the DA's office. So I -- I'm not sure what the context was for that --

Q But was it an in-person meeting?

A It was, yes.

Q Okay. And it says here that in the -- starting at the second sentence of paragraph 3, "Judge Padilla and I asked the monitors whether Texas's new bail reform laws or the consent decree would control HCCCL pretrial procedures since the decree conflicted with new state laws." Did I read that right?

A Yes, you did.

Q What new Texas laws are you -- scratch that. When you, in this declaration, refer to

Texas's new bail reform laws, are you referring to Senate Bill 6 as adopted in the second special session of the 2021 Texas legislature?
A Yes, in March of 2023, that's what I would've been referring to when it says state laws.
Q And that's because Senate Bill 6 went into effect around December 2022; right? It's okay if you don't --
A I don't --
Q I'll represent to you --
A -- specifically. I know that it was before I took the bench in January of 2023.
Q So Senate Bill 6 was recently in effect at the time of this meeting; right?
A I guess it depends on your definition of recently. I know it was in effect --
Q It had been less than six months since Senate Bill 6 took effect; right?
A I don't recall specifically when it took effect. I just know it was before I took the bench.
Q Understood. Understood. And the questions that you asked the monitor in that meeting in March 2023, those were limited to the impact of new Texas laws on the procedures outlined in the consent decree; right?

A Can you repeat that one more time for me, please?

Q Yeah. So it says here in your declaration that you asked about the impact of Texas's new bail reform laws at a March 2023 meeting with the court-appointed monitors; right?

A It says new state laws, yes.

Q New state laws. And my question is just that at that March 2023 meeting, your questions to the monitor were limited to the impact of these new Texas laws, Senate Bill 6, on the procedures outlined in the consent decree?

MR. RUSSO: Object to form.

BY MR. FIFE:

Q You can still answer.

A Not exactly.

Q Can you say more?

A The -- my concern was that the state law conflicted with the consent decree directly regarding the release of individuals without going in front of a magistrate as required by Senate Bill 6.

Q And -- understood. And so it was your view at the time that the general order bond system established by the consent decree conflicted with what you took in Senate Bill 6 to require individualized

consideration of each person by a magistrate; is that right?

A I -- I was concerned that Rule 9, as incorporated in the consent decree, was a direct conflict with state law.

Q And state law is Senate Bill 6?

A Correct.

Q And so the concern that you expressed to the monitor was that there was a direct conflict between new state law, Senate Bill 6; and the procedures required by the consent decree under local Rule 9?

A Yes.

Q And I wanted to turn to paragraph 4 here. So it references "our staff attorney Ashley Guice." Ashley Guice is now the presiding judge of Court 12; right?

A Yes.

Q But she was your staff attorney at the time?

A She was.

Q Am I saying the name correctly, Guice?

A Yes, I believe so.

Q Okay. And so it says here that Ashley Guice, in her capacity as your staff attorney, forwarded the Daves II opinion to the HCCCL judges on March 31, 2023; is that right?

A Yes.
Q When it says the Daves II opinion, does that refer to the second en banc decision issued by the Fifth Circuit in Daves against Dallas County?
A I believe it refers to the opinion that overruled ODonnell. So if that's what you're referring to, that's what we were sent.
Q So when Ms. Guice sent you this opinion, this opinion had just been released; right?
A Yes.
Q I believe it was -- I think it was actually released on March 31, 2023. Does that comport with your understanding of the opinion she sent you?
A I believe so, that -- that she sent it to us on the day that it was released.
Q So I'll represent to you that there was a first Daves en banc decision decided in 2022. That is not the opinion that you received. You received Daves II, which was issued in March of 2023; right?
A If Daves II refers to the opinion that overruled ODonnell, that's what we received.
Q And that was an -- the reason I just want to be clear here is because -- let me actually just make this simpler or move on. So --
MR. RUSSO: If you need a

representation from us as well, just to clear the record.

MR. FIFE: Yeah. It refers to Daves II.

MR. RUSSO: The opinion -- yeah, the opinion is the one that was issued on the 31st of March.

MR. FIFE: Okay. Okay. Yeah. No, I think that was my own confusion.

BY MR. FIFE:

Q I apologize, Judge. And as you just alluded to, in that opinion, Daves II, the en banc Fifth Circuit overruled the prior ODonnell decision rejecting Younger abstention in this case; right?

A That's my understanding of it, yes.

Q At the time in March 31, 2023, were you aware that the panel stated "For all these reasons" -- and I'm quoting -- "For all these reasons, we hold that pursuant to Younger, O'Shea, Tarter, and Wallace, neither ODonnell I nor this case should have been adjudicated in federal court. We overrule ODonnell I's holding against abstention"?

A If you're quoting directly from the opinion, then -- then yes.

Q And I guess my question is really just at

that time, you were aware that the en banc Fifth Circuit overruled ODonnell's Younger holding?

A Yes.

Q But in the spring of 2023, you did not file a motion asserting Younger abstention to the federal court; correct?

A I did not.

Q Now, in addition to Younger abstention, the Daves opinion, Daves II, the 2023 en banc opinion, also discussed Senate Bill 6. Is that familiar to you?

A I don't recall that.

Q Do you recall Daves discussion of mootness?

A I do not.

Q Okay. Now, in turning back to the affidavit, you said in paragraph -- oh, no, sorry. We're still in paragraph 4, second sentence. "At an HCCCL meeting in or around the first week of April 2023, I asked again about whether state law conflicts with the decree and what impact the new opinion has on the decree." Did I read that right?

A You did.

Q But you didn't -- and so you focused here with your colleagues about whether state law conflicts with the decree; is that right?

A And --

MR. RUSSO: Form.

BY MR. FIFE:

Q You can answer.

A That, in addition to the impact of the new opinion.

Q Did you ask them to vote on whether to advance Younger abstention in defense to the decree?

A I don't know that I'm allowed to discuss the content of judicial meetings ethically specifically.

Q Respectfully, Judge Goodhart, you put it at issue in paragraph 4 here.

[redacted]

[redacted]

Q And then you also said that there were no votes taken at that April 2023 meeting; right?

A I don't recall there being any votes about any rule changes at that meeting. And --

Q Okay. So to the best of your recollection, you do not remember a vote being taken at that April 2023 meeting on whether to move to modify the consent decree?

A I -- I do not recall there being a vote [redacted] You have to understand that the news of Daves was brand-new. Our meet our meeting would've been shortly after that opinion was published.

[redacted]

[redacted]

So I think there were a lot of moving parts, and so that's what was being discussed.

BY MR. FIFE:

Q Understood. And shortly after that, you received a letter from Mr. Van Fleet on April 6th of 2023 stating that he no longer represented you in this case; right?

A That's true. I think it was the same day as the meeting.

Q Do you know if it was before or after the meeting?

A I believe it was after the meeting.

Q Was Mr. Van Fleet at the meeting?

A No.

Q Okay. So you and the judges had a conversation. And then shortly thereafter, maybe several hours, few hours, you get this letter from Mr.

Van Fleet?

MR. RUSSO: Objection. Calls for speculation.

You can answer.

THE WITNESS: I -- I can tell you when I got the email from Mr. Van Fleet, and I believe it was in the evening of April the 6th.

BY MR. FIFE:

Q Okay. What prompted him to send this letter to you and Judge Padilla?

A I do not know.

Q Do you know -- do you have any understanding as to why Judge Johnson didn't receive a similar letter?

A I don't know.

Q And so I just want to recap the state of play. So as of April 7, 2023, you are aware of the Daves II opinion issued in March of 2023 but now did not have representation in the litigation; is that right?

A That's correct.

Q And at that time, you were concerned that the consent decree posed, in your words, a direct conflict with state law as modified by Senate Bill 6; right?

A Yes.
Q And then shortly after getting that letter from Mr. Van Fleet, you reached out to Mr. Grant Dorfman at the Office of the Attorney General?
A That's correct.
Q Who is Mr. Dorfman in the AG's office?
A He was -- I think he was the first assistant AG, or that's who I believed him to be. I'm not sure if that's correct or not. But he -- yes.
Q So at the time, he was a lawyer in the AG's office?
A Yes.
Q And it says here in paragraph 5, if you look here right at the end of page 1, it says "We were asking about whether we could request an AG opinion." Do you see that?
A I do.
Q Now, an AG opinion is just where the attorney general provides guidance on a legal question from certain public officials, more or less; right?
A Correct. That -- that's my understanding of what it is.
Q That's my understanding too. And so certain public officials, apparently not Harris County misdemeanor court judges, but yeah, certain public

officials can request this legal guidance from the AG's office through an AG opinion?

A Yes.

Q And so here at the bottom of paragraph 5, you say, we asked "whether we could request an AG opinion about which controls if there was a conflict between the consent decree or Texas's new laws." Did I read that right?

A You did.

Q And did you also ask Mr. Dorfman for if the AG could issue an opinion on whether Younger abstention required vacatur of the consent decree?

A We did discuss, at that time, the -- the -- because it was a -- a new case; right? So we did discuss that at the time as well.

Q I don't know if that was my question, though. My question is, did you ask for an attorney general opinion on whether Younger abstention required vacatur of the consent decree?

A I did not because I wasn't authorized to request an attorney general opinion as a judge.

Q But you said here you asked for one -- or you asked "whether we could request an attorney general opinion about which controls if there's a conflict, the consent decree or Texas's new laws";

right?

A Right. We discussed an attorney general's opinion and who it is that could ask for an attorney general's opinion. And it was clear that I wasn't a person who could ask for an attorney general opinion.

And the reason that was important is because during the monitors meeting, Mr. Van Fleet brought up the fact that it's possible that an attorney general opinion could be helpful. In that same conversation, we discussed whether or not the AG's office could represent us.

Q Did you agree that an AG opinion could be helpful?

A I thought it potentially could be helpful. That didn't happen, but I thought it could potentially be helpful at the time.

Q Did you think it could be helpful because it would address potential conflicts between Senate bill 6 and the consent decree?

A And Daves.

Q Did you ask the attorney general's opinion on whether the decree should be vacated based on Younger abstention?

A We -- we had a conversation about Daves and its implications on the decree. I think everybody was

reading it as ODonnell being overruled.

Q And it says here at the bottom of this paragraph that you eventually learned the AG could not represent you because you were not considered state employees; is that right?

A That's correct.

Q When did they say that -- when did they inform you they couldn't represent you?

A The definitive answer would've come probably between April of '24 and April of '25.

Q April of '24 or -- through maybe April of 2025?

A So yes, was my answer.

Q I guess we'll get to this more when we talk about the notes, but it's surprising to me that you don't remember a more exact date where they would've informed you of this given you took such scrupulous notes over your interactions with the AG's office.

MR. RUSSO: Objection. There's no question there.

BY MR. FIFE:

Q Well, I guess my question is, is your testimony that the best you can do is a year range, or is there a more specific date?

A There is not a specific date that I can

recall.

Q Okay. Understood. Now, you've mentioned a few times the effect -- that you were asking the AG about the effect of Daves II. What do you mean by the effect of Daves?

A Well, Daves did overrule ODonnell. And so in that -- in that -- with that conclusion, whether or not the decree was still in effect given that, and then also whether or not there were any outstanding challenges that we would have in the event that the decree stayed in place. So from the time that Daves --

Q So -- oh, go ahead, please.

A -- issued, there were discussions about it moving forward because of its ruling that everyone seemed to be ignoring.

Q So there were two parts to what you just said. The second one was "challenges we might face if the consent decree remained in place." What do you mean by that?

A Well, we were violating our oath of office in the state law every single day because of SB 6. And then a -- the Fifth Circuit had ruled that the judge did not have original jurisdiction over ODonnell -- Judge being Judge Rosenthal didn't have

original jurisdiction to begin with, which would under -- seem to undermine the decree.

Q And so I follow you that you -- at least part of your worry was that you were violating your oath by following the decree when you thought there was a direct conflict between the decree and state law. That first part of your answer, do I understand that right?

A Correct.

Q Okay. Now, the second thing you said was that you understood Daves to mean that Judge Rosenthal didn't have original jurisdiction; right?

A That Daves had overruled ODonnell based on Younger, yes.

Q Yeah. And something you said earlier was that part of your concern or confusion was whether the consent decree was still in effect. Did I understand that right?

A No.

MR. RUSSO: Let me object to form. Misstates prior testimony.

You can answer.

BY MR. FIFE:

Q My question is just if I understood your testimony correctly, so let so feel free to correct

me.

A The consent was in effect. The consent decree was in effect. Whether or not it was validly in effect was a concern because here we were, taking an oath of office to follow the laws of Texas and the United States of America, and we had Texas statutes that we were violating every day.

And we had a federal Fifth Circuit opinion saying that ODonnell had been overruled. It's very complicated and a very untenable and awkward position for a judge who was taken an oath of office to be in.

Q Completely understand. And thank you for your patience in walking me through that. If we could turn to paragraph 6, you said here that you were aware of briefing concerning the impact of Daves II opinion being submitted by Judge Rosenthal in a related proceeding Russell against Harris County. Do you see what I'm referring to in your declaration?

A I do.

Q You say, in the second sentence, "I waited along with my colleagues to see whether a decision in Russell would impact the decree." Did I read that right?

A You read that right.

Q Why did you think a decision in Russell

might impact a consent decree in a separate piece of litigation?

MR. RUSSO: Object to form of the question.

You can answer.

THE WITNESS: Well, we weren't sure how Russell was going to be resolved, but there were similar issues in Russell that had been presented in Daves. And as it turned out, it was resolved because of the Daves opinion for Younger abstention reasons.

BY MR. FIFE:

Q In your view, Russell was resolved based on Younger abstention?

A That is my understanding.

Q Okay. Now, paragraph 7 here says that "in October of 2023, Judge Johnson and" -- I'll insert an "and" there -- "met with other HCCCL judges at a retreat." Was that an in-person retreat?

A It was an in-person retreat out of the county. I believe it was in San Antonio.

Q In the Hill Country?

A I believe San Antonio is in the Hill Country.

Q Sorry. Sorry. So my question here is, you say that "we sought a consensus on whether the judges

would work to revise the decree to comply with state law. The majority of HCCCL judges declined." Did I read your declaration correctly?

A You did.

Q Now, during that meeting, you say here that the question that you asked your judicial colleagues was whether they would work to revise the decree to comply with state law; right?

A That -- that is what's written. But we had a very robust discussion about the state of ODonnell post-Daves and Russell as well.

[redacted]

[redacted] You said there were a concern that you all shared or many of the judges shared. Am I -- did I hear that right?

A Yes, I think that's a fair statement.

Q And that concern was related to what we just talked about, about potentially violating your oath of office?

A And whether or not we had any liability to -- to perpetuate the decree in light of Daves and

Russell. Those were also part of the very same conversation. It wasn't long after both of those decisions that we had this retreat. And the retreat, as I said, was intended for us to discuss matters of relevance to us. That's what we were doing.

Q Yeah. Yeah. No, completely fair. But ultimately, you could not find a majority consensus on how to move forward; is that right?

A That's correct.

[redacted]

Q Okay. Now, there's also quite a bit in your declaration about the county attorney. And I understand that in the fall of 2023, so I believe shortly after this retreat or maybe -- well, let me ask you. You asked the county attorney to hire a lawyer for you and Judge Padilla in this case; right?

A Yes, and I -- we were including Judge Johnson as well 'cause she had expressed interest that she also wanted representation.

Q So you, Judge Johnson, Judge Padilla -- and before we keep going, am I right that she prefers

Judge Padilla and not Padilla?

A That's correct.

Q Okay. I just want to make sure. So you and Judge Padilla requested that Harris County hire an attorney for you all and Judge Johnson in this matter; is that right?

A That's correct, shortly after the retreat when it was clear we wouldn't reach a consensus. You are correct. We asked for representation.

Q Okay. So you knew at that time that -- and based on his prior letter, that Mr. Van Fleet could not represent you in a challenge to significantly modify or vacate the consent decree?

A Yes.

Q And so you sought representation through the county attorney?

A That's correct.

Q And in paragraph 14 here, you say, "I continued communicating with the county attorney's office about my concerns about the decree and being forced to violate state law." Did I read that right? It's on top of page 3.

A Yes, that's correct.

Q And when did the county attorney -- in March of 2024, the county attorney put, on the

commissioner's court agenda, two contracts for legal representation for you and Judge Padilla; right?

MR. RUSSO: Objection to the form.

Go ahead. You can answer.

THE WITNESS: I'm not exactly sure which agenda it was placed on. I just know it was after the -- the primary election at their request.

BY MR. FIFE:

Q So sometime March, April 2024?

A It -- it was after the March primary, which I believe was March 3rd in 2024.

Q That sounds right. And they --

A So we asked -- we asked for a lawyer in the fall. We had a meeting with Menefee in December. And then we were told we're -- commissioners are not -- were not going to put it on the agenda until after the primary election in March. So that's when it happened, after the primary election in March.

Q Okay. And you referenced some of these communications in your declaration in paragraph 9, Exhibit 1-C and Exhibit 1-D. Do you see what I'm referring to?

A I do.

Q Were there any other email threads in this fall of 2023 effort to seek counsel that you didn't

attach to your declaration?

MR. RUSSO: Object to speculation. But you can answer if you know.

MR. FIFE: Sorry. That's a good point, Mr. Russo.

BY MR. FIFE:

Q Are there -- are you aware of any email threads between you and Mr. Fombonne or Representative Menefee who on -- that were not appended to your declaration?

A I -- I'm not aware of any others.

Q Okay. Let me change documents really quickly. I'm going to mark this next document as Exhibit 18.

(Exhibit 18 was marked for identification.)

So this is a email thread filed at Docket 864-4, Exhibit 1-C to the judges' renewed motion for vacatur on the basis of Younger abstention. And you see the first -- this is the last email in the thread is November 13, 2023. So we're still in that post-retreat period that you described?

A Yes.

Q Now, I'm at the bottom of page 3 of this thread. There's an email from Judge Padilla to

Jonathan Fombonne with you CC'd. Do you see that?
A I do.
Q Now, Judge Padilla writes "We are currently parties to a federal consent decree and do not have representation as our colleagues do. There's a conflict of interest that necessitates us having separate counsel." Did I read that right?
A You did.
Q It's in the middle of the email. Sorry. I spoke over you.
A That -- that's what it says. Yes, you read it correctly.
Q Did you understand Judge Padilla to be sending this email on behalf of both of you?
A Yes.
Q When she says that "there's a conflict of interest that necessitates us having separate counsel," is she referring to a conflict of interest between you, Judge Goodhart, and her, Judge Padilla, or you two and the other CCCL judges?
A I interpreted this to mean a conflict of interest between the county attorney's office and us and the other CCL judges. They had a lawyer.
Q Okay. So you --
A The county had a lawyer.

Q I'm sorry.
A We did not have a lawyer. Yeah.
Q Okay. So the conflict of interest being referred to here is on the one hand, you, Judge Padilla, and Judge Johnson, I take it; and then on the other is the county attorney's office and the 13 other judges who did not, at least then, want to join your efforts to seek vacatur or of the consent decree?
A Yes.
Q So you knew at this point in October 30, 2023, that the county attorney's office could not represent you in a motion to vacate or significantly modify the consent decree?
A I think that's fair to say. I think we -- yeah, that's fair to say. I was just looking at the --
Q Yeah.
A Because it says there's an email follow-up to a telephone conversation, so just wanted to -- yeah, that's a fair statement.
Q Excellent. And let me switch documents one more time. Or, well, I'm going to switch a few more times, but so this next document is Exhibit 19, or I'll mark as Exhibit 19.
//

(Exhibit 19 was marked for identification.)

A And after this, if we could take a restroom break, I would really appreciate it.

Q Yeah, this is a completely fine time to break too.

A Okay.

Q Do you want to take five minutes, ten minutes, whatever --

A Sure. Five minutes, just -- yeah, five minutes is great if you don't mind.

Q Yeah. Perfect.

A Okay. All right.

THE OFFICER: We are off the record at 10:42 a.m.

(Off the record.)

THE OFFICER: We are on the record at 10:55 a.m.

Counsel, you may proceed.

MR. FIFE: Wonderful.

BY MR. FIFE:

Q Now, Judge Goodhart, right before the break, I had marked -- this is Exhibit 19. This is Exhibit -- this was filed as Exhibit 1-D to your renewed motion to vacate at Docket 864-5. Now, I just

had a really quick question. So on Tuesday, April 23, 2024, Mr. Fombonne sent this email to you and Judge Padilla and CC'd Andrea Mintzer. Do you see that?

A I see it, yes.

Q And Mr. Fombonne said, "Earlier today the Commissioners Court declined to approve the request for outside counsel. Please let me know if you'd like to discuss." Did I read that right?

A Yes, you read that right.

Q And you understand that -- am I correct that here, Mr. Fombonne is referring to the request from you and Judge Padilla to have the county hire outside counsel for you all in this matter?

A Yes. The request we made in December of 2024 -- I'm sorry -- 2023.

Q Yeah. Okay. So request was in 2023. And that was at least part of the email thread we just reviewed before this. And then it goes up for a vote April of 2024; right?

A It appears that it was -- yes, that appears to be correct, in April of 2024.

Q Now, I guess my question is, what did you understand Commissioners Court to be voting on? Actually, yeah, let me ask it that way. At that time, what did you understand them to be voting on with

regards to your representation?

A Whether they would approve funds for us to have attorneys like everyone else did.

Q Right. So the question was whether the county would pay for your lawyers; right?

A That's correct.

Q Now, did anyone from the county tell you that you couldn't hire a lawyer on your own?

A Not that I recall.

Q And here, you -- am I remembering right that your request was for Mr. Peyton Peebles to represent you?

A Yes, that is correct.

Q And so as soon as you got this email, you could have signed your own retainer with Mr. Peebles, provided you worked out funding or however you all decided to structure it; right?

MR. RUSSO: Object to form. Speculation.

But you can answer.

THE WITNESS: I just want to make sure --

BY MR. FIFE:

Q No, that's a really -- let me retract. That was a bad question. There was no policy, rule, or

regulation that prohibited you from hiring Mr. Peebles on your own; right?

MR. RUSSO: Object to speculation.

THE WITNESS: You mean spend my personal savings to hire myself an attorney? Is that what you're saying?

BY MR. FIFE:

Q Not necessarily. I'm saying there was no -- you were not, at the time -- start over.

At the time, you were not aware of any policy, rule, or regulation that would've prohibited you from hiring Mr. Peebles on your own, whether that be your own personal funds, campaign funds, or some other funding arrangement?

A I was not aware of -- of prohibition against that, if that's your question.

Q And as least as far as you understand it at the time, you could have hired any lawyer you wanted to, whether it was Mr. Kirk, Cooper & Kirk, Cooper, or some other attorney in the city of Houston?

MR. RUSSO: Object to form. Speculation.

You can answer, though.

THE WITNESS: If -- if I wanted to spend my personal savings on a matter of which was in

my official capacity when all my colleagues had attorneys in their official capacities, the answer to that is yes, I could have done that.

BY MR. FIFE:

Q So you're saying yes, you could have hired any attorney of your choosing at the time?

A Yes, I could have.

MR. RUSSO: Object to form.

BY MR. FIFE:

Q Now, we've focused a lot on, like, these specific moments and conversations. And so I just want to take a step back. So at any point from April of 2023, when Mr. Van Fleet sent you the letter withdrawing as your counsel, through this vote in April of 2024, did you ever try to pay for your own attorney?

A With my -- my own funds?

Q Yes.

A I did not pay an attorney with my personal funds for an issue that impacted my official capacity when my -- again, when my colleagues had representation, the county had representation, Plaintiffs had representation, and I did not have representation. No, I did not dig into my own funds and hire a lawyer.

And you mentioned something just a moment ago about campaign funds. There were discussions about whether campaign funds could be used. And there were limitations on, one, what you could use campaign funds for and how much would be considered a contribution in kind.

So it wasn't an option to use campaign funds for election law purposes. And plus I don't have any campaign funds.

Q I guess my question is really, you know, a lot simpler. My only question was just from April of 2023 through March of 2024, you did not try to hire your own attorney to represent you in this matter?

MR. RUSSO: Travis, can I clarify an issue? Are you asking to represent her individually or her as the office as a party?

MR. FIFE: Okay. I'll clarify. So --

MR. RUSSO: So those are two distinct things.

MR. FIFE: Yeah. Good correction, Mr. Russo. I appreciate it.

BY MR. FIFE:

Q So in this case, you recognize you're sued in your official capacity; right?

A I do.

Q Which means that if you leave office, you will not -- you will no longer be a party to this consent decree?

A I -- I understand that.

Q Okay. So my question is, from April of 2023 through April of 2024, did you try to hire an attorney to represent your office in this matter?

A I did not try to secure an attorney with my own funds during that time period.

Q Okay. And I promise I'm not being pedantic. I just -- I feel like you're adding on something to the question I'm asking, which is, whether it be your own funds, a different funding arrangement, an outside funder, whatever it may be, my question is just at any point from April 2023 through April of 2024, did you try to hire an attorney to represent your office in this matter?

And it sounds like the answer is no.

A Well, I -- I think because there -- there are a lot of factors to that question because I was trying to secure representation, which I think is clear through our conversations with the attorney general's office, brainstorming, try to -- trying to figure out, you know, whether we could get representation since the county clearly was not going

to provide us representation despite everyone else having representation.

So the effort to try to secure counsel was there. But your question is specifically about whether I spent money to retain counsel?

Q Yes, my question is narrower.

A And -- and I did not do that. I did not spend my own money. I didn't spend my campaign money because I had no campaign money. And if I had, I wouldn't have been able to spend it. And I -- I wasn't aware of any other funding source to secure an attorney to represent me in my official capacity. So that was my confusion on your question.

Q And I think we just cleared it up. So thank you for bearing with me.

A Okay.

Q Now, relatedly -- or not relatedly, actually, but so from April of 2023 when Mr. Van Fleet withdrew through March -- or April of 2024 when the county declined to pay for representation, did you at any point ask the court-appointed monitors to modify the consent decree in your official capacity as presiding judge of Court 2?

MR. RUSSO: Sorry. Was that through '24?

MR. FIFE: Yes.
MR. RUSSO: Okay.
MR. FIFE: Let me just ask it again to make it clear.
BY MR. FIFE:
Q From April of 2023 through April of 2024, at any point did you ask the monitors to modify or vacate the consent decree?
A I did not specifically ask for a modification or a vacatur, but I did ask for guidance.
Q You asked for guidance. What does guidance mean? What were you looking for?
A The email to the monitors after the deputy was shot in front of the courthouse, the -- the individual that shot the deputy allegedly was on a general order bond.
And when that happened, I sent an email to the monitors and explained to them what had happened and asked for them to give us the authority that would substantiate the idea that the consent decree trumps state law and was still in effect.
Q Understood. And any other requests for guidance to the monitor I might be missing?
A I'd have to review the email just to verify, and I believe it's attached.

Q We'll get to it.
A I believe it's attached, so yeah, I'd have to read it.
Q We'll get to it. But that's the request for guidance that you're talking about?
A That -- that is, yes.
Q Okay. So my question is just, at any point from April of 2023 through April of 2024, did you ask the monitors to modify or vacate the consent decree?
A No.
Q At any point from April of 2023 through April of 2024, did you move to vacate the consent decree on the basis of Younger?
A I did not.
Q From the date of this email, April 23, 2024, to the end of 2024, did you hire outside counsel to represent your office in this matter?
A Did I personally hire outside counsel? I did not.
Q And from the date of this email, April 23, 2024, through the end of 2024, did you move to vacate the consent decree based on Younger abstention?
A When is the motion to vacate?
Q That was in December of 2025.
A You're saying the motion to vacate was

December of 2025? Is that --
Q Yeah, and I believe Ms. Russo would agree with that.
A Okay. Then I did not have -- I did not pay to retain outside counsel during that time period.
Q Meaning you did not file a motion to vacate on the basis of Younger from April 23, 2024, through the end of 2024?
A The -- the only official request for modification was the one that you referred to.
Q In December of 2025? I'm sorry. I just -- I'm not sure what I referred to.
MR. RUSSO: You guys are -- yeah.
THE WITNESS: Yeah.
MR. RUSSO: Y'all are -- you're not --
THE WITNESS: I'm sorry. Maybe we could start --
MR. RUSSO: So just let him ask --
BY MR. FIFE:
Q Wait. I'm sorry, Judge?
A I -- I just -- I think we've had a miscommunication, so if you could just repeat your question, please. I may not have understood you correctly.
Q Okay. Yeah, yeah, yeah. No, it was

supposed to be a very straightforward question. And I'm sorry. So from April 23, 2024, through the end of 2024, did you move to vacate the consent decree on the basis of Younger?

A I did not.

Q Okay. And same time frame, April 23rd of 2024 through the end of 2024, did you ask the monitors to dissolve the consent decree on the basis of Younger abstention?

A I did not.

Q Okay. Now, you've mentioned a few times the efforts you made with the attorney general's office, and I would like to turn there. So you had a conversation with Mr. Grant Dorfman that we talked about earlier in -- was that April of 2023? Is that right?

A That sounds about right.

Q Okay. Spring of 2023. I'm just making sure I understand the timeline. Then in 2024, you had additional conversations with the attorney general; is that right?

A Yes.

Q Judge Goodhart, if you could turn back to your affidavit.

A Okay.

Q So in 2025, you sent an email to Grayson Coker. Am I saying that right, Coker?

A I -- I think that's how he says his name.

Q Okay. Well, with apologies to Grayson if I'm doing -- if I'm mispronouncing it. But so in paragraph 12, you described this email that you sent in -- or a letter in April 28, 2025, to Grayson Coker; right?

A Right. That was on the heels of the shooting as well.

Q Yeah. And Mr. Coker works for Senator Joan Huffman; is that right?

A He -- he did at that time. I'm not sure if he still does or not.

Q At that time in April of 2025, Senator Huffman was the lead sponsor and drafter of several pieces of bail legislation and constitutional amendments; is that right?

MR. RUSSO: Object to speculation.

But if you know.

THE WITNESS: I'm not sure --

BY MR. FIFE:

Q Are you aware that she was? I'll tell you she was, but were you aware of that?

A I -- I was aware she was involved in SB 9

legislation.

Q Yeah. And I'll -- there were also, like, two constitutional amendments she was working on. But so I'm going to mark as Exhibit 20 -- or actually, let me just make this even cleaner. So in that paragraph, you say that you attached a true and correct copy of the letter to Grayson as Exhibit 1-E; is that right?

A Yes.

MR. FIFE: So this will be Exhibit -- are we on 19 or 20?

THE OFFICER: You just entered Exhibit 20, and I believe it's the letter you're --

MR. FIFE: Okay. Great. Let me --

BY MR. FIFE:

Q So, Judge Goodhart, I'm marking this as Exhibit 20.

(Exhibit 20 was marked for identification.)

This is a letter from -- or is this the letter that you described in that paragraph of your declaration? And I can -- I'm happy to scroll through it.

A Yes. Yes, it is.

Q Okay. And this was filed on the docket as document number 864-6. It was Exhibit 1-E of your

renewed motion to vacate on the basis of Younger abstention. Why did you select one of Senator Huffman's staffers to send this letter to?

A Again, we were seeking help at any -- at every turn, and I thought that Senator Huffman, being the chair of the criminal justice committee, might be able to give us some guidance on where we could get representation in this matter. And it was Mr. Coker who called me back.

Q Okay. And did --

A Or maybe he emailed me. I'm not sure how, but he -- once I reached out, he's the person that I believe reached back out to me.

Q And did Senator Huffman or someone from her office provide recommendations for representation?

A No, short of the AG -- short of the AG's office.

Q Okay. And in the middle of the first paragraph, you say that the AG's office "expressed interest in either representing us or intervening because of a state interest"; right?

A That's right.

Q And just before we do this next sentence, Ms. Gdula is Kimberly Gdula of the attorney general's office? She's a lawyer in that office?

A Yes.

Q And it says "I spoke to Ms. Gdula on these" -- and it lists out dates and dates you left messages. These dates where it's 4/8 4/15, 4/23 and 4/16, do you see those dates I'm referring to?

A I -- I do.

Q And these are dates in 2025; is that right?

A I believe so.

Q And in the middle of the first paragraph, in recounting your conversations with the attorney general, you write "We were and are concerned that we are being forced to violate state law daily because of the decree." Do you see that?

A I do see that.

Q Who is we?

A I would take we to be me and my Republican colleagues: Judge Johnson, Judge Garcia, and Judge Padilla.

Q And so --

A Although that's what was referenced there, but I -- I do know my other colleagues were concerned as well.

Q You know, that your other colleagues were concerned with being forced to violate state law daily because of the decree?

A Yes.
Q And these were the concerns that you brought to the attorney general's office and Ms. Gdula?
A That, among others.
Q What were the others?
A The Fifth Circuit decision in Daves and the result in Russell, which I think are referenced on the attachment to this email.
Q There was a attachment to this email?
A There was a --
Q Judge Goodhart, would you mind if we went off the record for two seconds?
A Sure.
THE OFFICER: Off the record at 11:17 a.m.
(Off the record.)
THE OFFICER: We are on the record at 11:18 a.m.
Counsel, you may proceed.
BY MR. FIFE:
Q Now, I apologize for the abrupt break, Judge Goodhart. But you said previously that you had attached a letter or some additional document to this email to Mr. Coker. It sounds like, though -- I'm not seeing any evidence of an attachment, and I'll tell

you that one wasn't produced in discovery to us. Would you be thinking about a different email?

A I think I misspoke. It's the two-page document that was sent to Mr. Coker about issues with bail in Harris County and why we should be concerned about it.

Q Okay. And --

A So if -- if -- I misspoke. I thought it was an attachment to this email, but it must not have been.

Q Would there have been a separate -- would you have sent it as a separate email?

A I don't recall.

Q You don't remember how you would've transmitted this letter to Mr. Coker?

A Oh, this -- this is an email that we're looking at.

Q Yeah.

A Exhibit 1-E.

Q Sorry. Sorry.

A Yes.

Q Let me rephrase because we're getting mixed up. Do you -- so at some point, maybe not in this email, but at some point, you sent a document that kind of laid out your views on the consent decree;

right?

A Yes, I think that's what you referred to when we were off the record, the two-pager.

Q Okay. So we will come back to that in due time, then. But my question was just, you don't remember how you transmitted that guidance document to Mr. Coker?

A Any document I sent to Mr. Coker would've been by email.

Q Okay. Do you remember that you did in fact transmit him that guidance document?

A I thought I did. I'd have to look at the actual document to confirm.

Q Okay. We can take this up in a second.

A Okay.

Q Now, you said that some of your other concerns were related to the Daves II opinion when we were discussing this sentence: "We were and are concerned that we are being forced to violate state law daily because of the consent decree."

A Yes.

Q So it's your testimony that one of the things you were concerned about was Younger abstention as it relates to the ODonnell consent decree?

A That's a fair statement, yes.

Q Okay. Do you have this email in front of you?
A I do not. Oh, I can see what you're publishing.
Q Yeah.
A But aside from that, I don't have another copy.
Q Can you -- is it zoomed in enough to where you can read it?
A Yes, I can see it.
Q Can you identify anywhere in this email where you mention Younger abstention?
MR. RUSSO: You want her to go off the record and review it?
MR. FIFE: I'm happy to sit here.
MR. RUSSO: Okay.
Take your time.
BY MR. FIFE:
Q Yeah, no rush.
A Can you scroll down for me, please?
Q Of course. And it's zoomed in enough for you?
A It is. Okay. You can keep going. It -- it does not mention Younger.
Q So it's your testimony, then, that you were

concerned about Younger abstention, but nowhere in this email to Mr. Coker did you mention Younger abstention?

A That's correct.

Q And you also stated in here that -- you said, "as the Harris County commissioners refuse to provide counsel for us to appear in federal court." Do you see that at the bottom of paragraph 1?

A I see that.

Q When you say "Harris County commissioners refuse to provide counsel for us," you're referring to yourself and Judge Garcia, Johnson, and Padilla --

A Yes. Yes.

Q Thank you. I'm sorry. I promise I'll be better about -- I just -- I keep interjecting when I feel like my questions are unclear, and it's cutting you off. I'm sorry.

So when you say the Harris County commissioners refuse to provide counsel, is what you're referring to that vote we discussed in April of 2024 where they declined to provide funds for your counsel?

MR. RUSSO: Object to form.

THE WITNESS: That, and Mr. Fombonne's representation that they had already declined to

provide us counsel, so yes.

BY MR. FIFE:

Q And by provide counsel, you mean --

A Commissioners Court --

Q Excuse me?

A Commissioners Court-approved funding for counsel.

Q Okay. And again, they did not prohibit you from retaining counsel on your own?

A They did --

MR. RUSSO: Object to form.

MR. FIFE: Yeah. Good point, Mr. Russo.

BY MR. FIFE:

Q The Commissioners Court did not prohibit you in your capacity as judge of Court 2 from finding representation in this matter on your own?

A They did not.

MR. RUSSO: Object to form. Calls for a legal conclusion.

BY MR. FIFE:

[redacted]



Veritext Legal Solutions
800-336-4000

[redacted]

MR. RUSSO: Let me object here.
Don't answer that. It's outside scope.
MR. FIFE: I -- respectfully, Mr.
Russo, you all attached this document to your renewed motion to vacate. You put it at issue.
MR. RUSSO: I get -- the topic is what the topic is.
BY MR. FIFE:
[redacted]

[redacted]

BY MR. FIFE:

Q So this email, scrolling back up to the top of page 1, this email was sent on April 28, 2025; right?

A Yes.

Q So at this time, you had been in office for about two years and four months, give or take?

A That's correct.

Q And up to that date, you had asked the county to pay for a lawyer of your choosing; right?

A Yes.

Q And you had asked the attorney general to represent you in this case for purposes of asserting conflicts between state law and the consent decree; is that right?

A And Daves.

Q What does "and Daves" mean?

A Meaning the discussions I had with the attorney general's office in seeking their representation included discussions about Daves overruling ODonnell and the conflict with state law.
Q Okay. From January 1, 2023, to April of 2025, did you attempt to hire a lawyer -- or scratch that.
From January 1, 2023, to the date of this email, April 28, 2025, did you speak to any other attorneys or law firms about representing you in this matter?
A I spoke to some other lawyers to try to brainstorm, and I'm not exactly sure the dates of it. I feel like it's in this time period. Spoke with some other lawyers brainstorming who might be able to represent us pro bono or if there were any other organizations that would be willing to step up and represent us in this matter.
Q And --
A And the bottom line was nobody was going to take this on for free.
Q Let me -- there was a lot in there. Let me work through it. So you did talk to other lawyers about pro bono representation or some other organization that might provide pro bono legal

services; right?

A Correct.

Q Do you have any -- and don't guess; I'm not asking for that. But do you have any indication of whether that was before or after April 28, 2025?

A I can tell you if you let me refresh my memory with the document that's been --

Q Is it on -- would the yellow -- would it be the yellow pages that this would be on?

A This? Yes.

Q Okay. Let's actually introduce that now, then, and just make sure everyone's looking at the same thing. Do you have a copy of those with you?

A I do not.

Q Okay. I'm going to mark this as Exhibit 21. It was produced yesterday, beginning at RCCCL-00001948.

(Exhibit 21 was marked for identification.)

So and now that we're here, can you just walk me through, like, what this document is? And I'm happy to give you as much time, scroll through it as you need.

A It's my personal notes just keeping track of who and when I made contact with people in an effort

to get assistance in this matter.

Q Okay. And the first date on here is August 12, 2024. Do you see that?

A I see that.

Q And you would agree, like, these notes are chronological, at least to the best of your ability?

A I think for the most part they are, yes.

Q Yeah, I think there's a few --

A There might a few -- there are a few, yeah. But I think for the most part, they are.

Q Okay. Yeah. So and did you make these contemporaneous with the conversation, or was this, like, "Oh, I need to write all of this stuff down because it's becoming more important or my lawyer senses are going off"?

A It was contemporaneous.

Q Okay. So you kept the same, like, legal pad jotting all these notes down as you had calls?

A That's right.

Q Okay. So this wasn't made like post hoc, like after Mr. Russo represented you and, you know, we were in this motion to vacate litigation?

A No, I was making these entries as they were happening, for the most part. Or maybe the day after, I'd go back and note it. But contemporaneous.

Q Yeah, but more or less contemporaneous. Okay. I'm going to take a wild guess here. And I think -- I want to say, are these the additional lawyers that you reference?
A Yes, and that was August 12th of 2025.
Q Okay. Great. So when you said, "Can I refresh my recollection," you were talking about this entry in your notes?
A That's correct.
Q Wonderful. Who is Paul S.?
A Paul Simpson.
Q Is he a lawyer?
A He is.
Q Do you know what firm he practices at?
A I don't recall the name of his firm.
Q Is he Houston-based, Texas-based?
A He is.
Q Okay. So we have Paul Simpson. M.J. Smith, who's that?
A Mary Jane Smith.
Q Same question, what is her -- where is she located and, like, what firm is she at?
A She's not an attorney, and she is located in Houston.
Q Why did you speak with her?

A Mary Jane Smith is involved in local Republican politics, and so we're friends through that avenue. And she's also friends with Paul Simpson.
Q So was this all one meeting, or was this multiple meetings?
A That was one meeting.
Q Okay. So we have Paul Simpson, attorney; Mary Jane Smith, non-lawyer but active in Harris County Republican politics. And then is this Jay Munisteri?
A It is.
Q And so is Jay -- Jay Munisteri is a lawyer; right?
A He is.
Q Where does he practice?
A In Houston.
Q What firm does he practice with?
A Not sure.
Q Okay. And then you have J.P., L.G. -- and I'm going to guess that this is P.G.?
A You can't read my writing? It is. It is P.G.
Q I was thinking to myself, you know, if I had to be the one to produce these contemporaneous notes, I would've had a much harder time understanding my own

writing. So but this refers to Jessica Padilla, Linda Garcia, and Paula Goodhart; right?
A That's correct.
Q Okay. So three judges and then two lawyers and a local Republican advocate is what the meeting was; right?
A Correct.
Q And Jay Munisteri, he was involved in the earlier proceedings in this case, if I remember right?
A I believe he had some involvement the early stages of ODonnell.
Q Okay. Did he work for the county attorney?
A I don't think he worked for the county attorney. He was a private lawyer.
Q Okay. But you're not sure what exactly his involvement was in ODonnell previously?
A I -- I know he was not on our -- our team. I -- I don't recall what his capacity was, what his involvement was. But I know he was not --
Q But he was there?
A He -- he was there, yeah. And -- and he was not an option to represent us in -- in our renewed challenge to the decree because he felt like he had a conflict.
Q Were you asking Paul Simpson to represent

you?

A Not specifically because Paul wasn't going to do it for free, so --

Q But was he willing to do it on a hired basis?

A I think he -- I'm not sure. But I think that if we'd had a conversation about having enough money to hire him to get involved in this very complex matter, that he -- he -- I'm speculating, but I think he would've entertained that idea.

Q Okay. So just bringing us back to how we got here, I asked you from January 1, 2023, to April of 2025, did you speak to any other attorneys or law firms about representing you in this matter. And you said, "I talked to some other lawyers at some point. I need to refresh my recollection." Is that a fair summary of the discussion we had a couple minutes ago?

MR. RUSSO: Objection. Misstates the record.

You can answer if you want.

BY MR. FIFE:

Q Let me just ask it simpler.

A -- ask -- rephrase.

Q Outside of -- excuse me, Judge?

A I just asked you to rephrase your question.

Q Yeah, totally fair. On August 12, 2025, you met with Paul Simpson, Mary Jane Smith, and Jay Munisteri; right? You had a meeting with them?

A I did, yes.

Q And I believe you said that the purpose of that meeting was to get help in finding representation, either pro bono or an organization that could represent you all pro bono; is that right?

A That is correct.

Q Okay. Now, my only other question is, outside of this meeting on August 12, 2025, what other lawyers besides the county and attorney general did you talk to about representing you in this matter?

A I don't believe there were any other lawyers. Of course there were a lot of lawyers I talked to about the predicament we were in 'cause I have a lot of lawyer friends.

But to your specific question, did I seek to spend my own money hiring another lawyer or get another lawyer to work pro bono? I don't recall. I was focused on the AG's office during that time period. So I don't recall, to answer your question.

Q So and I appreciate that clarity. That's a really helpful answer. And I just want to make sure I'm understanding. So you have a lot of lawyer

friends who you talked to about the ODonnell consent decree and your -- I think your word was "predicament"; is that right?

A It is quite the predicament. Yes, that was my word.

Q And but the only conversation you specifically had about getting pro bono representation in your capacity as judge of Court 2 in this matter was this August 12, 2025, meeting that we've been talking about?

MR. RUSSO: Object to form. Misstates prior testimony.

THE WITNESS: No.

MR. RUSSO: You can answer.

THE WITNESS: No. I had those conversations with the attorney general's office, of course with my colleagues. I mean, nobody wanted to help us, Mr. Fife, with our request to challenge the decree, for reasons I think you know.

And so my focus was trying to get assistance through the county attorney's office and Commissioners Court to represent me in my capacity as, you know, a judge. I spent almost a year in conversations with the AG's office about whether they could represent us, if there was a way, if there

was -- you know, really trying to explore that option.

And during that time, I believe we had conversations about whether, if they couldn't represent us, what other options we had, which would've included conversations about pro bono attorneys or organizations.

I don't recall specific conversations or meetings other than this -- other than what I've just said and this meeting in August of 2025.

BY MR. FIFE:

Q Okay. I understand now, and I appreciate that. I was a little confused, though. You said no one wanted to help you for reasons that you think I'm aware of.

A That's right.

Q I'm actually -- I'm curious what those reasons are.

A Because --

MR. RUSSO: Let me object. Calls for speculation as to what you're aware of.

But you can answer.

THE WITNESS: I think it's clear from the county thwarting our efforts to challenge the decree at every turn that they did not want to be in federal court with a challenge to the decree.

BY MR. FIFE:

Q Of course, the county agreed to the consent decree; right?

A The county did agree to the consent decree, but it's my impression that the county -- and certainly this is corroborated by their lack of willingness to help us -- did not want to be back in federal court in front of Judge Rosenthal with a challenge to the decree given the Daves opinion and given the change in state law.

Therefore, they thwarted our efforts at every turn, including the denial of representation when our colleagues had representation, the county had representation, the sheriff had representation, the plaintiffs had representation.

The only people who had no representation were those who were challenging the decree, which is me and my three Republican colleagues.

Q Okay. And I don't think this is what you were saying, but just to be clear, the county is not paying the plaintiffs -- to represent the plaintiffs?

A Well, I do know that the plaintiffs --

MR. RUSSO: Object. Let me object to form. Speculation. And I don't know what the point of that question is.

But if you can, listen to the question and answer what he's asking.

THE WITNESS: Sure.

BY MR. FIFE:

Q And when you say thwarted at every turn, you mean that the county denied your request to pay for -- to allocate funds for representation in this matter?

A I can't answer that with a yes or no.

Q How would you answer it?

MR. RUSSO: Object to the form. Asked and answered.

But go ahead.

MR. FIFE: That's fair enough. Let's move on.

BY MR. FIFE:

Q So can we -- while we're here on Exhibit 21, the yellow pages, this was produced to us yesterday after you all filed your renewed motions to vacate on Monday. And is there anything in this document that you feel is not captured in your declaration?

MR. RUSSO: Take your time to review it.

BY MR. FIFE:

Q Yeah, yeah, yeah, yeah. And I'm, again, happy to scroll through this.

A Okay. If you could scroll down. Okay. Please continue. Okay. I think this --
Q Excuse me?
A You can continue.
Q Oh, sorry.
A Okay. Just as of right now, I think the one thing that's -- that is not precise in the declaration, but it is mentioned that for several months I was communicating with the AG's office about potential representation or involvement is -- it -- it doesn't mention that I did send that two-pager to Ms. Gdula which I referenced earlier which expresses our concerns about Daves as well.
Q Okay. Great.
A And that was in May of 2025. So when referring to the two-pager, that's what I'm referring to.
Q And let's finish with just -- because, I mean, candidly, like, my kind of question is like, this was produced after y'all filed the motion. What am I missing here?
And so let's continue on with the question of just outside of the two-pager, which is referenced in your notes but not in the declaration, is there anything else referenced in here that didn't make it

into the declaration?

A I --

MR. RUSSO: Go ahead and answer.

THE WITNESS: I believe the meeting that I had on Teams in May -- on May 13th of 2025 is not in the declaration. If you can -- I'm sorry -- scroll down.

BY MR. FIFE:

Q We went over these. And then it's --

A I don't know that the 4/27 email with Grayson Coker - I'd have to review that. I'm not sure that's mentioned in -- in the declaration. And certainly the texts that I sent that I referenced here on April the 30th, those are not mentioned in the declaration.

Q So let me ask you about this 4/30 texts. So Ray Hunt is an executive with the Houston Police Officers Union; right?

A That's correct.

Q Very nice guy. And then Andy Kahan is with Houston Crime Stoppers?

A Yes.

Q Who is Jesse?

A Jesse is Jesse McClure.

Q What's her role -- relationship to you?

A Jesse McClure is a friend of mine, and he is also a judge.
Q Judge in Harris County?
A No, he is a judge in the state of Texas.
Q Okay. And this says something like Darrage Davila. Should this have been Darrell Davila in the lieutenant governor's office?
A That -- that's what it says. You just can't read my handwriting. That's --
Q Again, you're still doing much better than I would, so I --
A That -- that's Darrell -- that's Darrell Davila.
Q Okay. And then here it says "Coker responded to email." What did he respond?
A I -- I'm not sure. I'd have to look at it.
Q Okay. But that response wasn't in the email from Mr. Coker that we reviewed earlier? I believe it was Exhibit 20.
A I'm not sure. I'd have to look at it and see to refresh my memory.
Q I'm flipping -- did it -- did my screen change?
A It did. I can see the April 28th email.
Q Yeah. So this is back to Exhibit 20, which

is Exhibit 1-E of y'all's renewed motion to vacate. So there's a response that Mr. Coker sent to you to this email?

MR. RUSSO: Object to form.

BY MR. FIFE:

Q Is there?

A All I can -- all I can --

MR. RUSSO: Hold on a second. Misstates the record.

But go ahead.

THE WITNESS: All I can tell you is what my notes say, and I'd have to review that email, but --

BY MR. FIFE:

Q Okay. I'll flip -- flipping back to Exhibit 21, the yellow page notes that were produced yesterday, these texts to Mr. Hunt and Mr. Kahan, did they -- were they in the hopes of retaining counsel or recommendations for counsel?

A Yes.

Q Okay. What did you text Mr. Hunt?

A I don't recall, but he never replied.

Q Okay. What did you text Mr. Kahan?

A I don't recall, but he didn't reply either.

Q Okay. So these text messages on April 30,

2025, were to seek advice on finding a lawyer, but at least Mr. Hunt and Mr. Kahan didn't respond?

A That's right.

Q Okay. Turning to page 4, so this -- I just wanted a little bit of clarity on this May 28, 2025, entry. Can you help me understand who is Larisa -- these are all people in Commissioner Briones' office?

A Yes. That -- that's my belief, yes.

Q Okay. What was the purpose of the meeting with Commissioner Briones's office?

A Well, again, this is my efforts to get help to challenge the decree. I wanted to let Commissioner -- she was not on the meeting. It was her -- you know, her -- her folks on the meeting.

Q Okay. Yeah. Yeah.

A I wanted to make them aware of the predicament that we were in in Harris County and that we were -- what we were doing on a daily basis so that they would be aware of what was happening 'cause I wasn't -- I wasn't sure that they knew exactly what it meant to be perpetuating the decree.

Q What exactly did it mean, in your view?

A It meant that we were continuing to operate under a case that had been overruled by Daves and contrary to state law.



Veritext Legal Solutions
800-336-4000

Q Okay. Now, 5/30/2025, you sent the request to modify the consent decree to the monitor and colleagues; is that right?

A Right. That's right. My colleagues were all of the judges.

Q And so when you say spoke to Kim, is that Kimberly Gdula again?

A Yes.

Q At the -- on these August 4, 2025, phone calls, did you -- did the AG offer to represent you? What was the content of these phone calls?

A No, at that point, it -- it was clear that they were not going to represent us, that they could not represent us because we are county employees instead of state employees.

So at this point -- and I -- I don't know specifically when that decision was made, but by at this point when the modification request was sent to the monitors, I felt like I knew that the -- the attorney general's office could not represent us.

Q Okay. At this point, did they communicate to you their intent to intervene in the lawsuit?

A I don't believe so.

Q Yeah. Because it wasn't too long after this that they did give us notice at least that they were

planning to intervene, maybe late -- a couple weeks afterwards. And then we already talked about this August 12th meeting with Paul Simpson, Mary Jane -- Mary J. Smith and Jay Munisteri.

A Which, that was after we sent the request to the monitors.

Q Yes.

A So we were still seeking representation.

Q Okay. And just last thing on these yellow pages, so you had a meeting with John Fombonne on April 30, 2025; is that right?

A It appears so.

Q And this was about a month before you sent the letter to the monitors?

A Yes -- no, I think it was more than a month, but yes, it was before that.

Q What is this AG memo representation?

A Mr. Fombonne had mentioned something about -- the conversation -- there was conversation about the county representation of -- of county employees. And he brought up that the county cannot represent an individual in a disciplinary matter, only in matters that occur in their official capacities.

And so he referenced an attorney general memo about that, that if -- if, you know, there's a

county employee that acts outside of the color of their office, that they are not entitled to representation, such as in an -- as in a disciplinary matter.

Q Okay. And you asked how are -- "how we in everything didn't participate in the settlement." Am I right to understand that as "are we bound by this when we didn't participate in the settlement?"

A I think we wanted -- we -- the goal of this meeting was to get the authority for everything that he was saying. And so I -- I think that somebody brought the question of, okay, we know we got subbed in. How -- how did that -- well, let me rephrase that.

We know we -- we are bound by the decree. How did that happen when we didn't sign the original consent decree?

Q Yeah. And what is this, "validity about decree"? What does that mean?

A I think it was conversation about whether the -- the consent decree is -- is valid based on, again, the change in state law and that it had been overruled. And we were asking for the authority on that because when we asked that question, the answer was it's a court order.

But nobody -- and that was requested as far back as the monitors' meeting in April of 2023. And nobody would ever provide us with the authority for that position. So we'd specifically asked for the authority for that. And he agreed to do that, but he didn't -- he never responded.

Well, he did respond, but it was two months later. So again, no assistance from the county attorney's office.

Q Yeah. Yeah. Who of course has a different litigation position than you did at the time; right?

A Right, which is why we would've benefited from counsel.

Q Exactly. Okay.

A Denied that after repeated requests for it.

Q Now --

A And I believe --

Q Go ahead.

A That's okay. I'll wait for your next question.

Q Okay. Really quickly, so earlier you mentioned that you sought guidance from the monitors' office in relation to a shooting of a constable; is that right?

A Yes. I sent an email to -- to the monitors.

Q Okay. I'm going to mark this as Exhibit 22.
(Exhibit 22 was marked for identification.)
So Exhibit 22 is a document filed at 864-7 in this case, which you all marked as Exhibit 1-F to your renewed motion to vacate. I want to turn our attention to page 4, to start out with. Actually, if we can just start at the bottom. So this is page 5 of Docket 864-7, Exhibit 22. So this is an email from you, Judge Goodhart, to Brandon Garrett and Sandra Thompson; right?
A Yes.
Q And those -- Brandon Garrett and Sandra Thompson are the court-appointed monitors over the consent decree?
A Yes, they are.
Q Cory Stott is your staff attorney; right?
A Yes. And -- yes.
Q No, go ahead.
A I was just going to say he started, I believe, in early February of 2025.
Q Oh, Mr. Stott started in February of 2025?
A I believe it was early 2025.
Q And did he replace Ashley Guice?
A He did.

Q And that was because she got appointed to the seat that Judge Draper vacated?
A Correct.
Q So here you say -- and this is April 3, 2025. You write to Brandon -- or sorry -- Dr. Garrett and Dr. Thompson that "a Harris County deputy constable was shot on Monday. The individual accused of shooting Deputy Jones was released on April 16th on a general order bond."
You then say, at the end of this email, "Please provide me the legal authority you rely on to perpetuate the decree despite state law that requires all class A and class B" -- sorry -- "all class A and B misdemeanors arrestees to have an individualized hearing." Did I read that right?
A You did read that correctly.
Q By including Mr. Stott on this email, did you understand him to be acting as your attorney?
A No.
Q Why did you include him, then?
A Because I wanted our staff attorney and court administration to be aware of my communications with the monitor.
Q Okay. So this communication with him is not privileged? Or, well, sorry. Let me back up. That

didn't make sense.

Outside of CCing him on this email, you communicated with Mr. Stott about your views on the consent decree; right?

A Mr. Stott knew what our position was on the consent decree because --

Q But did he -- in your capacity as County Court at Law 2 or Court 2, did Mr. Stott provide you legal advice on navigating what you've referred to as a predicament related to violating your oath of office?

A Not -- not any more than he advised all the other judges. I mean, he is the lawyer to all of the judges. So he did not represent me in a capacity -- in an individual capacity.

Q Okay. So he didn't represent you in -- he was not acting as your lawyer when you communicated with the monitor team?

A Did not have a lawyer when I communicated with the monitors.

Q You were pro se?

MR. RUSSO: Objection.

THE WITNESS: Apart from --

MR. RUSSO: Legal conclusion.

Go ahead.

THE WITNESS: Apart from Mr. Stott.
BY MR. FIFE:
Q I thought you just said he wasn't acting as your lawyer when you communicated with the monitor in this email.
A I'm sorry. Repeat your question.
Q Yeah. Sorry. And this --
A I may have gotten -- got sidetracked by the objection. Go ahead.
Q And this is purely just like, I don't know, so it's not like -- it's an agendaless question. It's just, when you communicated with the monitor about this conflict with state law, was Mr. Stott your attorney for those purposes?
A No.
Q Okay. Because you didn't have representation in this matter when you made this communication; right?
A That's correct.
Q So you were acting pro se when you made this communication, and you included Mr. Stott just to -- for his awareness because he is your staff attorney?
A Okay. That's a -- a couple of different questions. So do you want to break it downs?
Q Sure.

A Okay.
Q So you included Mr. Stott in this email; right?
A Yes.
Q And you said you did so because you wanted your staff attorney to be aware of your communications with the court-appointed monitor; right?
A That's correct.
Q So when you sent this email, you were acting pro se, and Mr. Stott was just included for his awareness?
A When you say pro se, I wasn't acting as an attorney in this email. I was acting as a judge who --
Q I see. I see.
A -- is being overseen by federal monitors. And I was communicating with the federal monitors. So no, I was not acting pro se.
Q I see. You were acting on your own behalf, and Mr. Stott was not your attorney for this purpose in raising these questions to the monitor?
A You are correct.
Q Okay. So up until this email to Mr. Garrett, had you ever -- so the two data points that we've covered are you raised concern about a conflict

with state law in March of 2023 to the monitors; right?

A Correct. And yeah, and Daves. I'm sorry. That's not correct. Daves haven't come out yet.

Q Yeah.

A Yes, you are correct. Because SB 6 been passed before I took the bench.

Q Yeah.

A So yes, you are correct about that.

Q And you sent this email in April 2025; right?

A Yes.

Q Now, other than that, were there any other moments where you asked for guidance or clarification from the monitors directly?

A Not that I can recall.

Q Okay. So up until April 23, 2025, you had not requested that the monitors consider a modification or vacatur of the consent decree?

A I had not.

Q Including you had not asked them to dissolve, vacate, modify the consent decree on the basis of Younger abstention; right?

A The first motion to modify was the only motion to modify, which is the one that -- that was

sent to the monitors in 2025.
Q The first time you -- so what you're saying is the first time that you asserted Younger abstention was the first motion to modify, which I'll tell you was filed on December 11, 2025; right?
A That's not what I said. What I said is the first time I officially requested a modification from the monitors was in the fall of 2025.
Q Oh, okay. I'm -- that's my fault. I misheard you. So that means that before this email, you had not asked the monitors to modify, vacate, dissolve the consent decree on the basis of Younger?
A I made no other requests for modifications other than the one that I made.
Q Okay. And --
A Official requests for modification, I should say.
Q And by official, you mean directly to the monitor in a letter saying, "I am proposing this"?
A Right, because there were certainly efforts behind the scenes.
Q Yes. And I promise we're coming close. I'm marking this --
MR. RUSSO: -- going to say --
MR. FIFE: What?

MR. RUSSO: I'm sorry. I was going to say, do you want to take a quick break and go to the bathroom and --

MR. FIFE: Yeah. Yeah.

MR. RUSSO: Yeah.

MR. FIFE: This is a -- yeah, this is a good time.

THE OFFICER: We are off the record at twelve --

MR. FIFE: Is that okay with you, Judge Goodhart?

MR. RUSSO: Is that okay with you? Is that okay with you?

THE WITNESS: Sure. We can take a break.

THE OFFICER: We are off the record at 12:10 p.m.

(Off the record.)

THE OFFICER: We are on the record at 12:26.

Counsel, you may proceed.

BY MR. FIFE:

Q Judge, we've talked a few times about a one -- or a guidance document that you sent or a two-pager, and I just wanted to make clear what we're

referring to. So on Exhibit 21, in the middle here, we talked about an -- oh, in the -- towards the end of page 2 of Exhibit 21, you say -- or you wrote "Sent two-pager and judging transcript." Do you see that?
A I can't see what you're referring to.
Q Oh, sorry. What were we saying earlier about tech savviness? Can you see it now?
A Yes, "sent two-pager and jugging transcript."
Q Oh, jugging as in the crime?
A As in the crime.
Q And that was just made a crime last legislative cycle; right?
A I believe so. But before that, a burglary of a motor vehicle could be filed as a jugging if the facts and circumstances were appropriate.
Q Okay. So the two-pager that you just mentioned, I just want to confirm for the record that it's this document that begins on RCCCL 1970 and was produced last night. I can scroll through it, but this is the top.
A Can I see the second page and confirm that is the two-page document? Okay.
Q Yeah.
A Yeah, that's the two-page document where it

addresses the Fifth Circuit reversal.

Q Yeah. And then you have these two more pages of GOB examples; is that right?

A Yes, I created -- I created that, yes.

Q Okay. And so again, this is Exhibit twenty --

MR. FIFE: Court Reporter, could you help me out? I'm sorry. I want to mark this exhibit. And am I on 22?

THE OFFICER: You're on 23.

MR. FIFE: Okay. So I'll mark this as Exhibit 23.

(Exhibit 23 was marked for identification.)

BY MR. FIFE:

Q And I just want to confirm, Judge Goodhart, that this is the two-pager that we just discussed on your notes, which is Exhibit 21?

A I believe so.

Q Okay. And this is a true and accurate copy of the two-pager that you sent to certain officials?

A Yes.

Q Okay. Now, in the break, we discussed an email thread that began April 23, 2025, with your request for a legal authority to the court-appointed

monitors. Do you remember that?
A I do.
Q And I asked you if at that time, you had asked them to vacate, modify, or dissolve the decree on the basis of Younger abstention or some other basis. And you said that the only modification that you sent to the monitors, formal modification, was the one that was sent in later in 2025?
A That's correct.
Q Okay. I'm going to mark this as Exhibit 24. And this is Docket Number 740-2.
(Exhibit 24 was marked for identification.)
It was originally filed to one of the attorney general's motions back in August of 2026, again, Docket 740-2. So this is an email from you to again, Dr. Garrett, Dr. Thompson, who are the court-appointed monitors; right?
A Yes.
Q And you CC'd a number of people. So CTY criminal judges, this is, I'm guessing, a listserv that would've sent it to all of your judicial colleagues?
A Yes.
Q And Ed Wells and Sylvia Cherry work in,

like, court management and administration for the misdemeanor judges?
A Ed Wells is the court manager, and Sylvia Cherry is the deputy court manager.
Q Wonderful. And same question as before about Mr. Stott, your staff attorney. Here, what is the purpose of CCing him on this email?
A Just a notice issue since he's our staff lawyer. Yeah.
Q Yeah. And so at least as far as it's a formal request to modify the consent decree, Mr. Stott was not your lawyer for that purpose?
A That's correct, nor could he be.
Q Yes. You were acting on your own behalf?
A He -- he could not represent me given that he represents all 16 judges.
Q Yes. Yes.
A So I sent it -- I sent it on my own behalf and was joined by my colleagues.
Q That was my next question. So at the bottom of the document here -- this is page 4 of Docket 74-2 -- it says "Respectfully submitted, Paula Goodhart, Leslie Johnson, Jessica Padilla, and Linda Garcia." Do you see that?
A I do.

Q So this request for modification, you sent the email, but it was on behalf of the four judges listed at the bottom of page 4 here?
A Yes.
Q Okay. Sorry. Now, so -- apologies for my slow computer. So the first page -- or rather, page 2 of ECF 740-2 is just your cover email. But you attached a proposal to modify; right?
A Yes.
Q And that proposal to modify begins here on page three of the exhibit. And you can see here it has an explanation of why you believe modification is necessary?
A Correct.
Q And then a red line of Local Rule 9?
A Yes.
Q So this is a true and accurate copy of the modification proposal you sent to the monitors in May of 2025?
A Yes.
Q And I think earlier in the conversation you said that you sent a modification in fall of 2025. Am I right that that was just like a misspeaking or lapse of memory that the modification you were referring to is this May 2025 document you have in front of you?

A This is the only modification request that I sent to the monitors. So I'm -- I'm not sure what you're referring to that I may have said earlier.

Q Okay. And this was sent on May 30, 2025; right?

A Yes, after a meeting. Yes.

Q And you submitted this request, as we've discussed, on your own behalf, which means that you submitted it without paying for an outside lawyer?

A I submitted it pursuant to the protocol in the consent decree, which allows a party to do what we did.

Q And my only question is, you did not have an outside lawyer representing you in putting this request together?

A I did not have a lawyer representing me in my communication with the monitors.

Q Including this request?

A Including this request 'cause I was denied counsel.

Q Yes. And I wanted to look at this first page here. So the second full paragraph says -- I'm sorry. When I say first full page, I mean of the attachment, which is actually page 3 of the exhibit.

It says "The decree required the judges to

create local rules requiring all class A and class B misdemeanor arrestees apart from certain carve-out situations to be released without any judicial review, despite the mandates of Texas Code of Criminal Procedure Article 17.15." Do you see that?

A Yes.

Q And then the letter quotes: "The Texas legislature thereafter enacted Texas Code of Criminal Procedure Article 17.028," and it goes on to describe that provision and quote it -- quote, at least in part -- quote, at least, subsection A of 17.028; is that right?

A Yes.

Q And you say, "The consent decree and Local Rule 9" -- this is the next full paragraph after you quote 17.028. It says "The consent decree and Local Rule 9 are in direct conflict with clear, unambiguous, and mandatory Texas law. Arrestees are being released in violation of state law supported by an illegal standing order." Did I read that right?

A Yes.

Q Now, and at the very end of this page, you say, "We therefore formally request to invoke Section 32 of the consent decree and seek to modify its language. Specifically, we asked to amend Rule 9 in

the decree as follows to conform with state law."
A Correct.
Q Do you see that paragraph at the bottom?
A I do.
Q So your request here was to modify local Rule 9 to bring it into compliance with state law; right?
A At this point, that is what that request was, yes.
Q Okay. And on this next page -- this is page 4 of Exhibit 23 -- you have a redlined version of Rules 9.2, 9.4, 9.5, and 9.18; right?
A Yes.
Q Now, and correct me if I'm getting this wrong, but your proposal was to modify the consent decree in accordance with these redlines on page 4 of Exhibit 23?
A I wanted the consent decree to be set aside. This was a -- a solution in the short term that, if the monitors agreed, would take care of the problem we were having with violating state law.
Q But you wanted the consent decree gone, set aside --
A Yes, I did.
Q -- entirely?

A I -- I did, because of reasons already stated.

Q Yes. And you proposed this amendment, which you agree wouldn't have gotten rid of the consent decree entirely; right?

A I couldn't challenge the consent decree and request it be set aside without counsel that I was denied. So this was an attempt to get a solution to the daily problem that we were having of violating state law. This would at least, if the monitors and the parties would agree, would take care of that problem in the short term.

Q So if the parties had agreed to this proposal, the consent decree would still be enforced and binding, but it would be revised to reflect these proposed changes to Local Rule 9?

A And we would still be attempting to secure representation to challenge the decree In court.

Q I think you skipped over the answer to my original question, which was under this proposal, if all the parties had agreed, the consent decree would still be in effect and binding. It just would've been modified based on these proposed revisions to Local Rule 9?

A If that -- if everyone had agreed, that is

my understanding of what would've happened. But that doesn't negate or dispense with any other challenges we had --

Q Understood.

A -- regarding the decree that we couldn't make without representation.

Q Understood. And --

A This, we could do without representation. That, we cannot do without representation.

Q Okay. And but in this letter, you don't mention Younger abstention or Daves II, do you?

A I do not.

Q Now, I had a question. So after you submitted this letter, we all had a series of conference calls. I think there were two calls; is that right?

A When you say we, you mean the calls that included us or the ones that everybody else had without us?

Q The calls that -- the two conference calls where all of the parties were present, and the monitors.

A Okay. And the question about that is?

Q We had those two conference calls; right?

A Yes. There -- there were -- there were two

calls that we, as the proponents of this modification, were included in. It's my understanding after reviewing discovery that -- that everyone else had conference calls that excluded us after this was sent to the monitors, including the monitors.

Monitors had phone conversations with all other parties except for us regarding this that we were not invited to or included in.

Q And I guess my question is, so you said that Mr. Stott doesn't -- could not represent you in a challenge to the consent decree in federal court; right?

A That's correct.

Q But Mr. Stott was on those two conference calls, wasn't he?

A I don't recall whether he was or not.

Q You don't remember him calling the court-appointed monitor mendacious?

A Oh, I do remember that now. So he was on -- he was on one call, yes.

Q Judge Goodhart, what does mendacious mean?

A I got to -- I got to tell you, I had to look it up after that.

Q I'm in the same boat as you, and now I can't forget it.

A I -- I think it stands for the proposition that somebody is -- is materially misrepresenting something.

Q Intentionally.

A Okay.

Q Or a person who habitually lies.

A In -- in the context of how he said it, I -- I don't think that's probably how he meant it. That's not how I took it.

Q Okay. Would you agree --

A I -- I felt more -- yeah.

Q Do you agree that Brandon, Dr. Garrett, is mendacious?

A I -- I don't know.

Q And so Mr. Stott, he didn't represent you, is in fact not allowed to represent you in any challenge to the consent decree in federal court, but he attended this call and called the court-appointed monitor mendacious several times?

A I only remember that --

MR. RUSSO: Wait. Is there a question there?

THE WITNESS: Is there a question? Yes.

/

BY MR. FIFE:

Q Is that your testimony that he didn't represent you but still went on to advocate very intensely for the proposal that you had put forward?

A Which part of that question do you want me to answer?

MR. RUSSO: Object to form. And misstates the record.

BY MR. FIFE:

Q Do you agree that on that call, Mr. Stott advocated for the proposed modification that we were discussing?

A I would not agree with that.

Q How would you characterize his role?

A He was there on behalf of the 16 judges because the -- any action that was taken on this request was going to impact all 16 judges. So he -- he had a responsibility to be there to protect the 16 judges. And there -- the other 14 judges' attorney was there on the call as well.

So I -- I -- it's -- I think it was reasonable for him to be on the call since he represents all 16 judges in our day-to-day duties as judges. He's the staff attorney. But he cannot represent any one individual, particularly if there's

a conflict of interest, which there clearly was between the parties.

So he -- he was not in that role. But I think that he was there on behalf of all 16 and was asking very reasonable questions given that we were having to violate state law every single day. [redacted] In fact, the -- the redline is his recommendation [redacted]

That's not something I created. [redacted]

MR. RUSSO: Hey, are you done?

THE WITNESS: Yeah, I'm done.

MR. RUSSO: So just for the parties on the record, her testimony about what's happening in any of these judges meetings needs to be extremely confidential.

MR. FIFE: Attorney's eyes only. Yeah.

MR. RUSSO: So, you know, I just need y'all's agreement on that, and we can designate the

portions of the deposition later, but that's a big problem --

MR. FIFE: I mean, it's just a little -- yeah, I don't have any issues designating it confidential for now. I think, candidly, we would need to think about it just because of the declaration that's on file already makes several representations about those meetings.

But you designate it as confidential; it shifts us to challenge that. I don't know if we would or not, but --

MR. RUSSO: All I'm suggesting is that this record remain confidential in terms of disclosure until we can deal with that issue.

MR. FIFE: Yeah. Yeah, done.

BY MR. FIFE:

Q Okay. So you had just mentioned that Mr. Stott is the one who developed this redline version of Local Rule 9?

A Yes.

Q And did he also draft this text on page 3 of Exhibit 23, or was that something that you all put together?

A He did not draft that text.

Q As we discussed earlier, you sent this on

behalf of the four judges listed at the bottom of page 4; right?

A Correct.

Q But you didn't -- and so the other 12 judges did not join you in proposing this change; right?

A They did not.

Q And in your recollection, did Mr. Stott advocate for your proposal? It sounds like you were saying that's not what you think he was doing.

A I don't think he was advocating for our position specifically. [redacted]

Q Of course. The next document is -- I'll mark as Exhibit 24.

THE OFFICER: We're on 25, Counsel. Twenty-four I have down as the original filed motion August 26th.

MR. FIFE: Oh, yeah, yeah, yeah, yeah. Okay. Mark this as Exhibit 25.

(Exhibit 25 was marked for identification.)

MR. FIFE: And just to be clear, I was confused, then. My previous mentions to Exhibit 23, then, should have been to Exhibit 24 -- and I

apologize -- to the proposal filed at 740-2.

BY MR. FIFE:

Q Judge Goodhart this is a letter sent to you, Judge Padilla, Judge Johnson, and Judge Garcia on July 25, 2025; is that right? Or do you see that at the top?

A I can see it, yes.

Q And this is the letter that you received declining to adopt your proposed modification that we just reviewed as Exhibit 24; right?

A That's correct.

Q And are you aware that the attorney general sought to intervene in this case in August of 2025?

A Yes.

Q And we've already been over your communications with the attorney general. Were you aware ahead of time that the attorney general would seek leave to assert Younger abstention?

A I -- I don't recall. The -- the filing of their intervention actually caught me off guard, so I don't recall.

Q And then Judge Rosenthal denied the attorney general leave to intervene to assert Younger abstention. Are you aware of that?

A Yes.

Q And then in your motion on December 11, twenty -- or actually, let me back up. So are you aware that the attorney general at first tried to take an appeal from Judge Rosenthal's decision denying him leave to assert Younger abstention?

A Yes.

Q Are you aware that he voluntarily dismissed that appeal?

A Yes.

Q And then on December 11, 2025, you retained -- you had counsel and filed a motion to vacate, asserting Younger abstention, among other issues; right?

A I'm not sure of the date without --

Q December 2025, though?

A I know that it was after the AG's office filed a motion to intervene. The Commissioners Court said they would allow us counsel only if the federal judge allowed them to intervene.

Q That was in September; right?

A She -- I'm not sure. She did allow them to intervene, and then we were allowed to join that. I'm not sure if it's specifically on the date that you said.

Q No, I want to be really careful here because

I'm -- do you have any idea why they would've asked for that contingency in the commissioners court approval?

A I can speculate.

MR. RUSSO: Object to form.

BY MR. FIFE:

Q Well, sure.

A Do you want --

Q Let's have at it.

MR. RUSSO: Object to form.

THE WITNESS: They didn't want us to be in federal court. They did not want the judges who they knew were trying to request for the decree to be set aside to appear in federal court, given the Daves opinion. And they would -- they were thwarting our efforts at every turn.

BY MR. FIFE:

Q Now --

A But they didn't have a choice once the AG's office was granted leave to intervene.

Q And I guess my question is -- so I'm not asking -- this question is not at all about anything you and Mr. Russo or Ms. Olalde or anyone else at the firm have talked about. My question is only when you were previously looking for counsel before you

retained Greer Herz, did you reach out to them in your efforts to obtain counsel?

A Reach out to whom?

Q Greer Herz or Mr. Russo or Ms. Olalde.

A At what point?

Q Before September 2025, so like back when all of those other moments you were trying to find counsel that we talked about.

A I'm not sure when -- when we talked to them. It may have been after our renewed request to the county attorney's office. And similarly to the initial request, I think Mr. Fombonne probably asked us who we were considering. And so at that point, we would've, you know, reached out, you know, whenever we couldn't find anybody else to represent us pro bono.

Q And let me ask you. You're aware that one of the issues now before Judge Rosenthal is whether you all have waived the affirmative defense of Younger abstention; right?

A I am aware of that, yes.

Q And so you prepared -- you submitted a declaration in support of the fact that you did not waive Younger abstention; right?

A That's true, yes.

Q I had a question about something that y'all

put in your renewed motion to vacate. I can introduce it as an exhibit, but footnote 12 says "It is no surprise that these arguments were raised when Republicans were parties to this case.

"It is no secret that there were no Republican parties to this case after the consent decree was signed until 2023 when three Republican judges took office." What do you understand the relevance of that footnote to be to waiver?

MR. RUSSO: Object. Speculation.

THE WITNESS: Can I see it? I'm not --

BY MR. FIFE:

Q Yeah.

A Yeah. Let me take a look at It.

Q I'll mark this as Exhibit 26.

(Exhibit 26 was marked for identification.)

Yeah, that was a mouthful. Computer once again being slow. Apologies, Judge.

A And -- and I just remembered something that I want to go back to when you have a chance --

Q Let's do it now.

A -- that I remembered.

Q Yeah.

A Okay. Back in -- we met with Menefee in --

Christian Menefee, the county attorney, and Jonathan Fombonne in December of 2023 and requested representation to challenge the decree. That's when Mr. Menefee said he thought that, you know, we could potentially get counsel, but -- and we know what happened then.

It wasn't presented to Commissioners Court till after the primary. At that time, Mr. Fombonne had requested of us who, if -- if we were allowed to have counsel, who that counsel would be. We proposed two names. One of those individuals, Peyton Peebles, was able to do it.

There was a second lawyer; his name is Andrew Drumheller. He, in the end, was not able to do it, that he had a conflict. And so we may have reached out at that time to Mr. Russo to see if he and his group could represent us, if possible. But of course, that didn't happen.

Q Yeah.

A So that -- I think that was the first time we maybe initiated communication with them and then hadn't -- you know, that -- it didn't happen. We were denied counsel. And they weren't going to represent us for free. So fast-forward, we re-initiated contact with them when it looked like we might be getting

counsel.
Q Okay. Okay. So --
A So I just wanted to clarify that.
Q So September 2025 might not have been the first time, but if there -- there may have been prior attempts, but they didn't really get off the ground or go anywhere?
MR. RUSSO: Object to form.
THE WITNESS: Right, because Commissioner Courts object denied us counsel. And no one was going to represent us for free, as much as we liked and asked or hoped and asked.
BY MR. FIFE:
Q Understood. So back to Exhibit --
A And the --
Q -- and I appreciate the -- excuse me?
A I'm sorry. I'm just looking at the exhibit.
Q Oh, yeah. I was just -- you know, the big issue or one of the big issues in this case is whether y'all waived the affirmative defense of Younger abstention. And I'm just curious what this footnote 12 has to do with waiver.
A Can I see where footnote 12 is, please?
Q Like what the footnote is of?
A Yes.

Q Yeah.
A Yes.
Q So the argument was raised again by the AG citing his motion to intervene or maybe motion to vacate -- I forget which one, at 740 -- and by the judges citing your first motion to vacate in 2025. It was addressed by the Fifth Circuit in In Re Goodhart, the recent mandamus decision. It is now re-urged again. Footnote 12.
A Those are all true statements.
Q Yes. Well, yeah, we can quibble about them in our briefs. But I'm just -- because this struck -- I'm candidly just curious. I'm not sure what it's relevant to in terms of waiver, if anything.
MR. RUSSO: Let me object to speculation. And I assume you're asking her what her thoughts are on relevance?
MR. FIFE: Yeah.
MR. RUSSO: Not counsel's thoughts on relevance or any --
MR. FIFE: Yeah, of course. Of course. Yeah.
BY MR. FIFE:
Q This is a motion filed on your behalf. I'm not saying you have to have read everywhere. This

isn't -- again, this is not a gotcha question. This is purely, we have to respond to this; you know a lot about this case. What am I missing here, in your view?

A I'm not sure. I'm not sure what you're missing.

Q Okay. Then and we are -- so I guess one of -- and so you've said a couple times that you could not file -- let me think about this. So we covered this at the outset. But you consider yourself a very experienced attorney, at least in the context of criminal law, which you've presided over thousands of cases on; is that right?

A Yes.

Q And in that capacity, I think if I remember reading correctly, you even won a teaching award at the Texas Center for the Judiciary; is that right?

A And from the president of the Texas Criminal Defense Lawyers Association, yes.

Q Oh, really? What award?

A The president's award.

Q Oh, wow.

A Amongst other awards. But that is another award that I --

Q Amazing. And so you've presided over and

served counsel in many complex -- I mean, you're an award-winning criminal lawyer; right?

MR. RUSSO: There is such a thing.

MR. FIFE: Huh?

MR. RUSSO: There is such a thing.

BY MR. FIFE:

Q Is that right, Judge?

A Yes, I -- I am an experienced attorney that has won some awards.

Q And so I guess, you know, you've alluded to this a couple times, but why not just file a motion in the court and force commissioners hand?

A Well, I'm prohibited from practicing pro bono work. I can't -- while I'm a sitting court judge.

So I could not ethically, given what the judicial code of conduct says, represent myself pro bono in federal court, apart from the fact that I am not a federal court practitioner, particularly in matters of civil rights and civil -- civil federal procedure.

As -- as you know, it is unethical to practice areas of law that you are not proficient in. And I would say that I -- I would not be capable of representing myself or my colleagues for that matter

in a federal court proceeding, particularly one as complicated and voluminous and longstanding as this one.

So representing myself was not an option, ethically or otherwise.

Q And so there's two different ethical authorities you just talked about. There is the judicial canons. So let's put that to one side. In terms of the other thing you mentioned, you are not a federal court practitioner; right?

A Correct.

Q But you are a very experienced lawyer; right?

A I'm -- I'm an experienced lawyer that knows enough to not tread waters I'm unfamiliar with. And it wouldn't be fair when my colleagues all had representation. The county had representation. Your clients had representation. The sheriff had representation.

And I'm expected to represent myself and -- and leave my duties that the electorate has tasked me with through a democratic election to go fight a battle that I'm entitled to representation on? But I'm expected to represent myself? That wasn't going to happen. Ethically, I couldn't do it.

Q Ethically as in you would've -- if you represented yourself, you would've violated your ethics as to yourself?

A The Code Of Judicial Conduct prohibits a sitting judge from practicing law. There's a small --

Q Right. Let's put the code to one side. And I'm sorry. I didn't mean to interrupt. It's just, I do want to put the code to one side.

My question is just, when you talk about it would be unethical for you to represent yourself because you don't know enough about civil rights law, my question is just, how would you be violating, you know, attorney ethical rules if you were representing yourself?

A Because a lawyer --

MR. RUSSO: Object. Calls for legal conclusion.

But go ahead.

THE WITNESS: It's my understanding -- I'm going way back to the MM -- MMPR.

BY MR. FIFE:

Q MPRE, but yeah.

A MPRE. That's right. That's right. It's been a minute since I took that test. But nevertheless, I do note this. A lawyer cannot engage

in a field of -- of practice that they are not trained and experienced and competent to handle.

I am smart enough and experienced to know on my own, I could not represent myself -- even if I could ethically represent myself in federal court, represent myself in this matter. So -

Q Okay. I think I understand. Now, I -- and so just to make sure I understand your view, it's that you couldn't represent yourself in federal court on the attorney ethics side -- still putting the judicial ethics to one side -- because it is unethical to practice law if you are not qualified in that area of practice?

A That's my belief.

MR. RUSSO: Objection. Misstates the record. But go ahead.

BY MR. FIFE:

Q Now, I want to talk about the judicial ethics can on. I'm not a judge. Surprise. But I'm curious, can you walk me through that? You said something -- you started to say something about prohibits the practice of law.

A That's right. It specifically says that there are a few exceptions. So if there's an exception in statute, I think it is permissible on

small matters like a traffic ticket for you to go and represent yourself. And then of course, you can -- according to the -- the rule, you can counsel with family members on small matters.

You know, judges, when they are first elected to office, they go to judges school. And what we were taught and encouraged to do is to -- to never represent yourself pro bono except like I described and maybe if you were going to, you know, plead guilty on a traffic case or accept offense of driving, something of that nature, but certainly never even contemplate it in a matter that could impact the people you preside over, which clearly this would.

Q So you were already a party to this litigation; right? You're a defendant in this lawsuit ,or were a defendant in this lawsuit? Court 2 was a defendant?

A Court 2 is a defendant in this lawsuit.

Q Okay. And so your view is that the judicial ethic canon -- I'm sorry. Can you remind me what they're called?

A The judicial conduct code, so the code of conduct has provisions.

Q And your testimony is that that code would prohibit you from filing a motion pro se in litigation

that you, as judge of Court 2, were already a party in?

A That was my understanding.

Q Okay. And you said earlier when we were talking that you had -- I just want to be -- we've talked a lot about how the county, like -- is it fair to say that you feel and felt that the county owed you -- that you were entitled to the county providing funds for you to hire an attorney?

A I believe that the county -- since I -- I am a county employee and in my capacity as judge, that the county was to provide me counsel in matters related to my office that weren't matters of discipline.

Q Okay. What --

A Which this is not, so --

Q Yes. Yes, it is not. What law or policy did you or do you -- what policy, law, or regulation did you believe entitled you to that representation as a county employee?

A I'm not sure the specific provision, but I believe it's in the government code, the Texas government code.

MR. FIFE: Great. I think we're done here. And I would just like five minutes to talk with

co-counsel and double check my notes.

THE WITNESS: Good, 'cause I'm hungry.

MR. FIFE: Yeah, same. If we can go off the record, Bailey.

THE OFFICER: You are off the record at 1:10 p.m.

(Off the record.)

MR. HU: On our side.

THE OFFICER: We are now on record at 1:17 p.m.

MR. FIFE: Thank you for your time this morning, Judge Goodhart. I really appreciate it.

The plaintiffs will pass the witness.

EXAMINATION

BY MR. NWAOKORO:

Q Good afternoon, Judge Goodhart.

A Good afternoon.

Q I just have one question for you. Were you aware that Younger abstention could be waived?

A I was not.

MR. NWAOKORO: Okay. Thank you.

Pass the witness.

EXAMINATION

BY MR. HU:

Q Good afternoon, Judge. My name is Daniel Hu

with the County Attorney's Office. I just have a very -- a few questions for you as well.

A Good afternoon.

Q My first question is, so you met with my colleagues here at the County Attorney's office, and ultimately they did put your request for representation before Commissioners Court; correct?

A Correct.

Q And while Commissioners Court denied it, you, as an elected official, could also, through your office, put this back on the court agenda, couldn't you?

A Not that I'm aware of.

MR. HU: Okay. That's all the questions I have. Thank you very much.

THE WITNESS: Thank you, sir.

MR. RUSSO: Any others? Okay. We reserve questions for -- well, actually, give me five minutes. Give me five minutes to go off the record. Let me talk to Ms. Olalde before I pass.

MR. FIFE: So just let us know.

MR. RUSSO: I'll get in trouble if I don't do that.

THE OFFICER: You'd like to go off the record? We're off the record at 1:19 p.m.

(Off the record.)

THE OFFICER: We're on the record at 1:25 p.m.

Counsel, you may proceed.

MR. RUSSO: So yeah, we'll reserve questions for trial.

MR. FIFE: Nothing further from Plaintiffs.

MR. HU: Nothing further from Harris County.

MR. NWAOKORO: Nothing further from the Attorney General.

THE OFFICER: Would anybody like a copy of the transcript -- like to order the transcript? My apologies.

MR. HU: Yes. Harris County would like a copy expedited, please.

THE OFFICER: Which one was that? I apologize.

MR. HU: Harris County will order a copy expedited.

THE OFFICER: Harris County. Okay. Yes. Sorry.

MR. FIFE: Plaintiffs will order one as well with delivery requested on or before September

4th.

THE OFFICER: Mr. Hu, would September 4th work for you as well?

MR. HU: Yes.

THE OFFICER: Perfect. So Mr. Hu and for an order and Mr. Fife for the copy.

Anybody else like a order?

MR. NWAOKORO: Yeah, I'll get a copy too.

THE OFFICER: Copy as well. Expedited or normal?

MR. NWAOKORO: Normal is fine.

THE OFFICER: Normal is ten business days. Okay.

MR. RUSSO: Sorry. We do request to read and sign the final whenever it comes out. But I don't think we need a copy.

THE OFFICER: Sounds good. If that's all, I can take us off the record.

We are off the record at 1:27 p.m.

(Signature reserved.)

(Whereupon, at 1:27 p.m., the proceeding was concluded.)

CERTIFICATE OF DEPOSITION OFFICER

I, BAILEY CRUMBAUGH, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Bailey Crumbaugh

BAILEY CRUMBAUGH
Notary Public in and for the
State of Texas

[X] Review of the transcript was requested.

CERTIFICATE OF TRANSCRIBER

I, DAVID SHAHVERDIAN, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

DAVID SHAHVERDIAN

Odonnell, Maranda Lyn Et Al v. Harris County, Texas Et Al
Judge Paula Goodhart Job No. 8409576

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE_____ LINE_____ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE_____ LINE_____ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE_____ LINE_____ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE_____ LINE_____ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE_____ LINE_____ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

________________________________________ ___________________

Judge Paula Goodhart Date

Odonnell, Maranda Lyn Et Al v. Harris County, Texas Et Al
Judge Paula Goodhart 8409576

ACKNOWLEDGEMENT OF DEPONENT

I, Judge Paula Goodhart, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

Judge Paula Goodhart Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

September 4, 2026

Odonnell, Maranda Lyn Et Al v. Harris County, Texas Et Al

DEPOSITION OF: Judge Paula Goodhart 8409576

The above-referenced witness transcript is available for read and sign.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those on the attached Errata Sheet.

The witness should sign and notarize the attached Errata pages and return to Veritext at errata-tx@veritext.com.

According to applicable rules or agreements, if the witness fails to do so within the time allotted, a certified copy of the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

EXHIBIT 12

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

______________________________

MARANDA LYNN ODONNELL; LOETHA SHANTA MCGRUDER; and ROBERT RYAN FORD,

Plaintiffs,

v.

HARRIS COUNTY, TEXAS; HARRIS COUNTY SHERIFF ED GONZALEZ; COUNTY COURT AT LAW NO. 1 JUDGE ALEX SALGADO; COUNTY COURT AT LAW NO. 2 JUDGE PAULA GOODHART; COUNTY COURT AT LAW NO. 3 JUDGE LESLIE JOHNSON; COUNTY COURT AT LAW NO. 4 JUDGE SHANNON BALDWIN; COUNTY COURT AT LAW NO. 5 JUDGE DAVID FLEISCHER; COUNTY COURT AT LAW NO. 6 JUDGE KELLEY ANDREWS; COUNTY COURT AT LAW NO. 7 JUDGE ANDREW A. WRIGHT; COUNTY COURT AT LAW NO. 8 JUDGE ERIKA RAMIREZ; COUNTY COURT AT LAW NO. 9 JUDGE TORIA FINCH; COUNTY

Case No. 16-cv-01414

FOR READING & SIGNING PURPOSES ONLY

COURT AT LAW NO. 10 JUDGE
JUANITA JACKSON; COUNTY COURT AT
LAW NO. 11 JUDGE SEDRICK T.
WALKER; COUNTY COURT AT LAW NO.
12 JUDGE GENESIS DRAPER; COUNTY
COURT AT LAW NO. 13 JUDGE RAUL
RODRIGUEZ; COUNTY COURT AT LAW
NO. 14 JUDGE JESSICA PADILLA;
COUNTY COURT AT LAW NO. 15 JUDGE
TONYA JONES; COUNTY COURT AT
LAW NO. 16 JUDGE LINDA GARCIA;

Defendants,

and

THE ATTORNEY GENERAL OF TEXAS,
KEN PAXTON,

Intervenor.

__________________________________

FOR READING & SIGNING PURPOSES ONLY

DEPOSITION OF JUDGE LESLIE JOHNSON

DATE: Wednesday, September 2, 2026

TIME: 2:16 p.m.

LOCATION: Remote Proceeding
Greer, Herz & Adams LLP
123 Rosenberg Street, Suite 3000
Galveston, TX 77550

OFFICIATED BY: Bailey Crumbaugh

JOB NO.: 8409576

FOR READING & SIGNING PURPOSES ONLY

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS MARANDA LYNN ODONNELL, LOETHA SHANTA MCGRUDER, AND ROBERT RYAN FORD:

TRAVIS FIFE, ESQUIRE (by videoconference)
KIRSTEN BUDWINE, ESQUIRE (by videoconference)
SARAH BELLINGER BEEBE, ESQUIRE (by videoconference)
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741
travis@texascivilrightsproject.org
kirsten@texascivilrightsproject.org
sarah@texascivilrightsproject.org
(817) 991-4607

DANYELLE HONORE, ESQUIRE (by videoconference)
Texas Civil Rights Project
1500 McGowen, Suite 220
Houston, TX 77004
danyelle@texascivilrightsproject.org
(512) 474-5073

FOR READING & SIGNING PURPOSES ONLY

A P P E A R A N C E S (Cont'd)

ON BEHALF OF PLAINTIFFS MARANDA LYNN ODONNELL, LOETHA SHANTA MCGRUDER, AND ROBERT RYAN FORD:

ELIZABETH ROSSI, ESQUIRE (by videoconference)
Civil Rights Corps
1601 Connecticut Avenue Northwest, Suite 800
Washington, D.C. 20009
elizabeth@civilrightscorps.org
(202) 681-2721

ON BEHALF OF DEFENDANT HARRIS COUNTY, TEXAS:

DANIEL D. HU, ESQUIRE (by videoconference)
Harris County Attorney's Office
1010 Lamar, 11th Floor
Houston, TX 77002
daniel.hu@harriscountytx.gov
(832) 379-1112

SETH HOPKINS, ESQUIRE (by videoconference)
Harris County Attorney's Office
1318 Emancipation Avenue
Houston, TX 77003
seth.hopkins@harriscountytx.gov

FOR READING & SIGNING PURPOSES ONLY

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANTS COUNTY COURT AT LAW NO. 1 JUDGE ALEX SALGADO, COUNTY COURT AT LAW NO. 4 JUDGE SHANNON BALDWIN, COUNTY COURT AT LAW NO. 5 JUDGE DAVID FLEISCHER, COUNTY COURT AT LAW NO. 6 JUDGE KELLEY ANDREWS, COUNTY COURT AT LAW NO. 7 JUDGE ANDREW A. WRIGHT, COUNTY COURT AT LAW NO. 8 JUDGE ERIKA RAMIREZ, COUNTY COURT AT LAW NO. 9 JUDGE TORIA FINCH, COUNTY COURT AT LAW NO. 10 JUDGE JUANITA JACKSON, COUNTY COURT AT LAW NO. 11 JUDGE SEDRICK T. WALKER, COUNTY COURT AT LAW NO. 12 JUDGE GENESIS DRAPER, COUNTY COURT AT LAW NO. 13 JUDGE RAUL RODRIGUEZ, AND COUNTY COURT AT LAW NO. 15 JUDGE TONYA JONES:

GEORGE ALLAN VAN FLEET, ESQUIRE (by videoconference)
G. Allan Van Fleet P.C.
6218 Elm Heights Lane, Suite 201
Houston, TX 77081
allanvanfleet@gmail.com
(713) 826-1954



FOR READING & SIGNING PURPOSES ONLY

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANTS COUNTY COURT AT LAW NO. 2 JUDGE PAULA GOODHART, COUNTY COURT AT LAW NO. 3 JUDGE LESLIE JOHNSON, COUNTY COURT AT LAW NO. 14 JUDGE JESSICA PADILLA, AND COUNTY COURT AT LAW NO. 16 JUDGE LINDA GARCIA:

ANGIE OLALDE, ESQUIRE (by videoconference)
Greer, Herz & Adams LLP
2525 South Shore Boulevard, Suite 203
League City, TX 77573
aolalde@greerherz.com
(409) 797-3262

JOSEPH R. RUSSO, ESQUIRE (by videoconference)
Greer, Herz & Adams, LLP
123 Rosenberg Street, Suite 3000
Galveston, TX 77550
jrusso@greerherz.com
(409) 797-3215



FOR READING & SIGNING PURPOSES ONLY

A P P E A R A N C E S (Cont'd)

ON BEHALF OF INTERVENOR THE ATTORNEY GENERAL OF TEXAS, KEN PAXTON:

JOSEPH EMEKA NWAOKORO, ESQUIRE (by videoconference)
The Attorney General Of Texas Ken Paxton
4600 Highway 6 North
Houston, TX 77084
joe.nwaokoro@oag.texas.gov
(713) 973-4300

ALSO PRESENT:

Ava Stewart, Intern, Texas Civil Rights Program (by videoconference)
Chris Doyle, Intern, Texas Civil Rights Program (by videoconference)
Alexis Boehmer, Intern, Texas Civil Rights Program (by videoconference)
Judge Paula Goodhart, Defendant (by videoconference)

FOR READING & SIGNING PURPOSES ONLY

I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Fife | 12 |
| By Mr. Hu | 50 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 27 | Declaration of Judge Leslie Johnson | 33 |


QUESTIONS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 20 | 8 |

FOR READING & SIGNING PURPOSES ONLY

P R O C E E D I N G S

THE OFFICER: Good afternoon. My name is Bailey Crumbaugh; I'm the reporter assigned by Veritext to take the record of this proceeding. We are now on the record at 2:16 p.m.

This is the deposition of Judge Leslie Johnson taken in the matter of Maranda Lynn ODonnell, et al., vs. Harris County, Texas, et al., on Wednesday, September 2, 2026. The reporter is located in Houston, Texas, and the witness is located in Galveston, Texas.

I'm a notary authorized to take acknowledgments and administer oath in Texas. Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and
- shall constitute written stipulation

FOR READING & SIGNING PURPOSES ONLY

of such.

At this time, will everyone identify yourself for the record?

MR. FIFE: Travis Fife representing the plaintiffs, and I'm joined today by Elizabeth Rossi, Sarah Beebe and Kirsten Budwine, who are also attorneys representing the plaintiffs.

MS. OLALDE: Angie Olalde and Joseph Russo for the four judges. And with us today is the deponent and also Judge Goodhart.

MR. HU: Daniel Hu for Harris County. Joining me is my colleague Seth Hopkins.

THE OFFICER: Mr. Van Fleet --

MR. NWAOKORO: Joe --

THE OFFICER: Oh, sorry. Mr. Van Fleet, will you say yours again? Your mic did not pick up you. I'm sorry. Uh-oh.

MR. VAN FLEET: Let's try this.

THE OFFICER: You're good. Thank -- go ahead.

MR. VAN FLEET: Allan Van Fleet for the 12 non-moving judges.

THE OFFICER: Mr. -- I'm going to mispronounce -- Mr. Nwaokoro, can you please say yours again? I accidentally interrupted you.



FOR READING & SIGNING PURPOSES ONLY

MR. NWAOKORO: Sure. Joe Nwaokoro for the Office of the Attorney General.

THE OFFICER: All right. Thank you.

Hearing no objection, I will now swear in the witness.

Judge Johnson, will you please raise your right hand? Thank you.

WHEREUPON,

LESLIE JOHNSON,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE OFFICER: Perfect.

Counsel may proceed.

EXAMINATION

BY MR. FIFE:

Q Good afternoon, Judge Johnson. My name is Travis Fife. I'm a lawyer with the Texas Civil Rights Project, and I represent the plaintiffs in this matter. I first want to thank you for offering us some time this afternoon as well as this morning. If you could, just get us started by stating and spelling your full name for the record.

A Sure. It's Leslie Johnson, L-E-S-L-I-E J-O-H-N-S-O-N.





FOR READING & SIGNING PURPOSES ONLY

Q Wonderful. And I know that you heard me do all the introductory remarks with Judge Goodhart this morning, but I did just want to start with recapping some of those ground rules. So as you know, I will be asking you questions, and your answers will be recorded by the court reporter at the end of the table.

You understand that you need to speak up so the reporter can hear you?

A Yes.

Q And that means that I'm not trying to be rude, but if you answer with a nod or a head shake, I will ask you to verbally state your answer so it's clear for the reporter. All right?

A Sounds good.

Q And you understand that you were just sworn under oath?

A I do.

Q And that oath requires you to provide complete, truthful, and accurate answers?

A I understand that.

Q It's the same oath that you administer to witnesses in your courtroom. Do you understand that?

A Yes.

Q Additionally, if I ask a question that's



FOR READING & SIGNING PURPOSES ONLY

unclear or you don't understand for any reason at all, will you please let me know and I can rephrase the question?

A Yes, I will.

Q That way if you answer a question, it means you understood it; is that fair?

A That's fair.

Q And just like Judge Goodhart, if you need a break at any time, we can take a break. I just ask that you let me finish my question or you finish your answer prior to taking a break. Will you let me know if you need a break at any point?

A Sure.

Q And it sometimes happens that after a few minutes or a few hours, you sometimes remember additional information or want to clarify something. If that happens, just tell me. And again, just like Judge Goodhart, we will do it right there on the record while it's on your mind. Will you do that?

A Sounds good.

Q Now, I also wanted to just clear up a few additional things. So number one, you were in the room for the entirety of Judge Goodhart's deposition; is that right?

A Yes.



FOR READING & SIGNING PURPOSES ONLY

Q And the room that you're currently in, you're joined by Ms. Angela Olalde and Mr. Joe Russo, who are your attorneys; right?

A Yes.

Q Is Judge Goodhart still in the room?

A She is.

Q Okay. So you're with -- is anyone else in the room besides the three people we just mentioned?

A No.

Q Okay. And you understand that, of course, being in your attorney's office but that your attorney should not and you should not look at any notes or coaching on your testimony in the middle of a question or in the middle of your answer. You understand that; right?

A I do understand that.

Q Now I take it --

MS. OLALDE: Counsel, I can show you the room as well. I think Joe made that offer before, so whatever you feel comfortable.

MR. FIFE: No, I feel comfortable.

BY MR. FIFE:

Q And I take it you're familiar with the consent decree in this case, Docket 708 entered by Judge Rosenthal in November of 2019?





FOR READING & SIGNING PURPOSES ONLY

A I am.
Q And so you understand that if I say consent decree or the decree, I'm referring to the consent decree entered by Judge Rosenthal at Docket 708 in ODonnell against Harris County in November of 2019?
A Okay.
Q Do you agree that you're a party to the consent decree in your capacity as County Court at Law Judge 3?
A Yes.
Q And do you agree that your predecessor in Court 3 entered into the consent decree in 2019?
A Yes.
Q And do you agree that the consent decree remains in effect unless and until a court orders otherwise?
MS. OLALDE: Objection. Form.
THE WITNESS: Yes.
BY MR. FIFE:
Q But of course, we're here today because you've moved to vacate the consent decree; is that right?
A That's correct.
Q Now, how did you prepare for today's deposition?





FOR READING & SIGNING PURPOSES ONLY

A I had some trial prep with -- I mean, not trial prep, but some prep with the -- my lawyers. And I looked at -- excuse me. Go ahead. I looked at the exhibits that were attached to the motion that was filed on Monday.

Q Outside of those exhibits, did you look at any other documents?

A In preparation for today?

Q In -- yes.

A No.

Q Did you prepare any notes to help you remember things for today?

A No.

Q Did your attorneys provide you any sort of memorandum or reminders for facts to help you remember things for today? And again, this is not, like, legal strategy or anything like that. It's just purely did they give you like a list of facts to remember or reminders of certain things, factual things, that happened?

A Not that they prepared, no. I just looked at the documents that were already filed, like stuff that you've gone over with -- with Judge Goodhart.

Q Okay. And do you have any documents with you that you plan to refer to during the deposition?



FOR READING & SIGNING PURPOSES ONLY

A No, just my affidavit is in front of me. That's it.
Q Okay. Did you write on that affidavit at all?
A No.
Q It's completely blank?
A It's completely blank. Do you want to see it?
Q No, I trust you. I just --
A Yeah. No, it's completely blank. It's Exhibit 3. It's a copy of Exhibit 3.
Q Wonderful. And you're currently the presiding judge of County Court at Law 3; right?
A Yes, I am.
Q And you were elected in November of 2022?
A Yes.
Q And you took office January 1, 2023?
A That's correct.
Q Are you running this year for reelection?
A I am.
Q And that election is November 3, 2026?
A Yes.
Q And so you've won the Republican -- or you are the Republican nominee for County Criminal Court at Law 3 in this upcoming election?



FOR READING & SIGNING PURPOSES ONLY

A Yes.

Q Have you discussed the issue of how cash bail is set in misdemeanor cases in your campaign materials?

MS. OLALDE: Hold on. Travis, how is this within the scope of today's deposition?

MR. FIFE: It's in the scope because it reflects knowledge that if you were going to campaign on this issue that you would want it -- that then you would've moved sooner.

MS. OLALDE: Well, let's -- we'll deal with it question by question. Go ahead.

MR. FIFE: I'm sorry, Ms. Olalde. I didn't --

MS. OLALDE: We'll deal with it question by question.

MR. FIFE: Yes. Yeah. And this will be brief. This will be brief.

MS. OLALDE: Okay.

BY MR. FIFE:

Q So, Judge Johnson, my question was just whether bail reform or the issue of how cash bail is set in misdemeanor cases has been a part of your campaign for office?

A No, it has not.



FOR READING & SIGNING PURPOSES ONLY

Q It has not?
A No.
Q Okay. Judge Johnson, can I ask you, then, if this hasn't been an issue in your campaign, why do you think the Fifth Circuit made a move so quick?
MS. OLALDE: Objection. Calls for speculation.
Don't answer that.
BY MR. FIFE:
Q You can answer.
MS. OLALDE: No, I'm instructing her not to answer.
BY MR. FIFE:
Q Are you taking your attorney's advice not to answer?
A I am.
Q Okay. And prior to running for office, you were at the county attorney's office?
A I was, briefly, a couple years.
Q And am I right that you ran for county attorney in 2012?
A I did.
Q Were you successful?
A No, I was not.
Q And at the time you ran for county attorney,



FOR READING & SIGNING PURPOSES ONLY

were you in the county attorney's office?
A I was not.
Q Okay. And you've worked in private civil litigation; is that right?
A Briefly. Well, I did work for a real estate law firm when I left the county attorney's office.
Q At that law firm, did you primarily do real estate?
A Yes.
Q And while you were at the county attorney's office, I read somewhere that you worked in every division of the county attorney's office; is that right?
A Yes. But if I can explain what that was --
Q Please.
A -- that at the county attorney's office, when I started working there was right when Michael Fleming came into office. And he started this program with the new attorneys where he would have you go spend like two weeks in every division so that we had an understanding of all that the county attorney's office did.
Q Oh, wow.
A Like all the different roles that they had. So it wasn't as if I handled cases in all of them



FOR READING & SIGNING PURPOSES ONLY

'cause -- but it was that he just wanted the new lawyers to know exactly all the different hats that -- that were, you know, in the office.

Q Yeah. And so what did you primarily work on when you were at the county attorney's office?

A Well, I was in the trial division that I did mostly civil litigation for the county and represented, like, when officers were sued. I know I had some cases, but -- go ahead.

Q Oh, I was just going to say, are you -- when you say officers sued, you mean like 1983 civil rights cases?

A No. No.

Q Oh, okay. What did you mean, then?

A Well, like, I think one of my first cases was an officer that arrested somebody when they went to jury duty. And then another one is an officer that was taking somebody to jail and had a car wreck. And so the -- the, I guess, defendant in that case was suing the county for damages from the car wreck.

And then somebody tripped on a county sidewalk and had sued the county, so --

Q Okay. I think I understand. So how long were you at the county attorney's office in total?

A I don't know.



FOR READING & SIGNING PURPOSES ONLY

Q So when -- so we've covered your experience at the county attorney's office, your experience at a real estate firm or a firm where you primarily practiced real estate law. What is -- how did you become involved in criminal law?
A A friend of mine from law school that I had gone to law school with had a criminal law -- mainly a DWI practice and asked me to come work with him.
Q And so did you primarily do DWI defense?
A I did.
Q And what years, about, did you work for that friend's firm?
A Gosh, I don't recall.
Q And did you go straight from DWI defense to the bench? Or was there -- did you do anything in between?
A Well, I took -- yes. To answer your question, yes. But in the meantime, I took some time off because I had kids and I had some health concerns.
Q Okay. Do you remember about when that time off was?
A And when I say I took time off, I just kind of scaled back. I did more of the legwork in the office rather than having individual clients. So and when I started doing that was probably in twenty,



FOR READING & SIGNING PURPOSES ONLY

probably, twelve, thirteen.

Q Okay. And so did you practice criminal defense from when you started at the DWI practice up until your election to the bench?

A Yes.

Q Were you ever a prosecutor?

A No, I was an intern when I was in law school.

Q And so when you got to the bench, you had been, at that time, a defense attorney for over ten years; right?

A Yes.

Q About how many cases would you say you handled as a primary attorney?

A I have no idea.

Q We're talking hundreds, thousands?

A I have no idea.

Q Okay. But over a decade of experience?

A Yes.

Q Is it fair to say that you've had a pretty diverse career in the law from real estate to government defense to criminal defense?

A Yes. Those are -- I've done all of those. I don't know if you would consider that pretty diverse, but yeah, I've done all of those.



FOR READING & SIGNING PURPOSES ONLY

Q Yeah. As someone who has not done all of that, I consider it diverse. But I guess what my question really is, it's just that you have a lot of experience across different areas of law, and you bring that to your job on the bench; right?
A If that's how you want to characterize it, I mean --
Q How do you characterize it? Do you think you're inexperienced?
MS. OLALDE: Objection. Form.
BY MR. FIFE:
Q You can answer.
A No, I don't think I'm inexperienced, but I don't know that I'm as diverse as you -- you're saying, you know.
Q Okay. Fair enough. Now, I do just want to give you a reminder that Judge Rosenthal has authorized us to take your deposition limited to a single topic, which is the process and timing of the judges' efforts to challenge, vacate, or modify the consent decree, including their efforts to retain counsel to represent them on these issues.
Do you understand that?
A Yes.
Q Are you prepared to discuss that topic



FOR READING & SIGNING PURPOSES ONLY

today?

A As prepared as I can be, I guess.

Q Well, I guess we'll see. So when did you decide to run for -- and actually, let me back up. As you experienced with Judge Goodhart, I have really struggled with saying Harris County Criminal Courts at Law. And so if I just say Court 1 or Court 2 or Court 3, you understand I'm referring to the misdemeanor judicial positions in Harris County; right?

A Yes.

Q Okay. So when did you decide to run for Court 3 in the 2022 elections?

A I don't know exactly. I'm sorry. I don't know exactly.

Q Well, when you decided to run, did you know that the consent decree was operative in Harris County at the time?

A Yes.

Q Did you practice criminal defense from 2019 to 2021?

A Not a whole lot. That's when I was more concerned about my health and -- and the kids. But I did -- like I said, I did the -- I did legwork in the background, but I wasn't -- I wasn't seeing all the effects of ODonnell 'cause I wasn't over at the



FOR READING & SIGNING PURPOSES ONLY

courthouse a lot.

Q That makes sense. But you were aware it existed and was in effect?

A Yes.

Q And you probably had clients who benefited from the consent decree, I imagine; is that right?

MS. OLALDE: Objection. Form.

BY MR. FIFE:

Q You can answer.

A Well, like I said, I was doing legwork, so I didn't really have individual clients then.

Q Okay. Fair enough. And when you ran for office, were you aware that if you won, you would become a party to the consent decree in your official capacity if you won?

A To be honest, I didn't think about it. But, I mean, it -- once we were in office, yeah, it made sense. But I didn't think about -- that wasn't really what I was thinking about when I was running.

Q Yeah, that makes sense. So it's like you knew it was out there, you had some experience with it, but it wasn't like top of your mind during the campaign?

A I didn't really have --

MS. OLALDE: Wait. Wait. Is there a

FOR READING & SIGNING PURPOSES ONLY

question?

BY MR. FIFE:

Q I was just saying if I understood that right.

A Well, I didn't really have experience, but -- but I knew it was out there.

Q And when you took -- so you took office on January 1, 2023, after winning election to Court 3; right?

A Yes.

Q And did you receive a letter from Allan Van Fleet describing his representation of the county court at law judges?

A Yes.

Q And in that letter, he said that, at least to start with, he represents you in this litigation but that he could not advance a position for you that was adverse with whatever the majority of his clients decided?

A Yes, that was in conflict with the consent decree.

Q Yes. And so when you took office on January 1, 2023, and received this letter from Mr. Van Fleet, did you understand yourself to be bound by the consent decree as a party?



FOR READING & SIGNING PURPOSES ONLY

MS. OLALDE: Objection. Form.
BY MR. FIFE:
Q You can answer.
A I didn't really think about it, to be honest with you. I knew it was out there. I knew I had to follow what the law was, but I didn't really -- in the terms you just described it, I didn't think about it in that manner. But I knew that it was out there, and I knew I was, you know --
Q Had to follow it?
A Yeah.
Q Okay. And, I mean, yeah, and I apologize. But so you said that you didn't really think about it in the terms that I asked you that question. I'm curious if you could say anything more about how you did think about it?
A Ask your question again.
Q I'll move on. I don't think that was a very good question. So you submitted a declaration in this case on Monday; is that right?
A I did.
Q And you're aware that Judge Goodhart also submitted a declaration?
A I am.
Q Have you read Judge Goodhart's declaration?



FOR READING & SIGNING PURPOSES ONLY

A Not real closely, but I did kind of skim through it a -- yeah, but I --
Q But you heard her testimony today?
A I did.
Q Did Judge Goodhart testify to anything that was false?
A Not that I know of.
Q Did she say anything that you know to be wrong or untrue?
MS. OLALDE: Objection. Form.
THE WITNESS: Yeah, I can't really answer that. If you want to ask me about something specific, but I don't know of anything that right off the top of my head that I can think of that she said that was not correct.
BY MR. FIFE:
Q Yeah. Okay. That's all my question was. And so I want now, if -- going back to Exhibit 17, which was originally marked in Judge Goodhart's deposition and is Exhibit -- and is filed at 864-1. This is the declaration of Judge Goodhart.
A Can I see it?
Q Yeah. I'm -- sorry. I'm just --
A Oh, okay.
UNIDENTIFIED SPEAKER: -- put it up.



FOR READING & SIGNING PURPOSES ONLY

MS. OLALDE: -- tech slow.

THE OFFICER: Are you -- oh, sorry. Go ahead.

MS. OLALDE: So, Travis, we're also handing her a clean copy just so she can see it.

MR. FIFE: Wonderful. Wonderful.

BY MR. FIFE:

Q So, Judge Johnson, I'm going to give you a couple minutes. And if you can, give it that close read and tell me if there's anything in there that you disagree with or think is untrue.

MS. OLALDE: Travis, do you want to go off the record to give her the opportunity to read it closely?

MR. FIFE: No, she can read it closely. I'll sit here.

MS. OLALDE: All right.

THE OFFICER: Mr. Fife, you are entering that as an exhibit to this deposition or no, just referencing?

MR. FIFE: Maybe we can go off the record for a second.

THE OFFICER: Off the record. We are off the record at 2:44 p.m.

(Off the record.)



FOR READING & SIGNING PURPOSES ONLY

THE OFFICER: We are on the record at 2:44 p.m.
THE WITNESS: Okay.
BY MR. FIFE:
Q Have you had sufficient time to review the declaration?
A I have.
Q And is there anything in there that you believe to be false?
A Not -- I mean, if you have something specific, ask me. But no, I'm just -- I'm not sure that I knew everything to the T that was in here, not -- you know, but I don't know of anything that's false that's in here. And I don't believe anything is false that's in here.
Q Is there anything in there that you believe to be incomplete?
A Not that I can think of. But ask me specifically, if you're thinking -- I mean, I'm --
Q Well --
A I can't think --
Q And I'm sorry. I just -- you know, you just read it. You heard her testify this morning. And my question is just, is there anything that she's said that you think is incomplete and that you would like



FOR READING & SIGNING PURPOSES ONLY

to add to?

MS. OLALDE: Objection. Form. Asked and answered.

Travis, please don't argue with her. She's just trying to do her best.

THE WITNESS: So I can't really answer that.

BY MR. FIFE:

Q And now I am going to switch to your declaration. I'm marking this as Exhibit 26 [sic].

(Exhibit 27 was marked for identification.)

Now, Judge Johnson, this was filed as Docket 864-11, and this was attached as Exhibit 3 to the most recently -- y'all's renewed motion to vacate on the basis of Younger which was filed on Monday. This is a true and correct copy of the declaration that you submitted; right?

A Yes, it is.

Q And you say here that, in paragraph 2, "I never considered Allan Van Fleet as my attorney in the above-referenced case"; right?

A Yes.

Q So as far as you were concerned, up until November of 2025, you did not have a lawyer in your



FOR READING & SIGNING PURPOSES ONLY

capacity as judge of Court 3 in this matter; is that right?

A With regard to ODonnell, yes, that's correct.

Q Okay. Did you receive a letter from him withdrawing from representing you?

A I did not.

Q Okay. And then in paragraph 3, it says -- and I've highlighted it on my screen -- "I was aligned with Judges Goodhart and Padilla in their efforts to obtain representation and understood that they were working on that effort for us to obtain counsel." Did I read that right?

A You did.

Q Are there any steps that to obtain counsel that you took on your own?

A Well, Paula kind of drove the bus, so to speak, but we consistently talked about violating state law, having a lawyer, how do we -- how do we proceed? None of us really had the experience on how to -- how to proceed with this, with the -- violating the consent decree.

Nobody, you know, had that experience. And we had asked for a lawyer, and we weren't given a lawyer. And so, I mean, I don't know. Does that



FOR READING & SIGNING PURPOSES ONLY

answer your question?

Q I think so. Let me try it maybe a little bit different way. So do you remember this morning when Judge Goodhart and I were talking about all of these different meetings with the attorney general, the county attorney's office, and, like the group of attorneys we went through John, Jay Munisteri, et cetera?

A Mm-hmm.

Q And my question is just did you have any outside meetings with outside entities or attorneys that Judge Goodhart was not a part of?

A I believe so. There was -- because we were always talking about -- we were trying to brainstorm of who we could get as a lawyer. And so being that I had worked at the county attorney's office, there was a woman that was head of the federal trial division that I had thought about.

And then there was somebody that was under her as well that I works for, I believe, Bracewell now; I think he's a partner at Bracewell. And so I had thrown out those names, like maybe this is somebody that we could talk to. The woman, I found out, retired.

And I think -- and I'm not a hundred



FOR READING & SIGNING PURPOSES ONLY

percent, but I think I found it out by talking to the second lawyer that worked under her. I think he's the one that told me she retired. And so I think I reached out to them. And -- and I believe I talked to Judge Goodhart and Padilla about this as well. And then also, we had talk about --

Q Just, if I could --

A Sure.

Q -- because I can't write all of that, you said that you reached out or tried reaching out to two lawyers. One was the head of federal litigation at the county attorney's office; right?

A That's not exactly what I said. I said that I had thrown out these names to Paula -- I believe Paula and Jessica, but it may have just been Paula -- and that I think the only way I knew that she had retired was from talking to the second lawyer who had told me she retired. And then he was the other person that I believe I talked to about this case.

Q And he's the one you said was kind of in the county attorney's office but is now at Bracewell, you think?

A Well, right. But he -- but he worked in the federal division as well.

Q And this is the federal division of Harris

FOR READING & SIGNING PURPOSES ONLY

County Attorney's Office?

A Right.

Q Besides those two, did you provide any other names or suggestions for counsel that might be able to represent you all?

A Well, and something else that was brought up -- and I don't think Paula even mentioned this, but -- and I think it was Paula that I talked to. It may have been Jessica, but I'm -- I'm pretty sure it was Paula. There was somebody else that -- because we were throwing around names.

And there was somebody that had mentioned another person that I used to work with over at the county attorney's office. And I think -- I think Jessica had talked to her.

And -- and my -- I think there was -- it was thrown out like, "Does anybody know anything about this person? Do you think she would be good counselor?" or something to that effect. And so I talked to them about that person as well.

Q So the woman you knew at the county attorney who retired, you didn't speak with her about representing you in this matter because she retired; right?

A Yeah, I had no idea how to get in touch with



FOR READING & SIGNING PURPOSES ONLY

her. But also, she retired as well.

Q And then you just said that a name was thrown out that you said, "Oh, I know that person from the county attorney's office." Did you set up a meeting with that person to discuss representation in this matter?

A I did not. I think maybe Jessica talked to her, but what I mentioned to the other two is that -- no. No, I did not. To answer your question, no, I did not.

Q Okay. And the lawyer who was second in command in the county attorney's federal litigation division who now works at Bracewell, did you arrange a meeting with him?

A I don't know that he was second in command know. I know he's very smart, but I don't know that he was second in command. And I -- I don't -- I don't recall, but I believe I spoke to him on the phone for sure. I don't believe that I -- I didn't have a meeting with him, but I believe we talked about it on the phone.

Q Okay. But it didn't -- he didn't offer to represent y'all in -- or scratch that.

Did you ask him to represent you all in your capacity as judges in this matter?

FOR READING & SIGNING PURPOSES ONLY

A I can't recall.
Q Do you know when that phone call would've taken place?
A I don't, but it was early -- I mean, it was early on. It was as soon as we realized that we didn't have counsel and that the county wasn't going to let us find counsel.
Q Can you say more what you mean by the county wouldn't let you find counsel?
A Well, we asked them for counsel, and they wouldn't approve funds so that we could hire counsel.
Q But no one at the county attorney's office told you that you couldn't hire a lawyer of your choosing with non-county funds?
MS. OLALDE: Objection. Form.
THE WITNESS: No.
BY MR. FIFE:
Q So you could have -- let's say you had the funds for an attorney. You could go out and hire any lawyer you wanted and the county wouldn't stop you?
MS. OLALDE: Objection. Form.
THE WITNESS: I don't know that I could. I don't know that we could.
BY MR. FIFE:
Q Your view is that the county prohibited you



FOR READING & SIGNING PURPOSES ONLY

from retaining outside counsel?

MS. OLALDE: Objection.

THE WITNESS: No, I did not say that. I think the county wouldn't approve funds for us to have a lawyer when everybody else had a lawyer.

BY MR. FIFE:

Q Okay. Did you have any conversations with the county attorney's office that Judge Padilla and Judge Goodhart were not included in about securing funding for representation in this case?

A No. No. And we were a united front.

Q Yeah.

A I mean, Paula -- you know, Paula really was the lead, and -- Judge Goodhart was really the lead. And then they were kind of a voice for all of us. And then Judge Garcia obviously was elected later, and then -- you know, then it became the four, from the three to the four, so --

Q And that makes complete sense. I'm just trying to see if there are conversations or efforts that we haven't talked about yet today. And so a similar question about the attorney general's office. Did you have any -- did you ever make requests to the attorney general's office for representation in this matter that did not include Judge Padilla and Judge



FOR READING & SIGNING PURPOSES ONLY

Goodhart?

A No, Judge Goodhart did it on our behalf.

Q Okay. Outside of the meetings and ideas that we've discussed thus far, did you have any other conversations with outside lawyers about providing you representation in this case?

A I don't -- I -- I don't recall.

Q But there's -- you don't remember any that we haven't discussed?

A No. The three -- the three that we discussed were the ones that I proposed or that we talked about with Judge Goodhart and Judge Padilla. If there was anybody else, I don't recall. I'm not saying there wasn't, but I just don't recall anybody right now.

Q And you all eventually acquired counsel in the fall of 2025; is that right?

A Yes.

Q Okay. So from January 1, 2023, to November -- or excuse me -- to the fall of 2025, did you try to retain counsel that you or someone else paid for?

MS. OLALDE: Objection. Form.

THE WITNESS: We continuously tried to obtain counsel, like starting year one. We



FOR READING & SIGNING PURPOSES ONLY

continuously tried to have some counsel that would, you know, explain how to handle the -- the violation of state law, how we handle it. And so we continuously tried to have somebody that would be our voice, and we were denied at every turn.

BY MR. FIFE:

Q Did you ever try to pay out of pocket for representation?

A I didn't think I could do that, quite frankly.

Q Did you ever try to allocate your office's budget towards outside counsel?

A What -- can you explain what you mean by that?

Q Well, so you're presiding judge over Court 3; right?

A Right.

Q And Court 3 is allocated a certain amount of money each year to sustain itself and pay employees, et cetera; right?

A I have no idea. That's why we have the court management. I have no clue how it's all run.

Q Okay. From January 1, 2023, to November of 2025, did you ask the monitors to modify the consent decree or dissolve it or vacate it based on Younger



FOR READING & SIGNING PURPOSES ONLY

abstention?

A I did through Paula. Her voice was our voice.

Q Okay. At any point from January 1, 2023, to November 2025, did you file a motion in this case asking the court to vacate the consent decree on the basis of Younger?

A Just going to reiterate what I said, anything Paula was on all of our behalfs. So anything that she filed, I took as me filing as well. So --

MS. OLALDE: Wait. Just listen to his question.

THE WITNESS: Okay.

Do you want to repeat your question?

BY MR. FIFE:

Q Yeah. At any point from January 1, 2023, to November 2025, did you file a motion in this case asking the court to vacate the consent decree on the basis of Younger abstention?

A I personally did not.

Q Okay. But you understood that Judge Goodhart was working to find you all counsel and to advocate for an end to the decree?

A We all were.

Q Okay. And so what did you mean, then, that





FOR READING & SIGNING PURPOSES ONLY

Judge Goodhart was the voice?
A Because Judge Goodhart had more experience since she had been in this from, you know, early on and was, you know, on the bench during the original filing of the lawsuit. So she had more experience than any of the other -- first of all, more than myself and Judge Padilla, and then also more than Judge Garcia.
So she was the -- you know, and it -- it -- anyway, but yeah, no, so she was more the voice for all of us.
Q And I think that makes total sense. And so earlier this morning when we were walking through all these different efforts that you all had made to find counsel, a lot of those were communications from Judge Goodhart, but you all understood that those conversations were on your behalf?
Or rather, you understood that those communications were on your behalf as well?
A I did. I never believed that they were doing something that I was not going to be a part of.
Q Okay. But because Judge Goodhart had more experience, she led those efforts -- well, scratch that.
I guess my only remaining question is, well,



FOR READING & SIGNING PURPOSES ONLY

FOR READING & SIGNING PURPOSES ONLY

as Judge Goodhart was leading these efforts, were there any efforts besides what we've talked about today that you undertook outside of the three attorneys that we talked about?

A I can't really answer that 'cause I feel like your question is making it sound like I did nothing, and we constantly were each bouncing ideas off each other. We were talking about it. It was brought up --

Q Yeah.

A -- over and over again.

Q Yeah. And I'm sorry. I'm not trying to make it seem that way. My only question is trying to figure out if there are other conversations or letters or memorandum, email, that you would've sent that we didn't talk to Judge Goodhart about.

A I don't know the answer to that.

Q Okay. But you aren't aware of any communications that you sent outside of what we've discussed today?

A Can't answer that. I can't -- I can't think of anything right off the top of my head, but I can't answer that. Truthfully, I don't -- I don't know. I just know that it was a constant conversation. And I don't know if that's through email or face-to-face

or -- I don't think we sent memorandums to one another. But so --

Q So if we can turn back to Exhibit 26, your declaration.

A Yes.

Q I want to be incredibly clear that I do not want to know about edits to this document or anything that predated it. But this document, this declaration, was prepared to support your renewed motion to vacate on the basis of Younger abstention; right?

MS. OLALDE: Objection. Form.

THE WITNESS: I -- I assume so.

BY MR. FIFE:

Q And you -- were you aware on August 31st when you signed this document that one of the issues in the case before Judge Rosenthal is whether you waived Younger abstention?

A Yes.

Q And again, this is -- is there anything in this affidavit that mentions Younger abstention specifically?

A In this affidavit?

Q Yes.

A The one -- no.



FOR READING & SIGNING PURPOSES ONLY

Q Now, we went through your career history and, you know, various experiences at the county attorney, a law firm, criminal defense. I'm curious, if y'all weren't able to obtain counsel, why didn't you just represent yourself?

A Because I don't have the experience or the knowledge that's needed on this kind of litigation. It just -- it's -- I -- I mean, not -- that would be absurd. I just -- I don't have the experience. I don't know enough about it. I don't -- don't know enough about the federal court system and --

Q In April of 2023, were you aware that the Fifth Circuit issued its en banc decision in Daves against Dallas County?

A I was.

Q And that was because Ashley Guice emailed you a copy of it?

A That's correct.

Q Correct. In April of 2023, were you aware that the Fifth Circuit had overruled its prior opinion in ODonnell, this case, regarding Younger abstention?

A Wait. Say that again?

Q Were you aware that in that en banc Fifth Circuit opinion, the Fifth Circuit in Daves II overruled ODonnell I's Younger abstention holding?

FOR READING & SIGNING PURPOSES ONLY

A Yes.
Q But you did not move to vacate the consent decree on the basis of Younger abstention until December 11, 2025; isn't that right?
A I didn't have a lawyer to be my voice.
Q I understand. My question is narrower. So it's just, did you move to vacate the consent decree on the basis of Younger abstention prior to December 11, 2025?
A I didn't --
MS. OLALDE: Objection. Objection. Form.
THE WITNESS: I didn't have a lawyer.
BY MR. FIFE:
Q And because you didn't have a lawyer, you did not move to vacate the consent decree?
A I couldn't because I didn't have a lawyer.
Q Why couldn't you?
A Because I didn't have a lawyer.
Q Why do you need a lawyer to file a motion in court?
MS. OLALDE: Travis, I think that she's answered that question for you. Do you want to try to re-ask it, be more specific?
MR. FIFE: Yeah.



FOR READING & SIGNING PURPOSES ONLY

BY MR. FIFE:
Q I guess my question is, do you share Judge Goodhart's view that the judicial code of conduct would prohibit you from representing yourself pro se in this case?
A I don't know. To be honest, I hadn't really thought about it.
Q Okay. So that wasn't a reason why you didn't move to vacate?
A No. I think Paula was all of our -- she was our voice. And she had more experience than we did. And we didn't have a lawyer, and they weren't going to provide us a lawyer or funds to get a lawyer. In fact, they specifically denied that.
MR. FIFE: Okay. Can we take ten minutes?
THE WITNESS: Sure.
THE OFFICER: We're off the record at 3:15 p.m.
(Off the record.)
THE OFFICER: We are on the record at 3:21 p.m.
Counsel, you may proceed.
MR. FIFE: Judge Johnson, I just wanted to thank you for your time today. I know especially





FOR READING & SIGNING PURPOSES ONLY

with the morning session, it's been a long day.
Plaintiffs pass the witness.
MR. HU: Joe, do you have a question? Joe AG? No?
MR. NWAOKORO: The attorney general reserves his questions.
MR. HU: Okay.

EXAMINATION

BY MR. HU:
Q Judge Johnson, my name is Daniel Hu. I represent Harris County in this matter. I just have a couple of questions. Referring to Judge Goodhart's declaration, paragraph number 10, do you have that in front of you?
A I do.
Q Okay. It reads "In mid-December 2023, Judge Padilla and I met with Mr. Fombonne and Mr. Menefee." Then it goes on to say "Judge Johnson was also to attend the meeting." So my question for you is, did you attend that meeting or not?
A I did not.
Q Okay. Just curious. And then --
A Yeah, I --
Q Go ahead.
A I think I was going to, and then I ended up



FOR READING & SIGNING PURPOSES ONLY

not -- not going, knowing that they would let me know what had happened.

Q Okay. And then are you still admitted to practice before the United States District Court for the Southern District of Texas?

A I don't believe so, no.

Q Okay. But you were admitted at one time; right?

A At one time, I was.

MR. HU: Thank you very much, Judge. I don't have any further questions.

THE WITNESS: Thank you.

MR. VAN FLEET: I have no questions.

MS. OLALDE: We reserve.

MR. FIFE: Nothing further from Plaintiffs.

THE OFFICER: Anyone like to order a copy for this transcript?

MR. FIFE: Plaintiffs will order on the same schedule as the other transcript, on or before September 4th.

MR. HU: And Harris County will order a copy on the same terms as well.

MR. NWAOKORO: Same date with the AG.

MS. OLALDE: We would also like to read

FOR READING & SIGNING PURPOSES ONLY

and sign.

THE OFFICER: We are off the record at 3:23 p.m.

(Signature reserved.)

(Whereupon, at 3:23 p.m., the proceeding was concluded.)

FOR READING & SIGNING PURPOSES ONLY

# CERTIFICATE OF DEPOSITION OFFICER

I, BAILEY CRUMBAUGH, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



BAILEY CRUMBAUGH
Notary Public in and for the
State of Texas

[X] Review of the transcript was requested.

CERTIFICATE OF TRANSCRIBER

I, DAVID SHAHVERDIAN, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

DAVID SHAHVERDIAN

Odonnell, Maranda Lyn Et Al v. Harris County, Texas Et Al

Judge Leslie Johnson Job No. 8409576

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

________________________________  _______________

Judge Leslie Johnson Date

Odonnell, Maranda Lyn Et Al v. Harris County, Texas Et Al
Judge Leslie Johnson 8409576

ACKNOWLEDGEMENT OF DEPONENT

I, Judge Leslie Johnson, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

Judge Leslie Johnson Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

September 4, 2026

Odonnell, Maranda Lyn Et Al v. Harris County, Texas Et Al

DEPOSITION OF: Judge Leslie Johnson 8409576

The above-referenced witness transcript is available for read and sign.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those on the attached Errata Sheet.

The witness should sign and notarize the attached Errata pages and return to Veritext at errata-tx@veritext.com.

According to applicable rules or agreements, if the witness fails to do so within the time allotted, a certified copy of the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

[& - abstention]


**&**

**&** 3:5 7:8,15

**0**

**01414** 1:10

**1**

**1** 1:12 6:2 18:17 26:7 28:8,23 41:19 42:23 43:4,16
**10** 2:1 6:9 50:13
**1010** 5:14
**11** 2:3 6:10 48:4,9
**11th** 5:14
**12** 2:5 6:11 9:3 11:22
**123** 3:6 7:16
**13** 2:6 6:12
**1318** 5:21
**14** 2:8 7:4
**1405** 4:9
**15** 2:9 6:13
**1500** 4:18
**16** 1:10 2:11 7:5
**1601** 5:6
**17** 30:18
**1983** 22:11

**2**

**2** 1:14 3:2 7:2 10:9 26:7 33:20
**20** 9:13 56:15
**20009** 5:7
**201** 6:17
**2012** 20:21
**2019** 15:25 16:5,12 26:19
**202** 5:9
**2022** 18:15 26:12,20
**2023** 18:17 28:8,23 41:19 42:23 43:4,16 47:12,19 50:16
**2025** 33:25 41:17,20 42:24 43:5,17 48:4,9
**2026** 3:2 10:9 18:21 57:2
**203** 7:9
**220** 4:18
**2525** 7:9
**26** 33:10 46:3
**27** 9:8 33:11
**2:16** 3:3 10:5
**2:44** 31:24 32:2

**3**

**3** 1:15 7:3 16:9 16:12 18:11,11 18:13,21,25 26:8,12 28:8 33:14 34:1,8 42:16,18
**3000** 3:6 7:16
**31st** 46:15
**32489** 54:14
**33** 9:9
**36769** 53:16
**370-1112** 5:17
**3:15** 49:19
**3:21** 49:22
**3:23** 52:3,5

**4**

**4** 1:17 6:3 57:2
**409** 7:12,19
**4600** 8:7
**474-5073** 4:21
**4th** 51:21

**5**

**5** 1:18 6:4
**50** 9:4
**512** 4:21

**6**

**6** 1:20 6:5 8:7
**6218** 6:17
**681-2721** 5:9

**7**

**7** 1:21 6:6
**708** 15:24 16:4
**713** 6:20 8:10
**77002** 5:15
**77003** 5:22
**77004** 4:19
**77081** 6:18
**77084** 8:8
**77550** 3:7 7:17
**77573** 7:10
**78741** 4:10
**797-3215** 7:19
**797-3262** 7:12

**8**

**8** 1:23 6:7 9:13
**800** 5:6
**817** 4:14
**826-1954** 6:20
**832** 5:17
**8409576** 3:9 55:2 56:2 57:4
**864-1** 30:20
**864-11** 33:14

**9**

**9** 1:25 6:8
**973-4300** 8:10
**991-4607** 4:14

**a**

**ability** 53:10 54:7
**able** 37:4 47:4
**above** 33:22 56:7 57:5
**absent** 10:15
**abstention** 43:1 43:19 46:10,18

46:21 47:21,25 48:3,8
**absurd** 47:9
**accidentally** 11:25
**accuracy** 57:8
**accurate** 13:20 53:9 54:5
**acknowledge...** 56:3
**acknowledg...** 10:13
**acquired** 41:16
**action** 53:12,16 54:8,12
**actually** 26:4
**adams** 3:5 7:8 7:15
**add** 33:1
**additional** 14:16,22
**additionally** 10:15 13:25
**additions** 56:6
**administer** 10:13 13:22
**admitted** 51:3 51:7
**advance** 28:17
**adverse** 28:18
**advice** 20:14
**advocate** 43:23
**affidavit** 18:1,3 46:21,23
**afternoon** 10:2 12:17,21
**ag** 50:4 51:24
**agree** 10:14,17 16:7,11,14
**agreements** 57:14
**ahead** 11:20 17:3 19:12 22:9 31:3 50:24
**al** 10:8,8 55:1,1 56:1,1 57:3,3
**alex** 1:13 6:3
**alexis** 8:17
**aligned** 34:9
**allan** 6:14,16 11:21 28:11 33:21
**allanvanfleet** 6:19
**allocate** 42:11
**allocated** 42:18
**allotted** 57:15
**amount** 42:18
**andrew** 1:22 6:6
**andrews** 1:20 6:6
**angela** 15:2
**angie** 7:7 11:8
**answer** 9:11 13:12,13 14:5 14:11 15:14
20:8,10,12,15 23:17 25:12 27:9 29:3 30:12 33:6 35:1 38:9 45:5 45:17,21,23
**answered** 33:3 48:23
**answers** 13:5 13:20
**anybody** 37:17 41:13,14
**anyway** 44:10
**aolalde** 7:11
**apologize** 29:12
**appended** 56:7
**applicable** 10:21 57:7,14
**approve** 39:11 40:4
**april** 47:12,19
**areas** 25:4
**argue** 33:4
**arrange** 38:13
**arrested** 22:16
**ashley** 47:16
**asked** 23:8 29:14 33:2 34:24 39:10
**asking** 13:5 43:6,18
**assigned** 10:3
**assume** 46:13
**attached** 17:4 33:14 57:10,12
**attend** 50:19,20
**attorney** 2:14 8:2,6 12:2 15:11 20:21,25 24:10,14 33:21 35:5 37:21 39:19 40:22,24 47:3 50:5 53:14 54:10
**attorney's** 5:13 5:20 15:11 20:14,18 21:1 21:6,10,12,16 21:21 22:5,24 23:2 35:6,16 36:12,21 37:1 37:14 38:4,12 39:12 40:8
**attorneys** 11:7 15:3 17:14 21:19 35:7,11 45:4
**audio** 53:8 54:3
**august** 46:15
**austin** 4:10
**authorized** 10:12 25:18
**ava** 8:13
**available** 57:6
**avenue** 5:6,21
**aware** 27:2,13 29:22 45:18

[aware - comfortable]

46:15 47:12,19 47:23

**b**

**b** 9:6
**back** 23:23 26:4 30:18 46:3
**background** 26:24
**bail** 19:3,22,22
**bailey** 3:8 10:3 53:2,17
**baldwin** 1:17 6:4
**banc** 47:13,23
**based** 42:25
**basis** 33:16 43:7,19 46:10 48:3,8
**beebe** 4:6 11:6
**behalf** 4:2 5:2 5:11 6:2 7:2 8:2 41:2 44:17 44:19
**behalfs** 43:9
**believe** 32:9,14 32:16 35:13,20 36:4,14,19 38:18,19,20 51:6
**believed** 44:20
**bellinger** 4:6
**bench** 23:15 24:4,9 25:5 44:4
**benefited** 27:5
**best** 33:5 53:10 54:6
**bit** 35:3
**blank** 18:6,7,10
**boehmer** 8:17
**boulevard** 7:9
**bouncing** 45:7
**bound** 28:24
**bracewell** 35:20,21 36:21 38:13
**brainstorm** 35:14
**break** 14:9,9,11 14:12
**brief** 19:18,18
**briefly** 20:19 21:5
**bring** 25:5
**brought** 37:6 45:9
**budget** 42:12
**budwine** 4:5 11:6
**bus** 34:17

**c**

**c** 4:1 5:1 6:1 7:1 8:1 10:1
**call** 39:2
**called** 12:10
**calls** 20:6
**campaign** 19:3 19:8,24 20:4 27:23
**capacity** 16:8 27:15 34:1 38:25
**car** 22:18,20
**career** 24:21 47:1
**case** 1:9 15:24 22:19 29:20 33:22 36:19 40:10 41:6 43:5,17 46:17 47:21 49:5
**cases** 19:3,23 21:25 22:9,12 22:15 24:13
**cash** 19:2,22
**cause** 22:1 26:25 45:5
**certain** 17:19 42:18
**certificate** 53:1 54:1
**certified** 10:18 57:16
**certify** 53:4 54:2
**cetera** 35:8 42:20
**challenge** 25:20
**change** 55:4,7 55:10,13,16,19
**changes** 56:6 57:9
**characterize** 25:6,8
**choosing** 39:14
**chris** 8:15
**circuit** 20:5 47:13,20,24,24
**city** 7:10
**civil** 4:8,17 5:5 8:13,15,17 12:18 21:3 22:7,11
**civilrightscor...** 5:8
**clarify** 14:16
**clean** 31:5
**clear** 13:14 14:21 46:6
**clients** 23:24 27:5,11 28:18
**close** 31:9
**closely** 30:1 31:14,15
**clue** 42:22
**coaching** 15:13
**code** 49:3
**colleague** 11:12
**come** 23:8
**comfortable** 15:20,21

**command** 38:12,15,17
**communicati...** 44:15,19 45:19
**complete** 13:20 40:19 56:8
**completely** 18:6,7,10
**concerned** 26:22 33:24
**concerns** 23:19
**concluded** 52:6
**conduct** 49:3
**conflict** 28:20
**connecticut** 5:6
**consent** 15:24 16:2,3,8,12,14 16:21 25:21 26:16 27:6,14 28:20,24 34:22 42:24 43:6,18 48:2,7,16
**consider** 24:24 25:2
**considered** 33:21
**consistently** 34:18
**constant** 45:24
**constantly** 45:7
**constitute** 10:25
**cont'd** 5:1 6:1 7:1 8:1
**continuously** 41:24 42:1,4
**conversation** 45:24
**conversations** 40:7,20 41:5 44:17 45:14
**copy** 18:11 31:5 33:17 47:17 51:18,23 57:16
**corps** 5:5
**correct** 16:23 18:18 30:15 33:17 34:4 47:18,19 56:8
**corrections** 56:6
**counsel** 12:14 15:18 25:22 34:12,15 37:4 39:6,7,9,10,11 40:1 41:16,21 41:25 42:1,12 43:22 44:15 47:4 49:23 53:11,14 54:7 54:10
**counselor** 37:19
**county** 1:10,11 1:12,13,15,16 1:18,19,21,22 1:24,25 2:2,4,5 2:7,9,10 5:11 5:13,20 6:2,3,4 6:5,6,7,8,8,9,10 6:11,12 7:2,3,4 7:5 10:8 11:11 16:5,8 18:13 18:24 20:18,20 20:25 21:1,6 21:10,12,16,21 22:5,7,20,21,22 22:24 23:2 26:6,9,16 28:12 35:6,16 36:12,21 37:1 37:14,21 38:4 38:12 39:6,8 39:12,14,20,25 40:4,8 47:2,14 50:11 51:22 55:1 56:1 57:3
**couple** 20:19 31:9 50:12
**course** 15:10 16:20
**court** 1:1,12,13 1:15,16,18,19 1:21,22,24 2:1 2:2,4,6,7,9,10 6:2,3,4,5,6,7,8 6:9,10,11,11,12 7:2,3,4,5 13:6 16:8,12,15 18:13,24 26:7 26:7,7,12 28:8 28:13 34:1 42:15,18,22 43:6,18 47:11 48:21 51:4
**courthouse** 27:1
**courtroom** 13:23
**courts** 26:6
**covered** 23:1
**criminal** 18:24 23:5,7 24:2,22 26:6,19 47:3
**crumbaugh** 3:8 10:3 53:2,17
**curious** 29:15 47:3 50:22
**currently** 15:1 18:12
**cv** 1:10

**d**

**d** 5:12 9:1 10:1
**d.c.** 5:7
**dallas** 47:14
**damages** 22:20
**daniel** 5:12 11:11 50:10
**daniel.hu** 5:16
**danyelle** 4:16 4:20
**date** 3:2 51:24 55:24 56:12

[daves - errata]


**daves** 47:13,24
**david** 1:19 6:4 54:2,15
**day** 50:1 56:15
**deal** 19:11,15
**decade** 24:18
**december** 48:4 48:8 50:16
**decide** 26:4,11
**decided** 26:15 28:19
**decision** 47:13
**declaration** 9:8 29:19,23,25 30:21 32:6 33:10,17 46:4 46:9 50:13
**declare** 56:4
**decree** 15:24 16:3,3,4,8,12 16:14,21 25:21 26:16 27:6,14 28:21,25 34:22 42:25 43:6,18 43:23 48:3,7 48:16
**deemed** 56:6
**defendant** 5:11 8:19 22:19
**defendants** 2:12 6:2 7:2
**defense** 23:9,14 24:3,10,22,22 26:19 47:3
**denied** 42:5 49:14
**deponent** 11:10 56:3
**deposition** 3:1 10:6,23 14:23 16:25 17:25 19:6 25:18 30:20 31:19 53:1 57:4
**described** 29:7
**describing** 28:12
**description** 9:7
**different** 21:24 22:2 25:4 35:3 35:5 44:14
**digital** 53:8 54:3
**disagree** 31:11
**discuss** 25:25 38:5
**discussed** 19:2 41:4,9,11 45:20
**dissolve** 42:25
**district** 1:1,2 51:4,5
**diverse** 24:21 24:25 25:2,14
**division** 1:3 21:12,20 22:6 35:17 36:24,25 38:13
**docket** 15:24 16:4 33:13
**document** 46:7 46:8,16
**documents** 17:7,22,24
**doing** 23:25 27:10 44:21
**doyle** 8:15
**draper** 2:5 6:11
**drive** 4:9
**drove** 34:17
**duly** 12:10 53:5
**duty** 22:17
**dwi** 23:8,9,14 24:3

**e**

**e** 4:1,1 5:1,1 6:1 6:1 7:1,1 8:1,1 9:1,6 10:1,1 12:24,24 55:3 55:3,3
**earlier** 44:13
**early** 39:4,5 44:3
**ed** 1:11
**edits** 46:7
**effect** 16:15 27:3 37:19
**effects** 26:25
**effort** 34:12
**efforts** 25:20,21 34:10 40:20
44:14,23 45:1 45:2
**elected** 18:15 40:16
**election** 18:21 18:25 24:4 28:8
**elections** 26:12
**elizabeth** 5:4,8 11:5
**elm** 6:17
**email** 45:15,25
**emailed** 47:16
**emancipation** 5:21
**emeka** 8:4
**employed** 53:11,14 54:8 54:11
**employee** 53:13 54:10
**employees** 42:19
**en** 47:13,23
**ended** 50:25
**entered** 15:24 16:4,12
**entering** 31:19
**entirety** 14:23
**entities** 35:11
**erika** 1:23 6:7
**errata** 57:10,12 57:13

**es** 53:4
**especially** 49:25
**esquire** 4:4,5,6 4:16 5:4,12,19 6:14 7:7,14 8:4
**estate** 21:5,8 23:3,4 24:21
**et** 10:8,8 35:7 42:20 55:1,1 56:1,1 57:3,3
**eventually** 41:16
**everybody** 40:5
**evidentiary** 10:22
**exactly** 22:2 26:13,14 36:13
**examination** 9:2 12:15 50:8
**examined** 12:12
**excuse** 17:3 41:20
**exhibit** 9:8 18:11,11 30:18 30:20 31:19 33:10,11,14 46:3
**exhibits** 17:4,6
**existed** 27:3
**experience** 23:1 23:2 24:18 25:4 27:21 28:5 34:20,23 44:2,5,23 47:6 47:9 49:11
**experienced** 26:5
**experiences** 47:2
**explain** 21:14 42:2,13

**f**

**face** 45:25,25
**fact** 49:14
**facts** 17:15,18
**factual** 17:19
**fails** 57:15
**fair** 14:6,7 24:20 25:16 27:12
**fall** 41:17,20
**false** 30:6 32:9 32:14,15
**familiar** 15:23
**far** 33:24 41:4
**federal** 35:17 36:11,24,25 38:12 47:11
**feel** 15:20,21 45:5
**fife** 4:4 9:3 11:4 11:4 12:16,18 15:21,22 16:19 19:7,13,17,20 20:9,13 25:11 27:8 28:2 29:2 30:16 31:6,7 31:15,18,21 32:4 33:8 39:17,24 40:6 42:6 43:15 46:14 48:14,25 49:1,15,24 51:15,19
**fifth** 20:5 47:13 47:20,23,24
**figure** 45:14
**file** 43:5,17 48:20
**filed** 17:5,22 30:20 33:13,16 43:10
**filing** 43:10 44:5
**financially** 53:15 54:11
**finch** 1:25 6:8
**find** 39:7,9 43:22 44:14
**finish** 14:10,10
**firm** 21:6,7 23:3,3,12 47:3
**first** 12:10,20 22:15 44:6
**fleet** 6:14,16 11:13,16,18,21 11:21 28:12,23 33:21 51:13
**fleischer** 1:19 6:5
**fleming** 21:18
**floor** 5:14
**follow** 29:6,10
**follows** 12:12
**fombonne** 50:17
**ford** 1:7 4:3 5:3
**foregoing** 53:3 53:4 54:4 56:5
**form** 16:17 25:10 27:7 29:1 30:10 33:2 39:15,21 41:23 46:12 48:12
**found** 35:23 36:1
**four** 11:9 40:17 40:18
**frankly** 42:10
**friend** 23:6
**friend's** 23:12
**front** 18:1 40:11 50:14
**full** 12:23
**funding** 40:10
**funds** 39:11,14 39:19 40:4 49:13
**further** 51:11 51:15 53:13 54:9

**g**

**g** 6:16 10:1
**galveston** 3:7 7:17 10:11
**garcia** 2:11 7:6 40:16 44:8
**general** 2:14 8:2,6 12:2 35:5 50:5
**general's** 40:22 40:24
**genesis** 2:5 6:11
**george** 6:14
**give** 17:18 25:17 31:8,9 31:13
**given** 34:24 56:9
**gmail.com** 6:19
**go** 11:19 17:3 19:12 21:19 22:9 23:14 31:2,12,21 39:19 50:24
**goes** 50:18
**going** 11:23 19:8 22:10 30:18 31:8 33:9 39:6 43:8 44:21 49:12 50:25 51:1
**gonzalez** 1:11
**good** 10:2 11:19 12:17 13:15 14:20 29:19 37:18
**goodhart** 1:14 7:3 8:19 11:10 13:2 14:8,18 15:5 17:23 26:5 29:22 30:5,21 34:10 35:4,12 36:5 40:9,14 41:1,2 41:12 43:22 44:1,2,16,22 45:1,16
**goodhart's** 14:23 29:25 30:19 49:3 50:12
**gosh** 23:13
**government** 24:22
**greer** 3:5 7:8 7:15
**greerherz.com** 7:11,18
**ground** 13:4
**group** 35:6
**guess** 22:19 25:2 26:2,3 44:25 49:2
**guice** 47:16

**h**

**h** 9:6 12:25 55:3
**hand** 12:7
**handing** 31:5
**handle** 42:2,3
**handled** 21:25 24:14
**happened** 17:20 51:2
**happens** 14:14 14:17
**harris** 1:10,10 5:11,13,20 10:8 11:11 16:5 26:6,9,16 36:25 50:11 51:22 55:1 56:1 57:3
**harriscountyt...** 5:16,23
**hats** 22:2
**head** 13:12 30:14 35:17 36:11 45:22
**health** 23:19 26:22
**hear** 13:9
**heard** 13:1 30:3 32:23
**hearing** 12:4
**heights** 6:17
**help** 17:11,15
**hereto** 53:15 54:11 56:7
**herz** 3:5 7:8,15
**highlighted** 34:9
**highway** 8:7
**hire** 39:11,13 39:19
**history** 47:1
**hmm** 35:9
**hold** 19:5
**holding** 47:25
**honest** 27:16 29:4 49:6
**honore** 4:16
**hopkins** 5:19 11:12
**hours** 14:15
**houston** 1:3 4:19 5:15,22 6:18 8:8 10:10
**hu** 5:12 9:4 11:11,11 50:3 50:7,9,10 51:10,22
**hundred** 35:25
**hundreds** 24:16

**i**

**idea** 24:15,17 37:25 42:21

**ideas** 41:3 45:7
**identification** 33:12
**identify** 11:2
**ii** 47:24
**imagine** 27:6
**include** 40:25
**included** 40:9
**including** 25:21
**incomplete** 32:17,25
**incredibly** 46:6
**individual** 23:24 27:11
**inexperienced** 25:9,13
**information** 14:16
**instructed** 9:11
**instructing** 20:11
**intended** 10:20
**interested** 53:15 54:12
**intern** 8:13,15 8:17 24:7
**interrupted** 11:25
**intervenor** 2:16 8:2
**introductory** 13:2
**involved** 23:5
**issue** 19:2,9,22 20:4
**issued** 47:13
**issues** 25:22 46:16

**j**

**j** 12:24
**jackson** 2:2 6:9
**jail** 22:18
**january** 18:17 28:8,22 41:19 42:23 43:4,16
**jay** 35:7
**jessica** 2:8 7:5 36:15 37:9,15 38:7
**job** 3:9 25:5 55:2
**joe** 11:14 12:1 15:2,19 50:3,4
**joe.nwaokoro** 8:9
**john** 35:7
**johnson** 1:16 3:1 7:4 9:9 10:7 12:6,9,17 12:24 19:21 20:3 31:8 33:13 49:24 50:10,18 55:2 55:24 56:2,4 56:12 57:4
**joined** 11:5 15:2
**joining** 11:12
**jones** 2:10 6:13
**joseph** 7:14 8:4 11:8
**jrusso** 7:18
**juanita** 2:2 6:9
**judge** 1:12,14 1:15,17,18,20 1:21,23,25 2:1 2:3,5,6,8,9,11 3:1 6:3,3,4,5,6 6:7,8,9,10,11 6:12,13 7:3,3,4 7:5 8:19 9:8 10:6 11:10 12:6,17 13:2 14:8,18,23 15:5,25 16:4,9 17:23 18:13 19:21 20:3 25:17 26:5 29:22,25 30:5 30:19,21 31:8 33:13 34:1 35:4,12 36:5 40:8,9,14,16,25 40:25 41:2,12 41:12 42:15 43:21 44:1,2,7 44:8,15,22 45:1,16 46:17 49:2,24 50:10 50:12,16,18 51:10 55:2,24 56:2,4,12 57:4
**judges** 11:9,22 25:20 28:13 34:10 38:25
**judicial** 26:9 49:3
**jury** 22:17

**k**

**kelley** 1:20 6:5
**ken** 2:15 8:3,6
**kids** 23:19 26:22
**kind** 23:22 30:1 34:17 36:20 40:15 47:7
**kirsten** 4:5,12 11:6
**knew** 27:21 28:6 29:5,5,8,9 32:12 36:16 37:21
**know** 13:1,4 14:2,11 22:2,3 22:8,25 24:24 25:14,15 26:13 26:14,15 29:9 30:7,8,13 32:13,13,22 34:23,25 37:17 38:3,15,16,16 38:16 39:2,22

39:23 40:13,17 42:2 44:3,4,9 45:17,23,24,25 46:7 47:2,10 47:10 49:6,25 51:1
**knowing** 51:1
**knowledge** 19:8 47:7 53:10 54:6

**l**

**l** 12:24,24
**lamar** 5:14
**lane** 6:17
**law** 1:12,14,15 1:17,18,20,21 1:23,24 2:1,3,4 2:6,7,9,11 6:2,3 6:4,5,6,7,8,9,10 6:11,12,13 7:2 7:3,4,5 16:8 18:13,25 21:6 21:7 23:4,5,6,7 23:7 24:7,21 25:4 26:7 28:13 29:6 34:19 42:3 47:3
**laws** 10:22
**lawsuit** 44:5
**lawyer** 12:18 33:25 34:19,24 34:25 35:15 36:2,17 38:11 39:13,20 40:5 40:5 48:5,13 48:15,17,19,20 49:12,13,13
**lawyers** 17:2 22:2 36:11 41:5
**lead** 40:14,14
**leading** 45:1
**league** 7:10
**led** 44:23
**left** 21:6
**legal** 17:16 57:19
**legwork** 23:23 26:23 27:10
**leslie** 1:16 3:1 7:4 9:8 10:6 12:9,24 55:2 55:24 56:2,4 56:12 57:4
**letter** 28:11,15 28:23 34:5
**letters** 45:14
**limited** 25:18
**linda** 2:11 7:6
**line** 9:12 55:4,7 55:10,13,16,19
**list** 17:18
**listen** 43:11
**litigation** 21:4 22:7 28:16 36:11 38:12 47:7
**little** 35:2
**llp** 3:5 7:8,15
**located** 10:9,10
**location** 3:4
**loetha** 1:5 4:2 5:2
**long** 22:23 50:1
**look** 15:12 17:6
**looked** 17:3,3 17:21
**lot** 25:3 26:21 27:1 44:15
**lyn** 55:1 56:1 57:3
**lynn** 1:5 4:2 5:2 10:7

**m**

**made** 15:19 20:5 27:17 44:14 56:5
**majority** 28:18
**make** 40:23 45:13
**makes** 27:2,20 40:19 44:12
**making** 45:6
**management** 42:22
**manner** 10:23 29:8
**maranda** 1:5 4:2 5:2 10:7 55:1 56:1 57:3
**marked** 30:19 33:11
**marking** 33:10
**materials** 19:4
**matter** 10:7 12:20 34:1 37:23 38:6,25 40:25 50:11
**mcgowen** 4:18
**mcgruder** 1:6 4:3 5:3
**mean** 17:1 22:11,14 25:7 27:17 29:12 32:10,19 34:25 39:4,8 40:13 42:13 43:25 47:8
**means** 10:24 13:11 14:5
**meeting** 38:5 38:14,20 50:19 50:20
**meetings** 35:5 35:11 41:3
**memorandum** 17:15 45:15
**memorandums** 46:1
**menefee** 50:17
**mentioned** 15:8 37:7,12 38:8

mentions 46:21
met 50:17
mic 11:16
michael 21:17
mid 50:16
middle 15:13 15:14
mind 14:19 27:22
mine 23:6
minutes 14:15 31:9 49:16
misdemeanor 19:3,23 26:8
mispronounce 11:24
mm 35:9
modify 25:20 42:24
monday 17:5 29:20 33:16
money 42:19
monitors 42:24
montopolis 4:9
morning 12:21 13:3 32:23 35:3 44:13 50:1
motion 17:4 33:15 43:5,17 46:10 48:20
move 20:5 29:18 48:2,7 48:16 49:9
moved 16:21 19:10
moving 11:22
munisteri 35:7

**n**

n 4:1 5:1 6:1 7:1 8:1 9:1 10:1 12:25,25
name 10:2 12:17,23 38:2 50:10
names 35:22 36:14 37:4,11
narrower 48:6
necessary 56:6
need 13:8 14:8 14:12 48:20
needed 47:7
neither 53:11 54:7
never 33:21 44:20
new 21:19 22:1
nod 13:12
nominee 18:24
non 11:22 39:14
north 8:7
northwest 5:6
notarize 57:11
notary 10:12 53:18 56:13,19
note 57:9
noted 56:7
notes 15:12 17:11
november 15:25 16:5 18:15,21 33:25 41:20 42:23 43:5,17
number 14:22 50:13
nwaokoro 8:4 11:14,24 12:1 12:1 50:5 51:24

**o**

o 10:1 12:24,25
oag.texas.gov 8:9
oath 10:13 13:17,19,22
objection 10:15 12:4 16:17 20:6 25:10 27:7 29:1 30:10 33:2 39:15,21 40:2 41:23 46:12 48:11,11
obtain 34:11,12 34:15 41:25 47:4
obviously 40:16
odonnell 1:5 4:2 5:2 10:7 16:5 26:25 34:3 47:21,25 55:1 56:1 57:3
offer 15:19 38:22
offering 12:20
office 5:13,20 12:2 15:11 18:17 19:24 20:17,18 21:1 21:6,11,12,16 21:18,22 22:3 22:5,24 23:2 23:24 27:13,17 28:7,22 35:6 35:16 36:12,21 37:1,14 38:4 39:12 40:8,22 40:24
office's 42:11
officer 10:2 11:13,15,19,23 12:3,13 22:16 22:17 31:2,18 31:23 32:1 49:18,21 51:17 52:2 53:1,2
officers 22:8,11
official 27:14

**officiated** 3:8
**oh** 11:15,17 21:23 22:10,14 30:24 31:2 38:3
**okay** 15:7,10 16:6 17:24 18:3 19:19 20:3,17 21:3 22:14,23 23:20 24:2,18 25:16 26:11 27:12 29:12 30:17,24 32:3 34:5,8 38:11,22 40:7 41:3,19 42:23 43:4,13,21,25 44:22 45:18 49:8,15 50:7 50:16,22 51:3 51:7
**olalde** 7:7 11:8 11:8 15:2,18 16:17 19:5,11 19:13,15,19 20:6,11 25:10 27:7,25 29:1 30:10 31:1,4 31:12,17 33:2 39:15,21 40:2 41:23 43:11 46:12 48:11,22 51:14,25
**once** 27:17
**ones** 41:11
**operative** 26:16
**opinion** 47:20 47:24
**opportunity** 31:13
**order** 51:17,19 51:22
**orders** 16:15
**original** 44:4
**originally** 30:19
**outcome** 53:16 54:12
**outside** 17:6 35:11,11 40:1 41:3,5 42:12 45:3,19
**overruled** 47:20,25
**own** 34:16

**p**

**p** 4:1,1 5:1,1 6:1,1 7:1,1 8:1 8:1 10:1
**p.c.** 6:16
**p.m.** 3:3 10:5 31:24 32:2 49:19,22 52:3 52:5
**padilla** 2:8 7:5 34:10 36:5 40:8,25 41:12 44:7 50:17
**page** 9:2,7,12 55:4,7,10,13,16 55:19
**pages** 57:12
**paid** 41:22
**paragraph** 33:20 34:8 50:13
**part** 19:23 35:12 44:21
**parties** 10:13 10:16 53:12,14 54:8,11
**partner** 35:21
**party** 16:7 27:14 28:25
**pass** 50:2
**paula** 1:14 7:3 8:19 34:17 36:14,15,15 37:7,8,10 40:13,13 43:2 43:9 49:10
**paxton** 2:15 8:3 8:6
**pay** 42:7,19
**people** 15:8
**percent** 36:1
**perfect** 12:13
**permitted** 10:20
**person** 36:18 37:13,18,20 38:3,5
**personally** 43:20
**phone** 38:18,21 39:2
**pick** 11:17
**place** 39:3
**plaintiffs** 1:8 4:2 5:2 11:5,7 12:19 50:2 51:16,19
**plan** 17:25
**please** 11:24 12:6 14:2 21:15 33:4
**pocket** 42:7
**point** 14:12 43:4,16
**position** 28:17
**positions** 26:9
**practice** 23:8 24:2,3 26:19 51:4
**practiced** 23:4
**predated** 46:8
**predecessor** 16:11
**prep** 17:1,2,2
**preparation** 17:8
**prepare** 16:24 17:11

**prepared** 17:21 25:25 26:2 46:9 54:3
**present** 8:12
**presiding** 18:13 42:15
**pretty** 24:20,24 37:9
**primarily** 21:7 22:4 23:3,9
**primary** 24:14
**prior** 14:11 20:17 47:20 48:8 53:5
**private** 21:3
**pro** 49:4
**probably** 23:25 24:1 27:5
**procedural** 10:21
**proceed** 12:14 34:20,21 49:23
**proceeding** 3:4 10:4,19 52:6 54:4
**proceedings** 53:3,5,6,9 54:6
**process** 25:19
**produced** 10:18
**program** 8:13 8:15,18 21:18
**prohibit** 49:4
**prohibited** 39:25
**project** 4:8,17 12:19
**proposed** 41:11
**prosecutor** 24:6
**provide** 13:19 17:14 37:3 49:13
**providing** 41:5
**public** 53:18 56:19
**purely** 17:17
**put** 30:25

**q**

**qualified** 53:7
**question** 13:25 14:3,5,10 15:13 19:12,12 19:16,16,21 23:18 25:3 28:1 29:14,17 29:19 30:17 32:24 35:1,10 38:9 40:22 43:12,14 44:25 45:6,13 48:6 48:23 49:2 50:3,19
**questions** 9:11 13:5 50:6,12 51:11,13
**quick** 20:5
**quite** 42:9

**r**

**r** 4:1 5:1 6:1 7:1 7:14 8:1 10:1 55:3,3
**raise** 12:6
**ramirez** 1:24 6:7
**ran** 20:20,25 27:12
**rather** 23:24 44:18
**raul** 2:6 6:12
**reached** 36:4 36:10
**reaching** 36:10
**read** 21:11 29:25 31:10,13 31:15 32:23 34:13 51:25 56:5 57:6,8
**reads** 50:16
**real** 21:5,7 23:3 23:4 24:21 30:1
**realized** 39:5
**really** 25:3 26:5 27:11,18,24 28:5 29:4,6,13 30:11 33:6 34:20 40:13,14 45:5 49:6
**reason** 14:1 49:8 55:6,9,12 55:15,18,21
**recall** 23:13 38:18 39:1 41:7,13,14
**recapping** 13:3
**receive** 28:11 34:5
**received** 28:23
**recently** 33:15
**record** 10:4,5 10:16 11:3 12:23 14:19 31:13,22,23,24 31:25 32:1 49:18,20,21 52:2 53:9 54:5
**recorded** 10:23 13:6 53:6
**recording** 10:18 53:8 54:4
**reduced** 53:7
**reelection** 18:19
**refer** 17:25
**referenced** 33:22 57:5
**referencing** 31:20
**referring** 16:3 26:8 50:12

**reflects** 19:8
**reform** 19:22
**regard** 34:3
**regarding** 47:21
**reiterate** 43:8
**related** 53:11 54:7
**relative** 53:13 54:10
**remaining** 44:25
**remains** 16:15
**remarks** 13:2
**remember** 14:15 17:12,15 17:18 23:20 35:3 41:8
**reminder** 25:17
**reminders** 17:15,19
**remote** 3:4
**remotely** 10:14
**renewed** 33:15 46:9
**repeat** 43:14
**rephrase** 14:2
**reporter** 10:3,9 13:6,9,14
**represent** 12:19 25:22 37:5 38:23,24 47:5 50:11
**representation** 28:12 34:11 38:5 40:10,24 41:6 42:8
**represented** 22:8
**representing** 11:4,7 34:6 37:23 49:4
**represents** 28:16
**republican** 18:23,24
**requested** 53:21
**requests** 40:23
**required** 56:13
**requires** 13:19
**reserve** 51:14
**reserved** 52:4
**reserves** 50:6
**retain** 25:21 41:21
**retaining** 40:1
**retired** 35:24 36:3,17,18 37:22,23 38:1
**return** 57:12
**review** 32:5 53:21
**right** 12:3,7 13:14 14:18,24 15:3,15 16:22 18:13 20:20 21:4,13,17 24:11 25:5 26:9 27:6 28:4 28:9 29:20 30:13 31:17 33:18,22 34:2 34:13 36:12,23 37:2,24 41:15 41:17 42:16,17 42:20 45:22 46:11 48:4 51:8
**rights** 4:8,17 5:5 8:13,15,17 12:18 22:11
**robert** 1:6 4:3 5:3
**rodriguez** 2:7 6:12
**roles** 21:24
**room** 14:23 15:1,5,8,19
**rosenberg** 3:6 7:16
**rosenthal** 15:25 16:4 25:17 46:17
**rossi** 5:4 11:5
**rude** 13:12
**rules** 10:22 13:4 57:14
**run** 26:4,11,15 42:22
**running** 18:19 20:17 27:19
**russo** 7:14 11:9 15:2
**ryan** 1:6 4:3 5:3

**s**

**s** 4:1 5:1 6:1 7:1 8:1 9:6 10:1 12:24,25 55:3
**salgado** 1:13 6:3
**sarah** 4:6,13 11:6
**saying** 25:15 26:6 28:3 41:14
**says** 34:8
**scaled** 23:23
**schedule** 51:20
**school** 23:6,7 24:8
**scope** 19:6,7
**scratch** 38:23 44:23
**screen** 34:9
**se** 49:4
**second** 31:22 36:2,17 38:11 38:15,17
**securing** 40:9
**sedrick** 2:3 6:10

**see** 18:7 26:3 30:22 31:5 40:20
**seeing** 26:24
**seem** 45:13
**sense** 27:2,18 27:20 40:19 44:12
**sent** 45:15,19 46:1
**september** 3:2 10:9 51:21 57:2
**session** 50:1
**set** 19:3,23 38:4
**seth** 5:19 11:12
**seth.hopkins** 5:23
**shahverdian** 54:2,15
**shake** 13:12
**shannon** 1:17 6:4
**shanta** 1:6 4:3 5:3
**share** 49:2
**sheet** 57:10
**sheriff** 1:11
**shore** 7:9
**show** 15:18
**sic** 33:10
**sidewalk** 22:22
**sign** 52:1 57:6 57:11
**signature** 52:4 53:16 54:14
**signed** 46:16 57:17
**similar** 40:22
**single** 25:19
**sit** 31:16
**skills** 53:10 54:6
**skim** 30:1
**slow** 31:1
**smart** 38:16
**solutions** 57:19
**somebody** 22:16,18,21 35:19,23 37:10 37:12 42:4
**soon** 39:5
**sooner** 19:10
**sorry** 11:15,17 19:13 26:13 30:23 31:2 32:22 45:12
**sort** 17:14
**sound** 45:6
**sounds** 13:15 14:20
**south** 7:9
**southern** 1:2 51:5
**speak** 13:8 34:18 37:22
**speaker** 30:25
**specific** 30:13 32:11 48:24
**specifically** 32:19 46:22 49:14
**speculation** 20:7
**spelling** 12:22
**spend** 21:20
**spoke** 38:18
**start** 13:3 28:16
**started** 12:22 21:17,18 23:25 24:3
**starting** 41:25
**state** 13:13 34:19 42:3 53:19
**states** 1:1 51:4
**stating** 12:22
**stenographic** 10:24
**steps** 34:15
**stewart** 8:13
**stipulation** 10:25
**stop** 39:20
**straight** 23:14
**strategy** 17:17
**street** 3:6 7:16
**struggled** 26:6
**stuff** 17:22
**submitted** 29:19,23 33:18
**subscribed** 56:14
**successful** 20:23
**sued** 22:8,11,22
**sufficient** 32:5
**suggestions** 37:4
**suing** 22:20
**suite** 3:6 4:18 5:6 6:17 7:9,16
**support** 46:9
**sure** 12:1,24 14:13 32:11 36:8 37:9 38:19 49:17
**sustain** 42:19
**swear** 10:14 12:4
**switch** 33:9
**sworn** 10:16 12:10 13:16 53:5 56:14
**system** 47:11

**t**

**t** 2:3 6:10 9:6 32:12 55:3,3
**table** 13:7
**take** 10:4,12 14:9 15:17,23 25:18 49:15

[taken - turn]


**taken** 10:7 39:3 53:3,12 54:9
**talk** 35:23 36:6 45:16
**talked** 34:18 36:4,19 37:8 37:15,20 38:7 38:20 40:21 41:12 45:2,4
**talking** 24:16 35:4,14 36:1 36:17 45:8
**tech** 31:1
**tell** 12:11 14:17 31:10
**ten** 24:10 49:15
**terms** 29:7,14 51:23
**testified** 12:12
**testify** 30:5 32:23
**testifying** 53:5
**testimony** 15:13 30:3 56:8 57:8
**texas** 1:2,10 2:14 4:8,17 5:11 8:2,6,13 8:15,17 10:8 10:10,11,13 12:18 51:5 53:19 55:1 56:1 57:3
**texascivilrigh...** 4:11,12,13,20
**thank** 11:19 12:3,7,20 49:25 51:10,12
**things** 14:22 17:12,16,19,19
**think** 15:19 20:5 22:15,23 25:8,13 27:16 27:18 29:4,7 29:13,16,18 30:14 31:11 32:18,21,25 35:2,21,25 36:1,2,3,16,22 37:7,8,14,14,16 37:18 38:7 40:4 42:9 44:12 45:21 46:1 48:22 49:10 50:25
**thinking** 27:19 32:19
**thirteen** 24:1
**thought** 35:18 49:7
**thousands** 24:16
**three** 15:8 40:18 41:10,10 45:3
**throwing** 37:11
**thrown** 35:22 36:14 37:17 38:3
**time** 3:3 11:2 12:21 14:9 20:25 23:18,20 23:22 24:10 26:17 32:5 49:25 51:7,9 57:15
**timeframe** 57:7
**timing** 25:19
**today** 11:5,9 16:20 17:8,12 17:16 26:1 30:3 40:21 45:3,20 49:25
**today's** 16:24 19:6
**told** 36:3,18 39:13
**tonya** 2:10 6:13
**took** 18:17 23:17,18,22 28:7,7,22 34:16 43:10
**top** 27:22 30:14 45:22
**topic** 25:19,25
**toria** 1:25 6:8
**total** 22:24 44:12
**touch** 37:25
**towards** 42:12
**transcriber** 54:1
**transcript** 10:18 51:18,20 53:21 54:3,5 56:5,8 57:5,16
**transcriptionist** 53:8
**travis** 4:4,11 11:4 12:18 19:5 31:4,12 33:4 48:22
**trial** 17:1,2 22:6 35:17
**tried** 36:10 41:24 42:1,4
**tripped** 22:21
**true** 33:17 53:9 54:5 56:8
**trust** 18:9
**truth** 12:11,11 12:12
**truthful** 13:20
**truthfully** 45:23
**try** 11:18 35:2 41:21 42:7,11 48:23
**trying** 13:11 33:5 35:14 40:20 45:12,13
**turn** 42:5 46:3

**twelve** 24:1
**twenty** 23:25
**two** 21:20 36:10 37:3 38:8
**tx** 3:7 4:10,19 5:15,22 6:18 7:10,17 8:8 57:13
**typewriting** 53:7

**u**

**uh** 11:17
**unclear** 14:1
**under** 10:21 13:17 35:19 36:2
**understand** 10:17 13:8,16 13:21,23 14:1 15:10,14,16 16:2 22:23 25:23 26:8 28:24 48:6
**understanding** 21:21
**understood** 14:6 28:3 34:11 43:21 44:16,18
**undertook** 45:3
**unidentified** 30:25
**united** 1:1 40:11 51:4
**untrue** 30:9 31:11
**upcoming** 18:25
**used** 37:13 57:16
**uses** 10:20

**v**

**v** 1:9 55:1 56:1 57:3
**vacate** 16:21 25:20 33:15 42:25 43:6,18 46:10 48:2,7 48:16 49:9
**van** 6:14,16 11:13,15,18,21 11:21 28:11,23 33:21 51:13
**various** 47:2
**verbally** 13:13
**verify** 57:8
**veritext** 10:4 57:12,19
**veritext.com.** 57:13
**videoconfere...** 4:4,5,7,16 5:4 5:12,19 6:15 7:7,14 8:5,14 8:16,18,20
**view** 39:25 49:3
**violating** 34:18 34:21
**violation** 42:2
**voice** 40:15 42:5 43:2,3 44:1,10 48:5 49:11
**vs** 10:8

**w**

**wait** 27:25,25 43:11 47:22
**waived** 46:18
**walker** 2:4 6:10
**walking** 44:13
**want** 12:20 13:3 14:16 18:7 19:9 25:6 25:16 30:12,18 31:12 43:14 46:6,7 48:23
**wanted** 14:21 22:1 39:20 49:24
**washington** 5:7
**way** 14:5 35:3 36:16 45:13
**we've** 23:1 41:4 45:2,19
**wednesday** 3:2 10:9
**weeks** 21:20
**went** 22:16 35:7 47:1
**winning** 28:8
**withdrawing** 34:6
**witness** 10:10 10:14,16,17 12:5,10 16:18 30:11 32:3 33:6 39:16,22 40:3 41:24 43:13 46:13 48:13 49:17 50:2 51:12 53:4 57:5,7,9 57:11,15
**witnesses** 13:23
**woman** 35:17 35:23 37:21
**won** 18:23 27:13,15
**wonderful** 13:1 18:12 31:6,6
**work** 21:5 22:4 23:8,11 37:13
**worked** 21:3,11 35:16 36:2,23
**working** 21:17 34:12 43:22
**works** 35:20 38:13
**would've** 19:10 39:2 45:15

[wow - younger]


**wow** 21:23
**wreck** 22:18,20
**wright** 1:22 6:7
**write** 18:3 36:9
**written** 10:25
**wrong** 30:9

**x**

**x** 9:1,6 53:21

**y**

**y'all** 38:23 47:4
**y'all's** 33:15
**yeah** 18:10 19:17 22:4 24:25 25:1 27:17,20 29:11 29:12 30:2,11 30:17,23 37:25 40:12 43:16 44:10 45:10,12 48:25 50:23
**year** 18:19 41:25 42:19
**years** 20:19 23:11 24:11
**younger** 33:16 42:25 43:7,19 46:10,18,21 47:21,25 48:3 48:8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**MARANDA LYNN O'DONNELL, Plaintiff,**

**vs.**

**HARRIS COUNTY TEXAS, ET AL, Defendants.**

**Case Number 4:16-CV-01414**

**Houston, Texas**
**September 22, 2026**

******************************************************************

**MOTION HEARING**
**BEFORE THE HONORABLE LEE H. ROSENTHAL**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**

**FOR THE PLAINTIFFS:**

**Jeremy D. Cutting**
**Travis Walker Fife**
**Elizabeth Ann Rossi**
**Texas Civil Rights Project**
P.O. Box 1108
Houston, Texas 77251
(817)991-4607; travis@texascivilrightsproject.org

**Joseph Grinstein,** Susman Godfrey, LLP, for Plaintiff
**George Allan VanFleet,** for 12 Judges
**Murray J. Fogler,** for Sheriff Ed Gonzalez
**Seth Barrett Hopkins,** for Harris County

**Daniel Hu, for Harris County**
**Harris County Attorney**
1010 Lamar
Houston, Texas 77002
(832)370-1112; daniel.hu@harriscountytx.gov

**FOR THE DEFENDANTS:**

**Joseph Emeka Nwaokoro**
**Office of the Attorney**
General Litigation Division
P.O. Box 12548
Austin, Texas 78701
(512)979-5382; joe.nwaokoro@oag.texas.gov

**APPEARANCES CONTINUED:**

**Joseph R. Russo, Jr.**
**Angela Olalde**
**Greer, Herz & Adams, LLP**
123 Rosenberg Street, Suite 3000
Galveston, Texas 77550
(409)797-3200; jrusso@greerherz.com

* * * * *

COURT REPORTER:
Angela M. Hailey, CSR, CRR, RPR, RMR
Official Court Reporter, U.S.D.C.
515 Rusk Street, 8th Floor, Suite 8004
Houston, Texas 77002
Phone(713)250-5787; angela_hailey@txs.uscourts.gov

Proceedings reported by stenotype, transcript produced by computer-aided transcription.

* * * * *

12:53:18 ***(Tuesday, September 22, 2026, 1:00 p.m., U.S. District Judge Lee H. Rosenthal presiding.)***

*** * COURT CALLED TO ORDER * ***

THE COURT: Good afternoon. Go ahead and state your
12:58:44 appearances, and you may be seated.

MS. ROSSI: Elizabeth Rossi for the plaintiffs.

MR. CUTTING: Jeremy Cutting for plaintiffs.

MR. FIFE: Travis Fife for the plaintiffs.

MR. GRINSTEIN: Joe Grinstein for the plaintiffs.

12:58:50 MR. VANFLEET: Allan VanFleet for the 12 judges.

MR. FOGLER: Murray Fogler for the Sheriff.

MR. HOPKINS: Seth Hopkins for Harris County.

MR. HU: Daniel Hu for Harris County.

MR. NWAOKORO: Joe Nwaokoro for the Attorney General.

12:59:01 MR. RUSSO: Joe Russo for four judges.

MS. OLALDE: Angela Olalde for four judges.

THE COURT: All right. Thank you very much. So, I have been directed to decide abstention expeditiously. That is, therefore, the focus of today's hearing. That doesn't mean
12:59:22 it's going to be the only thing addressed, but I think it is where we need to start and probably end. So, I have a number of motions in front of me, but the motion to abstain is movant's, so I'd like to hear from them first.

MR. RUSSO: May we approach, Your Honor?

12:59:49 THE COURT: Please. Just please speak into the

12:59:51 microphone, everybody.

MR. RUSSO: May it please the Court, Your Honor, we're here today to address the foundations of the consent decree rather than its merit. That you'll notice in a lot of the 01:00:15 briefing, particularly the response provided by plaintiffs and Harris County as well, there is a large discussion of the merits of the consent decree, how it's working, expenses and--

THE COURT: Well, before you get there, I want to give all sides an opportunity to address kind of the order of 01:00:35 operations. I have this mandamus opinion. What does it require me to rule on and what does it require me to rule on first. So, if I rule on Younger first, if I decide I need to abstain, what then? If I decide I don't need to abstain, what then? Can I decide that I do need to abstain and yet continue 01:01:10 with the inquiry by deciding if certain provisions of the consent decree are compatible with Younger while others might offend it. So, I need some assistance before we get into the details in deciding what to decide and what to decide first.

MR. RUSSO: Well, so, Your Honor, looking at the 01:01:32 Court's mandate, they have directed you to consider plaintiff's or the movants', judges', motion for abstention expeditiously, but secondarily and apply and follow Daves II. And I'm sure the Court is well aware that the Daves II opinion from 2023 is more than just an abstention issue, it's certainly a mootness 01:01:58 issue.

01:01:58 THE COURT: Right. So if I abstain, can I then decide mootness? Must I then decide mootness?

MR. RUSSO: The Court always has jurisdiction to determine whether it has jurisdiction. You are aware of that.
01:02:10 So, given that the manner in which we went up to the Fifth Circuit and came back down, it seems to us appropriate that the Court consider the abstention issue, but at the same time, Your Honor, the mootness issue is front -- right behind, right behind the Court's consideration. From our view, there were
01:02:33 two directives from *In Re: Goodhart*, which is consider our abstention motion and apply and follow Daves II, which is more than just the abstention.

THE COURT: So Daves II in your mind is mootness.

MR. RUSSO: It's both, yes, Your Honor, it
01:02:50 addresses --

THE COURT: That's an additional component.

MR. RUSSO: Yes, it does, Your Honor, and it fits squarely within this case. Of course, within Daves II, they directed specifically the O'Donnell -- overruled O'Donnell's
01:03:05 prior rulings and from its own body and changed the law.

THE COURT: Yes, this case is kind of gone up and down and all around.

MR. RUSSO: It's quite the history. But for the Court's consideration, to the extent that we're discussing
01:03:21 abstention, the one fact issue that we can talk about is this

01:03:26 waiver issue which the Court addressed at the end of its opinion and the plaintiffs -- we've addressed, but plaintiffs have also addressed it in their response. Would you like to hear argument on that point or are we still wrestling with the
01:03:42 process and procedures of decisions?

THE COURT: I think we have to talk about both, so go ahead.

MR. RUSSO: So, Your Honor, it's been our contention since *In Re: Goodhart* came down, and we maintain this position
01:03:59 in our conferences with the Court, that we don't believe that the mandate requires a Rule 60(b) analysis. But the backdrop to that is if Rule 60(b) applies --

THE COURT: Well, if I want to undo, modify or vacate the consent decree, is there a way to do that without going
01:04:18 through 60(b)?

MR. RUSSO: The Court always has oversight over its own consent decrees, and the case law is pretty clear on that.

THE COURT: But oversight requires a procedural mechanism to implement. What is the procedural mechanism and
01:04:31 the requirements of that procedural mechanism, if not 60(b)?

MR. RUSSO: Well, because of the way that this case came back down, our view is that you had a duty to respond to the mandate --

THE COURT: I agree.

01:04:45 MR. RUSSO: -- which is deal with abstention, and the

01:04:46 Court didn't necessarily direct you to deal with Rule 60. Now, if Rule -- not to hide from it, if Rule 60 is the device the Court uses, you reach the same result. But the question that plaintiffs are raising is do I have to do this equitable analysis. And that was far from the *In Re: Goodhart* opinion. They, in fact, said discovery is not required on any of these issues related to what their mandate required. So, in terms of continuing discovery, there should be none.

01:05:03

THE COURT: Well, if I decide, if I decide abstention first, and I must, I think that's the order of operations, abstention first. If I abstain, what authority do I have to do more?

01:05:29

MR. RUSSO: The authority, Your Honor, is to follow the opinion from *In Re: Goodhart*, follow the opinion from Daves which is this case should never have been decided at all in this court. So --

01:05:48

THE COURT: There seems to be a little bit of an internal inconsistency there. If I abstain, usually that's followed by a period, as in full stop, right? So, if I abstain, then is an opinion on mootness advisory and, therefore, not -- somebody in the Fifth Circuit may be able to do it, but it is less welcomed from a District judge.

01:06:09

MR. RUSSO: If the Court abstains and vacates the consent decree --

01:06:27 THE COURT: Wait, wait. If I abstain --

01:06:32 MR. RUSSO: I was clarifying the Court's question.
THE COURT: So, you think I should abstain and move on to the second prong, if you will, and vacate the consent decree.
01:06:40 MR. RUSSO: Yes, Your Honor.
THE COURT: And the authority to do that comes from?
MR. RUSSO: From both the mandate, which is applying Daves to its heart, which it removes -- that's why I started with we're discussing the foundation, the bedrock of the
01:06:57 consent decree, both on abstention ground as the Court has noted there is a mootness argument right behind it, which both of those concepts deal with what the --
THE COURT: That is an alternative holding in Daves. Does the mandate require me to rule on the alternatives?
01:07:17 MR. RUSSO: The mandate, in all of its terms, require the Court to abstain from this case.
THE COURT: And my question is what happens after that if I do abstain?
MR. RUSSO: Following Daves as the mandate states,
01:07:35 dismiss this case, vacate the consent decree and dismiss. That's what Daves did and that's what the Court has been directed to do under the mandate, we believe.
THE COURT: All right. Did you want to talk about waiver?
01:07:54 MR. RUSSO: Yes, Your Honor. So, the Fifth Circuit

coming back down addressed this issue of the judge's ability to raise the question of abstention and whether they've waived it. They removed the question of entry of the consent decree back in 2019 and its impacts there. So, with the Court's view to look at these things, the consideration really should be from the entry of Daves, which is March 31st of 2023.

THE COURT: Some years after the consent decree.

MR. RUSSO: Yes, Your Honor. And forward and what was happening during that process. If I may approach the bench, I just have a demonstrative that lays out the timeline.

THE COURT: Hand it to my law clerk please. Do you have a copy for all counsel?

MR. RUSSO: It's making its way.

THE COURT: Go ahead.

MR. RUSSO: So, thank you, Your Honor. The document just basically lays out what our evidence shows if you're digging through the documents and the motion that we filed as well as our reply. It starts with our judges, four judges taking the bench and -- I'm sorry, three of their judges took the bench in January of '23.

THE COURT: How many of these judges are up for re-election in November?

MR. RUSSO: Three positions.

THE COURT: Judges Goodhart, Johnson, and Padilla, are all three of them?

01:09:36 MR. RUSSO: Yes, Your Honor.

THE COURT: Okay. So, just Garcia who is not, correct?

MR. RUSSO: Yeah, and that's where I was headed. So, 01:09:39 Judge Garcia took the bench in January of 2025.

THE COURT: So, although the Fifth Circuit didn't order me to issue an opinion by a particular date, it seems clear that they want me to decide before these judges perhaps lose their seats.

01:09:55 MR. RUSSO: I believe that's correct, Your Honor. I think that was where the Fifth Circuit was headed in terms of the expeditious consideration.

THE COURT: I think so too. Although they didn't explain why the election was raised to such a level of 01:10:08 importance, but that's -- I think you and I agree on the reason for that.

MR. RUSSO: Thank you, Your Honor. Yes, the Purcell issues and reverse Purcell issues.

THE COURT: Reverse Purcell.

01:10:22 MR. RUSSO: Did come up with voting rights, voting cases, it's a sensitive issue.

THE COURT: This is an unusual application of those concerns, but go ahead.

MR. RUSSO: So, Your Honor, walking through this 01:10:32 analysis or the evidence that we presented the Court with,

01:10:38 Daves II was issued in March of 2023. Shortly thereafter, with the three judges who were recently elected, they received a letter from Mr. VanFleet who was representing at the time all of the County judges who were all Democrat and had consistent one position. Our judges, three of the judges took office, they received a letter from Mr. VanFleet saying, hey, I represent these individuals, I'll represent you, with a couple caveats which is can't take a position contrary to the rest of the group and if that happens, I can't represent you.

01:11:16 So, a few days later, April 6th -- I'm sorry, actually that letter was received in January, early January that Mr. VanFleet got in touch with our judges. Fast forward to after the Daves opinion being issued, our judges looked at the opinion and started raising questions about the impact of Daves in a judge's meeting. A few days later on April 6th, Mr. VanFleet removes himself from representing Judges Goodhart and Padilla, and so at that point habeas was withdrawn. So, from that point forward until my office was retained by the judges in October of 2025, they were unrepresented in terms of being able to bring a motion forward to the Court.

So, Judge Goodhart, giving the questions that she has about the impact of Daves, starts talking to the Texas Attorney General's Office to see whether they can offer representation to her --

01:12:31 THE COURT: May I ask a question here?

01:12:33 MR. RUSSO: Absolutely, Your Honor.

THE COURT: I understand that there are a timeline in which the judges seek representation without success. My question is why the judges couldn't proceed pro se? I think
01:12:48 they're all lawyers. They're all members of the state bar?

MR. RUSSO: And mainly, as you might expect, the base of their practice is criminal law and they're not very well versed in civil law. Not only that, Your Honor, it seems a little strange that every party in this case has representation
01:13:12 except for our judges. Even the County judges that are together on their opinion, in other words, as long as you stay with us, as long as you're not of a different opinion, you get counsel, but once you do, you no longer have counsel. So, the idea of, well, represent yourself in this situation was not
01:13:35 something the judges were comfortable with and that's their testimony. They didn't feel -- they're not competent to do it, they would have been out on a limb --

THE COURT: You've answered the question.

MR. RUSSO: And so, they begin to ask the Texas A.G.'s
01:13:50 Office do you have any obligations to represent, what can you do here, can you step in here? The A.G. was unable to do that.

Fast forward to the August of 2023 period, and if the Court most likely remembers, the Russell case was ongoing at the time --

01:14:05 THE COURT: I remember.

01:14:06 MR. RUSSO: -- relating to the felony judges, and our judges saw that that was happening, motions were filed. And the briefing schedule was laid out, eventually the Court issued its opinion in August of '23. The hope from our side was that
01:14:21 that opinion would have some impact on the O'Donnell matter. Of course, it didn't. So then by October of '23, they meet with the other judges to see if can we get on a consensus to talk about what's going on with state law and what's going on with Daves, but that didn't come to fruition.

01:14:46 So, after that they meet with the County Attorney's Office and ask, *We need counsel assigned for us.* And the County Attorney's Office talked about the issue back and forth. And in our reply, we have laid out -- there are two statutes involved in this situation, Your Honor. First of all, under
01:15:13 Texas Government Code 45.201, the County Attorney is the primary attorney for any County offices, and that would include -- and the State of Texas, frankly, for ongoing cases. So, the reality is the County Attorney's Office has a duty at the front end of this thing to deal with County offices who are
01:15:35 sued. And the Court is well aware, this case, these defendants were sued in their official capacity in which case it's their courtrooms effectively that are part of the case, which is another reason why the pro se representation is not a good idea.

01:15:51 Nevertheless, secondarily Texas Local Government Code

157.901, requires a County to obtain counsel and pay for that counsel in the event -- basically in the event that a conflict comes up.

Now, all that being said, when our four judges were asking for this issue to be put on a commissioner's agenda, that was pushed back to April of 2024 by the County's Office to get past the primaries. And once it made it to the agenda, as the Court might suspect, the County commissioners declined to represent our folks or to provide counsel for them. So, as of April 2024, they had asked for counsel specifically, they're denied by the County Court, by Commissioners Court and that would continue, that state would continue until the A.G. ended up intervening.

In the meantime, our judges being without counsel again, just got broken up discussions with the A.G.'s Office, reach out to colleagues in the State Senator's Office, what can we do to get representation or what can we do to deal with the state issues, the state bail issues and the application of Daves. That runs all the way through 2025. They get Judge Garcia comes on board, January 2025.

There's a specific letter that Judge Goodhart -- that is in our files, Exhibit 1E, where she sent a letter to the Senator's aide, which I think his name is Coker, she lays out what she's been doing to try to find counsel in April of 2025. Eventually, due to an arrestee who was released on G.O.B. who

shot a deputy, Judge Goodhart then talks to the -- goes to the monitor and says, *Hey, this is an issue, what's the legal authority for the consent decree to continue in place given that state law has changed and you've got Daves out there.*

Of course, the monitor did not respond, said go back to the County Attorney. The County Attorney couldn't provide an opinion on that at the time.

Eventually, the four judges put together a proposed modification to the consent decree and sent it to the monitors. That was in May 2025. That document was created from one of their staff attorneys for the judges, all 16 judges to consider. There was no consensus to put it forward, but Judge Goodhart took that work product and moved it over to the monitors and said, *Hey, here are some issues that we need to deal with for state law.*

Eventually, the monitors chewed on it, they gathered the troops at the exclusion of our judges, had discussions about how we're going to handle it, had discussions eventually with our judges, and in July of 2025, issues a letter saying -- basically declining to engage in any further conversations about the modification proposed, that you're just -- one of the main points they made was you're a minority of judges, you're in the minority, you don't have enough people to get any changes done.

THE COURT: So, for the waiver analysis, if even one

01:20:00 judge does not waive, is that enough?

MR. RUSSO: Yes, Your Honor, it is.

THE COURT: Because?

MR. RUSSO: Well, because each of these individuals 01:20:12 have their own obligations to deal with their office and determine whether the consent decree was subject to a challenge under the abstention doctrine and/or mootness. And that's something that *In Re: Goodhart* hit on, which is the concern being that, oh, well, every time that somebody, an office flips 01:20:43 over, we're going to have this challenge and it's going to be an ongoing problem, whereas the Fifth Circuit said no, that's protected by the backdrop which is look at the facts related to the specific situation. So --

THE COURT: You mean the election?

01:21:05 MR. RUSSO: Not the election, no. The merits of that individual's arguments are considered on their own. In this case, what you have is -- because if you have three judges in the same position and then come January, they've already been denied counsel, come January '25, another judge, the fourth 01:21:27 judge comes on and she's in the exact same position, she's got all the same news and successes and failures in terms of obtaining counsel that the other three are going to have, so her waiver analysis should start from January, in our view.

Shortly after July of 2025 when the monitor declines 01:21:57 to engage for modifications, the A.G. decides it's going to

01:22:06 step in and files its intervention action in August, a month later in 2025. An interesting thing happens. At that point, our judges go back to the County Attorney and say, *Well, now can we have counsel now, we've got another party, this case is* 01:22:24 *gearing up a little bit more*? And the Commissioner's Court decided yes, we will provide you with counsel on the condition that the Court allows the A.G. to intervene. And of course, the Court issued an order in October, October 30th --

THE COURT: Allowing limited intervention.

01:22:49 MR. RUSSO: Yes, allowing the intervention which is when we were finally able to be engaged on the case and move forward with our motion, which is basically how we get here.

So, carefully when you read through the briefing or read through the responses of Harris County and the plaintiffs 01:23:06 mention, *Well, the four judges didn't move for anything until December of '25.* And Your Honor, as again, the Court is aware, the parties are setting up the schedule to file motions and it wasn't as though the four judges were sitting around for three months doing nothing.

01:23:26 THE COURT: So, couple questions about what you put forward. So, you say that only one judge is needed who did not waive, right?

MR. RUSSO: I'm sorry? Can you restate that?

THE COURT: You just told me that as long as one judge 01:23:44 doesn't waive, there's effectively no waiver, correct?

01:23:49 MR. RUSSO: I agree with that.

THE COURT: Okay. So, let's assume we get one new officeholder, fresh waiver clock. Does that mean that any time there's an election and a new judge, everything starts over again? 01:24:04 That doesn't seem like a good way to operate.

MR. RUSSO: So, that specifically was addressed by *In Re: Goodhart* opinion in which -- if I can find it quickly.

THE COURT: The Fifth Circuit does cite a case for the proposition that democracy cannot bind the polity forever. Is 01:24:29 that what you're looking for?

MR. RUSSO: Well, that, in addition to the comment that the Court still has to look at the background facts behind every one of these challenges.

THE COURT: Looking at the politics of waiver, if you 01:24:47 will, and the politics of not waiver, the effect of it. So, we have a super majority of judges who favor the consent decree. We have four judges who eventually take the position that it should never have been issued and it needs to be modified or vacated. What do I do with that? Ignore it?

01:25:15 MR. RUSSO: Well, according to *In Re: Goodhart*, you analyze whether waiver actually occurred.

THE COURT: Okay. But if just one judge who doesn't waive can raise at any time issues that would support an argument for waiver -- I mean for vacating the decree, even 01:25:52 though a super majority of the judges continue to support the

01:25:56 decree, does that have any place in the analysis?

MR. RUSSO: You're saying the fact that there's a majority on one side and a minority on the other side. I don't think it does, and the reason is this, you have every single 01:26:11 office has its own office head. Each one is sued in an individual capacity. And this is the problem with just providing counsel to the majority, that the County is obligated to address all of the opinions of each office, otherwise we don't need to sue them all, we can just sue the majority and be 01:26:32 done with it, but that's not the way it's ever been done under the law and that's not the right approach. At the end of the day, each office needs to be protected and represented.

THE COURT: And if a majority of the judges continue to support the decree -- well, let's say it was flipped. A 01:26:56 majority of the judges don't want the decree, democracy would then operate, in your system in what you're advocating, to address the problem that the Fifth Circuit recognized.

MR. RUSSO: I think I agree with what Your Honor is saying. I don't think our view of it changes. If you have one 01:27:27 side -- if you have one judge who has an issue with the manner and operation of the decree and the foundation on which it is based, which is what we have here, and again, Your Honor, this is a very odd situation where we have opinion from the Fifth Circuit saying yes, and then an opinion from the Fifth Circuit 01:27:49 saying no. I can't imagine we're going to see that very often.

01:27:56 So, to some degree, a lot of this discussion is going to be limited based by the particulars of this case, but nevertheless, the sentence I was looking for is the one that reads, *"The decision whether to vacate or modify a consent* 01:28:10 *decree turns on other factors such as changed circumstances or a change in the law."* And so, that analysis has to be done. And we're also in--

THE COURT: That analysis would require a comparison of the consent decree provisions with the intervening state 01:28:31 statutes, right?

MR. RUSSO: In many circumstances it would. In this circumstance, it would not.

THE COURT: Why?

MR. RUSSO: Because this is an abstention problem, 01:28:43 it's a mootness problem.

THE COURT: But I couldn't vacate the decree without doing that. I can't decide mootness without figuring out if particular provisions of the state statute violate or offend particular -- make provisions of the consent decree offensive 01:29:04 under state law, so how do I do that? I don't have the record before me to do that now.

MR. RUSSO: Your Honor, I don't know if that's true or not.

THE COURT: I don't see the briefing on that.

01:29:18 MR. RUSSO: Well, on the other issue, though, is that

01:29:21 you have Daves on the exact same situation, the exact same facts. That's what I think carries *In Re: Goodhart* through the day is that they're very confident that the situation that they were looking at in Dallas was the exact same situation that was being applied to in Harris County.
01:29:38

THE COURT: I have a very detailed consent decree. Right?

MR. RUSSO: Yes, Your Honor.

THE COURT: I don't recall that Dallas had the same consent decree.
01:29:51

MR. RUSSO: Well, to the extent that the consent decree is modifying the way that the state law is having things run, there really are no issues for the Court to address.

THE COURT: I think the key words there are "to the extent." What do I have before me in the record that would define that extent?
01:30:13

MR. RUSSO: And the Court specifically is focused on what's the conflict or is there a conflict?

THE COURT: Or to put it another way, not just in terms of the statute, some of the cases that I have read with similar kinds of analyses required of them view abstention not as a blanket rule, but as a decision that requires a much more focused analysis of whether certain provisions of, say, the consent decree do and do not violate Younger. Because not all the provisions by definition or necessarily violate Younger.
01:30:28
01:31:05

01:31:13 So, in the case of -- let me pull it out here -- *Joseph vs. Ingram,* 275 F 3rd, 1253, Tenth Circuit considering consent decrease that were challenged, under Younger says abstention is not a blanket issue here, it requires a provision by provision 01:31:43 analysis. Does the same issue exist here? And if not, why not?

MR. RUSSO: It does not.

THE COURT: Second question, why?

MR. RUSSO: Because the fundamental problem in this 01:31:58 case with abstention is the underlying existence or the existence of the underlying state action which determines bail and the ability of the arrestee --

THE COURT: You mean the statute.

MR. RUSSO: Statutorily.

01:32:10 THE COURT: S.B.

MR. RUSSO: Correct.

THE COURT: S.B. 9 and 6, is that what you're talking about?

MR. RUSSO: Actually, Your Honor, it's even before 01:32:17 that. The Daves II opinion again reversed what -- overturned what happened in O'Donnell, so it was their view, it didn't necessarily turn on S.B. 6 or S.B. 9, although those were in play and existed at the time. They overruled O'Donnell to say what was happening before and what we decided in the reviewing 01:32:37 what state courts are doing for arrestee's benefit is the wrong

01:32:41 way to handle this. And that's the entirety of the consent decree, Your Honor. The fact is that individuals who are dealing in the state system with the right to bail have the ability to discuss those issues with their defense attorney and
01:32:59 have the judge who is in front of them and seeing those facts determine what that bail should look like, and eventually, that is what Daves turned on. And so for that reason, there's not going to be a room left, I guess I should say, room left in the consent decree if abstention applies the way Daves II said it
01:33:22 should.

THE COURT: So if I find no waiver, and I find I must abstain, what does that do to the rest of the issues if I stop there?

MR. RUSSO: I don't think the Court should stop there.

01:33:38 THE COURT: I should go on and decide mootness.

MR. RUSSO: I think the Court should -- I think the Court can decide the abstention issue and vacate the consent decree and dismiss the case based upon Daves II's analysis of abstention. The Court could also do a mootness analysis and
01:33:58 then your opinion would look a lot like Daves, I think, the result being vacating consent decree and dismissal of the case.

THE COURT: All right. Let me hear from the other side.

MR. RUSSO: Thank you, Your Honor.

01:34:23 MR. CUTTING: Good afternoon, Your Honor.

01:34:50 THE COURT: I have been told I should abstain by mootness or dismiss. What's your take?

MR. CUTTING: I disagree.

THE COURT: Can you pull that mic up so you're talking
01:34:58 more directly into it.

MR. CUTTING: How is that, Your Honor?

THE COURT: We'll find out.

MR. CUTTING: Yes, a lot to cover based on that. I would ask if the Court is amenable, my colleague Mr. Fife is
01:35:16 prepared to handle the Court's questions about waiver and timeliness under Rule 60, and I'm ready to talk about Rule 60's application, the mandate, things spinning out of that, if that's all right.

THE COURT: Okay.

01:35:29 MR. CUTTING: I believe Your Honor began by asking about what the critical decision points that we have to address here today are.

THE COURT: And in what order.

MR. CUTTING: Yes. And this chart, I hope it's not
01:35:45 overwhelming, but is meant to be a bit of a guide to that in how plaintiffs and non-movants generally in our brief conceive of the decision points along the way.

THE COURT: After the Goodhart or before Goodhart?

MR. CUTTING: After Goodhart.

01:36:00 THE COURT: Good.

01:36:01 MR. CUTTING: No, our position is that this Court should follow Goodhart's mandate.

THE COURT: I have to.

MR. CUTTING: Of course. But it's also our position 01:36:08 that this Court should not read things into Goodhart that are not a part of the decision, particularly of the mandate. The mandate is clear. The mandate says to consider abstention and to follow Daves, and we submit that is exactly what this Court should do.

01:36:22 Before I begin talking a little bit more about Goodhart, I do just want to make a quick detour to the mootness point. Mr. Russo is raising mootness here and it's the first I've heard of this argument that Goodhart actually -- that its mandate includes a mandate for this Court and to consider 01:36:41 mootness. That is not how we read that mandate. As I said, it says consider Younger, follow Daves. Those together should give a sense of what part of Daves the Court was contemplating. There is nothing in Goodhart that indicates it was actually saying apply law on mootness. And of course --

01:37:03 THE COURT: But mootness was an alternative holding in Daves.

MR. CUTTING: Of course, yes.

THE COURT: So, why isn't the instruction to follow Daves consistent with consideration of mootness?

01:37:13 MR. CUTTING: Well, because the Court was

considering -- in this mandamus action, it was considering the limited issue of deciding abstention. So, in that context it was clear that it was referring to the abstention holding of Daves and rightly observed that that holding was made as a matter of law. We don't contest that at all. But just to speak a little bit more on mootness. We did address this briefly in our response brief in opposition, we believe that argument is improperly raised at this time before this Court. The Court asked for briefing specifically on the issue of abstention, that is what we discussed at the status conference. That is what opposing counsel --

THE COURT: That is what the Fifth Circuit told me to consider first.

MR. CUTTING: We think that is both what the mandate said, it's also what the parties agreed to. We believe that it's improperly raised at this juncture, although of course, if the Court denies this motion based on Younger, the movants would continue to have the other arguments that they have raised including mootness and we would go on to address those, but it is inappropriate at this juncture.

Additionally, even if the mootness argument were raised, it would not excuse this Court from having to go through Rule 60 in order to reach its conclusion. Mootness is no different from abstention which is no different from any other issue in that when these issues are raised post judgment,

01:38:47 they go through Rule 60. That is what the Supreme Court has said multiple times with no ambiguity whatsoever.

A case to bring to the Court's attention, cited in our brief is Coney Island Auto Parts, which is a Supreme Court case 01:39:01 from the past term. In that case, slightly different facts, but I think it demonstrates a relevant lesson here which is that a party sought to vacate a final judgment based on an argument under Rule 60(b)(4) that that judgment was void. The lower Court found they had not complied with Rule 60(c)'s 01:39:25 reasonable time requirement, which applies to Rule 60(b)(4), (5) and (6), and said to that, you may be saying this judgment is void, it may in fact have been void. They were alleging no service, no proper service in that case.

THE COURT: And of course, Daves didn't get into any 01:39:43 of this because we did no final judgment.

MR. CUTTING: Exactly, nor could it. And yet the Court said there unanimously, We do not let you around the Rule 60 standard, both 60(b) and 60(c), just because of the nature of the underlying argument you are raising. It may be a very 01:40:04 serious one, like the judgment itself is void. That is about as serious as you could get, and yet that does not allow you to circumvent the rule.

And so, if that does not allow you to circumvent the rule, I think it really shows that neither does abstention and 01:40:18 neither would mootness, although as I said, I don't think that

01:40:21 is properly before the Court at this time or briefed.

THE COURT: So, your focus here is on the tran-substantive nature of Rule 60 that we are so protective of the interest in finality that we are not going to let even the 01:40:37 assertion of significant interest in the correctness of judgment override that.

MR. CUTTING: That is absolutely correct, Your Honor. Even if a grievous jurisdictional error, if it is not brought timely is no excuse for disrupting that interest in finality. 01:40:56 That is the difference between a Rule 12 argument and a Rule 60 argument. And a lot of what we've been hearing so far this afternoon pretends as though we were in a Rule 12 world, and we just aren't. That is different, we are in a Rule 60 world, it means no matter what.

01:41:14 Of course, as Mr. Russo mentioned, this Court always has oversight authority, but as you observed, that happens through the mechanism of Rule 60, and there has been no case cited in this proceeding that indicates anything else. There is no case in which a Court has gone around Rule 60 to modify 01:41:33 or vacate a final judgment.

THE COURT: The Fifth Circuit doesn't address many of these aspects. They cite Rufo.

MR. CUTTING: They cite Rufo twice, Your Honor.

THE COURT: Which is obviously implicates the Rule 60 01:41:54 analysis.

01:41:55 MR. CUTTING: They mention equities in the case of the election. So, we are just asking this Court to of course comply with the mandate in Goodhart, even though we think it is wrong, but also to apply other binding precedent, to apply Rule 01:42:09 60 including subsection (c)(1) which requires this Court to evaluate timeliness, to consider both steps of the Rule 60 analysis including whether Daves is a qualifying change in law, and if it is and the consent decree is vacated, whether constitutional violations are likely to re-occur, and to look 01:42:29 at what the evidence shows regarding the equities around vacatur.

We think doing all of this is fully consistent with the mandate in Goodhart and that the alternative -- alternate interpretation advanced by the Attorney General and the four 01:42:44 judges is wildly broad and unsupported by Goodhart's text. Their petition to the Fifth Circuit asks for an order requiring the Fifth Circuit -- excuse me, requiring this Court to move more quickly. It got that.

THE COURT: I'm here.

01:43:01 MR. CUTTING: This Court is definitely here complying with that, but they did not get more than that.

THE COURT: So, you don't read the Fifth Circuit's opinion as all but ordering me to abstain.

MR. CUTTING: No, Your Honor. I think the Fifth 01:43:12 Circuit's opinion, they could have done that very clearly.

They elected not to. They said --

THE COURT: The mandamus was to rule quickly, not to rule a certain way.

MR. CUTTING: Rule quickly and to follow Daves. And I think what the movants are trying to do is turn that follow Daves into much more than it actually is.

THE COURT: So, what do you think follow Daves means here?

MR. CUTTING: So, I think what follow Daves means, that's understood within the context of the Rule 60 inquiry, which as I mentioned, Goodhart implicitly embraces by citing Rufo which is the source of that inquiry. So, it says follow Daves, it also says Daves does not hinge upon factual development or discovery.

Now, I probably -- we're probably on the same page in having to read that a few times, but the answer to how, what that means is this, the only reasonable way to read that sentence in Goodhart and consistent with binding case law from Supreme Court and elsewhere is a reflection of what everyone agrees happened in Daves, which is that the Fifth Circuit decided the Middlesex factors in that case, meaning they assessed the Middlesex factors, they found all three had been met, and for that reason, because that was the only argument on abstention presented to it, it found it as a matter of law that it needed to abstain, and it did. And it similarly explicitly

01:44:36 overruled, although we have noted that there is some question about Daves's force given the mootness holding in that case. But putting that aside, we're accepting for the moment that Goodhart has now said to apply Daves, certainly.

01:44:55 And Daves decided as a matter of law that the Middlesex factors were met and it overruled O'Donnell One, which similarly only considered the Middlesex factors and in that case found that they were not met. And so, there's no doubt that Goodhart said follow Daves, that Daves's abstention 01:45:16 holding was made as a matter of law without discovery or fact evidence, and that that overruled O'Donnell One. None of that is disputed here. But that then fits into the first step under Rufo and Rule 60(b)(5) because it is this Court's obligation to decide a broader question in that first step under Rufo, 01:45:39 because it needs to decide -- well, first it needs to decide whether the movants waived Younger.

It also needs to decide whether under Rule 60, Daves is a qualifying change in law, that is whether --

THE COURT: Is it just Daves or is it also the 01:45:55 statutes, state statutes?

MR. CUTTING: Whether S.B. 6 and S.B. 9 are qualifying changes in law?

THE COURT: Yes.

MR. CUTTING: Well, no, as I said, I think that is a 01:46:03 law -- that is an argument based on conflict with state law

that is not before the Court right now. If that were before the Court, I think there would be some question about the interaction between the state law --

THE COURT: And I don't have a record to decide that, which is the point I made to Mr. Russo.

MR. CUTTING: Absolutely. The Court would also need to decide whether Daves or Goodhart required this Court to abstain including by revisiting its 2016 holding, which this part was never challenged, which found that bail hearings fall within a Sprint category -- excuse me, that bail hearings do not fall within a Sprint category, and considering whether irreparable harm prevents application of Younger. So, those are two issues that relate to whether or not a Court can decide to abstain that are outside the scope of what was considered in O'Donnell One and what was considered in Daves II.

So, this Court would still have to assess those in the first instance or when it comes to Sprint, it would actually be in the second instance. But certainly those aren't controlled by Daves, and thus they aren't controlled by Goodhart.

THE COURT: So abstention is not controlled.

MR. CUTTING: Abstention is not controlled. What is controlled is the part that Daves dealt with, which is the Middlesex factor. So, Goodhart is instructing-- we read Goodhart to be instructing this Court to say take Daves and add it to -- apply it as binding precedent. Revisit Younger, but

01:47:32 use Daves and see if you get a different result. Now --

THE COURT: Get a different result than Daves did?

MR. CUTTING: Well, sure, or a different result than you did in 2016. But see what the result is, let me put it that way. 01:47:46 Although I do think there's some force to the fact that the 2016 holding on the Sprint factors is now law of the case. But either way, the Court needs to consider add step one in Rufo, and this is well established by Rufo and Rufo remains the controlling authority on this, whether Daves is a 01:48:09 significant change in law and whether it applies on these facts and arguments. And certainly Daves, in accepting Daves as binding precedent, even though it happened much later, is kind of takes some arguments off the table. It resolves the Middlesex factors, we are not arguing otherwise, but it also 01:48:27 leaves some on the table because it did not have those issues before it.

This Court will also then need to proceed to step two and -- well, certainly will need to proceed to step two if it finds that everything it considers weighs in favor of 01:48:42 abstention. We would say that you should still go and look at the record for step two purposes, regardless of what you find in step one because I think it's particularly important here in a case that is likely to receive appellate review that the record be complete, that it be clear, that it be as amenable as 01:49:04 possible to a reasoned decision on appeal. And so we would ask

01:49:07 the Court then continue, regardless of what it finds in step one, to look at the record and see, ask the question of whether vacating a consent decree would result in constitutional violations. Here there is a voluminous record that says yes it 01:49:22 would. And also ask whether the equities weigh against vacatur, which we have testimony from the heads of every involved agency head in the Harris County post arrest system who have weighed in on this question decisively. So, these are the questions for the Court.

01:49:44 THE COURT: So, when I first issued the O'Donnell opinion, it was based on, yes, a voluminous record, thousands literally of hours of bail hearings that showed constitutional violations repeatedly in dealing with the issue of bail grants or denials to misdemeanor defendants. There was an ample 01:50:21 factual record, there was a hundred-plus page decision and that received waves of appellate review. So, when you say look at the record, do I go back to that record? Do I look at the record after the ruminations of the Appellate Court? Rumination in the original meaning of what a cow's stomach does 01:50:54 to what goes in the front end when it gets chewed over and chewed over and it comes out with the result it did. So, when you say look at the record, what are you telling me to look at?

MR. CUTTING: I think the Court can certainly look to the original record if it wishes to do so, but the way that we 01:51:10 have been conceiving of it is more that the record that matters

01:51:15 most is the record now before it, which is about whether vacating the consent decree risks creating or perpetuating the same constitutional violations that the consent decree was put in place to address. And so, that requires looking at the

01:51:32 record we have submitted along with our response and opposition, but also matching it up to the record that the Court made before issuing its order on the preliminary injunction because that will show whether the similar violations are, you know, the ones that plaintiffs and

01:51:53 non-movants now say are likely to occur.

Also, certainly O'Donnell One to the extent it affirms this Court's findings of fact and also most of its conclusions of law and just narrows the injunction, that that also tells us that the real issue here is about people not receiving

01:52:14 constitutional bail determinations. And what that means is individualized, they need to be individualized and they need to be based -- they cannot result in arbitrary or unnecessary detention.

THE COURT: So, the consent decree itself sets out

01:52:28 very specific findings, observations, that became embodied in the Court order adopting the consent decree that set out and summarized the Court's earlier findings and injunction.

MR. CUTTING: That is exactly right, that is a place -- that would be a logical place to start in assessing

01:52:56 whether the constitutional violations the consent decree was

meant to address might return without it.

THE COURT: So, I have two questions about that analysis. One, there's a kind of a ironic circularity about it that I'm asked to abstain, unclear what that means about my ability, if I do abstain, to vacate the consent decree. Having abstained, can I then rule on whether to vacate or modify something that the parties agreed to, then ask me to embody in a consent decree? First question.

Second question is that to examine whether the same inequities would occur, I would also have to take into account the changes, if any, that S.B. 6 and 9 would have implemented and what the relationship between what the consent decree requires and the statutes now require is. And again, I'm concerned that I don't have a record adequate to do that. So, when you tell me to look at the record, I'm scratching my head as to what the relevant record is.

MR. CUTTING: Okay. Well, I will do my best to address that, Your Honor. First, I think that we depart from Mr. Russo in conceding it as that within the Rufo two-step determination that you are actually deciding to abstain and then continuing to decide whether or not to vacate. It is that you are assessing -- the Court is assessing whether or not this change in law would apply here had it been the law back when the case was filed. It is assessing the applicability of the law and the fact that it is significant.

01:54:56 THE COURT: Maybe I'm just not following you and I apologize if that's the case, but that takes me back to the question that I started with. The Fifth Circuit has told me the first thing you need to do and do quickly is decide whether 01:55:14 or not you need to abstain. If I decide that I do need to abstain, does that end the inquiry, my inquiry?

MR. CUTTING: There's just no precedent for breaking out the Rule 50 analysis. Rufo says assess the change in law and whether it warrants relief, and that is part of the same 01:55:40 inquiry. So, certainly deciding abstention is part of that, but it is not a stopping point where you stop, you say okay, I'm abstaining, I am voluntarily divesting of jurisdiction --

THE COURT: Not so voluntarily, let's be clear. But I'm directed to decide abstention first. And if I understand 01:56:05 what you're saying, and tell me if I've got it wrong, you're focusing on the third step, the Younger analysis, and you are asking me to look at the adequacy of the state procedures that would enable an accused in a state criminal case to raise in an effective manner the constitutional issues regarding bail 01:56:42 decisions. Is that what you're focusing on?

MR. CUTTING: Not quite, Your Honor.

THE COURT: Okay, reframe it for me.

MR. CUTTING: We take Daves holding as binding precedent here.

01:56:53 THE COURT: Of course.

01:56:54 MR. CUTTING: And that resolves the Middlesex factors which you include adequacy of opportunity.

THE COURT: Yes.

MR. CUTTING: However, it does not, as I mentioned,
01:57:00 include whether Daves is a significant change in law in the first place because it did not make legal what the decree was designed to prevent. It does not include whether or not bail hearings fit in one of the Sprint categories and if you don't fit in the Sprint categories, you do not pass go, you do not
01:57:18 proceed to the Middlesex factors. And it does not address the great and irreparable harm exception which applies even if the Sprint categories and the Middlesex factors are met. So, we think there's more for the Court to do there, but it's not on the third factor of the Middlesex test because that part is
01:57:35 foreclosed by Daves.

THE COURT: I agree with that.

MR. CUTTING: So, all we are saying is that the Court needs to go through this analysis and apply Younger abstention to the facts of this case, and that is consistent with what
01:57:48 Goodhart is saying to do. The first step of proceeding here in figuring out whether or not to grant the requested relief is to go through Younger. We agree with that. But there is not -- the Court does not stop and abstain halfway through. Under Rule 60, which again we've established I think is the only
01:58:10 mechanism for considering this, it is not a Rule 12 world where

01:58:14 you kind of consider abstention, then abstain or not, and then look to relief or some kind of remedy phase. It is bundled together under Rule 60, it all happens in the same inquiry. Of course, there is an order to it and that is how you comply with 01:58:30 Goodhart, you first consider abstention, you then move on to considering constitutional violations and the equities under Rufo step two. But Rufo is crystal clear, this Court may not vacate a consent decree if doing so would create or perpetuate constitutional violations. It does not say first it considers 01:58:54 whether the argument being raised might deprive it of the case or deprive the jurisdiction and then only if it still retains jurisdiction does it do this. That is part of the test. It is fused together with the first part and there is no separating them under Rule 60 under Rufo, that is not the way precedent 01:59:16 indicates this proceeds.

THE COURT: So, what do I do with the phrase that has been haunting me for some time, "*This case never should have been filed in federal court*"?

MR. CUTTING: I don't think you need to do anything 01:59:28 with that phrase, Your Honor. That is a statement of regret about perhaps issuing Daves later than the majority in Goodhart would have liked, but that is not -- or where it's stated from Daves rather, but that does not change again the fact that we are in Rule 60 world now, we are not in Rule 12 world. And 01:59:53 yes, Goodhart has opened the door to including Daves as law

01:59:57 that this Court can apply in going through step one and then step two of Rufo, but it does not do more than that, and I don't think that phrase demands anything different. That is a statement that we would disagree with anyways because, as we 02:00:15 said, there are different facts in this case and different arguments, and so we don't think Daves would actually foreclose them. But the fact of the matter is, Daves was not the law when this case was filed. This case proceeded under binding law at that time and reached the correct result.

02:00:37 I was a little confused during some of Mr. Russo's presentation. It seemed as though there was some ambiguity about allowing the Court could proceed under Rule 60, so I was relieved to hear that and I hope I wasn't misunderstanding it. However, I did also hear the mandate from Goodhart 02:01:00 mischaracterized as saying this Court needs to dismiss this case and vacate the consent decree. And I'll just point out the obvious here, that is not in the mandate and that is not in the case. It would have been very easy for the Goodhart majority to say that. Now, if it had said that, it would mean 02:01:21 that it was circumventing Rule 60 entirely and that would have been a extremely radical thing for an unpublished per curiam opinion to do, but either way, we look to the text of the decision, there's nothing in there that says that, so I do object to that characterization of the mandate that this Court 02:01:40 must follow.

02:01:43 I do want to just touch on Your Honor's question about state law, if that's not taking us off --

THE COURT: No, that's fine. Keep going.

MR. CUTTING: So, Your Honor's correct that there's no 02:02:00 record in place to assess conflicts between state law and the consent decree at that time. That argument is not before this case. However, that does not mean that state law is irrelevant in this case. In fact, the fact record that we have built and submitted in this case, in this particular motion shows, and 02:02:22 this is unrebutted evidence, showing that S.B. 9 literally requires the very constitutional violation that this case was brought to address. Without the consent decree in place, in a significant portion of cases, hearing officers will be forced to impose secured money bail that may result in pretrial 02:02:39 detention, even in situations where they have determined that detention is unnecessary. And so, that alone under Rufo's cannot create or perpetuate constitutional violations limitation, which is this Court's north star, it's the outer boundary of this Court's equitable flexible modification 02:03:00 authority, that is the outer boundary and that takes us past it. So, that is why S.B. 9 is relevant here.

As for whether state law more generally has an influence here, case law is clear that that does not have an effect, that mere compliance with the law is not a reason for 02:03:29 vacating consent decree nor do we submit that this law is

02:03:34 synched up with federal law or that it is being fully complied with.

*(Pause.)*

So, the case I was looking for here, so the -- as I 02:04:05 said, the evidentiary record shows that state law currently requires the automatic application of secured money bail and, therefore, prohibits individualized consideration at a bail hearing. But also this case has never been about state law, it has been about county practices. In fact, when this case was 02:04:24 filed, there was state law requiring individualized consideration in bail cases. Now, obviously that state law was not being followed, and so this record shows, unlike other counties, this county has a documented history of decades of failing to provide individualized consideration to misdemeanor 02:04:45 arrestees, even when required by state law.

So, even taking at face value movant's argument that S.B. 6 requires individualized consideration, therefore you have nothing to worry about if you get rid of a consent decree, and even pushing aside S.B. 9's obvious contradiction of that, 02:05:03 that is not what this case is about and it's really about what is happening on the ground and what stands to happen if the consent decree is vacated. So, even if that state law actually did reflect federal law and S.B. 9 were not there, and even if Harris County did not have this particular history of defying 02:05:24 it, it would not excuse the Court from needing to look at the

02:05:27 overall equities. And that is because just mere compliance with the law cannot justify vacatur, as the Fifth Circuit stated in *Frazar v. Ladd*, which is 457 F. 3d, 432. There the Fifth Circuit in 2006 said, *"If the Court wished the law to be* 02:06:01 *that consent decrees must be dissolved if defendants comply with federal law, it would have expressly stated so. It did not. A rule of law based on a single factor --"* and here a parenthetical *"--(compliance with federal law) is the opposite of the Court's requirement of equitable flexibility. We hold* 02:06:19 *that the District Court properly determined that the applicable legal standard in this case came from Rufo and Cooper."*

So, I say that to underscore that this Court does not need the record on S.B. 6 and S.B. 9 to decide this abstention issue. That record will be important for the other argument 02:06:40 that movants raise about a conflict with state law alleging that that is a circumstance requiring further relief or similar relief.

THE COURT: So I can decide and indeed must decide abstention without deciding whether to vacate or modify the 02:06:59 consent decree based on asserted conflicts with the state law.

MR. CUTTING: Absolutely, that is outside the scope both as a matter of what is raised in this motion and also it is not something that this Court need to or even should consider as part of what the two steps of Rufo command here. 02:07:22 That is absolutely correct.

02:07:26 THE COURT: So, did you want to talk about the waiver on the part of the judges, particularly focusing on Judge Garcia who didn't assume office until January of 2025?

MR. CUTTING: Absolutely. I'm going to cede the podium to my colleague for that, but I just want to leave with 02:07:42 a few big picture points.

THE COURT: Sure.

MR. CUTTING: The movants have asked this Court to treat Goodhart as a permission slip to skip Rule 60 altogether. 02:07:56 I think we've covered that there's no precedent whatsoever for that, and Goodhart even cites to Rufo, not around it. Rule 60 is the only door to the relief that they seek.

The judges petitioned the Fifth Circuit for an order saying speed up, and they got it, and that is exactly what this 02:08:10 Court is now doing all while following Daves within that structure of Rule 60.

No Court has yet applied Rule 60 to this motion or this record. That is this Court's task, it is not this Court's responsibility to attempt to read tea leaves and predict what 02:08:28 the Fifth Circuit might do on eventual review of that decision. This Court is obligated to apply Rule 60 in the first instance, following the law as it currently stands, and making the factual findings required for a clear record and adequate review on appeal. And so, this Court now has the record before 02:08:46 it and that's precisely what it should do. And on this record,

02:08:50 it should follow Goodhart and other binding law and deny the motion to vacate.

And I'll turn it over to Mr. Fife to talk more about waiver and timeliness under Rule 60, unless Your Honor has any
02:09:01 questions before I sit down.

THE COURT: So, if I draw a bright line distinction between ruling on abstention and then ruling on mootness, I gather your argument is that at a minimum, you would want to submit additional briefing on the mootness issues since you
02:09:31 really didn't address it in what you filed so far, and that would only be a question if I did not abstain under Younger or if I did abstain and then went on to discuss mootness as if I had not abstained.

MR. CUTTING: I think you're correct on the first part
02:09:52 which is that we would absolutely request a chance to brief that. That has not been briefed. I don't think -- as I said, big picture, I don't think it lands the Court in a different place from needing to go through Rufo's steps and consider the equities and likelihood of constitutional violations, but it is
02:10:08 a different case and there is not the record to see what if any conflicts exist there. And whether the Court could proceed through -- I do want to --

THE COURT: It's a messy procedural question. If I do abstain, what does that do to my authority to then determine
02:10:32 whether there's a conflict between a consent decree and state

02:10:37 law that might support modification, if not vacatur? What do I do with my ability to consider, as you say, the Rule 60 factors including the equities?

MR. CUTTING: Our position remains, Your Honor, that 02:10:53 it would not be at step one that you are deciding to abstain. You are deciding that Younger fits those facts and arguments, but you would still proceed to step two. And the way we know that, we don't have a lot of Younger cases in this posture and that's because they're typically rejected, and we have noted 02:11:15 that, you have noted that. This has been put back on the table by authorities, you know, above us, but just for the record, that's why there's so little case law there. We, of course, maintain that is the correct position on that Younger cannot be raised post judgment. But here we are, we are treating it as 02:11:35 though it can be properly raised and then treating it through the Rufo test.

Now, if the Court finds Rufo step one is met under the analysis we discussed, I won't belabor it, but then it still needs to proceed to step two and analyze whether there are 02:11:53 constitutional violations likely to occur and what the equities point towards. And so it is not abstaining at in between step one and step two, it is finding that circumstances of step one are fit and then it is going on to see whether -- and in fact, abstaining is the wrong term for what any of the end point 02:12:13 would be. It is either vacatur or nothing.

02:12:18 THE COURT: The Fifth Circuit has directed me to decide abstention, so I can't simply say you're using the wrong term.

MR. CUTTING: No, but it is abstention within the
02:12:28 context of Rule 60, it is still deciding it in the step one of Rufo, but that does not mean that the end point is this Court abstains. That has no meaning after a judgment. The end point is that the Court proceeds to step two to decide whether or not to vacate. And that is--

02:12:44 THE COURT: Because in this case abstention is essentially saying I can't enforce the consent decree. Is that what you're saying?

MR. CUTTING: It's not even that, Your Honor. It's maybe a parallel would be a party that tries to raise a change
02:12:58 in subject -- law concerning subject matter jurisdiction as a change in law that should justify vacatur. Now, even if the Court at step one finds that that change is significant and that it applies or would have applied on that case's facts had it been decided prejudgement, the Court is not suddenly
02:13:20 divested of jurisdiction and can't proceed to step two, it still proceeds to step two because we are in Rule 60 land, not in Rule 12 world, and it must decide whether the equities and the risk of constitutional violations, what type of a modification, if any, they support. And so, if that is the way
02:13:42 it proceeds with a Court that is essentially deciding subject

matter jurisdiction within step one, certainly the same approach applies when we're deciding abstention within that step one part. Now, this is very --

THE COURT: The Fifth Circuit tells me I don't need any facts, I don't need any discovery, but you're telling me that I have to include factors, the equities, risk of constitutional violations, which inherently require a record.

MR. CUTTING: That's right, Your Honor.

THE COURT: So that's a real inconsistency.

MR. CUTTING: Well, what it said was that Daves does not require any discovery or fact evidence and this also comes in the context of a case that was almost through with discovery at the point that the Fifth Circuit actually decided it. And again, if Goodhart had meant to completely up end Rufo's standard, which of course is something that legally it could not do, but even if it had been trying to do that, it would not have hidden this proverbial elephant in a mouse hole by not even saying it. It would say Rule 60 doesn't apply, it would say, We direct the Court to vacate the consent decree, it would say, The Court needs to stop and, you know -- it would direct it to say that and it would say what it meant about Rule 60. It does not say that. It cites Rule 60 approvingly, it talks about the equities, it talks about how a change in law alone is not circumstances to justify vacatur. And so, I just reject a reading of Goodhart that insinuates that it is somehow

02:15:32 completely undoing Rufo's 25-year-old standard.

THE COURT: All right. Let me hear from your colleague.

MR. CUTTING: Thank you, Your Honor.

02:15:46 THE COURT: And then I'll let the non-movants weigh in.

MR. FIFE: Good afternoon, Your Honor. Travis Fife for the plaintiffs.

The judges of Courts 2, 3, 14 and 16 waived Younger 02:16:08 abstention via entry of the consent decree in an intentional course of conduct taken after entry of the consent decree. Now, *In Re: Goodhart*, we admit, forecloses the first theory of waiver on a wrong view that successors aren't bound by the predecessor's waiver, but taking that as a given, even under 02:16:27 Goodhart's conduct based waiver theory, these judges waived Younger twice over.

Number one, under Goodhart's reasoning, each one of them including Judge Garcia, Court 16, could have filed well before November 2025. And number two, each of them 02:16:45 affirmatively chose to recognize the monitor as an arm of this Court's jurisdiction and seek modification rather than vacatur.

THE COURT: So, the Fifth Circuit seems to rely heavily on the inability of the four judges to get their own counsel, and really doesn't acknowledge the relevance much less 02:17:11 importance of the additional points that you've mentioned. How

02:17:17 do you advise that I ignore that?

MR. FIFE: And I think that that is just a virtue of how the waiver issue was teed up to the Fifth Circuit. So, as we've discussed at status conferences over the last month, what
02:17:30 the Fifth Circuit said was under the four judges' version of facts, we don't see how they could have moved before November 2025. And the two bases for waiver that I just outlined are two ways that the record reflects that that, quote, version of facts was wrong.

02:17:50 Now, I'd like to return to the second theory about seeking modification rather than vacatur as a form of waiver and just stick to the easiest path to find waiver which is what the Fifth Circuit said which is they could have moved well before November 2025. There are two concrete ways they could
02:18:12 have moved before. Number one, they could have hired outside counsel, and number two, as Your Honor suggested, they could have moved pro se.

Now, in her deposition, Judge Goodhart stated that she felt it was unethical for her or her colleagues to represent
02:18:27 themselves, both under attorney ethical rules and under the judicial code of conduct. To be candid with the Court, I was surprised that that made it into their reply brief because Judge Goodhart is just obviously wrong on those issues.

Number one, on the attorney ethics rule, the duty of
02:18:47 competence under Rule 1.01 applies when an attorney takes

02:18:53 appointment. It does not apply in pro se litigation, particularly where the person is already a defendant in the lawsuit.

Number two, on the Judicial Conduct Code, Cannon 4, 02:19:05 subsection (G) expressly authorizes judges who are bound by that provision to represent themselves pro se. In fact, this is unnecessary because of the plain text of the statute, but a 1998 judicial ethics opinion from Texas, this is opinion number 226 that we'll include the full text of in our supplement says, 02:19:34 quote, *A judge may always represent herself in a legal action*, end quote.

And so, it is just wrong that they couldn't have moved pro se. So when the Fifth Circuit says could they have moved in this court before November 2025, the answer is a resounding 02:19:51 no. And a quick note on this demonstrative, I actually think it's incredibly helpful because it takes them 23 entries and two full pages to finally get to we filed the motion with the Court to vacate on the basis of Younger at the very end of their chart. And so when the Court is reviewing this 02:20:12 demonstrative, which candidly I think you should, I would also tack on to each of these bullets a *and we chose not to move either before the monitor or the Court to vacate the consent decree on the basis of Younger.*

And following the Fifth Circuit, it's very plain. The 02:20:33 Fifth Circuit said on their version of facts they couldn't have

02:20:36 moved until November 2025. Actually, the record shows they had a lot of options to move earlier, and under *In Re: Goodhart*, that constitutes waiver and that's all the Court needs to say about Younger abstention.

02:20:50 THE COURT: Does that apply to Judge Garcia as well?

MR. FIFE: Yes, Your Honor. She could have moved on January 1, 2025.

THE COURT: That's the day she assumed office.

MR. FIFE: Yes, Your Honor. And as the Court may or
02:21:04 may not remember, Judge Garcia was briefly a defendant in this original lawsuit from early 2016 through the 2016 election.

THE COURT: I think she was a participant starting in October of 2016.

MR. FIFE: Yes, Your Honor, when they created that
02:21:24 court that eventually she lost election for. But the point still stands that it's not as if she was taking office unaware of this case or being bound by it. And while we didn't depose Judge Garcia, one of the first questions we asked in the depositions of Judge Goodhart and Johnson was *When you took*
02:21:47 *office on 1/1/2023, were you aware that you were bound by the consent decree*, each of them said yes, full stop. And so, I think it is -- it would be a little incredulous to argue that Judge Garcia, a prior defendant, then came into office not knowing about the consent decree. And so, I think all you have
02:22:09 to do is say *In Re: Goodhart* says could they have filed before

November 2025. Obviously under Texas law and the facts of this case, they could have. That's waiver, motion denied.

Now, if the Court has any other questions about that theory, I'm happy to address it. I think the Court can just rest itself on they could move pro se, but the judges have made a big controversy about, well, the County didn't want to allocate taxpayer funds to provide them counsel. And I would approach this question in two ways if I was the Court. The first is they cite this statute, Local Government Code Texas -- Local Government Code 157.901, which requires that County Commissioners pay for counsel where an official is, quote, sued by any entity.

Candidly, I think it's actually a complicated question of state law, whether the County has an obligation to pay for someone to reopen an already closed matter. I think the Court shouldn't really get into that. They have manners of dealing with that under state law where they could mandamus the Commissioners Court to fulfill what they claim is their obligation. But even if that isn't -- but even if the commissioners should have paid for counsel, that same provision of state law expressly recognizes that officials may choose to hire their own counsel. At subsection (C), it says that a County official is not required to accept the counsel the County provides. Meaning there are situations where an official capacity defendant can and does choose their own

02:23:59 counsel.

Now, I take the judge's point that they did not want to pay either with their own funds or some other source, but that is a choice that they made. Comity requires not only the
02:24:13 Court to abstain in appropriate circumstances, which this isn't for the reasons Mr. Cutting said, but it also under Hodory requires the Court to respect the decisions and the cost benefit analysis of state officials. That cost benefit analysis that the judges of Courts 2, 3, 14 and 16 made was to
02:24:32 not spend money to hire outside counsel and they are stuck with that decision and no principle of comity or federalism requires you to perform a counterfactual analysis of what they could have and should have done if they actually wanted to raise Younger.

02:24:49 So, again, I think waiver here is just apply the plain text of *In Re: Goodhart*, everyone agrees that it authorizes a conduct-based waiver or that it recognize a conduct-base waiver. They frame it in terms of, well, what was the judge's version of events, they couldn't file until November 2025.
02:25:11 Actually, they could have. Three of these judges could have filed 32 months earlier, and Judge Garcia could have filed eleven months earlier.

Now, I heard the Court's scepticism of our second theory of conduct-based waiver which is that by asking for
02:25:28 modification of the decree the judges put their arguments up to

02:25:34 the federal court and the monitor to agree with. I don't want to abandon that theory because I think it's forceful, but I do just want to say that in addition to the waiver issue, I think another easy way out of this mess if the Court finds that Rule
02:25:51 60 applies is to just apply the reasonable time limit of Rule 60(c)(1). The four judges don't in their reply don't even expressly address that issue. The Attorney General addresses it but through a candidly confusing equivocation of Rule 24's timeliness with the Court's futility holding on intervention
02:26:14 and Younger abstention -- go ahead.

THE COURT: So, what would you view as a reasonable time for a Rule 60(c) analysis?

MR. FIFE: I think for the Attorney General, within 30 days from the issuance of Daves, given he was litigating the
02:26:30 issue in Daves and Russell. And, you know, we give him credit for when he files to intervene, so if he gets that intervention filed within 30 days, you wouldn't hear anything from me.

For the four judges, I think the time -- I think it's a little bit more complicated because of Goodhart's predecessor
02:26:56 or successor. I think properly viewed, that the judges should have moved as soon as possible after the Daves opinion issued. I think that Judge Garcia is in a difficult position to assess because Goodhart doesn't say anything about how the predecessor or successor issue relates to (c)(1), so I think properly
02:27:19 viewed under cases like Salazar and the R.C. case out of

02:27:23 Alabama we cite in our brief, she is on -- it's the office
that's on the clock, not her as an individual person or judge.

THE COURT: No, I mean I think if you make it
individual specific, then you just keep resetting the clock.

02:27:40 MR. FIFE: Exactly. And I just think that that is
flatly inconsistent with the way the Supreme Court has treated
Rule 60(c)(1). Mr. Cutting quoted the Coney Island case which
was unanimous in result in 8/1 in the majority opinion where
the Court said even a void judgment we are going to enforce
02:28:01 this time limit because the finality of judgments is so
important.

And the Rule 60 time limit isn't a -- you know, it's
not something that this Court is imposing sua sponte. It's
something that Congress through the Rules Enabling Act and the
02:28:18 judiciary implemented to prevent what was a very confusing
amalgamation of common law writs and inherent authority
proceedings that were causing chaos among the federal bench,
and so I think that a proper view of this Court's role is to
apply Rule 60(c)(1) under the factors and discretionary
02:28:45 analysis we laid out in our brief and to say that the County
Court at Law of judge 16 waited two and a half years to raise
Younger which is not within a reasonable time.

Again, we cosign the analysis of Salazar and R.C., the
Alabama case on, you know, how their argument about changing
02:29:12 political wins and things work and -- yeah, and so I'm happy to

02:29:20 continue discussing waiver, but I did just want to say there's another kind of clear offramp here, which is Rule 60 is the procedural vehicle, I don't know if I have to do all this equity stuff, but (c)(1) definitely applies.

02:29:33 THE COURT: But the advantage of the Rule 60 analysis is that it doesn't bring into the equation the equitable factors that may in turn rest on facts that are not before me in the record.

MR. FIFE: Well, so yes, that is true. All of the --

02:29:53 the record is complete as it's going to be on timeliness. Many of those facts are just docket entries that you have.

Now, I did want to make a slight addendum to how the record discussion went before, which is I actually think that that's a question for the moving party. Because similar to

02:30:12 Coney Island and the BLOM Bank case, the Supreme Court is now in a unanimous BLOM Bank case and then an 8/1 Coney Island opinion has kind of banged its hands on the podium.

THE COURT: Try gavel.

MR. FIFE: Bang the gavel, yes. We don't get one of

02:30:32 those, so I'm not used to --

THE COURT: I don't have one.

MR. FIFE: Well, they've banged the gavel repeatedly in two straight terms that says Rule 60 is strenuous extraordinary relief, so I think the question is for them,

02:30:45 where is the record.

02:30:47 THE COURT: So, would it be inconsistent for me to say, okay, I've looked through all this, I conclude that I must abstain under Younger, but then hold that Rule 60 hasn't been met, not a reasonable time.

02:31:07 MR. FIFE: With a very slight -- and I'm not playing semantics, I'll explain why it's substantive. But I think what the Court would actually hold is if this case was filed today, I would abstain. But this case is already at final judgment, which means Rule 60 is the only procedural vehicle that can 02:31:28 vacate the consent decree and they've failed the Rule 60 test twice over. One, by filing the motion within an unreasonable time, and two, because the only record the Court has is the constitutional violations, the tens of thousands of violations that were occurring before the consent decree and the thousands 02:31:48 that will occur if you vacate. And again, I think you can make the (c)(1) point without even addressing the equities. I think --

THE COURT: Just unreasonable time, full stop.

MR. FIFE: Candidly, Your Honor, we could all go have 02:32:04 a coffee break and you could do this opinion in 30 minutes on (c)(1). Shoot my shot.

But yes, that is I think -- now, I do just want to make one additional point which is that the Younger waiver issue, you can disagree with us on whether Rule 60 applies and 02:32:26 still apply the straightforward Younger analysis that I

outlined before. And if the Court is open to it, I would love the opportunity to just briefly address our second waiver theory for the four judges under Goodhart and then very briefly on the Attorney General.

THE COURT: Okay.

MR. FIFE: So, the second theory was that by continually requesting modification, that by continually requesting modification to correct purported conflicts with state law, the four judges sought to have those claims recognize this Court's continuing jurisdiction. Now, I understand that the Fifth Circuit really focused on, well, could they have moved earlier. And again, but if you look at the underlying cases there, they're citing the Dayton Schools case, they're citing Hodory, and the principle underlying those cases is comity does not apply when you have put your claims up for -- you have put the issues up for federal adjudication. And the two examples that we have cited favorably that the Court also cited favorably on waiver was Cradle of Liberty and Norton, again it's the E.D.N.Y. case. And in those cases, the government defendants, they stayed state court proceedings and affirmatively said federal court sort this out for us. They paused the state proceedings to allow the federal court to go forward.

Now, I've recognized that in an obvious way that is not what happened here, but Daves I rejected any sort of bright

02:34:11 line rule for whether a party has waived Younger. And the context here is that it's not as if these judges were just waiting for some state court proceeding to unfold. Every single day they delayed was allowing themselves to be bound by
02:34:29 the consent decree and this Court's jurisdiction. So again going back to the demonstrative, I think our second theory is that we would add *Did not move to vacate* and *Allowed ourselves to be bound by the consent decree.* And so when they're making these attempts to modify the consent decree, they're not saying
02:34:52 get rid of it in the way that they are today. They're saying, hey, 16 judges, let's get together and correct this thing and, you know, fulfill what we think S.B. 6 requires. We disagree. And that that is a request to continue this Court having jurisdiction and analogous to the Norton and Cradle of Liberty
02:35:15 cases.

THE COURT: So, your position is that all the judges waived?

MR. FIFE: Yes, via entry of the consent decree. And Judge Garcia on the second theory -- so, number one, is in
02:35:38 their characterization, she just kind of joined the party with the other three who, as we've outlined in our brief and the evidence we presented, were really trying to garner support for modification, not vacatur. So, on their telling, she joined those efforts and the only affirmative step she made was to
02:36:01 send a formal request. Judge Goodhart sent it, but in her

02:36:04 deposition she said it was on behalf of all four of them, to modify the consent decree to allege -- to make it consistent with alleged conflicts in state law.

Now, I will spot them there is a lot of examples in

02:36:21 the record of Judge Goodhart saying something to the effect of, *Well, I was worried about Daves II, we talked amongst ourselves about Daves II.* That, we do not dispute that. I think what it comes down to is a legal question of whether, you know, talking amongst yourselves or via e-mails or in phone calls with the

02:36:42 Attorney General's Office can preserve an issue when all of this other outside facing conduct is saying no, we just want to modify. And I think when you look at the underpinnings of waiver, especially in this case of the thousands of hours of videos that you and my co-counsel watched and the immense

02:37:06 amount of resources from everyone in the County and the judiciary, waiver is designed to prevent unfair prejudice, and allowing them to have these what I would call not secret but inside chats about their concerns about Daves II and outwardly just request modification, I think that that is the exact type

02:37:30 of gamesmanship that waiver and prejudice that waiver is designed to prevent.

Just quickly on the Attorney General, I would just deny his motion to reconsider under Rule 24. The Court already reached that as an independent ground and I just wouldn't even

02:37:49 evaluate whether he waived Younger or not, but I'm obviously

02:37:53 happy to answer any questions the Court has about that.

THE COURT: Not right now.

MR. FIFE: Wonderful. Thank you, Your Honor.

THE COURT: Thank you. Does it make more sense to
02:38:09 have a response to what has been presented from the plaintiff so far and then turn to the additional arguments that I think Mr. VanFleet presented, Mr. Hu presented? You tell me what makes the most sense. Should I get all of your arguments out and then let the Attorney General and Mr. Russo respond?

02:38:32 MR. VANFLEET: Well, I do have a couple of points on waiver.

THE COURT: Come on up.

MR. VANFLEET: It maybe makes sense to wait for the other stuff.

02:38:45 Your Honor, I wanted to make clear the Attorney General is incorrect that the 12 judges do not join in the waiver arguments. When they joined in the briefs with the plaintiffs in Harris County, that includes everything including waiver, and I believe both the four judges and the Attorney
02:39:05 General, perhaps especially the Attorney General have waived the abstention arguments.

Two things came to mind on your questioning, Your Honor. One, what could the judges have done themselves. They could have done, as Judge Draper and I were discussing again,
02:39:22 the first time we talked after she was appointed to the bench,

02:39:25 she reached out to me in a phone call and said, *"I want you to represent me too. How do I pay you?"*

The other thing you raised is pro se representation. And that reminds me of the very first argument I had in the 02:39:42 Fifth Circuit in 1980 before Chief Judge Brown, it's *Henson versus Estelle*, 645 F. 2nd 71. Unlike these four judges who are not only highly intelligent, highly educated members of the bar, members of the bench, John Wesley Henson had an IQ of sub 90. I don't remember exactly. And I was appointed by the 02:40:13 Fifth Circuit to try to revive his habeas petition which was pro se, which was handwritten and which was rejected by the Southern District of Texas as being untimely. In the Fifth Circuit, despite his low IQ, his inability to get any kind of legal help except a prison jailhouse lawyer, they said too late 02:40:39 is too late, it causes prejudice and no excuse for you, you are out of here.

I'll have some final points on the other parts.

THE COURT: All right. Mr. Hu.

MR. HU: Daniel Hu for Harris County. Just limited to 02:40:58 the abstention question, just want to point out that the County agrees with the plaintiff's interpretation of Goodhart and we join in their arguments. And then just two things on the waiver question, Section 157.901 that was discussed, that regards the Harris County taxpayers paying for legal 02:41:18 representation, typically comes up more in the context of like

02:41:22 when a deputy is sued as a defendant, not when someone disagrees with a County policy and wants to challenge it or, like in this case, a consent decree.

And just one other minor fact. Judge Johnson, one of 02:41:37 the plaintiffs is actually admitted to practice in this court and could have been representing herself pro se. That's it, Your Honor.

THE COURT: I assume that later you'll want to argue some of the points you made about the effects on Harris County 02:41:55 and its taxpayers if the consent decree were to be vacated?

MR. HU: Yes, Your Honor. I would like to do that at the appropriate time.

THE COURT: All right. Thank you. All right. Am I going to hear next from the Attorney General on waiver or are 02:42:10 we back to Mr. Russo?

MR. NWAOKORO: Mr. Russo, Your Honor, and I'll go after him.

THE COURT: Mr. Russo, if I could start off with a question for you.

02:42:42 MR. RUSSO: Certainly.

THE COURT: So, looking at Rule 60(c), does a new officeholder in your judgment when that new officeholder does take office, does that individual get a fresh start, a fresh clock to move to modify or vacate a consent decree that was 02:43:02 previously entered?

02:43:04 MR. RUSSO: Yes.

THE COURT: Okay. So, any limiting principles? Ten years, 20 years, got a consent decree, fresh clock, move to vacate?

02:43:19 MR. RUSSO: That's an interesting question and why --

THE COURT: I thought so.

MR. RUSSO: It's very applicable because we're dealing with a governmental entity here. And as the *In Re: Goodhart* noted and the City of Chicago case is that this particularized 02:43:34 question about barring future government officials from ever having a say in their own office is something that is not -- the Fifth Circuit is not -- this Court shouldn't live with either. You have to allow officials elected in the future to have a say in their own office, you can't bind them forever.

02:43:55 And with respect to your first question is do they get a new clock, yes they do. But the question is at that point, how do they go about challenging whatever situation there is. That's again *In Re: Goodhart* addressed that in the sentence I read earlier where they said it turns on this particular 02:44:14 circumstances of the case at issue. So, I think all that is addressed in what the Fifth Circuit and the mandate the Fifth Circuit provided to the Court.

THE COURT: All right. Go ahead.

MR. RUSSO: So, just to address a couple issues, I'll 02:44:37 deal with the waiver arguments first. So, first counsel --

02:44:44 actually, second counsel, they presented two main arguments to the Court which is, first of all, they could have filed before November 25th and they could have done so pro se. Your Honor, the idea or notion that these judges have to move forward pro 02:45:01 se when everyone else in the case is represented, including their cohorts who just have a different opinion than they have, is not something this Court should tolerate. The idea, though, also that the County is deciding not to pay for their representation is -- the situation there is the party who's I 02:45:32 guess controlling the purse strings in that situation is actually opposed to the opinion and the position. So, the fact that the County declined representation in this instance is particularly problematic because the County in this instance again is opposing every opinion that the four judges want to 02:45:55 pose. And so, that conduct by itself is, from our perspective, problematic and should be viewed in this Court.

And if you're going to walk through an analysis of what's the reasonable time to bring your case, in every one of those cases, the question becomes, well, what are the 02:46:16 circumstances behind that. One of those is we're talking to parties and having to deal with parties who don't want our voices heard, and so that in and of itself presents a problem. Does the Court have a question?

THE COURT: But the judges had every First Amendment 02:46:36 and other right to speak up, nothing that the other judges that

02:46:44 I see in the record did do or could have done to squelch them.

MR. RUSSO: And here's the great thing, Your Honor, if
they had something to say to the Court, they had a lawyer--

THE COURT: Half of my civil docket is pro se
02:47:02 litigants and they're not lawyers much less judges. So,
there's not a structural disadvantage that makes other cases
suspect.

MR. RUSSO: And in each one of those cases that you're
referring to, I presume, tell me if I'm wrong, when you have
02:47:18 pro se people representing themselves, they're representing
themselves, which is not what is happening in this situation.
These are capacity defendants, and so this idea or notion that
there's people that represent themselves independently pro se,
this is a different situation.

02:47:37 THE COURT: So, your theory gives new officeholders a
fresh 60(c) clock, but Goodhart says the mere transfer of power
from one officeholder to another is not enough to vacate a
consent decree. Right?

MR. RUSSO: I agree with that.

02:47:59 THE COURT: So, how do we make those consistent?

MR. RUSSO: Well, we review the circumstances under
those particular situations. If the Court reviews the
circumstances and determines on its own view is this
individual's position timely and what's its merit.

02:48:24 THE COURT: All right.

MR. RUSSO: Move on?

THE COURT: Please.

MR. RUSSO: One other thing I want to mention, though, that *In Re: Goodhart* discusses in terms of the thought about what the Court was concerned with and what proof was in front of them. The second to last paragraph of *In Re: Goodhart* they address this question of the four judges state in their motion they apparently could not file the motion before November of 2025. And then it goes on, *"When as they represent they were finally able to obtain counsel independent from that of the other 12 Harris County Criminal Court at Law judges, all of whom support the consent decree's continuation."*

Your Honor, that is still true. We still have a situation where these four judges were not represented until that day. So, the idea or notion that, well, Fifth Circuit just didn't have all the facts in front of them, it's not the merit as you might suspect. What the Fifth Circuit was looking at is did these people have representation separate and apart from their other represented courts, and the answer to that is an emphatic no, even under every piece of documentation that they filled the record with. So, to that extent, if *In Re: Goodhart* is correct in the statement that they thought that was the important fact, then that turns the day for the four judges in terms of waiver.

The issue of this notion that by discussing with the

02:50:08 monitor and making an attempt to maybe get some resolution and that is somehow waiving arguments, there's no basis for that, Your Honor, either in the case law. In fact, there's a case we cited in our reply, if I can find it real quickly, where the 02:50:29 parties actually engaged in discussion on a consent decree. And the Court held that -- see if I can find it. It's in our briefing. The Court held that that action in and of itself is not a waiver.

The other thing is *In Re: Goodhart* picked up on this 02:50:51 issue of activity in its discussion of whether signing, by signing the consent decree prior officeholders could have itself waived on behalf of later parties, and they said there citing to RTM, that even going through the entire case engaging in discovery, that is not waiver. So, the Fifth Circuit again 02:51:17 in *In Re: Goodhart* has taken a pretty hard line on case activity and then conduct that constitutes waiver in terms of the abstention argument.

Turning quickly to sort of the Younger arguments, this idea that mootness is the first time that we've heard or talked 02:51:57 about the mootness issue that counsel mentioned, it's been a while ago, but section three of our motion actually discusses the issue, that mootness is sort of the co-equal ground on which to resolve this case under Daves II, and so it's not new, it's something that we are aware of, the Court is aware of it 02:52:22 as well.

02:52:25 Struggling with this issue of how do I deal with abstention and mootness. Interestingly enough, as the Court is aware, Daves II did the analysis and performed both and said we should abstain and then said the case is moot as well, so you
02:52:39 know, Daves gives the Court some instruction on how to deal with both of those situations.

Let me look at my notes here. There were discussions about plaintiff's counsel discussed this equity analysis, step one and step two. From our perspective, Your Honor, and from
02:53:00 the perspective of *In Re: Goodhart*, there really is no step two and they're not expecting one, which is why they concluded that, again, O'Donnell One is this case. So, when they abstained and overturned O'Donnell, that's in this case. And it goes on to say, Daves II does not hinge upon factual
02:53:25 development or discovery, so I think the Court picked up on that, but the point is there's step one. Analyze abstention and we believe once you do that, you will find grounds to vacate the consent decree and dismiss the case.

Plaintiff's counsel also makes a -- they're making the
02:53:53 argument that vacating the consent decree is going to result in tons of constitutional violations and there's going to be all manner of problems.

THE COURT: And every Harris County taxpayer will be paying more.

02:54:11 MR. RUSSO: Every --

02:54:12 THE COURT: Every Harris County taxpayer will be paying more.

MR. RUSSO: Well, here is the principle that I want to make sure the Court is aware --

02:54:19 THE COURT: That's one of their arguments that you didn't mention.

MR. RUSSO: Right. We objected to some of the evidence, we don't think it's pertinent by virtue of *In Re: Goodhart* and we still think that's the case, meaning discovery 02:54:32 is not necessary for determining abstention. But here is the important point that you didn't hear from counsel in terms of the use of this Middlesex County case. This Court should not assume that county officials are going to act in an unconstitutional basis. In fact, the opposite is true. The 02:54:49 presumption is that government officials do the right thing.

THE COURT: That was a presumption that did not prevent the findings and conclusions that were entered in the original O'Donnell.

MR. RUSSO: And I completely understand --

02:55:04 THE COURT: That's the record.

MR. RUSSO: And I completely understand what the Court is saying, but to the extent that plaintiff's counsel is suggesting that the Court should believe that at this point in time, if the consent decree goes away that Harris County is 02:55:20 going to start engaging in constitutionally violative

02:55:24 practices, Middlesex County is very clear, that's not the Court's presumption. You presume that the County acts in good faith rather than numerous constitutional violations are going to happen. And in fact, as we talked about before, the changes 02:55:45 in Texas law were designed to deal with most of the issues that this case was originally brought to correct. And that still remains a backstop, Your Honor, if the consent decree exists or doesn't exist, as does the fact that County judges themselves have the ability to control the local rules and the manner in 02:56:10 which bail is conducted, as long as it's within boundaries of state law, which again --

THE COURT: And the Constitution.

MR. RUSSO: As long as it's within the boundaries of state law and the federal Constitution. And just so we're 02:56:24 clear, there is no challenge to the constitutionality of S.B. 6 or S.B. 9 with the manner in which those statutes are being operated. And as I said before, there are 253 counties outside of this one which are using Texas law to handle bail, and that's where this case -- that's where Harris County ends up, 02:56:51 back with the rest of the state.

THE COURT: So, you're asking me to modify or vacate the consent decree.

MR. RUSSO: Yes.

THE COURT: Are you framing that request procedurally 02:57:07 here in this federal court under Rule 60?

02:57:14 MR. RUSSO: If the Court feels like -- our view is the Court is under mandate to do it.

THE COURT: Well, I've got to find a procedural mechanism to effectuate the mandate.

02:57:25 MR. RUSSO: The discussion earlier was that -- our view is the mandate is the procedure. Just as if the case had just started. Look at what this case looks like, given Daves, during the foundational putting this consent decree together, should the Court have --

02:57:49 THE COURT: Abstained.

MR. RUSSO: -- abstained. And that from our perspective Rule 60 is not required. Although, again, Judge, we are adamant that even if you apply Rule 60, Rule 60(b)5, (b)6, you're going to reach -- you should reach the same 02:58:08 result. There is absolutely no reason to engage in any equity analysis under Rule 60(b) or under the mandate that's been presented to the Court. And so --

THE COURT: All right. Thank you. I didn't mean to cut you off. Had you finished?

02:58:31 MR. RUSSO: I was going to ask the Court if you had any other additional questions for us on the waiver question. We didn't really get into the standard, but waiver is intentional relinquishment of a known right.

THE COURT: I know what the standard is.

02:58:48 MR. RUSSO: It's defendant's necessity to prove all

02:58:49 that, so with that, we're concluded.

THE COURT: Thank you.

MR. NWAOKORO: Good afternoon, Your Honor. Joe Nwaokoro for the Attorney General. I don't agree with a lot of 02:59:10 with Mr. Fife, but I agree with him on one thing, this can take 30 minutes. We should be quick. And as a matter of fact, that was our position at the beginning when they went into we need to have month-long discovery and here we are over a year later since we filed our motion to intervene.

02:59:31 I would like to point the Court as far as the questions go, I would like to remind the Court that *In Re: Goodhart* was well aware of the post judgment posture of this case. I direct the Court's attention to the last paragraphs of page three of the opinion where they recognize the question 02:59:56 that the Court had about how to reconcile the abstention issue with Rule 60. And their response was kind of terse which is I guess why we're here today. And they say follow Daves. And I think the fundamental issue here with my friends on the other side is, first, they don't think Daves II was properly decided. 03:00:24 And I understand. I mean, some of the plaintiffs' counsel here worked on the Daves II litigation and they don't seem to have given up. And the second issue is they seem to be paying lip service to *In Re: Goodhart*, which they believe was egregiously decided. But if you are to follow *In Re: Goodhart,* Your Honor, 03:00:43 and we have -- the Court has a mandate to follow not just the

03:00:48 letter, but also the spirit of the law. *Collins versus Department of Treasury*, 83 F. 4th, 970. The Court has a duty to implement both the letter and the spirit of the mandate. And the question is what is the spirit of that mandate. And 03:01:08 listening to plaintiff's and the non-movants, it is all Rule 60(b) analysis.

Part of the question there is this, and there's a big distinction because when you look at the cases that they have cited, first of all, none of them comes really close to the 03:01:23 issue at hand. The panel was well aware of Joseph Ingram when they issued the mandate. The Court was well aware of some of the cases they've cited are not simply cases they've cited in -- none of them comes close to the issues we have here.

THE COURT: Very unusual case, I agree with that.

03:01:43 MR. NWAOKORO: This is an instance to show bail reform case, this is not the run-of-the-mill judgment in which you recognize, okay, there's a post judgment issue, what do we do now, there's a finality. There's an ongoing monitoring, okay? And everything they have is about equities. And if you look at 03:02:02 Daves II, Daves II starts by saying in the discussion on mootness -- if Your Honor gives me a second.

Daves II in its discussion of mootness, page 63, says after discussing Younger, says, *"That explains why federal courts must abstain from invoking equity to interfere with* 03:02:29 *ongoing state criminal proceedings where plaintiffs have*

03:02:33 *adequate opportunities to raise constitutional issues."*

Along with that, about 60 analyses here, it's nothing here but equity, equity, equity. So I agree with Mr. Russo. When the Fifth Circuit came down with its decision with its
03:02:49 mandate relating to Younger, the Court should also consider mootness and even if it didn't, it can also do it sua sponte on its own. The Court needs to determine that it has jurisdiction all the time.

There's a discussion here about mootness and 60(b)
03:03:08 needing a record, but these are issues that Daves II have already addressed. Daves II looking at-- and I listened to my colleague on the other side talking about the record needed to develop mootness, etc. Daves foreclosed all of that. S.B. 6 -- it was interesting hearing him talk about S.B. 9, but S.B.
03:03:28 6, the bail reform case, the same case at issue in Daves, S.B. 6 is still there and there's no discussion about it. And following Daves means, of course, following the spirit and intent of the mandate and that means complying with what Daves has stated.

03:03:47 Now, that is by way of a preamble, Your Honor. If I may, I will take a step back because we've not been allowed to intervene to raise Younger yet, so I will start with my reconsideration motion if that is okay or would you prefer that I go into the waiver, Your Honor?

03:04:07 THE COURT: I think I am obligated to decide the

03:04:10 Younger issue. Let's start and stop with that.

MR. NWAOKORO: Okay. So, as far as Younger goes, they have alleged, of course, that there's been a waiver of Younger. As far as the state goes, all they have is really implied conduct and all of that has been rejected by *In Re: Goodhart*. A waiver by a state has to be explicit. It also has to be unequivocal. The unambiguous aspect seems to be lost, it has to be explicit, it has to be unequivocal. And my friends with Harris County also in their briefing, they stated that you cannot assert Younger by meetings and e-mails. Well, that also points the other way. You also cannot waive Younger by meetings and e-mails. And the cases that they've cited, Cradle of Liberty, miles away from the case here. I mean, The City of Philadelphia requested merits on that case.

03:05:14 Here, the Attorney General, first of all, we did not intervene. Left to them, we waived Younger by intervening, we waived Younger by not intervening. They claim we waive Younger by intervening because we are bound. Well, that premise came up by the Court in *In Re: Goodhart* which stated that consent by predecessors is not binding on successors, and there's no reason to extend that even to the states. If that is not binding on counter officials, how could it even be binding on the state that was a non-party throughout this and what the state has or hasn't done in other cases. But they tried to have it both ways. They raise the issue about the state's

03:06:00 involvement in Daves and Russell. When we respond to that, they say woe, woe, woe, that is beside the point, doesn't matter about this case.

Well, the state has been consistent in challenging the 03:06:14 federal oversight, and I cite in Younger, in Daves, and in this case, and as soon as we got the opportunity we moved to intervene, so we have not waived that and they have no evidence, all they can have will be supposition. And actually what you're going to have is a redirection into 60(c)(1). 03:06:34 Well, they cite not a single case supporting important 60(b) standard to determine the timeliness of Younger.

And one thing also they seem to forget, under Rufo, the Court has to apply a flexible standard and we have cases again stating that timeliness is the timing contextually. 03:06:56 There is no straight timeline. So, the state has timely intervened to raise Younger. We have not waived Younger at any point. We have not enclosed to any evidence of Younger. All you have would be silence -- a straight handwritten note that one of the judges had, but none of them under binding Fifth 03:07:24 Circuit precedent is enough to waive Younger.

And the last thing I will state, Your Honor, will be one of the questions again you have, and I see you're wrestling with that notwithstanding the mandate is this, Younger following Daves mandates dismissal. And to the extent that the 03:07:50 Court needs a procedural device, I think we've also outlined

03:07:56 that in our briefing, 60(b)(5) gives you that outlet. It can no longer be equitable to continue to enforce or to apply a consent decree judgment that the Court should have abstained from in the first place. And Daves and Goodhart have all 03:08:15 directed that this Court case should not be brought in the federal court in the first place.

THE COURT: Thank you.

MR. NWAOKORO: Thank you, Your Honor.

THE COURT: Response?

03:08:36 MR. FIFE: Thank you, Your Honor. Travis Fife again for plaintiffs. I'll address waiver and timeliness. Mr. Cutting will address equities and then we are hopeful that our colleagues at the County can present some of the taxpayer costs. I just want to start with a recognition that a lot of 03:08:53 the discussion today has been exceptionally technical and very detailed focused and that is well and good. These issues are important, let's be rigorous about them. But if we take a step back, I want to really focus on Your Honor's question about, well, if a new judge was appointed tomorrow, does that restart 03:09:12 all of these clocks. And I didn't hear a clear answer from Mr. Russo on what is the limiting principle. The reality is is that the federal court system as created by Congress and the rules adopted by the judiciary set time limits when you have to file motion to dismiss, when you have to file a notice of 03:09:30 appeal, when you have to file a petition for writ of

certiorari. On movants' view, they can make those arguments or they can file the notice of appeal or challenge a judgment whenever they want, and as long as they have an abstention or jurisdictional hook to make those arguments. That is exactly what the Supreme Court in a 8/1 opinion about Justice Alito rejected in Coney Island. Justice Alito gave the example of the federal rules of appellate procedure which has a jurisdictional clock of 30 days.

Now, it is just incredulous to say that these judges can move whenever and however they want without any regards for the time and the reliance interest that their conduct and the pendency of the consent decree generated from other parties. We're talking tens of millions of dollars. I think the estimate Mr. Hu will present is around 33 million. We're talking about 30,000 people who are processed through the system every year, and in their view, they can wait for as long as they want with no limiting principle. Rule 60(c)(1) does not countenance that regime, and as the Court has expressed through its questions today, that regime is absurd and contrary to the system that Congress and the judiciary have created to resolve civil litigation.

There's a number of smaller points there. First, they continually conflate (c)(1) timeliness with waiver. Those are different standards. As I explained, Rule (c)(1) is akin to Rule Four of the Rules of Appellate Procedure that says if you

want to challenge this judgment, do so in a reasonable time. Their failure to do so -- their Younger argument might be the best, most obviously correct argument in the federal court system. It's not. Rule 61 applies collaterally to that. You don't have to say anything about the merits of their Younger argument, just like a Court of Appeals that dismisses for lack of jurisdiction for failure to timely appeal doesn't say anything about the underlying merits of the appeal.

Waiver, on the other hand, is about intentional relinquishment of the right. I, frankly, agree that in some ways as I said I --

THE COURT: A much harder case.

MR. FIFE: Yes, I think there are ways out, but I do think (c)(1) is just as clear as the sky is blue.

And the next issue that came up was that whether it applies to the seat or the individual official. I heard Mr. Russo say yes it applies to the seat, but maybe I missed it, I didn't hear a case or any sort of legal authority that supports that. As Your Honor said, as Your Honor quoted, *In Re: Goodhart* doesn't require that rule and it would be hugely destabilizing to adopt it in the context of a rule of civil procedure that is designed to, A, preserve the finality of judgments and, B, avoid a mash-up of different common law writs and that's designed to streamline post judgment procedures.

The other thing I would say is, again, I would just

03:12:54 follow the approach in Salazar and R.C., the Alabama case, both of which don't totally ignore the change in politics, but filter it in to a context based analysis of the Rule 60(c)(1) analysis. And here it is undisputed that the judges of Courts 03:13:22 2, 3, 14 and 16 knew about Daves when it issued and didn't move until December 11th, 2025. That is facially untimely under Rule 60(c)(1). The most comprehensive treatment of the rule that we found was Norglass case which cites a number of courts both from the Fifth Circuit and a case from the Fourth Circuit 03:13:48 that affirmed denial of a Rule 60 motion after three to four months.

Moving a little -- I think it makes sense to address this attorney issue that Mr. Russo raised. Number one, I didn't hear a response to whether they had the legal capacity 03:14:09 to move pro se, so we rest on our arguments there, they could have. In addition, as Mr. Hu pointed out and Judge Goodhart admitted at her deposition, they were never prohibited from hiring outside counsel. And I take Mr. Russo's point that there are ticky-tacky differences between the pro se litigant 03:14:32 cases that we cite in our brief and this situation. But I think the upshot of the rules that we have identified is that inability to find a lawyer and inability to find a lawyer and failure to act appropriately as a pro se party does not excuse ignorance of the Rules of Civil Procedure. We have identified 03:14:59 cases that involve naming the wrong defendant, that involve

03:15:02 trying to toll the statute of limitations, failure to exhaust. And in what I think is one of the more compelling cases, *United States against Fowler*, there the criminal defendant delayed finding an appointed attorney -- or paying for an attorney
03:15:18 because he wasn't found to qualify for appointed counsel. And Mr. Fowler and an attorney in Utah on his behalf actually asked the Court for a continuance and said I need more time, I can't get up to speed this quickly. And the Court said no, and forced Mr. Fowler to endure a federal criminal prosecution
03:15:38 without a lawyer because of his delay.

And so, I take Mr. Russo's point that there are complicated issues in this case, but as a matter of law, their failure to move pro se or hire their own lawyer does not excuse their untimeliness under Rule 61 or their waiver of Younger by
03:15:57 failing to move earlier.

And again, I just want to reiterate that as the Court has picked up on, I take it that County Court at Law 16 is probably our hardest case on waiver or our hardest defendant on waiver, and I think the answer there is just to follow *In Re:*
03:16:16 *Goodhart*. And for the reasons I've just explained, she could have moved on January 1, 2025, instead she allowed herself to be bound by the consent decree for 11 months and that is inconsistent with an intent to assert Younger abstention and constitutes waiver.

03:16:37 THE COURT: Let me ask you a question. Not a ruling,

03:16:41 not even hinting at a ruling, but assume that the Court decides abstention is the result.

MR. FIFE: Yes.

THE COURT: Assume that the Rule 60 requirements have 03:16:54 not been met, not.

MR. FIFE: Yes.

THE COURT: What happens to the consent decree?

MR. FIFE: It remains in place and I would just -- to write that opinion, I would really just unanimous BLOM Bank 03:17:10 case that says Rule 60 is the vehicle, 8/1 Coney Island case that says timeliness means what it says, and even for a void judgment, you still have to satisfy Rule 60(c)(1).

And the other piece that I haven't noted that in this example I want to make really, really clear is that when you 03:17:32 look at the Norglass case or even implicit in the court, it's more clear in Norglass and in Clark against Davis, but the burden is on them to prove timeliness. And actually, I would ask the Court to look at the Bissonnette case that they identify. And in that Bissonnette case, the District Court 03:17:58 actually treats timeliness as a threshold issue, so before it even looks at the merits of modification or vacatur, it asks was Rule 60 -- was this motion timely. And then under the binding precedent of Norglass, the resounding answer for their motion is no it is not.

03:18:29 There's one other point I wanted to make on

03:18:32 timeliness. So, I think that the way that Your Honor just described a possible decision, it would be a holding in three parts. It would be Rule 60 is the procedural vehicle, I follow Daves II and abstention should have applied, but they brought 03:18:49 this motion in an unreasonable amount of time under Rule 60(c)(1), motion denied.

If the Court is interested at all, I do just want to address some of what the Attorney General said. So, the Attorney General mentions that -- and Mr. Cutting will handle 03:19:18 his points on Rule 60(b) and the equities, but the Attorney General is really using his non-party status in a way that is, to be charitable, highly suspect. So, he simultaneously claims that he couldn't have waived Younger because he was never a party, but also says that he's not bound by the decisions of 03:19:47 any of the parties to the litigation. Now, I think there are really strong arguments why he waived Younger, but that type of gamesmanship with his non-party status and the huge amount of time that he was in office, I would just say untimely under Rule 24, motion to reconsider denied, he doesn't have standing 03:20:07 to raise Younger.

Now, on the waiver issue, sorry --

THE COURT: Standing?

MR. FIFE: He is not considered a party for that purpose because he was denied leave to intervene, so he does 03:20:21 not have party status to assert a Rule 60 motion asserting

03:20:26 Younger. Because of course, Rule 60 only applies to parties who seek relief from final judgment.

Apologies, that was messy.

The one point I'd make on the merits of waiver is the

03:20:42 Attorney General, his consistent referring is twofold. Number one is that he says he has consistently disagreed with the consent decree. That's no surprise. But there's a difference between disagreeing because you don't think the federal court has the power to reach the issue and affirmatively asking the

03:21:03 federal court to resolve the merits on your side. Read the two Fifth Circuit amicus briefs that he led, and point one in both of those is this Court got the 14th Amendment question wrong. And nowhere in there does he mention comity or -- sorry, nowhere in there does he mention Younger abstention.

03:21:28 And of course, even if he as a non-party raised these issues, he still doesn't explain why he didn't intervene after November 2018 when he knew the case was going to be settled. And so, completely agree with you that waiver for Judge Garcia can be tough, there's some complicated questions of law there.

03:21:48 I think by comparison, the Attorney General's waiver is incredibly clear and excusing that waiver here would be severely prejudicial to the parties who built this consent decree when the Attorney General knew it was happening. And so like Judge Goodhart said in her notes, he dropped the ball.

03:22:13 Any questions, Your Honor? Otherwise, I turn it to

03:22:15 Mr. Cutting.

THE COURT: Mr. Cutting?

MR. CUTTING: Hello again, Your Honor. I will try and be brief, with no promises. Just very briefly on the mootness point, I think we've fairly well covered this. Mootness was not addressed in Goodhart. Goodhart says consider Younger. It does not say consider mootness. To the extent defendant says Daves II, that is understood in the context of that mandate saying consider Younger and follow Daves II. You could still comply with that mandate even if you read it what I would say is overly broadly to include mootness, by just considering mootness later when that motion is properly raised and before the Court. It is not part of what the Court should be considering at this moment.

I do want to make one friendly amendment to my co-counsel's response to your hypothetical about if this Court were to find Rule -- if I'm understanding correctly, were to find that Rule 60 applies, which we believe is an inescapable conclusion based on binding case law unaffected by Goodhart, and it then found that abstention should have applied at Rufo step one, but it also found the motion was untimely and so it denied it. Am I understanding the Court's hypothetical correctly?

THE COURT: I think so.

MR. CUTTING: Okay. One amendment I would make is

03:23:51 that the Court is still obligated to proceed to step two under that hypothetical and make findings about whether or not constitutional violations would occur. And that is because there is no procedure within Rule 60 or precedent for splitting
03:24:07 Rule 60 and bifurcating it in the way that the Court has at times asked questions about or the way that movants appear to be suggesting. We know that that there is no precedent for bifurcation because we know both from the statements such as BLOM Banks, statements that it is Rule 60(b) standard and only
03:24:30 Rule 60(b) standard that applies when a party seeks relief from final judgment. Other cases such as *Cook v. Birmingham News* that state the exclusivity of Rule 60. And once you're under Rule 60, we then have cases like BLOM Bank, but also like Coney Island Auto that show what happens when a party does try and
03:24:49 dissect that standard, the 60(b) standard, and take it into multiple parts and kind of tackle one part at a time. And Courts as recently as this past term reject that out of hand unanimously and say that is not the way Rule 60 works because it needs to be considered all at once as part of the same
03:25:10 consideration and yielding one result, not two piecemeal results, that there is just no precedent for that, there is no case that has ever done that that we've seen. This Court needs to consider the constitutional violations and the equities regardless of what it finds on step one, and that is consistent
03:25:33 with Goodhart's mandate.

Earlier the Court said, perhaps paraphrasing, that Goodhart had instructed it to decide abstention first. I don't think that's what the mandate says. The mandate is that this Court should consider Younger on an expedited basis. It is absolutely doing that within the confines of the Rule 60 analysis when it proceeds through step one and step two of that analysis, so that is fully compliant with Goodhart. So again, this Court need do nothing more than apply Goodhart in binding law and apply the Rule 60 framework, but it needs to apply the entirety of the Rule 60 framework. That framework is not divisible and cannot be bifurcated.

I want to talk for a moment -- well, first I want to talk for a moment about just to note that as we indicated in the chart that we provided as a demonstrative, there are a lot of different ways this Court can find in our favor and deny the motion. We would encourage the Court to support appellate review wherever possible by considering and making findings on each path or any path that it is as implicated in order to really assist the Appellate Courts with that task. So, even if the Court were to find that the judges have waived or that their motion under Rule 60 was untimely, we would suggest the Court still reach a finding under Rule 60's Rufo analysis.

I do want to take just a moment of Court's time to talk about the record. So, our friends on the other side said that there was a presumption that county officials, that

03:27:19 government officials would behave in compliance with the law. That's really a red herring. That is neither here nor there. We are here with, as Your Honor pointed out, first off, of a record of initial violations going back decades in this county. 03:27:36 Those pressures, those cultural forces and pressures as former judge and current Chief Public Defender Genesis Draper pointed out in her declaration, those forces still exist, and without the consent decree they are going to cause resumed constitutional violations. That, in conjunction with doing 03:27:58 something that this county has never done before which is asking the third largest county in the country to detain everyone who is arrested until they can be provided with a constitutionally compliant individualized bail hearing, cannot do that, it has never done that. It used to be that the way 03:28:18 pre-hearing release was handled was through access to money. This Court changed that. The consent decree changed that. There is a new system that actually makes sense and still offers the same essential release valves to this overburdened system and that's something that all of these declarants in the 03:28:38 record have spoken to.

We are not relying on a presumption that county officials will not behave in accordance with state law. We are submitting a record that shows that whatever anyone's intention, the pressures will result in the same types of 03:28:57 constitutional violations that this consent decree was put in

03:29:04 place to stop. So, for example, the evidence is quite extensive and we recommend looking through all of it, but just to briefly summarize, there is no plan to absorb the 28,000 additional cases that will be forced into the system without
03:29:26 the decree in place and there will be a reversion to perfunctory hearings and non-individualized unaffordable secured bail except for indigent arrestees. That is exactly what O'Donnell One condemned, and of course this Court.

For instance, Chief Hearing Officer Diggs predicts
03:29:43 that, *The inevitable result of adding 28,000 cases each year to hearing dockets will leave hearing officers and justice system partners without enough time or information to make the individualized decisions required by the Constitution. In an effort to keep up, hearing officers will be forced to make*
03:30:14 *quick, less rigorous bail decisions resulting in inevitable increase in arbitrary and unconstitutional detention.*

The Bail Division Chief Bingham predicts that hearing officers, quote, *will impose unaffordable bail announcing cases where detention is not justified.*

03:30:30 Former judge and now Chief Public Defender Genesis Draper puts it as, quote, *Because the cultural and political forces that led to the prevalence of money bail prior to the consent decree are still active, the hearing officers are likely to revert to their past practices of reflexively*
03:30:44 *imposing unaffordable secured bond where pretrial detention is*

03:30:49 *unsupported by evidence. In short, the old unconstitutional system will reemerge.*

And the court-appointed monitors concluded similarly, they stated in their response to these same judges' proposal to end pre-hearing release, quote, *We have serious constitutional concerns of what is being proposed.*

03:31:01

So, we are not relying on any presumption, this is not something that is in equipoise for a presumption to influence. This is an unrebutted record and what is lacking from movants' objection to it is any evidence to the contrary. And at the risk of repeating ourselves too much, it is their burden on this motion. I know it may not always feel that way, but it is. So, and again, this all adds to S.B. 9 which as I mentioned earlier, also requires constitutional violations of the very type this consent decree was geared toward preventing.

03:31:20

03:31:41

So, that alone is enough to find vacatur, to deny vacatur under Rufo's second step. However, and again, even in a chance on reply, movants continue not to identify any case where a Court has vacated a consent decree or even a final judgment in the face of a record like that. And one example of the way this consideration can play out while it's not identical as this one, but is instructive is Rufo itself.

03:32:09

So, after that case was remanded from the Supreme Court, the First Circuit considered the sheriff's motion to modify the consent decree based on a change in law. The

03:32:30

03:32:34 sheriff was asserting that the Supreme Court's decision in *Bell v. Wolfish*, which rejected a constitutional challenge to the practice of putting two detainees in the same jail cell, that that meant he should be able to modify the decree to permit 03:32:49 double celling. However, the District Court denied the motion and the First Circuit affirmed, reasoning that permitting double celling could lead to conditions such as increased violence, disease transmission that would themselves become unconstitutional. The Court rejected the argument that double 03:33:05 celling is never unconstitutional as too simplistic, emphasizing that the sheriff had not met his burden to show a minimal risk the constitutional violation would recur. As the Court said, *"It is far from clear on the record before us that the immediate plans proposed by the sheriff are constitutional,* 03:33:21 *let alone any perspective next steps that might follow from the complete vacation of the consent decree."*

That is the north star for this Court to follow is whatever happens this Court cannot take action on this consent decree that exposes class members to significant risk of 03:33:45 recurring violations.

And then the equities further militate against vacatur and I won't spend too much time on this because I know Mr. Hu is planning on addressing some of the cost information. But the equities are incredibly powerful here. So, even if the 03:34:05 movants could show that there is relatively little or no

03:34:09 likelihood of return of original constitutional violations, we have the sheriff, the District Attorney, the Chief Public Defender, and 12 of the 16 County Court at Law judges and the monitors all vociferously opposing vacatur and they have 03:34:25 quantified catastrophic financial costs, as Mr. Hu will detail, and also public safety harms that will result. To the extent this Court reaches the equities given the constitutional concerns, I outlined Rufo requires deference to these local administrators' views, and movants, four judges out of 16, are 03:34:45 the outliers not the definitive voice of this local government.

Again, movants offered zero evidence rebutting this. They cannot carry a burden they have never attempted to shoulder and the Court should leave it at that. And like I said, no matter what, the Court should proceed to the second 03:35:02 part of the Rule 60 analysis, that it is really part and parcel of the same and I think Rufo makes that clear as well as many cases interpreting it.

Unless Your Honor has --

THE COURT: I do have one question. And I think I 03:35:25 asked this of Mr. Russo and I wanted your response. Goodhart contains the following language, *"To be clear, this does not mean that mere transfer of power from one officeholder to another is enough to vacate a consent decree as the plaintiffs suggest."* Did the plaintiffs suggest that?

03:35:48 MR. CUTTING: I don't recall whether we did or not, I

03:35:52 think to the extent that statement is relevant seems to suggest an appreciation that there are equitable considerations at play in whether or not to vacate a consent decree and is in line with Goodhart's citing of Rufo in that regard. We have
03:36:10 acknowledged that that -- we think that holding on the general effect of --

THE COURT: A new officeholder.

MR. CUTTING: -- a new officeholder and official capacity waiver is egregiously wrong and will not ultimately
03:36:24 carry the day. But even that statement seems to acknowledge something other than a mere transfer of office.

THE COURT: This says that a mere transfer is not enough.

MR. CUTTING: Exactly. No, I think what I am perhaps
03:36:45 stumbling trying to articulate is I believe it's saying that a transfer in office is enough to negate a waiver, even an express waiver, however, it does not on its own justify vacatur. You still have to go through Rufo in order to do that. That's how I read that.

03:37:06 THE COURT: All right. Thank you. That's helpful.

MR. CUTTING: So, Goodhart I think properly construed does not support much less require the radical analysis that movants have proposed here. We would urge the Court to deny the motion, and as our demonstrative suggests, there are a
03:37:25 number of ways it can do that and we would urge it to reach as

03:37:28 many of them as possible and to make factual findings wherever possible.

THE COURT: When you say deny the motion, there are several motions as you point out.

03:37:37 MR. CUTTING: At this point, I am referring to the four judges' motion -- actually, I believe it was styled as a renewed request for Younger abstention. However, I believe it is effectively a motion to vacate. And that, of course, is conditionally joined by the Attorney General pending

03:38:00 consideration of his renewed -- his motion for reconsideration of his motion to intervene, we oppose intervention as we have explained. That is our position on those motions.

THE COURT: Thank you. All right.

***(Counsel setting up exhibit demonstrative.)***

03:39:07 MR. HU: This exhibit, it's in our brief. I made it as big as we could.

THE COURT: Do you all have copies so you can follow along?

MR. HU: They do. It's in our brief.

03:39:42 THE COURT: Go ahead.

MR. HU: As Mr. Cutting noted, Rufo step two equitable analysis may be appropriate in looking at the motion for -- renewed motion for abstention. I'd like to address two points, one of them is the cost to Harris County should the consent

03:40:10 decree be vacated.

THE COURT: Excuse me. Mr. Russo?

MR. RUSSO: Your Honor, can we make sure we have a copy of that document?

THE COURT: They said it's in their brief. Can you give docket entry and page number.

MR. HU: It's in the text of the brief itself.

THE COURT: Docket entry and page number if you have it handy?

COUNSEL: 885 - 14 is the declaration where the chart is page.

THE COURT: Thank you.

MR. NWAOKORO: Your Honor, for the record, we objected to all these exhibits and this evidence.

THE COURT: Certainly going to consider this exhibit. I think it's relevant, whether it carries anybody's day or not is a separate issue. Go ahead.

MR. HU: I want to address two points on the part of Harris County. One is the cost to the Harris County taxpayers if the consent decree were vacated and the second is public safety. The public safety aspect is shown in the Ferguson declaration and other declarations which we and the plaintiffs have put in the record if the consent decrease is vacated. We're looking at approximately 28,000 people a year who will be going through the Joint Processing Center. Of course, that will vary depending on arrests and things like that, but based

03:41:26 on the numbers from the monitor report, we're looking at about 28,000 people a year. What is that going to mean? Without general order bonds, it's going to mean more people in the Processing Center taking a longer time, and more importantly, 03:41:41 right now as the sheriff put forth in his declaration, there is a focus on processing people who are charged with felonies. If you have all of these folks that are charged with misdemeanors crowded in there as well, the Joint Processing Center only has capacity of 200 people, there's more likelihood for potential 03:42:04 for some altercations, but also in the processing as people are trying to get through the shear numbers, there is the possibility that something could be missed, more felons could potentially be released, things could be overlooked. More importantly, the 48-hour rule which the Court is aware of, 03:42:23 people may be held to that point where they may have to be released because they've been in custody for 48 hours, and so that is one of the public safety concerns if the consent decree were vacated.

Another concern is the cost to the taxpayers of Harris 03:42:40 County, and this chart just sort of summarizes my argument. First off, we look at the Sheriff's Office, not only costs for the Joint Processing Center, but there will be additional security personnel, additional people have to be held. What does that mean? Additional facilities may have to be used. 03:42:58 For example, right now it is the goal of Harris County to stop

03:43:03 outsourcing, in other words, sending people who would otherwise be placed in Harris County Jail to a facility in Louisiana. If we're looking at 28,000 more people a year in custody, the jails, the Harris County Jail will probably have to be used to 03:43:19 house some of those people. What that means is at the cost of about $4.6 million the contract to keep people outsourced in Louisiana will continue. This is in the Mills affidavit which is part of our submission.

In addition, at the Joint Processing Center, Harris 03:43:36 Health provides a clinic. This is very important because people coming into the Joint Processing Center often have overlooked acute medical needs that have to be addressed, more people will be needed to staff that clinic to the cost of approximately $4 million a year, $4.4 million a year. There 03:43:54 will be additional need for staff by the District Attorney, the County Courts. The courts are anticipating instead of running one court a day with misdemeanor bond hearings, they're going to have to go to two running at the same time, have additional -- five additional hearing officers.

03:44:13 In addition, the District Clerk's Office will have to staff that court, so we're looking at $599,000 for the District Clerk, the County Courts about $1.2 million. The District Attorney, of course, will need additional staff. Pretrial Services will have to have additional staff because right now 03:44:37 with general order bonds, people that are getting general order

03:44:40 bonds do not go to Pretrial Services. Now they're going to have to open a case for every single person coming into the Joint Processing Center, 28,000 more cases, 42 additional people having to do that, the cost of approximately
03:44:55 $4.2 million.

And then finally, the Public Defender will need additional resources to deal with this surge, approximately $2.4 million. And because people are held in custody longer, cases will go over to the manage assigned counsel, another $2.9
03:45:17 million totaling out to again rough estimates of approximately $32.8 million to the taxpayers of Harris County if the consent decree were vacated.

Finally, I notice that Judge Draper is here in the courtroom with me and I don't know -- I realize this is not an
03:45:36 evidentiary hearing, but if the Court would like to hear from her to personally tell you what this can do to both her office and as a former County Court at Law judge, I'll be happy to ask her as an officer to come up and tell you that.

THE COURT: I appreciate your offer on behalf of Judge
03:45:53 Draper. Couple questions. I am told by the Court that sent it back that this is not a fact-based determination. What do I do with these facts if I am instructed that facts are not germane to the inquiry that I have to conduct on abstention?

MR. HU: We would disagree, that we believe there are
03:46:27 some facts, as Mr. Cutting has pointed out, you have to get to

03:46:31 the Rufo step two factors in connection with using Rule 60 as the vehicle to consider abstention.

THE COURT: In order to apply Daves, do I need facts?

MR. HU: I think you do, for two reasons. One is to 03:46:49 the extent you have to look at mootness, we would welcome the opportunity to present briefing and argument on the question of mootness. Also, looking at Daves, Daves was, of course, a situation that took place before consent decree, before an agreement. There's a lot to be covered that Daves wouldn't 03:47:11 cover. In other words, Daves didn't need a much developed record. Here, it's different.

THE COURT: And third, going back to the sentence that I earlier described, *"This case never should have been brought in federal court,"* isn't the state court equally able to 03:47:35 consider the constitutional challenges and the equitable factors that you have presented in these numbers?

MR. HU: I suppose perhaps going forward, but when you look at what has changed in the law since that time, I think it remains with this Court especially because you can't do a class 03:47:54 action in state court in a criminal context like you have here, so I guess the answer to the question is no, really the state courts can't do it because you have class action vehicle.

THE COURT: Although a class action asserting constitutional violations under the Texas Constitution as well 03:48:19 as the Federal Constitution could be filed in the Harris County

03:48:23 state courts, correct?

MR. HU: I suppose it could, although if it's a question of the Federal Constitution, I believe the jurisdiction would be proper in this court.

03:48:37 THE COURT: It could be removed, probably.

MR. HU: Correct.

THE COURT: Which raises the question of how I implement the statement, *Well, it could have been, should have been filed in state court,* if a federal constitutional 03:48:56 challenge would have resulted in removal, there's a kind of a circularity in that, the way I understand it.

MR. HU: That true, but I think at the end of the day, if the case is removed, it's removed and it could have been brought in state court, but it more properly lies before this 03:49:13 Court.

THE COURT: And as I think a dissent pointed out, it wasn't. All right. Did you want to respond?

MR. NWAOKORO: Thank you, Your Honor. I was trying to see if we could get a straight answer from Mr. Hu. I think the 03:49:38 answer to your response to your first question was perhaps going forward. And then the second one he says, I suppose it could. So, I would read that to mean yes. Of course, he would probably disagree with me.

But a couple of points that I would like to respond to 03:49:55 Your Honor, and I think that is the issue here. This is 60(b)

03:49:59 heavy, all this is 60(b), and their approach is inconsistent, not only with their briefing before this Court, but also in what they're saying, what they told the U.S. Supreme Court, Harris County stated this is a sequential step, sequential.
03:50:15 The plaintiff said the same thing. In this hearing, they are lumping everything together. And if you look at the 60(c)(1) analysis, that takes into the facts, that is inconsistent. The road map that Mr. Cutting has showed you is a road map to nowhere. All it takes you is far, far away from *In Re:*
03:50:36 *Goodhart* because it's inviting you to revisit the facts, to analyze inequities, to look at the facts relating timeliness, and that is an inquiry that this Court -- that is an inquiry that the mandate has expressly told this Court not to do. It doesn't hinge on factual development.

03:50:58 In their response to the waiver issue, they stated essentially that the Attorney General waived by waiting by delay. Well, *In Re: Goodhart* foreclosed that. It stated that the four judges merely by waiting over two years after Daves wasn't enough, and so we are reciting the same arguments, same
03:51:24 issues that the Court has already foreclosed. So, you don't have a precise measurement of time that would implicate waiver. That has been addressed. So, the timeliness issue has been addressed.

They're also arguing that the Attorney General was not
03:51:39 even a party. Again, they are trying to re-litigate the order

03:51:44 that this Court granted on October 30, 2025. The mechanism for us would have been on the two issues of mootness and conflict with state law is 60 (b)(5), 60(b)6, and that is stated in the court's order. If they are saying now that there is a
03:52:03 timeliness issue to raise 60(b), then naturally that would affect those other 60(b) related motions. Now, they try to say confusion as to how that would apply, but what they are saying here is they are invoking Rule 24 timeliness, Rule 60(c) and trying to ascertain whether or not waiver under Younger is
03:52:27 timely. And again, they cite not a single case, not a single authority to support that. And as far as the burden goes in terms of waiver, let's not forget that they bear the burden of proving that by a preponderance of evidence, and there is no waiver here.

03:52:47 I would like to go through again the elements of Younger.

THE COURT: I think I know the elements of Younger. Thank you.

MR. NWAOKORO: Two things there, Your Honor, would be
03:52:57 the objections they made. The pretrial bail, that is clearly within Sprint's first category. And irreparable harm exception, Daves already foreclosed that issue, so I'm surprised they're still raising these objections because this has been dealt with. So, the point again I'm making is delay
03:53:18 is not waiver, the Fifth Circuit has clearly foreclosed that

03:53:21 issue. The conduct base waiver that they keep drumming up, again, the Court has also dispensed with that issue, it has to be express, it has to be explicit, and they have to prove it by preponderance of the evidence.

03:53:42 The other point I will make is I will take the Court back to Daves when Mr. Cutting was discussing constitutional violations in relation to Rule S.B. 9. This is not new. We have seen this before. If you look at Daves and that's at page 635, the same argument was made about S.B. 6, and the Court 03:54:11 cited the plaintiff's position there that Dallas County's bail practices allegedly remain unconstitutional irrespective of S.B. 6 and irrespective of the existence of bail schedules. That is the same argument that has been rehashed here in light of S.B. 9., and the same result should apply when *In Re:* 03:54:34 *Goodhart* says follow Daves II. So, the issues they are raising are going to equities, weighing of equities, going into facts, that is far, far away from what *In Re: Goodhart* has ordered this Court to do.

And they speak about unrebutted record. Well, as a 03:54:52 threshold matter, we have objected and we continue to object to any evidence that they are trying to introduce in this. The monitor's report is challenged. The Harris County's record which they incorporated in their brief is challenged not only on the basis of relevance, but also these are really 03:55:14 undisclosed expert opinion dressed up as lay opinion, so we

03:55:19 have outlined in our briefing various reasons why, besides relevance, why this should not even be considered. So, to say that all of this has been unrebutted is inaccurate.

And I would close on a couple of points, Your Honor, 03:55:39 and that is the reconsideration motion, motion is still pending. We believe we should be allowed to join again in Younger, there is nothing flowing from the four judges through us. And again, they cannot be challenging the four judges on the one hand and state that there is adequate representation. 03:56:03 There is not. And I think that issue is also foreclosed by U.S. and Fifth Circuit precedent that I think Burger is on point on this issue, so the state interest is not being represented by the counter officials, and the state interest does not turn on who sits on a County Court at Law bench. Our 03:56:22 interest is enduring.

To the extent that they have a timeliness objection, well, we move to reconsider, we look to the case of *In Re: Goodhart*, and *In Re: Goodhart* is again intervening change in law that the Court should respectfully consider. Again, *In Re:* 03:56:41 *Goodhart* has really undercut, if I may respectfully state so, Your Honor, the basis for which you had denied intervention in the first place. Thank you.

THE COURT: Thank you. Mr. Hu, if I understand you correctly, these costs would be simply based on vacating the 03:57:04 decree, not on -- well, you tell me, does it assume?

03:57:11 MR. HU: The assumption for these costs, Your Honor, is that the decree would be vacated, Rule 9 would go away in its current form, and so there would be this additional number of folks needing full magistration.

03:57:27 THE COURT: What about S.B. 9?

MR. HU: Yes, S.B. 9, it would be assuming they would go into effect.

THE COURT: All right. Just one other clarification. Obviously the role of this information given the unusual nature 03:57:43 of the mandate is something I have to think about very carefully.

MR. HU: Yes, Your Honor, and just to address a point from the A.G., these were prepared by the Harris County's Office of Management Budget and with of course input from all 03:58:01 the department heads, so this is not an expert issue, this is something that the budget people routinely do as a matter of their day-to-day job.

THE COURT: Thank you.

MR. VANFLEET: Your Honor.

03:58:19 THE COURT: Yes, Mr. VanFleet.

MR. VANFLEET: Throughout these proceedings, the 12 judges have taken a back seat, as have I. Three points, one, I want to make absolutely clear that the 12 judges absolutely support the analyses that you've seen presented by the 03:58:34 plaintiffs and the Harris County with respect to what would

03:58:36 happen if this is vacated and particularly the GOBs go away. In our brief, the judges state very succinctly what the plaintiffs and Harris County have brought to you in detail in documents and in declarations by the people who are most 03:58:54 intimate with the criminal justice processing in this county.

Second point. I want to go back to the willies you expressed at the beginning of this hearing about issuing an advisory opinion. Right? That's not just your personal prudence, it's grounded in Article Three. Article Three 03:59:20 doesn't really allow you to say, *Oh, gee, back then I should have abstained anticipating what the law might become.* You don't get to do that under Article Three. A federal court has to do something. And what Mr. Russo admitted in response to your question is that the something he wants you to do is 03:59:47 vacate this final judgment, this consent decree. And the United States Congress and the Supreme Court has said there is one way to do that, that is Rule 60, with all it implies, with all that has gone here.

Finally, a word on finality. My constitutional 04:00:12 history professor told us that Chief Justice Vinson said of his Court, *"We're not final because we are invincible, we're invincible because we're final."*

This Court is not final nor is a divided panel of the Fifth Circuit. Whatever you decide here is going to go up and 04:00:40 it's going to go up again. The 12 judges pray that when it

04:00:46 goes up it is in a posture of what you believe is the correct decision, the right decision under law. Thank you.

THE COURT: All right. So, we still have briefs that are to be submitted. Thursday is the deadline. And we have 04:01:13 not really had briefing on a few of the issues that have been aired today.

I am curious as to whether the defendants, the movants think that there are provisions of the consent decree that do not violate Younger. I don't know what your answer to that 04:02:07 would be.

And the O'Donnell plaintiffs have not addressed mootness in their briefs, so I need your briefs to address that. I want the briefs to very systematically lay out, and this may be the stuff of flow charts, the order of operations. 04:03:05 If I do abstain, what, if I don't abstain, what. And the what is what happens to the consent decree. So, specific guidance building off of what you've argued today would be very helpful.

So, mootness, limiting principles for Rule 60(c), and the order of operations are specific points I'd like both sides 04:03:43 to engage in. All of this, of course, is against the backdrop of the Fifth Circuit's instruction that I resolve abstention swiftly, and in any event, well in advance of the election because the movants may no longer have their offices after the election. So, you have your assignments and then I have mine. 04:04:18 Yes, sir?

MR. NWAOKORO: Your Honor, just inquiring as to whether or not there are provisions of the consent decree.

THE COURT: I'm sorry, I didn't understand you, sir.

MR. NWAOKORO: I think you began by asking if there are provisions of the consent decree that do not violate state law. Is that what you are asking?

THE COURT: Yes.

MR. NWAOKORO: Okay. Your Honor, wouldn't that take us away from the Younger analysis?

THE COURT: I think it's actually part and parcel or could be, so I need to have your understanding of whether and site you back to the case that we discussed earlier in which the Circuit Court remanded to the District Court for a specific analysis on whether there were provisions of the consent decree that did offend Younger or that did not offend Younger, and to have instead of a blanket analysis a precision approach. You may also argue in the alternative that a blanket analysis be the appropriate way to go, but I do want your approach to what a more focused Younger approach analysis would be.

MR. NWAOKORO: Thank you for clarifying, Judge.

THE COURT: Thank you.

MR. CUTTING: Your Honor, I was just hoping to clarify, this mootness argument, you envision that as part of the existing post hearing brief or a stand-alone brief addressing a hypothetical motion to vacate based on mootness.

04:05:57 THE COURT: I don't like stand-alone briefs on specific issues because that is often simply a way to avoid page limits, so one brief.

MR. CUTTING: One brief, okay. But it's covering an

04:06:12 entirety of a response to a hypothetical motion to vacate based on mootness.

THE COURT: I'm not sure it's so hypothetical, but yes.

MR. CUTTING: The only motion that was filed following

04:06:23 Goodhart was the motion to abstain on the basis or renew request for Younger, nothing about mootness.

THE COURT: But Daves obviously analyzed mootness and so I would like to have your take on it because the Fifth Circuit told me to abstain and follow Daves.

04:06:45 MR. CUTTING: Thank you, Your Honor.

THE COURT: And that's part of Daves. That may be a crude approach, but I'm trying to make sure that I attend to all of the aspects of the Fifth Circuit's instructions on the remand. You still look puzzled.

04:07:09 MR. CUTTING: No, Your Honor, I'm just thinking through a response to what sounds like an entire new motion to vacate in two days, but we'll find a way.

THE COURT: I take your point that, yes, the motion to vacate was based on abstention and that's what I have to deal

04:07:31 with first, but I would like, since you haven't talked about

04:07:36 mootness and the Fifth Circuit did talk about mootness both in what it told me to consider, Daves, which talks about mootness, I don't want to leave it unattended or unaddressed. I don't think it's as hypothetical as you posit it.

04:08:03 MR. CUTTING: Understood.

THE COURT: You may convince me that it is because the Fifth Circuit reading through all of the various instructions in the Goodhart opinion, it said to follow Daves, to comply with Daves and to deal with abstention, so I'm trying to do 04:08:26 both, have both sides analysis on what it would look like to do both.

MR. CUTTING: One small note of clarification, Your Honor.

THE COURT: Sure.

04:08:58 MR. CUTTING: Are you construing the four judges' renewed motion as raising mootness, and if so, under what provision of 60(b) or is it just a stand-alone issue that we should be sure to address.

THE COURT: I think it's a stand-alone issue.

04:09:19 MR. CUTTING: More as to whether Goodhart -- what Goodhart demands with regard to mootness.

THE COURT: Exactly, exactly. And it may be that that doesn't come up until we rule on abstention, which is what they've told me to do expeditiously and which takes us back to 04:09:38 the question we started with, the order of operations. Once I

04:09:42 rule on abstention if I decide that I do need to abstain, what happens. If I don't abstain, what happens, what do I need to do next or in addition.

MR. CUTTING: Understood.

04:09:56 THE COURT: Years ago when we were, my law clerk and I working through all of those videos and working on O'Donnell, we had a discussion in which we observed to each other that the case was an entire federal courts class, an entire civil procedure class, and an entire civil rights class, and I'm 04:10:22 leaving out some, and it's still true.

MS. ROSSI: Local government law.

THE COURT: True. And the limits of appellate procedure, or the lack of limits. I think it is still true. There's a lot to go through, and with the added challenge of 04:10:47 doing it expeditiously.

So, thank you to all sides for your work in getting us to the next stages. And the briefs on all sides were very good and I appreciate that. You are all excused.

*(4:11 p.m.)*

04:11:30 * * *

04:11:30

* * * * *

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Date signed: October 3, 2026

/s/ Angela M. Hailey
___________________________________
Angela M. Hailey, CSR, CRR, RPR, RMR
Official Court Reporter
U.S.D.C. Southern District of Texas
Houston Division

COUNSEL: [1] 97/9
MR. CUTTING: [64]
MR. FIFE: [22] 3/8 49/7 50/2 52/6 52/9 52/14 55/13 56/5 57/9 57/19 57/22 58/5 58/19 59/6 60/18 62/3 79/10 81/13 84/3 84/6 84/8 85/23
MR. FOGLER: [1] 3/11
MR. GRINSTEIN: [1] 3/9
MR. HOPKINS: [1] 3/12
MR. HU: [17] 3/13 63/19 64/11 96/15 96/19 96/21 97/6 97/17 100/24 101/4 101/17 102/2 102/6 102/12 107/1 107/6 107/12
MR. NWAOKORO: [13] 3/14 64/16 74/3 75/15 77/2 79/8 97/12 102/18 104/19 110/1 110/4 110/8 110/20
MR. RUSSO: [84]
MR. VANFLEET: [5] 3/10 62/10 62/13 107/19 107/21
MS. OLALDE: [1] 3/16
MS. ROSSI: [2] 3/6 113/11
THE COURT: [202]

$

$1.2 [1] 99/22
$1.2 million [1] 99/22
$2.4 [1] 100/8
$2.4 million [1] 100/8
$2.9 [1] 100/9
$32.8 [1] 100/11
$32.8 million [1] 100/11
$4 [1] 99/14
$4 million [1] 99/14
$4.2 [1] 100/5
$4.2 million [1] 100/5
$4.4 [1] 99/14
$4.4 million [1] 99/14
$4.6 [1] 99/6
$4.6 million [1] 99/6
$599,000 [1] 99/21

'

'23 [3] 9/20 13/4 13/6
'25 [2] 16/19 17/16
's [1] 27/9

/

/s [1] 114/13

0

01414 [1] 1/4

1

1.01 [1] 50/25
1/1/2023 [1] 52/20
1010 [1] 1/18
11 [1] 83/22
1108 [1] 1/12
1112 [1] 1/19
11th [1] 82/6
12 [13] 1/15 3/10 28/10 28/12 38/25 39/24 47/22 62/16 68/11 94/3 107/21 107/23 108/25
123 [1] 2/3
1253 [1] 22/2
12548 [1] 1/23
14 [4] 49/9 54/9 82/5 97/9
14th [1] 86/12
157.901 [3] 14/1 53/10 63/23
16 [10] 15/11 49/9 49/18 54/9 56/21 60/11 82/5 83/17 94/3 94/9
1980 [1] 63/5
1998 [1] 51/8
1:00 [1] 3/1
1E [1] 14/22

2

20 [1] 65/3
200 [1] 98/9
2006 [1] 43/4
2016 [6] 32/8 33/4 33/6 52/11 52/11 52/13
2018 [1] 86/17
2019 [1] 9/4
2023 [5] 4/23 9/6 11/1 12/22 52/20
2024 [2] 14/6 14/10
2025 [22] 10/5 11/19 14/19 14/20 14/24 15/10 15/19 16/24 17/2 44/3 49/19 50/7 50/14 51/14 52/1 52/7 53/1 54/19 68/9 82/6 83/21 104/1
2026 [3] 1/6 3/1 114/11
22 [2] 1/6 3/1
226 [1] 51/9
23 [1] 51/16
24 [3] 61/23 85/19 104/8
24's [1] 55/8
25-year-old [1] 49/1
250-5787 [1] 2/9
253 [1] 72/17
25th [1] 66/3
275 [1] 22/2
28,000 [6] 91/3 91/10 97/23 98/2 99/3 100/3
2nd [1] 63/6

3

30 [6] 55/13 55/17 58/20 74/6 80/8 104/1
30,000 [1] 80/15
3000 [1] 2/3
30th [1] 17/8
31st [1] 9/6
32 [1] 54/21
3200 [1] 2/4
33 million [1] 80/14
370-1112 [1] 1/19
3d [1] 43/3
3rd [1] 22/2

4

409 [1] 2/4
42 [1] 100/3
432 [1] 43/3
45.201 [1] 13/15
457 [1] 43/3
4607 [1] 1/13
48 [1] 98/16
48-hour [1] 98/14
4:11 [1] 113/19
4:16-CV-01414 [1] 1/4
4th [1] 75/2

5

50 [1] 37/8
512 [1] 1/24
515 [1] 2/8
5382 [1] 1/24
5787 [1] 2/9

6

60 [110]
60's [2] 24/11 89/22
61 [2] 81/4 83/14
63 [1] 75/22
635 [1] 105/9
645 [1] 63/6
6th [2] 11/10 11/15

7

71 [1] 63/6
713 [1] 2/9
77002 [2] 1/19 2/9
77251 [1] 1/13
77550 [1] 2/4
78701 [1] 1/23
797-3200 [1] 2/4

8

8/1 [4] 56/8 57/16 80/5 84/10
8004 [1] 2/8
817 [1] 1/13
83 [1] 75/2
832 [1] 1/19
885 [1] 97/9
8th [1] 2/8

9

9's [1] 42/19
90 [1] 63/9
970 [1] 75/2
979-5382 [1] 1/24
991-4607 [1] 1/13

A

A.G [5] 12/21 14/12 16/25 17/7 107/13
A.G.'s [2] 12/19 14/15
abandon [1] 55/2
ability [6] 9/1 22/12 23/4 36/5 46/2 72/9
able [6] 7/21 11/20 17/11 68/10 93/4 101/14
about [90]
above [2] 46/11 114/6
above-entitled [1] 114/6
absolutely [11] 12/1 28/7 32/6 43/21 43/25 44/4 45/15 73/15 89/5 107/23 107/23
absorb [1] 91/3
abstain [40]
abstained [7] 36/6 45/13 70/13 73/10 73/11 79/3 108/11
abstaining [3] 37/12 46/21 46/24
abstains [2] 7/23 47/7
abstention [69]
absurd [1] 80/19
accept [1] 53/23
accepting [2] 31/3 33/11
access [1] 90/15
accordance [1] 90/22
according [1] 18/20
account [1] 36/10
accused [1] 37/18
acknowledge [2] 49/24 95/10
acknowledged [1] 95/5
act [3] 56/14 71/13 82/23
action [9] 17/1 22/11 26/1 51/10 69/7 93/18 101/20 101/22 101/23
active [1] 91/23
activity [2] 69/10 69/16
acts [1] 72/2
actually [30]
acute [1] 99/12
adamant [1] 73/13
Adams [1] 2/3
add [3] 32/24 33/7 60/7
added [1] 113/14
addendum [1] 57/12
adding [1] 91/10
addition [6] 18/11 55/3 82/16 99/9 99/20 113/3
additional [18] 5/16 45/9 49/25 58/23 62/6 73/21 91/4 98/22 98/23 98/24 99/15 99/19 99/19 99/23 99/24 100/3 100/7 107/3
Additionally [1] 26/21
address [29]
addressed [14] 3/20 6/1 6/2 6/3 9/1 18/6 65/18 65/21 76/11 87/6 99/12 103/22 103/23 109/11
addresses [2] 5/15 55/7
addressing [3] 58/16 93/23 110/25
adds [1] 92/13
adequacy [2] 37/17 38/2
adequate [4] 36/14 44/23 76/1 106/9
adjudication [1] 59/16
administrators' [1] 94/9
admit [1] 49/12
admitted [3] 64/5 82/17 108/13
adopt [1] 81/21
adopted [1] 79/23
adopting [1] 35/21
advance [1] 109/22
advanced [1] 29/14
advantage [1] 57/5
advise [1] 50/1
advisory [2] 7/20 108/8
advocating [1] 19/16
affect [1] 104/6
affidavit [1] 99/7
affirmative [1] 60/24
affirmatively [3] 49/20 59/21 86/9
affirmed [2] 82/10 93/6
affirms [1] 35/11
after [19] 8/17 9/7 11/12 13/10 16/24 24/23 24/24 34/18 47/7 49/11 55/21 62/25 64/17 75/23 82/10 86/16 92/23 103/18 109/23
afternoon [5] 3/4 23/25 28/12 49/7 74/3
again [43]
against [5] 34/5 83/3 84/16 93/21 109/20
agency [1] 34/7
agenda [2] 14/5 14/7
ago [2] 69/21 113/5
agree [14] 6/24 10/15 18/1 19/18 38/16 38/22 55/1 67/19 74/4 74/5 75/14 76/3 81/10 86/18
agreed [2] 26/15 36/7
agreement [1] 101/9
agrees [3] 30/20 54/16 63/21
ahead [8] 3/4 6/7 9/14 10/23 55/10 65/23 96/20 97/16

## A

**aide [1]** 14/23
**aided [1]** 2/11
**aired [1]** 109/6
**akin [1]** 80/24
**AL [1]** 1/5
**Alabama [3]** 56/1 56/24 82/1
**Alito [2]** 80/5 80/6
**all [90]**
**Allan [2]** 1/15 3/10
**allege [1]** 61/2
**alleged [2]** 61/3 77/3
**allegedly [1]** 105/11
**alleging [2]** 27/12 43/15
**allocate [1]** 53/7
**allow [5]** 27/21 27/23 59/22 65/13 108/10
**allowed [4]** 60/7 76/21 83/21 106/6
**allowing [5]** 17/9 17/10 40/12 60/4 61/17
**allows [1]** 17/7
**almost [1]** 48/12
**alone [8]** 41/16 48/23 92/16 93/15 110/24 111/1 112/17 112/19
**along [4]** 24/22 35/5 76/2 96/18
**already [8]** 16/18 51/2 53/15 58/8 61/23 76/11 103/20 104/22
**also [49]**
**altercations [1]** 98/10
**alternate [1]** 29/13
**alternative [4]** 8/13 25/20 29/13 110/17
**alternatives [1]** 8/14
**although [10]** 10/6 10/13 22/22 26/16 27/25 31/1 33/5 73/12 101/23 102/2
**altogether [1]** 44/9
**always [5]** 5/3 6/16 28/15 51/10 92/12
**am [9]** 37/12 64/13 76/25 87/22 95/14 96/5 100/20 100/22 109/7
**amalgamation [1]** 56/16
**ambiguity [2]** 27/2 40/11
**amenable [2]** 24/9 33/24
**amendment [4]** 66/24 86/12 87/15 87/25
**amicus [1]** 86/11
**among [1]** 56/17
**amongst [2]** 61/6 61/9
**amount [3]** 61/15 85/5 85/17
**ample [1]** 34/14
**analogous [1]** 60/14
**analyses [3]** 21/21 76/2 107/24
**analysis [47]**
**analyze [4]** 18/21 46/19 70/16 103/11
**analyzed [1]** 111/12
**angela [6]** 2/2 2/7 2/9 3/16 114/13 114/14
**Ann [1]** 1/11
**announcing [1]** 91/18
**another [10]** 13/23 16/19 17/4 21/19 55/4 57/2 67/17 94/23 98/19 100/9
**answer [11]** 30/16 51/14 62/1 68/19 79/20 83/19 84/23 101/21 102/19 102/20 109/9
**answered [1]** 12/18
**anticipating [2]** 99/16 108/11
**any [39]**
**anybody's [1]** 97/15
**anyone's [1]** 90/23
**anything [8]** 17/15 28/18 39/19 40/3 55/17 55/23 81/5 81/8
**anyways [1]** 40/4
**apart [1]** 68/18
**Apologies [1]** 86/3
**apologize [1]** 37/2
**apparently [1]** 68/8
**appeal [6]** 33/25 44/24 79/25 80/2 81/7 81/8
**Appeals [1]** 81/6
**appear [1]** 88/6
**appearances [3]** 1/9 2/1 3/5
**appellate [8]** 33/23 34/16 34/18 80/7 80/25 89/16 89/19 113/12
**applicability [1]** 36/24
**applicable [2]** 43/10 65/7
**application [5]** 10/22 14/18 24/12 32/12 42/6
**applied [5]** 21/5 44/17 47/18 85/4 87/20
**applies [17]** 6/12 23/9 27/10 33/10 38/11 47/18 48/2 50/25 55/5 57/4 58/24 81/4 81/16 81/17 86/1 87/18 88/10
**apply [28]**
**applying [1]** 8/7
**appointed [6]** 62/25 63/9 79/19 83/4 83/5 92/3
**appointment [1]** 51/1
**appreciate [2]** 100/19 113/18
**appreciation [1]** 95/2
**approach [11]** 3/24 9/9 19/11 48/2 53/8 82/1 103/1 110/16 110/18 110/19 111/17
**appropriate [5]** 5/6 54/5 64/12 96/22 110/18
**appropriately [1]** 82/23
**approvingly [1]** 48/22
**approximately [5]** 97/23 99/14 100/4 100/7 100/10
**April [5]** 11/10 11/15 14/6 14/10 14/24
**April 2024 [1]** 14/10
**April 6th [2]** 11/10 11/15
**arbitrary [2]** 35/17 91/16
**are [129]**
**aren't [4]** 28/13 32/18 32/19 49/13
**argue [3]** 52/22 64/8 110/17
**argued [1]** 109/17
**arguing [2]** 33/14 103/24
**argument [30]**
**arguments [22]** 16/16 26/18 33/11 33/13 40/6 46/6 54/25 62/6 62/8 62/17 62/21 63/22 65/25 66/1 69/2 69/18 71/5 80/1 80/4 82/15 85/16 103/19
**arm [1]** 49/20
**around [7]** 5/22 17/18 27/17 28/19 29/10 44/11 80/14
**arrest [1]** 34/7
**arrested [1]** 90/12
**arrestee [2]** 14/25 22/12
**arrestee's [1]** 22/25
**arrestees [2]** 42/15 91/7
**arrests [1]** 97/25
**Article [3]** 108/9 108/9 108/12
**articulate [1]** 95/15
**as [171]**
**ascertain [1]** 104/9
**aside [2]** 31/3 42/19
**ask [12]** 11/25 12/19 13/11 24/9 33/25 34/2 34/5 36/7 73/20 83/25 84/18 100/17
**asked [8]** 14/10 26/9 36/4 44/8 52/18 83/6 88/6 94/20
**asking [10]** 14/5 24/15 29/2 37/17 54/24 72/21 86/9 90/11 110/4 110/6
**asks [2]** 29/16 84/21
**aspect [2]** 77/7 97/20
**aspects [2]** 28/22 111/18
**assert [3]** 77/10 83/23 85/25
**asserted [1]** 43/20
**asserting [3]** 85/25 93/1 101/23
**assertion [1]** 28/5
**assess [4]** 32/16 37/8 41/5 55/22
**assessed [1]** 30/22
**assessing [4]** 35/24 36/22 36/22 36/24
**assigned [2]** 13/11 100/9
**assignments [1]** 109/24
**assist [1]** 89/19
**assistance [1]** 4/17
**assume [7]** 18/2 44/3 64/8 71/13 84/1 84/4 106/25
**assumed [1]** 52/8
**assuming [1]** 107/6
**assumption [1]** 107/1
**at [107]**
**attempt [2]** 44/19 69/1
**attempted [1]** 94/12
**attempts [1]** 60/9
**attend [1]** 111/17
**attention [2]** 27/3 74/13
**attorney [42]**
**Attorney's [3]** 13/10 13/12 13/18
**attorneys [1]** 15/11
**August [3]** 12/22 13/4 17/1
**Austin [1]** 1/23
**authorities [1]** 46/11
**authority [11]** 7/11 7/13 8/6 15/3 28/16 33/9 41/20 45/24 56/16 81/18 104/11
**authorizes [2]** 51/5 54/16
**Auto [2]** 27/4 88/14
**automatic [1]** 42/6
**avoid [2]** 81/23 111/2
**aware [13]** 4/23 5/4 13/20 17/16 52/20 69/24 69/24 70/3 71/4 74/12 75/10 75/11 98/14
**away [7]** 71/24 77/13 103/9 105/17 107/2 108/1 110/9

## B

**back [26]**
**backdrop [3]** 6/11 16/12 109/20
**background [1]** 18/12
**backstop [1]** 72/7
**bail [28]**
**ball [1]** 86/24
**Bang [1]** 57/19
**banged [2]** 57/17 57/22
**Bank [4]** 57/15 57/16 84/9 88/13
**Banks [1]** 88/9
**bar [2]** 12/5 63/8
**Barrett [1]** 1/16
**barring [1]** 65/10
**base [3]** 12/6 54/17 105/1
**based [23]**
**bases [1]** 50/7
**basically [4]** 9/16 14/2 15/20 17/12
**basis [8]** 51/18 51/23 69/2 71/14 89/4 105/24 106/21 111/10
**be [125]**
**bear [1]** 104/12
**became [1]** 35/20
**because [62]**
**become [2]** 93/8 108/11
**becomes [1]** 66/19
**bedrock [1]** 8/9
**been [49]**
**before [45]**
**began [2]** 24/15 110/4
**begin [2]** 12/19 25/10
**beginning [2]** 74/7 108/7
**behalf [4]** 61/1 69/12 83/6 100/19
**behave [2]** 90/1 90/22
**behind [5]** 5/8 5/9 8/11 18/12 66/20
**being [15]** 11/13 11/19 14/4 14/14 16/9 21/5 23/21 39/10 42/1 42/12 52/17 63/12 72/16 92/6 106/12
**belabor [1]** 46/18
**believe [18]** 6/10 8/22 10/10 24/15 26/7 26/15 62/19 70/17 71/23 74/23 87/18 95/15 96/6 96/7 100/24 102/3 106/6 109/1
**Bell [1]** 93/1
**bench [8]** 9/9 9/19 9/20 10/5 56/17 62/25 63/8 106/14
**benefit [3]** 22/25 54/8 54/8
**beside [1]** 78/2
**besides [1]** 106/1
**best [2]** 36/17 81/3
**between [9]** 28/10 32/3 36/12 41/5 45/7 45/25 46/21 82/19 86/8
**bifurcated [1]** 89/11
**bifurcating [1]** 88/5
**bifurcation [1]** 88/8
**big [5]** 44/6 45/17 53/6 75/7 96/16
**bind [2]** 18/9 65/14

## B

**binding [14]** 29/4 30/18 32/25 33/12 37/23 40/8 45/1 77/20 77/22 77/22 78/19 84/23 87/19 89/8
**Bingham [1]** 91/17
**Birmingham [1]** 88/11
**Bissonnette [2]** 84/18 84/19
**bit [6]** 7/17 17/5 24/20 25/10 26/6 55/19
**blanket [4]** 21/22 22/4 110/16 110/17
**BLOM [5]** 57/15 57/16 84/9 88/9 88/13
**blue [1]** 81/14
**board [1]** 14/20
**body [1]** 5/20
**bond [2]** 91/25 99/17
**bonds [3]** 98/3 99/25 100/1
**both [25]**
**bound [9]** 49/13 51/5 52/17 52/20 60/4 60/8 77/18 83/22 85/14
**boundaries [2]** 72/10 72/13
**boundary [2]** 41/19 41/20
**Box [2]** 1/12 1/23
**break [1]** 58/20
**breaking [1]** 37/7
**brief [20]** 24/21 26/7 27/4 45/15 50/22 56/1 56/20 60/21 82/20 87/4 96/15 96/19 97/4 97/6 105/23 108/2 110/24 110/24 111/3 111/4
**briefed [2]** 28/1 45/16
**briefing [13]** 4/5 13/3 17/13 20/24 26/9 45/9 69/7 77/9 79/1 101/6 103/2 106/1 109/5
**briefly [6]** 26/7 52/10 59/2 59/3 87/4 91/3
**briefs [8]** 62/17 86/11 109/3 109/12 109/12 109/13 111/1 113/17
**bright [2]** 45/6 59/25
**bring [4]** 11/20 27/3 57/6 66/18
**broad [1]** 29/15
**broader [1]** 31/14
**broadly [1]** 87/11
**broken [1]** 14/15
**brought [8]** 28/8 41/12 72/6 79/5 85/4 101/13 102/14 108/3
**Brown [1]** 63/5
**budget [2]** 107/14 107/16
**building [1]** 109/17
**built [2]** 41/8 86/22
**bullets [1]** 51/21
**bundled [1]** 39/2
**burden [6]** 84/17 92/11 93/11 94/12 104/11 104/12
**Burger [1]** 106/11
**but [139]**

## C

**call [2]** 61/17 63/1
**CALLED [1]** 3/3
**calls [1]** 61/9
**came [9]** 5/6 6/9 6/22 43/11 52/23 62/22 76/4 77/18 81/15
**can [48]**
**can't [11]** 11/8 11/9 19/25 20/17 47/2 47/11 47/20 65/14 83/7 101/19 101/22
**candid [1]** 50/21
**candidly [4]** 51/20 53/13 55/8 58/19
**Cannon [1]** 51/4
**cannot [12]** 18/9 35/17 41/17 43/2 46/13 77/10 77/11 89/11 90/13 93/18 94/12 106/8
**capacity [7]** 13/21 19/6 53/25 67/12 82/14 95/9 98/9
**carefully [2]** 17/13 107/11
**carries [2]** 21/2 97/15
**carry [2]** 94/12 95/10
**case [127]**
**case's [1]** 47/18
**cases [31]**
**catastrophic [1]** 94/5
**categories [3]** 38/8 38/9 38/12
**category [3]** 32/10 32/11 104/21
**cause [1]** 90/8
**causes [1]** 63/15
**causing [1]** 56/17
**caveats [1]** 11/8
**cede [1]** 44/4
**cell [1]** 93/3
**celling [3]** 93/5 93/7 93/10
**Center [7]** 97/24 98/4 98/8 98/22 99/9 99/11 100/3
**certain [3]** 4/15 21/23 30/3
**certainly [11]** 4/24 31/4 32/18 33/11 33/18 34/23 35/11 37/10 48/1 64/20 97/14
**certify [2]** 114/5 114/7
**certiorari [1]** 80/1
**challenge [9]** 16/6 16/10 64/2 72/15 80/2 81/1 93/2 102/10 113/14
**challenged [4]** 22/3 32/9 105/22 105/23
**challenges [2]** 18/13 101/15
**challenging [3]** 65/17 78/4 106/8
**chance [2]** 45/15 92/18
**change [15]** 20/6 29/7 31/18 33/10 36/23 37/8 38/5 39/23 47/14 47/16 47/17 48/23 82/2 92/25 106/18
**changed [6]** 5/20 15/4 20/5 90/16 90/16 101/18
**changes [5]** 15/24 19/19 31/22 36/11 72/4
**changing [1]** 56/24
**chaos [1]** 56/17
**characterization [2]** 40/24 60/20
**charged [2]** 98/6 98/7
**charitable [1]** 85/12
**chart [5]** 24/19 51/19 89/14 97/9 98/20
**charts [1]** 109/14
**chats [1]** 61/18
**chewed [3]** 15/16 34/20 34/21
**Chicago [1]** 65/9
**Chief [7]** 63/5 90/6 91/9 91/17 91/20 94/2 108/20
**choice [1]** 54/4
**choose [2]** 53/21 53/25
**chose [2]** 49/20 51/21
**Circuit [55]**
**Circuit's [4]** 29/22 29/25 109/21 111/18
**circularity [2]** 36/3 102/11
**circumstance [2]** 20/12 43/16
**circumstances [9]** 20/5 20/11 46/22 48/24 54/5 65/20 66/20 67/21 67/23
**circumvent [2]** 27/22 27/23
**circumventing [1]** 40/20
**cite [9]** 18/8 28/22 28/23 53/9 56/1 78/5 78/10 82/20 104/10
**cited [10]** 27/3 28/18 59/17 59/18 69/4 75/9 75/12 75/12 77/12 105/10
**cites [3]** 44/11 48/22 82/8
**citing [5]** 30/11 59/13 59/14 69/13 95/4
**City [2]** 65/9 77/13
**civil [8]** 1/12 12/8 67/4 80/21 81/21 82/24 113/8 113/9
**claim [2]** 53/18 77/17
**claims [3]** 59/9 59/15 85/12
**clarification [2]** 107/8 112/12
**clarify [1]** 110/23
**clarifying [2]** 8/1 110/20
**Clark [1]** 84/16
**class [7]** 93/19 101/19 101/22 101/23 113/8 113/9 113/9
**clear [22]** 6/17 10/8 25/7 26/3 33/24 37/13 39/7 41/23 44/23 57/2 62/15 72/1 72/15 79/20 81/14 84/14 84/16 86/21 93/13 94/16 94/21 107/23
**clearly [3]** 29/25 104/20 104/25
**clerk [3]** 9/11 99/22 113/5
**Clerk's [1]** 99/20
**clinic [2]** 99/10 99/13
**clock [8]** 18/3 56/2 56/4 64/24 65/3 65/16 67/16 80/8
**clocks [1]** 79/20
**close [3]** 75/9 75/13 106/4
**closed [1]** 53/15
**co [3]** 61/14 69/22 87/16
**co-counsel [1]** 61/14
**co-counsel's [1]** 87/16
**co-equal [1]** 69/22
**code [6]** 13/15 13/25 50/21 51/4 53/9 53/10
**coffee [1]** 58/20
**cohorts [1]** 66/6
**Coker [1]** 14/23
**collaterally [1]** 81/4
**colleague [4]** 24/9 44/5 49/3 76/12
**colleagues [3]** 14/16 50/19 79/13
**Collins [1]** 75/1
**come [7]** 10/20 13/9 16/18 16/19 62/12 100/18 112/23
**comes [11]** 8/6 14/3 14/20 16/20 32/17 34/21 48/11 61/8 63/25 75/9 75/13
**comfortable [1]** 12/15
**coming [3]** 9/1 99/11 100/2
**comity [4]** 54/4 54/11 59/15 86/13
**command [1]** 43/24
**comment [1]** 18/11
**commissioner's [2]** 14/5 17/5
**commissioners [5]** 14/8 14/11 53/11 53/18 53/20
**common [2]** 56/16 81/23
**comparison [2]** 20/8 86/20
**compatible [1]** 4/16
**compelling [1]** 83/2
**competence [1]** 50/25
**competent [1]** 12/16
**complete [3]** 33/24 57/10 93/16
**completely [5]** 48/14 49/1 71/19 71/21 86/18
**compliance [4]** 41/24 43/1 43/8 90/1
**compliant [2]** 89/7 90/13
**complicated [4]** 53/13 55/19 83/12 86/19
**complied [2]** 27/9 42/1
**comply [6]** 29/3 39/4 43/5 87/10 112/8 114/7
**complying [2]** 29/20 76/18
**component [1]** 5/16
**comprehensive [1]** 82/7
**computer [1]** 2/11
**computer-aided [1]** 2/11
**conceding [1]** 36/19
**conceive [1]** 24/21
**conceiving [1]** 34/25
**concepts [1]** 8/12
**concern [2]** 16/8 98/19
**concerned [2]** 36/14 68/5
**concerning [1]** 47/15
**concerns [5]** 10/23 61/18 92/6 94/8 98/17
**conclude [1]** 58/2
**concluded [3]** 70/11 74/1 92/3
**conclusion [2]** 26/23 87/19
**conclusions [2]** 35/12 71/17
**concrete [1]** 50/14
**condemned [1]** 91/8
**condition [1]** 17/6
**conditionally [1]** 96/9
**conditions [1]** 93/7
**conduct [14]** 49/11 49/15 50/21 51/4 54/17 54/17 54/24 61/11 66/15 69/16 77/5 80/11 100/23 105/1
**conduct-base [1]** 54/17
**conduct-based [2]** 54/17 54/24
**conducted [1]** 72/10

## C

**Coney [7]** 27/4 56/7 57/15 57/16 80/6 84/10 88/13
**conference [2]** 26/10 114/8
**conferences [2]** 6/10 50/4
**confident [1]** 21/3
**confines [1]** 89/5
**conflate [1]** 80/23
**conflict [7]** 14/2 21/18 21/18 31/25 43/15 45/25 104/2
**conflicts [5]** 41/5 43/20 45/21 59/8 61/3
**confused [1]** 40/10
**confusing [2]** 55/8 56/15
**confusion [1]** 104/7
**Congress [4]** 56/14 79/22 80/20 108/16
**conjunction [1]** 90/9
**connection [1]** 101/1
**consensus [2]** 13/7 15/12
**consent [105]**
**consider [26]**
**consideration [12]** 5/9 5/24 9/5 10/12 25/24 42/7 42/11 42/14 42/17 88/20 92/21 96/10
**considerations [1]** 95/2
**considered [8]** 16/16 31/7 32/14 32/15 85/23 88/19 92/24 106/2
**considering [9]** 22/2 26/1 26/1 32/11 38/25 39/6 87/11 87/14 89/17
**considers [2]** 33/19 39/9
**consistent [10]** 11/4 25/24 29/12 30/18 38/19 61/2 67/20 78/4 86/5 88/24
**consistently [1]** 86/6
**constitutes [3]** 52/3 69/16 83/24
**Constitution [6]** 72/12 72/14 91/13 101/24 101/25 102/3
**constitutional [35]**
**constitutionality [1]** 72/15
**constitutionally [2]** 71/25 90/13
**construed [1]** 95/21
**construing [1]** 112/15
**contains [1]** 94/21
**contemplating [1]** 25/17
**contention [1]** 6/8
**contest [1]** 26/5
**context [10]** 26/2 30/10 47/5 48/12 60/2 63/25 81/21 82/3 87/8 101/20
**contextually [1]** 78/14
**continually [3]** 59/7 59/7 80/23
**continuance [1]** 83/7
**continuation [1]** 68/12
**continue [14]** 4/14 14/12 14/12 15/3 18/25 19/13 26/18 34/1 57/1 60/13 79/2 92/18 99/7 105/20
**CONTINUED [1]** 2/1
**continuing [3]** 7/8 36/21 59/10
**contract [1]** 99/6
**contradiction [1]** 42/19
**contrary [3]** 11/8 80/19 92/10
**control [1]** 72/9
**controlled [5]** 32/18 32/19 32/20 32/21 32/22
**controlling [2]** 33/9 66/10
**controversy [1]** 53/6
**conversations [1]** 15/20
**convince [1]** 112/6
**Cook [1]** 88/11
**Cooper [1]** 43/11
**copies [1]** 96/17
**copy [2]** 9/12 97/3
**correct [19]** 10/3 10/10 17/25 22/16 28/7 40/9 41/4 43/25 45/14 46/13 59/8 60/11 68/22 72/6 81/3 102/1 102/6 109/1 114/5
**correctly [3]** 87/17 87/23 106/24
**correctness [1]** 28/5
**cosign [1]** 56/23
**cost [9]** 54/7 54/8 93/23 96/24 97/18 98/19 99/5 99/13 100/4
**costs [5]** 79/14 94/5 98/21 106/24 107/1
**could [53]**
**couldn't [7]** 12/4 15/6 20/16 51/12 51/25 54/19 85/13
**counsel [39]**
**counsel's [1]** 87/16
**countenance [1]** 80/18
**counter [2]** 77/22 106/13
**counterfactual [1]** 54/12
**counties [2]** 42/13 72/17
**country [1]** 90/11
**county [80]**
**County's [4]** 14/6 105/10 105/22 107/13
**couple [7]** 11/7 17/20 62/10 65/24 100/20 102/24 106/4
**course [28]**
**court [260]**
**court's [27]**
**court-appointed [1]** 92/3
**courtroom [1]** 100/14
**courtrooms [1]** 13/22
**courts [15]** 22/25 49/9 54/9 68/19 75/24 82/4 82/8 88/17 89/19 99/16 99/16 99/22 101/22 102/1 113/8
**cover [2]** 24/8 101/10
**covered [3]** 44/10 87/5 101/9
**covering [1]** 111/4
**cow's [1]** 34/19
**Cradle [3]** 59/18 60/14 77/12
**create [2]** 39/8 41/17
**created [4]** 15/10 52/14 79/22 80/20
**creating [1]** 35/2
**credit [1]** 55/15
**criminal [8]** 12/7 37/18 68/11 75/25 83/3 83/9 101/20 108/5
**critical [1]** 24/16
**crowded [1]** 98/8
**CRR [2]** 2/7 114/14
**crude [1]** 111/17
**crystal [1]** 39/7
**CSR [2]** 2/7 114/14
**cultural [2]** 90/5 91/21
**curiam [1]** 40/21
**curious [1]** 109/7
**current [2]** 90/6 107/3
**currently [2]** 42/5 44/22
**custody [3]** 98/16 99/3 100/8
**cut [1]** 73/19
**Cutting [12]** 1/10 3/7 54/6 56/7 79/12 85/9 87/1 87/2 96/21 100/25 103/8 105/6
**CV [1]** 1/4

## D

**Dallas [3]** 21/4 21/9 105/10
**Daniel [3]** 1/17 3/13 63/19
**daniel.hu [1]** 1/19
**date [2]** 10/7 114/11
**Daves [112]**
**Daves's [2]** 31/2 31/9
**Davis [1]** 84/16
**day [12]** 19/12 21/3 52/8 60/4 68/15 68/23 95/10 97/15 99/17 102/12 107/17 107/17
**days [6]** 11/10 11/15 55/14 55/17 80/8 111/22
**Dayton [1]** 59/13
**deadline [1]** 109/4
**deal [15]** 6/25 7/1 8/12 13/19 14/17 15/15 16/5 65/25 66/21 70/1 70/5 72/5 100/7 111/24 112/9
**dealing [4]** 23/3 34/13 53/16 65/7
**dealt [2]** 32/22 104/24
**decades [2]** 42/13 90/4
**December [2]** 17/16 82/6
**December 11th [1]** 82/6
**decide [35]**
**decided [9]** 7/15 17/6 22/24 30/21 31/5 47/19 48/13 74/19 74/24
**decides [2]** 16/25 84/1
**deciding [12]** 4/15 4/18 26/2 36/20 37/10 43/19 46/5 46/6 47/5 47/25 48/2 66/8
**decision [15]** 20/4 21/22 24/16 24/22 25/6 33/25 34/15 40/23 44/20 54/11 76/4 85/2 93/1 109/2 109/2
**decisions [6]** 6/5 37/20 54/7 85/14 91/13 91/15
**decisively [1]** 34/8
**declarants [1]** 90/19
**declaration [4]** 90/7 97/9 97/21 98/5
**declarations [2]** 97/21 108/4
**declined [2]** 14/8 66/12
**declines [1]** 16/24
**declining [1]** 15/20
**decrease [2]** 22/3 97/22
**decree [111]**
**decree's [1]** 68/12
**decrees [2]** 6/17 43/5
**defendant [9]** 51/2 52/10 52/23 53/25 64/1 82/25 83/3 83/18 87/7
**defendant's [1]** 73/25
**defendants [8]** 1/6 1/21 13/20 34/14 43/5 59/20 67/12 109/7
**Defender [4]** 90/6 91/20 94/3 100/6
**defense [1]** 23/4
**deference [1]** 94/8
**define [1]** 21/16
**definitely [2]** 29/20 57/4
**definition [1]** 21/25
**definitive [1]** 94/10
**defying [1]** 42/24
**degree [1]** 20/1
**delay [3]** 83/10 103/17 104/24
**delayed [2]** 60/4 83/3
**demands [2]** 40/3 112/21
**democracy [2]** 18/9 19/15
**Democrat [1]** 11/4
**demonstrates [1]** 27/6
**demonstrative [7]** 9/10 51/15 51/20 60/6 89/14 95/24 96/14
**denial [1]** 82/10
**denials [1]** 34/14
**denied [9]** 14/11 16/19 53/2 85/6 85/19 85/24 87/22 93/5 106/21
**denies [1]** 26/17
**deny [6]** 45/1 61/23 89/15 92/16 95/23 96/3
**depart [1]** 36/18
**department [2]** 75/2 107/15
**depending [1]** 97/25
**depose [1]** 52/17
**deposition [3]** 50/18 61/1 82/17
**depositions [1]** 52/19
**deprive [2]** 39/10 39/11
**deputy [2]** 15/1 64/1
**described [2]** 85/2 101/13
**designed [6]** 38/7 61/16 61/21 72/5 81/22 81/24
**despite [1]** 63/13
**destabilizing [1]** 81/21
**detail [2]** 94/5 108/3
**detailed [2]** 21/6 79/16
**details [1]** 4/18
**detain [1]** 90/11
**detainees [1]** 93/3
**detention [6]** 35/18 41/15 41/16 91/16 91/19 91/25
**determination [2]** 36/20 100/21
**determinations [1]** 35/15
**determine [6]** 5/4 16/6 23/6 45/24 76/7 78/11
**determined [2]** 41/15 43/10
**determines [2]** 22/11 67/23
**determining [1]** 71/10
**detour [1]** 25/11
**develop [1]** 76/13
**developed [1]** 101/10
**development [3]** 30/14 70/15 103/14
**device [2]** 7/2 78/25

## D

**did [36]**
**didn't [26]**
**difference [2]** 28/10 86/7
**differences [1]** 82/19
**different [19]** 12/12 26/24 26/24 27/5 28/13 33/1 33/2 33/3 40/3 40/5 40/5 45/17 45/20 66/6 67/14 80/24 81/23 89/15 101/11
**difficult [1]** 55/22
**digging [1]** 9/17
**Diggs [1]** 91/9
**direct [4]** 7/1 48/19 48/20 74/13
**directed [7]** 3/18 4/20 5/19 8/22 37/14 47/1 79/5
**directives [1]** 5/10
**directly [1]** 24/5
**disadvantage [1]** 67/6
**disagree [6]** 24/3 40/4 58/24 60/12 100/24 102/23
**disagreed [1]** 86/6
**disagreeing [1]** 86/8
**disagrees [1]** 64/2
**discovery [11]** 7/6 7/8 30/14 31/10 48/5 48/11 48/12 69/14 70/15 71/9 74/8
**discretionary [1]** 56/19
**discuss [2]** 23/4 45/12
**discussed [6]** 26/10 46/18 50/4 63/23 70/8 110/12
**discusses [2]** 68/4 69/21
**discussing [7]** 5/24 8/9 57/1 62/24 68/25 75/23 105/6
**discussion [12]** 4/6 20/1 57/13 69/5 69/10 73/5 75/20 75/22 76/9 76/16 79/15 113/7
**discussions [4]** 14/15 15/17 15/18 70/7
**disease [1]** 93/8
**dismiss [7]** 8/20 8/20 23/18 24/2 40/15 70/18 79/24
**dismissal [2]** 23/21 78/24
**dismisses [1]** 81/6
**dispensed [1]** 105/2
**dispute [1]** 61/7
**disputed [1]** 31/12
**disrupting [1]** 28/9
**dissect [1]** 88/15
**dissent [1]** 102/16
**dissolved [1]** 43/5
**distinction [2]** 45/6 75/8
**DISTRICT [18]** 1/1 1/1 1/8 3/1 7/22 43/10 63/12 84/19 93/5 94/2 99/15 99/20 99/21 99/22 110/13 114/2 114/3 114/15
**divested [1]** 47/20
**divesting [1]** 37/12
**divided [1]** 108/23
**divisible [1]** 89/11
**DIVISION [4]** 1/2 1/22 91/17 114/15
**do [128]**
**docket [4]** 57/11 67/4 97/5 97/7
**dockets [1]** 91/11
**doctrine [1]** 16/7
**document [3]** 9/15 15/10 97/3
**documentation [1]** 68/20
**documented [1]** 42/13
**documents [2]** 9/17 108/4
**does [59]**
**doesn't [18]** 3/19 17/25 18/5 18/22 28/21 48/18 49/24 55/23 57/6 72/8 78/2 81/7 81/20 85/19 86/16 103/14 108/10 112/23
**doing [10]** 14/24 17/19 20/17 22/25 29/12 39/8 44/15 89/5 90/9 113/15
**dollars [1]** 80/13
**don't [53]**
**done [14]** 15/24 19/10 19/10 20/6 29/25 54/13 62/23 62/24 66/3 67/1 77/24 88/22 90/10 90/14
**door [2]** 39/25 44/12
**double [3]** 93/5 93/7 93/9
**doubt [1]** 31/9
**down [8]** 5/6 5/21 6/9 6/22 9/1 45/5 61/8 76/4
**Draper [5]** 62/24 90/6 91/21 100/13 100/20
**draw [1]** 45/6
**dressed [1]** 105/25
**dropped [1]** 86/24
**drumming [1]** 105/1
**due [1]** 14/25
**during [3]** 9/9 40/10 73/8
**duty [4]** 6/22 13/18 50/24 75/2

## E

**e-mails [3]** 61/9 77/10 77/12
**E.D.N.Y [1]** 59/19
**each [12]** 16/4 19/5 19/8 19/12 49/17 49/19 51/21 52/21 67/8 89/18 91/10 113/7
**earlier [12]** 35/22 52/2 54/21 54/22 59/12 65/19 73/5 83/15 89/1 92/14 101/13 110/12
**early [2]** 11/11 52/11
**easiest [1]** 50/12
**easy [2]** 40/18 55/4
**Ed [1]** 1/16
**educated [1]** 63/7
**effect [5]** 18/15 41/24 61/5 95/6 107/7
**effective [1]** 37/19
**effectively [3]** 13/22 17/25 96/8
**effects [1]** 64/9
**effectuate [1]** 73/4
**effort [1]** 91/14
**efforts [1]** 60/24
**egregiously [2]** 74/23 95/9
**either [7]** 33/7 40/22 46/25 51/22 54/3 65/13 69/3
**elected [3]** 11/2 30/1 65/13
**election [10]** 9/22 10/14 16/14 16/15 18/4 29/2 52/11 52/15 109/22 109/24
**elements [2]** 104/15 104/17
**elephant [1]** 48/17
**eleven [1]** 54/22
**Elizabeth [2]** 1/11 3/6
**else [2]** 28/18 66/5
**elsewhere [1]** 30/19
**embodied [1]** 35/20
**embody [1]** 36/7
**embraces [1]** 30/11
**Emeka [1]** 1/21
**emphasizing [1]** 93/11
**emphatic [1]** 68/20
**enable [1]** 37/18
**Enabling [1]** 56/14
**enclosed [1]** 78/17
**encourage [1]** 89/16
**end [14]** 3/21 6/1 13/19 19/11 34/20 37/6 46/24 47/6 47/7 48/14 51/11 51/18 92/5 102/12
**ended [1]** 14/12
**ends [1]** 72/19
**endure [1]** 83/9
**enduring [1]** 106/15
**enforce [3]** 47/11 56/9 79/2
**engage [4]** 15/20 16/25 73/15 109/20
**engaged [2]** 17/11 69/5
**engaging [2]** 69/13 71/25
**enough [11]** 15/23 16/1 67/17 70/2 78/20 91/12 92/16 94/23 95/13 95/16 103/19
**entered [2]** 64/25 71/17
**entire [5]** 69/13 111/21 113/8 113/8 113/9
**entirely [1]** 40/20
**entirety [3]** 23/1 89/10 111/5
**entitled [1]** 114/6
**entity [2]** 53/12 65/8
**entries [2]** 51/16 57/11
**entry [7]** 9/3 9/6 49/10 49/11 60/18 97/5 97/7
**envision [1]** 110/23
**equal [1]** 69/22
**equally [1]** 101/14
**equation [1]** 57/6
**equipoise [1]** 92/8
**equitable [8]** 7/4 41/19 43/9 57/6 79/2 95/2 96/21 101/15
**equities [21]** 29/1 29/10 34/5 39/6 43/1 45/19 46/3 46/20 47/22 48/6 48/23 58/16 75/19 79/12 85/10 88/23 93/21 93/24 94/7 105/16 105/16
**equity [7]** 57/4 70/8 73/15 75/24 76/3 76/3 76/3
**equivocation [1]** 55/8
**error [1]** 28/8
**especially [3]** 61/13 62/20 101/19
**essential [1]** 90/18
**essentially [3]** 47/11 47/25 103/16
**established [2]** 33/8 38/24
**Estelle [1]** 63/6
**estimate [1]** 80/14
**estimates [1]** 100/10
**ET [1]** 1/5
**etc [1]** 76/13
**ethical [1]** 50/20
**ethics [2]** 50/24 51/8
**evaluate [2]** 29/6 61/25
**even [49]**
**event [3]** 14/2 14/2 109/22
**events [1]** 54/19
**eventual [1]** 44/20
**eventually [8]** 13/3 14/25 15/8 15/16 15/18 18/17 23/6 52/15
**ever [3]** 19/10 65/10 88/22
**every [15]** 12/9 16/9 18/13 19/4 34/6 60/3 66/14 66/18 66/24 68/20 70/23 70/25 71/1 80/16 100/2
**everybody [1]** 4/1
**everyone [5]** 30/19 54/16 61/15 66/5 90/12
**everything [5]** 18/4 33/19 62/18 75/19 103/6
**evidence [18]** 9/16 10/25 29/10 31/11 41/10 48/11 60/22 71/8 78/8 78/17 91/1 92/1 92/10 94/11 97/13 104/13 105/4 105/21
**evidentiary [2]** 42/5 100/15
**exact [5]** 16/20 21/1 21/1 21/4 61/19
**exactly [11]** 25/8 27/16 35/23 44/14 56/5 63/9 80/4 91/7 95/14 112/22 112/22
**examine [1]** 36/9
**example [5]** 80/6 84/14 91/1 92/20 98/25
**examples [2]** 59/17 61/4
**except [3]** 12/10 63/14 91/7
**exception [2]** 38/11 104/22
**exceptionally [1]** 79/15
**exclusion [1]** 15/17
**exclusivity [1]** 88/12
**excuse [9]** 26/22 28/9 29/17 32/10 42/25 63/15 82/23 83/13 97/1
**excused [1]** 113/18
**excusing [1]** 86/21
**exhaust [1]** 83/1
**exhibit [4]** 14/22 96/14 96/15 97/14
**exhibits [1]** 97/13
**exist [4]** 22/5 45/21 72/8 90/7
**existed [1]** 22/23
**existence [3]** 22/10 22/11 105/12
**existing [1]** 110/24
**exists [1]** 72/7
**expect [1]** 12/6
**expecting [1]** 70/11
**expedited [1]** 89/4
**expeditious [1]** 10/12
**expeditiously [4]** 3/18 4/21 112/24 113/15
**expenses [1]** 4/7
**expert [2]** 105/25 107/15
**explain [3]** 10/14 58/6 86/16
**explained [3]** 80/24 83/20 96/12
**explains [1]** 75/23
**explicit [3]** 77/6 77/8 105/3

## E

**explicitly [1]** 30/25
**exposes [1]** 93/19
**express [2]** 95/17 105/3
**expressed [2]** 80/18 108/7
**expressly [5]** 43/6 51/5 53/21 55/7 103/13
**extend [1]** 77/21
**extensive [1]** 91/2
**extent [13]** 5/24 21/11 21/15 21/16 35/11 68/21 71/22 78/24 87/7 94/6 95/1 101/5 106/16
**extraordinary [1]** 57/24
**extremely [1]** 40/21

## F

**face [2]** 42/16 92/20
**facially [1]** 82/6
**facilities [1]** 98/24
**facility [1]** 99/2
**facing [1]** 61/11
**fact [26]**
**fact-based [1]** 100/21
**factor [3]** 32/23 38/14 43/7
**factors [16]** 20/5 30/21 30/22 31/6 31/7 33/6 33/14 38/1 38/10 38/12 46/2 48/6 56/19 57/7 101/1 101/16
**facts [26]**
**factual [6]** 30/13 34/15 44/23 70/14 96/1 103/14
**failed [1]** 58/10
**failing [2]** 42/14 83/15
**failure [5]** 81/2 81/7 82/23 83/1 83/13
**failures [1]** 16/21
**fairly [1]** 87/5
**faith [1]** 72/3
**fall [2]** 32/9 32/11
**far [13]** 7/5 28/11 45/10 62/6 74/10 77/2 77/4 93/13 103/9 103/9 104/11 105/17 105/17
**Fast [2]** 11/12 12/22
**favor [3]** 18/16 33/19 89/15
**favorably [2]** 59/17 59/18
**federal [27]**
**federalism [1]** 54/11
**feel [2]** 12/16 92/12
**feels [1]** 73/1
**fees [1]** 114/7
**felonies [1]** 98/6
**felons [1]** 98/12
**felony [1]** 13/1
**felt [1]** 50/19
**Ferguson [1]** 97/20
**few [5]** 11/10 11/15 30/16 44/6 109/5
**Fife [7]** 1/11 3/8 24/9 45/3 49/7 74/5 79/10
**Fifth [54]**
**figuring [2]** 20/17 38/21
**file [7]** 17/17 54/19 68/8 79/24 79/24 79/25 80/2
**filed [19]** 9/17 13/2 36/24 39/18 40/8 42/10 45/10 49/18 51/17 52/25 54/21 54/21 55/17 58/7 66/2 74/9 101/25 102/9 111/9
**files [3]** 14/22 17/1 55/16
**filing [1]** 58/11
**filled [1]** 68/21
**filter [1]** 82/3
**final [12]** 27/7 27/15 28/20 58/8 63/17 86/2 88/11 92/19 108/15 108/21 108/22 108/23
**finality [6]** 28/4 28/9 56/10 75/18 81/22 108/19
**finally [6]** 17/11 51/17 68/10 100/6 100/13 108/19
**financial [1]** 94/5
**find [19]** 14/24 18/7 23/11 23/11 24/7 33/21 50/12 69/4 69/6 70/17 73/3 82/22 82/22 87/17 87/18 89/15 89/20 92/16 111/22
**finding [3]** 46/22 83/4 89/22
**findings [8]** 35/12 35/20 35/22 44/23 71/17 88/2 89/17 96/1
**finds [6]** 33/19 34/1 46/17 47/17 55/4 88/24
**fine [1]** 41/3
**finished [1]** 73/19
**first [52]**
**fit [3]** 38/8 38/9 46/23
**fits [3]** 5/17 31/12 46/6
**five [1]** 99/19
**flatly [1]** 56/6
**flexibility [1]** 43/9
**flexible [2]** 41/19 78/13
**flipped [1]** 19/14
**flips [1]** 16/9
**Floor [1]** 2/8
**flow [1]** 109/14
**flowing [1]** 106/7
**focus [4]** 3/19 28/2 79/18 98/6
**focused [5]** 21/17 21/23 59/11 79/16 110/19
**focusing [3]** 37/16 37/20 44/2
**Fogler [2]** 1/16 3/11
**folks [3]** 14/9 98/7 107/4
**follow [29]**
**followed [2]** 7/19 42/12
**following [10]** 8/19 37/1 44/15 44/22 51/24 76/17 76/17 78/24 94/21 111/9
**force [2]** 31/2 33/5
**forced [4]** 41/13 83/9 91/4 91/14
**forceful [1]** 55/2
**forces [3]** 90/5 90/7 91/22
**foreclose [1]** 40/6
**foreclosed [7]** 38/15 76/13 103/17 103/20 104/22 104/25 106/10
**forecloses [1]** 49/12
**foregoing [1]** 114/5
**forever [2]** 18/9 65/14
**forget [2]** 78/12 104/12
**form [2]** 50/11 107/3
**formal [1]** 60/25
**format [1]** 114/7
**former [3]** 90/5 91/20 100/17
**forth [2]** 13/12 98/5
**forward [12]** 9/8 11/12 11/18 11/20 12/22 15/12 17/12 17/21 59/23 66/4 101/17 102/21
**found [9]** 27/9 30/22 30/24 31/8 32/9 82/8 83/5 87/20 87/21
**foundation [2]** 8/9 19/21
**foundational [1]** 73/8
**foundations [1]** 4/3
**four [30]**
**fourth [2]** 16/19 82/9
**Fowler [3]** 83/3 83/6 83/9
**frame [1]** 54/18
**framework [3]** 89/9 89/10 89/10
**framing [1]** 72/24
**frankly [2]** 13/17 81/10
**Frazar [1]** 43/3
**fresh [5]** 18/3 64/23 64/23 65/3 67/16
**friendly [1]** 87/15
**friends [3]** 74/18 77/8 89/24
**front [7]** 3/22 5/8 13/19 23/5 34/20 68/5 68/16
**fruition [1]** 13/9
**fulfill [2]** 53/18 60/12
**full [6]** 7/19 51/9 51/17 52/21 58/18 107/4
**fully [3]** 29/12 42/1 89/7
**fundamental [2]** 22/9 74/18
**funds [2]** 53/7 54/3
**further [4]** 15/20 43/16 93/21 114/7
**fused [1]** 39/13
**futility [1]** 55/9
**future [2]** 65/10 65/13

## G

**G.O.B [1]** 14/25
**Galveston [1]** 2/4
**gamesmanship [2]** 61/20 85/17
**Garcia [13]** 10/2 10/5 14/20 44/3 49/18 52/5 52/10 52/18 52/23 54/21 55/22 60/19 86/18
**garner [1]** 60/22
**gather [1]** 45/8
**gathered [1]** 15/16
**gave [1]** 80/6
**gavel [3]** 57/18 57/19 57/22
**geared [1]** 92/15
**gearing [1]** 17/5
**gee [1]** 108/10
**general [26]**
**General's [3]** 11/23 61/10 86/20
**generally [2]** 24/21 41/22
**generated [1]** 80/12
**Genesis [2]** 90/6 91/20
**George [1]** 1/15
**germane [1]** 100/22
**get [33]**
**gets [2]** 34/20 55/16
**getting [2]** 99/25 113/16
**give [4]** 4/8 25/17 55/15 97/5
**given [9]** 5/5 15/3 31/2 49/14 55/14 73/7 74/22 94/7 107/9
**gives [4]** 67/15 70/5 75/21 79/1
**giving [1]** 11/21
**go [39]**
**goal [1]** 98/25
**GOBs [1]** 108/1
**Godfrey [1]** 1/15
**goes [9]** 15/1 34/20 68/9 70/14 71/24 77/2 77/4 104/11 109/1
**going [47]**
**gone [3]** 5/21 28/19 108/18
**Gonzalez [1]** 1/16
**good [10]** 3/4 13/23 18/5 23/25 24/25 49/7 72/2 74/3 79/16 113/17
**Goodhart [93]**
**Goodhart's [7]** 25/2 29/15 49/15 49/17 55/19 88/25 95/4
**got [12]** 11/12 14/15 15/4 16/20 17/4 29/18 37/15 44/14 65/3 73/3 78/6 86/12
**government [10]** 13/15 13/25 53/9 53/10 59/20 65/10 71/15 90/1 94/10 113/11
**governmental [1]** 65/8
**grant [1]** 38/21
**granted [1]** 104/1
**grants [1]** 34/13
**great [2]** 38/11 67/2
**Greer [1]** 2/3
**greerherz.com [1]** 2/4
**grievous [1]** 28/8
**Grinstein [2]** 1/15 3/9
**ground [4]** 8/10 42/21 61/24 69/22
**grounded [1]** 108/9
**grounds [1]** 70/17
**group [1]** 11/9
**guess [4]** 23/8 66/10 74/17 101/21
**guidance [1]** 109/16
**guide [1]** 24/20

## H

**habeas [2]** 11/17 63/10
**had [31]**
**hailey [4]** 2/7 2/9 114/13 114/14
**half [2]** 56/21 67/4
**halfway [1]** 38/23
**hand [5]** 9/11 75/10 81/9 88/17 106/9
**handle [5]** 15/18 23/1 24/10 72/18 85/9
**handled [1]** 90/15
**hands [1]** 57/17
**handwritten [2]** 63/11 78/18
**handy [1]** 97/8
**happen [3]** 42/21 72/4 108/1
**happened [4]** 22/21 30/20 33/12 59/25
**happening [6]** 9/9 13/2 22/24 42/21 67/11 86/23
**happens [11]** 8/17 11/9 17/2 28/16 39/3 84/7 88/14 93/18 109/16 113/2 113/2
**happy [4]** 53/4 56/25 62/1 100/17
**hard [1]** 69/15
**harder [1]** 81/12
**hardest [2]** 83/18 83/18
**harm [3]** 32/12 38/11 104/21

## H

**harms [1]** 94/6
**HARRIS [36]**
**harriscountytx.gov [1]** 1/19
**has [86]**
**hasn't [2]** 58/3 77/24
**haunting [1]** 39/17
**have [233]**
**haven't [2]** 84/13 111/25
**having [8]** 21/12 26/22 30/16 36/5 60/13 65/11 66/21 100/4
**he [28]**
**he's [1]** 85/14
**head [3]** 19/5 34/7 36/15
**headed [2]** 10/4 10/11
**heads [2]** 34/6 107/15
**Health [1]** 99/10
**hear [13]** 3/23 6/4 23/22 40/13 40/14 49/2 55/17 64/14 71/11 79/20 81/18 82/14 100/15
**heard [5]** 25/13 54/23 66/22 69/19 81/16
**hearing [20]** 1/7 3/19 28/11 41/13 42/8 76/14 90/13 90/15 91/9 91/11 91/11 91/14 91/17 91/23 92/5 99/19 100/15 103/5 108/7 110/24
**hearings [6]** 32/9 32/10 34/12 38/8 91/6 99/17
**heart [1]** 8/8
**heavily [1]** 49/23
**heavy [1]** 103/1
**held [5]** 69/6 69/7 98/15 98/23 100/8
**Hello [1]** 87/3
**help [1]** 63/14
**helpful [3]** 51/16 95/20 109/17
**Henson [2]** 63/5 63/8
**her [13]** 11/24 16/23 50/18 50/19 50/19 56/2 60/25 82/17 86/24 90/7 100/16 100/16 100/18
**here [66]**
**here's [1]** 67/2
**herring [1]** 90/2
**herself [3]** 51/10 64/6 83/21
**Herz [1]** 2/3
**hey [4]** 11/6 15/2 15/14 60/11
**hidden [1]** 48/17
**hide [1]** 7/2
**highly [3]** 63/7 63/7 85/12
**him [4]** 55/15 64/17 74/5 76/14
**himself [1]** 11/16
**hinge [3]** 30/13 70/14 103/14
**hinting [1]** 84/1
**hire [3]** 53/22 54/10 83/13
**hired [1]** 50/15
**hiring [1]** 82/18
**his [17]** 14/23 61/23 63/10 63/13 63/13 83/6 83/10 85/10 85/11 85/17 86/5 93/11 96/10 96/10 96/11 98/5 108/20
**history [4]** 5/23 42/13 42/24 108/20
**hit [1]** 16/8
**Hodory [2]** 54/6 59/14
**hold [3]** 43/9 58/3 58/7
**holding [12]** 8/13 25/20 26/3 26/4 31/2 31/10 32/8 33/6 37/23 55/9 85/2 95/5
**hole [1]** 48/17
**Honor [91]**
**Honor's [3]** 41/1 41/4 79/18
**HONORABLE [1]** 1/8
**hook [1]** 80/4
**hope [3]** 13/4 24/19 40/13
**hopeful [1]** 79/12
**hoping [1]** 110/22
**Hopkins [2]** 1/16 3/12
**hour [1]** 98/14
**hours [3]** 34/12 61/13 98/16
**house [1]** 99/5
**HOUSTON [6]** 1/2 1/5 1/13 1/19 2/9 114/15
**how [27]**
**however [8]** 38/4 40/14 41/7 80/10 92/17 93/5 95/17 96/7
**Hu [11]** 1/17 3/13 62/7 63/18 63/19 80/14 82/16 93/22 94/5 102/19 106/23
**huge [1]** 85/17
**hugely [1]** 81/20
**hundred [1]** 34/15
**hundred-plus [1]** 34/15
**hypothetical [7]** 87/16 87/22 88/2 110/25 111/5 111/7 112/4

## I

**I'd [5]** 3/23 50/10 86/4 96/23 109/19
**I'll [10]** 11/7 40/16 45/3 49/5 58/6 63/17 64/16 65/24 79/11 100/17
**I'm [28]**
**I've [6]** 25/13 37/15 58/2 59/24 73/3 83/20
**idea [7]** 12/14 13/24 66/4 66/7 67/12 68/15 69/19
**identical [1]** 92/22
**identified [2]** 82/21 82/24
**identify [2]** 84/19 92/18
**if [153]**
**ignorance [1]** 82/24
**ignore [3]** 18/19 50/1 82/2
**II [26]**
**II's [1]** 23/18
**imagine [1]** 19/25
**immediate [1]** 93/14
**immense [1]** 61/14
**impact [3]** 11/14 11/22 13/5
**impacts [1]** 9/4
**implement [3]** 6/19 75/3 102/8
**implemented [2]** 36/11 56/15
**implicate [1]** 103/21
**implicated [1]** 89/18
**implicates [1]** 28/24
**implicit [1]** 84/15
**implicitly [1]** 30/11
**implied [1]** 77/4
**implies [1]** 108/17
**importance [2]** 10/15 49/25
**important [8]** 33/22 43/14 56/11 68/23 71/11 78/10 79/17 99/10
**importantly [2]** 98/4 98/14
**impose [2]** 41/14 91/18
**imposing [2]** 56/13 91/25
**improperly [2]** 26/8 26/16
**in [469]**
**inability [4]** 49/23 63/13 82/22 82/22
**inaccurate [1]** 106/3
**inappropriate [1]** 26/20
**include [7]** 13/17 38/2 38/5 38/7 48/6 51/9 87/11
**includes [2]** 25/14 62/18
**including [9]** 26/19 29/5 29/7 32/8 39/25 46/3 49/18 62/18 66/5
**inconsistency [2]** 7/18 48/9
**inconsistent [5]** 56/6 58/1 83/23 103/1 103/7
**incorporated [1]** 105/23
**incorrect [1]** 62/16
**increase [1]** 91/16
**increased [1]** 93/7
**incredibly [3]** 51/16 86/21 93/24
**incredulous [2]** 52/22 80/9
**indeed [1]** 43/18
**independent [2]** 61/24 68/10
**independently [1]** 67/13
**indicated [1]** 89/13
**indicates [3]** 25/18 28/18 39/15
**indigent [1]** 91/7
**individual [5]** 19/6 56/2 56/4 64/23 81/16
**individual's [2]** 16/16 67/24
**individualized [9]** 35/16 35/16 42/7 42/10 42/14 42/17 90/13 91/6 91/13
**individuals [3]** 11/7 16/4 23/2
**inequities [2]** 36/10 103/11
**inescapable [1]** 87/18
**inevitable [2]** 91/10 91/15
**influence [2]** 41/23 92/8
**information [3]** 91/12 93/23 107/9
**Ingram [2]** 22/2 75/10
**inherent [1]** 56/16
**inherently [1]** 48/7
**initial [1]** 90/4
**injunction [3]** 35/8 35/13 35/22
**input [1]** 107/14
**inquiring [1]** 110/1
**inquiry [10]** 4/15 30/10 30/12 37/6 37/6 37/10 39/3 100/23 103/12 103/12
**inside [1]** 61/18
**insinuates [1]** 48/25
**instance [7]** 32/17 32/18 44/21 66/12 66/13 75/15 91/9
**instead [3]** 83/21 99/16 110/16
**instructed [2]** 89/2 100/22
**instructing [2]** 32/23 32/24
**instruction [3]** 25/23 70/5 109/21
**instructions [2]** 111/18 112/7
**instructive [1]** 92/22
**intelligent [1]** 63/7
**intent [2]** 76/18 83/23
**intention [1]** 90/24
**intentional [3]** 49/10 73/23 81/9
**interaction [1]** 32/3
**interest [7]** 28/4 28/5 28/9 80/11 106/12 106/13 106/15
**interested [1]** 85/7
**interesting [3]** 17/2 65/5 76/14
**Interestingly [1]** 70/2
**interfere [1]** 75/24
**internal [1]** 7/18
**interpretation [2]** 29/14 63/21
**interpreting [1]** 94/17
**intervene [9]** 17/7 55/16 74/9 76/22 77/16 78/7 85/24 86/16 96/11
**intervened [1]** 78/16
**intervening [6]** 14/13 20/9 77/16 77/17 77/18 106/18
**intervention [7]** 17/1 17/9 17/10 55/9 55/16 96/11 106/21
**intimate [1]** 108/5
**into [23]**
**introduce [1]** 105/21
**invincible [2]** 108/21 108/22
**inviting [1]** 103/10
**invoking [2]** 75/24 104/8
**involve [2]** 82/25 82/25
**involved [2]** 13/14 34/7
**involvement [1]** 78/1
**IQ [2]** 63/8 63/13
**ironic [1]** 36/3
**irrelevant [1]** 41/7
**irreparable [3]** 32/12 38/11 104/21
**irrespective [2]** 105/11 105/12
**is [573]**
**Island [7]** 27/4 56/7 57/15 57/16 80/6 84/10 88/14
**isn't [5]** 25/23 53/19 54/5 56/12 101/14
**issuance [1]** 55/14
**issue [62]**
**issued [9]** 11/1 11/13 13/3 17/8 18/18 34/10 55/21 75/11 82/5
**issues [31]**
**issuing [3]** 35/7 39/21 108/7
**it [338]**
**it's [74]**
**its [28]**
**itself [9]** 27/20 35/19 53/5 66/15 66/22 69/7 69/12 92/22 97/6

J

**jail [3]** 93/3 99/2 99/4
**jailhouse [1]** 63/14
**jails [1]** 99/4
**January [11]** 9/20 10/5 11/11 11/11 14/20 16/18 16/19 16/23 44/3 52/7 83/21
**January 1 [2]** 52/7 83/21
**January 2025 [1]** 14/20
**Jeremy [2]** 1/10 3/7
**job [1]** 107/17
**Joe [4]** 3/9 3/14 3/15 74/3
**joe.nwaokoro [1]** 1/24
**John [1]** 63/8
**Johnson [3]** 9/24 52/19 64/4
**join [3]** 62/16 63/22 106/6
**joined [4]** 60/20 60/23 62/17 96/9
**Joint [6]** 97/24 98/8 98/22 99/9 99/11 100/3
**Joseph [5]** 1/15 1/21 2/2 22/1 75/10
**Jr [1]** 2/2
**jrusso [1]** 2/4
**judge [49]**
**judge's [4]** 9/1 11/15 54/2 54/18
**judges [89]**
**judges' [5]** 4/21 50/5 92/4 96/6 112/15
**judgment [25]**
**judgments [2]** 56/10 81/23
**judicial [4]** 50/21 51/4 51/8 114/8
**judiciary [4]** 56/15 61/16 79/23 80/20
**July [2]** 15/19 16/24
**juncture [2]** 26/16 26/20
**jurisdiction [15]** 5/3 5/4 37/12 39/11 39/12 47/15 47/20 48/1 49/21 59/10 60/5 60/14 76/7 81/7 102/4
**jurisdictional [3]** 28/8 80/4 80/8
**just [89]**
**justice [5]** 80/5 80/6 91/11 108/5 108/20
**justified [1]** 91/19
**justify [4]** 43/2 47/16 48/24 95/17

K

**keep [5]** 41/3 56/4 91/14 99/6 105/1
**key [1]** 21/14
**kind [13]** 4/9 5/21 33/12 36/3 39/1 39/2 57/2 57/17 60/20 63/13 74/16 88/16 102/10
**kinds [1]** 21/21
**knew [3]** 82/5 86/17 86/23
**know [20]** 20/22 35/9 46/7 46/11 48/20 55/15 56/12 56/24 57/3 60/12 61/8 70/5 73/24 88/7 88/8 92/12 93/22 100/14 104/17 109/9
**knowing [1]** 52/24
**known [1]** 73/23

L

**lack [2]** 81/6 113/13
**lacking [1]** 92/9
**Ladd [1]** 43/3
**laid [3]** 13/3 13/13 56/20
**Lamar [1]** 1/18
**land [1]** 47/21
**lands [1]** 45/17
**language [1]** 94/21
**large [1]** 4/6
**largest [1]** 90/11
**last [4]** 50/4 68/6 74/13 78/21
**late [2]** 63/14 63/15
**later [9]** 11/10 11/15 17/2 33/12 39/21 64/8 69/12 74/8 87/12
**law [99]**
**lawsuit [2]** 51/3 52/11
**lawyer [6]** 63/14 67/3 82/22 82/22 83/10 83/13
**lawyers [2]** 12/5 67/5
**lay [2]** 105/25 109/13
**lays [3]** 9/10 9/16 14/23
**lead [1]** 93/7
**leave [5]** 44/5 85/24 91/11 94/13 112/3
**leaves [2]** 33/15 44/19
**leaving [1]** 113/10
**led [2]** 86/11 91/22
**LEE [2]** 1/8 3/2
**left [3]** 23/8 23/8 77/16
**legal [9]** 15/2 38/6 43/11 51/10 61/8 63/14 63/24 81/18 82/14
**legally [1]** 48/15
**less [5]** 7/22 49/24 67/5 91/15 95/22
**lesson [1]** 27/6
**let [11]** 22/1 23/22 27/17 28/4 33/4 49/2 49/5 62/9 70/7 83/25 93/15
**let's [7]** 18/2 19/14 37/13 60/11 77/1 79/17 104/12
**letter [8]** 11/3 11/6 11/11 14/21 14/22 15/19 75/1 75/3
**level [1]** 10/14
**Liberty [3]** 59/18 60/14 77/13
**lies [1]** 102/14
**light [1]** 105/13
**like [33]**
**liked [1]** 39/22
**likelihood [3]** 45/19 94/1 98/9
**likely [6]** 12/23 29/9 33/23 35/10 46/20 91/24
**limb [1]** 12/17
**limit [3]** 55/5 56/10 56/12
**limitation [1]** 41/18
**limitations [1]** 83/1
**limited [4]** 17/9 20/2 26/2 63/19
**limiting [4]** 65/2 79/21 80/17 109/18
**limits [4]** 79/23 111/3 113/12 113/13
**line [4]** 45/6 60/1 69/15 95/3
**lip [1]** 74/22
**listened [1]** 76/11
**listening [1]** 75/5
**literally [2]** 34/12 41/10
**litigant [1]** 82/19
**litigants [1]** 67/5
**litigate [1]** 103/25
**litigating [1]** 55/14
**litigation [5]** 1/22 51/1 74/21 80/21 85/15
**little [11]** 7/17 12/9 17/5 25/10 26/6 40/10 46/12 52/22 55/19 82/12 93/25
**live [1]** 65/12
**LLP [2]** 1/15 2/3
**local [7]** 13/25 53/9 53/10 72/9 94/8 94/10 113/11
**logical [1]** 35/24
**long [8]** 12/11 12/12 17/24 72/10 72/13 74/8 80/3 80/16
**longer [5]** 12/13 79/2 98/4 100/8 109/23
**look [35]**
**looked [2]** 11/13 58/2
**looking [17]** 4/19 18/10 18/14 20/3 21/4 35/4 42/4 64/21 68/17 76/11 91/2 96/22 97/23 98/1 99/3 99/21 101/7
**looks [2]** 73/7 84/21
**lose [1]** 10/9
**lost [2]** 52/15 77/7
**lot [13]** 4/4 20/1 23/20 24/8 28/11 46/8 52/2 61/4 74/4 79/14 89/14 101/9 113/14
**Louisiana [2]** 99/2 99/7
**love [1]** 59/1
**low [1]** 63/13
**lower [1]** 27/9
**lumping [1]** 103/6
**LYNN [1]** 1/3

M

**made [15]** 14/7 15/22 26/4 31/10 32/5 35/7 50/22 53/5 54/4 54/9 60/24 64/9 96/15 104/20 105/9
**magistration [1]** 107/4
**mails [3]** 61/9 77/10 77/12
**main [2]** 15/22 66/1
**mainly [1]** 12/6
**maintain [2]** 6/9 46/13
**majority [10]** 18/16 18/25 19/3 19/7 19/9 19/13 19/15 39/21 40/19 56/8
**make [27]**
**makes [7]** 62/8 62/13 67/6 70/19 82/12 90/17 94/16
**making [7]** 9/13 44/22 60/8 69/1 70/19 89/17 104/24
**manage [1]** 100/9
**Management [1]** 107/14
**mandamus [4]** 4/10 26/1 30/2 53/17
**mandate [42]**
**mandates [1]** 78/24
**manner [6]** 5/5 19/20 37/19 70/22 72/9 72/16
**manners [1]** 53/16
**many [6]** 9/21 20/11 28/21 57/10 94/16 96/1
**map [2]** 103/8 103/8
**MARANDA [1]** 1/3
**March [2]** 9/6 11/1
**March 31st [1]** 9/6
**mash [1]** 81/23
**mash-up [1]** 81/23
**matching [1]** 35/6
**matter [18]** 13/5 26/5 28/14 30/24 31/5 31/10 40/7 43/22 47/15 48/1 53/15 74/6 78/3 83/12 94/14 105/20 107/16 114/6
**matters [1]** 34/25
**may [30]**
**May 2025 [1]** 15/10
**maybe [5]** 37/1 47/14 62/13 69/1 81/17
**me [49]**
**mean [17]** 3/19 16/14 18/3 18/24 22/13 40/19 41/7 47/6 56/3 73/18 74/20 77/13 94/22 98/2 98/3 98/24 102/22
**meaning [5]** 30/21 34/19 47/7 53/24 71/9
**means [11]** 28/14 30/7 30/9 30/17 35/15 36/4 58/9 76/17 76/18 84/11 99/5
**meant [5]** 24/20 36/1 48/14 48/21 93/4
**meantime [1]** 14/14
**measurement [1]** 103/21
**mechanism [7]** 6/19 6/19 6/20 28/17 38/25 73/4 104/1
**medical [1]** 99/12
**meet [2]** 13/6 13/10
**meeting [1]** 11/15
**meetings [2]** 77/10 77/12
**members [4]** 12/5 63/7 63/8 93/19
**mention [6]** 17/15 29/1 68/3 71/6 86/13 86/14
**mentioned [6]** 28/15 30/11 38/4 49/25 69/20 92/14
**mentions [1]** 85/9
**mere [6]** 41/24 43/1 67/16 94/22 95/11 95/12
**merely [1]** 103/18
**merit [3]** 4/4 67/24 68/17
**merits [8]** 4/7 16/15 77/14 81/5 81/8 84/21 86/4 86/10
**mess [1]** 55/4
**messy [2]** 45/23 86/3
**met [8]** 30/23 31/6 31/8 38/12 46/17 58/4 84/5 93/11
**mic [1]** 24/4
**microphone [1]** 4/1
**Middlesex [12]** 30/21 30/22 31/6 31/7 32/23 33/14 38/1 38/10 38/12 38/14 71/12 72/1
**might [11]** 4/16 12/6 14/8 36/1 39/10 44/20 46/1 68/17 81/2 93/15 108/11
**miles [1]** 77/13
**militate [1]** 93/21
**mill [1]** 75/16
**million [9]** 80/14 99/6 99/14 99/14 99/22 100/5 100/8 100/10 100/11
**millions [1]** 80/13
**Mills [1]** 99/7
**mind [2]** 5/13 62/22
**mine [1]** 109/24

## M

**minimal [1]** 93/12
**minimum [1]** 45/8
**minor [1]** 64/4
**minority [3]** 15/22 15/23 19/3
**minutes [2]** 58/20 74/6
**mischaracterized [1]** 40/15
**misdemeanor [3]** 34/14 42/14 99/17
**misdemeanors [1]** 98/7
**missed [2]** 81/17 98/12
**misunderstanding [1]** 40/13
**modification [13]** 15/9 15/21 41/19 46/1 47/24 49/21 50/11 54/25 59/7 59/8 60/23 61/19 84/21
**modifications [1]** 16/25
**modified [1]** 18/18
**modify [12]** 6/13 20/4 28/19 36/6 43/19 60/9 61/2 61/12 64/24 72/21 92/25 93/4
**modifying [1]** 21/12
**moment [5]** 31/3 87/14 89/12 89/13 89/23
**money [5]** 41/14 42/6 54/10 90/15 91/22
**monitor [8]** 15/2 15/5 16/24 49/20 51/22 55/1 69/1 98/1
**monitor's [1]** 105/22
**monitoring [1]** 75/18
**monitors [5]** 15/9 15/14 15/16 92/3 94/4
**month [3]** 17/1 50/4 74/8
**month-long [1]** 74/8
**months [5]** 17/19 54/21 54/22 82/11 83/22
**moot [1]** 70/4
**mootness [57]**
**more [36]**
**most [8]** 12/23 35/1 35/12 62/8 72/5 81/3 82/7 108/4
**motion [53]**
**motions [6]** 3/22 13/2 17/17 96/4 96/12 104/6
**mouse [1]** 48/17
**movant's [2]** 3/23 42/16
**movants [17]** 24/21 26/17 30/5 31/16 35/10 43/15 44/8 49/5 75/5 88/6 92/18 93/25 94/9 94/11 95/23 109/7 109/23
**movants' [3]** 4/21 80/1 92/9
**move [19]** 8/2 17/11 17/15 29/17 39/5 51/21 52/2 53/5 60/7 64/24 65/3 66/4 68/1 80/10 82/5 82/15 83/13 83/15 106/17
**moved [13]** 15/13 50/6 50/13 50/15 50/17 51/12 51/13 52/1 52/6 55/21 59/12 78/6 83/21
**moving [2]** 57/14 82/12
**Mr [9]** 11/3 11/6 11/11 11/15 24/9 45/3 64/18 74/5 107/20
**Mr. [38]**
**Mr. Cutting [10]** 54/6 56/7 79/12 85/9 87/1 87/2 96/21 100/25 103/8 105/6
**Mr. Fowler [2]** 83/6 83/9
**Mr. Hu [8]** 62/7 63/18 80/14 82/16 93/22 94/5 102/19 106/23
**Mr. Russo [14]** 25/12 28/15 32/5 36/19 62/9 64/15 64/16 76/3 79/21 81/17 82/13 94/20 97/1 108/13
**Mr. Russo's [3]** 40/10 82/18 83/11
**Mr. VanFleet [1]** 62/7
**much [11]** 3/17 21/22 30/6 33/12 49/24 67/5 81/12 92/11 93/22 95/22 101/10
**multiple [2]** 27/2 88/16
**Murray [2]** 1/16 3/11
**must [9]** 5/2 7/10 23/11 40/25 43/5 43/18 47/22 58/2 75/24
**my [24]**

## N

**name [1]** 14/23
**naming [1]** 82/25
**narrows [1]** 35/13
**naturally [1]** 104/5
**nature [3]** 27/18 28/3 107/9
**necessarily [3]** 7/1 21/25 22/22
**necessary [1]** 71/10
**necessity [1]** 73/25
**need [33]**
**needed [4]** 17/21 30/25 76/12 99/13
**needing [4]** 42/25 45/18 76/10 107/4
**needs [17]** 18/18 19/12 31/15 31/15 31/17 33/7 38/18 40/15 46/19 48/20 52/3 76/7 78/25 88/19 88/22 89/9 99/12
**negate [1]** 95/16
**neither [3]** 27/24 27/25 90/2
**never [12]** 7/15 18/18 32/9 39/17 42/8 82/17 85/13 90/10 90/14 93/10 94/12 101/13
**nevertheless [2]** 13/25 20/3
**new [13]** 18/2 18/4 64/21 64/22 65/16 67/15 69/23 79/19 90/17 95/7 95/8 105/7 111/21
**news [2]** 16/21 88/11
**next [5]** 64/14 81/15 93/15 113/3 113/17
**no [62]**
**non [9]** 24/21 35/10 49/5 75/5 77/23 85/11 85/17 86/15 91/6
**non-individualized [1]** 91/6
**non-movants [4]** 24/21 35/10 49/5 75/5
**non-party [4]** 77/23 85/11 85/17 86/15
**none [5]** 7/8 31/11 75/9 75/13 78/19
**nor [4]** 27/16 41/25 90/2 108/23
**Norglass [4]** 82/8 84/15 84/16 84/23
**north [2]** 41/18 93/17
**Norton [2]** 59/19 60/14
**not [247]**
**note [4]** 51/15 78/18 89/13 112/12
**noted [7]** 8/11 31/1 46/9 46/10 65/9 84/13 96/21
**notes [2]** 70/7 86/24
**nothing [10]** 17/19 25/18 40/23 42/18 46/25 66/25 76/2 89/8 106/7 111/11
**notice [4]** 4/4 79/24 80/2 100/13
**notion [4]** 66/4 67/12 68/15 68/25
**notwithstanding [1]** 78/23
**November [11]** 9/22 49/19 50/7 50/14 51/14 52/1 53/1 54/19 66/3 68/8 86/17
**November 2018 [1]** 86/17
**November 2025 [7]** 49/19 50/7 50/14 51/14 52/1 53/1 54/19
**November 25th [1]** 66/3
**now [46]**
**nowhere [3]** 86/13 86/14 103/9
**number [18]** 1/3 3/21 49/17 49/19 50/15 50/16 50/24 51/4 51/8 60/19 80/22 82/8 82/13 86/5 95/25 97/5 97/7 107/3
**numbers [3]** 98/1 98/11 101/16
**numerous [1]** 72/3
**Nwaokoro [3]** 1/21 3/14 74/4

## O

**O'DONNELL [16]** 1/3 5/19 13/5 22/21 22/23 31/6 31/11 32/15 34/10 35/11 70/12 70/13 71/18 91/8 109/11 113/6
**O'Donnell's [1]** 5/19
**oag.texas.gov [1]** 1/24
**object [2]** 40/24 105/20
**objected [3]** 71/7 97/12 105/20
**objection [2]** 92/10 106/16
**objections [2]** 104/20 104/23
**obligated [4]** 19/7 44/21 76/25 88/1
**obligation [3]** 31/13 53/14 53/19
**obligations [2]** 12/20 16/5
**observations [1]** 35/20
**observed [3]** 26/4 28/16 113/7
**obtain [2]** 14/1 68/10
**obtaining [1]** 16/22
**obvious [3]** 40/17 42/19 59/24
**obviously [8]** 28/24 42/11 50/23 53/1 61/25 81/3 107/9 111/12
**occur [6]** 29/9 35/10 36/10 46/20 58/15 88/3
**occurred [1]** 18/21
**occurring [1]** 58/14
**October [7]** 11/19 13/6 17/8 17/8 52/13 104/1 114/11
**October 30 [1]** 104/1
**October 30th [1]** 17/8
**odd [1]** 19/23
**off [7]** 33/13 41/2 64/18 73/19 90/3 98/21 109/17
**offend [4]** 4/17 20/18 110/15 110/15
**offensive [1]** 20/19
**offer [2]** 11/23 100/19
**offered [1]** 94/11
**offers [1]** 90/18
**office [34]**
**officeholder [7]** 18/3 64/22 64/22 67/17 94/22 95/7 95/8
**officeholders [2]** 67/15 69/11
**officer [2]** 91/9 100/18
**officers [6]** 41/13 91/11 91/14 91/18 91/23 99/19
**offices [3]** 13/16 13/19 109/23
**official [8]** 2/8 13/21 53/11 53/23 53/25 81/16 95/8 114/14
**officials [11]** 53/21 54/8 65/10 65/13 71/13 71/15 77/22 89/25 90/1 90/22 106/13
**offramp [1]** 57/2
**often [3]** 19/25 99/11 111/2
**oh [2]** 16/9 108/10
**okay [17]** 10/2 18/2 18/22 24/14 36/17 37/11 37/22 58/2 59/5 65/2 75/17 75/18 76/23 77/2 87/25 110/8 111/4
**Olalde [2]** 2/2 3/16
**old [2]** 49/1 92/1
**on [209]**
**once [6]** 12/13 14/7 70/17 88/12 88/19 112/25
**one [93]**
**ones [1]** 35/9
**ongoing [5]** 12/23 13/17 16/11 75/18 75/25
**only [22]** 3/20 12/8 17/21 30/17 30/23 31/7 38/24 39/11 44/12 45/11 54/4 58/9 58/12 60/24 63/7 86/1 88/9 98/8 98/21 103/2 105/23 111/9
**open [2]** 59/1 100/2
**opened [1]** 39/25
**operate [2]** 18/5 19/16
**operated [1]** 72/17
**operation [1]** 19/21
**operations [5]** 4/10 7/10 109/14 109/19 112/25
**opinion [40]**
**opinions [1]** 19/8
**opportunities [1]** 76/1
**opportunity [5]** 4/9 38/2 59/2 78/6 101/6
**oppose [1]** 96/11
**opposed [1]** 66/11
**opposing [3]** 26/11 66/14 94/4
**opposite [2]** 43/8 71/14
**opposition [2]** 26/7

## O

**opposition... [1]** 35/6
**options [1]** 52/2
**or [116]**
**order [23]**
**ordered [1]** 105/17
**ordering [1]** 29/23
**original [5]** 34/19 34/24 52/11 71/18 94/1
**originally [1]** 72/6
**other [48]**
**others [1]** 4/16
**otherwise [4]** 19/8 33/14 86/25 99/1
**our [66]**
**ourselves [3]** 60/7 61/6 92/11
**out [39]**
**outer [2]** 41/18 41/20
**outlet [1]** 79/1
**outliers [1]** 94/10
**outlined [6]** 50/8 59/1 60/21 78/25 94/8 106/1
**outside [7]** 32/14 43/21 50/15 54/10 61/11 72/17 82/18
**outsourced [1]** 99/6
**outsourcing [1]** 99/1
**outwardly [1]** 61/18
**over [13]** 6/16 15/13 16/10 18/4 34/20 34/21 45/3 49/16 50/4 58/11 74/8 100/9 103/18
**overall [1]** 43/1
**overburdened [1]** 90/18
**overlooked [2]** 98/13 99/12
**overly [1]** 87/11
**override [1]** 28/6
**overruled [5]** 5/19 22/23 31/1 31/6 31/11
**oversight [4]** 6/16 6/18 28/16 78/5
**overturned [2]** 22/20 70/13
**overwhelming [1]** 24/20
**own [15]** 5/20 6/17 16/5 16/16 19/5 49/23 53/22 53/25 54/3 65/11 65/14 67/23 76/7 83/13 95/17

## P

**p.m [2]** 3/1 113/19
**P.O [2]** 1/12 1/23
**Padilla [2]** 9/24 11/17
**page [9]** 30/15 34/15 74/14 75/22 97/5 97/7 97/10 105/8 111/3
**pages [1]** 51/17
**paid [1]** 53/20
**panel [2]** 75/10 108/23
**paragraph [1]** 68/6
**paragraphs [1]** 74/13
**parallel [1]** 47/14
**paraphrasing [1]** 89/1
**parcel [2]** 94/15 110/10
**parenthetical [1]** 43/8
**part [25]**
**participant [1]** 52/12
**particular [7]** 10/7 20/18 20/19 41/9 42/24 65/19 67/22
**particularized [1]** 65/9
**particularly [7]** 4/5 25/6 33/22 44/2 51/2 66/13 108/1
**particulars [1]** 20/2
**parties [11]** 17/17 26/15 36/7 66/21 66/21 69/5 69/12 80/12 85/15 86/1 86/22
**partners [1]** 91/12
**parts [4]** 27/4 63/17 85/3 88/16
**party [19]** 12/9 17/4 27/7 47/14 57/14 60/1 60/20 66/9 77/23 82/23 85/11 85/14 85/17 85/23 85/25 86/15 88/10 88/14 103/25
**pass [1]** 38/9
**past [5]** 14/7 27/5 41/20 88/17 91/24
**path [3]** 50/12 89/18 89/18
**Pause [1]** 42/3
**paused [1]** 59/22
**pay [6]** 14/1 53/11 53/14 54/3 63/2 66/8
**paying [5]** 63/24 70/24 71/2 74/22 83/4
**pendency [1]** 80/12
**pending [2]** 96/9 106/6
**people [25]**
**per [1]** 40/21
**perform [1]** 54/12
**performed [1]** 70/3
**perfunctory [1]** 91/6
**perhaps [7]** 10/8 39/21 62/20 89/1 95/14 101/17 102/20
**period [2]** 7/19 12/22
**permission [1]** 44/9
**permit [1]** 93/4
**permitting [1]** 93/6
**perpetuate [2]** 39/8 41/17
**perpetuating [1]** 35/2
**person [3]** 51/2 56/2 100/2
**personal [1]** 108/8
**personally [1]** 100/16
**personnel [1]** 98/23
**perspective [5]** 66/15 70/9 70/10 73/12 93/15
**pertinent [1]** 71/8
**petition [3]** 29/16 63/10 79/25
**petitioned [1]** 44/13
**phase [1]** 39/2
**Philadelphia [1]** 77/14
**phone [3]** 2/9 61/9 63/1
**phrase [3]** 39/16 39/20 40/3
**picked [3]** 69/9 70/15 83/17
**picture [2]** 44/6 45/17
**piece [2]** 68/20 84/13
**piecemeal [1]** 88/20
**place [16]** 15/3 19/1 35/4 35/24 35/24 38/6 41/5 41/12 45/18 79/4 79/6 84/8 91/1 91/5 101/8 106/22
**placed [1]** 99/2
**plain [3]** 51/7 51/24 54/15
**plaintiff [4]** 1/3 1/15 62/5 103/5
**plaintiff's [7]** 4/20 63/21 70/8 70/19 71/22 75/5 105/10
**plaintiffs [23]**
**plaintiffs' [1]** 74/20
**plan [1]** 91/3
**planning [1]** 93/23
**plans [1]** 93/14
**play [3]** 22/23 92/21 95/2
**playing [1]** 58/5
**please [5]** 3/25 3/25 4/2 9/11 68/2
**plus [1]** 34/15
**podium [2]** 44/5 57/17
**point [40]**
**pointed [5]** 82/16 90/3 90/6 100/25 102/16
**points [17]** 15/22 24/16 24/22 44/6 49/25 62/10 63/17 64/9 77/11 80/22 85/10 96/23 97/17 102/24 106/4 107/22 109/19
**policy [1]** 64/2
**political [2]** 56/25 91/21
**politics [3]** 18/14 18/15 82/2
**polity [1]** 18/9
**portion [1]** 41/13
**pose [1]** 66/15
**posit [1]** 112/4
**position [17]** 6/9 11/5 11/8 16/18 16/20 18/17 25/1 25/4 46/4 46/13 55/22 60/16 66/11 67/24 74/7 96/12 105/10
**positions [1]** 9/23
**possibility [1]** 98/12
**possible [6]** 33/25 55/21 85/2 89/17 96/1 96/2
**post [7]** 26/25 34/7 46/14 74/12 75/17 81/24 110/24
**posture [3]** 46/8 74/12 109/1
**potential [1]** 98/9
**potentially [1]** 98/13
**power [3]** 67/16 86/9 94/22
**powerful [1]** 93/24
**practice [3]** 12/7 64/5 93/3
**practices [4]** 42/9 72/1 91/24 105/11
**pray [1]** 108/25
**pre [2]** 90/15 92/5
**pre-hearing [2]** 90/15 92/5
**preamble [1]** 76/20
**precedent [13]** 29/4 32/25 33/12 37/7 37/24 39/14 44/10 78/20 84/23 88/4 88/7 88/21 106/11
**precise [1]** 103/21
**precisely [1]** 44/25
**precision [1]** 110/16
**predecessor [2]** 55/19 55/23
**predecessor's [1]** 49/14
**predecessors [1]** 77/20
**predict [1]** 44/19
**predicts [2]** 91/9 91/17
**prefer [1]** 76/23
**prejudgement [1]** 47/19
**prejudice [3]** 61/16 61/20 63/15
**prejudicial [1]** 86/22
**preliminary [1]** 35/7
**premise [1]** 77/18
**prepared [2]** 24/10 107/13
**preponderance [2]** 104/13 105/4
**prescribed [1]** 114/8
**present [3]** 79/13 80/14 101/6
**presentation [1]** 40/11
**presented [10]** 10/25 30/24 60/22 62/5 62/7 62/7 66/1 73/17 101/16 107/24
**presents [1]** 66/22
**preserve [2]** 61/10 81/22
**presiding [1]** 3/2
**pressures [3]** 90/5 90/5 90/24
**presume [2]** 67/9 72/2
**presumption [7]** 71/15 71/16 72/2 89/25 90/21 92/7 92/8
**pretends [1]** 28/12
**pretrial [5]** 41/14 91/25 99/23 100/1 104/20
**pretty [2]** 6/17 69/15
**prevalence [1]** 91/22
**prevent [5]** 38/7 56/15 61/16 61/21 71/17
**preventing [1]** 92/15
**prevents [1]** 32/12
**previously [1]** 64/25
**primaries [1]** 14/7
**primary [1]** 13/16
**principle [5]** 54/11 59/14 71/3 79/21 80/17
**principles [2]** 65/2 109/18
**prior [4]** 5/20 52/23 69/11 91/22
**prison [1]** 63/14
**pro [19]** 12/4 13/23 50/17 51/1 51/6 51/13 53/5 63/3 63/11 64/6 66/3 66/4 67/4 67/10 67/13 82/15 82/19 82/23 83/13
**probably [7]** 3/21 30/15 30/15 83/18 99/4 102/5 102/23
**problem [7]** 16/11 19/6 19/17 20/14 20/15 22/9 66/22
**problematic [2]** 66/13 66/16
**problems [1]** 70/22
**procedural [9]** 6/18 6/19 6/20 45/23 57/3 58/9 73/3 78/25 85/3
**procedurally [1]** 72/24
**procedure [8]** 73/6 80/7 80/25 81/22 82/24 88/4 113/9 113/13
**procedures [3]** 6/5 37/17 81/24
**proceed [11]** 12/4 33/17 33/18 38/10 40/12 45/21 46/7 46/19 47/20 88/1 94/14
**proceeded [1]** 40/8
**proceeding [3]** 28/18 38/20 60/3
**proceedings [7]** 2/10 56/17 59/20 59/22 75/25 107/21 114/6
**proceeds [5]** 39/15 47/8 47/21 47/25 89/6
**process [2]** 6/5 9/9
**processed [1]** 80/15
**processing [10]** 97/24 98/4 98/6 98/8 98/10 98/22 99/9 99/11 100/3 108/5
**produced [1]** 2/10
**product [1]** 15/13

## P

**professor [1]** 108/20
**prohibited [1]** 82/17
**prohibits [1]** 42/7
**Project [1]** 1/12
**promises [1]** 87/4
**prong [1]** 8/3
**proof [1]** 68/5
**proper [3]** 27/13 56/18 102/4
**properly [9]** 28/1 43/10 46/15 55/20 55/24 74/19 87/12 95/21 102/14
**proposal [1]** 92/4
**proposed [5]** 15/8 15/21 92/6 93/14 95/23
**proposition [1]** 18/9
**prosecution [1]** 83/9
**protected [2]** 16/12 19/12
**protective [1]** 28/3
**prove [3]** 73/25 84/17 105/3
**proverbial [1]** 48/17
**provide [5]** 14/9 15/6 17/6 42/14 53/7
**provided [4]** 4/5 65/22 89/14 90/12
**provides [2]** 53/24 99/10
**providing [1]** 19/7
**proving [1]** 104/13
**provision [5]** 22/4 22/4 51/6 53/20 112/17
**provisions [10]** 4/15 20/9 20/18 20/19 21/23 21/25 109/8 110/2 110/5 110/14
**prudence [1]** 108/9
**public [8]** 90/6 91/20 94/2 94/6 97/19 97/20 98/17 100/6
**pull [2]** 22/1 24/4
**Purcell [3]** 10/17 10/18 10/19
**purported [1]** 59/8
**purpose [1]** 85/24
**purposes [1]** 33/21
**purse [1]** 66/10
**pushed [1]** 14/6
**pushing [1]** 42/19
**put [14]** 14/5 15/8 15/12 17/20 21/19 33/4 35/3 46/10 54/25 59/15 59/16 90/25 97/22 98/5
**puts [1]** 91/21
**putting [3]** 31/3 73/8 93/3
**puzzled [1]** 111/19

## Q

**qualify [1]** 83/5
**qualifying [3]** 29/7 31/18 31/21
**quantified [1]** 94/5
**question [50]**
**questioning [1]** 62/22
**questions [18]** 11/14 11/21 17/20 24/10 34/9 36/2 45/5 52/18 53/3 62/1 73/21 74/11 78/22 80/19 86/19 86/25 88/6 100/20
**quick [4]** 25/11 51/15 74/6 91/15
**quickly [9]** 18/7 29/18 30/2 30/4 37/4 61/22 69/4 69/18 83/8
**quite [3]** 5/23 37/21 91/1
**quote [7]** 50/9 51/10 51/11 53/11 91/18 91/21 92/5
**quoted [2]** 56/7 81/19

## R

**R.C [3]** 55/25 56/23 82/1
**radical [2]** 40/21 95/22
**raise [13]** 9/2 18/23 37/18 43/15 47/14 54/13 56/21 76/1 76/22 77/25 78/16 85/20 104/5
**raised [14]** 10/14 26/8 26/16 26/19 26/22 26/25 39/10 43/22 46/14 46/15 63/3 82/13 86/15 87/12
**raises [1]** 102/7
**raising [7]** 7/4 11/14 25/12 27/19 104/23 105/15 112/16
**rather [5]** 4/4 39/23 49/21 50/11 72/3
**re [38]**
**re-election [1]** 9/22
**re-litigate [1]** 103/25
**re-occur [1]** 29/9
**reach [8]** 7/3 14/16 26/23 73/14 73/14 86/9 89/22 95/25
**reached [3]** 40/9 61/24 63/1
**reaches [1]** 94/7
**read [15]** 17/13 17/14 21/20 25/5 25/15 29/22 30/16 30/17 32/23 44/19 65/19 86/10 87/10 95/19 102/22
**reading [2]** 48/25 112/7
**reads [1]** 20/4
**ready [1]** 24/11
**real [3]** 35/14 48/9 69/4
**reality [2]** 13/18 79/21
**realize [1]** 100/14
**really [27]**
**reason [8]** 10/15 13/23 19/4 23/7 30/23 41/24 73/15 77/21
**reasonable [8]** 27/10 30/17 55/5 55/11 56/22 58/4 66/18 81/1
**reasoned [1]** 33/25
**reasoning [2]** 49/17 93/6
**reasons [4]** 54/6 83/20 101/4 106/1
**rebutting [1]** 94/11
**recall [2]** 21/9 94/25
**receive [1]** 33/23
**received [4]** 11/2 11/6 11/11 34/16
**receiving [1]** 35/14
**recently [2]** 11/2 88/17
**reciting [1]** 103/19
**recognition [1]** 79/14
**recognize [5]** 49/20 54/17 59/10 74/14 75/17
**recognized [2]** 19/17 59/24
**recognizes [1]** 53/21
**recommend [1]** 91/2
**reconcile [1]** 74/15
**reconsider [3]** 61/23 85/19 106/17
**reconsideration [3]** 76/23 96/10 106/5
**record [60]**
**recur [1]** 93/12
**recurring [1]** 93/20
**red [1]** 90/2
**redirection [1]** 78/9
**reemerge [1]** 92/2
**referring [4]** 26/3 67/9 86/5 96/5
**reflect [1]** 42/23
**reflection [1]** 30/19
**reflects [1]** 50/8
**reflexively [1]** 91/24
**reform [2]** 75/15 76/15
**reframe [1]** 37/22
**regard [2]** 95/4 112/21
**regarding [2]** 29/10 37/19
**regardless [3]** 33/21 34/1 88/24
**regards [2]** 63/24 80/10
**regime [2]** 80/18 80/19
**regret [1]** 39/20
**rehashed [1]** 105/13
**reiterate [1]** 83/16
**reject [2]** 48/24 88/17
**rejected [7]** 46/9 59/25 63/11 77/5 80/6 93/2 93/9
**relate [1]** 32/13
**related [3]** 7/7 16/12 104/6
**relates [1]** 55/24
**relating [3]** 13/1 76/5 103/11
**relation [1]** 105/7
**relationship [1]** 36/12
**relatively [1]** 93/25
**release [3]** 90/15 90/18 92/5
**released [3]** 14/25 98/13 98/16
**relevance [3]** 49/24 105/24 106/2
**relevant [5]** 27/6 36/16 41/21 95/1 97/15
**reliance [1]** 80/11
**relief [9]** 37/9 38/21 39/2 43/16 43/17 44/12 57/24 86/2 88/10
**relieved [1]** 40/13
**relinquishment [2]** 73/23 81/10
**rely [1]** 49/22
**relying [2]** 90/21 92/7
**remain [1]** 105/11
**remains [5]** 33/8 46/4 72/7 84/8 101/19
**remand [1]** 111/19
**remanded [2]** 92/23 110/13
**remedy [1]** 39/2
**remember [3]** 12/25 52/10 63/9
**remembers [1]** 12/23
**remind [1]** 74/11
**reminds [1]** 63/4
**removal [1]** 102/10
**removed [4]** 9/3 102/5 102/13 102/13
**removes [2]** 8/8 11/16
**renew [1]** 111/10
**renewed [4]** 96/7 96/10 96/23 112/16
**reopen [1]** 53/15
**repeatedly [2]** 34/13 57/22
**repeating [1]** 92/11
**reply [6]** 9/18 13/13 50/22 55/6 69/4 92/18
**report [2]** 98/1 105/22
**reported [1]** 2/10
**REPORTER [3]** 2/7 2/8 114/14
**represent [12]** 11/7 11/7 11/9 12/14 12/20 14/9 50/19 51/6 51/10 63/2 67/13 68/9
**representation [11]** 11/23 12/3 12/9 13/23 14/17 63/3 63/25 66/9 66/12 68/18 106/9
**represented [5]** 19/12 66/5 68/14 68/19 106/13
**representing [5]** 11/3 11/16 64/6 67/10 67/10
**request [7]** 45/15 60/13 60/25 61/19 72/24 96/7 111/11
**requested [2]** 38/21 77/14
**requesting [2]** 59/7 59/8
**require [10]** 4/11 4/11 8/14 8/15 20/8 36/13 48/7 48/11 81/20 95/22
**required [9]** 7/6 7/7 21/21 32/7 42/15 44/23 53/23 73/12 91/13
**requirement [2]** 27/10 43/9
**requirements [2]** 6/20 84/4
**requires [18]** 6/11 6/18 14/1 21/22 22/4 29/5 35/4 36/13 41/11 42/6 42/17 53/10 54/4 54/7 54/11 60/12 92/14 94/8
**requiring [4]** 29/16 29/17 42/10 43/16
**resetting [1]** 56/4
**resolution [1]** 69/1
**resolve [4]** 69/23 80/21 86/10 109/21
**resolves [2]** 33/13 38/1
**resounding [2]** 51/14 84/23
**resources [2]** 61/15 100/7
**respect [3]** 54/7 65/15 107/25
**respectfully [2]** 106/19 106/20
**respond [6]** 6/22 15/5 62/9 78/1 102/17 102/24
**response [16]** 4/5 6/3 26/7 35/5 62/5 74/16 79/9 82/14 87/16 92/4 94/20 102/20 103/15 108/13 111/5 111/21
**responses [1]** 17/14
**responsibility [1]** 44/19
**rest [6]** 11/8 23/12 53/5 57/7 72/20 82/15
**restart [1]** 79/19
**restate [1]** 17/23
**result [20]** 7/3 23/21 33/1 33/2 33/3 33/4 34/3 34/21 35/17 40/9 41/14 56/8 70/20 73/15 84/2 88/20 90/24 91/10 94/6 105/14
**resulted [1]** 102/10
**resulting [1]** 91/15
**results [1]** 88/21
**resumed [1]** 90/8
**retained [1]** 11/18
**retains [1]** 39/11
**return [3]** 36/1 50/10 94/1

## R

**reverse [2]** 10/18 10/19
**reversed [1]** 22/20
**reversion [1]** 91/5
**revert [1]** 91/24
**review [6]** 33/23 34/16 44/20 44/24 67/21 89/17
**reviewing [2]** 22/24 51/19
**reviews [1]** 67/22
**revisit [2]** 32/25 103/10
**revisiting [1]** 32/8
**revive [1]** 63/10
**rid [2]** 42/18 60/10
**right [41]**
**rightly [1]** 26/4
**rights [3]** 1/12 10/20 113/9
**rigorous [2]** 79/17 91/15
**risk [5]** 47/23 48/6 92/11 93/12 93/19
**risks [1]** 35/2
**RMR [2]** 2/7 114/14
**road [2]** 103/8 103/8
**role [2]** 56/18 107/9
**room [2]** 23/8 23/8
**Rosenberg [1]** 2/3
**ROSENTHAL [2]** 1/8 3/2
**Rossi [2]** 1/11 3/6
**rough [1]** 100/10
**routinely [1]** 107/16
**RPR [2]** 2/7 114/14
**RTM [1]** 69/13
**Rufo [30]**
**Rufo's [5]** 41/16 45/18 48/14 49/1 92/17
**rule [132]**
**rules [8]** 50/20 56/14 72/9 79/23 80/7 80/25 82/21 82/24
**ruling [4]** 45/7 45/7 83/25 84/1
**rulings [1]** 5/20
**Rumination [1]** 34/19
**ruminations [1]** 34/18
**run [2]** 21/13 75/16
**running [2]** 99/16 99/18
**runs [1]** 14/19
**Rusk [1]** 2/8
**Russell [3]** 12/23 55/15 78/1
**Russo [17]** 2/2 3/15 25/12 28/15 32/5 36/19 62/9 64/15 64/16 64/18 76/3 79/21 81/17 82/13 94/20 97/1 108/13
**Russo's [3]** 40/10 82/18 83/11

## S

**S.B [28]**
**safety [4]** 94/6 97/20 97/20 98/17
**said [52]**
**Salazar [3]** 55/25 56/23 82/1
**same [32]**
**satisfy [1]** 84/12
**saw [1]** 13/2
**say [49]**
**saying [27]**
**says [29]**
**scepticism [1]** 54/23
**schedule [2]** 13/3 17/17
**schedules [1]** 105/12
**Schools [1]** 59/13
**scope [2]** 32/14 43/21
**scratching [1]** 36/15
**se [19]** 12/4 13/23 50/17 51/1 51/6 51/13 53/5 63/3 63/11 64/6 66/3 66/5 67/4 67/10 67/13 82/15 82/19 82/23 83/13
**seat [3]** 81/16 81/17 107/22
**seated [1]** 3/5
**seats [1]** 10/9
**second [19]** 8/3 22/8 32/18 36/9 50/10 54/23 59/2 59/6 60/6 60/19 66/1 68/6 74/22 75/21 92/17 94/14 97/19 102/21 108/6
**secondarily [2]** 4/22 13/25
**secret [1]** 61/17
**section [2]** 63/23 69/21
**secured [4]** 41/14 42/6 91/7 91/25
**security [1]** 98/23
**see [14]** 11/23 13/7 19/25 20/24 33/1 33/4 34/2 45/20 46/23 50/6 67/1 69/6 78/22 102/19
**seeing [1]** 23/5
**seek [4]** 12/3 44/12 49/21 86/2
**seeking [1]** 50/11
**seeks [1]** 88/10
**seem [4]** 18/5 74/21 74/22 78/12
**seemed [1]** 40/11
**seems [8]** 5/6 7/17 10/7 12/8 49/22 77/7 95/1 95/10
**seen [3]** 88/22 105/8 107/24
**semantics [1]** 58/6
**Senator's [2]** 14/16 14/23
**send [1]** 60/25
**sending [1]** 99/1
**sense [6]** 25/17 62/4 62/8 62/13 82/12 90/17
**sensitive [1]** 10/21
**sent [4]** 14/22 15/9 60/25 100/20
**sentence [4]** 20/3 30/18 65/18 101/12
**separate [2]** 68/18 97/16
**separating [1]** 39/13
**September [2]** 1/6 3/1
**September 22 [1]** 3/1
**sequential [2]** 103/4 103/4
**serious [3]** 27/20 27/21 92/5
**service [3]** 27/13 27/13 74/23
**Services [2]** 99/24 100/1
**set [2]** 35/21 79/23
**Seth [2]** 1/16 3/12
**sets [1]** 35/19
**setting [2]** 17/17 96/14
**settled [1]** 86/17
**several [1]** 96/4
**severely [1]** 86/22
**she [18]** 11/21 14/22 14/23 50/18 52/6 52/8 52/12 52/15 52/16 56/1 60/20 60/23 60/24 61/1 62/25 63/1 83/20 83/21
**she's [3]** 14/24 16/20 16/20
**shear [1]** 98/11
**sheriff [7]** 1/16 3/11 93/1 93/11 93/14 94/2 98/5
**sheriff's [2]** 92/24 98/21
**Shoot [1]** 58/21
**short [1]** 92/1
**Shortly [2]** 11/1 16/24
**shot [2]** 15/1 58/21
**should [55]**
**shoulder [1]** 94/13
**shouldn't [2]** 53/16 65/12
**show [5]** 35/8 75/15 88/14 93/11 93/25
**showed [2]** 34/12 103/8
**showing [1]** 41/10
**shown [1]** 97/20
**shows [8]** 9/16 27/24 29/10 41/9 42/5 42/12 52/1 90/23
**side [9]** 13/4 19/3 19/3 19/20 23/23 74/19 76/12 86/10 89/24
**sides [5]** 4/9 109/19 112/10 113/16 113/17
**signed [1]** 114/11
**significant [7]** 28/5 33/10 36/25 38/5 41/13 47/17 93/19
**signing [2]** 69/10 69/11
**silence [1]** 78/18
**similar [4]** 21/21 35/8 43/16 57/14
**similarly [3]** 30/25 31/7 92/3
**simplistic [1]** 93/10
**simply [4]** 47/2 75/12 106/24 111/2
**simultaneously [1]** 85/12
**since [5]** 6/9 45/9 74/9 101/18 111/25
**single [7]** 19/4 43/7 60/4 78/10 100/2 104/10 104/10
**sir [2]** 109/25 110/3
**sit [1]** 45/5
**site [1]** 110/12
**sits [1]** 106/14
**sitting [1]** 17/18
**situation [15]** 12/14 13/14 16/13 19/23 21/1 21/3 21/4 65/17 66/9 66/10 67/11 67/14 68/14 82/20 101/8
**situations [4]** 41/15 53/24 67/22 70/6
**skip [1]** 44/9
**sky [1]** 81/14
**slight [2]** 57/12 58/5
**slightly [1]** 27/5
**slip [1]** 44/9
**small [1]** 112/12
**smaller [1]** 80/22
**so [214]**
**some [33]**
**somebody [2]** 7/21 16/9
**somehow [2]** 48/25 69/2
**someone [2]** 53/15 64/1
**something [21]** 12/15 16/8 36/7 43/23 48/15 56/13 56/14 61/5 65/11 66/7 67/3 69/24 90/10 90/19 92/8 95/11 98/12 107/10 107/16 108/13 108/14
**soon [2]** 55/21 78/6
**sorry [6]** 9/19 11/10 17/23 85/21 86/13 110/3
**sort [6]** 59/21 59/25 69/18 69/22 81/18 98/20
**sought [2]** 27/7 59/9
**sounds [1]** 111/21
**source [2]** 30/12 54/3
**SOUTHERN [4]** 1/1 63/12 114/3 114/15
**speak [4]** 3/25 26/6 66/25 105/19
**specific [8]** 14/21 16/13 35/20 56/4 109/16 109/19 110/13 111/2
**specifically [5]** 5/19 14/10 18/6 21/17 26/9
**speed [2]** 44/14 83/8
**spend [2]** 54/10 93/22
**spinning [1]** 24/12
**spirit [4]** 75/1 75/3 75/4 76/17
**splitting [1]** 88/4
**spoken [1]** 90/20
**sponte [2]** 56/13 76/6
**spot [1]** 61/4
**Sprint [7]** 32/10 32/11 32/17 33/6 38/8 38/9 38/12
**Sprint's [1]** 104/21
**squarely [1]** 5/18
**squelch [1]** 67/1
**staff [6]** 15/11 99/13 99/15 99/21 99/23 99/24
**stages [1]** 113/17
**stand [4]** 110/24 111/1 112/17 112/19
**stand-alone [4]** 110/24 111/1 112/17 112/19
**standard [12]** 27/18 43/11 48/15 49/1 73/22 73/24 78/11 78/13 88/9 88/10 88/15 88/15
**standards [1]** 80/24
**standing [2]** 85/19 85/22
**stands [3]** 42/21 44/22 52/16
**star [2]** 41/18 93/17
**start [9]** 3/21 16/23 35/24 64/18 64/23 71/25 76/22 77/1 79/14
**started [5]** 8/8 11/14 37/3 73/7 112/25
**starting [1]** 52/12
**starts [4]** 9/18 11/22 18/4 75/20
**state [71]**
**state's [1]** 77/25
**stated [12]** 39/22 43/3 43/6 50/18 76/19 77/9 77/19 92/4 103/4 103/15 103/17 104/3
**statement [6]** 39/20 40/4 68/22 95/1 95/10 102/8
**statements [2]** 88/8 88/9
**states [8]** 1/1 1/8 8/19 77/21 83/3 108/16 114/2 114/9
**stating [1]** 78/14
**status [5]** 26/10 50/4 85/11 85/17 85/25

## S

**statute [6]** 20/18 21/20 22/13 51/7 53/9 83/1
**statutes [6]** 13/13 20/10 31/20 31/20 36/13 72/16
**Statutorily [1]** 22/14
**stay [1]** 12/11
**stayed [1]** 59/20
**stenotype [1]** 2/10
**step [46]**
**steps [4]** 29/6 43/24 45/18 93/15
**stick [1]** 50/12
**still [31]**
**stomach [1]** 34/19
**stop [11]** 7/19 23/12 23/14 37/11 38/23 48/20 52/21 58/18 77/1 91/1 98/25
**stopping [1]** 37/11
**straight [4]** 57/23 78/15 78/18 102/19
**straightforward [1]** 58/25
**strange [1]** 12/9
**streamline [1]** 81/24
**Street [2]** 2/3 2/8
**strenuous [1]** 57/23
**strings [1]** 66/10
**strong [1]** 85/16
**structural [1]** 67/6
**structure [1]** 44/16
**Struggling [1]** 70/1
**stuck [1]** 54/10
**stuff [3]** 57/4 62/14 109/14
**stumbling [1]** 95/15
**styled [1]** 96/6
**sua [2]** 56/13 76/6
**sub [1]** 63/8
**subject [4]** 16/6 47/15 47/15 47/25
**submission [1]** 99/8
**submit [3]** 25/8 41/25 45/9
**submitted [3]** 35/5 41/9 109/4
**submitting [1]** 90/23
**subsection [3]** 29/5 51/5 53/22
**substantive [2]** 28/3 58/6
**success [1]** 12/3
**successes [1]** 16/21
**successor [2]** 55/20 55/24
**successors [2]** 49/13 77/20
**succinctly [1]** 108/2
**such [5]** 10/14 20/5 88/8 88/11 93/7
**suddenly [1]** 47/19
**sue [2]** 19/9 19/9
**sued [5]** 13/20 13/21 19/5 53/11 64/1
**suggest [4]** 89/21 94/24 94/24 95/1
**suggested [1]** 50/16
**suggesting [2]** 71/23 88/7
**suggests [1]** 95/24
**Suite [2]** 2/3 2/8
**summarize [1]** 91/3
**summarized [1]** 35/22
**summarizes [1]** 98/20
**super [2]** 18/16 18/25
**supplement [1]** 51/9
**support [11]** 18/23 18/25 19/14 46/1 47/24 60/22 68/12 89/16 95/22 104/11 107/24
**supporting [1]** 78/10
**supports [1]** 81/19
**suppose [3]** 101/17 102/2 102/21
**supposition [1]** 78/8
**Supreme [10]** 27/1 27/4 30/19 56/6 57/15 80/5 92/23 93/1 103/3 108/16
**sure [9]** 4/22 33/3 44/7 71/4 97/2 111/7 111/17 112/14 112/18
**surge [1]** 100/7
**surprise [1]** 86/7
**surprised [2]** 50/22 104/23
**Susman [1]** 1/15
**suspect [4]** 14/8 67/7 68/17 85/12
**swiftly [1]** 109/22
**synched [1]** 42/1
**system [12]** 19/16 23/3 34/7 79/22 80/16 80/20 81/4 90/17 90/19 91/4 91/11 92/2
**systematically [1]** 109/13

## T

**table [3]** 33/13 33/15 46/10
**tack [1]** 51/21
**tackle [1]** 88/16
**tacky [1]** 82/19
**take [21]** 11/8 18/17 24/2 32/24 36/10 37/23 54/2 64/23 74/5 76/21 79/17 82/18 83/11 83/17 88/15 89/23 93/18 105/5 110/8 111/13 111/23
**taken [3]** 49/11 69/15 107/22
**takes [8]** 33/13 37/2 41/20 50/25 51/16 103/7 103/9 112/24
**taking [6]** 9/19 41/2 42/16 49/14 52/16 98/4
**talk [12]** 5/25 6/6 8/23 13/8 24/11 44/1 45/3 76/14 89/12 89/13 89/24 112/1
**talked [6]** 13/12 61/6 62/25 69/19 72/4 111/25
**talking [9]** 11/22 22/17 24/4 25/10 61/8 66/20 76/12 80/13 80/15
**talks [4]** 15/1 48/22 48/23 112/2
**task [2]** 44/18 89/19
**taxpayer [4]** 53/7 70/23 71/1 79/13
**taxpayers [5]** 63/24 64/10 97/18 98/19 100/11
**tea [1]** 44/19
**technical [1]** 79/15
**teed [1]** 50/3
**tell [7]** 36/15 37/15 62/7 67/9 100/16 100/18 106/25
**telling [3]** 34/22 48/5 60/23
**tells [2]** 35/13 48/4
**Ten [1]** 65/2
**tens [2]** 58/13 80/13
**Tenth [1]** 22/2
**term [4]** 27/5 46/24 47/3 88/17
**terms [13]** 7/7 8/15 10/11 11/19 16/21 21/20 54/18 57/23 68/4 68/24 69/16 71/11 104/12
**terse [1]** 74/16
**test [4]** 38/14 39/12 46/16 58/10
**testimony [2]** 12/16 34/6
**TEXAS [23]**
**texascivilrightsproject.org [1]** 1/13
**text [6]** 29/15 40/22 51/7 51/9 54/16 97/6
**than [15]** 4/4 4/24 5/12 29/21 30/6 33/2 33/3 39/21 40/2 49/21 50/11 66/6 72/3 89/8 95/11
**thank [26]**
**that [863]**
**that's [54]**
**their [62]**
**them [29]**
**themselves [9]** 50/20 51/6 60/4 62/23 67/10 67/11 67/13 72/8 93/8
**then [51]**
**theory [11]** 49/12 49/15 50/10 53/4 54/24 55/2 59/3 59/6 60/6 60/19 67/15
**there [100]**
**there's [38]**
**thereafter [1]** 11/1
**therefore [4]** 3/19 7/21 42/7 42/17
**these [41]**
**they [158]**
**they're [21]** 12/5 12/5 12/7 12/16 14/10 21/3 46/9 59/13 59/14 60/8 60/9 60/10 67/5 67/10 70/11 70/19 99/17 100/1 103/3 103/24 104/23
**they've [9]** 9/2 16/18 57/22 58/10 75/12 75/12 77/12 98/16 112/24
**thing [16]** 3/20 13/19 17/2 37/4 40/21 60/11 63/3 67/2 68/3 69/9 71/15 74/5 78/12 78/21 81/25 103/5
**things [10]** 9/5 21/12 24/12 25/5 56/25 62/22 63/22 97/25 98/13 104/19
**think [121]**
**thinking [1]** 111/20
**third [4]** 37/16 38/14 90/11 101/12
**this [274]**
**those [38]**
**though [10]** 17/18 18/25 20/25 28/12 29/3 33/12 40/11 46/15 66/7 68/3
**thought [3]** 65/6 68/4 68/22
**thousands [4]** 34/11 58/13 58/14 61/13
**three [19]** 9/19 9/23 9/25 11/2 11/5 16/17 16/22 17/18 30/22 54/20 60/21 69/21 74/14 82/10 85/2 107/22 108/9 108/9 108/12
**threshold [2]** 84/20 105/20
**through [38]**
**throughout [2]** 77/23 107/21
**Thursday [1]** 109/4
**thus [1]** 32/19
**ticky [1]** 82/19
**ticky-tacky [1]** 82/19
**time [43]**
**timeline [3]** 9/10 12/2 78/15
**timeliness [18]** 24/11 29/6 45/4 55/9 57/10 78/11 78/14 79/11 80/23 84/11 84/17 84/20 85/1 103/11 103/22 104/5 104/8 106/16
**timely [6]** 28/9 67/24 78/15 81/7 84/22 104/10
**times [3]** 27/2 30/16 88/6
**timing [1]** 78/14
**today [9]** 4/3 24/17 58/7 60/10 74/17 79/15 80/19 109/6 109/17
**today's [1]** 3/19
**together [8]** 12/11 15/8 25/16 39/3 39/13 60/11 73/8 103/6
**told [11]** 17/24 24/1 26/12 37/3 100/20 103/3 103/13 108/20 111/14 112/2 112/24
**tolerate [1]** 66/7
**toll [1]** 83/1
**tomorrow [1]** 79/19
**tons [1]** 70/21
**too [7]** 10/13 63/2 63/14 63/15 92/11 93/10 93/22
**took [6]** 9/19 10/5 11/5 15/13 52/19 101/8
**totaling [1]** 100/10
**totally [1]** 82/2
**touch [2]** 11/12 41/1
**tough [1]** 86/19
**toward [1]** 92/15
**towards [1]** 46/21
**tran [1]** 28/3
**tran-substantive [1]** 28/3
**transcript [3]** 2/10 114/5 114/7
**transcription [1]** 2/11
**transfer [5]** 67/16 94/22 95/11 95/12 95/16
**transmission [1]** 93/8
**travis [5]** 1/11 1/13 3/8 49/7 79/10
**Treasury [1]** 75/2
**treat [1]** 44/9
**treated [1]** 56/6
**treating [2]** 46/14 46/15
**treatment [1]** 82/7
**treats [1]** 84/20
**tried [1]** 77/24
**tries [1]** 47/14
**troops [1]** 15/17
**true [8]** 20/22 57/9 68/13 71/14 102/12 113/10 113/12 113/13
**try [6]** 14/24 57/18 63/10 87/3 88/14 104/6
**trying [12]** 30/5 48/16 60/22 83/1 95/15 98/11 102/18 103/25 104/9 105/21 111/17 112/9

## T

**Tuesday [1]** 3/1
**turn [7]** 22/22 30/5 45/3 57/7 62/6 86/25 106/14
**turned [1]** 23/7
**Turning [1]** 69/18
**turns [3]** 20/5 65/19 68/23
**twice [3]** 28/23 49/16 58/11
**two [49]**
**two-step [1]** 36/19
**twofold [1]** 86/5
**txs.uscourts.gov [1]** 2/9
**type [4]** 47/23 61/19 85/16 92/15
**types [1]** 90/24
**typically [2]** 46/9 63/25

## U

**U.S [3]** 3/1 103/3 106/11
**U.S.D.C [2]** 2/8 114/15
**ultimately [1]** 95/9
**unable [1]** 12/21
**unaddressed [1]** 112/3
**unaffected [1]** 87/19
**unaffordable [3]** 91/6 91/18 91/25
**unambiguous [1]** 77/7
**unanimous [3]** 56/8 57/16 84/9
**unanimously [2]** 27/17 88/18
**unattended [1]** 112/3
**unaware [1]** 52/16
**unclear [1]** 36/4
**unconstitutional [6]** 71/14 91/16 92/1 93/9 93/10 105/11
**under [61]**
**undercut [1]** 106/20
**underlying [6]** 22/10 22/11 27/19 59/13 59/14 81/8
**underpinnings [1]** 61/12
**underscore [1]** 43/12
**understand [9]** 12/2 37/14 59/11 71/19 71/21 74/20 102/11 106/23 110/3
**understanding [3]** 87/17 87/22 110/11
**understood [4]** 30/10 87/8 112/5 113/4
**undisclosed [1]** 105/25
**undisputed [1]** 82/4
**undo [1]** 6/13
**undoing [1]** 49/1
**unequivocal [2]** 77/7 77/8
**unethical [1]** 50/19
**unfair [1]** 61/16
**unfold [1]** 60/3
**UNITED [6]** 1/1 1/8 83/2 108/16 114/2 114/9
**unless [2]** 45/4 94/18
**unlike [2]** 42/12 63/6
**unnecessary [3]** 35/17 41/16 51/7
**unpublished [1]** 40/21
**unreasonable [3]** 58/11 58/18 85/5
**unrebutted [4]** 41/10 92/9 105/19 106/3
**unrepresented [1]** 11/19
**unsupported [2]** 29/15 92/1
**until [10]** 11/18 14/12 17/15 44/3 52/1 54/19 68/14 82/6 90/12 112/23
**untimeliness [1]** 83/14
**untimely [5]** 63/12 82/6 85/18 87/21 89/21
**unusual [3]** 10/22 75/14 107/9
**up [39]**
**upon [3]** 23/18 30/13 70/14
**upshot [1]** 82/21
**urge [2]** 95/23 95/25
**us [17]** 5/6 12/12 13/11 35/13 41/2 41/20 46/11 58/24 59/21 73/21 93/13 104/2 106/8 108/20 110/9 112/24 113/16
**use [2]** 33/1 71/12
**used [4]** 57/20 90/14 98/24 99/4
**uses [1]** 7/3
**using [4]** 47/2 72/18 85/11 101/1
**usually [1]** 7/18
**Utah [1]** 83/6

## V

**vacate [35]**
**vacated [12]** 18/19 29/8 42/22 64/10 92/19 96/25 97/19 97/22 98/18 100/12 107/2 108/1
**vacates [1]** 7/23
**vacating [7]** 18/24 23/21 34/3 35/2 41/25 70/20 106/24
**vacation [1]** 93/16
**vacatur [16]** 29/11 34/6 43/2 46/1 46/25 47/16 48/24 49/21 50/11 60/23 84/21 92/16 92/17 93/21 94/4 95/18
**value [1]** 42/16
**valves [1]** 90/18
**VanFleet [8]** 1/15 3/10 11/3 11/6 11/12 11/16 62/7 107/20
**various [2]** 106/1 112/7
**vary [1]** 97/25
**vehicle [6]** 57/3 58/9 84/10 85/3 101/2 101/22
**versed [1]** 12/8
**version [4]** 50/5 50/9 51/25 54/19
**versus [2]** 63/6 75/1
**very [30]**
**via [3]** 49/10 60/18 61/9
**videos [2]** 61/14 113/6
**view [15]** 5/9 6/22 9/4 16/23 19/19 21/21 22/21 49/13 55/11 56/18 67/23 73/1 73/6 80/1 80/16
**viewed [3]** 55/20 55/25 66/16
**views [1]** 94/9
**Vinson [1]** 108/20
**violate [5]** 20/18 21/24 21/25 109/9 110/5
**violation [2]** 41/11 93/12
**violations [27]**
**violative [1]** 71/25
**violence [1]** 93/8
**virtue [2]** 50/2 71/8
**vociferously [1]** 94/4
**voice [1]** 94/10
**voices [1]** 66/22
**void [6]** 27/8 27/12 27/12 27/20 56/9 84/11
**voluminous [2]** 34/4 34/11
**voluntarily [2]** 37/12 37/13
**voting [2]** 10/20 10/20

## W

**wait [4]** 7/25 7/25 62/13 80/16
**waited [1]** 56/21
**waiting [3]** 60/3 103/16 103/18
**waive [7]** 16/1 17/22 17/25 18/23 77/11 77/17 78/20
**waived [17]** 9/2 31/16 49/9 49/15 60/1 60/17 61/25 62/20 69/12 77/16 77/17 78/7 78/16 85/13 85/16 89/20 103/16
**waiver [73]**
**waiving [1]** 69/2
**walk [1]** 66/17
**Walker [1]** 1/11
**walking [1]** 10/24
**want [46]**
**wanted [4]** 54/13 62/15 84/25 94/20
**wants [2]** 64/2 108/14
**warrants [1]** 37/9
**was [146]**
**wasn't [5]** 17/18 40/13 83/5 102/17 103/19
**watched [1]** 61/14
**waves [1]** 34/16
**way [39]**
**ways [8]** 50/8 50/14 53/8 77/25 81/11 81/13 89/15 95/25
**we [196]**
**we'll [3]** 24/7 51/9 111/22
**we're [24]**
**we've [12]** 6/2 17/4 28/11 38/24 44/10 50/4 60/21 69/19 76/21 78/25 87/5 88/22
**weigh [2]** 34/5 49/5
**weighed [1]** 34/8
**weighing [1]** 105/16
**weighs [1]** 33/19
**welcome [1]** 101/5
**welcomed [1]** 7/22
**well [65]**
**went [4]** 5/5 45/12 57/13 74/7
**were [44]**
**Wesley [1]** 63/8
**what [171]**
**what's [7]** 13/8 13/8 15/2 21/18 24/2 66/18 67/24
**whatever [4]** 65/17 90/23 93/18 108/24
**whatsoever [2]** 27/2 44/10
**when [56]**
**whenever [2]** 80/3 80/10
**where [27]**
**whereas [1]** 16/11
**wherever [2]** 89/17 96/1
**whether [59]**
**which [93]**
**while [5]** 4/16 44/15 52/17 69/21 92/21
**who [30]**
**who's [1]** 66/9
**whom [1]** 68/12
**why [19]** 8/8 10/14 12/4 13/23 20/13 22/5 22/8 25/23 41/21 46/12 58/6 65/5 70/11 74/17 75/23 85/16 86/16 106/1 106/2
**wildly [1]** 29/15
**will [48]**
**willies [1]** 108/6
**wins [1]** 56/25
**wished [1]** 43/4
**wishes [1]** 34/24
**withdrawn [1]** 11/17
**within [19]** 5/18 5/18 30/10 32/10 32/11 36/19 44/15 47/4 48/1 48/2 55/13 55/17 56/22 58/11 72/10 72/13 88/4 89/5 104/21
**without [16]** 6/14 12/3 14/14 20/16 20/17 31/10 36/1 41/12 43/19 58/16 80/10 83/10 90/7 91/4 91/12 98/2
**woe [3]** 78/2 78/2 78/2
**Wolfish [1]** 93/2
**won't [2]** 46/18 93/22
**Wonderful [1]** 62/3
**word [1]** 108/19
**words [4]** 12/11 21/14 99/1 101/10
**work [3]** 15/13 56/25 113/16
**worked [1]** 74/21
**working [3]** 4/7 113/6 113/6
**works [1]** 88/18
**world [6]** 28/12 28/13 38/25 39/24 39/24 47/22
**worried [1]** 61/6
**worry [1]** 42/18
**would [120]**
**wouldn't [4]** 55/17 61/24 101/9 110/8
**wrestling [2]** 6/4 78/22
**writ [1]** 79/25
**write [1]** 84/9
**writs [2]** 56/16 81/23
**wrong [13]** 22/25 29/4 37/15 46/24 47/2 49/13 50/9 50/23 51/12 67/9 82/25 86/12 95/9

## Y

**yeah [2]** 10/4 56/25
**year [9]** 49/1 74/8 80/16 91/10 97/23 98/2 99/3 99/14 99/14
**years [6]** 9/7 56/21 65/3 65/3 103/18 113/5
**yes [45]**
**yet [5]** 4/14 27/16 27/21 44/17 76/22
**yielding [1]** 88/20
**you [235]**
**you'll [2]** 4/4 64/8
**you're [24]**
**you've [5]** 12/18 15/4 49/25 107/24 109/17
**Younger [72]**
**your [126]**
**yourself [1]** 12/14

## Y

**yourselves [1]** 61/9

## Z

**zero [1]** 94/11

United States District Court
Southern District of Texas
**ENTERED**
October 05, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MARANDA LYNN ODONNELL, *et al.*, on behalf of themselves and all others similarly situated, | § | |
| | § | |
| | § | |
| | § | CIVIL ACTION NO. H-16-1414 |
| Plaintiffs, | § | |
| v. | § | |
| | § | |
| HARRIS COUNTY, TEXAS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

Nearly seven years ago, constitutional challenges to the Harris County, Texas system for setting bail for individuals accused of misdemeanor offenses were resolved through a consent decree and final judgment. *ODonnell v. Harris County*, No. H-16-1414, 2019 WL 6219933 (S.D. Tex. Nov. 21, 2019); (Docket Entry No. 707). Harris County has operated under the consent decree since then. The Fifth Circuit initially affirmed *ODonnell*'s conclusion that the bail practices had violated the Constitution by detaining arrestees solely because they could not afford to pay, and affirmed the consent decree injunction with minor modifications. *ODonnell v. Harris County*, 892 F.3d 147 (5th Cir. 2018). In 2023, the Fifth Circuit, sitting en banc, overruled its panel decision and *ODonnell I*'s holding that the doctrine of *Younger* abstention, *Younger v. Harris*, 401 U.S. 37 (1971),[1] did not apply to prevent a federal court from addressing the constitutional violations established by an extensive record. *Daves v. Dallas County*, 64 F.4th 616, 635 (5th Cir. 2023) (en banc) ("*Daves II*"), *cert. denied*, 144 S. Ct. 548 (2024); *see also Daves II*, 64 F.4th at 633–35 (noting that "[a] coequal ground for dismissing [*Daves II*] is mootness" "by virtue of

[1] Even though "[t]he governmental party was Younger, [and] the private party [was] Harris," [the court] refer[s] to th[is] case as *Younger*." *Daves II*, 64 F.4th at 639 n.2 (Southwick, J., concurring).

intervening state law[,]" Senate Bill 6 ("S.B. 6")[2]). In *Daves II*, the Fifth Circuit stated that *ODonnell I* "should [not] have been adjudicated in federal court[,]" 64 F.4th at 631, quoted in *In re Goodhart*, No. 26-20337, 2026 WL 2517641, at *2 (5th Cir. Aug. 26, 2026) (per curiam).

Over two years later, four Harris County Criminal Court at Law Judges (the "Four Judges") moved in this court to abstain under *Younger* and to vacate or modify the consent decree. (Docket Entry Nos. 793, 864). The twelve other Harris County Criminal Court at Law Judges, as well as Harris County and the Harris County Sheriff, oppose this request and support the continued operation of the decree. (Docket Entry Nos. 805, 806, 807, 883, 884, 891, 892, 893). The Texas Attorney General filed a "Conditional Joinder in the Four Judges' Renewed Request for *Younger* Abstention[,]" (Docket Entry No. 865). The Attorney General stated that "[t]he consent decree should be vacated for the reasons set forth in the Four Judges' Renewed Request." (*Id.* at 1). The Attorney General also moved for reconsideration to re-urge his intervention to assert *Younger* abstention, (Docket Entry No. 861). The movants, the Four Judges and the Attorney General, have sought modification or vacatur of the consent decree in their briefing, (Docket Entry Nos. 741, 742, 793, 864, 865, 886, 887, 894, 895), and at the most recent motion hearing, (Docket Entry No. 888).

The Fifth Circuit has tasked this court with expeditiously deciding the *Younger* abstention issue—well in advance of the November election, in which three of the Four Judges are on the ballot and could lose their seats—and with faithfully applying *Daves II*'s holding overruling *ODonnell I*'s holding against *Younger* abstention. *In re Goodhart*, 2026 WL 2517641, at *5. After

[2] S.B. 6 is the same Texas law at issue in the present case. "S.B. 6 went into effect on December 2, 2021." (Docket Entry No. 896 at 34).

receiving expedited briefing from the parties and hearing, the court addresses both issues in this memorandum and opinion.

Because the *ODonnell I* consent decree is a final judgment, the proper procedure for modification or vacatur is through Federal Rule of Civil Procedure 60(b),[3] which imposes a "reasonable time" requirement. *See Coney Island Auto Parts Unlimited, Inc. v. Burton Tr. for Vista-Pro Auto., LLC*, 607 U.S. 155, 157–58 (2026) ("*Coney Island*"); *accord Kemp v. United States*, 596 U.S. 528, 533 (2022) ("All [Rule 60(b) motions] must be filed 'within a reasonable time.'"). On August 26, 2025, the Attorney General moved to intervene and vacate the consent decree. (Docket Entry Nos. 740, 741, 742). This was 29 months—over two years—after *Daves II* overruled *ODonnell I*'s holding against *Younger* abstention. *Compare Daves II*, 64 F.4th at 631, 635; *with* (Docket Entry Nos. 740, 741, 742). The Four Judges waited 950 days after *Daves II* issued to file their first motion, which was a motion to substitute themselves as parties under Rule 25(d). (Docket Entry No. 767). In December 2025, the Four Judges moved to vacate or modify the consent decree. (Docket Entry No. 793). That was almost three years after *Daves II.* (*See id.*).

After a careful review of the motions, the briefs, the parties' supplemental briefs, the record, and the applicable law, the court denies the motions to vacate or modify the consent decree because the requested Rule 60(b) relief was not "made within a reasonable time," as Rule 60(c) requires. The court also declines to abstain because doing so would, in effect, "relieve [the movants] . . . from [the] final judgment," without complying with Rule 60's requirements.

The reasons for these rulings are set out below.

[3] The movants have not sought relief under Rule 60(d). (*See generally* Docket Entry Nos. 741, 742, 793, 864, 865, 886, 887, 894, 895).

## I. The Litigation and Entry of the Consent Decree

Close to a decade ago, Maranda Lynn ODonnell filed a class-action lawsuit challenging Harris County's police and practice of jailing about 40% of people arrested for misdemeanor offenses for the duration of their cases solely because they could not pay money bail, without constitutionally adequate procedures to justify their continued detention. *ODonnell v. Harris County*, 251 F. Supp. 3d 1052, 1058 (S.D. Tex. 2017), *aff'd as modified*, 892 F.3d 147 (5th Cir. 2018).

The parties vigorously litigated the case before this court and the Fifth Circuit. Harris County, the County Criminal Court at Law Judges, the Criminal Law Hearing Officers, and the Sheriff moved to dismiss the complaint, in part based on *Younger* abstention. (Docket Entry No. 80 at 25–31 (citing *Younger v. Harris*, 401 U.S. 37 (1971)). The court denied the motion to abstain. (Docket Entry No. 125).

In 2017, the court held an eight-day preliminary-injunction hearing. (Docket Entry Nos. 222, 223, 228–30, 246, 247, 251). In advance of the hearing, several parties, including bail bondsmen whose financial interests supported continuing the existing bail-bond system, moved to intervene. (Docket Entry No. 202). The Texas Attorney General did not. The court granted the plaintiffs' motion for a preliminary injunction, finding that the evidence showed that County's bail practices likely violated the Constitution's Equal Protection Clause and Due Process Clause, (Docket Entry Nos. 302, 304), and granted the motion for class certification, (Docket Entry No. 303).

The County and the Hearing Officers appealed, asserting again that the district court should have abstained under *Younger.* (Docket Entry Nos. 309, 310). The Attorney General did not intervene, but he did file an amicus brief. *See* Br. for State of Texas *et al.*, *ODonnell v. Harris*

*County*, No. 17-20333, 2017 WL 2861848 (5th Cir. June 26, 2017). The Attorney General argued that the Fifth Circuit should vacate the preliminary injunction, but he did not raise *Younger* abstention. *See id.*

The Fifth Circuit affirmed this court's decision that *Younger* abstention was not required, that the plaintiffs were likely to succeed on the merits of their claims, and that most of the preliminary injunction was proper. *See generally ODonnell v. Harris County (ODonnell I)*, 892 F.3d 147 (5th Cir. 2018) (opinion on rehearing), *overruled in part by Daves v. Dallas County* (*Daves I*), 22 F.4th 522 (5th Cir. 2022), *and by Daves II*, 64 F.4th 616. The Attorney General did not intervene in the appeal and did not seek additional review from the Fifth Circuit en banc or from the Supreme Court.[4] The Fifth Circuit remanded the case to this court.

On remand, the court entered a revised preliminary injunction, (Docket Entry Nos. 426, 427), which the County Judges appealed, (Docket Entry No. 434). The Attorney General again filed an amicus brief, arguing that the Fifth Circuit should vacate the preliminary injunction. Br. for State of Texas *et al.*, *ODonnell v. Goodhart*, No. 18-20466, 2018 WL 4603243 (5th Cir. Sept. 17, 2018). The Fifth Circuit stayed pending the appeal portions of the revised preliminary injunction. *See generally ODonnell v. Goodhart (ODonnell II)*, 900 F.3d 220 (5th Cir. 2018), *overruled in part by Daves I*, 22 F.4th 522.

The parties continued to litigate the case before this court while the County Judges' appeal of the revised preliminary injunction was pending. The parties submitted cross-motions for summary judgment, which included *Younger* arguments. (*See* Docket Entry No. 432). Before

---

[4] The defendants only sought review from the Supreme Court in the form of a stay pending appeal from the district court's original preliminary injunction. *See ODonnell v. Harris County*, 260 F. Supp. 3d 810 (S.D. Tex. 2017) (denying a stay pending appeal). Justice Thomas denied the defendants' application for a stay pending appeal. *Harris County v. ODonnell*, No. 16A1204, 2017 WL 11824167, at *1 (U.S. June 7, 2017).

those motions were decided, newly elected County Judges took office, withdrew the pending appeal, and began settlement negotiations, (Docket Entries Nos. 551, 532). The parties routinely updated the court on the status of the settlement negotiations. (*See, e.g.*, Docket Entry Nos. 563, 590, 594). The Attorney General did not seek to intervene when the parties started negotiating settlement; after the district court denied without prejudice the County Judges' motion for summary judgment, which had asserted *Younger* abstention, (Docket Entry No. 540); after the parties notified the court of a new local rule that would provide a foundation for the proposed settlement, (Docket Entry No. 557); after the court ordered the defendants to comply with the new local rule, (Docket Entry Nos. 573, 575); or at any point during the work and public filings that led to the parties' consent decree.

After three years of litigation, including two appeals to the Fifth Circuit, the parties announced a settlement on July 25, 2019. (Docket Entry Nos. 615, 617). The court permitted interested individuals and entities to file amicus briefs in support of, or in opposition to, the proposed consent decree to aid in its consideration of the parties' proposal. (Docket Entry No. 643). The Attorney General submitted written testimony arguing that the proposed consent decree was contrary to Texas law; that it was against the public interest because it endangered public safety; and, because the case was moot, that the court lacked subject-matter jurisdiction to enter the consent decree. (Docket Entry No. 689). At the final hearing to determine the fairness of the proposed class settlement and consent decree, the court afforded the Attorney General time to argue his position, which he did. (Docket Entry Nos. 692, 700; *see* Docket Entry No. 704 at 58:13–64:5). However, the Attorney General did not assert *Younger* abstention, even though every other party in the case had abandoned the issue and instead submitted the constitutional issues to this court for a decision on the merits.

On November 21, 2019, after considering the parties' and amici's submissions and arguments, the court entered the consent decree.[5] (Docket Entry Nos. 708, 709). In March 2020, the Attorney General moved to intervene in another case before this court raising similar challenges to Harris County's felony, as opposed to misdemeanor, bail system. (*Russell v. Harris County*, Case No. 4:19-cv-226 (S.D. Tex.), Docket Entry Nos. 38, 46). In August 2021, Texas enacted S.B. 6, which altered the State's bail laws. *See* S.B. 6, 87th Leg. (Tex. 2021). In January 2022, the Fifth Circuit remanded the *Daves* case to the Dallas district court with instructions to address *Younger* abstention and mootness. *Daves I*, 22 F.4th at 548. In July 2022, the district court in *Daves* issued its post-remand opinion, concluding that *Younger* abstention was not required but that the case had been made moot by the Texas legislature's enactment of S.B. 6, and dismissing the case in advance of final judgment. *Daves v. Dallas County*, No. 3:18-cv-154, 2022 WL 2473364, at *3, *6 (N.D. Tex. July 6, 2022).

In January 2023, the Attorney General moved to dismiss the *Russell* case, arguing that S.B. 6 made the challenges to the Harris County bail system moot. (*Russell* Docket Entry Nos. 642, 669). Two months later, on March 31, 2023, the Fifth Circuit issued *Daves II*,[6] which held that S.B. 6 mooted the case and that the district court had to abstain from adjudicating the case under *Younger*. *Daves II*, 64 F.4th at 635; *see Russell v. Harris County*, No. H-19-cv-226, 2023 WL 5658936, at *3 (S.D. Tex. Aug. 31, 2023) (discussing *Daves II*). The Attorney General did not

[5] Since the consent decree's entry as a final judgment, no party has asked this court to take any judicial steps to enforce it.

[6] The third prong of *Younger*—adequate opportunities to raise the constitutional objections in the state proceedings—is a case-specific, factually-intensive inquiry. *Daves II* did not have *ODonnell*'s record before it. *Cf.* 64 F.4th at 620–36. *Younger* also has additional exceptions for great and immediate injuries and bad faith that *Daves II* did not analyze. *Compare Younger*, 401 U.S. at 38–58, *with Daves II*, 64 F.4th at 620–36.

move to intervene or to vacate the consent decree in *ODonnell* during the development of other cases involving challenges to the Texas bail systems.

In June 2025, the Texas Legislature enacted S.B. 9, which expanded the bail-system amendments made in S.B 6. *See* S.B. 9, 89th Leg. (Tex. 2025). On August 26, 2025, 29 months after the en banc court issued its opinion overruling *ODonnell I*, "this very case," the Attorney General moved to intervene and vacate the consent decree, (Docket Entry Nos. 741, 742), stating:

> The Court should grant the motion because, as the Fifth Circuit held in *Daves v. Dallas County*, 64 F.4th 616, 631 (5th Cir. 2023) (en banc), the Court should not have exercised jurisdiction, and Senate Bill 6 ("S.B. 6") rendered plaintiffs' claims moot. Alternatively, dissolution is warranted under Federal Rule of Civil Procedure 60(b) given intervening changes in state law.

(Docket Entry No. 741). Senate Bill 9 became effective on September 1, 2025. In a detailed 35-page memorandum and opinion, this court granted the Attorney General's motion to intervene to move to vacate or amend the consent decree based on the changes to Texas bail systems made in S.B. 6 and S.B. 9. (Docket Entry No. 764). In the same memorandum and opinion, the court denied, in part, the Attorney General's motion to intervene to assert *Younger* abstention on the ground that the Attorney General had waived his *Younger* arguments. *ODonnell v. Harris County*, 808 F. Supp. 3d 738, 749–62 (S.D. Tex. 2025); (Docket Entry No. 764 at 8–31); *see also ODonnell*, 808 F. Supp. 3d at 762 ("The Attorney General does not have a right to intervene to argue *Younger* abstention. His motion is untimely[] and . . . [therefore] futile. The parties waived *Younger* abstention, and the Attorney General would step into their shoes as an intervenor. The Attorney General also waived *Younger* abstention himself because he allowed the court to enter the consent decree, did not appeal it, and did not raise *Younger* on appeal."); (Docket Entry No. 764 at 31). The Attorney General appealed the intervention order. (Docket Entry No. 777).

Four of the sixteen Harris County Criminal Court at Law Judges (the "Four Judges") moved to substitute themselves as parties for their predecessors in public office under Federal Rule of Civil Procedure 25(d) on November 5, 2025. (Docket Entry No. 767). The Four Judges waited 950 days after *Daves II* issued to file this motion. (*See id.*). A week after the Four Judges moved to substitute themselves as parties, the court issued a scheduling order with several discovery dates and briefing dates, to which no intervenor objected. (Docket Entry No. 773). The Four Judges moved to vacate the consent decree under Rule 60(b) on December 11, 2025, about 32.5 months after *Daves II* had issued. (Docket Entry No. 793). The same day, the Attorney General moved for voluntary dismissal of his appeal, which was granted. (25-20543, Docket Entry Nos. 19, 20). The Four Judges' motion to vacate largely echoed the points in the Attorney General's motion, which cited S.B. 6 as intervening state law and *Younger* abstention. (*Compare* Docket Entry No. 793, *with* Docket Entry Nos. 741, 742).

About five months later, the Four Judges moved for an expedited ruling on their *Younger* arguments. (Docket Entry No. 803). This court denied the Four Judges' motion for expedited consideration, on the ground that some fact discovery was needed to rule on the motions to vacate or modify the consent decree post-final judgment. (Docket Entry No. 821). The Four Judges petitioned for a writ of mandamus, which was granted. (Docket Entry No. 859). The Fifth Circuit stated that "[t]he district court must consider the four judges' *Younger* abstention argument on an expedited basis, well in advance of the upcoming Texas judicial election on November 3, 2026." (*Id.* at 9). The Fifth Circuit "also direct[ed] the district court to follow *Daves II,*" (*id.*), which did not "hinge upon factual development or discovery[,]" *id.* at 7). The mandamus opinion did not

refer to the Attorney General. *Cf. id.* at 1–9 (referencing only the Four Judges); *In re Goodhart*, 2026 WL 2517641, at *1–5.

The day after the mandamus opinion issued and again a few days later, this court held hearings with all the parties to set a briefing schedule that would allow compliance with the Fifth Circuit's directive for both expedited consideration of abstention and adherence to *Daves II.* (Docket Entry Nos. 860, 863). The court ordered an expedited briefing schedule, (Docket Entry No. 867), and held a three-and-a-half-hour motion hearing as soon as the parties' schedules permitted, (Docket Entry No. 888). To the parties' credit, all complied with the expedition required by the Fifth Circuit.

The Four Judges moved to vacate the consent decree through a "Renewed Request for Younger Abstention," (Docket Entry No. 864),[7] and the Attorney General filed a "Conditional Joinder in the Four Judges' Request for *Younger* Abstention," (Docket Entry No. 865). The Attorney General stated that "[t]he consent decree should be vacated for the reasons set forth in the Four Judges' Renewed Request." (*Id.* at 1).

## II. The Legal Standards

### A. Rule 60.

"Federal Rule of Civil Procedure 60 permits a court to 'relieve a party . . . from a final judgment, order, or proceeding' . . . ." *Coney Island Auto Parts Unlimited, Inc. v. Burton Tr. for Vista-Pro Auto., LLC*, 607 U.S. 155, 158 (2026) ("*Coney Island*"). "Parties may seek relief under Rule 60 by filing a motion with the court." *Id.* Relief under Rule 60(b) requires the movant to demonstrate:

(1) mistake, inadvertence, surprise, or excusable neglect;

[7] The Four Judges' motion is listed as a "Renewed Motion to Vacate[,]" on the docket. (Docket Entry No. 864).

> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
> (4) the judgment is void;
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> (6) any other reason that justifies relief.

FED. R. CIV. P. 60(b) (titled "Grounds for Relief from a Final Judgment, Order, or Proceeding"); *see also Osborne v. Belton*, 131 F.4th 262, 270 (5th Cir. 2025) (per curiam) ("The burden of establishing at least one of the grounds for Rule 60(b) relief is on the movant." (citations omitted)). "Rule 60(b) enables a court to grant relief from a judgment in circumstances in which the need for truth outweighs the value of finality in litigation." 12 Joseph T. McLaughlin, et al., MOORE'S FEDERAL PRACTICE (hereinafter "12 MOORE'S") § 60.02[2] (3d ed. 2026) (citation omitted). "[I]n almost all circumstances, a court may not grant relief under Rule 60(b) sua sponte, that is, in the absence of a motion." 12 MOORE'S § 60.62 (citing, *inter alia*, *Chavez v. Balesh*, 704 F.2d 774, 777 (5th Cir. 1983) ("If the court acted simply upon its own initiative, then we would not uphold its action under Rule 60(b), because unlike Rule 60(a), 60(b) allows the court to act only 'upon motion.'")); *cf. Chavez*, 704 F.2d at 777 ("This court has held that a district judge may initiate such a motion and grant relief under Rule 60(b)(1) if the judge gives some sort of written notice to the parties." (citing *McDowell v. Celebrezze*, 310 F.2d 43, 44 (5th Cir. 1962) (per curiam))).

"The scope of relief that may be obtained under Rule 60(b) is strictly limited." 12 MOORE'S § 60.02[2]. Granting a Rule 60(b) motion requires "extraordinary circumstances" justifying relief. *Pryor v. U.S. Postal Serv.*, 769 F.2d 281, 287 (5th Cir. 1985); *see also In re Pettle*, 410 F.3d 189, 191 (5th Cir. 2005) ("We have consistently held that the relief under Rule 60(b) is considered an extraordinary remedy . . . [and that] [t]he desire for a judicial process that is predictable mandates

caution in reopening judgments." (citations and internal quotations omitted; alterations in original)). "Rule 60(b) may not be used to provide an avenue for challenges of mistakes of law that should ordinarily be raised by timely appeal." *Pryor*, 729 F.2d at 286 (citations omitted); *see also Halliburton Energy Servs. v. NL Indus.*, 618 F. Supp. 2d 614, 620 (S.D. Tex. 2009) ("The scope of review under Rule 60(b) is narrower than on a direct appeal." (citing *Aucoin v. K-Mart Apparel Fashion Corp.*, 943 F.2d 6, 8 (5th Cir. 1991) (per curiam))).

The Supreme Court has recently emphasized that "Rule 60 also imposes a time limit for such motions." *Coney Island*, 607 U.S. at 158. "A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." FED. R. CIV. P. 60(c)(1); *see also Coney Island*, 607 U.S. at 157 (holding "that this time limit applies to a motion alleging that a judgment is void" under Rule 60(b)(4)); *accord*, *Kemp v. United States*, 596 U.S. 528, 538 (2022) ("[A]ll Rule 60(b) motions[] must be made 'within a reasonable time.'" (citing FED. R. CIV. P. 60(c)(1))). "A district court may not apply the normal rules for enlarging the time limits set out in Rule 60 for making a Rule 60(b) motion." 12 MOORE'S § 60.03[1] (citing FED. R. CIV. P. 60(c)(1)). "Rule 6(b), which sets out those normal time-extension rules do not apply to Rule 60(b) motions." 12 MOORE'S § 60.03[1] (citing FED. R. CIV. P. 6(b)(2)). "The [Rule 60(b)] motion does not affect the judgment's finality or suspend its operation." FED. R. CIV. P. 60(c)(2).

"In assessing the reasonableness of a delay in bringing a Rule 60(b) motion, the relevant period is usually measured from the time at which the moving party could have filed the motion, which is not necessarily the date on which the underlying judgment was entered." 12 MOORE'S § 60.65[1] (citing, *inter alia*, *Clark v. Davis*, 850 F.3d 770, 780 (5th Cir. 2017) ("[T]imeliness . . . is measured as of the point in time when the moving party has grounds to make [a Rule 60(b)] motion,

regardless of the time that has elapsed since the entry of judgment." (alterations in original; citation omitted))). "Reasonableness turns on the 'particular facts and circumstances of the case.'" *Clark*, 850 F.3d at 780 (citing, *inter alia*, *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994)); *see also Ashford v. Steuart*, 657 F.2d 1053, 1055 (9th Cir. 1981) (per curiam) ("What constitutes 'reasonable time' depends upon the facts of each case, taking into consideration the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and prejudice to other parties." (citations omitted)).

Courts consider "whether the party opposing the motion has been prejudiced by the delay in seeking relief and . . . whether the moving party had some good reason for his failure to take appropriate action sooner." *Clark*, 850 F.3d at 780 (citing *Lairsey v. Advance Abrasives Co.*, 542 F.2d 928, 930 (5th Cir. 1976) (citing 11 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2866, at 228-29)); *see also Pryor*, 769 F.2d at 287 ("This Court has pointedly announced that a party has a duty of diligence to inquire about the status of a case, and that Rule 60(b) relief will be afforded only in 'unique circumstances.'" (citing *Wilson v. Atwood Grp.*, 725 F.2d 255, 257–58 (5th Cir. 1984) (en banc))).

### B. *Younger* Abstention

Article III extends the judicial power "to all cases, in law and equity, arising under th[e] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." U.S. CONST. art. III, § 2. Congress then vested "district courts" with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. When the Constitution and Congress grant federal courts jurisdiction over a case, those courts have a "virtually unflagging obligation ... to exercise th[at] jurisdiction . . . ." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *see Cohens v.*

*Virginia*, 19 U.S. 264, 404 (1821) (Marshall, C.J.) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given."). Abstention doctrines are limited "federalism-flavored carveouts" to that obligation, created "[o]ut of respect for the legitimate interest of the state, and to avoid needless friction[.]" *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1084–85 (5th Cir. 2023).

*Younger* is one such doctrine. *Id.* "*Younger* requires federal court abstention when three criteria are met: (1) the federal proceeding would interfere with an ongoing state judicial proceeding; (2) the state has an important interest in regulating the subject matter of the claim; and (3) the plaintiff has an adequate opportunity in the state proceedings to raise constitutional challenges." *Daves II*, 64 F.4th at 625 (citations and internal quotations omitted). Its features follow from traditional "court noninterference in equity with state proceedings" and notions of "comity" and federalism that shape the exercise of the federal courts' judicial power. *Id.*

Yet abstention doctrines, including *Younger*, have their own exceptions, when the balance of federal-and-state interests shifts back toward the federal courts exercising their jurisdiction. "[C]ourts may disregard the *Younger* doctrine when: (1) the state court proceeding was brought in bad faith or with the purpose of harassing the federal plaintiff, (2) the [challenged] state statute is 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence, and paragraph, and in whatever manner and against whomever an effort might be made to apply it,' or (3) application of the doctrine was waived." *Texas Ass'n of Bus. v. Earle*, 388 F.3d 515, 519 (5th Cir. 2004) (citing, *inter alia*, *Younger*, 401 U.S. at 49). The third exception is at issue here.

Because "abstention under *Younger* is not jurisdictional"—it is, after all, an exception to jurisdiction, rather than a jurisdictional rule itself—"application of the doctrine can be waived." *Daves I*, 22 F.4th at 545. When a "[s]tate voluntarily chooses to submit to a federal forum,

principles of comity do not demand that the federal court force the case back into the [s]tate's own system." *Ohio Bureau of Emp. Servs. v. Hodory*, 431 U.S. 471, 480 (1977). State defendants may choose, when "faced with the prospect of lengthy administrative appeals followed by equally protracted state judicial proceedings," "to submit . . . constitutional issue[s]" to federal courts "for immediate resolution." *Id.*; *accord Brown v. Hotel Emps.*, 468 U.S. 491, 500 n.9 (1984); *Sosna v. Iowa*, 419 U.S. 393, 396 n.3 (1975).

## III. Analysis

### A. Rule 60

The movants, the Four Judges and the Attorney General, have sought modification or vacatur of the consent decree in their briefing, (Docket Entry Nos. 741, 742, 793, 861, 864, 865, 873, 886, 887, 894, 895), and at the most-recent motion hearing, (Docket Entry No. 888). At the motion hearing, the Four Judges stated that their "view is the [Fifth Circuit's August 2026] mandate is the procedure." (Docket Entry No. 895-1 at 70:22–23 (Rough Tr. Hr'g 9/22/2026)).

At the post-final-judgment stage, modifying or vacating a consent decree is through Rule 60. *See Coney Island*, 607 U.S. at 158 ("Federal Rule of Civil Procedure 60 permits a court to 'relieve a party . . . from a final judgment, order, or proceeding' . . . ."). The mandamus opinion did not alter the requirement to proceed through Rule 60 to seek vacatur or modification of the final judgment consent decree. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).

This court could not have granted Rule 60(b) relief sua sponte, even after *Daves II*. 12 MOORE'S § 60.62 ("[I]n almost all circumstances, a court may not grant relief under Rule 60(b) sua sponte, that is, in the absence of a motion." (citing, *inter alia*, *Chavez*, 704 F.2d at 777 ("If the court acted simply upon its own initiative, then we would not uphold its action under Rule 60(b),

because unlike Rule 60(a), 60(b) allows the court to act only 'upon motion.'"))). The movants, the Four Judges and the Attorney General, have the burden of demonstrating that Rule 60(b) relief is proper. *See Osborne*, 131 F.4th at 270 ("The burden of establishing at least one of the grounds for Rule 60(b) relief is on the movant." (citation omitted)).

Rule 60's "operative language clearly requires parties to make Rule 60(b) motions within a reasonable time." *Coney Island*, 607 U.S. at 161; *see also Clark*, 850 F.3d at 780 ("[T]imeliness . . . is measured as of the point in time when the moving party has grounds to make [a Rule 60(b)] motion, regardless of the time that has elapsed since the entry of judgment." (alterations and ellipsis in original)). The key question is when the Rule 60 clock started—which Rule 60(b) motion was available to the movants, and importantly, when it was available.

The record shows that the Rule 60(b) clock started on March 31, 2023, the date *Daves II* issued. *See* 64 F.4th at 620–36. In *Daves II*, the en banc court expressly overruled *ODonnell I*'s holding against abstention and held that *Daves II* was moot because of the intervening change in law, S.B. 6. *Id.* at 631, 635. That point was emphasized in *In re Goodhart*, 2026 WL 2517641, at *3, which stated that "…*Daves II* expressly held that '*ODonnell I*,' this very case, 'should [not] have been adjudicated in federal court.'" (citing *Daves II*, 64 F.4th at 631); *see also In re Goodhart*, 2026 WL 2517641, at *3 ("Again, *ODonnell I is this case*. *Daves II* does not hinge upon factual development or discovery." (emphasis in original)).

In *Daves II*, the Fifth Circuit reversed the *ODonnell* holding that *Younger* abstention did not apply. 64 F.4th at 631. That started the Rule 60(b)(5) clock to challenge the failure to abstain under *Younger*, which resulted in the consent decree and final judgment in *ODonnell*. FED. R. CIV. P. 60(b)(5); *see also* 12 MOORE'S § 60.46[1] ("The overall standard appears to be that one judgment is based on another when the first judgment is so related to the second that the first

judgment has claim or issue preclusion effects on the second[.]" (citations omitted)); *see also Lubben v. Selective Serv. Sys. Local Bd. No. 27*, 453 F.2d 645, 650 (1st Cir. 1972) ("For a decision to be 'based on' a prior judgment within the meaning of Rule 60(b)(5), the prior judgment must be a necessary element of the decision, giving rise, for example, to the cause of action or a successful defense . . . It is not sufficient that the prior judgment provides only precedent for the decision." (citations omitted)).

Under either formulation, the en banc court's express overruling of *ODonnell I*'s abstention holding started the Rule 60(b)(5) clock. *See id.*; *see also Overrule*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("(Of a court) to overturn or set aside (a precedent) by expressly deciding that it should no longer be controlling law <in *Brown v. Board of Education*, the Supreme Court overruled *Plessy v. Ferguson*>.").

The court briefly discusses the other potential avenues of Rule 60(b) relief.[8] Relief under Rule 60(b)(1), (2), or (3) is unavailable at this juncture, for two reasons. First, the movants have not invoked these three subsections. (*See generally* Docket Entry Nos. 741, 742, 793, 861, 864, 865, 873, 886, 887, 894, 895). Second, the Attorney General and the Four Judges moved to vacate beyond the one-year time limit that Rule 60(c) provides for such motions. *See* FED. R. CIV. P. 60(c) ("A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.").

Rule 60(b)(4) is not the proper vehicle for modification or vacatur because this "court had jurisdiction at the time it entered the judgment[,]" the court's actions comported with due process,

[8] The movants have not sought relief under Rule 60(d). (*See generally* Docket Entry Nos. 741, 742, 793, 861, 864, 865, 873, 886, 887, 894, 895).

and the court's abstention holdings were affirmed on appeal. *See Callon Petroleum Co. v. Frontier Ins. Co.*, 351 F.3d 204, 208–10 (5th Cir. 2003) (affirming denial of a Rule 60(b)(4) motion because the district court had diversity jurisdiction, even though abstention "would have been proper, if not obligatory[]" had it been timely raised before settlement); *see also Borne v. River Pars. Hosp., L.L.C.*, 548 F. App'x 954, 957 (5th Cir. 2013) (per curiam) ("[A] void judgment is one which, from its inception, was a complete nullity and without legal effect." (citing *Carter v. Fenner*, 136 F.3d 1000, 1006 (5th Cir. 1998) (quoting *United States v. Zima*, 766 F.2d 1153, 1159 (7th Cir. 1985)))); *see also Lubben*, 453 F.2d at 649 ("In the interest of finality, the concept of void judgments is narrowly construed . . . Only in the rare instance of a clear usurpation of power will a judgment be rendered void.").

At the final hearing to determine the fairness of the proposed class settlement and consent decree, the court afforded the Attorney General time to argue his position. (Docket Entry Nos. 692, 700; *see* Docket Entry No. 704 at 58:13–64:5). The Attorney General did present arguments against the decree, but he did not assert *Younger* abstention, even though every other party in the case had abandoned that issue and instead had submitted the constitutional issues to the court for a decision on the merits.

The Four Judges contend that "at th[e] time [when the consent decree was entered], all parties were united, the local rules had already been amended, and no controversy existed for the [c]ourt to determine." (Docket Entry No. 886 at 17 n.7). But the fact that the parties agreed on a particular result does not mean that there was no Article III case or controversy when the court entered the consent decree. *Cf. United States v. Texas*, 181 F.4th 548 (5th Cir. 2026) (affirming the denial of intervention, even though the movants-appellants claimed there was no case or controversy because the Attorney General and Department of Justice were aligned on the position

that federal law expressly preempted Texas's law allowing illegal aliens to obtain in-state tuition rates, at the time the district court entered the consent judgment). As noted, the Attorney General did present arguments against the decree, but not based on *Younger* abstention.

Rule 60(b)(6) relief is not available because Rule 60(b)(5) relief was available to seek to modify or vacate the consent decree and final judgment. *See BLOM Bank SAL v. Honickman*, 605 U.S. 204, 211 ("Rule 60(b)(6) provides only grounds for relief not already covered by the preceding five paragraphs. Were it otherwise, the catchall provision could swallow the preceding paragraphs and 'b[e] used to circumvent' their time bars." (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863, n.11 (1988))); *see also BLOM Bank SAL*, 605 U.S. at 211 ("Thus, we have repeatedly held that relief under Rule 60(b)(6) is available 'only when Rules 60(b)(1) through (b)(5) are inapplicable.'" (citing, *inter alia*, *Kemp*, 596 U.S. at 533)). In any event, "[a] change in decisional law after entry of judgment does not constitute exceptional circumstances and is not alone grounds for relief from a final judgment." *Bailey v. Ryan Stevedoring Co., Inc.*, 894 F.2d 157, 160 (5th Cir. 1990) (citing *McKnight v. United States Steel Corp.*, 726 F.2d 333, 336 (7th Cir. 1984); *Title v. United States*, 263 F.2d 28, 31 (9th Cir. 1959)).

**1. The Four Judges' Motion to Vacate**

The Four Judges' motion to vacate does not comply with Rule 60(c)'s "reasonable time" requirement. *See* FED. R. CIV. P. 60(c). The Four Judges' Rule 60 clock began to run when *Daves II* was issued on March 31, 2023, and stopped, at the earliest, on November 5, 2025, when the Four Judges formally moved to substitute themselves as parties under Federal Rule of Civil Procedure 25(d).[9] *Compare Daves II*, 64 F.4th at 620–36, *with* (Docket Entry No. 767; Docket Entry No.

[9] The Four Judges moved to vacate on December 11, 2025, which was 986 days after *Daves II* issued. (Docket Entry No. 793). The Four Judges moved to substitute themselves as parties on November

885 at 62 ("All 16 judges received a copy of the [*Daves II*] decision from their staff attorney the day it issued." (citing Docket Entry No. 864-1 (Goodhart Decl.) ¶ 4) ("At a[] [Harris County Criminal Court at Law] meeting in or around the first week of April 2023, [Judge Paula Goodhart] asked again about whether state law conflicts with the Decree and what the impact the new [*Daves II*] opinion has on the Decree.")))). Judge Goodhart testified that she read the *Daves II* opinion on March 31, 2023, and answered in the affirmative that she understood that the en banc court overruled the prior *ODonnell* decision rejecting *Younger* abstention in this case. (Docket Entry No. 885 at 62 (citing Docket Entry No. 885-16 (Goodhart Dep.) at 15:11–24)).

When *Daves II* issued, Judges Goodhart, Johnson, and Padilla were in office. (*See* Docket Entry No. 767). They waited 950 days, or about 31.5 months, from *Daves II*'s issuance to file their first motion in the present case. (*Id.* (substituting themselves as parties under Rule 25(d)); *cf. First Republic Bank Fort Worth v. Norglass, Inc.*, 958 F.2d 117, 120 (5th Cir. 1992) ("*Norglass*") ("[T]he grounds for filing the Rule 60(b) motion . . . were known to the intervenor-movants all along."). The fact that the Four Judges waited 950 days is important to the Rule 60(c) reasonable-time analysis.

A related question is the Four Judges' party status during this period. Either the Four Judges were parties to this litigation under Federal Rule of Civil Procedure 25(d) when they were in office, or they were not. If the former applies and these Judges were already parties when they were in office, they did not need to intervene; if the latter applies, the Four Judges needed to intervene to become parties.

5, 2025, which was 950 days after *Daves II* issued. (Docket Entry No. 767). The court uses the more lenient 950 days as the timeline to assess the Four Judges' delay in moving for Rule 60 relief.

The court explores whether the Four Judges, when they were in office, were parties to this litigation under Rule 25(d). Rule 25(d) provides,

> An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded. The court may order substitution at any time, but the absence of such an order does not affect the substitution.

FED. R. CIV. P. 25(d) (titled "Public Officers; Death or Separation from Office").

Under the plain text of Rule 25(d), the Four Judges were "automatically substituted as . . . part[ies]" when they were in or took office. *See id.*; 6 Judge Jerry E. Smith, MOORE'S FEDERAL PRACTICE (hereinafter "6 MOORE'S") § 25.42[1] ("When a public officer leaves office, the officer's successor is 'automatically substituted as a party.' The rule does not require a motion or application or any showing of a need to continue the action." (citing, *inter alia*, *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 480 n.1 (5th Cir. 2008))). Under Rule 25(d), Judges Goodhart, Johnson, and Padilla were parties to this case, even before *Daves II* issued, because these judges had assumed office earlier in January 2023.[10] (*See* Docket Entry No. 767). That the court did not formally grant the unopposed motion to substitute parties until November 5, 2025, the same day that the Four Judges formally moved to substitute themselves under Rule 25(d), does not change the fact that they were already parties. *See* FED. R. CIV. P. 25(d); *see also* 6 MOORE'S § 25.42[1] ("An order of substitution may be rendered by the court at any time, but this is not necessary, and omitting an order does not affect the substitution or the conduct of the litigation." (citations omitted)).

---

[10] Judge Garcia assumed office in January 2025 and became a party to the litigation upon assuming office. *Compare* FED. R. CIV. P. 25(d), *with* (Docket Entry No. 864-1 (Goodhart Decl.) ¶ 13).

The Four Judges, as parties under Rule 25(d), waited 950 days after *Daves II* to move to substitute themselves, and even longer to move to vacate the consent decree.[11] The Fifth Circuit stated in *In re Goodhart* that the "four judges apparently could not file such a motion until November 2025," when they "were finally able to obtain counsel independent from that of the other twelve Harris County Criminal Court at Law judges, all of whom support the consent decree's continuation." 2026 WL 2517641, at *4. The *Goodhart* opinion noted that the plaintiffs disputed that account, but the record before the panel did not show that the Four Judges were incorrect. *See id.* On remand, the parties developed a record on the Four Judges' 950-day delay.

"It remains undisputed that the other three movant-judges knew of the *Daves II* opinion the day it issued when they were in office."[12] (Docket Entry No. 896 at 17 n.6 (citing Docket Entry No. 864-1 (Judge Goodhart Decl.) ¶ 4 ("[S]taff attorney, Ashley Guice, forwarded the *Daves II* opinion to the [Harris County Criminal Court at Law] [("]HCCCL[")] Judges on March 31, 2023. At an HCCCL meeting in or around the first week of April 2023, [Judge Goodhart] asked again about whether state law conflicts with the [consent] [d]ecree and what impact the new opinion has on the [consent] [d]ecree. Shortly after that meeting, Judge Padilla and [Judge Goodhart] received the April 6, 2023[,] letter from Mr. Van Fleet [counsel for the 12 Harris County Criminal Court at Law Judges who support the consent decree and oppose its vacatur or modification] withdrawing from any representation of [Judge Goodhart] and Judge Padilla . . . ."))). "Judges Padilla, Johnson, and [Judge Goodhart] wanted an answer to whether the state law or the [c]onsent [d]ecree controlled, and what impact *Daves II* had on the [c]onsent [d]ecree . . . ." (Docket Entry No. 864-

[11] After assuming office, Judge Garcia waited over 11 months to move to vacate the consent decree. (Docket Entry No. 793).

[12] "Judge Garcia is aligned with [Judge Goodhart], Judge Padillia, and Judge Johnson with respect to [the] concerns about the [c]onsent [d]ecree and its conflict with state law." (Docket Entry No. 864-1 (Goodhart Decl.) ¶ 13).

1 (Goodhart Decl.) ¶ 5). "Around this time, [Judge Goodhart] was aware of briefing concerning the impact of the *Daves II* opinion being submitted to Judge Rosenthal in a related proceeding, *Russell v. Harris Cnty.*, No. H-19-226. [Judge Goodhart] waited, along with [her] colleagues, to see whether a decision in *Russell* would impact the [consent] [d]ecree . . . ." (*Id.* ¶ 6); *see also* Minute Entry, *Russell v. Harris County*, No. 4:19-CV-226, Docket Entry 661 (Mar. 31, 2023) ("The court conferred with the parties on the impact of the Fifth Circuit[']s most recent en banc decision in *Daves v. Dallas County*.").

The Four Judges excuse their delay by asserting that they were monitoring the developments in *Russell v. Harris* County, No. H-19-226, and waiting to see whether that decision would impact the consent decree. (*See* Docket Entry No. 864-1 (Goodhart Decl.) ¶ 6). But that argument does not explain the Four Judges' two-and-a half-year delay in moving to vacate the consent decree after *Daves II* issued. The Four Judges did not make the court aware of any change in their substantive position for over 950 days after *Daves II* issued. That is precisely the type of delay that courts analyze in evaluating the timeliness of a motion to change or vacate a final judgment under Rule 60. *See Clark*, 850 F.3d at 780.

The Four Judges argue that the delay was needed because they had to obtain counsel to enable them to move to substitute themselves as party. A detailed and thorough review of the record developed on remand shows that the Four Judges could have obtained private or pro bono counsel well before they formally moved to substitute themselves as parties in November 2025. (*See, e.g.*, Docket Entry Nos. 767, 768, 864-1, 885-16). Judges Padilla and Goodhart wanted Harris County to provide taxpayer-funded representation. (*See* Docket Entry No. 864-1 (Goodhart Decl.) ¶ 8). The County Attorney's office promptly informed the Four Judges that it would not provide taxpayer-funded counsel to represent them. (*Id.* ¶ 16). The Four Judges acknowledge that

the Commissioners Court did not prohibit them from finding representation in the matter. (Docket Entry No. 885-16 (Goodhart Dep.) at 30:15–18). State law permitted the Four Judges to hire their own counsel. *See* TEX. LOC. GOV'T CODE § 157.901(c). Judge Goodhart focused her efforts to obtain counsel on the County Attorney's and Attorney General's offices. (*See* Docket Entry No. 885-16 (Goodhart Dep.) at 20:22–21:09, 33:10–22). Judge Goodhart did not seek counsel outside of these offices or seek pro bono counsel until August 12, 2025. (*See id.* at 33:01–17 (the purpose of the August 12, 2025, meeting was to find pro bono representation)). The Four Judges' briefing does not respond to the Rule 25(d) analysis to support, much less command, a contrary result on reasonable timeliness under Rule 60.

The Four Judges do not fare better under the alternative scenario, in which they were not, by virtue of their office, parties to the litigation when *Daves II* issued, and therefore needed to intervene. To modify or vacate a consent decree, a putative intervenor must be granted leave to intervene as a party. 6 Edward J. Brunet et al., MOORE'S FEDERAL PRACTICE (hereinafter "6 MOORE'S") § 24.20 (3d ed. 2026) ("[T]he intervenor is not considered a party unless leave to intervene is granted." (citing, *inter alia*, *White v. Tex. Am. Bank/Galleria*, 958 F.2d 80, 83 (5th Cir. 1992) ("[U]ntil the Appellants received leave to intervene, they were not parties to the suit and, consequently, had no standing to be served or respond to NCNB's summary judgment motion . . . It was only when the court permitted [Appellants] to intervene that the Appellants became parties to the action, equal in status to the original parties." (citations omitted)))); *see also U.S. ex rel. Eisenstein v. City of N.Y.*, 556 U.S. 928, 933 ("[I]ntervention is the requisite method for a nonparty to become a party to a lawsuit." (citation omitted)); *see also Robert Ito Farm, Inc. v. Cnty. of Maui*, 842 F.3d 681, 687 (9th Cir. 2016) ("[A] prospective intervenor does not become a party to the suit unless and until he is allowed to intervene."); *see also* FED. R. CIV. P. 60(b) ("On motion and just

terms, the court may relieve a *party* or its legal representative from a final judgment[.]" (emphasis added)). But the Four Judges waited 950 days after *Daves II*'s issuance to move to intervene.

The Four Judges' 950-day delay in filing any motion prejudiced the existing parties who supported the consent decree, were bound by its terms, and had acted in reliance on its provisions.[13] *See Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (noting that the timeliness requirement serves to "guard against prejudicing the original parties by the failure to apply sooner" (citing *McDonald v. E.J. Lavino Co.*, 430 F.2d 1065, 1074 (5th Cir. 1970))). The movants rely on *Doe v. Briley*, 562 F.3d 777, 781 (6th Cir. 2009), but in that case, the movant "ha[d] not identified even a shred of prejudice that [it] ha[d] suffered as a result of [the] [d]efendants' delay." *See id.* In the present case, the prejudice to the non-moving parties has been identified and is significant. *Cf. id.* Second, *Doe* is distinguishable. The consent decree in that case was entered after the Supreme Court decided in *Wisconsin v. Constantineau*, 400 U.S. 433, 434–39 (1971), that the Constitution (as opposed to only state defamation law) appeared to protect a "stand-alone liberty interest in one's reputation," *Doe*, 562 F.3d at 780, and before the Court decided *Paul v. Davis*, 424 U.S. 693 (1976), which "emphatically made clear that it does not." *Doe*, 562 F.3d at 780. The consent decree [in *Doe*] . . . was entered during the time between the two decisions. *Id.* In the present case, by contrast, the constitutional holding underpinning the consent decree—that the Harris County's wealth-based bail system violated due process and equal protection—was not disturbed. (*Compare* Docket Entry Nos. 708, 709, 896 at 15 n.5, *with Doe*, 562 F.3d at 789–90 ("[T]here has been a change in the law," . . . whose effect is that '[t]he foundation upon which the [decree] was built has crumbled.'" (citation omitted))). Third, because vacating the consent decree final

[13] The analysis in this paragraph generally applies whether the Four Judges are viewed as parties under Rule 25(d) or as intervenors.

judgment must comply with Rule 60(b), and the parties have limited their motions and arguments to Rule 60(b), (*see generally* Docket Entry Nos. 741, 742, 793, 861, 864, 865, 873, 886, 887, 894, 895), today's holding does not "'bind all future officers of the State' . . . to the decree's proscriptions" because other avenues of Rule 60 relief that have not been raised remain open.[14] *Cf. Doe*, 562 F.3d at 781.

Consent decrees are "reached after careful consideration by the parties involved; they do not wish, and should not be forced, to defend the decree in [motions] brought long after the decree was signed." *Hefner v. New Orleans Pub. Serv., Inc.*, 605 F.2d 893, 898 (5th Cir. 1979). Intervention years later, "for the purpose of challenging [a] consent agreement," prejudices the parties "by jeopardizing months of negotiations, causing substantial litigation expenses, and even more substantial expenses of implementation." *United States v. Allegheny-Ludlum Indus., Inc.*, 553 F.2d 451, 453 (5th Cir. 1977) (per curiam). An intervention to undo the parties' "bargain," *United States v. U.S. Steel Corp.*, 548 F.2d 1232, 1235 (5th Cir. 1977), means that "[a] negotiated settlement of a difficult problem is put at risk, to the disadvantage of the named parties, the class," and, here, Harris County, *Corley v. Jackson Police Dep't*, 755 F.2d 1207, 1210 (5th Cir. 1985). "To allow a tardy intervenor to block the settlement agreement after all that effort would result in the parties' combined efforts being wasted completely." *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 950 (7th Cir. 2000); *accord Delaware Valley Citizens' Council for Clean Air v. Pennsylvania*, 674 F.2d 970, 975 (3d Cir. 1982) ("The fact that appellants knew or should have known of the pendency of this lawsuit at an earlier time and failed to act at that time to protect

---

[14] The court expresses no view on the appropriateness of relief under Rule 60(d) or prong one of Rule 60(b)(5) for the "satisf[action], release[], or discharge[]" of "the judgment," FED. R. CIV. P. 60(b)(5), (d), because the Texas Attorney General and the Four Judges have not, at this time, requested such relief. (*See generally* Docket Entry Nos. 741, 742, 793, 861, 864, 865, 873, 886, 887, 894, 895).

their interests weighs heavily against the timeliness of these motions." (citations omitted)); *Jones v. Caddo Par. Sch. Bd.*, 735 F.2d 923, 935 (5th Cir. 1984) (en banc); *Orange County v. Air Cal.*, 799 F.2d 535, 538 (9th Cir. 1986); *In re Dep't of Energy Stripper Well Exemption Litig.*, 864 F.2d 796, 801 (Temp. Emer. Ct. App. 1988); *City of Bloomington v. Westinghouse Elec. Corp.*, 824 F.2d 531, 536 (7th Cir. 1987); *Farmland Dairies v. Comm'r of New York State Dep't of Agric. & Markets*, 847 F.2d 1038, 1044–45 (2d Cir. 1988); *United States v. BASF-Inmont Corp.*, 52 F.3d 326, at *3 (6th Cir. 1995) (per curiam); *Hollywood Cmty. Synagogue, Inc. v. City of Hollywood*, 254 F. App'x 769, 771 (11th Cir. 2007) (per curiam).

Returning to Rule 25(d), if the Four Judges, upon taking office, were parties to the litigation, the prejudice to the nonmoving parties is just as significant, if not greater. The absence of a timely motion for Rule 60(b) relief meant that all the parties to the decree acted in reliance on it. The supermajority of judges and other parties supporting the decree reasonably relied on the lack of a timely motion seeking to vacate it under *Daves II*.

The Four Judges' 950-day delay makes their motion to vacate or modify under Rule 60 based on *Daves II* untimely. A comparison with other cases is illustrative because the Fifth Circuit has held untimely far shorter delays in the Rule 60(b) context. *See Clark*, 850 F.3d at 782 ("As noted, Clark filed his Rule 60(b) motion on September 19, 2014, almost sixteen months after [the relevant case] was decided on May 28, 2013. If, rather than the date [the relevant case] issued, we utilize August 2013, the date that conflict-free counsel was appointed by the state habeas court, then the Rule 60(b)(6) motion was filed twelve months after new counsel was appointed. Using either date, the rule 60(b)(6) motion was untimely."). *Clark* is illustrative because the petitioner's counsel was "barred by a Texas statute from representing [the petitioner] in any federal proceeding" and could only have "advis[ed] [the petitioner] to seek federal habeas counsel and

pursue concurrent federal proceedings." *Id.* at 783 (citations omitted). Nevertheless, the petitioner in *Clark* did not find federal habeas counsel for more than a year. *See id.* A similar situation occurred in the present case, albeit in a different context, because the Four Judges were advised that the existing attorneys could not represent them in a challenge to the consent decree. (Docket Entry No. 896 at 11). Despite these issues, the Four Judges did not submit anything, "either through hired counsel or on their own, until November 2025, thirty-one months after *Daves II*." (*See id.*). In *Norglass*, the Fifth Circuit favorably cited cases in other circuits holding that unjustified delays ranging from ten weeks to one year did not comply with Rule 60's reasonable-time requirements. *See* 958 F.2d at 121 (collecting cases); *see also id.* ("[W]e are comfortable affirming the district court's judgment because there is no abuse of discretion in finding that a *two year* delay in filing a Rule 60(b) motion is beyond the bounds of reasonableness when, as here, the moving party has given no valid justification for the delay." (emphasis in original; citations omitted)).

Counsel for the Four Judges contends that Judge Garcia, who assumed office on January 1, 2025, gets a fresh Rule 60(c) clock at that time, because "we're dealing with a governmental entity here." (Docket Entry No. 896-1 at 63:14–64:09).[15] But that proposition is not consistent with Rule 25(d) or Rule 60(c). *See* FED. R. CIV. P. 25(d), 60(c). When a public official takes office, that official becomes a party to existing litigation against the official in her official capacity. *See* 6 MOORE'S § 25.42[1], [2]; *id.* § 25.43[1], [2] (noting that a public official "stands in the same position as the predecessor . . . and has the same procedural position in the suit as did the predecessor" (citations omitted)); *see also Stroman Realty, Inc.*, 513 F.3d at 480 n.1. A new-

[15] Counsel for the Four Judges did not articulate a limiting principle—under Rule 60(c)'s framework—when asked if the new-officeholder new-clock theory would apply to officeholders who took office ten or twenty years later. (*See* Docket Entry No. 896-1 at 63:14–64:09).

officeholder new-clock theory is inconsistent with Rule 60(c)'s reasonable-time requirement, which would be undermined if swearing in a new public official allowed that official to move to vacate a final judgment years, even decades, after the grounds for making the Rule 60(b) motion were available and were not pursued in a reasonable time. *Cf. Coney Island*, 607 U.S. at 159–61. Third, the new-officeholder new-clock theory would have broad trans-substantive Rule 60 consequences for other consent decrees. *Cf. Texas*, 181 F.4th at 551–62 (affirming the denial of intervention in a case involving a consent decree that prevents illegal aliens from obtaining in-state tuition rates in Texas); *see also Salazar v. District of Columbia*, 729 F. Supp. 2d 257, 261 (D.D.C. 2010) ("To read . . . Rule [60]'s 'reasonable time' requirement to allow a complete change of position with each election of a new administration would completely undermine the interests of finality and repose that the Rule is designed to protect."); *see also id.* n. 5 ("Indeed, such a reading would undoubtedly prejudice many interests in a community and raise doubts about whether commitments made and relied upon could be trusted for the future."); *see also In re Goodhart*, 2026 WL 2517641, at *4 (noting that the "mere transfer of power from one officeholder to another is [not] enough to vacate or modify a consent decree").

The fact that Judge Garcia assumed office in 2025 does not allow her to restart the reasonable-time clock. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all other respects other than name, to be treated as a suit against the entity . . . It is *not* a suit against the official personally, for the real party in interest is the entity." (emphasis in original; citation omitted)). In any event, there is no basis to restart the Rule 60(c) clock for Judge Garcia; she had appeared in this litigation as early as October 2016, (Docket Entry Nos. 67–71). Even under the Four Judges' new-officeholder new-clock theory, Judge Garcia's eleven-month delay in moving

to vacate is untimely. *See Norglass*, 958 F.2d at 121 (favorably citing circuit-court holdings that affirmed denials of Rule 60(b) relief based on unjustified untimeliness ranging from ten weeks to a year); *see also Tamayo v. Stephens*, 740 F.3d 986, 991 (5th Cir. 2014) (per curiam) (holding that the district court did not abuse its discretion in denying a Rule 60(b) motion because the controlling law "was issued on May 28, 2013, nearly 8 months" earlier and the petitioner "waited until January 20, 2014, two days before his scheduled execution, to file th[e] [Rule 60(b)] motion").

The movants do not argue that relief is available under Rule 60(b)(5) for the "satisf[action], release[], or discharge[]" of the judgment. *See* FED. R. CIV. P. 60(b)(5); (*see generally* Docket Entry Nos. 741, 742, 793, 861, 864, 865, 873, 886, 894, 895). Instead, the movants' argument for Rule 60(b)(5) relief is that prospective application of the consent decree is no longer equitable. FED. R. CIV. P. 60(b)(5) (prong three); (*see generally* Docket Entry Nos. 741, 742, 793, 861, 864, 865, 873, 886, 887, 894, 895). The problem with this argument is that the movants' basis for prospective inequity rests on Rule 60(b) grounds that were available as soon as *Daves II* issued, but were not pursued within a reasonable time. The Four Judges argue that this case is different because it involves "an ongoing decree imposing institutional reforms[,]" whereas *Coney Island* involved "a final judgment." (*Cf.* Docket Entry No. 895 at 17). The Four Judges' argument is unpersuasive, for two reasons.

First, the Four Judges seek to vacate or modify the consent decree and final judgment years after they had grounds for a Rule 60(b) motion, without complying with the Rule 60(c)(1) reasonable time requirement. *See Clark*, 850 F.3d at 780. Second, that the decree may have "ongoing" effects does not remove or create an exception to the Rule 60(c)(1) reasonable time limit for challenging final judgments. *Cf. Coney Island*, 607 U.S. at 159 (holding that Rule 60(c)(1)'s reasonable time-limit applies even to challenges to void judgments and rejecting the

argument that a movant can seek relief at any time just because a "void judgment is a legal nullity"); *see also Kemp*, 596 U.S. at 530 ("[A] Rule 60(b)(1) motion, like *all* Rule 60(b) motions, must be made 'within a reasonable time.'" (emphasis added)).

Second, the Supreme Court's recent decision in *Coney Island* reinforces *Kemp*'s statement that Rule 60(b) motions must be made within a reasonable time. *See* 607 U.S. at 158–59. If a reasonable time-limit applies to void judgments, even though "the passage of time cannot cure voidness," "the same principle holds true" here. *See id.* Just as the reasonable time-limit applies to challenges even to void judgments, the reasonable time-limit applies to modifications or vacatur motions involving institutional-reform consent decrees. *See id.* at 158–59. "Statutes and rules routinely limit the time during which a party can seek relief from a judgment infected by error." *Id.* at 159. The movants cannot invoke a prospective inequity argument to avoid the fact that the Rule 60(b)(5) clock started when *Daves II* issued or the fact that they did not file a motion in the intervening 950-day period. *See id.* at 161 ("Here, the operative language clearly requires parties to make Rule 60(b) motions within a reasonable time."); *see also Kemp*, 596 U.S. at 530; *cf. R.C. by Ala. Disabilities Advoc. Program v. Nachman*, 969 F. Supp. 682, 701 (M.D. Ala. 1997) ("The [c]ourt is aware of no extraordinary circumstance militating in favor of reaching the merits of defendant's 60(b)(5) motion."), *aff'd sub nom. R.C. v. Nachman*, 145 F.3d 363 (11th Cir. 1998).

**2. The Attorney General's Motion to Vacate**

The Attorney General's request to modify or vacate the consent decree is also untimely.[16] The Attorney General knew about *Daves II* when it issued "because his office litigated th[e] case on behalf of the District Court Judges who were defendants." (Docket Entry No. 885 at 62); *see*

[16] Although the court denied the Attorney General's motion to intervene to invoke *Younger* abstention, the Attorney General was allowed to intervene to assert mootness. (Docket Entry No. 764 at

*also Daves II*, 64 F.4th at 618 (listing counsel appearances for the Attorney General). In a similar case, in which "the Attorney General participated as counsel for the Felony Judges (until they were dismissed) and [as] the Intervenor (after the Felony Judges were dismissed), the [c]ourt discussed the potential impact of *Daves II* with the parties the day it issued." (Docket Entry No. 885 at 62 (citing Minute Entry, *Russell v. Harris County*, No. 4:19-CV-226, Docket Entry 661 (Mar. 31, 2023) ("The court conferred with the parties on the impact of the Fifth Circuit[']s most recent en banc decision in *Daves v. Dallas County*."))). *Daves II* issued on March 31, 2023. The Attorney General did not move to intervene to seek to vacate the consent decree until August 26, 2025. (Docket Entry Nos. 740, 741, 742). The record shows that the Attorney General's 879-day (29-month) delay after *Daves II* issued in moving to intervene to seek to vacate the consent decree, (Docket Entry Nos. 740, 741, 742), fails to meet the Rule 60(c) reasonable-time requirement.

The Attorney General states that the delay was due to his Office's "deliberation." (Docket Entry No. 873 at 11). But the Attorney General has not identified case law, in the intervention or Rule 60(b) context, excusing a prospective intervenor's deliberation-based delay in moving to challenge a final judgment. (*See generally* Docket Entry Nos. 740, 741, 742, 861, 873, 887, 894). Rule 60 requires such deliberation to take place within a reasonable time. *See* FED. R. CIV. P. 60(c).

The Attorney General argues that "[t]he finality interest underpinning Rule 60(c)(1) is especially weak for an ongoing institutional-reform decree, which 'is itself an ongoing remedy that precludes finality as long as it endures.'" (Docket Entry No. 894 at 15–16 (quoting *Alexander v.*

32–35). The court addresses whether the Attorney General has complied with Rule 60(c)(1)'s reasonable time-limit requirement because the Attorney General has status as an intervenor, albeit for a different reason. The court concludes that the Attorney General has not satisfied Rule 60(c)(1)'s reasonable time-limit requirement for the requested relief.

*Bahou*, 512 F. Supp. 3d 363, 371 (N.D.N.Y. 2021))). The Attorney General argues that the nonmovants' reliance on *Coney Island* is "misplaced" because "*Coney Island* holds only that Rule 60(c)(1)'s reasonable-time limit applies to a motion under Rule 60(b)(4) alleging that a judgment is void for defective service." (Docket Entry No. 894 at 16 (emphasis and citation omitted)). The Attorney General's contention is unpersuasive, for three reasons. First, *Bahou* predates the Supreme Court's recent case law explaining that "all Rule 60(b) motions[] must be made 'within a reasonable time.'" *See Kemp*, 596 U.S. at 530; *see also Coney Island*, 607 U.S. at 157 ("Rule 60(c)(1) requires parties to make Rule 60(b) motions within a 'reasonable time.'"); *see also id.* at 158 (citing *Kemp*, 596 U.S. at 533 ("Rule 60(c) imposes deadlines on Rule 60(b) motions. All must be filed 'within a reasonable time.'")). Second, in *Coney Island*, the Supreme Court noted that allowing a "special, unlimited-time principle" "would have extreme implications" because an "adversely affected party could wait as long as it wanted" without "be[ing] required to comply with . . . deadline[s]." *See* 607 U.S. at 159–60. The Supreme Court held that Rule 60(c)(1)'s reasonable-time limit applies, despite "several Courts of Appeals[] and a prominent treatise[,]" which "rel[ied] on the generally accepted maxim that a 'void judgment is a legal nullity'" and "that the passage of time cannot turn such a nullity into an enforceable judgment." *See id.* at 159 (citations omitted). Third, the court in *Bahou* discussed, *inter alia*, the appropriateness of relief under prong one of Rule 60(b)(5) for the "satisf[action], release[], or discharge[]" of "the judgment." 512 F. Supp. 3d at 369–70; FED. R. CIV. P. 60(b)(5). The Texas Attorney General and the Four Judges have not requested relief under prong one of Rule 60(b)(5). (*See generally* Docket Entry Nos. 741, 742, 793, 861, 864, 865, 873, 886, 887, 894, 895). In *Bahou*, "Syracuse d[id] not challenge the timeliness of the government's motion to the extent that the government argue[d]

that the substantial objectives of the consent decree ha[d] been met." 512 F. Supp. 3d at 371. In this case, the parties vigorously dispute timeliness under Rule 60(c). *Cf id.*

**B. *Younger* Abstention**

The Fifth Circuit tasked this court with expeditiously deciding the *Younger* abstention issue—well in advance of the November election—and with faithfully applying *Daves II*'s holding overruling *ODonnell I*'s holding against *Younger* abstention. *In re Goodhart*, 2026 WL 2517641, at *5. For the following reasons, the court believes it has followed both directives.

The law about *Younger* abstention in bail-reform cases has changed since this court decided *ODonnell.* If *ODonnell* were filed today, it would face a vastly different landscape of en banc precedent than when this court relied on[17] then-binding-en-banc precedent in *Pugh v. Rainwater*, which held that "imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible." *See* 572 F.2d 1053, 1056 (5th Cir. 1978) (en banc) (citing *Williams v. Illinois*, 399 U.S. 235 (1970); *Tate v. Short*, 401 U.S. 395 (1971)); *see also Pugh*, 572 F.2d at 1056 ("We view such deprivation of liberty of one who is accused but not convicted of crime as presenting a question having broader effects and constitutional implications than would appear from a rule stated solely for the protection of indigents.").

To be sure, it would be "proper, if not obligatory, for the district court to" abstain under *Younger*, if *ODonnell* were filed today. *See Callon Petroleum Co. v. Frontier Ins. Co.*, 351 F.3d

[17] At the time that this court entered the consent decree, the court relied on the unanimous guidance of *Gerstein v. Pugh*, 420 U.S. 103, 108 n.9 (1975) ("The District Court correctly held that respondents' claim for relief was not barred by the equitable restrictions on federal intervention in state prosecutions, *Younger v. Harris*, 401 U.S. 37 (1971). The injunction was not directed at the state prosecutions as such, but only at the legality of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution. The order to hold preliminary hearings could not prejudice the conduct of the trial on the merits." (citing *Conover v. Montemuro*, 477 F.2d 1073, 1082 (3d Cir. 1972); *cf. Perez v. Ledesma*, 401 U.S. 82, 91 (1971); *Stefanelli v. Minard*, 342 U.S. 117 (1951))).

204, 209–10 (5th Cir. 2003) ("We can certainly agree that, had the Superintendent timely moved the district court to dismiss or stay this action on *Buford* grounds, it would have been proper, if not obligatory, for the district court to have done so. However, these are not the facts before us."); *see also id.* at 206–12 (affirming the denial of Rule 60(b) relief without abstaining under *Buford*). Notably, although the court in *Callon* recognized that abstention would have been proper earlier in the case, it denied Rule 60(b) relief and did not require abstention. *Id.* A final judgment stands, even in a case in which abstention would have been "obligatory" at the outset, when the parties do not meet their burden to vacate or modify under Rule 60. *See id.*; FED. R. CIV. P. 60. The *Daves II* holding that this case "should [not] have been adjudicated in federal court" does not in itself vacate the final judgment under Rule 60(b), though the final judgment may be susceptible to an alternative challenge under Rule 60. *Compare Callon*, 351 F.3d at 206–12, *with Daves II*, 64 F.4th at 631; *In re Goodhart*, 2026 WL 2517641, at *2. Abstention is not jurisdictional, and this is not a case in which the court has lost jurisdiction. *See Daves I*, 22 F.4th at 545.

Even though *Daves II* held that this court should have abstained rather than enter the parties' consent decree, this court cannot vacate or modify the consent decree under Rule 60(b), as the movants request, because they have not satisfied Rule 60(c)'s reasonable-time requirement. *See Coney Island*, 607 U.S. at 159 (applying the reasonable-time limit even to void judgments and reiterating that all Rule 60(b) motions must be filed within a reasonable time). At this time, an abstention holding does not address or cure the movants' Rule 60(c) reasonable-time issue. The movants have not cited, and the court has not found, a case in which a court performed a Rule 60(c) analysis, held that Rule 60(c) was not satisfied, and then proceeded to abstain under *Younger*. Abstention at this point, years after the consent decree final judgment, would be the functional equivalent of "reliev[ing] [the movants] . . . from [the] final judgment," which cannot be done

without satisfying Rule 60's requirements. *See* FED. R. CIV. P. 60. Nevertheless, once Rule 60's requirements are met,[18] this court recognizes its obligation under current Fifth Circuit precedent to abstain in this case, absent a *Younger* waiver determination.

**1. Waiver**

The plaintiffs argue that this court can determine whether the movants have waived their *Younger* arguments. (*See* Docket Entry Nos. 885, 896). In the interest of thoroughness, the court begins its discussion with the Attorney General.

**a. The Attorney General**

The court has carefully considered whether to depart from its detailed memorandum and opinion holding that the Attorney General waived *Younger* abstention. *See ODonnell v. Harris County*, 808 F. Supp. 3d 738, 749–62 (S.D. Tex. 2025); (Docket Entry No. 764 at 8–31); *see also ODonnell*, 808 F. Supp. 3d at 762 ("The Attorney General does not have a right to intervene to argue *Younger* abstention. His motion is untimely[] and . . . [therefore] futile. The parties waived *Younger* abstention, and the Attorney General would step into their shoes as an intervenor. The Attorney General also waived *Younger* abstention himself because he allowed the court to enter the consent decree, did not appeal it, and did not raise *Younger* on appeal."); (Docket Entry No. 764 at 31). The Attorney General moved for voluntary dismissal of the appeal, which the Fifth Circuit granted. (No. 25-20543, Docket Entry Nos. 19, 20; Docket Entry No. 777). The mandamus opinion does not refer to the Attorney General and does not, at this point, necessitate a contrary

[18] The court expresses no view on the appropriateness of relief under Rule 60(d) or prong one of Rule 60(b)(5) for the "satisf[action], release[], or discharge[]" of "the judgment," FED. R. CIV. P. 60(b)(5) and 60(d), because the Texas Attorney General and the Four Judges have not, at this time, requested such relief. (*See generally* Docket Entry Nos. 741, 742, 793, 861, 864, 865, 873, 886, 887, 894, 895).

holding. *Cf. In re Goodhart*, 2026 WL 2517641, at *1–5 (referencing only the Four Judges); (Docket Entry No. 859).

The court denies the Attorney General's motion for reconsideration, (Docket Entry No. 861), because the record shows that Attorney General waived *Younger* abstention.

**b. The Four Judges**

The nonmovants, the *ODonnell* plaintiffs, argue that the Four Judges waived *Younger* abstention. (Docket Entry No. 885 at 65–71). "Under Texas law, the elements of waiver include: (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *Boren v. U.S. Nat'l Bank Ass'n*, 807 F.3d 99, 105 (5th Cir. 2015) (citations omitted). There are two theories of waiver: express waiver and implied waiver. *See id.* at 106 ("Waiver . . . can occur either expressly, through a clear repudiation of the right, or impliedly, through conduct inconsistent with a claim to the right." (citation omitted)).

The first two elements of the waiver analysis— (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence—are easier to determine. The Four Judges were aware of *Daves II*'s existence and the en banc opinion's effect on the *Younger* abstention and mootness inquiries. These two waiver elements have been satisfied. At issue is the third element, "the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *See Boren*, 807 F.3d at 105. The *ODonnell* plaintiffs acknowledge that the *Goodhart* panel "rejected the express-wavier theory."[19] (Docket Entry No. 885 at 67). With this

[19] Plaintiffs have noted that they "intend to challenge that ruling in an appropriate forum." (Docket Entry No. 885 at 67).

first route to establishing waiver closed, the *ODonnell* plaintiffs must prove that the Four Judges impliedly waived *Younger* abstention.

After a detailed and thorough review of the record, the court finds that, well before November 2025, the Four Judges were able to find counsel independent of their twelve judicial colleagues who support the consent decree. (*See* Docket Entry Nos. 864-1, 885-16). The County chose not to fund affirmative litigation to reopen a case that had already been closed for some years. (*See id.*). The Four Judges focused their efforts on obtaining taxpayer-funded counsel and on the Attorney General's office. (*See id.*). The Four Judges did not seek other outside counsel or pro bono counsel until August 2025, 29 months—almost two and a half years—after *Daves II* issued. (*See id.*). The court finds that the Four Judges' efforts to obtain counsel were dilatory, but dilatory conduct does not equate to an implied waiver, which requires "conduct inconsistent with a claim to the right." *See Boren* at 105–06.

The court holds that the Four Judges did not waive their ability to raise *Younger* abstention. The court is dubious as to the applicability of *Younger* abstention at the post-final-judgment stage because the court is not aware of authority allowing parties to challenge a consent decree and final judgment based on *Younger* abstention when the parties did not expressly reserve defenses in the consent decree's text.[20] The court notes that the Fifth Circuit did not mention this issue in its opinion in *In re Goodhart*, 2026 WL 2517641, at *1–5.

---

[20] In their mandamus petition, the Four Judges cited *Joseph A. ex rel. Corrine Wolfe v. Ingram*, 275 F.3d 1253, 1272 (10th Cir. 2002) ("*Joseph A.*"), as their only case supporting the position that *Younger* abstention is warranted at the post-final-judgment stage. (26-20337, Docket Entry 2-1 at 28). But in *Joseph A.*, the consent decree "permitt[ed] *Younger* arguments after the entry of [the] consent decree because the agreement specifically allowed the defendants to raise 'any . . . defense' after the expiration of a 'one-year 'cease fire'' during which 'no defenses could be raised.'" (Docket Entry 764 at 24); *ODonnell v. Harris County*, 808 F. Supp. 3d 738, 758 (S.D. Tex. 2025) (discussing *Joseph A.*, 275 F.3d at 1266).

*Joseph A.*'s approach in allowing abstention differs from that of other courts. *Compare* 275 F.3d at 1272, *with Off. of Child Advocate v. Lindgren*, 296 F. Supp. 2d 178, 194 (D. R.I. 2004) ("[E]ven if

Assuming that *Younger* abstention applies and applying our circuit's interpretation of *Younger* abstention, this court must abstain when Rule 60's requirements are met. *See Daves II*, 64 F.4th at 620–33, 35; *see also In re Goodhart*, No. 26-20337, 2026 WL 2517641, at *2 (noting that the Fifth Circuit "expressly stated that '*ODonnell I*,' this very case, 'should [not] have been adjudicated in federal court.'" (citing *Daves II*, 64 F.4th at 631, 635)); *see also id.* at *3 ("*Daves II* does not hinge upon factual development or discovery.").

* * *

The court recognizes the peculiar procedural posture of the present case and notes that two points are seemingly in tension with one another. On one hand, this court, following recent Supreme Court precedent, cannot grant the requested Rule 60(b) relief from the final judgment because Rule 60(c)'s reasonable-time limit has not been met. *See* FED. R. CIV. P. 60. Rule 60(c) precludes the requested modification or vacatur of the consent decree, based on the present record, motions, and briefs. *See Coney Island*, 607 U.S. at 157–62; (*see generally* Docket Entry Nos. 741, 742, 793, 861, 864, 865, 873, 886, 887, 894, 895). If the court abstains under *Younger*, that will preclude any judicial action on the consent decree and final judgment, effectively "reliev[ing] [the

---

abstention had been appropriate initially in this litigation, there is no authority that supports abstention after the entry of a final judgment in federal court."); *Se. Pa. Transp. Auth. v. Pa. Pub. Util. Comm'n*, 210 F. Supp. 2d 689, 707 (E.D. Pa. 2002) ("The [c]onsent [d]ecree, which is a final judgment on the merits, and can therefore only be the result of 'proceedings of substance on the merits' in a federal court, was approved in 1996 [(a year before state proceedings began)]. *Younger* abstention is therefore inapplicable in this case."), *aff'd sub nom. Nat'l R.R. Passenger Corp. v. Pa. Pub. Util Comm'n*, 342 F.3d 242 (3d Cir. 2003).

The court in *Joseph A.* noted "that the parties enjoyed the bargained-for benefits for that year, regardless of whether any of the potential defenses ultimately proved successful." 275 F.3d at 1266. In the present case, no analogous provision exists in the consent decree. (*See* Docket Entry Nos. 708, 709). *Joseph A.* did not conduct a Rule 60(c) reasonable-time analysis, which has become more salient after the Supreme Court's recent decision in *Coney Island*. *See* 607 U.S. at 157–62.

Even in *Joseph A.*, the court stated that "[a] provision-by-provision *Younger* analysis appears prudent, however, for the fact that one provision may not be enforcement in light of *Younger* does not necessarily warrant voiding the entire consent decree." 275 F.3d at 1272; *see also id.* at 1273 (remanding to the district court "for further briefing and findings" to "determine in the first instance which, if any, of the . . . provisions can be enforced in light of *Younger*").

movants] . . . from [the] final judgment." *See* FED. R. CIV. P. 60. That circumvents the Rule 60 requirements. *See id.* On the other hand, when Rule 60's requirements are met, the court acknowledges that it will have to abstain from proceedings seeking further relief because the Four Judges have not waived *Younger* abstention.[21] *See Daves II*, 64 F.4th at 631, 635. If abstention is nevertheless warranted irrespective of a Rule 60 determination, any modification or vacatur of the consent decree must still go through Rule 60. To avoid running afoul of Rule 60, the court declines to abstain under *Younger* at this time, based on the present motions and briefing. (*See generally* Docket Entry Nos. 741, 742, 793, 861, 864, 865, 873, 886, 887, 894, 895).

The court believes that it has complied, in good faith, with the Fifth Circuit's mandate and has faithfully applied binding Fifth Circuit and Supreme Court precedents. *Compare Coney Island*, 607 U.S. at 157–62, *with Daves II*, 64 F.4th at 618–36.

## IV. Conclusion

The court denies the Attorney General's motion for reconsideration, (Docket Entry No. 861); denies the Four Judges' motion, (Docket Entry No. 864); and denies the Attorney General's conditional joinder, (Docket Entry No. 865). The motion to suspend briefing deadlines, (Docket Entry No. 897), is granted.

The court denies the motions to vacate or modify the consent decree and final judgment because the requested Rule 60(b) relief was not "made within a reasonable time," as Rule 60(c) requires. The court declines to abstain because doing so would have the effect of "reliev[ing] [the movants] . . . from [the] final judgment," despite the failure to comply with Rule 60. Importantly, this does not mean that this consent decree cannot be challenged, vacated, or modified. But on the

[21] This waiver-acknowledgment applies to only the Four Judges and does not bind any future successors, who may choose to waive *Younger* abstention.

present record and briefs, the court cannot grant the requested relief. The court expresses no view on the appropriateness of relief under Rule 60(d) or prong one of Rule 60(b)(5) for the "satisf[action], release[], or discharge[]" of "the judgment," FED. R. CIV. P. 60(b)(5) and 60(d), because the Texas Attorney General and the Four Judges have not, at this time, requested such relief. (*See generally* Docket Entry Nos. 741, 742, 793, 861, 864, 865, 873, 886, 887, 894, 895).

This is a final and appealable order.

SIGNED on October 5, 2026, at Houston, Texas.

Lee H. Rosenthal
Senior United States District Judge